**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, <u>et al.</u>,<br><br>                Debtors. | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**DECLARATION OF AMY B. SCHWETZ, EXECUTIVE
VICE PRESIDENT & CHIEF FINANCIAL OFFICER
OF DEBTOR PEABODY ENERGY CORPORATION, IN SUPPORT OF
<u>FIRST DAY MOTIONS OF DEBTORS AND DEBTORS IN POSSESSION</u>**

I, Amy B. Schwetz, hereby declare under penalty of perjury:

1.        I am the Executive Vice President and Chief Financial Officer of Peabody

Energy Corporation ("<u>PEC</u>"), one of the debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>" and, with their non-Debtor

affiliates, the "<u>Company</u>").  I have held these positions at PEC since July 2015.  I am also the

Debtors' principal accounting officer.  Prior to assuming my current position, I served PEC as,

among other things, Senior Vice President of Finance and Administration – Australia (from June

2013 through June 2015); Senior Vice President of Finance and Administration – Americas

(from March 2012 through June 2013); Vice President of Investor Relations (from December

2011 through March 2012); Vice President of Capital and Financial Planning (from November

2009 through December 2011); Director of Financial Planning (from August 2007 through

October 2009); and Director of Compliance and Accounting Policies (from August 2005 through

August 2007).  Prior to joining the Debtors, I was employed by Ernst & Young LLP where I held

levels of escalating responsibility over eight years.  In addition to the aforementioned positions

with the Debtors, I am also an officer of Debtor Peabody Holding Company, LLC and Debtor

Peabody Investments Corp. ("PIC").  As part of my employment and service in these capacities, I

am generally familiar with the Debtors' history, day-to-day operations, business and financial

affairs and books and records, as well as the Debtors' restructuring efforts.

      2.      On April 13, 2016 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Court").

      3.      To minimize the adverse effects of filing for chapter 11 protection and to

enhance their ability to consummate a successful restructuring and confirm a chapter 11 plan, the

Debtors have filed a number of pleadings requesting various kinds of "first day" relief

(collectively, the "First Day Motions") concurrently with the filing of this declaration (the "First

Day Declaration").  I am generally familiar with the contents of each of the First Day Motions

discussed in this Declaration (including the exhibits and other attachments to such motions) and,

to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I

believe the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to

operate in chapter 11 with minimum disruptions; (b) is important to the Debtors' achievement of

a successful restructuring; and (c) best serves the Debtors' estates and creditors' interests.  Further,

it is my belief that the relief sought in the First Day Motions is narrowly tailored and necessary

to achieve the goals identified above.

      4.      I submit this First Day Declaration in support of:  (a) the 154 Debtors'

petitions for relief under chapter 11 of the Bankruptcy Code; and (b) the First Day Motions.

Except as otherwise indicated, all statements set forth in this First Day Declaration are based

upon:  (a) my personal knowledge; (b) information supplied to me by other members of the

Debtors' management or the Debtors' professionals; (c) my review of relevant documents; or

(d) my opinion based upon my experience and knowledge of the Debtors' operations and

financial conditions.  If called upon to testify, I could and would testify to the facts set forth in

this Declaration.  I am authorized by the Debtors to submit this Declaration.

5.        Part I of this Declaration provides a summary overview of the Debtors'

structure, history and operations.  Part II contains a detailed description of the Debtors' capital

structure (including their long-term debt and other material obligations).  Part III describes

(a) the Debtors' declining financial performance (including declining sales volume, revenues and

liquidity) in light of global macroeconomic and regulatory conditions and (b) the Debtors' efforts

to right-size their business and maximize profitability in an extraordinarily challenging

environment for coal producers.  Part IV sets forth relevant facts in support of the First Day

Motions.

**Part I**

**The Debtors' Structure, History and Operations**

A.    Organizational Structure

6.        The Company is the world's largest private sector coal company by volume.

Its history in the coal business dates back to 1883.  The Debtors consist of 154 entities, all of

which are wholly owned direct or indirect subsidiaries of Debtor PEC, a Delaware corporation

incorporated in 1998 that became a public company in 2001.[1]  The Debtors' corporate

---

[1]    All wholly owned domestic direct and indirect subsidiaries of PEC have commenced chapter 11 cases
excluding:  Sterling Centennial Missouri Insurance Corp. ("Sterling"); Global Center for Energy and
Human Development, LLC ("GEC"); P&L Receivables Company ("P&L Receivables"); and Newhall
Funding Company ("Newhall").  Sterling did not file a chapter 11 petition because it is a special purpose,
bankruptcy-remote indirect subsidiary of PEC that is responsible for the Debtors' general
liability/automotive liability and property insurance programs. GEC did not file a chapter 11 petition

headquarters are located in St. Louis, Missouri, and the Debtors are incorporated or otherwise

formed in Delaware, Missouri, Illinois, Indiana and Gibraltar.[2]

_____

(continued…)

because it is not a guarantor under any prepetition debt and is a funding vehicle for non-debtors.  P&L Receivables did not file a chapter 11 petition because it is a special-purpose entity which is the "seller" under the Company's accounts receivable securitization program.  Newhall did not file a chapter 11 petition because it is a Massachusetts trust with no assets.

The following foreign subsidiary of PEC has commenced a chapter 11 case in this Court:  Peabody Holdings (Gibraltar) Limited ("Peabody Gibraltar").  Peabody Gibraltar will petition for a recognition proceeding in Gibraltar.

The following domestic subsidiaries of PEC have commenced chapter 11 cases in this Court but are not guarantors under the First Lien Credit Agreement (as defined below): Midwest Coal Reserves of Kentucky, LLC; Peabody China, LLC; Peabody Mongolia, LLC;  PG Investments Six, L.L.C. , Four Star Holdings, LLC; Seneca Property, LLC; Southwest Coal Holdings, LLC; Twentymile Equipment Company, LLC; Peabody Asset Holdings, LLC; Peabody IC Funding Corp.; Peabody IC Holdings, LLC, United Minerals Company, LLC and Kentucky United Coal, LLC.

[2]   The Debtor entities which are currently domiciled in Missouri are as follows:  Peabody Energy Corporation; Peabody Investments Corp.; Peabody International Services, Inc.; Peabody International Investments, Inc.; Peabody Holding Company, LLC; Peabody Operations Holding, LLC; Peabody Venezuela Coal Corporation; Midco Supply and Equipment Corporation; Peabody Terminal Holding Company, LLC; Peabody Terminals, LLC; Peabody Midwest Operations, LLC; Dyson Creek Mining Company, LLC; Peabody Bear Run Mining, LLC; Peabody Wild Boar Mining, LLC;  Peabody Bear Run Services, LLC; Peabody Gateway Services, LLC; Peabody Illinois Services, LLC; Peabody Indiana Services, LLC; Peabody Wild Boar Services, LLC; Peabody Midwest Management Services, LLC; Peabody Midwest Services, LLC; Midwest Coal Acquisition Corporation Peabody Coulterville Mining, LLC; Peabody Gateway North Mining, LLC; Riverview Terminal Company; Black Hills Mining Company LLC; Point Pleasant Dock Company LLC; Peabody Powder River Operations, LLC; West Roundup Resources, LLC; BTU Western Resources, Inc.; Peabody Powder River Services, LLC; Peabody Wyoming Services, LLC; Peabody Colorado Operations, LLC; Colorado Yampa Coal Company, LLC; Moffat County Mining, LLC; Shoshone Coal Corp.; Hayden Gulch Terminal, LLC; Peabody Sage Creek Mining, LLC; Peabody Rocky Mountain Services, LLC; Peabody Rocky Mountain Management Services, LLC; Peabody Colorado Services, LLC; Peabody Twentymile Mining, LLC ; New Mexico Coal Resources, LLC; Peabody Natural Resources Company; Gallo Finance Company, LLC.; Peabody America, LLC.; El Segundo Coal Company, LLC; Peabody New Mexico Services, LLC; Peabody Coalsales, LLC ; COALSALES II, LLC; Peabody Coaltrade, LLC ; Peabody Energy Solutions, Inc.; American Land Development, LLC; Dyson Creek Coal Company, LLC; Juniper Coal Company, LLC.; Independence Material Handling, LLC; Cottonwood Land Company; Cyprus Creek Land Company; American Land Holdings of Illinois, LLC; Midwest Coal Reserves of Illinois, LLC; Illinois Land Holdings, LLC; Century Mineral Resources, Inc.; American Land Holdings of Indiana, LLC; Midwest Coal Reserves of Indiana, LLC; American Land Holdings of Kentucky, LLC; Caseyville Dock Company, LLC; Peabody Recreational Lands LLC; Hillside Recreational Lands, LLC; Peabody-Waterside Development LLC; Cyprus Creek Land Resources, LLC; Peabody Development Company, LLC; Central States Coal Reserves Of Illinois, LLC; Central States Coal Reserves of Indiana, LLC; Peabody Natural Gas LLC; American Land Holdings of WV, LLC; Conservancy Resources, LLC; School Creek Coal Resources, LLC; American Land Holdings of Colorado, LLC; Sage Creek Holdings, LLC; Peabody Electricity, LLC; Star Lake Energy Co. LLC; Peabody Energy Gen. Holding Co. Inc.; Lively Grove Energy Partners, LLC; Thoroughbred Generating Company LLC; Thoroughbred Mining

7.	The Debtors' current organizational structure is the result of acquisitions and an internal restructuring initiative that started in 2004 and was completed in 2009.  As part of this restructuring, separate legal entities were formed with responsibilities for mining operations, coal reserves and land, equipment and employees.  A simplified organizational chart is attached to this Declaration as Annex A.

*Management Structure*

8.	In addition to the updated organizational structure, the Company has also secured a new leadership team in recent years.  In mid-2015, in addition to my promotion to the CFO position, the Debtors appointed a new Chief Executive Officer, who has been with the Company since September 2013, and recruited a new Chief Legal Officer to the management team, who started in August 2015.  Further, the Board of Directors also elected a new, non-executive Chairman, effective January 1, 2016.   Accordingly, the Company is moving forward with a fresh perspective as it evaluates its strategic options in what continues to be a volatile coal market both domestically and internationally.

---

(continued…)

Company LLC; Mustang Energy Company. LLC; Peabody Wyoming Gas, LLC; Peabody Venture Fund, LLC; Peabody Powertree Investments LLC; Highwall Mining Services Company; HMC Mining LLC; PEC Equipment Company LLC; Peabody Services Holdings, LLC; Caballo Grande, LLC; Peabody Cardinal Gasification, LLC; Empire Land Holdings, LLC; Peabody Trout Creek Reservoir LLC; Pond River Land Company; Pacific Export Resources, LLC; Peabody School Creek Mining, LLC; Sage Creek Land & Reserves, LLC; Twentymile Holdings, LLC; American Land Holdings Of New Mexico, LLC; Four Star Holdings, LLC; Francisco Equipment Company, LLC; Francisco Land Holdings Company, LLC; Francisco Mining, LLC; Kentucky Syngas, LLC; Lively Grove Energy, LLC; Marigold Electricity, LLC; Nm Equipment Company, LLC; Peabody Archveyor LLC; Peabody Energy Investments, Inc.; Peabody Magnolia Grove Holdings, LLC; Peabody Southwest, LLC; Peabody Southwestern Coal Company, LLC.; Peabody Williams Fork Mining, LLC; Porcupine Production LLC; Porcupine Transportation LLC; Seneca Property, LLC; Southwest Coal Holdings, LLC; Twentymile Equipment Company, LLC; Wild Boar Equipment Company, LLC; Wild Boar Land Holdings Company, LLC; James River Coal Terminal, LLC; Peabody Employment Services, LLC; Coal Reserve Holding Limited Liability Company No. 1; Peabody Asset Holdings, LLC; Peabody IC Funding Corp.; Peabody IC Holdings, LLC; and Peabody Holdings (Gibraltar) Limited.

*Operational Structure – Historical Building Blocks*

9.        The current depressed market is a marked departure from relatively recent market highs.  Reflecting those highs, in 2011, the Company had a peak market capitalization of approximately $20 billion and a market capitalization to debt ratio of 8.0 to one.  The Company's Adjusted EBITDA was over $2 billion. Because of its market and operational strength during the high period of 2011, the Company decided to strategically expand its presence in the Australian market by investing in a significant platform there to further diversify the Company's customer base and access higher growth global markets.  Given the general financial strength of the industry, and of the Company in particular, the Company financed a number of investments with debt including, among others, the 2011 acquisition of PEA-PCI (formerly Macarthur Coal Limited), an independent coal company in Australia, which included two operating mines, a 50% equity-affiliate joint venture arrangement, several development projects and thermal and metallurgical coal reserves and resources.

10.        In 2012, the Company secured significant coal reserves to augment its production capability in the United States' Powder River Basin by submitting bids for control of the North and South Porcupine reserve area to the U.S. Bureau of Land Management ("BLM") which awarded the lease following a sealed bid auction process.  Specifically, in two bids won in May and June 2012, the Company leased more than approximately 1.1 billion tons of reserves from the U.S. federal government.  The reserves were adjacent to the Company's North Antelope Rochelle Mine and were leased for a weighted average price of $1.10 per mineable ton, or a total of $1.2 billion over a five year period ending in December 2016.  In addition to these substantial bid payments, the federal government receives a 12.5% royalty when the coal is sold as consideration for the reserves.

