# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>Debtors.[1] | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 345, 363(c)(1), 364, 503(b)(1) AND 553 OF THE BANKRUPTCY CODE, FOR INTERIM AND FINAL ORDERS:  (I) APPROVING THE CONTINUED USE OF THE DEBTORS' CASH MANAGEMENT SYSTEM, BANK ACCOUNTS AND BUSINESS FORMS; (II) GRANTING A WAIVER OF THE REQUIREMENTS OF SECTION 345(b) AND CERTAIN OF THE U.S. TRUSTEE'S OPERATING GUIDELINES; (III) PERMITTING CONTINUED INTERCOMPANY TRANSACTIONS; (IV) PRESERVING AND PERMITTING THE EXERCISE OF INTERCOMPANY SETOFF RIGHTS; AND (V) AUTHORIZING BANKS TO HONOR <u>CERTAIN TRANSFERS AND CHARGE CERTAIN FEES AND OTHER AMOUNTS</u>**

Peabody Energy Corporation ("<u>PEC</u>") and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby move this

Court, pursuant to sections 345, 363(c)(1), 364, 503(b)(1) and 553 of title of 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), for the entry of interim and final orders:

> (a)     Approving the Debtors' continued use of (i) their current cash management system, as it may be modified by any interim or final order approving the Debtors' continued use of cash collateral or proposed postpetition secured debtor in possession financing (the "<u>DIP Facility</u>"),[2] (ii) certain of their existing bank accounts (collectively, the "<u>Bank</u>

---

[1]     The Debtors are their employer identification numbers are listed on Schedule 1 attached hereto.  The addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

[2]     On the date hereof, the Debtors filed a motion seeking interim and final approval of the DIP Facility.

Accounts") (as well as authorizing the Debtors to open and close bank accounts, including as necessary or appropriate in connection with the DIP Facility) and (iii) their business forms, each as modified to the extent described herein;

(b)       Granting a waiver of the requirements of section 345(b) of the Bankruptcy Code and certain of the United States Trustee Guidelines (as defined below);

(c)       Permitting the Debtors to continue engaging in the Intercompany Transactions (as defined below) and granting super-priority administrative expense status to all postpetition claims arising from Inter-Debtor Transactions (as defined below) subject only to claims with a higher priority granted by (a) any interim or final order approving the Debtors' postpetition use of cash collateral or the DIP Facility and (b) any interim or final order approving continuation of the ARS Program (as defined below);

(d)       Permitting the Debtors to reconcile and set off any mutual prepetition and mutual postpetition obligations between Debtors arising from Intercompany Transactions through the cash management system described below; and

(e)       Authorizing all banks participating in the Debtors' cash management system to honor certain transfers provided that sufficient funds are available in the applicable accounts to cover such transfers and charge Bank Fees (as defined below) and certain other amounts.

In support thereof, the Debtors respectfully represent as follows:[3]

### Jurisdiction and Venue

1.        This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]        Copies of the proposed orders will be made available on the Debtors' case website at http://www.kccllc.net/peabody.

2

**Background**

2.        On April 13, 2016 (the "Petition Date"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy

Code.  The Debtors are authorized to continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

3.        Debtor PEC is a Delaware corporation headquartered in St. Louis,

Missouri.  PEC was incorporated in 1998 and became a public company in 2001.  Each of the

other Debtors is a wholly-owned direct or indirect subsidiary of PEC.

4.        PEC is the world's largest private-sector coal company (by volume), with

26 active coal mining operations located in the United States and Australia.  The Debtors'

domestic mines produce and sell thermal coal, which is primarily purchased by electricity

generators.  PEC's Australian operations mine both thermal and metallurgical coal, a majority of

which is exported to international customers.  As of December 31, 2015, Debtor PEC and its

subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and

approximately 500,000 acres of surface property through ownership and lease agreements.  In

the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons

of proven and probable coal reserves, and the Debtors generated sales of approximately 180

million tons of coal.  In addition to its mining operations, the Debtors market and broker coal

from other coal producers across the United States, Australia, Europe and Asia.

5.        The Debtors operate in a competitive and highly regulated industry that

has experienced strong headwinds and precipitously declining demand and pricing in recent

years due to the rise of low priced alternative energy sources – including an abundance of natural

3

gas. Combined with these factors, slowing global economic growth drove a wide range of goods prices lower in 2015 and resulted in the largest broad market decline since 1991. Indeed, demand from electric utilities in the United States alone declined approximately 110 million tons in 2015. These market conditions, in connection with lower realized pricing in the United States and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor subsidiaries' coal sales during 2015. As a result of these challenges, several large United States coal companies have filed for chapter 11 protection in recent years.

6.     A comprehensive description of the Debtors' businesses and operations, capital structure and the events leading to the commencement of these chapter 11 cases can be found in the Declaration of Amy Schwetz, Executive Vice President and Chief Financial Officer of Debtor PEC, in Support of First Day Motions of Debtors and Debtors in Possession (the "First Day Declaration"), which was filed contemporaneously herewith and is incorporated herein by reference.

**Facts Relevant to This Motion**

7.     As set forth in the First Day Declaration, PEC is the direct or indirect parent of each of the other Debtors and the Debtors' domestic and foreign non-debtor affiliates (collectively, the "Non-Debtor Affiliates" and, together with the Debtors, the "PEC Entities"). Accordingly, the Debtors are "affiliates" within the meaning of section 101(2) of the Bankruptcy Code. The Debtors, as affiliated entities, have historically used a centralized cash management system (as it may be modified, the "Cash Management System") in the day-to-day operation of their businesses. The Debtors make and receive thousands of payments per week, with several billions of dollars flowing through the Cash Management System annually. The Cash Management System provides a well-established mechanism for the collection, concentration,

4

management and disbursement of funds used in the Debtors' businesses and provides a system by which the Debtors can accurately record all transactions made.

        8.     In connection with the Cash Management System, as of the Petition Date, the Debtors maintained 71 domestic bank accounts and one foreign bank account in the ordinary course of their businesses, including concentration accounts, depository accounts, investment accounts, trust accounts and disbursement accounts (collectively, the "Bank Accounts"), through which the Debtors manage cash receipts and disbursements.  The principal components of the Cash Management System and the flow of funds through the Bank Accounts in that system, as they existed prior to the Petition Date, are described below.

***Deposits and Receivables***

        9.     In 2015, the Debtors received several billion dollars in payments from customers on account of coal sales and other revenue sources.  Payments are received from these sources via checks, cash, automated clearing house ("ACH"), electronic funds transfer and wire transfer.  The vast majority of these receipts flow through a Master Concentration account, with an account number ending in 7721 (the "Master Concentration Account"), maintained by Debtor PEC at Bank of America, N.A. ("Bank of America").  As set forth in greater detail below, the Debtors use the centralized Cash Management System to facilitate the flow of funds collected into the Master Concentration Account.  As of April 8, 2016, the balance in the Master Concentration Account was approximately $49 million.

        10.     Depository Accounts.  As of the Petition Date, the Cash Management System had six separate zero-balance lockbox accounts (collectively, the "ARS Lockbox Accounts"), which are used in connection with the Debtors' accounts receivable securitization

program (the "ARS Program").[4]  Each of the ARS Lockbox Accounts is held by Non-Debtor

Affiliate P&L Receivables Company, LLC ("P&L Receivables")[5] at PNC Bank, N.A. ("PNC

Bank").  The ARS Lockbox Accounts include (a) an account that receives the coal sale receipts

for sales originated by Debtor Peabody Coalsales, LLC ("Coalsales")[6] and (b) five other accounts

for certain coal sales receipts where the applicable counterparty has purchased coal from a

Debtor that is not Coalsales.

    11. Every day, receipts in the ARS Lockbox Accounts are automatically swept

into a restricted P&L Receivables account at PNC Bank, with an account number ending in 7101

(the "Collateral Account").[7]  As of April 8, 2016, the Collateral Account held a balance of

approximately $74.9 million securing obligations owed to the Securitization Purchasers (as such

term is defined in the ARS Motion).  To the extent that the funds held within the Collateral

Account exceed the effective capacity of the ARS Program, PNC Bank will release such excess

funds into the Debtors' Cash Management System, through which such funds are ultimately

transferred into the Master Concentration Account.[8]

---

[4] A detailed description of the ARS Program can be found in the Motion of the Debtors and Debtors in
Possession, Pursuant to Sections 105, 362(d), 363(b)(l), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(d), 364(e)
and 365 of the Bankruptcy Code for Entry of Interim and Final Orders:  (I) Authorizing Certain Debtors to
Continue Selling and Contributing Receivables and Related Rights Pursuant to a Securitization Facility;
(II) Modifying the Automatic Stay; and (III) Granting Related Relief (the "ARS Motion"), filed
substantially contemporaneously herewith.  Pursuant to the ARS Motion, the Debtors seek authority to
maintain the ARS Program on a postpetition basis.

[5] P&L Receivables is a bankruptcy-remote special purpose entity established under the laws of Delaware.

[6] The vast majority of the Debtors' coal sales occur through Coalsales.  As a result, this account receives the
majority of the Debtors' coal sale receipts.

[7] P&L Receivables also maintains an account at Bank of America, with account number ending 7763, from
which various ARS Program-related transfers are made (e.g., payments in respect of borrowings under the
ARS Program).

[8] The funds released from the Collateral Account are transferred into the Master Concentration Account after
passing (a) through an account held by P&L Receivables at PNC Bank, with account number ending in
6361 and then (b) through an account held by PEC at PNC Bank, with account number ending in 5539 (the

12.    In addition to the ARS Lockbox Accounts, the Debtors maintain six

miscellaneous receipt accounts (the "Miscellaneous Receipt Accounts") at PNC Bank, which

receive receipts from third parties that are not related to the ARS Program, such as, among other

things, non-securitized proceeds from the Debtors' coal brokerage operations.[9]  Funds received

into these Miscellaneous Receipt Accounts are transferred into the 5539 Account.  These

amounts are then transferred into the Master Concentration Account.[10]  Additionally, in certain

circumstances, third parties may pay funds directly into the Master Concentration Account.