11.        After the acquisitions of 2011 through 2012, international coal prices began a downward cycle dropping to their lowest levels in 2016.  This, coupled with lower volumes, resulted in the Company's debt burden becoming unsustainable.

*Operational Structure – Current Operations*

12.        In a challenging market environment, the Company continues to maintain a strong operational base and geographic diversity.  The Debtors' target operating model is structured around the U.S. business unit, the Australian business unit and a corporate unit that is responsible for corporate functions and shared services.  Today, the Company conducts business through seven segments (defined below):  (a) Powder River Basin Mining; (b) Midwestern U.S. Mining; (c) Western U.S. Mining; (d) Australian Metallurgical Mining; (e) Australian Thermal Mining; (f) Trading and Brokerage; and (g) Corporate and Other, which includes, among other things, selling and administrative expenses, corporate hedging activities, mining and export/transportation joint ventures, restructuring charges and activities associated with the optimization of the Company's coal reserve and real estate holdings, minimum charges on certain transportation-related contracts, the closure of inactive mining sites and certain energy-related commercial matters.  As of December 31, 2015, the Company owned interests in 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators.  The Company's Australian operations mine both thermal and metallurgical coal, a majority of which is exported.  As of December 31, 2015, the Company's property holdings include an estimated 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property.  In the United States alone, as of December 31, 2015, the Company holds an estimated 5.5 billion tons of proven and probable coal reserves, and the Company had U.S. coal sales of approximately 180 million tons.

13.     In addition to its mining operations, the Company markets and brokers coal from itself and other coal producers primarily across the United States, Australia, Europe and Asia.  In total, the Company's 2015 mining segment's coal sale volumes were approximately 214 million tons, a decline of 7% from 2014, while its 2015 trading and brokerage volumes were approximately 15 million tons.

14.     U.S. Mining Operations:  The principal business of the Debtors' mining segments in the United States (respectively, "Powder River Basin Mining," "Western U.S. Mining" and "Midwestern U.S. Mining") is the mining, preparation and sale of thermal coal.[3] This coal is primarily supplied to U.S. electricity generators, with a portion sold into seaborne export markets as conditions warrant.  Coal demand from electric utilities in the United States declined approximately 110 million tons in 2015 based, in large part, on reduced degree heating days in the United States, the El Nino effect, flat generation demand and an abundance of extremely low priced natural gas.

15.     The Debtors' Powder River Basin Mining operations control approximately 98,000 of surface acres located in the Powder River Basin area of Wyoming (the "PRB").  The Debtors are the largest coal producer and holder of reserves in the PRB, controlling an estimated three billion tons in proven and probable reserves that represent more than 20 years of capacity at current production levels.  Operations in the PRB utilize surface mining extraction techniques in which land is contemporaneously reclaimed as part of the mining process.  Coal produced in the PRB generally has both lower sulfur and British Thermal Units ("Btu") content relative to other U.S. coal basins.  The North Antelope Rochelle mine in the PRB is the world's largest and most productive coal mine and has been recognized by the Wyoming Department of Environmental

---

[3]     Thermal coal is burned for steam to run turbines to generate electricity.

Quality and the United States Department of Interior as an industry leader in reclamation practices. This mine operates with two 12-hour shifts per day, 365 days per year and employs approximately 1,150 workers. In 2015, the Debtors shipped nearly 140 million tons of coal from their PRB operations to approximately 100 separate facilities in 24 states.

16.    The Debtors' Western U.S. Mining operations are comprised of mines located in New Mexico, Arizona and Colorado. These mining operations are characterized by a mix of surface and underground operations and of coal with mid-range sulfur and Btu content. While the Debtors view this region as non-core to their portfolio, these mining operations have provided strong and stable cash flows to the Debtors. Coal sales from these operations primarily serve the local markets in which they operate, with sales totaling approximately 18 million tons in 2015.

17.    The Debtors' Midwestern U.S. Mining operations include, among other things, active mines in Illinois and Indiana. These mining operations are characterized by a mix of surface and underground operations and coal with a higher sulfur and high Btu content. Collectively, the Debtors sold approximately 21 million tons from their Midwestern U.S. Mining operations in 2015.

18.    Australian Mining Operations: The Company's Australian mining operations are not part of these chapter 11 cases. The Company's mining segments in Australia include active metallurgical coal mines in Queensland and New South Wales ("Australian Metallurgical Mining"). The Company's mining segments in Australia also include active thermal mining operations in New South Wales ("Australian Thermal Mining"). The Australian operations are among the leading producers of seaborne metallurgical coal and are one of the largest seaborne pulverized coal injection suppliers. Australian operations are characterized by both surface and

underground extraction processes for the mining of various qualities of metallurgical and thermal coal. Metallurgical coal qualities produced in Australia include hard coking, semi-hard coking, semi-soft and pulverized coal injection coals.[4] The Australian operations are primarily export focused with customers spread across several countries, but a portion of the Australian operations' coal is sold domestically. In total, the Australian mining operations sold over 35 million tons of coal in 2015.

19.     <u>Trading and Brokerage</u>:  This segment of the Debtors' operations engages in the direct and brokered trading of coal and freight-related contracts, largely in Australia, China, Europe, India, the United Kingdom and the United States. Non-domestic entities engaging in these activities did not seek protection under Chapter 11.[5] The Company acts as both principal and agent in support of various coal production related activities that involve both coal produced by the Company, coal sourced from third-parties, and off-take agreements with other coal producers. This business segment also provides transportation-related services, which involve financial derivative contracts and physical contracts. This segment includes both economic hedging, and from time to time, cash flow hedging in support of the Company's coal trading strategy.

20.     <u>Corporate and Other</u>:  This segment of the Company's operations includes, among other things, corporate hedging activities, selling and administrative expenses, activities associated with the Company's joint ventures, resource management activity and post-mining obligations. The segment includes Gold Fields Mining, LLC ("<u>Gold Fields</u>"), a dormant, non-

---

[4]     Metallurgical coal is generally used by steel producers.

[5]     The non-debtor trading and brokerage entities are: Peabody Coaltrade Australia Pty Limited; Peabody COALTRADE Pacific Pty Ltd; PT Peabody Coaltrade Indonesia; Peabody Coaltrade International Limited; Peabody COALTRADE GmbH; Peabody Coaltrade Asia Private Ltd; 9 East Shipping (Asia) Pte Ltd.; and Peabody Coaltrade India Private Limited.

coal producing subsidiary of the Company that was managed and owned by Hanson PLC with Gold Fields' former affiliates.  Hanson PLC, a predecessor owner of the Company, transferred ownership of Gold Fields to the Company in the February 1997 spin-off of its energy business. The Company never managed or operated Gold Fields as an active mining entity.[6]

21.      The Company also holds a 50% equity interest in Middlemount Coal Pty. Ltd., which owns the Middlemount Mine in Queensland, Australia.[7]  The Company also owns a 5.06% interest in the Prairie State Energy Campus, 1,600 megawatt coal- fueled electricity generating facility in Illinois ("Prairie State"), and a 37.5% interest in Dominion Terminal Associates, a coal export terminal in Newport News, Virginia.

22.      On a consolidated basis, the Company, as of December 31, 2015: (a) had total assets and liabilities of approximately $11.0 billion and $10.1 billion, respectively; (b) had consolidated 2015 revenues of approximately $5.6 billion; and, as of the Petition Date (c) employs approximately 7,100 employees globally (approximately 5,400 of whom are hourly).

## Part II

## The Debtors' Capital Structure

A.     Long-Term Debt[8]

23.      As of the Petition Date, the Debtors had approximately:

- $4.3 billion of secured obligations consisting of:[9]

---

[6]      Gold Fields is currently a defendant in several lawsuits and has received notices of several other potential claims arising out of lead contamination from mining and milling operations.  Gold Fields is also involved in investigation or remediating a number of other contaminated sites.

[7]      The Australian subsidiaries of PEC have not commenced chapter 11 cases and continue to operate in the ordinary course of business.

[8]      The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

[9]      These amounts exclude accrued but unpaid interest as of the Petition Date.

o   (a) $1.65 billion revolving credit facility (the "Revolving Credit Facility") and
    (b) $1.2 billion term loan facility (the "Term Loan Facility") issued pursuant to
    that certain Amended and Restated Credit Agreement dated September 24, 2013
    by and between PEC as Borrower, Citibank, N.A., as Administrative Agent,
    Swing Line Lender and L/C Issuer and the other lenders party to the credit
    agreement; Citigroup Global Markets, Inc., Merrill Lynch, Pierce, Fenner &
    Smith Incorporated, BNP Paribas Securities Corp., Credit Agricole Corporate and
    Investment Bank, HSBC Securities (USA) Inc., Morgan Stanley Senior Funding,
    Inc., PNC Capital Markets LLC and RBS Securities Inc., as Joint Lead Arranger
    and Joint Book Managers and Bank of America, N.A., as Syndication Agent; and
    MUFG Union Bank, N.A., Compass Bank, Credit Suisse Securities (USA) LLC,
    J.P. Morgan Securities LLC, Standard Chartered Bank, U.S. Bank National
    Association and Wells Fargo Bank N.A. as Co-Documentation Agents  (as
    amended and restated, the "2013 Credit Agreement"), and as amended by the
    Omnibus Amendment Agreement, dated as of February 5, 2015 (the "Omnibus
    Amendment"), among PEC, Citibank, N.A., as Administrative Agent and L/C
    Issuer, and the other lenders party thereto (the 2013 Credit Agreement, as
    amended by the Omnibus Amendment, the "First Lien Credit Agreement").  As of
    the Petition Date, the Debtors had drawn approximately $947 million in cash
    under the Revolving Credit Facility and had posted approximately $675 million in
    letters of credit under the Revolving Credit Facility;[10]

o   As of March 31, 2016, the Debtors had foreign currency and fuel transactions
    outstanding under their prepetition International Swaps and Derivatives
    Association ("ISDA") Master Agreements – forms published by ISDA, the swap
    industry's association, in the approximate notional amounts of $1.1 billion
    (foreign currency) and $271 million (for fuel), respectively, which are generally
    considered "Swap Obligations," as that term is defined in the First Lien Credit
    Agreement.  "Swap Obligations," to the extent valid and in a net liability position,
    are first lien obligations secured by collateral and all property that is subject to
    liens under the First Lien Credit Agreement;[11]

o   $1.0 billion in principal amount of 10.00% senior secured second lien notes issued
    on March 16, 2015 by PEC, due in March 2022 (the "2022 Secured Notes"),
    which are secured by a second-priority lien on all the assets that secure the
    Debtors' obligations under the First Lien Credit Agreement, subject to permitted
    liens and other limitations; and

---

[10]   Balance subject to currency fluctuations due to letters of credit being issued in both US dollars and
       Australian dollars.

[11]   Part of the $4.3 billion in secured indebtedness reflects the mark to market value rather than notional value
       of the debt.  As of April 11, 2016, the mark to market value was approximately $171 million for foreign
       currency and approximately $127.8 million for fuel.

     o   The Securitization Facility (as defined below), which has a maximum capacity of $180 million, subject to eligible accounts receivable.[12]

- $4.5 billion unsecured indebtedness, consisting of approximately:[13]

     o   $1.5 billion in principal amount of 6.00% senior notes issued in November 2011 by PEC, due in November 2018 (the "2018 Unsecured Notes");

     o   $650 million in principal amount of 6.50% senior notes issued in August 2010 by PEC, due in September 2020 (the "2020 Unsecured Notes");

     o   $1.3 billion in principal amount of 6.25% senior notes issued in November 2011 by PEC, due in November 2021 (the "2021 Unsecured Notes");

     o   $250 million in principal amount of 7.875% senior notes issued in October 2006 by PEC, due in November 2026 (the "2026 Unsecured Notes");

     o   $732.5 million in principal amount of convertible junior subordinated debentures by PEC, due in December 2066 (the "2066 Unsecured Notes"); and

     o   $22 million in, among other things, capital lease obligations.

24.       For ease of reference, a one-page table summarizing the foregoing is attached hereto as Annex B.

25.       First Lien Credit Agreement:  On September 24, 2013, PEC entered into a credit agreement with the lenders party thereto and Citibank, N.A. as Administrative Agent. This agreement was unsecured, except for a pledge of 65% of Peabody Investments (Gibraltar) Limited and a pledge of the stock of Debtor Peabody IC Funding Corp.  On February 5, 2015, the Debtors entered into an Omnibus Amendment related to the 2013 Credit Agreement that provided the Debtors with financial flexibility in exchange for the pledge of certain collateral and, among other things, amended negative covenants, lien covenants, financial maintenance

---

[12]    As described more fully below, although the Securitization Facility is administered through a wholly-owned, bankruptcy-remote subsidiary, P&L Receivables, to the extent transfers of receivables are re-characterized as an extension of credit rather than true sales, the Debtors party to the Securitization Facility have granted first priority security interests and liens on the receivables in favor of the Administrator (as defined below).