***Disbursements and Payables***

13.    Payroll.  The Debtors administer their own payroll[11] and make the vast

majority (approximately 98%) of employee payroll payments via ACH transfer.  The Debtors

make their remaining employee payroll payments by check from one of the Payroll Accounts

---

(continued…)

"5539 Account").  The Debtors also engage in various Inter-Debtor Transactions to allow the ARS Program to function (the "Receivables Transactions").  Specifically, in accordance with the ARS Program, certain Debtors that generate receivables sell those receivables to PEC, and PEC contributes those receivables to P&L Receivables.  Later, to repay the receivable-generating Debtors for their initial sale of the receivables, PEC will transfer funds into one of six accounts maintained by those Debtors at Bank of America.  Such funds are ultimately swept out of those accounts and back into the Cash Management System, through the Master Disbursement Account (as defined below).

[9]    Although one of the Miscellaneous Receipt Accounts is maintained in the name of "Lee Ranch Coal Company," this account is actually maintained by Debtor Peabody Natural Resources Company ("Natural Resources") at PNC Bank, with account number ending in 1439.  The name "Lee Ranch Coal Company" is a tradename used by Debtor Natural Resources.

[10]    The Debtors also manage a non-Debtor lockbox receivables account at PNC Bank related to Springfield Coal Company, from which funds are, at various times, transferred into the Debtors' Cash Management System.

[11]    Although the Debtors do not employ a payroll administrator, the Debtors do employ Ceridian HCM, Inc. ("Ceridian"), which provides the Debtors with payroll tax administration and certain payment services.

7

(defined below).[12]  Payroll is funded by amounts transferred from the Master Concentration Account, through a PEC account held at U.S. Bank, N.A. ("U.S. Bank"), with account number 0672, and ultimately into three separate zero-balance payroll accounts maintained at U.S. Bank (the "Payroll Accounts").  Two of the Payroll Accounts are maintained by Debtor Peabody Investments Corp. ("PIC").  The third Payroll Account is maintained by Debtor Peabody Western Coal Company.

14.     The Debtors also make transfers to Ceridian from the Master Disbursement Account (as defined below) for the purposes of paying, among other things, certain employee-related obligations, such as employee-related taxes and wage garnishments.[13]

15.     Operating / Disbursement Accounts.  Debtor PIC maintains the Debtors' master disbursement account at Bank of America, with account number ending in 7747 (the "Master Disbursement Account").  The Master Disbursement Account funds substantially all of Debtors' ordinary course domestic operations through wire and ACH transfers. Approximately $4.0 billion was disbursed from the Master Disbursement Account during 2015. The Debtors may also make disbursements to certain third parties from the Master Concentration Account.

---

[12]     Most of the Debtors' employees that receive payment by check are employed in the states of Wyoming and Arizona.

[13]     These types of payments are also discussed in the Motion of Debtors and Debtors in Possession for an Order:  (I) Authorizing Payment of Prepetition Employee Wages and Benefits; (II) Authorizing Payment and Continuation of Certain Postpetition Employee Wages and Benefits; (III) Authorizing Payment of Costs and Expenses Incident to the Foregoing; (IV) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (V) Granting Other Related Relief (the "Employee Motion"), filed substantially contemporaneously herewith.  Additionally, from time to time the Debtors make payments to an account in connection with the Wyoming Quality Health Center.  The Debtors' involvement with the Wyoming Quality Health Center is discussed in further detail in the Employee Motion.

8

16.    The Debtors maintain 12 other stand-alone operating accounts for various discrete purposes (collectively with the Master Disbursement Account, the "Operating Accounts").  Debtor PIC maintains the following two operating accounts at Bank of America: (a) an account ending in 5431 that is primarily used for disbursing funds to vendors via check and (b) an account ending in 7734 that is a zero-balance account primarily used to pay taxes and royalties owed to government entities.

17.    Debtor PEC maintains the following three other operating accounts:  (a) a deposit account at HSBC that is used to pay HSBC for certain peer-to-peer services that HSBC provides to the Debtors and generally has infrequent activity (the "PEC HSBC Account"); (b) an account with Morgan Stanley, which PEC has used for the purposes of repurchasing PEC's publicly traded debt and equity from time to time (the "Securities Repurchase Account") and (c) a foreign account at HSBC (London), which is primarily used for distributing funds in pounds sterling (the "GBP Account").  As of April 8, 2016, approximately $400,000 was deposited in the GBP Account and during 2015, the GBP Account made one disbursement of £13,490, which disbursement was made to the Master Concentration Account.  The GBP Account is used sparingly.

18.    Debtor Four Star Holdings, LLC ("Four Star Holdings") maintains the following two accounts that were both established for the purposes of facilitating a specific asset sale transaction:  (a) an account at Regions Bank with account number ending in 9985 and (b) an account at Bank of America with account number ending in 0949.

19.    Debtor Gold Fields Mining, LLC ("Gold Fields") maintains one operating account at Bank of America, with account number ending in 7750, which Gold Fields primarily uses to pay certain environmental liability obligations.  Debtor Peabody International Services,

Inc. maintains an account at Bank of America, with account number ending in 2615, which is primarily used to fund obligations to the Debtors' employees that currently are located in foreign countries.

20.     Debtor Peabody Natural Gas, LLC maintains an operating account at Bank of America, with account number ending in 4219, although this account usually has minimal activity.  Debtor Peabody Asset Holdings, LLC maintains an account at Bank of America, which is primarily used to receive payments in connection with certain sales of the Debtors' real property.

21.     Finally, Debtor Peabody Holdings (Gibraltar) Limited maintains an operating account, with account number ending 8465 (the "Gibraltar Account") at Bank of America, which was opened in connection with the Debtors' acquisition of Non-Debtor Affiliate PEA-PCI (formerly Macarthur Coal Limited).  The Gibraltar Account has been used in the past to transfer cash between certain affiliated entities without using "flow of funds" agreements; as of April 7, 2016, the Gibraltar Account held $2.5 million.

22.     Purchasing Card Program.  The Debtors maintain an account at Wells Fargo Bank, N.A. ("Wells Fargo") that was opened in connection with their purchasing card program (the "Purchasing Card Program").[14]  The Debtors do not actively use this account.  The Purchasing Card Program is collateralized by a $2 million letter of credit and is used to pay authorized expenses incurred by certain of the Debtors' employees.

_____

[14]     A more detailed description of the Debtors' Purchasing Card Program is set forth in the Employee Motion, filed substantially contemporaneously herewith.

10

23.     <u>Investment Accounts</u>.  As of the Petition Date, the Debtors maintain 23 investment accounts (collectively, the "<u>Investment Accounts</u>") at various banking institutions.[15] As of April 8, 2016, the Debtors' Investment Accounts collectively contained approximately $75.3 million.  These funds are generally invested in (a) money market accounts where the bank guarantees a rate of return or (b) money market mutual funds.  Most of the Debtors' Investment Accounts have had minimal activity during 2016.  The Debtors maintain many of their Investment Accounts largely for the sake of convenience and flexibility.

24.     Funds in the Investment Accounts have been invested in securities and other investments in accordance with an investment policy (the "<u>Investment Policy</u>") approved by the Board of Directors of PEC (the "<u>Board</u>"), with one minor exception.[16]  The Investment Policy sets forth the guidelines employed by the Debtors when determining how to manage their corporate cash reserves.  The Investment Policy specifies parameters designed primarily to (a) preserve principal, and (b) maintain a high degree of liquidity and – only secondarily – to (c) achieve returns that are competitive with short term alternatives.  For example, generally speaking, certain riskier investments, such as options, futures contracts and mortgage-backed strip securities (among other derivatives) are not permissible investments under the Investment Policy.

---

[15]     The Debtors maintain their Investment Accounts at the following banking institutions:  (a) Bank of Ireland; (b) BNP Paribas; (c) Crédit Agricole; (d) Morgan Stanley; (e) National Australia Bank; (f) OCBC Bank; (g) PNC Bank; (h) Royal Bank of Scotland; (i) Standard Chartered Bank; (j) U.S. Bank; (k) UMB Bank; (l) Wells Fargo Bank; (m) Citibank, N.A. ("<u>Citibank</u>"); (n) Goldman Sachs; (o) Commerce Bank, (p) TD Bank, N.A. ("<u>TD Bank</u>"), (q) Regions Bank, (r) Branch Banking and Trust Company ("<u>BB&T</u>"), (s) Bank of America, (t) BBVA Compass Bankshares ("<u>BBVA</u>") and (u) Merrill Lynch.  The eight investment accounts that are maintained at foreign banks are held at U.S. branches of those foreign banks.

[16]     While Debtor Gold Fields' Investment Account at Merrill Lynch (the "<u>Gold Fields Investment Account</u>") is not subject to the Investment Policy, this account is essentially dormant.  As of April 8, 2016, no funds were invested in the Gold Fields Investment Account.

25.   <u>Working Fund Accounts</u>.  The Debtors maintain 12 working fund accounts (collectively, the "<u>Working Fund Accounts</u>") at various banks.[17]  The Debtors fund the Working Fund Accounts, which effectively are imprest fund petty cash accounts, on an as-needed basis for certain of their operations in the United States.   The Working Fund Accounts are generally used at the mine-level to pay for, among other things:  (a) occasional repair work; (b) immediate payment of severance or overtime;[18] and (c) employee recognition events.  As of the April 8, 2016, the aggregate balance across all 12 Working Fund Accounts was de minimis.

26.   <u>Environmental / Trust Accounts</u>.  Debtor Gold Fields maintains four financial assurance / trust accounts at U.S. Bank in respect of its environmental obligations, which contained, as of February 29, 2016, approximately $6.75 million.  Debtor PEC also maintains a trust account at Texas Capital Bank, with account number ending 8596.