[13]    These amounts exclude accrued but unpaid interest as of the Petition Date.

covenants and additional mandatory prepayments, including with respect to the net proceeds of certain asset sales (subject to customary reinvestment rights).  As noted above, the First Lien Credit Agreement provides for a $1.65 billion Revolving Credit Facility and a $1.20 billion Term Loan Facility.  All obligations under the First Lien Credit Agreement are guaranteed by the Guarantors (as defined below) and are secured by (a) a pledge of 65% of the stock of Peabody Investments (Gibraltar) Limited, a holding company for the Company's Australian operations, (b) a pledge of the stock of Debtor Peabody IC Funding Corp., a holding company whose sole asset is an intercompany receivable, which had a book value of $5.5 billion as of December 31, 2015, owed to it by Debtor Peabody IC Holdings LLC and (c) "Collateral" (as defined in the First Lien Credit Agreement).[14]  The Collateral explicitly excludes certain assets, including, among others: (a) motor vehicles or other assets with certificates of title with a net book value of less than $1 million; (b) commercial tort claims where the amount of the net proceeds claimed is less than $10 million; (c) contracts and assets to the extent granting a lien would be prohibited by, or cause a default under, or breach a contract or would be prohibited by applicable law; (d) letter of credit rights; (e) the receivables and related receivables assets sold in the Debtors' accounts securitization program; (f) certain real property interests that are not material real property; (g) certain trademark applications; and (h) certain equity interests of foreign subsidiaries, non-wholly owned subsidiaries, non-profits and similar entities.

---

[14]   "Collateral" is defined in the First Lien Credit Agreement as: consisting of "…substantially all of the personal property and material owned real property of the Borrower and the Guarantors, and includes all Accounts, Receivables, As-Extracted Collateral, Chattel Paper, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Instruments, Insurance, Intellectual Property, Inventory, Investment Property, Letter of Credit Rights, Money, Pledged Equity Interests, Vehicles, Collateral Accounts, Goods, Commercial Tort Claims (each as defined in the Uniform Commercial Code), supporting books and records, and all proceeds, products, supporting obligations and guarantees in support of the foregoing. Notwithstanding the foregoing, the Collateral excludes the Excluded Assets." See First Lien Credit Agreement, § 2.

26.       As mentioned above, substantially all of the domestic subsidiaries of PEC guarantee obligations under the First Lien Credit Agreement.  "Guarantors" as defined in the First Lien Credit Agreement, include all domestic subsidiaries of PEC other than the following: (a) any subsidiary not wholly-owned, directly or indirectly, by PEC to the extent it is prohibited by the terms of any contractual obligation from guaranteeing obligations under the First Lien Credit Agreement; (b) any domestic subsidiary of PEC substantially all of whose assets consist of equity interests in a foreign subsidiary if making such domestic subsidiary a Guarantor would result in adverse tax consequences to PEC or certain of its subsidiaries; and (c) subsidiaries of PEC that are nominated as "Unrestricted Subsidiaries" including those designated as Unrestricted Subsidiaries in connection with a permitted securitization program, such as the Securitization Facility (as defined below). See First Lien Credit Agreement, § 1.01.  Under the above criteria, the following entities, among others, are not Guarantors under the First Lien Credit Agreement: (i)  P&L Receivables; (ii) Sterling; (iii) GEC; (iv) Newhall; (v) Four Star Holdings, LLC; (vi) Seneca Property, LLC; (vii) Southwest Coal Holdings, LLC; and (vii) Twentymile Equipment Company, LLC.

27.       The Term Loan Facility has a maturity date of September 24, 2020, and the principal amount of the Term Loan Facility is subject to quarterly amortization payments equal to .25% of outstanding principal each quarter through June 30, 2020.   The Revolving Credit Facility has a maturity date that is the earlier of (a) September 24, 2018 or (b) 91 days prior to the maturity date of the 2018 Unsecured Notes, if still in existence.

28.       All borrowings under the Term Loan Facility and the Revolving Credit Facility (other than swing line borrowings and borrowings denominated in currencies other than U.S. dollars) bear interest, at PEC's option, at either: (a) a base rate equal to the highest of (i) the

Federal Funds Rate plus 0.50%, (ii) the one-month eurocurrency rate plus 1.0% and (iii) the

annual rate of interest in effect for that day as publicly announced by the administrative agent as

its "prime rate" (subject, in each case, to a floor of 2.00%) or (b) a eurocurrency rate for the

relevant interest period (which will be one, two, three or six months or, subject to availability,

one or two weeks or twelve months, as selected by PEC) (subject to a floor of 1.00%), plus (1) in

the case of term loan borrowings, 2.25% per year for borrowings bearing interest at the base rate

and 3.25% per year for borrowings bearing interest at the eurocurrency rate or (2) in the case of

revolving credit borrowings, a rate dependent on the ratio of PEC's debt as compared to PEC's

adjusted consolidated EBITDA, ranging from 0.75% to 1.50% per year for borrowings bearing

interest at the base rate, and from 1.75% to 2.50% per year for borrowings bearing interest at the

eurocurrency rate.

29.     The First Lien Credit Agreement contains certain restrictive covenants.  These

include, without limitation, restrictions on the ability of PEC and certain of its subsidiaries to:

(a) incur liens; (b) incur debt; (c) make investments (including acquisitions); (d) engage in

fundamental changes such as mergers and dissolutions; (e) dispose of assets; (f) change the

nature of PEC's business; (g) enter into transactions with affiliates; or (h) enter into agreements

with negative pledge clauses.

30.     The First Lien Credit Agreement also contains events of default, including

without limitation: (a) non-payment; (b) violations of covenants under the First Lien Credit

Agreement; (c) the existence of materially erroneous or misleading warranties and

representations in the First Lien Credit Agreement; (d) the commencement of insolvency

proceedings by PEC or its applicable subsidiaries; (e) an admission by PEC or its applicable

subsidiaries of inability to pay debts as they become due; (f) the occurrence of an Employee

-16-

Retirement Income Security Act of 1974, as amended ("ERISA") event related to a pension or multiemployer plan; or (g) a change of control event.  In addition, the default (after giving effect to any applicable grace periods) by PEC or certain of its subsidiaries with respect to indebtedness in excess of $75 million, or the entry of a final judgment against PEC or certain of its subsidiaries regarding the same amount, constitutes an event of default under the First Lien Credit Agreement.

31.     In February 2016, the Company borrowed approximately $947 million under its Revolving Credit Facility, which represented the then-remaining undrawn available amount.  As of the Petition Date, the Company has no remaining availability under the Revolving Credit Facility with approximately $675 million in outstanding letters of credit.

32.     Securitization Facility.  The Debtors maintain an accounts receivable securitization program (the "Securitization Program") with PNC Bank, National Association (the "Administrator") through a wholly-owned, bankruptcy-remote subsidiary, P&L Receivables, whereby Debtors have access to a revolving credit facility (the "Securitization Facility").  The Securitization Program historically has been available for two purposes: (a) to obtain cash advances by selling interests in P&L Receivables' pool to the Securitization Purchasers (as defined below) and (b) for the issuance of letters of credit.  Currently, the Debtors utilize proceeds from the sale of their accounts receivable solely for the issuance of letters of credit.

33.     The Securitization Program operates through a series of true sales of receivables of certain of the Debtors by those Debtors to PEC.  PEC, in turn, contributes those receivables to P&L Receivables and P&L Receivables, in turn, sells those certain eligible trade receivables (the "Receivables") to the purchasers under the Securitization Program and obtains cash or letters of credit from the Administrator secured by the receivables pool.  Under the

Securitization Program, the transfer of the receivables is perfected by filing UCC financing statements. To the extent these transfers are recharacterized as an extension of credit rather than true sales, the Debtors party to the Securitization Facility have granted first priority security interests and liens on the receivables, and the proceeds therefrom, in favor of the Administrator and the Securitization Purchasers (as defined below).

34.      The Securitization Facility was originally set to expire in April 2016, but on March 25, 2016, the Debtors continued, amended and restated this facility. As set forth above, the Securitization Facility has a maximum capacity of $180 million, subject to eligible accounts receivable, and is fully utilized. Pursuant to the Amended Purchase Agreements, as defined in the motion, the maturity date of the Securitization Facility was extended to March 25, 2018. In exchange for the extension, the Company agreed, inter alia, to increase certain pricing elements of the Securitization Program, relinquish control over the accounts in which the Receivables are collected and provide more frequent reports on receivables balances before cash is remitted to the Debtors' control. In addition, prior to the Petition Date, the Debtors and the Administrator amended the Securitization Facility further eliminating provisions that would terminate the Securitization Facility automatically upon commencement of the chapter 11 cases.

35.      2022 Secured Notes: On March 16, 2015, the Debtors completed the offering of the 2022 Secured Notes, the proceeds of which were used to fund the purchase of their 7.375% Senior Notes that were due in November 2016 (the "2016 Unsecured Notes") and to redeem the aggregate principal amount of the 2016 Unsecured Notes not tendered in the tender offer. Interest is payable on the 2022 Secured Notes semi-annually on March 15 and September 15 of each year until March 15, 2022. The 2022 Secured Notes are secured by a second-priority lien on all of the assets that secure PEC's obligations under the First Lien Credit

Agreement, subject to permitted liens and other limitations. The indenture for the 2022 Secured Notes also contains a limit, consistent with the First Lien Credit Agreement, on the amount of debt that may be secured by Principal Property and Capital Stock, each as defined in the First Lien Credit Agreement. As of the Petition Date, approximately $1.06 billion in principal and accrued interest was outstanding under the 2022 Secured Notes.

36.        2018 Unsecured Notes and 2021 Unsecured Notes:  On November 15, 2011, the Debtors completed the offering of the 2018 Unsecured Notes and the 2021 Unsecured Notes primarily to fund the acquisition of PEA-PCI (formerly Macarthur Coal Limited) and related fees and expenses. The 2018 Unsecured Notes and 2021 Unsecured Notes are due on November 15, 2018 and November 15, 2021, respectively. Interest is payable on both the 2018 Unsecured Notes and the 2021 Unsecured Notes on May 15 and November 15 of each year. As of the Petition Date, (a) approximately $1.56 billion in principal and accrued interest was outstanding under the 2018 Unsecured Notes and (b) approximately $1.37 billion in principal and accrued interest was outstanding under the 2021 Unsecured Notes.

37.        2020 Unsecured Notes:  On August 25, 2010, the Debtors completed the offering of the 2020 Unsecured Notes. The 2020 Unsecured Notes mature on September  15,  2020 with interest payments due semiannually on March 15 and September 15. As of the Petition Date, approximately $674 million in principal and accrued interest was outstanding under the 2020 Unsecured Notes.

38.        2026 Unsecured Notes:  On October 12, 2006, the Debtors consummated the sale of the 2026 Unsecured Notes. The 2026 Unsecured Notes mature on November 1, 2026 with interest payments due semiannually on May 1 and November 1. As of the Petition Date,

approximately $259 million in principal and accrued interest was outstanding under the 2026 Unsecured Notes.

39.     2066 Unsecured Notes:  On December 20, 2006, the Debtors consummated the sale of $732.5 million in aggregate principal amount of 4.75% Convertible Junior Subordinated Debentures due 2066.  The 2066 Unsecured Notes mature on December 15, 2066. Interest on the 2066 Unsecured Notes is payable semiannually on June 15 and December 15 and accrues at the rate of 4.75% per year.  The 2066 Unsecured Notes are convertible, subject to certain conditions, prior to maturity into cash or shares of (i) perpetual preferred stock of PEC or, under certain circumstances, (ii) common stock, par value $0.01 per share, of PEC.  As of the Petition Date, approximately $744 million in principal and accrued interest was outstanding under the 2020 Unsecured Notes.[15]

B.    Trade Debt

40.     The Debtors' trade debt consists of amounts owed to utilities and suppliers of various goods and services, including, among others, maintenance and repair parts and services, required mining equipment and support structures, commodities and explosives.  The majority of the Debtors' vendors are paid on negotiated terms, which have generally ranged from 30 to 60 days.   As of the Petition Date, the Debtors estimate that approximately $80 million is outstanding to their trade vendors, not including month-end accruals.  In addition, the Debtors estimate that based on historic averages that approximately $40 million relates to goods that were provided to the Debtors within 20 days of the Petition Date.

---

[15]     This amount excludes the unamortized discount.

C.    Federal Coal Lease Obligations

41.    The Debtors have numerous U.S. federal coal leases, including leases related to the Debtors' principal coal reserves in the PRB, that are administered by the U.S. Department of Interior under the Federal Coal Leasing Amendment Act of 1976.  Under these leases, the Debtors must develop each federal lease within ten years of the lease award, and are required to extract 1.0% of the reserves within that ten-year period or are subject to minimum royalty payments.  In addition to these leases, "bonus bids" require per-ton payments to the federal government, which totaled $1.2 billion over a five year period ending in December 2016 for the North and South Porcupine reserves in the PRB.  The Debtors pay the federal government an annual rent of $3.00 per acre and annual production royalties of 12.5% of the gross proceeds of coal mined and sold for surface-mined coal and 8% of gross proceeds for underground-mined coal.  The U.S. federal government limits by statute the amount of federal land that may be leased by any company and its affiliates at any time to 75,000 acres in any one state and 150,000 acres nationwide.  As of December 31, 2015, the Debtors leased 7,687 acres of federal land in Colorado, 640 acres in New Mexico and 52,556 acres in Wyoming, for a total of 60,883 acres nationwide.  An additional 8,262 acres in Wyoming are held under lease by application with the BLM, which are also subject to the U.S. federal government limits.  The Debtors also lease approximately 65,000 acres of land in northern Arizona lying within the boundaries of the Navajo Nation and Hopi Indian reservations.  These leases are governed by provisions similar to the BLM provisions applicable to U.S. federal coal leases.