27.   Charts summarizing the Debtors' Cash Management System, as it existed as of the Petition Date, are attached hereto as <u>Exhibit A-1</u> and <u>Exhibit A-2</u>.[19]  A schedule of the Debtors' prepetition Bank Accounts (the "<u>Account Schedule</u>") is attached hereto as <u>Exhibit B</u>.[20] <u>Exhibit A-1</u>, <u>Exhibit A-2</u> and <u>Exhibit B</u> are incorporated herein by reference.

---

[17]   The Debtors maintain Working Fund Accounts at (a) UMB Bank; (b) Wells Fargo Bank; (c) U.S. Bank; (d) Fifth Third Bank; (e) Grants State Bank; (f) Farmers State Bank; (g) Regions Bank and (h) Coulterville Banking Center.  The Working Fund Account maintained by the Debtors at Grants State Bank has an account number ending in 3722 and is maintained in the name of "Lee Ranch Coal Company."  As noted above, "Lee Ranch Coal Company" is a tradename for Debtor Natural Resources.  This account is maintained by Debtor Natural Resources.

[18]   The Debtors make termination payments from Working Fund Accounts typically when, under state law, the Debtors must pay a terminated employee his or her severance pay within hours or days of the payroll department being notified of the termination.  On a postpetition basis, the Debtors will make severance payments only pursuant to an order of this Court.

[19]   <u>Exhibit A-1</u> summarizes the cashflows in the Debtors' Cash Management System that are not part of the ARS Program.  <u>Exhibit A-2</u> summarizes the cashflows in the Debtors' Cash Management System that are part of the ARS Program.

[20]   The Account Schedule attached as <u>Exhibit B</u> is intended to be inclusive, but the Debtors may have inadvertently omitted certain Bank Accounts.  The Debtors reserve the right to supplement the schedule

***Transactions Among the Debtors***

28.     In the ordinary course of their businesses prior to the Petition Date, the

Debtors provided goods and services to, and engaged in intercompany financial transactions with,

(a) each other (collectively, the "Inter-Debtor Transactions") and (b) their Non-Debtor Affiliates

(collectively, the "Inter-Affiliate Transactions" and, together with the Inter-Debtor Transactions,

the "Intercompany Transactions").  As set forth above, the Debtors manage their expenses and

revenues through a centralized Cash Management System.  The Debtors, however, maintain

sufficient records to track Intercompany Transactions, such that these transactions should be

permitted to continue after the commencement of these cases.

29.     Certain Debtors provide services to, and engage in commercial Inter-

Debtor Transactions with, each other in the ordinary course of their businesses.  For instance, in

the ordinary course of the Debtors' businesses, certain Debtors lease mining equipment to other

Debtors.  As another example, to allow the ARS Program to function, certain Debtors engage in

the Receivables Transactions (described above), which involve the inter-Debtor transfer of

receivables and cash.  These transactions generate intercompany receivables and payables, which

are recorded on the Debtors' books and records.

30.     The Debtors engage in transactions with Non-Debtor Affiliates as well.

For instance, the Debtors perform many "back office" functions (including selling, general and

administrative functions ("SG&A") for themselves and also for Non-Debtor Affiliates.  A

---

(continued…)

and, in any event, request authority to maintain all of their Bank Accounts, whether or not identified on the
Account Schedule.

portion of the costs of these SG&A functions are generally allocated to the Non-Debtor Affiliates, and a receivable is recorded on the books of the Debtor that provided or performed the related function.  In other circumstances, the Debtors engage in arm's-length commercial transactions, or transfer funds directly to, Non-Debtor Affiliates.  For example, in rare instances, the Debtors may receive Non-Debtor Affiliate coal sale payments.  In those situations, the Debtors typically remit such payments to the applicable Non-Debtor Affiliate.[21]

31.     The Intercompany Transactions result in the generation of intercompany payables and receivables, which are recorded in the books and records of the transacting entities. Payments or disbursements by one PEC Entity made or collected on behalf of another would give rise to an asset for one PEC Entity and a liability for another.  The PEC Entities use various pricing methods to account for Intercompany Transactions.  The pricing of certain transactions includes a reasonable mark up (some of which arrangements are outlined in agreements among the applicable PEC Entities).[22]  All of these transactions are recorded on the Debtors' books and records.

32.     The Intercompany Transactions are necessary due to the complex corporate structure of the PEC Entities.  Discontinuation or disruption of the Intercompany Transactions would be detrimental to the Debtors' estates because the PEC Entities are dependent

---

[21]     As another example, the Debtors transfer funds to Non-Debtor Affiliate Sterling Centennial Missouri Insurance Corporation ("Sterling") for the purposes of maintaining certain of their insurance programs. The Debtors' insurance programs, including the involvement of Non-Debtor Affiliate Sterling, are set forth in greater detail in the Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Interim and Final Orders Authorizing Them to:  (I) Maintain, Continue and Renew Their Property, Casualty, Liability, Workers' Compensation and Other Insurance Programs, Policies and Agreements; and (II) Honor Certain Prepetition Obligations in Respect Thereof, filed substantially contemporaneously herewith.

[22]     The PEC Entities do not impose or pay, as applicable, mark-ups on Intercompany Transactions arising solely from the flow of cash through their Cash Management System, although interest is charged on any intercompany loans pursuant to the applicable intercompany loan agreements.

upon each other for goods, services and funding for their operations. The Debtors, thus, submit that continuing the Intercompany Transactions is essential and is in the best interests of the Debtors' respective estates and creditors.[23]

33.     If this Court authorizes the continuation of Intercompany Transactions, amounts will be owed from one PEC Entity to another, creating postpetition intercompany claims. The Debtors will continue to maintain records as they did prior to the Petition Date such that any Intercompany Transaction will be properly accounted for as necessary.[24]  To ensure that each individual Debtor will not, at the expense of its particular creditors, fund the operations of another Debtor, the Debtors request that the Court confirm the super-priority administrative expense status of claims among Debtors arising from Inter-Debtor Transactions, subject only to claims with a higher priority granted by (a) any interim or final order approving the Debtors' postpetition use of cash collateral or the DIP Facility and (b) any interim or final order approving continuation of the ARS Program.  In addition, the Debtors request that the Court confirm the authority of the PEC Entities to set off mutual prepetition and mutual postpetition claims arising from Intercompany Transactions.

## **Argument**

### *Continued Use of the Cash Management System Is Warranted*

34.     The Debtors hereby seek authority to continue the collection, concentration, disbursement and investment of cash pursuant to their Cash Management System.

---

[23]  If the Court approves the relief requested in this Motion, the Debtors will continue to record intercompany transactions consistent with past practices, and in no event will any of the Debtors pay for the prepetition or postpetition obligations incurred or owed by any of the other Debtors inconsistent with such past practices.

[24]  In addition, the Debtors will put in place account procedures to identify and distinguish between prepetition and postpetition Intercompany Transactions and provide reasonable access to such records to Citibank, N.A., as administrative agent for the DIP Facility (the "Administrative Agent").

Bankruptcy courts routinely permit chapter 11 debtors to continue using their existing cash management systems, generally treating requests for such relief as a relatively "simple matter." In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in relevant part, 997 F.2d 1039, 1061 (3d Cir. 1993).  The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  In re Columbia Gas Sys. Inc., 997 F.2d 1039, 1061 (3d Cir. 1993).  See also Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets."); Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.), 778 F.2d 617, 621 (11th Cir. 1985) (holding that the debtors' postpetition use of their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code).[25]

35.    Pursuant to section 363(c) of the Bankruptcy Code, a debtor, as debtor in possession, is authorized to "enter into transactions . . . in the ordinary course of business without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Section 363(c) "strik[es] the optimal balance

---

[25]    Because orders approving the continued use of preexisting cash management systems generally are entered at the time of or shortly after the commencement of a bankruptcy case, and because the benefits to affiliated debtors of such systems are widely recognized, few if any requests for the entry of such orders are ever contested.  In fact, references to court orders authorizing the continued use of centralized cash management systems generally are found in opinions regarding collateral proceedings, rather than in reported decisions approving or disapproving the use of a particular system.  See, e.g., In re FRG, Inc., 107 B.R. 461, 465 (Bankr. S.D.N.Y. 1989) (involving motion to transfer venue, but referring to an order authorizing the debtors to continue to utilize their prepetition cash management system).

between the interests of the debtor and creditors" to "serve the 'overriding goal of maximizing the value of the estate.'" Habinger, Inc. v. Metro. Cosmetic & Reconstructive Surgery Clinic, P.A., 124 B.R. 784, 786 (D. Minn. 1990) (quoting United States ex rel. Harrison v. Estate of Deutscher (In re H&S Transp. Co.), 115 B.R. 592, 599 (M.D Tenn. 1990)).  "The ordinary course of business standard is intended to allow a debtor the flexibility it needs to run its business and respond quickly to changes in the business climate." Habinger, 124 B.R. at 786 (internal quotation marks omitted).

36.     The Bankruptcy Code does not define "ordinary course of business." However, bankruptcy courts within the Eighth Circuit have held that a transaction qualifies as "ordinary course" if it:  (a) "is of a type that is commonly undertaken within the debtor's industry," Peltz v. Gulfcoast Workstation Grp. v. Peltz (In re Bridge Info. Sys., Inc.), 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003); and (b) is consistent with the reasonable expectations of creditors. Johnston v. First St. Cos. (In re Waterfront Cos.), 56 B.R. 31, 35 (Bankr. D. Minn. 1985).  See also In re Bridge Info. Sys., Inc., 293 BR. at 486 (courts look to "whether interested parties would reasonably expect[] the particular debtor in possession to seek court approval before entering into the questioned transaction").  A "fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a pre-petition business practice." In re Commercial Mortg. & Fin., Co., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (citing Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.), 186 B.R. 414, 426 (N. D. Ill. 1995)).  See also Comm. of Asbestos Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986) (finding that "the nature of the debtor's business prior to its Chapter 11 filing is compared to its course of conduct postpetition").  In determining whether a transaction is ordinary, two relevant factors are the type of business a

17

debtor is engaged in as well as the size and nature of the business and transaction in question.  In re H&S Transp. Co., 115 B.R. at 598.