D.     Capital Lease Obligations

42.     As of the Petition Date, the Company's liability related to capital lease

obligations (e.g., leases of certain property, plant and mining equipment) totaled approximately

$27.2 million.

E.     Reclamation Obligations

43.     The Debtors view land restoration as an essential part of the mining process,

take great pride in this work and have been routinely recognized for their restoration programs.

The Debtors' reclamation obligations (the "Reclamation Obligations") arise pursuant to the

federal Surface Mining Control and Reclamation Act of 1977 and similar state statutes, which

generally require that mined land be restored in accordance with specified standards and an

approved reclamation plan.  Standards for mine reclamation have been established by various

state and federal regulatory agencies and dictate the reclamation requirements at the Debtors'

mining properties.  The Debtors' Reclamation Obligations consist principally of costs necessary

to (a) reclaim refuse and slurry ponds, (b) reclaim mining areas, (c) seal portals at underground

mines and (d) treat water used in mining operations.

44.     As of the Petition Date, the Debtors had posted third-party surety bonds in

favor of the applicable government agencies and other third parties in the several states,

including:  Arizona ($294.4 million); Colorado ($30.6 million); Illinois ($62.6 million); Indiana

($10.9 million); Montana ($5 million); and Pennsylvania ($17.1 million).[16]  The vast majority of

surety bonds relate to the Debtors' Reclamation Obligations.  In four states, however, as of the

Petition Date, the Debtors maintained the privilege of self-bonding for their Reclamation

---

[16]     The Arizona bonds are posted with the OSM and BLM.  The majority of the surety bond obligation
amounts in Illinois and Pennsylvania consist of indemnifications of third-party companies.  As a result, the
Debtors' obligations in these instances are with the surety companies, not the states.

Obligations.  These states, and each state's bonded amount, are approximately: Wyoming

($728 million); New Mexico ($181 million); Illinois ($92 million); and Indiana ($147 million).

The Debtors' ability to self-bond reduces their costs of providing financial assurances to

applicable government agencies for the Debtors' Reclamation Obligations.  To the extent the

Debtors are unable to maintain their current level of self-bonding due to legislative or regulatory

changes, changes in their financial condition or for any other reason, the Debtors would be

required to obtain replacement financial assurances.  Self-bonding is permitted at the discretion

of each state with oversight from the Office of Surface Mining ("OSM").  While the Debtors

have historically demonstrated compliance in the states in which they self-bond, their self-

bonding status may be challenged or withdrawn at any time.  The OSM has recently issued

notices to five states[17] alleging possible violations relating to the continued self-bonding by coal

companies, including the Debtors, in that state.  The notices required the violation to be corrected

or for the state to explain why a violation does not exist.

45.        As of the Petition Date, the Company's aggregate accrued Reclamation

Obligations – based on a variety of assumptions tied to the Company's existing operations and

mine plans that may change in light of actual events – are approximately $723 million globally,

with approximately $25 million of planned expenditures expected to occur within one year.

F.        Regulatory Compliance Costs

46.        The coal industry is heavily regulated by federal, state and local authorities

with respect to, among other things:  (a) permitting and licensing requirements; (b) air and water

---

[17]        The states are Colorado, Illinois, Indiana, New Mexico and Wyoming.  The Debtors have posted a
third-party bond to satisfy their bonding obligations in Colorado and no longer self-bond in that state.

emissions; (c) property reclamation; (d) soil remediation; (e) protection of surface and groundwater; and (f) surface subsidence from underground mining.

G.    Black Lung Benefit Obligations

47.    The Debtors are liable under the Black Lung Benefits Act (the "BLBA") to pay benefits to certain miners diagnosed with black lung and their eligible dependents. Based on recent studies, experience and certain demographic assumptions, the Debtors' BLBA expenditures for 2016 will be essentially flat when compared to 2015 expenditures of approximately $2 million.

48.    The Debtors secondarily are liable for the BLBA liabilities related to workers employed by Patriot Coal Corporation ("Patriot") subsidiaries that previously were subsidiaries of certain of the Debtors.  For the period ended December 31, 2015, the Debtors recorded a charge of $114.4 million, net of income taxes, related to Patriot's BLBA obligations.  The Debtors estimate that the annual cash cost to fund these potential liabilities will range between $10 and $15 million.

H.    Hedging Obligations

49.    The Debtors and their non-Debtor affiliates are exposed to several risks in the normal course of business including (a) foreign currency exchange rate risk for non-U.S. dollar expenditures and balances, (b) price risk on commodities produced by and utilized in mining operations and (c) interest rate risk on various debt obligations.  Prior to the Petition Date, the Debtors managed these risks by transactions in over-the-counter markets with financial institutions under ISDA Master Agreements – forms published by ISDA, the swap industry's association.  As of March 31, 2016, the Debtors had significant foreign currency and fuel transactions outstanding under their prepetition ISDA Master Agreements, in the approximate

notional amounts of $1.1 billion and $271 million, respectively.  The Debtors had no interest rate or explosive hedges outstanding.

I.      Stock

50.      As of December 31, 2015, PEC had 53.3 million shares of common stock authorized, 19.3 million shares of common stock issued and 18.5 million shares of common stock outstanding.

## Part III

### Recent Financial Performance and Events
### Leading to the Commencement of the Chapter 11 Cases

A.      The Debtors' Declining Financial Performance.

51.      Over the past several years, American coal producers have encountered reduced demand and lower coal prices created by sluggish economic growth, an abundance of extremely low priced natural gas and increased regulatory hurdles.  This convergence – of marked reductions in volume and pricing – substantially impacted the Company's revenues and cash flows.

*Price Declines*

52.       Slowing global economic growth drove a wide range of industry prices lower in 2015, resulting in the largest broad resource market decline since 1991.  Seaborne coal prices continued to decline due to an oversupply in the global market (e.g., reductions in Chinese imports more than offset supply cutbacks and economic weakness particularly in China).

*Volume Declines*

53.      At the same time, the market experienced worldwide reductions in the demand for steel (largely tied to China's exporting of steel and drop in the demand for metallurgical coal imports).  In 2015, seaborne metallurgical coal demand declined by approximately 15 million

tons.  In seaborne thermal coal markets, demand declined eight percent as a result of a nearly

75 million ton reduction in Chinese imports, lower European demand and a decline in

international liquefied natural gas prices.  The overall decline in seaborne thermal demand

primarily impacted U.S. exports which were down 41%.

54.        This confluence of events has resulted in an overall decline in demand for

U.S. coal.  Among other factors, demand from electric utilities declined approximately

110 million tons in 2015 based, in large part, on reduced degree heating days in the United States,

the El Nino effect, flat generation demand and an abundance of extremely low priced natural gas.

Natural gas prices fell nearly 40% in 2015 to an average of $2.63 per mm/Btu, which drove

coal's share of electricity generation in the power sector down to 33% compared with

approximately 40% in the prior year.  U.S. coal production declined by approximately 105

million tons in 2015 as production cutbacks accelerated during the year.  As a result, fourth

quarter 2015 production was down approximately 50 million tons compared to the same period

in 2014.  Despite supply rationalizations, reduced coal demand led to utility inventories rising

nearly 30% above prior year levels.  For the Debtors specifically, overall U.S. coal shipments

were down 7% in 2015 (down 3% in the PRB and down 20% outside of the PRB). Year-to-date

U.S. coal production shipments in 2016 through March are down another 31%, and average

natural gas prices have declined 30%, suggesting that these trends are continuing.



**Jan 2014 - Mar 2016 Benchmark Index Prices**

55.       Despite the delivery of a strong operating performance by the Company in 2015 (as described below), the decline in coal prices had significant negative impacts on the Company's results, resulting in (a) a net loss for 2015 of approximately $2.0 billion (on total assets and liabilities of approximately $11.0 billion and $10.1 billion respectively) and (b) steadily contracting cash flow from operations.



**Jan 2011 - Mar 2016 Seaborne Benchmark Index Prices [1]**

(1)  Lpw-Vol PCI is a composite of quaterly settlement and prompt index prices

56.       The Debtors are assuming, as reflected in their DIP Budget, that pressure will remain over the next year and that coal demand by utilities will fall below 2015 levels.

-27-

57.     In 2015, the Company ended the year with $1.2 billion of liquidity and about $710 million in letters of credit outstanding compared to available liquidity of $2.1 billion as of December 31, 2014.  In 2015, the Company's liquidity was impacted by providing credit support to financial institutions, approximately $400 million in cash interest payments, $277 million in reserve installments, lower cash from operations and a $75 million payment to the Patriot Voluntary Employee Benefits Association ("VEBA").[18]  The sharp decline in liquidity occurred primarily in the fourth quarter of 2015 when available liquidity decreased approximately $600 million from $1.8 billion since September 30, 2015 primarily due to providing additional credit support to financial institutions, $188 million in reserve installments, cash interest payments and lower cash from operations.  As of the Petition Date, liquidity totals approximately $636 million, primarily consisting of cash.  The Debtors also have approximately $845 million in letters of credit from the Revolving Credit Facility and the Securitization Facility that support bank guarantees, surety bonds, hedges and other obligations.

B.     The Debtors' Efforts to Realign Their Business Operations and Maximize Profitability.

58.     Recognizing the need to reposition the Company in light of prevailing global coal industry conditions, prepetition, the Debtors aggressively engaged in a series of activities to improve the business by focusing on core priorities in operational, organizational, portfolio and financial areas of the business.  Some of the most recent efforts are described below.

---

[18]     The Debtors made this payment pursuant to a 2013 settlement agreement that the Debtors entered into with the UMWA and Patriot in connection with Patriot's first bankruptcy case (the "2013 Settlement").  After Patriot filed a second bankruptcy in May 2015, a dispute developed with the UMWA regarding the Debtors' obligation to make two remaining payments due in 2016 and 2017 under the 2013 Settlement totaling $145 million.  On December 30, 2015, the Debtors entered into another settlement agreement with Patriot and the UMWA resolving that dispute (the "2015 Settlement"), which became effective on January 6, 2016. The 2015 Settlement, among other things, eliminated any obligation for the Debtors to pay the remaining $145 million under the 2013 Settlement and required the Debtors instead to pay the VEBA up to $75 million over ten months in 2016.

*Operational Measures in 2015 and 2016*

59.      The Company set a new record for safety, with a 13% reduction in the global

safety incidence rate to 1.25 per 200,000 hours worked for employees and contractors versus the

prior year record.

60.      At the operational level, the Debtors improved per ton operating costs by 5%

in the United States and 24% in Australia in 2015.  As a result of these improvements, Australia's

production costs were the lowest they have been for the current asset base.  Gross margins across

four of the Debtors' five operating segments averaged 26%.  As a result, despite the brutal effects

of lower pricing in recent years, all of the Company's U.S. operations were cash-flow positive in

2015, and the Company's Australian platform increased its contribution of Adjusted EBITDA in

2015 compared with 2014 levels.  In fact, when comparing the year ended December 31, 2015 to

December 31, 2013, the Company realized cost savings of $1.1 billion that mitigated $1.0 billion

in lower pricing and $610 million in unfavorable hedging impacts.

61.      At the corporate level, the Company created a leaner organizational structure

by reducing hundreds of positions and reducing selling, and general and administrative expenses

("SG&A Expenses") to the lowest levels in nearly a decade.  Actions also included closing

multiple regional and global business offices.  The Company streamlined the organization,

reduced entire layers of management, and implemented a shared services model to reduce costs.

As a result, the Company reduced SG&A Expenses by 28%, or nearly $70 million, from 2013 to

2015.  In addition, as of February 11, 2016, the Company targeted to reduce 2016 SG&A

Expenses 12-18%.

62.      The Company also has modified its compensation to reflect alignment with

Company returns.  In 2015, the value of shares awarded in payment of earned units was less than

1% of the original grant-date value, resulting in a 99% decline in long-term incentive

compensation value.  In addition, all stock options and stock appreciation rights were out of the

money and had no realized value.  Peabody's CEO and CFO earn 11% and 21% less,

respectively, in base compensation than their recent predecessors.  Over the course of the past

twelve months, Peabody decreased its annual cash incentive awards payments for executives and

salaried employees by 50% of achievement, decreased its annual equity awards for executives by

50% of value, and the President and CEO took a voluntary 10% reduction in base compensation

and the Board took an over 18% reduction in retainers, all reflecting the company's aggressive

cost management initiatives.

63.     The Company also reduced capital spending by 35% in 2015, resulting in the

lowest level of capital spending in nearly a decade.  Based on guidance provided as of

February 11, 2016, capital expenditures in 2016 will also be reduced to $120 - $140 million, with

a focus on safety initiatives and sustaining lower production levels.