37.    Within the purview of section 363(c) of the Bankruptcy Code, a debtor in possession is authorized to continue the "routine transactions" associated with its cash management system.  Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1453 (10th Cir. 1996).  Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, investment and disbursement of cash pursuant to the Cash Management System.

38.    The Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  It provides significant benefits to the Debtors' estates including, among other things, the ability to (a) control and monitor corporate funds, (b) invest idle cash, (c) ensure the maximum availability of funds when and where necessary and (d) reduce costs and administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.  The smooth operation of the Debtors' businesses requires the continuation of the Cash Management System during the pendency of these chapter 11 cases.

39.    Notwithstanding the benefits that the Cash Management System provides to the Debtors, the Office of the United States Trustee, Region 13 (the "United States Trustee") has established operating guidelines for debtors in possession (the "United States Trustee Guidelines") that would restrict the Debtors' ability to maintain the Cash Management System. The United States Trustee Guidelines provide, among other things, that chapter 11 debtors must close all existing bank accounts upon filing their petitions and open new "debtor-in-possession"

18

accounts in certain financial institutions designated as authorized depositories by the United States Trustee (each, an "Authorized Depository Institution").

40.     As a practical matter, however, it would be difficult, expensive, disruptive and administratively burdensome to require the Debtors to close all of their existing Bank Accounts and open new, segmented debtor-in-possession bank accounts for each Debtor entity at the very outset of these chapter 11 cases.  The Debtors thus seek a waiver of the requirements of the United States Trustee Guidelines to the extent that they prohibit the Debtors from continuing to utilize their existing Cash Management System.  To protect against the possible inadvertent payment of prepetition claims, the Debtors immediately will advise their banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors.  The Debtors, moreover, have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing all of their Bank Accounts and opening new ones.

41.     In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) maximize value for stakeholders by allowing the Debtors to continue their operations without disruption.

42.     Accordingly, maintaining the existing Cash Management System is not only essential, but is in the best interest of creditors and other parties in interest.[26]

---

[26]     As a matter of course, the Debtors will continue to maintain current records with respect to all transfers of cash, so that all transactions can be readily ascertained, traced and recorded properly on applicable intercompany accounts.

43. The continued postpetition use of cash management systems similar to that requested here has been approved as a routine matter in chapter 11 cases in this district and has been approved in other chapter 11 cases involving large coal companies in other districts. See, e.g., In re Noranda Aluminum, Inc., No. 16-10083 (Bankr. E.D. Mo. Feb. 9, 2016) (Docket No. 79); In re Arch Coal, Inc., No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016 and April 8, 2016) (Docket No. 56 and 671); In re Bakers Footwear Grp., Inc., No. 12-49658 (Bankr. E.D. Mo. Oct. 5, 2012 and Nov. 1, 2012) (Docket Nos. 58 and 165); In re Mid America Brick & Structural Clay Prods., L.L.C., No. 13-20029 (Bankr. E.D. Mo. Feb. 20, 2013) (Docket No. 26); In re US Fidelis, Inc., No. 10-41902 (Bankr. E.D. Mo. Mar. 10, 2010) (Docket No. 36); In re Dry Ice, Inc., No 05-49452 (Bankr. E.D. Mo. July 11, 2005 and Aug. 15, 2005) (Docket Nos. 16 and 145); accord In re Alpha Natural Res., Inc., No. 15-33896 (Bankr. E.D. Va. Aug. 5, 2015 and Oct. 8, 2015) (Docket Nos. 125 and 624); In re Walter Energy, Inc., No. 15-02741 (Bankr. N.D. Ala. Aug. 3, 2015) (Docket No. 332); In re Patriot Coal Corp., No. 15-32450 (Bankr. E.D. Va. May 13, 2015) (Docket No. 53); In re James River Coal Co., No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014) (Docket No. 89); In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.NY July 10, 2012 and Aug. 2, 2012) (Docket Nos. 32 and 252).[27]

**_Request for Waiver of the Requirements of Section 345 of the Bankruptcy Code_**

44. Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits that are not "insured or guaranteed by the United

---

[27]    Unreported orders cited herein are not attached to this Motion. Copies of these orders will be made available to the Court or other parties upon request made to the Debtors' counsel.

States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires the estate to obtain from the entity with which the money is deposited a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise.[28]  In addition, as noted above, United States Trustee Guidelines require, among other things, that a debtor maintain its postpetition bank accounts at an Authorized Depository Institution.

45.    In 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors[,]" Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for just cause." 140 Cong. Rec. H 10,767 (Oct. 4, 1994), 1994 WL 545773.  In In re Service Merchandise Co., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999), the court identified a number of factors to be considered when determining whether cause exists to waive the requirements of section 345(b) of the Bankruptcy Code, including:  (a) the sophistication of the debtor's business; (b) the bank ratings of the financial institutions where the debtor's funds are held; and (c) the benefit to the debtor of current practices.  See id. at 896.

46.    The Debtors believe that cause exists to justify a waiver of section 345(b) of the Bankruptcy Code in this case.  Substantially all of the Debtors' depository / receipt accounts, payroll accounts, operating / disbursement accounts, working fund accounts and other accounts are held at Authorized Depository Institutions, which have been approved by the United

---

[28]    In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303.  Section 9303 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond.

21

States Trustee as depository institutions where a debtor in possession may maintain a bank account.  The Authorized Depository Institutions that maintain the majority of the Debtors' accounts include Bank of America, PNC Bank, U.S. Bank and UMB Bank, among others. Moreover, with the exception of certain accounts discussed below (primarily relating to the Debtors' investment activities), all of the Debtors' domestic Bank Accounts are insured by the United States through the Federal Deposit Insurance Corporation (the "FDIC").  In addition, the Debtors believe that the Banks generally are large, well-known and well-capitalized institutions. In light of the foregoing, the Debtors believe that "cause" exists to waive the requirements of section 345(b) with respect to the Debtors' Bank Accounts that are either held at Authorized Depository Institutions or are FDIC-insured.

47.     With respect to the Debtors' remaining Bank Accounts, the Debtors believe that cause exists to waive the requirements for section 345(b) for these accounts as well. Three of the Debtors' remaining Bank Accounts – (a) the GBP Account held at HSBC (London), (b) the PEC HSBC Account and (c) the Securities Repurchase Account held at Morgan Stanley – do not relate to investment activity.  As of April 8, 2016, the GBP Account had a relatively low balance of approximately $400,000, and the Debtors use the account sparingly.  With respect to the PEC HSBC Account, as noted above, this account is used to pay HSBC for certain peer-to-peer services provided to the Debtors, and has infrequent activity.  Finally, concerning the Securities Repurchase Account, the Debtors have used this account in the past to repurchase the Debtors' outstanding debt and equity.  The Debtors do not plan to use the Securities Repurchase Account during these chapter 11 cases.  Moreover, just as with respect to the Debtors' domestic Bank Accounts, the Debtors believe that the Banks that maintain these Bank Accounts (HSBC (London), HSBC and Morgan Stanley) are large, well-known and well-capitalized institutions.

22

Given the relatively de minimis amounts and activity involved, the Debtors submit that cause exists to waive the applicable requirements of section 345 of the Bankruptcy Code with respect to the GBP Account and the Securities Repurchase Account.

48.     Finally, the Debtors also believe that "cause" exists to waive the requirements of section 345(b) for their remaining Bank Accounts — the Investment Accounts — and the Debtors' Investment Policy.  Importantly, many of the Debtors' Investment Accounts are held at Authorized Depository Institutions.[29]  Although the rest of the Debtors' Investment Accounts are not held at Authorized Depository Institutions, like the banks discussed above, the Debtors believe that these banks are respected and well-capitalized.[30]

49.     Funds in Investment Accounts are invested prudently, in accordance with the Investment Policy.[31]  The Investment Policy specifies parameters designed primarily to (a) preserve principal and (b) maintain a high degree of liquidity and – only secondarily – to (c) achieve returns that are competitive with short term alternatives.  In other words, the Debtors' investments through these investment accounts, in accordance with the Investment Policy, carry minimal credit risk.  Finally, the Debtors are part of a large, sophisticated enterprise and have an experienced treasury team in place that has determined that investments through these investment accounts pursuant to the Investment Policy will benefit the Debtors and the value of the Debtors' estates.

---

[29]     These banks include:  (a) Commerce Bank; (b) Regions Bank; (c) Bank of America; (d) U.S. Bank; (e) UMB Bank; (f) Wells Fargo; (g) PNC Bank and (h) Citibank.

[30]     These banks include:  (a) TD Bank; (b) BB&T; (c) BBVA; (d) Bank of Ireland; (e) BNP Paribas; (f) Crédit Agricole; (g) Morgan Stanley; (h) National Australia Bank; (i) OCBC Bank; (j) Royal Bank of Scotland; (k) Standard Chartered Bank; (l) Goldman Sachs and (m) Merrill Lynch.

[31]     Although the Gold Fields Investment Account is not governed by the Investment Policy, this account is effectively dormant, and as of April 8, 2016, there were zero funds invested in this account.

23

50.     For the reasons set forth above, the Debtors believe that "cause" exists to waive the applicable requirements of section 345 of the Bankruptcy Code with respect to any of their Bank Accounts or Investment Policies that are not, as a technical matter, compliant with section 345 of the Bankruptcy Code.