*Divestitures in 2015 and 2016*

64.     The Company has also moved aggressively to shed non-core businesses and

properties.  In 2015 alone, the Company realized cash proceeds of $70 million related to their

ongoing resource management activities through the sale of surplus land and coal reserves.  On

November 20, 2015, the Company entered into a purchase and sale agreement with a subsidiary

of Bowie Resource Partners, LLC pursuant to which the Company agreed to sell its El Segundo

and Lee Ranch coal mines and related assets located in New Mexico and the Twentymile Mine

in Colorado (the "Four Star Transaction") for $358 million.  The closing of the Four Star

Transaction was scheduled to occur during the first fiscal quarter of 2016 but was delayed due to

the buyer's inability to secure financing for this purchase and its own restructuring. As of the Petition Date, the transaction has been terminated.

65.     After a thorough and competitive process, on January 19, 2016, the Debtors entered into the Prairie State Interest Purchase and Sale Agreement (the "Prairie State Agreement") with Wabash Valley Power Association, Inc. ("Wabash").  Under the Prairie State Agreement, the Debtors agreed to sell their entire ownership interest in LGEP (the "LGEP Membership Interest"), which includes a 5.06% undivided ownership interest in Prairie State (the "Prairie State Ownership Interest"), to Wabash for $57 million in cash (collectively, the "Prairie State Sale").  The Federal Energy Regulatory Commission ("FERC") approved the Prairie State Sale on April 6, 2016.  Before the Prairie State Sale can close, Wabash must obtain approval for the Prairie State Sale from the Indiana Utility Regulatory Commission ("IURC"). The Debtors are currently working with Wabash to obtain IURC approval in order that they may bring this proposed sale before the Court.

*Expiring and Declining Committed Obligations*

66.     In addition to operational measures and divestitures, the Debtors are facing expiring and declining liabilities as related to previously committed obligations.  For example, as noted above, the Debtors recently resolved a dispute concerning the 2013 Settlement, which improved the Debtors' expected 2017 cash flows by $70 million while spreading a $75 million payment scheduled for January 4, 2016 equally over the first ten months of 2016.  Also, while the Company incurred approximately $487 million in total hedging losses in 2014 and 2015, the Company has not added to any currency hedges since August 2014.[19]

---

[19]     The Company's hedging position was intended to offset its costs related to Australian operations (for currency) and use of diesel (for fuel), but in recent years exacerbated the Company's earnings losses at a time of sharp market declines.

67.     The Company proactively assigned excess non-debtor Australian port capacity to another producer, which is expected to reduce infrastructure costs in Australia by approximately $60 million through 2020.  In addition, the Debtors recently amended contracts to reduce certain U.S. transportation and logistics costs expected to be due in early 2017.  In connection with these amendments, the Debtors will realize a net reduction of approximately $45 million in estimated liquidated damage payments that otherwise would have become due in early 2017.

68.     The Debtors' final PRB lease reserve installment of approximately $250 million is scheduled to be paid in the second half of 2016.  This payment is related to the Debtors' last lease-by-application process in 2012.  As a result of investments in prior years, the Debtors' PRB reserves represent more than 20 years of current production, which provides a competitive advantage relative to other producers.

*Financing Measures and Negotiations with Creditors*

69.     As the coal markets began to decline, the Debtors took several actions in the credit markets to attempt to enhance their liquidity, reduce debt and provide the businesses with additional operating flexibility.  First, the Debtors entered into the Omnibus Amendment on February 5, 2015, which: (a) amended certain financial covenants and (b) provided for certain additional mandatory prepayments including with the net cash proceeds of certain asset sales, subject to customary reinvestment rights, in exchange for the provision of collateral.

70.     Subsequently, the Debtors issued the 2022 Secured Notes on March 16, 2015 and used the net proceeds of $975 million in part to fund a tender offer to purchase the 2016 Unsecured Notes and to redeem the aggregate principal amount of the 2016 Unsecured Notes that was not tendered in the tender offer.

71.      Despite all of these accomplishments, these efforts did not fully overcome the bleak industry backdrop.  As a result, the Debtors engaged Jones Day and Lazard Fréres & Co. LLC ("Lazard") to begin evaluating the Debtors' strategic alternatives (the "Transaction Discussions").  The Debtors, with their advisors' assistance, began to engage in a series of dialogues with their key debt holders with near-term maturities to evaluate whether an out-of-court transaction to de-lever the Company and to provide additional liquidity could be effectuated.

72.      Though the parties engaged in protracted negotiations regarding potential out-of-court alternatives, including potential debt buybacks, debt exchanges and new financing to improve the Debtors' liquidity and reduce their financial obligations, it became increasingly apparent that the parties would be unable to reach an agreement as related to the Transaction Discussions that met the Debtors' objectives around liquidity.   In addition, it was growing less likely that the Four Star Transaction would close by the end of the first quarter thereby putting the Company's ability to maintain compliance with its Consolidated Interest Coverage Ratio, as defined in the First Lien Credit Agreement, in jeopardy.  These factors, in concert with the accelerating deterioration in market conditions and rapidly increasing capital calls, were hampering the Debtors' alternatives.  On February 29, 2016, the Company filed a Form 12b-25 with the United States Securities and Exchange Commission delaying the filing of its Form 10-K Annual Report for the year ended December 31, 2015 ("10-K") to address these matters. On the same date, the Company furnished a Form 8-K informing the market that certain proposed exchanges and transactions discussed as related to the Transaction Discussions had not materialized.

73.    On March 16, 2016, the Company filed its 10-K.  In the 10-K, the Company announced that it had elected to exercise the 30-day grace period with respect to a $21.1 million semi-annual interest payment due March 15, 2016 for the 2020 Unsecured Notes and a $50.0 million semi-annual interest payment due March 15, 2016 on the 2022 Secured Notes.  Failure to pay these interest amounts on March 15, 2016 did not constitute an immediate event of default under the indentures governing these notes, but would become an event of default if the payment were not made within 30 days of such date.  In the 10-K, the Company also announced that the First Lien Credit Agreement and its governing documents contain covenants that, among other things, required the Debtors to furnish audited financial statements within 90 days after the fiscal year without a "going concern" uncertainty paragraph in the auditor's opinion.  The consolidated financial statements for the year ended December 31, 2015 included a "going concern" paragraph.

74.    Due to a number of near-term pressures placed on the Debtors' liquidity including increasing calls for collateral, further erosion particularly in U.S. market demand and the lack of completion of the Four Star Transaction, the Debtors have determined in their business judgment that commencement of these chapter 11 cases is the best course to preserve and maximize liquidity and value for their stakeholders.  It is the Debtors' belief that the relief provided by chapter 11 will enable them to continue to restructure their debt and operations while riding out the storm that has beset the coal industry.  At the same time, coal is a key source of global electricity generation and an essential ingredient in steelmaking.  Coal fuels approximately 40 percent of global electricity.  Over time, third-party estimates project that both the U.S. and global coal demand will stabilize.  U.S. gas prices are projected to rebound from recent lows.  And globally, thermal coal is expected to continue to fuel hundreds of existing coal generating plants as well as scores more that are under construction.  The Company has an

unmatched asset base, strong underlying operational performance, outstanding workforce, new management team and favorable geographic diversity.  The Company's production is located in the best mining regions in the U.S. and Australia, and it serves customers in some 25 countries on six continents.   The Company is a global leader in sustainable mining, energy access and clean coal solutions.  The Company holds an estimated 6.3 billion tons of coal reserves and half a million acres of surface lands.  The Company plans to continue to build on these unique advantages and significant strengths that favorably distinguish it from its competitors.  Upon emergence, the Debtors believe these factors will provide the basis for the Company to be a leader in the industry well into the future.

## Part IV

### First Day Motions

75.        Concurrently with the filing of their chapter 11 cases, the Debtors filed the First Day Motions requesting various forms of relief.  The Debtors anticipate that the Court will (a) conduct a hearing soon after the Petition Date at which it will hear and consider many of the First Day Motions on an interim or final basis and (b) consider the remainder of the First Day Motions (and final relief for others) on or about a date that is 21 days after the Petition Date.

76.        Generally, the First Day Motions have been designed to meet the goals of (a) preserving and protecting the Debtors' chapter 11 estates, including by paying certain claims of employees, (b) obtaining necessary debtor in possession financing to provide the Debtors' estates with sufficient liquidity to operate and (c) establishing procedures for the smooth and efficient functioning of the Debtors' estates.  I believe that the relief sought in each of the First

Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to reorganize successfully.[20]

A.      Administrative Pleadings

77.      Expedited Hearing:  The Debtors will request entry of an order (a) scheduling an expedited hearing on certain of the First Day Motions and (b) approving the First Day Notice. I believe that expedited relief is essential to maintaining the normal day-to-day operations of the Debtors' businesses and is necessary to preserve and maximize the value of Debtors' estates.

78.      Joint Administration:  The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of their chapter 11 cases, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015(B) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Missouri (the "Local Bankruptcy Rules").  Specifically, Debtors will request that the Court jointly administer these cases under the lead case, PEC.  Lastly, due to the large number of debtors, the Debtors will request, among other things, that: (a) the Court waive requirements that notices sent by the Debtors contain their name, address and last four digits of the taxpayer identification number of each debtor; (b) the Court authorize Debtors to utilize a combined service list and combined notices to creditors and other parties-in-interest; and (c) the Court authorize Debtors to file consolidated monthly operating reports while simultaneously maintaining separate disbursement reports.  I believe that the joint administration of the Debtors' respective estates is warranted and will ease the administrative burden for the Court, the Office of the Clerk of the Court and parties in interest.

---

[20]      Capitalized terms not otherwise defined in Part IV have the meanings given to them in the corresponding First Day Motion.

79.     <u>Filing Redacted Creditor Matrix, Consolidated Lists of Creditors and Related Relief</u>:  Given the affiliated nature of the Debtors and the fact that they share a number of creditors in common, the Debtors believe that filing a list of their creditors holding the 50 largest unsecured claims on a consolidated basis in lieu of filing separate lists of the largest 20 unsecured creditors for each of the Debtors would facilitate the United States Trustee's review of creditors' claims and its appointment of a single Creditors' Committee in these cases. The Debtors will also seek a waiver of the requirement that each Debtor file a list of creditors containing the name and address of each entity included or to be included on a Debtor's schedules of liabilities (as such information will be provided to the Debtors' claims and noticing agent).  Finally, the Debtors will also seek approval of the form and manner of the notice of commencement of these chapter 11 cases and of the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "<u>Section 341 Meeting</u>").

80.     <u>Extension of Time to File Schedules and Statements</u>:  Because of the size and complexity of PEC's businesses and the Debtors' financial affairs, and because of the numerous critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors will move for entry of an order granting them an extension of time until 60 days following the Petition Date to gather the information necessary to complete and file the required:  (a) schedules of assets and liabilities; (b) schedules of executory contracts and unexpired leases; and (c) statements of financial affairs. In addition, the Debtors will request entry of an order authorizing the United States Trustee to schedule the Section 341 Meeting after the 40-day deadline set forth in Bankruptcy Rule 2003(a).

81.     The Debtors also request an extension of the time until no later than 45 days after the Petition Date to (a) file their initial reports of financial information in respect of entities

in which their chapter 11 estates hold a controlling or substantial interest, as set forth in

Bankruptcy Rule 2015.3 or (b) file a motion with the Court seeking a modification of such

reporting requirements for cause.

82.     Case Management:  To aid in the administration of the Debtors' bankruptcy

cases, Debtors seek entry of an order that, inter alia:  (a) establishes requirements for filing and

serving notices, motions, applications, declarations, objections and other court documents;

(b)  delineates standards for notices of hearings and agenda letters; (c) fixes periodic omnibus

hearing dates and articulates mandatory guidelines for scheduling hearings and objection

deadlines; and (d) limits matters that are required to be heard by the Court.  The Debtors believe

that these Case Management Procedures will maximize the efficiency and orderly administration

of these cases, while at the same time ensuring that appropriate notice is provided.  The Debtors

also believe that the Case Management Procedures will limit the administrative burdens and

costs associated with filing and serving notices.

83.     Application to Retain Claims and Noticing Agent:  The Debtors recognize that

the large number of creditors and other parties in interest involved in these chapter 11 cases may

impose heavy administrative and other burdens upon the Court and the Clerk's Office.

To relieve the Court and the Clerk's Office of these burdens, the Debtors will seek the entry of an

order (a) appointing Kurtzman Carson Consultants LLC ("KCC") as the Debtors' noticing and

claims agent in these chapter 11 cases and (b) approving the terms of KCC's employment and

retention.  KCC may, among other things:  (i) prepare and serve all notices required in the

Debtors' chapter 11 cases, including notice of the commencement of these chapter 11 cases and

the Section 341 Meeting; (ii) maintain a copy of the claims register; and (iii) assist with the

mailing and tabulation of ballots in connection with any vote to accept or reject any plan or plans

proposed in these chapter 11 cases.  The Debtors obtained and reviewed engagement proposals

from four other claims and noticing agents to ensure that the claims agent's selection was made

through a competitive process.  The Debtors submit, based on all engagement proposals obtained

and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services

and expertise.