51.     Bankruptcy courts in this and other districts have granted relief similar to that requested herein.  See, e.g., In re Noranda Aluminum, Inc., No. 16-10083 (Bankr. E.D. Mo. Feb. 9, 2016) (Docket No. 79) (interim order waiving requirements of section 345(b) of the Bankruptcy Code and authorizing debtors to invest cash in accordance with prepetition practices); In re Arch Coal, Inc., No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016 and April 8, 2016) (Docket No. 56 and 671) (same); In re Bakers Footwear Grp., Inc., No. 12-49658 (Bankr. E.D. Mo. Oct. 5, 2012 and Nov. 1, 2012) (Docket Nos. 58 and 165) (order waiving requirements of section 345(b) of the Bankruptcy Code and authorizing debtor to invest cash in accordance with prepetition practices); accord In re Alpha Natural Res., Inc., No. 15-33896 (Bankr. E.D. Va. Aug. 5, 2015 and Oct. 8, 2015) (Docket Nos. 125 and 624) (interim and final orders waiving requirements of section 345(b) of the Bankruptcy Code and authorizing debtors to invest cash in accordance with prepetition practices); In re Walter Energy, Inc., No. 15-02741 (Bankr. N.D. Al. Aug. 3, 2015) (Docket No. 332) (same); In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del. May 2, 2014 and June 4, 2014) (Docket Nos. 304 and 801) (same); In re James River Coal Co., No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014) (Docket No. 89) (order waiving requirements of section 345(b) of the Bankruptcy Code and authorizing debtor to invest cash in accordance with prepetition practices).

***Permitting Continued Intercompany Transactions and Granting Super-Priority Administrative Expense Status to Amounts Arising from Inter-Debtor Transactions is Appropriate***

52.      As described above, central to the Debtors' operations are a variety of ordinary course Intercompany Transactions.  It is, therefore, imperative that the Debtors be permitted to continue to engage in the Intercompany Transactions during these chapter 11 cases. In particular, concerning Inter-Debtor Transactions, if PEC cannot continue to provide funding to certain of the other PEC Entities from the Master Concentration Account, those entities will lack sufficient funds to pay the costs associated with their operations, including paying their employees and providing the shared services necessary to the operation of the Debtors' business.

53.      Further, unless the Debtors are permitted to continue engaging in the Inter-Affiliate Transactions, certain Non-Debtor Affiliates may be unable to continue operations due to, among other things, an inability to replace the many services that the Debtors provide.

54.      If this Court authorizes the continuation of the Intercompany Transactions, at any given time there may be balances due and owing from one PEC Entity to another. These balances represent extensions of intercompany credit.  The Debtors will continue to maintain records of all Intercompany Transactions, including records of all investments by PEC in other PEC Entities, if any, and current intercompany accounts receivable and payable. In addition, the Debtors will put in place account procedures to identify and distinguish between prepetition and postpetition Intercompany Transactions and provide reasonable access to such records to the Administrative Agent under the DIP Facility and the official committee of unsecured creditors.

55.      In addition, solely with respect to transactions among the Debtors (i.e., the Inter-Debtor Transactions), the Debtors respectfully request that, pursuant to section 503(b)(1) of the Bankruptcy Code, all claims arising from Inter-Debtor Transactions occurring after the

25

Petition Date be accorded super-priority administrative expense status, subject only to claims with a higher priority granted by (a) any interim or final order approving the Debtors' postpetition use of cash collateral or the DIP Facility and (b) any interim or final order approving continuation of the ARS Program.  According such status to claims arising from Inter-Debtor Transactions will ensure that each separate Debtor will continue to bear ultimate payment responsibility for its respective liabilities.[32]

56.    Finally, the Bankruptcy Code also provides a debtor in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without a notice and a hearing. 11 U.S.C. § 364(a).  See also In re Amdura Corp., 75 F.3d at 1453 ("The freedom to continue operation includes the freedom to obtain unsecured credit and to incur unsecured debt in the ordinary course of business."); In re Statmore, 177 B.R. 312 (Bankr. D. Neb. 1995).  The Debtors therefore seek authorization, to the extent necessary, to obtain unsecured credit in connection with the Inter-Debtor Transactions and incur unsecured debt in connection with the Inter-Debtor Transactions and the Inter-Affiliate Transactions in the ordinary operation of their Cash Management System.

57.    The continuation of intercompany transactions, including intercompany transactions with non-debtor affiliates to preserve and protect the value of a debtor's enterprise, and granting administrative expense or super-priority administrative expense status for such transactions, as requested here, has been granted in this and other districts in large chapter 11

---

[32]    By this Motion, the Debtors do not request administrative priority status for claims arising between the Debtors and the Non-Debtor Affiliates (i.e., the Inter-Affiliate Transactions).  The relief requested herein is not intended to affect the rights of the Non-Debtor Affiliates to seek administrative expense status for claims arising from Inter-Affiliate Transactions, which rights shall be fully preserved.  As described above, however, the Debtors may infrequently receive certain coal sale payments on behalf of certain Non-Debtor Affiliates.  Consistent with the Cash Management System, the Debtors intend, during these cases, to remit such payments to the applicable Non-Debtor Affiliate, as such payments do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code.  See 11 U.S.C. § 541.

cases.  See, e.g., In re Noranda Aluminum, Inc., No. 16-10083 (Bankr. E.D. Mo. Feb. 9, 2016) (Docket No. 79) (interim order authorizing the continuation of intercompany transactions and granting super-priority administrative expense status to postpetition intercompany claims); In re Arch Coal Co., No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016 and April 8, 2016) (Docket No. 56 and 671) (same); accord In re Alpha Natural Res., Inc., No. 15-33896 (Bankr. E.D. Va. Aug. 5, 2015 and Oct. 8, 2015) (Docket Nos. 125 and 624) (same); In re Patriot Coal Co., No. 15-32450 (Bankr. E.D. Va. May 13, 2015) (Docket No. 53) (authorizing the continuation of intercompany transactions and granting administrative expense priority to intercompany claims); In re Magnetation LLC, No. 15-50307 (Bankr. D. Minn. May 7, 2015) (Docket No. 58) (same); In re RadioShack Corp., No. 15-10197 (Bankr. D. Del. Mar. 9, 2015) (Docket No. 880) (authorizing the continuation of intercompany transactions including among nondebtor affiliates and granting administrative expense priority to intercompany claims); In re James River Coal Co., No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014) (Docket No. 89) (authorizing the continuation of intercompany transactions and granting super-priority administrative expense status to postpetition intercompany claims); In re Patriot Coal Co., No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012 and Aug. 2, 2012) (Docket Nos. 32 and 252) (authorizing the continuation of intercompany transactions including among nondebtor subsidiaries and granting super priority administrative expense status to debtor postpetition intercompany claims).

***Preserving and Permitting the Exercise of Intercompany Setoff Rights is Appropriate***

58.     The Debtors also seek authorization to preserve and exercise setoff rights among PEC Entities that arise through the operation of their Cash Management System. Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor

to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 553(a).

59.     To enforce a right of set-off, a creditor need establish only two facts: mutuality and timing.  See United States v. Gerth, 991 F.2d 1428, 1431 (8th Cir. 1993); Gulfcoast Workstation Corp. & Relational Fund Corp. v. Peltz (In re Bridge Info. Sys., Inc.), 314 B.R. 421, 428 (Bankr. E.D. Mo. 2004); In re Lehman Bros. Inc., 458 B.R. 134, 139-40 (Bankr. S.D.N.Y. 2011).  See also Verco Indus. V. Spartan Plastics (In re Verco Indus.), 704 F.2d 1134, 1139 (9th Cir. 1983) ("the timing and mutuality elements must both be satisfied to establish a set-off . . . .").  Although courts have not uniformly defined the elements of mutuality, most courts require that the debts are owed (a) between the same parties and (b) in the same right and capacity.  See 5 Collier on Bankruptcy ¶ 553.03[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); Kleinsmith v. Alcoa Emp. & Cmty. Credit Union (In re Kleinsmith), 361 B.R. 504, 509 (Bankr. S.D. Iowa 2006); Bank of Cairo & Moberly v. Thurston (In re Thurston), 139 B.R. 14, 15 (Bankr. W.D. Mo. 1992).  See also Cohen v. Savs. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 896 F.2d 54, 57 (3d Cir. 1990) (explaining that the right of setoff depends on the existence of mutual debts and claims between the creditor and debtor).  Timing requires that both the debt and the claim arise prepetition. Gerth,  991 B.R. at 1431; Cooper –Jarrett, Inc. v. Cent. Transp., Inc., 726 F.2d 93, 96 (3d Cir. 1984) (noting that "a creditor may not set off its pre-petition claims against a debt owed to the debtor which came into existence after the filing of the bankruptcy petition.").  In other words, "a creditor may not set off a prepetition claim against a post-petition debt it owes the debtor, and likewise it may not set off a post-petition claim that it has against a prepetition debt it

28

owes to a debtor."  Arnold M. Quittner, <u>Setoff & Recoupment</u>, 715 PLI/Comm 663, 694 (1995) (citing <u>Metco Mining & Minerals, Inc. v. PBS Coals, Inc. (In re Metco Mining and Minerals, Inc.)</u>, 171 B.R. 210 (Bankr. W.D. Pa. 1994)).  <u>See also</u> <u>In re Moore</u>, 376 B.R. 704, 707 (Bankr. W.D. Ark. 2007) (section 553 of the Bankruptcy Code "precludes the setoff of post-petition claims against pre-petition debts."); <u>Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)</u>, 181 B.R. 730, 739 (Bankr. S.D.N.Y 1995) ("Courts have interpreted debts in the same right to mean that a 'pre-petition debt cannot offset a post-petitition debt.'") (quoting <u>Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 743 F.Supp. 176, 182 (S.D.N.Y. 1990)).

60.     The Cash Management System and related controls allow the Debtors to track all obligations owing between related entities and thereby ensure that setoffs will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code.  Accordingly, the Debtors respectfully request that the PEC Entities expressly be authorized to set off mutual prepetition and mutual postpetition obligations relating to Intercompany Transactions.

***Continued Use of Business Forms Is Warranted***

61.     In the ordinary course of their businesses, the Debtors use a variety of checks and other business forms (collectively, and as they may be modified, the "<u>Business Forms</u>").  To avoid a significant disruption to their business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense, the Debtors request that they be authorized to continue to use their Business Forms substantially in the forms existing immediately before the Petition Date.  In the absence of such relief, the estates will be required to bear a potentially significant expense that the Debtors respectfully submit is unwarranted.