84.     Motion to Confirm the Protections of the Automatic Stay:  To aid in the

administration of the Debtors' bankruptcy cases and to avoid disruption to the Debtors'

businesses, the Debtors will seek the entry of an order, pursuant to section 105(a) of the

Bankruptcy Code, that confirms the application of three key protections afforded to the Debtors

under the Bankruptcy Code:  (a) the automatic stay provisions of section 362 of the Bankruptcy

Code; (b) the anti-termination and anti-modification provisions of section 365 of the Bankruptcy

Code; and (c) the anti-discrimination provisions of section 525 of the Bankruptcy Code

(collectively, the "Code Protections").

85.     The Debtors believe that (a) the extensive and highly regulated nature of their

businesses, (b) their need for, and reliance upon, among other things, contract parties continuing

to perform their obligations and (c) their interactions with parties who may be unfamiliar with,

are mistaken regarding or who simply ignore the Code Protections require the entry of an order

confirming those protections in order to maximize value for stakeholders.  Furthermore, to

ensure that any violations of the Code Protections do not disrupt the Debtors' businesses, the

Debtors are seeking approval of a formal and expeditious process for promptly adjudicating any

such violations; to the extent they are not otherwise resolved.

86.     Procedures for Trading in Equity Securities:  The Debtors have incurred

losses and other creditable expenses for federal income tax purposes during the course of

operating their businesses.  As of December 31, 2015, the Debtors currently estimate they have

net federal tax credits of approximately $635 million and federal tax capital losses of

approximately $180 million, and the Debtors expect to incur additional tax losses and credits

through the Petition Date and through the time that they emerge from their chapter 11 cases

(collectively, the "<u>NOLs</u>").  These NOLs are valuable tax attributes, which could translate into

future reductions of the Debtors' income tax liabilities.

87.     The Debtors may lose the ability to use their NOLs if they experience an

"ownership change" for federal income tax purposes.  To prevent this potential loss of property

of the Debtors' estates and to preserve to the fullest extent possible the flexibility to craft a plan

of reorganization that maximizes the use of their NOLs, or to shelter taxable income or gain, if

any, from any sale of their assets through a court-supervised auction process, the Debtors seek

the entry of interim and final orders:  (a) establishing notice and objection procedures that must

be satisfied before certain transfers of beneficial interests in equity securities in PEC are deemed

effective; (b) establishing a record date for notice and potential sell-down procedures for trading

in claims against the Debtors; and (c) granting related relief.  The relief sought will enable the

Debtors to closely monitor certain transfers of equity securities, and thereby put the Debtors in a

position to quickly act to prevent or to limit such transfers if necessary to preserve their NOLs.

Additionally, establishing a record date with respect to trading in claims against the Debtors will

ensure that claimholders receive sufficient notice that any claims purchased after such date may

ultimately be subject to certain sell-down procedures in the event an order approving such

procedures is sought by the Debtors and entered by the Court to preserve the Debtors' ability to

use their NOLs.

88.    <u>Appointment of Foreign Representative for Peabody Gibraltar</u>:  Peabody

Holdings (Gibraltar) Limited ("<u>Peabody Gibraltar</u>"), one of the Debtors in these chapter 11 cases,

serves principally as a holding company and directly and indirectly owns certain debtor and non-

debtor subsidiaries.  The company is incorporated in Gibraltar.  Due to its connection with

Gibraltar, Peabody Gibraltar intends to promptly seek ancillary relief in Gibraltar, pursuant to the

Insolvency (Cross Border Insolvencies) Regulations 2014 made under the Insolvency Act 2011

of Gibraltar in the Supreme Court of Gibraltar (the "<u>Gibraltar Court</u>").  Such a proceeding would

be commenced to, among other things, provide Peabody Gibraltar and/or its assets protection

from judicial process in Gibraltar.  To facilitate Peabody Gibraltar's efforts to have its chapter 11

case recognized by the Gibraltar Court as a "foreign proceeding," and to avoid any doubt as to

who has appropriate authority to seek recognition of Peabody Gibraltar's chapter 11 case in

Gibraltar, PEC and Peabody Gibraltar request that the Court expressly authorize and appoint me

to act as the foreign representative for Peabody Gibraltar.  The appointment of a foreign

representative is necessary and appropriate and is in the best interest of PEC and Peabody

Gibraltar's estates and creditors.

89.    <u>Ordinary Course Professionals Motion</u>:  The Debtors employ many

professionals, including lawyers and accountants, who render a variety of services that are not

related to the Debtors' restructuring efforts  and will continue doing so during these chapter 11

proceedings (collectively, the "<u>Ordinary Course Professionals</u>").  These Ordinary Course

Professionals assist the Debtors' officers and managers in carrying out their assigned duties and

responsibilities and are essential to the Debtors' business operations.  The Debtors thus seek

entry of an order (a) authorizing them to retain, employ and pay Ordinary Course Professionals

without the submission of separate retention applications and the issuance of separate retention

orders for each Ordinary Course Professional and (b) approving such retention and employment

as of the Petition Date or the date upon which the Ordinary Course Professional began his or her

work.

90.        The Debtors desire to employ the Ordinary Course Professionals to render

professional services to their estates in the same manner and for the same purposes as such

services were provided prior to the Petition Date.  The Ordinary Course Professionals will

generally not be involved in the administration of these chapter 11 cases nor will they be

involved in counseling and advising the Debtors with respect to the material restructuring issues

to be addressed.  Instead, Ordinary Course Professionals will provide services in connection with

the ongoing management of the Debtors' day-to-day business operations and affairs.

91.        The Debtors do not believe that any individual Ordinary Course Professional

will have monthly fees, exclusive of expenses, of more than $75,000 or total fees, exclusive of

expenses, of more than $750,000 during the pendency of these chapter 11 cases.

92.        Interim Compensation Motion:  The Debtors will seek authorization to retain

and employ: (a) pursuant to section 327 of the Bankruptcy Code:  (i) Jones Day, as bankruptcy

counsel; (ii) Armstrong Teasdale LLP, as local counsel; and (ii) FTI Consulting, Inc., as financial

advisor;  (b) pursuant to sections 327 and 328 of the Bankruptcy Code, Lazard, as investment

banker; and (c) other professionals from time to time during these chapter 11 cases and upon the

review of the Debtors' needs.  Additionally, the Debtors understand that the statutory committee

of unsecured creditors appointed in these cases is likely to retain counsel and possibly other

professionals to represent it.

93.        The Debtors will seek an order (a) establishing an orderly, regular process for

the allowance and payment of compensation and reimbursement for attorneys and other

professionals whose services are authorized by this Court and (b) establishing a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committees appointed in these cases.

B.     Pleadings Regarding Business Operations of the Debtors

94.     Prepetition Taxes:  The Debtors, in the ordinary course of their business, incur various tax and other liabilities to governmental entities, including, among others, prepetition production taxes, black lung excise taxes, sales and use taxes, franchise taxes, environmental and safety taxes, certain business and other fees, state income taxes (collectively, the "Prepetition Taxes") owed to certain taxing authorities (the "Taxing Authorities").  Prior to the Petition Date, the Debtors generally paid their tax obligations as they became due.

95.     The Debtors are required to pay certain severance taxes – i.e., taxes related to the value or quantity of coal "severed" from the ground – and other production taxes related to the extraction of coal (collectively, the "Production Taxes").  As of the Petition Date, the Debtors estimate that the aggregate amount of Production Taxes owing to the Taxing Authorities is approximately $149.5 million.

96.     Pursuant to Section 4121 of the Internal Revenue Code, the Debtors are required to pay federal black lung excise taxes (the "Black Lung Excise Taxes"), the proceeds of which are held in trust by the federal government and used to compensate coal miners who develop pneumoconiosis, also known as "black lung disease."  As of the Petition Date, the Debtors estimate that the aggregate amount of Black Lung Excise Taxes owing to the federal government is approximately $2.8 million.

97.     The Debtors are required to pay certain sales taxes, gross receipts taxes and other similar taxes in connection with the sale of coal to their customers and purchases of tangible personal property (collectively, the "Sales Taxes").  The Debtors are also required to pay

-43-

use taxes (together with the Sales Taxes, the "Sales and Use Taxes") when they make certain purchases of tangible personal property from out-of-jurisdiction vendors.  As of the Petition Date, the Debtors estimate that the aggregate amount of Sales and Use Taxes owing to the Taxing Authorities is less than $3.0 million.

98.     The Debtors pay franchise taxes and de minimis costs related license fees to certain of the Taxing Authorities to maintain the right to operate their business in the relevant taxing jurisdictions (collectively, the "Franchise Taxes").  The Debtors estimate that the aggregate amount of prepetition Franchise Taxes owing to the Taxing Authorities is approximately $1 million.

99.     In the ordinary course of business, the Debtors pay (a) certain taxes and fees owing to federal and state Taxing Authorities (collectively, the "Reclamation Taxes"), the proceeds of which are used to reclaim abandoned mine sites and (b) various fees, penalties and assessments to governmental authorities in connection with the Debtors' obligations to comply with environmental, health and safety laws and regulations (together with the Reclamation Taxes, the "Environmental and Safety Charges").  The Debtors estimate that the aggregate amount of Environmental and Safety Charges owing to the Taxing Authorities as of the Petition Date is approximately $12.3 million.

100.     The Debtors seek the entry of interim and final orders allowing them, in their reasonable discretion, to pay the Prepetition Taxes to the Taxing Authorities, including all Prepetition Taxes subsequently determined upon audit to be owed for periods prior to the Petition Date.  The Debtors believe they have ample business justifications to pay the Prepetition Taxes because it is my understanding that:  (a) certain of the Prepetition Taxes may constitute secured or priority claims, so their payment will not prejudice general unsecured creditors;

(b)  certain of the Prepetition Taxes, such as the Sales and Use Taxes, do not constitute property

of the Debtors' chapter 11 estates because they are "trust fund taxes" held by the Debtors in trust

for the benefit of those third parties to whom payment is owed or on behalf of whom such

payment is being made; (c) the failure to pay certain of the Prepetition Taxes may impact the

Debtors' ability to conduct business in certain jurisdictions; (d) Taxing Authorities may impose

personal liability on responsible officers or directors of the Debtors for the failure to pay certain

Prepetition Taxes; and (e) liability for certain unpaid Prepetition Taxes levied in Wyoming may

be asserted against the Debtors' customers.  Therefore, to prevent immediate and irreparable

harm that would result from such disruptions and distractions, the Debtors seek authority to pay

these claims.

101.    Surety Bonds:  In the ordinary course of the Debtors' businesses and on a

regular basis, the Debtors are required to provide surety bonds to third-parties and governmental

authorities.  The Debtors provide these surety bonds to these entities on a regular basis pursuant

to their Surety Bond Program.

102.    As noted above, the Debtors use their Surety Bond Program to satisfy, among

other things, their Reclamation Obligations.  As of the Petition Date, pursuant to their Self-

Bonding Privileges, the Debtors had approximately $1.15 billion of self-bonding in place for

Reclamation Obligations – the majority of which, approximately $728 million, relates to the

Debtors' operations in Wyoming.  As of the Petition Date, the Debtors' outstanding self-bonding

obligations were still in place.

103.    Additionally, as of the Petition Date, the Debtors had approximately

$538 million in outstanding Third-Party Surety Bonds.  Approximately $337 million in

aggregate amount of these Third-Party Surety Bonds relate to the Debtors' Reclamation

Obligations.  The remainder of the Third-Party Surety Bonds includes, but is not limited to, workers' compensation bonds, road bonds, prospecting bonds and lease bonds.

104.     It is essential to the Debtors' operations that they maintain their Surety Bond Program on an ongoing and uninterrupted basis.  The non-payment of obligations under the Surety Bond Program could result in one or more of the surety bond Issuers attempting to terminate, declining to renew or refusing to enter into Third-Party Surety Bonds with the Debtors in the future.  If any Surety Bonds lapse without renewal, or if the Debtors are unable to self-bond or obtain new Third-Party Surety Bonds for certain purposes, the Debtors could default on various obligations, which could severely disrupt the Debtors' operations and impair the Debtors' prospects for a successful reorganization.  Moreover, it could (a) cause the Debtors to be in violation of applicable law, (b) prevent them from continuing mining operations and (c) disrupt the provision of benefits to their employees, among other things.  Furthermore, the Debtors may need additional bonding capacity not currently provided under the Surety Bond Program to provide the financial assurances to third parties that are required for the Debtors to continue business operations during these chapter 11 cases.  The inability to secure a surety bond may require the Debtors to purchase insurance coverage at greater expense to the Debtors' estates.

105.     Although I believe that the Debtors may continue their Surety Bond Program postpetition in the ordinary course of their businesses, the Debtors seek an order assuring issuers and third parties of the Debtors' immediate authority to maintain, continue and renew their Surety Bond Program without interruption and in accordance with the same practices and procedures employed before the Petition Date, including the performance of Indemnity Agreements and the maintenance of collateral to support their Surety Bonds.  The Debtors seek to (a) eliminate any doubt on the part of any party with respect to the Debtors' authority to

continue such programs and (b) encourage issuers not to attempt to terminate or decline to renew the Third-Party Surety Bonds, or refuse to enter into Third-Party Surety Bonds with the Debtors in the future.  The Debtors also request that the Court authorize the Debtors to perform all other actions necessary to implement the relief requested, including, but not limited to, effecting postpetition fund transfers in replacement of any fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Surety Bond Program.