62.    Authority to continue the use of business forms as proposed by the

Debtors here has been granted in numerous other chapter 11 cases in this district.  See, e.g., In re

Noranda Aluminum, Inc., No. 16-10083 (Bankr. E.D. Mo. Feb. 9, 2016) (Docket No. 79);

In re Arch Coal, Inc., No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016 and April 8, 2016)

(Docket No. 56 and 671); In re Mid America Brick & Structural Clay Products, L.L.C., No. 13-

20029 (Bankr. E.D. Mo. Feb. 20, 2013) (Docket No. 26); In re Bakers Footwear Grp., Inc., No.

12-49658 (Bankr. E.D. Mo. Oct. 5, 2012 and Nov. 1, 2012) (Docket Nos. 58 and 165); In re US

Fidelis, Inc., No. 10-41902 (Bankr. E.D. Mo. Mar. 10, 2010) (Docket No. 36); In re Dry Ice, Inc.,

No. 05-49452 (Bankr. E.D. Mo. July 11, 2005 and Aug. 15, 2005) (Docket Nos. 16 and 145).

***Authorization for (A) Banks to Honor Certain Transfers and to Charge Back Returned
Items and (B) the Debtors to Pay Bank Fees Is Warranted***

63.    Concurrently with the filing of this Motion, the Debtors have filed motions

requesting authority to pay, in their discretion and in the ordinary course of their business,

certain prepetition obligations to employees, taxing authorities and other entities.  With respect

to some of this debt, prior to the Petition Date, the Debtors issued checks or initiated drafts, wires

or ACH transfers that may not yet have cleared the banking system.  In other cases, the Debtors

would issue the relevant checks or authorize the transfers postpetition on account of such

prepetition debt once the Court entered an order permitting the Debtors to do so.  The Debtors

intend to inform their banks which prepetition checks, drafts, wires or ACH transfers should be

honored pursuant to orders of the Court authorizing such payment.

64.    As a result of the foregoing, the Debtors request their banks and financial

institutions (collectively, the "Banks") be authorized, when requested by the Debtors, to the

extent permitted by the Debtors' post-petition secured debtor in possession financing, to accept

and honor all representations from the Debtors as to which checks, drafts, wires or ACH

30

transfers should be honored or dishonored consistent with any order(s) of this Court and governing law, whether such checks, drafts, wires or ACH transfers are dated prior to, on or subsequent to the Petition Date and provided that sufficient funds are available and standing in the Debtors' credit in the applicable accounts to cover such checks and fund transfers.  Pursuant to the relief requested in this Motion, the Banks shall not be liable to any party on account of (a) following the Debtors' instructions or representations as to any order of this Court; (b) the honoring of any prepetition check or item if in good faith and without inquiry, such Bank believes that the Court has authorized such prepetition check or item to be honored or (c) an innocent mistake made despite implementation of reasonable item handling procedures.  Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with the Court's order or otherwise.

65.     Finally, the Debtors request authority for the Banks to charge and the Debtors to pay or honor both prepetition and postpetition service and other fees (not including professional fees), costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees").  The Debtors also request that the Banks be authorized to charge back returned items to the Bank Accounts in the normal course of business.

66.     The Debtors require this relief to minimize the disruption of the Cash Management System and to assist them in accomplishing a smooth transition to operating in chapter 11.  Authority for banks to honor prepetition transfers and to charge back returned items and for debtors to pay bank fees has been routinely granted in other chapter 11 cases in this District and other districts.  See, e.g. In re Noranda Aluminum, Inc., No. 16-10083

(Bankr. E.D. Mo. Feb. 9, 2016) (Docket No. 79); In re Arch Coal Co., No. 16-40120 (Bankr.

E.D. Mo. Jan. 13, 2016 and April 8, 2016) (Docket No. 56 and 671); accord In re Alpha Natural

Res Inc., No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015) (Docket No. 624); In re Patriot Coal

Corp., No. 15-32450 (Bankr. E.D. Va. May 13, 2015) (Docket No. 53); In re Magnetation LLC,

No. 15-50307 (Bankr. D. Minn. May 7, 2015) (Docket No. 58); In re James River Coal Co.,

No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014) (Docket No. 89); In re AMF Bowling

Worldwide, Inc., No. 12-36495 (Bankr. E.D. Va. Nov. 14, 2012) (Docket No. 56); In re Patriot

Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012 and Aug. 2, 2012) (Docket Nos.

32 and 252).

### Requests for Immediate Relief and Waiver of Stay

67.     Pursuant to Rules 4001(c), 6003(b) and 6004(h) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek entry of orders granting the

relief requested by this Motion on an interim and final basis and, to the extent it applies, a waiver

of any stay of the effectiveness of such orders.

68.     Bankruptcy Rule 4001(c) provides that, when presented with a motion for

authority to obtain credit, the "court may conduct a hearing before [14 days after service of the

motion], but the court may authorize the obtaining of credit only to the extent necessary to avoid

immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c).

Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is

necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the

filing of the petition, issue an order granting … a motion to use, sell, lease or otherwise incur an

obligation regarding property of the estate, including a motion to pay all or part of a claim that

arose before the filing of the petition."  Fed. R. Bankr. P. 6003(b).  In other words, where the

32

failure to grant any such requested relief would result in immediate and irreparable harm to the

Debtors' estates, the Court may authorize the relief prior to the twenty second day following the

Petition Date.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 14 days after entry of

the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

69.     As set forth above and in the First Day Declaration the immediate

continued use of the Bank Accounts, Cash Management System and Business Forms and related

relief is essential to prevent immediate and potentially irreparable damage to the Debtors'

operations.  Accordingly, the Debtors submit that ample cause exists to justify:  (a) the

immediate entry of an Interim Order granting the interim relief sought herein pursuant to

Bankruptcy Rules 4001(c) and 6003(b), to the extent that they apply; and (b) a waiver of the 14-

day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies, with respect to the

order.

**Debtors' Reservation of Rights**

70.     Nothing contained herein or in the proposed Interim Order and Final

Order is intended or should be construed as:  (a) an admission as to the validity of any claim

against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute any

claim on any grounds; (c) a promise to pay any claim; or (d) a request to assume or reject any

executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.  The

Debtors expressly reserve the right to contest any claim under applicable bankruptcy and non-

bankruptcy law.

71.     Notwithstanding anything set forth in this Motion, including, without

limitation, the Debtors' request for authority to engage in postpetition Intercompany Transactions,

33

nothing herein shall constitute a request for a determination regarding the priority or validity of any prepetition intercompany obligations between and among the PEC Entities, including without limitation, whether such claims should be recharacterized as equity contributions. Nothing in this Motion shall constitute a waiver of any rights, claims or defenses with respect thereto, all of which are specifically reserved hereby.

**Notice**

72.    Notice of this Motion has been given to: (a) Davis Polk & Wardwell LLP and Bryan Cave LLP as counsel to Citibank, N.A. as Administrative Agent for the First Lien Secured Credit Facility and the Debtors' proposed debtor in possession secured credit facility; (b) Brown Rudnick LLP, as counsel to Wilmington Savings Fund Society, FSB as prospective trustee and collateral agent for the Secured Second Lien Notes; (c) Foley & Lardner LLP, as counsel to Wilmington Trust Company as prospective Indenture Trustee for the Unsecured Notes;[33] (d) Robinson & Cole LLP, as counsel to U.S. Bank as resigning trustee and collateral agent for the Second Lien Notes, the Unsecured Notes and the Convertible Notes;[34] (e) counsel to any ad hoc committees; (f) the Debtors' 50 largest unsecured creditors; (g) Mayer Brown LLP, as counsel to PNC Bank, N.A., as Administrator under the Debtors' prepetition accounts receivable securitization facility; (h) the United Mine Workers of America; (i) the Office of the United States Trustee for the Eastern District of Missouri; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Department of the Interior;

---

[33]    These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; and the (iv) 7.875% Senior Notes due November 2026.

[34]    These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; (iv) 7.875% Senior Notes due November 2026; and the (v) Convertible Junior Subordinated Debentures due December 2066.

(m) the United States Department of Labor; (n) the United States Attorney's Office for the Eastern District of Missouri; and (o) Pension Benefit Guaranty Corporation (collectively, the "Notice Parties").  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

**No Prior Request**

73.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter an interim order, substantially in the form submitted to the Court, granting the relief requested herein on an interim basis; (ii) enter a final order, substantially in the form submitted to the Court, granting the relief requested herein; and (iii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: April 13, 2015
      St. Louis, Missouri

Respectfully submitted,

/s/ Steven N. Cousins
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 621-5065
Email:  scousins@armstrongteasdale.com
Email:  sehlers@armstrongteasdale.com

Heather Lennox (*pro hac vice* pending)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Amy Edgy (*pro hac vice* pending)
Daniel T. Moss (*pro hac vice* pending)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