106.    <u>Adequate Assurance of Payment of Utilities</u>:  The Debtors currently use electric, natural gas, water, sewer, waste removal, telecommunications and other similar services provided by approximately 50 different Utility Companies.  The Debtors estimate that their average monthly obligations to the Utility Companies on account of services rendered total approximately $5.8 million.  Uninterrupted utility service is essential to the Debtors' ongoing operations, as well as the safety thereof, and is thus key to preserving value for all interested stakeholders.  The Debtors would not be able to operate their mines and coal processing facilities in the absence of continuous utility service.  Should any Utility Company refuse or discontinue service, even for a brief period, the affected mine or facility would be forced to stand idle. The temporary or permanent discontinuation of utility services at any of the Debtors' mines or other facilities could irreparably harm the Debtors' businesses and the value of the Debtors' estates.  The Debtors intend to pay any postpetition obligations to the Utility Companies in a timely fashion and in the ordinary course, as they have substantially done prior to the Petition Date.

107.    I understand that, under the Bankruptcy Code, a utility may alter, refuse or discontinue a chapter 11 debtor's utility service if the utility does not receive from the debtor or

the trustee adequate "assurance of payment" within 30 days of the Petition Date.  To comply with the requirements of section 366 of the Bankruptcy Code, the Debtors seek an order of this Court authorizing them to provide adequate assurance by depositing approximately $1.3 million into a segregated, interest bearing account within ten days of the Petition Date.  This deposit would remain in such an account for the duration of these chapter 11 cases and be applied to any postpetition defaults in payment to any Utility Company.  This Adequate Assurance Deposit equals the approximate cost of two weeks' worth of utility expenses, based on the historical average during calendar year 2015 and is net of any prepetition deposits, letters of credit, surety bonds or other similar forms of adequate assurance already provided to Utility Companies.  In addition, if any Utility Company believes additional assurance is required, it may request such assurance, pursuant to specific procedures set forth in the motion.

108.     Vendor Comfort:  In connection with the ordinary course of operations, the Debtors rely on numerous vendors, suppliers and service providers to provide the Debtors with, among other things, mining equipment and replacement parts, diesel fuel, ammonium-nitrate and emulsion-based explosives, off-the-road tires, steel-related products and electricity – each an integral component of the Debtors' ongoing and regular operations.  The Debtors will, therefore, seek an order, among other things, authorizing the Debtors to satisfy such obligations in the ordinary course of their businesses.

109.     Coal Contracts:  Sales of coal to customers, particularly sales transacted through coal sale contracts ("Coal Sale Contracts"), are the primary source of revenue for the Debtors and accounted for the vast majority of the Debtors' 2015 revenues.  The Debtors routinely sell substantially all of their coal pursuant to the terms of Coal Sale Contracts.  In the ordinary course of their business, the Debtors are routinely and continually in the process of

negotiating, renegotiating, executing and performing under numerous Coal Sale Contracts, which are central to the Debtors' business operations.  As of the Petition Date, the Debtors had approximately 150 open Coal Sale Contracts.  Continuing to enter into and perform under Coal Sale Contracts is necessary to prevent potential immediate and irreparable harm to the Debtors' businesses, as further described in the relevant motion.

110.    Although the Debtors generate the overwhelming majority of coal sales from coal produced at their mining complexes, the Debtors also purchase a portion of the coal they sell from third parties (the "Coal Purchase Contracts" and, together with Coal Sale Contracts, the "Coal Contracts").  Coal purchasers enable the Debtors, among other things, to address occasional shortfalls in production and otherwise satisfy the requirements of certain Coal Sale Contracts, including through blending of different qualities of coal.  Accordingly, although the Debtors do not use Coal Purchase Contracts to obtain much of the coal they ultimately sell, Coal Purchase Contracts still constitute an important part of the Debtors' businesses.

111.    I understand that the Debtors may continue to enter into, negotiate and perform under Coal Contracts in the ordinary course of their business.  Nonetheless, the Debtors believe that counterparties to the Coal Contracts may be uncertain of the effect of the Debtors' chapter 11 cases on the Coal Contracts and may, therefore, perceive a risk that the Debtors lack authority to enter into and perform under them.  This uncertainty may deter parties from entering into or negotiating Coal Contracts, which would threaten to impair the Debtors' operations and ultimately undermine the value of the Debtors' estates.  Such uncertainty could create an advantage for the Debtors' competitors and severely harm the Debtors' prospects for a successful reorganization.

112.        Given that the Debtors constantly negotiate, enter into and perform under Coal

Contracts, it would be impracticable, administratively burdensome and costly for the Debtors to

seek Court approval with respect to each separate Coal Sale Contract transaction.  Moreover,

having to seek Court approval of every transaction involving a Coal Contract likely would put

the Debtors at a competitive disadvantage and potentially cause them to lose sales opportunities.

The requested relief, therefore, will allow the Debtors to take advantage of coal sale

opportunities as they arise, thus maintaining the Debtors' competitive position within their

industry and maximizing the value of the estates.  Additionally, the Debtors seek immediate

relief because customers take certain actions in reliance on the Debtors' performance under the

Coal Contracts, including, for example, arranging for the receipt and transport of purchased coal

by railcar at the Debtors' mines.  Therefore, the Debtors must continue to arrange and

consummate coal shipments and perform other actions under the Coal Contracts without delay to

avoid disrupting their business operations going forward.  Due to customer reliance and the

planning required to enter into and perform under Coal Contracts, the Debtors seek the

immediate entry of an order confirming their authority to enter into and perform under Coal

Contracts.

C.      Cash Management and Financial Pleadings

113.        Cash Management:  As mentioned above, PEC is the direct or indirect parent

of each of the other Debtors.  The Debtors and their non-debtor affiliates utilize a consolidated

cash management system (the "Cash Management System") to collect, contribute, manage and

disburse funds used in the Debtors' businesses and provide a system by which the Debtors can

accurately record all transactions made.

114.     As of the Petition Date, the Debtors maintained approximately 70 domestic

accounts and one foreign bank account in the ordinary course of their business including:

(a) depository accounts; (b) concentration accounts; (c) investment accounts; and

(d) disbursement accounts.  The Cash Management System is further described, in detail, in the

relevant motion.

115.     The Cash Management System provides significant benefits to the Debtors'

estates including, among other things, the ability to: (a) control and monitor corporate funds;

(b) invest idle cash; (c) ensure the maximum availability of funds when and where necessary;

and (d) reduce costs and administrative expenses by facilitating the movement of funds and the

development of timely and accurate account balance and presentment information.  The smooth

operation of the Debtors' businesses requires the continuation of the Cash Management System

during the pendency of these chapter 11 cases.  Moreover, as a practical matter, it would be

difficult, expensive, disruptive and administratively burdensome to require the Debtors to close

all of their existing bank accounts and open new, segmented debtor-in-possession bank accounts

for each Debtor entity at the very outset of these chapter 11 cases as required by the operating

guidelines promulgated by the Office of the United States Trustee.  Preserving a "business as

usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated

with any substantial disruption of the Cash Management System will (a) facilitate the Debtors'

stabilization of their postpetition operations and (b) maximize value for stakeholders by allowing

the Debtors to continue their operations without disruption.

116.     Thus, under the circumstances, maintaining the existing Cash Management

System (as modified consistent with the DIP Financing) is not only essential, but is in the best

interest of creditors and other parties in interest.  The Debtors therefore will request authority for

the continued use of (a) their current Cash Management System, (b) certain of their existing bank accounts (as well as authorization for the Debtors to open and close bank accounts (including as necessary or appropriate in connection with the DIP Facility)) and (c) their business forms. Further, the Debtors will seek authority to continue investing their cash reserves pursuant to their Investment Policy. The Debtors also will seek authorization from the Court for the banks involved in the Debtors' Cash Management System to honor certain transfers and charge certain bank fees and other amounts as further described in the motion.

117.    Last, the Debtors will seek authority to continue engaging in certain intercompany transactions (as more fully discussed in the motion) ("Intercompany Transactions") through the Debtors' Cash Management System, and certain other relief related thereto. Prior to the Petition Date, in the ordinary course of their businesses, the Debtors engaged in Intercompany Transactions with (a) other Debtors (the "Inter-Debtor Transactions") and (b) non-Debtor affiliates (the "Inter-Affiliate Transactions"). The Inter-Debtor Transactions include, among other things: (a) the leasing of equipment from one Debtor to another and (b) inter-Debtor coal sale transactions to facilitate the Debtors' sale of coal to third parties. The Inter-Affiliate Transactions include, among other things: (a) the Debtors' transactions with Sterling (the Debtors' captive insurance company) that allow certain of the Debtors' insurance programs to function and (b) the Debtors' provision of certain "shared services" to certain non-Debtor affiliates.

118.    Continuation of the Intercompany Transactions is necessary due to the complex corporate structure of the Debtors and is accordingly in the best interests of the Debtors' respective estates and creditors. Any discontinuation of the Intercompany Transactions would be detrimental to the Debtors' estates because the Debtors are dependent upon each other for goods,

services and funding for their operations.  The Debtors will continue to maintain records as they did prior to the Petition Date such that Intercompany Transaction can be properly accounted for if and as necessary.  To ensure that each individual Debtor will not, at the expense of its particular creditors, fund the operations of another Debtor, the Debtors request that the Court grant super-priority administrative expense status to all postpetition claims arising from Inter-Debtor Transactions and permit the Debtors to reconcile and set off any mutual prepetition obligations between Debtors arising from Intercompany Transactions through the Cash Management System.

119.     DIP Financing and Cash Collateral:  The development and implementation of the Debtors' business plan that will serve as the basis for the plan of reorganization requires time and funding.  Given the significant cash costs associated with the Debtors' businesses, and in consultation with their financial advisors, the Debtors have determined that they require access to both new capital and existing cash collateral ("Cash Collateral") to provide such time and resources, conduct their business operations, achieve their restructuring goals and maximize value of their estates.

120.     Further, in consultation with their financial advisors, the Debtors have concluded that (a) the short term volatility prevailing in the market made it prudent to lock in adequate financing at the outset of the Debtors' restructuring process (if an appropriate financing facility and agreed use of Cash Collateral could be obtained) and (b) incurring short term cash losses without the assurance of such financing would be imprudent.  In further consultation with their advisors, the Debtors determined that a delay in obtaining financing could subject them to unnecessary risk that necessary financing on favorable terms (or at all) would be unavailable at a future date, thus undermining the Debtors' ability to successfully restructure.

121.     The Debtors therefore have negotiated and are seeking authority to enter into debtor-in-possession credit facilities, as described in the relevant Motion, that will provide postpetition financing (the "DIP Financing") in the form of:  (a) a $500 million term loan facility to provide new liquidity to the Debtors for business needs; (b) a $100 million letter of credit accommodation facility; and (c) an accommodation facility for Bonding Requests[21] in the form of (or any combination of) (i) a carve-out from the Collateral with superpriority claim status, subject only to the Fees Carve-Out, entitling the authority to make any Bonding Request to receive proceeds of Collateral first in priority before distribution to any DIP Lender or other prepetition secured creditor (the "Bonding Carve-Out"), and/or (ii) the issuance of letters of credit under the DIP Financing secured by the Cash Collateral (the "Bonding Facility Letters of Credit" and, together with the Bonding Carve Out, the "Bonding Accommodation") in an aggregate stated amount (the "Bonding Accommodation Cap") of up to $200 million.  In conjunction with the proposed DIP Financing, the Debtors also will obtain consensual use of certain cash collateral of the First Lien Credit Agreement Lenders and the Second Lien Noteholders.

122.     Through the DIP Financing and the use of Cash Collateral, the Debtors will have access to the necessary funding to (a) continue the day-to-day operations of their businesses, (b) comply with regulatory obligations, (c) develop and implement a long term business plan and (d) properly fund these chapter 11 cases through a successful restructuring.  Securing the DIP Financing with the support of Prepetition First Lien Lenders also will send a strong and positive

---

[21]     "Bonding Requests" means any demand, request or requirement of any Governmental Authority for any surety bond, letter of credit or other financial assurance pursuant to any Mining Law, Reclamation Law or Environmental Law, or any related Permit, in each case, to the extent such surety bond, letter of credit or other financial assurance is to satisfy or replace an obligation for which the Borrower or any of its Restricted Subsidiaries (with respect to operations in the United States) is self-bonded as of the Closing Date.

message to the Debtors' employees, regulators and business partners that the Debtors believe will
benefit their businesses.  For example, the DIP Financing will provide comfort to the Debtors'
vendors, suppliers, customers and employees that the Debtors will be able to continue to meet
their commitments during these cases.  Likewise, the proposed DIP Financing will help provide
governmental agencies with confidence that the Debtors have funding for their reclamation and
similar obligations.