36

## <u>SCHEDULE 1</u>

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 1. | Peabody Energy Corporation | 13-4004153 |
| 2. | American Land Development, LLC | 20-3405570 |
| 3. | American Land Holdings of Colorado, LLC | 26-3730572 |
| 4. | American Land Holdings of Illinois, LLC | 30-0440127 |
| 5. | American Land Holdings of Indiana, LLC | 20-2514299 |
| 6. | American Land Holdings of Kentucky, LLC | 20-0766113 |
| 7. | American Land Holdings of New Mexico, LLC | 32-0478983 |
| 8. | American Land Holdings of West Virginia, LLC | 20-5744666 |
| 9. | Arid Operations, Inc. | 84-1199578 |
| 10. | Big Ridge, Inc. | 37-1126950 |
| 11. | Big Sky Coal Company | 81-0476071 |
| 12. | Black Hills Mining Company, LLC | 32-0049741 |
| 13. | BTU Western Resources, Inc. | 20-1019486 |
| 14. | Caballo Grande, LLC | 27-1773243 |
| 15. | Caseyville Dock Company, LLC | 20-8080107 |
| 16. | Central States Coal Reserves of Illinois, LLC | 43-1869432 |
| 17. | Central States Coal Reserves of Indiana, LLC | 20-3960696 |
| 18. | Century Mineral Resources, Inc. | 36-3925555 |
| 19. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 |
| 20. | COALSALES II, LLC | 43-1610419 |
| 21. | Colorado Yampa Coal Company, LLC | 95-3761211 |
| 22. | Conservancy Resources, LLC | 20-5744701 |
| 23. | Cottonwood Land Company | 43-1721982 |
| 24. | Cyprus Creek Land Company | 73-1625890 |
| 25. | Cyprus Creek Land Resources LLC | 75-3058264 |
| 26. | Dyson Creek Coal Company, LLC | 43-1898526 |
| 27. | Dyson Creek Mining Company, LLC | 20-8080062 |
| 28. | El Segundo Coal Company, LLC | 20-8162824 |
| 29. | Empire Land Holdings, LLC | 61-1742786 |
| 30. | Falcon Coal Company, LLC | 35-2006760 |
| 31. | Four Star Holdings, LLC | 30-0885825 |
| 32. | Francisco Equipment Company, LLC | 37-1805119 |
| 33. | Francisco Land Holdings Company, LLC | 36-4831111 |
| 34. | Francisco Mining, LLC | 30-0922117 |
| 35. | Gallo Finance Company, LLC | 43-1823616 |
| 36. | Gold Fields Chile, LLC | 13-3004607 |
| 37. | Gold Fields Mining, LLC | 36-2079582 |
| 38. | Gold Fields Ortiz, LLC | 22-2204381 |
| 39. | Hayden Gulch Terminal, LLC | 86-0719481 |
| 40. | Highwall Mining Services Company | 20-0010659 |
| 41. | Hillside Recreational Lands, LLC | 32-0214135 |
| 42. | HMC Mining, LLC | 43-1875853 |
| 43. | Illinois Land Holdings, LLC | 26-1865197 |
| 44. | Independence Material Handling, LLC | 43-1750064 |
| 45. | James River Coal Terminal, LLC | 55-0643770 |
| 46. | Juniper Coal Company, LLC | 43-1744675 |
| 47. | Kayenta Mobile Home Park, Inc. | 86-0773596 |
| 48. | Kentucky Syngas, LLC | 26-1156957 |
| 49. | Kentucky United Coal, LLC | 35-2088769 |
| 50. | Lively Grove Energy, LLC | 20-5752800 |
| 51. | Lively Grove Energy Partners, LLC | 26-0180403 |
| 52. | Marigold Electricity, LLC | 26-0180352 |
| 53. | Midco Supply and Equipment Corporation | 43-6042249 |
| 54. | Midwest Coal Acquisition Corp. | 20-0217640 |
| 55. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 |

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 56. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 |
| 57. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 |
| 58. | Moffat County Mining, LLC | 74-1869420 |
| 59. | Mustang Energy Company, LLC | 43-1898532 |
| 60. | New Mexico Coal Resources, LLC | 20-3405643 |
| 61. | NM Equipment Company, LLC | 36-4821991 |
| 62. | Pacific Export Resources, LLC | 27-5135144 |
| 63. | Peabody America, LLC | 93-1116066 |
| 64. | Peabody Archveyor, L.L.C. | 43-1898535 |
| 65. | Peabody Arclar Mining, LLC | 31-1566354 |
| 66. | Peabody Asset Holdings, LLC | 20-3367333 |
| 67. | Peabody Bear Run Mining, LLC | 26-3582291 |
| 68. | Peabody Bear Run Services, LLC | 26-3725923 |
| 69. | Peabody Caballo Mining, LLC | 83-0309633 |
| 70. | Peabody Cardinal Gasification, LLC | 20-5047955 |
| 71. | Peabody China, LLC | 43-1898525 |
| 72. | Peabody Coalsales, LLC | 20-1759740 |
| 73. | Peabody COALTRADE International (CTI), LLC | 20-1435716 |
| 74. | Peabody COALTRADE, LLC | 43-1666743 |
| 75. | Peabody Colorado Operations, LLC | 20-2561644 |
| 76. | Peabody Colorado Services, LLC | 26-3723774 |
| 77. | Peabody Coulterville Mining, LLC | 20-0217834 |
| 78. | Peabody Development Company, LLC | 43-1265557 |
| 79. | Peabody Electricity, LLC | 20-3405744 |
| 80. | Peabody Employment Services, LLC | 26-3730348 |
| 81. | Peabody Energy Generation Holding Company | 73-1625891 |
| 82. | Peabody Energy Investments, Inc. | 68-0541702 |
| 83. | Peabody Energy Solutions, Inc. | 43-1753832 |
| 84. | Peabody Gateway North Mining, LLC | 27-2294407 |
| 85. | Peabody Gateway Services, LLC | 26-3724075 |
| 86. | Peabody Holding Company, LLC | 74-2666822 |
| 87. | Peabody Holdings (Gibraltar) Limited | 20-5543587 |
| 88. | Peabody IC Funding Corporation | 46-2326991 |
| 89. | Peabody IC Holdings, LLC | 30-0829603 |
| 90. | Peabody Illinois Services, LLC | 26-3722638 |
| 91. | Peabody Indiana Services, LLC | 26-3724339 |
| 92. | Peabody International Investments, Inc. | 26-1361182 |
| 93. | Peabody International Services, Inc. | 20-8340434 |
| 94. | Peabody Investments Corp. | 20-0480084 |
| 95. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 |
| 96. | Peabody Midwest Management Services, LLC | 26-3726045 |
| 97. | Peabody Midwest Mining, LLC | 35-1799736 |
| 98. | Peabody Midwest Operations, LLC | 20-3405619 |
| 99. | Peabody Midwest Services, LLC | 26-3722194 |
| 100. | Peabody Mongolia, LLC | 20-8714315 |
| 101. | Peabody Natural Gas, LLC | 43-1890836 |
| 102. | Peabody Natural Resources Company | 51-0332232 |
| 103. | Peabody New Mexico Services, LLC | 20-8162939 |
| 104. | Peabody Operations Holding, LLC | 26-3723890 |
| 105. | Peabody Powder River Mining, LLC | 43-0996010 |
| 106. | Peabody Powder River Operations, LLC | 20-3405797 |
| 107. | Peabody Powder River Services, LLC | 26-3725850 |
| 108. | Peabody PowerTree Investments, LLC | 20-0116980 |
| 109. | Peabody Recreational Lands, L.L.C. | 43-1898382 |
| 110. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 |
| 111. | Peabody Rocky Mountain Services, LLC | 20-8162706 |
| 112. | Peabody Sage Creek Mining, LLC | 26-3730653 |
| 113. | Peabody School Creek Mining, LLC | 20-3585831 |

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 114. | Peabody Services Holdings, LLC | 26-3726126 |
| 115. | Peabody Southwest, LLC | 20-5744732 |
| 116. | Peabody Southwestern Coal Company, LLC | 43-1898372 |
| 117. | Peabody Terminal Holding Company, LLC | 26-1087861 |
| 118. | Peabody Terminals, LLC | 31-1035824 |
| 119. | Peabody Trout Creek Reservoir LLC | 30-0746873 |
| 120. | Peabody Twentymile Mining, LLC | 26-3725223 |
| 121. | Peabody Venezuela Coal Corp. | 43-1609813 |
| 122. | Peabody Venture Fund, LLC | 20-3405779 |
| 123. | Peabody-Waterside Development, L.L.C. | 75-3098342 |
| 124. | Peabody Western Coal Company | 86-0766626 |
| 125. | Peabody Wild Boar Mining, LLC | 26-3730759 |
| 126. | Peabody Wild Boar Services, LLC | 26-3725591 |
| 127. | Peabody Williams Fork Mining, LLC | 20-8162742 |
| 128. | Peabody Wyoming Gas, LLC | 20-5744610 |
| 129. | Peabody Wyoming Services, LLC | 26-3723011 |
| 130. | PEC Equipment Company, LLC | 20-0217950 |
| 131. | PG INVESTMENTS SIX, L.L.C. | 43-1898530 |
| 132. | Point Pleasant Dock Company, LLC | 20-0117005 |
| 133. | Pond River Land Company | 73-1625893 |
| 134. | Porcupine Production, LLC | 43-1898379 |
| 135. | Porcupine Transportation, LLC | 43-1898380 |
| 136. | Riverview Terminal Company | 13-2899722 |
| 137. | Sage Creek Holdings, LLC | 26-3286872 |
| 138. | Sage Creek Land & Reserves, LLC | 38-3936826 |
| 139. | School Creek Coal Resources, LLC | 20-2902073 |
| 140. | Seneca Coal Company, LLC | 84-1273892 |
| 141. | Seneca Property, LLC | 36-4820253 |
| 142. | Shoshone Coal Corporation | 25-1336898 |
| 143. | Southwest Coal Holdings, LLC | 37-1794829 |
| 144. | Star Lake Energy Company, L.L.C. | 43-1898533 |
| 145. | Sugar Camp Properties, LLC | 35-2130006 |
| 146. | Thoroughbred Generating Company, L.L.C. | 43-1898534 |
| 147. | Thoroughbred Mining Company LLC. | 73-1625889 |
| 148. | Twentymile Coal, LLC | 95-3811846 |
| 149. | Twentymile Equipment Company, LLC | 38-3982017 |
| 150. | Twentymile Holdings, LLC | 38-3937156 |
| 151. | United Minerals Company, LLC | 35-1922432 |
| 152. | West Roundup Resources, LLC | 20-2561489 |
| 153. | Wild Boar Equipment Company, LLC | 32-0488114 |
| 154. | Wild Boar Land Holdings Company, LLC | 36-4831131 |

## Exhibit A-1

**Chart Summarizing the Debtors' Non-ARS Program Cash Movement**

Exhibit A-1

# Peabody Energy Corporation, *et al.*
# Cash Management Diagram

[1] The legal entity is Peabody Natural Resource Company; however, Lee Ranch Coal Company, a trade name, is the account name reflected on the bank statement.