123.    The DIP Financing, including the consensual use of Cash Collateral, provides
the Debtors with their best opportunity to maintain their current operations and implement a
successful restructuring for the benefit of their creditors.  In light of the Debtors' overall
circumstances, the Debtors believe that they could not obtain postpetition financing from another
lending source on terms equal or superior to the DIP Financing.

124.    For all of these reasons, the Debtors' decision to enter into the DIP Financing
is a sound exercise of their business judgment.

125.    Securitization Facility:  The Debtors seek entry of interim and final orders
(a) authorizing certain of the Debtors to enter into the amendments negotiated between the
Debtors and the Administrator (the "Amendments") and assume, amend and continue to perform
under the amended purchase agreement (the "Amended Purchase Agreements") that govern the
Debtors' Securitization Facility, (b) granting superpriority claims (the "Superpriority Claims"),
subject only to the DIP Superpriority Claims (which shall be pari passu with the Superpriority
Claims), the Fees Carve-Out and the Bonding Carve-Out, in favor of P&L Receivables, the
Administrator and the Securitization Purchasers with respect to certain of Debtors'
indemnification obligations (and a performance guarantee by the certain of the Debtors) under
the Securitization Facility, (c) granting security interests and liens on the Receivables to be sold

on or after the Petition Date in favor of the Administrator and the Securitization Purchasers to the extent any transfer of such Receivables is subsequently avoided or recharacterized as an extension of credit or a pledge rather than an absolute sale (the "Liens"), (d) modifying the automatic stay to permit certain setoff and netting transactions contemplated under the Securitization Facility and (e) granting certain other related relief.

126.     The relief requested in this motion is being sought in connection with, and as a condition to, the Administrator's and Securitization Purchasers' agreement to enter into the Amendments.  Based on my knowledge of the Debtors' businesses and ongoing efforts to maintain value-maximizing financing arrangements, I believe that the Securitization Facility is the Debtors' most efficient and cost-effective means of issuing and maintaining other methods of providing necessary letters of credit to counterparties.  For example, fully collateralizing letters of credit would likely prove more expensive than maintaining and renewing the letters of credit that currently have been issued under the Securitization Facility.  Thus, the relief sought in connection with maintaining the Securitization Facility, including, among other things, approval of the Superpriority Claims and the Liens, is necessary to preserve the Securitization Facility and avoid disruption to the Debtors' business operations.

127.     Further, it is my experience that the Administrator, the Securitization Purchasers, P&L Receivables and the Debtors have all acted in good faith in conducting the purchases and sales of Receivables, the issuance of letters of credit and the other transactions consummated under the Securitization Facility.

128.     I believe that the relief requested concerning the Securitization Facility is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and

constitutes a critical element in achieving a successful and smooth transition to chapter 11.

Accordingly, on behalf of the Debtors, I respectfully submit that this motion should be granted.

129.　　　　Sealing Motions:  The Debtors seek entry of orders authorizing the Debtors to

file under seal certain Letter Agreements for each of the Banks and Citi, setting forth fees and

other costs associated with the Receivables Purchase Agreement and the Debtors' proposed

accounts receivable securitization program, and the DIP Financing, respectively, directing that

the Letter Agreements shall remain under seal and confidential and not be made available to

anyone without: (a) the consent of the Debtors and the Banks; (b) the consent of the Debtors and

Citi; or (c) further order from the Court (after notice and hearing), in each case, under

appropriate confidentiality agreements reasonably satisfactory to the parties.

130.　　　　The Letter Agreements contain commercially sensitive information that merits

protection under section 107(b)(1) of the Bankruptcy Code and require the confidentiality of the

fees therein. As is customary in the finance industry, the Banks and Citi treat this information as

highly sensitive and confidential.  Such information is rarely disclosed to the public or made

available to competitor financial institutions.

131.　　　　I believe that the relief requested in the Sealing Motions are in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on

behalf of the Debtors, I respectfully submit that the Sealing Motions should be granted.

　　　　　　　I, Amy B. Schwetz, the undersigned Executive Vice President and Chief Financial

Officer of PEC, declare under penalty of perjury that the foregoing is true and correct.

Dated: April 13, 2016
St. Louis, Missouri

/s/ Amy B. Schwetz_____
Amy B. Schwetz
Executive Vice President and Chief Financial
Officer of Peabody Energy Corporation

## ANNEX A



Peabody Energy Corporation (1000)
Peabody Investments Corp. (1001)
Peabody COALSALES, LLC (1500)
COALSALES II, LLC (1501)
Peabody Energy Solutions, Inc. (1505)
Peabody International Investments, Inc. (1006)
10%
90%
Peabody Holdings (Gibraltar) Limited (5200)
Peabody IC Holdings, LLC (1004)
Peabody COALTRADE, LLC (1502)
Peabody International Services, Inc. (1005)
Peabody IC Funding Corp. (1003)
Peabody COALTRADE International (CTI), LLC (1503)
Peabody Employment Services, LLC (5204)
Highwall Mining Services Company (1910)
Pacific Export Resources, LLC (1510)
Marigold Electricity, LLC (1614)
Four Star Holdings, LLC (1060)
- Southwest Coal Holdings, LLC
- New Mexico Coal Resources, LLC (1440)
- El Segundo Coal Company, LLC (1444)
- Gallo Finance Company, LLC (1442)
- Peabody New Mexico Services, LLC (1445)
- NM Equipment Company, LLC
- Peabody America, LLC (1443)
- Peabody Natural Resources (1446)
- American Land Holdings of New Mexico, LLC
- Peabody Southwestern Coal Company, LLC
- Peabody Colorado Operations, LLC (1420)
- Peabody Colorado Services (1431)
- Peabody Rocky Mountain Services, LLC (1429)
- Peabody Rocky Mountain Management Services, LLC (1430)
- Sage Creek Holdings, LLC (1666)
- Twentymile Coal Company, LLC (1422)
- Twentymile Equipment Company, LLC
- Seneca Property, LLC
- Hayden Gulch Terminal, LLC (1426)
- Peabody Williams Fork Mining, LLC (1427)
- Colorado Yampa Coal Company, LLC (1423)
- Juniper Coal Company, LLC (1602)
- Moffat County Mining, LLC (1424)
- Twentymile Holdings, LLC (1190)
- Peabody Twentymile Mining, LLC (1432)
- Peabody Sage Creek Mining, LLC (1428)
PEC Equipment Company, LLC (1920)
- Francisco Equipment Company, LLC
- Wild Boar Equipment Company, LLC
American Land Development, LLC (1600)
- American Land Holdings of Colorado, LLC (1664)
- Empire Land Holding, LLC (1668)
- Sage Creek Land and Reserves, LLC (1191)
- Peabody Trout Creek Reservoir, LLC (1667)
- Cottonwood Land Company (1605)
- Coal Reserve Holding, Limited Liability Company No. 1 (1606) (99.1%)
- American Land Holdings of Illinois, LLC (1610)
- Hillside Recreational Lands, LLC ( 1626)
- Central States Coal Reserves of IL, LLC (1641)
- Century Mineral Resources, Inc. (1613)
- Illinois Land Holdings, LLC (1612)
- Midwest Coal Reserves of Illinois, LLC (1611)
- American Land Holdings of Indiana, LLC (1615)
- Midwest Coal Reserves of Indiana, LLC (1616)
- Central States Coal Reserves of IN, LLC (1642)
- Francisco Land Holdings Company
- Wild Boar Land Holdings Company, LLC
- Cyprus Creek Land Company (1607)
- Peabody Recreational Lands, LCC (1625)
- Dyson Creek Coal Company, LLC (1601)
- American Land Holdings of West Virginia, LLC (1651)
- Cyprus Creek Land Resources, LLC (1635)
- Pond River Land Company (1608)
- Independence Material Handling, LLC (1604)
- American Land Holdings of Kentucky, LLC (1620)
- Midwest Coal Reserves of Kentucky, LLC (1621)
- Peabody-Waterside Development, LLC (1630)
Peabody Holding Company, LLC (1020)
- Peabody Venezuela Corp. (1085)
- Peabody Terminal Holding Company, LLC (1144)
- Peabody Terminals, LLC (1145)
- James River Coal Terminal, LLC (1146)(96.9%)
- Midco Supply and Equipment Corporation (1090)
- Peabody Western Coal Company (1460)
- Kayenta Mobile Home Park, Inc. (1461)
- Peabody Development Company, LLC (1640)
- Big Sky Coal Company (1412)
Gold Fields Mining, LLC (1080)
- Arid Operations, Inc. (1081)
- Gold Fields Chile, LLC (1082)
- PG Investments Six, LLC
- Gold Fields Ortiz, LLC (1083)
Peabody Natural Gas, LLC (1650)
- Peabody Wyoming Gas, LLC (1765)
- Peabody Southwest, LLC (1653)
Peabody Venture Fund, LLC (1800)
- Peabody PowerTree Investments, LLC (1830)
HMC Mining LLC (1911)
Peabody Services Holdings, LLC (1930)
- Peabody Midwest Services, LLC (1259)
- Peabody Bear Run Services, LLC (1252)
- Peabody Illinois Services, LLC (1254)
- Peabody Wild Boar Services, LLC (1256)
- Peabody Gateway Services, LLC (1253)
- Peabody Indiana Services, LLC (1255)
- Peabody Midwest Management Services, LLC (1257)
- Conservancy Resources, LLC (1652)
- Peabody Wyoming Services, LLC (1410)
- Peabody Powder River Services, LLC (1404)
Peabody Operations Holding, LLC (1030)
- Peabody Midwest Operations LLC (1200)
- Black Hills Mining Company, LLC (1290)
- Caseyville Dock Company (1622)
- Dyson Creek Mining Company, LLC (1213)
- Point Pleasant Dock Company, LLC (1295)
- Peabody Bear Run Mining, LLC (1227)
- Peabody Wild Boar Mining, LLC (1228)
- Big Ridge, Inc. (1226)
- Riverview Terminal Company (1275)
- Midwest Coal Acquisition Corp. (1270)
- Peabody Coulterville Mining Inc, LLC (1271)
- Peabody Gateway North Mining, LLC (1272)
- Peabody Midwest Mining, LLC (1220)
- Peabody Arclar Mining, LLC (1221)
- Falcon Coal Company, LLC (1222)
- Sugar Camp Properties, LLC (1223)
- Francisco Mining, LLC
- United Minerals Company, LLC (1224)
- Kentucky United Coal, LLC (1225)
- Shoshone Coal Corporation (1425)
- Seneca Coal Company, LLC (1421)
- Peabody Powder River Operations, LLC (1400)
- West Roundup Resources, LLC (1401)
- Peabody School Creek Mining, LLC (1403)
- BTU Western Resources, Inc. (1402)
- School Creek Coal Resources, LLC (1660)
- Peabody Caballo Mining, LLC (1414)
- Peabody Powder River Mining, LLC (1413)
Peabody Mongolia, LLC (4200)
Peabody China, LLC (4100)
Peabody Archveyor, LLC
Porcupine Transportation, LLC
Porcupine Production, LLC
Peabody Electricity, LLC (1700)
- Caballo Grande, LLC (1780)
- Peabody Cardinal Gasification, LLC (1760)
- Mustang Energy Company, LLC (1740)
- Peabody Asset Holdings, LLC (1741)
- Kentucky Syngas, LLC (1770)
- Lively Grove Energy, LLC (1726)
- Lively Grove Energy Partners, LLC (1725)
- Star Lake Energy Company, LLC (1705)
- Thoroughbred Mining Company, LLC (1735)
- Peabody Magnolia Grove Holdings, LLC
- Peabody Energy Generation Holding Company (1710)
- Thoroughbred Generating Company, LLC (1730)
- Peabody Energy Investments, Inc

## ANNEX B

**INSTITUTIONAL DEBT STRUCTURE AS OF THE PETITION DATE**

| DESCRIPTION OF DEBT | AMOUNT |
|---|---|
| **I.  Secured Debt** | |
| Revolving Credit Facility | $1.65 billion |
| Term Loan Facility | $1.2 billion |
| Swap Obligations Under International Swaps and Derivatives Association Master Agreements | $1.1 billion (foreign currency) $271 million (fuel) (both approximate notional amounts)[22] |
| 10.00% Senior Secured Second Lien Notes Due 2022 | $1.0 billion |
| **SECURED DEBT TOTAL** | **$4.3 billion** |
| **II.  Primary Unsecured Debt** | |
| 6.00% Senior Notes Due 2018 | $1.5 billion |
| 6.50% Senior Notes Due 2020 | $650 million |
| 6.25% Senior Notes Due 2021 | $1.3 billion |
| 7.875% Senior Notes Due 2026 | $250 million |
| Convertible Junior Subordinated Debentures Due 2066 | $732.5 million |
| Capital Lease and Certain Other Obligations | $22 million |
| **UNSECURED DEBT TOTAL** | **$4.5 billion** |
| **TOTAL INSTITUTIONAL DEBT** | **$8.8 billion** |

---

[22] Part of the $4.3 billion in secured indebtedness reflects the mark to market value rather than notional value of the debt.  As of April 11, 2016, the mark to market value was approximately $171 million for foreign currency and approximately $127.8 million for fuel.