**<u>Exhibit A-2</u>**

**Chart Summarizing the Debtors' ARS Program Cash Movement**

Exhibit A-2

Peabody Energy Corporation, et al.
Cash Management Diagram





**<u>Exhibit B</u>**

**Schedule of Prepetition Bank Accounts**

Exhibit B

| Legal Entity | Banking Institution | Account No. | Account Purpose / Type |
|---|---|---|---|
| **Debtor Accounts:** | | | |
| **SHOWN INDIVIDUALLY IN EXHIBIT B-1:** | | | |
| PEABODY INVESTMENTS CORPORATION | PNC BANK | x1375 | NON-ARS RECEIPT |
| PEABODY NATURAL RESOURCES COMPANY [1] | PNC BANK | x1439 | NON-ARS RECEIPT |
| PEABODY DEVELOPMENT COMPANY | PNC BANK | x1295 | NON-ARS RECEIPT |
| GOLD FIELDS MINING, LLC | PNC BANK | x1447 | NON-ARS RECEIPT |
| PEABODY NATURAL GAS, LLC | PNC BANK | x9694 | NON-ARS RECEIPT |
| PEABODY COALTRADE INTERNATIONAL (CTI), LLC [1] | PNC BANK | x0195 | NON-ARS RECEIPT |
| | | | |
| PEABODY MIDWEST MINING, LLC | BANK OF AMERICA | x7815 | ARS RECEIPT |
| PEABODY POWDER RIVER MINING, LLC [1] | BANK OF AMERICA | x7873 | ARS RECEIPT |
| PEABODY WESTERN COAL COMPANY | BANK OF AMERICA | x7860 | ARS RECEIPT |
| COALSALES II, LLC | BANK OF AMERICA | x7828 | ARS RECEIPT |
| PEABODY COALTRADE, LLC | BANK OF AMERICA | x7844 | ARS RECEIPT |
| | | | |
| PEABODY ENERGY CORPORATION | PNC BANK | x5539 | RECEIPT CONCENTRATION |
| PEABODY ENERGY CORPORATION | BANK OF AMERICA | x7721 | MASTER CONCENTRATION |
| PEABODY ENERGY CORPORATION | U.S. BANK | x0672 | PAYROLL |
| PEABODY INVESTMENTS CORPORATION | U.S. BANK | x4740 | PAYROLL |
| PEABODY INVESTMENTS CORPORATION | U.S. BANK | x7836 | PAYROLL |
| PEABODY WESTERN COAL COMPANY | U.S. BANK | x2082 | PAYROLL |
| PEABODY INVESTMENTS CORPORATION | BANK OF AMERICA | x7747 | MASTER DISBURSMENT |
| | | | |
| **NOT SHOWN INDIVIDUALLY IN EXHIBIT B-1:** | | | |
| PEABODY ENERGY CORPORATION | PNC BANK | X9WCM [2] | INVESTMENT |
| PEABODY ENERGY CORPORATION | BANK OF AMERICA | x2317 | INVESTMENT |
| PEABODY ENERGY CORPORATION | WELLS FARGO BANK | x6745 | INVESTMENT |
| GOLD FIELDS MINING, LLC | MERRILL LYNCH | x4184 | INVESTMENT |
| PEABODY ENERGY CORPORATION | UMB BANK | x0471 | INVESTMENT |
| PEABODY ENERGY CORPORATION | BANK OF IRELAND | x3401 | INVESTMENT |
| PEABODY ENERGY CORPORATION | BNP PARIBAS | x998 | INVESTMENT |
| PEABODY ENERGY CORPORATION | U.S. BANK | x0308 | INVESTMENT |
| PEABODY ENERGY CORPORATION | CREDIT AGRICOLE | x0369 | INVESTMENT |
| PEABODY ENERGY CORPORATION | MORGAN STANLEY | x3476 | INVESTMENT |
| PEABODY ENERGY CORPORATION | OCBC BANK | x0002 | INVESTMENT |
| PEABODY ENERGY CORPORATION | NATIONAL AUSTRALIA BANK | x9009 | INVESTMENT |
| PEABODY ENERGY CORPORATION | BB&T BANK | x5408 | INVESTMENT |
| PEABODY ENERGY CORPORATION | BBVA COMPASS BANKSHARES | x6185 | INVESTMENT |
| PEABODY ENERGY CORPORATION | REGIONS BANK | x0061 | INVESTMENT |
| FOUR STAR HOLDINGS, LLC | REGIONS BANK | x9977 | INVESTMENT |
| PEABODY ENERGY CORPORATION | TD BANK | x4661 | INVESTMENT |
| FOUR STAR HOLDINGS, LLC | TD BANK | x4679 | INVESTMENT |
| PEABODY INVESTMENTS CORPORATION | COMMERCE BANK | x4951 | INVESTMENT |
| PEABODY ENERGY CORPORATION | GOLDMAN SACHS | x1467 | INVESTMENT |
| PEABODY ENERGY CORPORATION | CITIBANK | x7362 | INVESTMENT |
| PEABODY ENERGY CORPORATION | ROYAL BANK OF SCOTLAND | x0153 | INVESTMENT |
| PEABODY ENERGY CORPORATION | STANDARD CHARTERED BANK | x8001 | INVESTMENT |
| | | | |
| PEABODY NATURAL RESOURCES COMPANY [1] | GRANTS STATE BANK | x3722 | WORKING FUND |
| PEABODY INVESTMENTS CORPORATION | FIFTH THIRD BANK | x7783 | WORKING FUND |
| PEABODY RECREATIONAL LANDS LLC [1] | U.S. BANK | x1279 | WORKING FUND |
| BIG RIDGE, INC. | FARMERS STATE BANK | x3271 | WORKING FUND |
| PEABODY INVESTMENTS CORPORATION | UMB BANK | x2684 | WORKING FUND |
| TWENTYMILE COAL, LLC [1] | WELLS FARGO BANK | x3692 | WORKING FUND |
| PEABODY COULTERVILLE MINING, LLC [1] | COULTERVILLE BANKING CENTER | x3141 | WORKING FUND |
| PEABODY POWDER RIVER SERVICES, LLC [1] | UMB BANK | x0246 | WORKING FUND |
| PEABODY ROCKY MOUNTAIN MANAGEMENT SERVICES, LLC [1] | UMB BANK | x0270 | WORKING FUND |
| PEABODY ROCKY MOUNTAIN SERVICES, LLC [1] | UMB BANK | x0262 | WORKING FUND |
| PEABODY INVESTMENTS CORPORATION | REGIONS BANK | x0088 | WORKING FUND |
| PEABODY WESTERN COAL CO | WELLS FARGO BANK | x3356 | WORKING FUND |

Exhibit B

| Legal Entity | Banking Institution | Account No. | Account Purpose / Type |
|---|---|---|---|
| PEABODY ENERGY CORPORATION | MORGAN STANLEY | x4815 | OTHER OPERATING |
| PEABODY INVESTMENTS CORP. | BANK OF AMERICA | x5431 | OTHER OPERATING |
| PEABODY INVESTMENTS CORP. | BANK OF AMERICA | x7734 | OTHER OPERATING |
| GOLD FIELDS MINING LLC | BANK OF AMERICA | x7750 | OTHER OPERATING |
| PEABODY NATURAL GAS LLC | BANK OF AMERICA | x4219 | OTHER OPERATING |
| PEABODY ENERGY CORPORATION | HSBC LONDON | x7208 | OTHER OPERATING |
| PEABODY HOLDINGS (GIBRALTAR) LIMITED | BANK OF AMERICA | x8465 | OTHER OPERATING |
| PEABODY INTERNATIONAL SERVICES INC. | BANK OF AMERICA | x2615 | OTHER OPERATING |
| PEABODY ENERGY CORPORATION | HSBC US | x7995 | OTHER OPERATING |
| PEABODY ASSET HOLDINGS, LLC [1] | BANK OF AMERICA | x3574 | OTHER OPERATING |
| FOUR STAR HOLDINGS, LLC | BANK OF AMERICA | x0949 | OTHER OPERATING |
| FOUR STAR HOLDINGS, LLC | REGIONS BANK | x9985 | OTHER OPERATING |
| | | | |
| GOLD FIELDS MINING, LLC [1] | U.S. BANK | x7000 | ENVIRONMENTAL |
| GOLD FIELDS MINING, LLC | U.S. BANK | x3000 | ENVIRONMENTAL |
| GOLD FIELDS MINING, LLC [1] | U.S. BANK | x8000 | ENVIRONMENTAL |
| GOLD FIELDS MINING, LLC | U.S. BANK | x7000 | ENVIRONMENTAL |
| | | | |
| PEABODY ENERGY CORPORATION | TEXAS CAPITAL BANK | x8596 | TRUST |
| | | | |
| PEABODY ENERGY CORPORATION | WELLS FARGO BANK | x3458 | P-CARD |

**Non-Debtor Accounts:**

| SHOWN INDIVIDUALLY IN EXHIBIT B-2: | | | |
|---|---|---|---|
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x1287 | ARS LOCKBOX |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x1367 | ARS LOCKBOX |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x1308 | ARS LOCKBOX |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x3238 | ARS LOCKBOX |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x1359 | ARS LOCKBOX |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x5295 | ARS LOCKBOX |
| | | | |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x6361 | CONCENTRATION |
| P&L RECEIVABLES COMPANY LLC | PNC BANK | x7101 | COLLATERAL |
| P&L RECEIVABLES COMPANY LLC | BANK OF AMERICA | x7763 | OPERATING |

**Notes:**
[1] The legal entity name does not match the account name.
[2] Overnight investment account for the x5539 account.