## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

In re:

Peabody Energy Corporation, et al.,

Debtors.[1]

Case No. 16-42529
CHAPTER 11

(Joint Administration Requested)

Hearing Date and Time:
TBD

Hearing Location:
TBD

### MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER: (I) AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE WAGES AND BENEFITS; (II) AUTHORIZING PAYMENT AND CONTINUATION OF CERTAIN POSTPETITION EMPLOYEE WAGES AND BENEFITS; (III) AUTHORIZING PAYMENT OF COSTS AND EXPENSES INCIDENT TO THE FOREGOING; (IV) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS; AND (V) GRANTING OTHER RELATED RELIEF

Peabody Energy Corporation ("PEC") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court, pursuant to sections 105(a), 363, 507(a)(4), 507(a)(5), 541(b)(7) and 541(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order:  (a) authorizing, but not requiring, the Debtors in accordance with their stated policies (as such policies may be amended from time to time in the ordinary course of the Debtors' businesses) and in their discretion, to pay and honor as set forth herein, all or a portion of the amounts owing (and any associated administrative obligations) under or related to prepetition Wages and Salaries, Deductions, Withholdings, Payroll Taxes, Processing Costs, Purchasing Card and Reimbursable Expenses, Relocation Expenses, 401(k) Plans, Paid Time Off, Temporary Workers, Non-Insider Severance

---

[1]    The Debtors and their employer identification numbers are listed on Schedule 1 attached hereto.  The addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

Programs, Benefit Programs, Non-Insider Incentive Plans, Mine-Level Incentives, Non-Insider

Retention Awards, Allowance Programs, Other Employee Programs (each as individually

defined below and, collectively, the "Employee Wages and Benefits"); (b) authorizing, but not

requiring, the Debtors in accordance with their stated policies (as such policies may be amended

from time to time in the ordinary course of the Debtors' businesses) and in their discretion, to (i)

pay and honor, unless otherwise set forth herein, all of the postpetition amounts owing (and any

associated administrative obligations) under or related to Employee Wages and Benefits and (ii)

continue postpetition and in the ordinary course of their businesses the Employee Wages and

Benefits, as those Employee Wages and Benefits were in effect as of the Petition Date and as

may be modified, terminated, amended or supplemented from time to time; (c) authorizing

applicable banks and other financial institutions (collectively, the "Banks") to receive, process

and pay any and all checks presented for payment of, and electronic payment requests relating to

any of the foregoing; and (d) granting certain related relief, and in support thereof, respectfully

represent as follows:[2]

### Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States

District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to

28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

2.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under the Bankruptcy Code.  The

Debtors are authorized to continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]      A copy of the proposed order will be made available on the Debtors' case website at
http://www.kccllc.net/peabody.

3.      Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri.  PEC was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a wholly-owned direct or indirect subsidiary of PEC.

4.      PEC is the world's largest private-sector coal company (by volume), with 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators.  PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is exported to international customers.  As of December 31, 2015, Debtor PEC and its subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements.  In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons of proven and probable coal reserves, and the Debtors generated sales of approximately 180 million tons of coal.  In addition to its mining operations, the Debtors market and broker coal from other coal producers across the United States, Australia, Europe and Asia.

5.      The Debtors operate in a competitive and highly regulated industry that has experienced strong headwinds and precipitously declining demand and pricing in recent years due to the rise of low priced alternative energy sources – including an abundance of natural gas.  Combined with these factors, slowing global economic growth drove a wide range of goods prices lower in 2015 and resulted in the largest broad market decline since 1991.  Indeed, demand from electric utilities in the United States alone declined approximately 110 million tons in 2015.  These market conditions, in connection with lower realized pricing in the United States and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor

3

subsidiaries' coal sales during 2015.  As a result of these challenges, several large United States coal companies have filed for chapter 11 protection in recent years.

6.      A comprehensive description of the Debtors' businesses and operations, capital structure and the events leading to the commencement of these chapter 11 cases can be found in the Declaration of Amy Schwetz, Executive Vice President and Chief Financial Officer of Debtor PEC, in Support of First Day Motions of Debtors and Debtors in Possession (the "First Day Declaration").  In further support of this Motion, the Debtors have filed the Declaration of Julie A. Nadolny in Support of Certain Requests for First Day Relief (the "Supporting Declaration").  Both the First Day Declaration and the Supporting Declaration were filed contemporaneously herewith and are incorporated herein by reference.

### Employee Wages and Benefits

7.      The Debtors currently employ approximately 4,554 active full and part time employees (the "Employees").  The Employees are comprised of:  (a) approximately 953 salaried Employees, which are comprised of approximately 845 salaried exempt Employees and approximately 108 salaried non-exempt Employees and (b) approximately 3,601 hourly Employees, which are comprised of approximately 3,588 full time Employees and approximately 13 part time Employees.  With respect to the full time hourly Employees, there are approximately 3,290 non-represented Employees and approximately 298 represented Employees. The Debtors' represented hourly Employees are subject to one collective bargaining agreement ("CBA") with the United Mine Workers of America ("UMWA") District 22; these Employees are employed by Debtor Peabody Western Coal Company ("PWCC").  In the ordinary course of the Debtors' businesses, the Debtors also utilize various Temporary Workers (as defined below).

8.      The success of these chapter 11 cases depends upon the continued and uninterrupted service of the Employees.  Throughout the Debtors' operations, the Employees

perform a variety of critical functions including, among others, the mining and processing of coal; procurement and supply; sales and marketing; accounting and finance; administration; environmental health, safety and legal compliance; human resources, investor relations and corporate communications; legal; business development; training; and corporate compliance. Each individual Employee contribution to the Debtors' operations, as well as such Employees' relationships with customers, vendors and others, is essential to the administration of these chapter 11 cases, preservation of the value of the Debtors' estates and, thus, the ability of the Debtors to successfully emerge from these cases.

9.      Recent market conditions in concert with the strong headwinds facing the Debtors – including a decline in coal prices, recent U.S. bankruptcies in the coal industry, a decreased global demand in coal and a highly regulated environment – have created a stressful working environment for the Employees.  Any interruptions in payment of Employee Wages and Benefits will only impose additional hardship on Employees and likely jeopardize their continued performance and loyalty to the Debtors.  Indeed, such interruptions would likely have a devastating effect on Employee morale and expose the Debtors to potential safety, environmental and legal compliance risks.  The costs of these risks are too great compared to the benefits afforded by the Court's approval of the relief requested herein.

<u>Wages and Salaries</u>

10.      Employees are paid bi-weekly or semi-monthly through a payroll system that is administered by the Debtors (collectively, the "<u>Wages and Salaries</u>").  The bi-weekly payroll for non-St. Louis based salaried and hourly Employees last occurred on March 27, 2016, and the semi-monthly payroll for salaried employees last occurred on March 31, 2016.  For each pay period, it is assumed that Employees work their scheduled shifts and submit appropriate documentation for (a) any overtime work or (b) if they worked for fewer hours than scheduled

shift hours during the pay period.  The Debtors estimate that the average gross monthly payroll, based on actual Wages and Salaries paid to Employees during calendar year 2015, is approximately $34.6 million.  As of the Petition Date, the Debtors estimate that they owe approximately $15.5 million in Employee Wages and Salaries, excluding Paid Time Off and other payments on account of Benefit Programs (as defined below).[3]  Accordingly, the Debtors request authority both to pay amounts due and owing and continue Employee Wages and Salaries, as necessary, going forward.

Deductions and Withholdings

11.    For each applicable pay period, the Debtors routinely deduct (the "Deductions") certain amounts from Employee paychecks.  Such deductions include, without limitation, pre- and after-tax deductions payable such as, among others, an Employee's share of Benefit Programs, contributions under health savings accounts and 401(k) programs, legally ordered deductions and miscellaneous voluntary and involuntary deductions.  Deductions are generally paid to either third party providers or to offset claim costs for the Benefit Programs. On average, based on actual Deductions during calendar year 2015, the Debtors deduct a total of approximately $6.6 million per month from Employees' paychecks, which amount the Debtors remit to the appropriate recipients.  The Debtors hereby seek authority, but not direction, to continue remitting the Deductions to the appropriate parties.

12.    In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withholdings").  The Debtors must then match the withheld amounts from their own funds for

---

[3]    The Debtors believe that none of their current Employees are owed in excess of the $12,850 cap for Employee Wages and Benefit Programs provided for under section 507(a)(4) of the Bankruptcy Code, excluding certain Withholdings and Paid Time Off.  Such obligations are expected to be paid in the ordinary course as they become due and payable.

6

Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes").  In the aggregate, the Debtors estimate that Payroll Taxes total approximately $14.4 million per month, based on actual monthly Payroll Taxes paid during calendar year 2015.  As of the Petition Date, based on historical data, the Debtors estimate that they likely have not yet turned over approximately $1.5 million in Payroll Taxes for the most recent payroll period up to the Petition Date.  The Debtors hereby seek authority, but not direction, to continue remitting the Payroll Taxes to the appropriate taxing authorities as needed, including, without limitation, with respect to the most recent payroll period up to the Petition Date, and any prior period.

13.     Finally, the Debtors also incur costs incident to various Employee Wages and Salaries, such as payments to parties for charges associated with the administration of the Wages and Salaries and for other costs incident to the provision thereof (collectively, the "Processing Costs").  Based on historical data, the Debtors estimate that they incur approximately $175,000 in annual Processing Costs, a portion of which remains unpaid as of the Petition Date.  Payment of the unpaid Processing Costs is justified because the failure to pay any such amounts might disrupt services of third-party providers.  By paying these Processing Costs, the Debtors will likely avoid even temporary disruptions of such services, ensuring that the Employees obtain all of their compensation without interruption.  Accordingly, the Debtors hereby seek authority, but not direction, to continue remitting the Processing Costs to the appropriate third parties.

Purchasing Cards and Reimbursements

14.     Prepetition, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred in the scope of their work on behalf of the Debtors

7

(the "Reimbursable Expenses").  These included, among others, transportation, lodging, meals and other necessary and appropriate miscellaneous business expenses permitted pursuant to the Debtors' policies regarding Reimbursable Expenses.

15.    The vast majority of Employees with Reimbursable Expenses participate in the Debtors' purchasing card program with Wells Fargo (the "Purchasing Card").  In accordance with the Debtors' agreement with Wells Fargo, the Debtors issue to certain Employees a Purchasing Card for (a) business travel and related expenses and (b) various other miscellaneous operating related purchases and non-purchase order purchases needed during the course of business.  As of the Petition Date, the Debtors have approximately 775 active Purchasing Cards.  The Debtors believe that the Purchasing Cards are beneficial to the Debtors because they (a) minimize the need for Employees to incur personal expenses for purchases made on behalf of the Debtors and (b) facilitate the processing of expenses by the Debtors.  To ensure compliance with the Debtors' policies regarding Reimbursable Expenses, Employees, their managers and the Debtors' audit department thoroughly review Purchasing Card statements to ensure that Employees' personal expenses are not paid for by the Debtors.

16.    Based on information available to the Debtors regarding actual Purchasing Card expenditures during calendar year 2015, the Debtors typically incur approximately $1.0 million in Purchasing Card charges each month.  These charges are processed and documented in essentially the same manner as personal credit cards:  Wells Fargo generates a monthly statement that is transmitted to the Debtors to review and pay appropriate charges.   As of the Petition Date, the Debtors estimate that they owe approximately $600,000 on account of appropriate Purchasing Card charges.  Pursuant to the Debtors' contract with Wells Fargo, the Debtors were required to provide a letter of credit to Wells Fargo in the amount of approximately $2.0 million

8

on December 11, 2015.[4]  Absent payment of prepetition amounts outstanding, Wells Fargo may cancel the Purchasing Cards.  In this scenario, Employees would be required to pay for Reimbursable Expenses themselves and submit receipts to the Debtors for reimbursement.  Such a result would burden the Debtors' auditing department and require significant additional time and expense to process reimbursement requests from Employees.  Furthermore, this would require certain Employees to pay for business related expenses, some of which would be significant, from their own personal funds.

17.    Employees also incur certain out-of-pocket Reimbursable Expenses that are not charged to a Purchasing Card.  These expenses are incurred by Employees performing duties in the ordinary course of the Debtors' operations.  Employees are reimbursed for these expenses after submitting an expense report (with appropriate receipts) that is reviewed and approved by the Debtors.  Although the Debtors request that Employees promptly submit reimbursement requests for these out-of-pocket expenses, there is inevitably some lag time between the incurrence of such an expense and processing the Debtors' payment thereof.  Nonetheless, based on historical information, the Debtors typically have approximately $100,000 in non-Purchase Card Reimbursable Expenses each month, and estimate that approximately $150,000 is due and owing as of the Petition Date to Employees for these expenses.

18.    By this Motion, the Debtors seek authority, but not direction, to (a) pay to Wells Fargo for all appropriate charges under the Purchasing Card program that are due and owing as of the Petition Date, (b) continue using the Purchasing Card program in the ordinary course of business during these chapter 11 cases, (c) continue paying all Purchasing Card program charges and related expenses as they arise in the ordinary course of the Debtors' operations and (d) continue paying Employees for any Reimbursable Expenses incurred prior to

---

[4]    As of the Petition Date, the Debtors are not aware of a draw by Wells Fargo under this letter of credit.

the Petition Date or that Employees will incur during these chapter 11 cases whether or not as part of the Purchasing Card program.

Relocation Expenses

19.     In the ordinary course of business, given the global nature of the Debtors' operations, the Debtors pay or reimburse Employees or certain third parties for relocation and related expatriate expenses incurred at the Debtors' request or for the Debtors' benefit (the "Relocation Expenses") pursuant to established written policies.  The Relocation Expenses generally include amounts incurred for immigration support, rental and home finding/purchase/sale assistance, temporary lodging and housing and related expenses, moving expenses, income tax assistance, travel expenses for home finding and home visits, storage, lease termination, sales and marketing assistance and spousal employment assistance.

20.     As of the Petition Date, the Debtors estimate that approximately $90,000 is due and owing to either Employees or third parties in connection with Relocation Expenses. Based on expectations regarding future expenditures, the Debtors estimate that the monthly Relocation Expenses going forward will be approximately $85,000, which amount is largely a result of anticipated expenses related to the preparation of tax related materials.  Accordingly, the Debtors request authority, but not direction, both to pay amounts due and owing under such programs as of the Petition Date and continue Relocation Expenses, as necessary, going forward.

Health and Welfare Benefit Programs

21.     The Debtors maintain and/or contribute to a number of employee benefit programs, including, but not limited to, programs that offer:

a)      Health care coverage;
b)      Prescription drug coverage;
c)      Dental;
d)      Vision;
e)      Disability and life insurance coverage;

10

f)      Accidental death and dismemberment;
g)      Business travel accident insurance;
h)      Employee assistance and wellness programs;
i)      Dependent care and healthcare flexible spending accounts;
j)      Long term care;
k)      Medical benefits for certain international Employees;
l)      Coalition Family Health Center (Debtor-sponsored clinic);[5] and
m)      Stop-loss insurance.[6]

(collectively, the "Benefit Programs").  As of the Petition Date, there were approximately 13,200

Employees and additional individuals participating in Benefit Programs, including inactive and

disabled Employees and their dependents.  These Benefit Programs are self-insured or fully-

insured with the costs being (a) paid fully by the Debtors, (b) shared by the Debtors and

Employees or (c) fully paid by the Employees, depending on the program.  Given the timing

elements involved in the receipt and processing of costs and expenses associated with the Benefit

Programs, precise dollar estimates are difficult to calculate.  Nonetheless, based on 2015 actual

Benefit Program costs, the Debtors estimate that approximately $4.6 million, which includes

related administrative costs, is due and owing in connection with the Benefit Programs as of the

Petition Date.  Further, based on 2015 actual expenditures, the Debtors estimate that the Benefit

Program cost, including related administrative costs, going forward will be approximately $10.3

million per month.

        22.     By this Motion, the Debtors seek authority, but not direction, to (a) pay all

cost and expenses (net of any rebates, discounts or other setoffs) associated with the Benefit

---

[5]      This center is a primary care clinic and pharmacy located in the Powder River Basin in Northeast Wyoming that provides primary care and wellness benefits to approximately 4,000 of the Debtors' Employees, retirees and dependents.  It is funded by the Debtors in a partnership with two other coal companies, which share, on a proportional basis, in the costs and related administrative expenses.  During 2015, the Debtors paid approximately $2.5 million in connection with the operation and administration of this facility, and estimate that as of the Petition Date, $750,000 is due and owing in connection with the center's operations.

[6]      Solely with respect to the Kayenta mine operations and pursuant to a customer contract, the Debtors purchased a stop-loss insurance policy to cap the Debtors' exposure to certain healthcare claims.  The costs associated with this stop-loss policy are entirely borne by this customer, with the Debtors only serving as a pass through for such healthcare claims and expenses between the insurer and the customer.  By this Motion, the Debtors seek authority to pay any amounts due and owing as of the Petition Date, seek reimbursement from the customer for such amounts and continue this insurance program postpetition.

11

Programs, including those accrued but unpaid as of the Petition Date and (b) continue

(or modify) Benefit Programs in the ordinary course of the Debtors' businesses during these

chapter 11 cases.

<u>Paid Time Off</u>

23.    In addition to certain monetary forms of compensation, the Debtors

provide Employees with other forms of compensation, including, among other things, certain

paid time off benefits (the "<u>Paid Time Off</u>") such as:  (a) paid vacation of between ten days and

25 days per year,[7] which is calculated based such things as the amount of continual employment

with the Debtors and relevant prior experience (whether with the Debtors or in the industry

generally); (b) the use of paid holidays and personal/sick days under certain circumstances; and

(c) statutorily required benefits, such as military duty leave, jury duty leave and family and

medical leave.  For each eligible Paid Time Off day, Employees are paid their regularly

scheduled wages.[8]

24.    The Debtors seek to have Employees that have any banked or earned Paid

Time Off as of the Petition Date be permitted to utilize that Paid Time Off postpetition, without

disruption to the Debtors' general policies regarding Paid Time Off.

<u>401(k) Plans</u>

25.    The Debtors also maintain two qualified defined contribution plans:

(i) PIC Employee Retirement Account (the "<u>PIC Qualified 401(k)</u>") and (ii) Peabody Western –

---

[7]    The Debtors' Powder River Basin Employees are eligible to defer a maximum of 360 hours of vacation time, but must use a minimum of 40 hours of current year vacation time before deferring any remaining, unused hours.  Also, the Debtors previously permitted certain Employees to bank unused vacation hours each year.  As of the Petition Date, this program and the value of the days are frozen and Employees are no longer able to bank unused vacation hours.

[8]    Generally, Employees are eligible for Paid Time Off, such as vacation, as of January 1 each year. However, if an Employee leaves the Debtors for any reason, other than retirement or long-term disability, and has at least one year of continuous service, such Employee will generally receive a pro-rated lump sum payment of certain of their unused Paid Time Off (<u>i.e.</u>, for each month worked during the year, the payout increases incrementally).

12

UMWA 401(k) Plan (the "PW 401(k) Plan," and, together with the PIC Qualified 401(k), the "401(k) Plans").  The PIC Qualified 401(k) is a voluntary defined contribution plan.  All eligible salaried and non-represented Employees of the Debtors are eligible to participate as of the date of their employment or anytime thereafter.  The PIC Qualified 401(k) is subject to the provisions of ERISA.  The PIC Qualified 401(k) allows participants to invest in, among other things, a selection of mutual funds and common/collective trusts.  Each year, participants may contribute from 1% to 60% of their eligible compensation to the PIC Qualified 401(k).  Certain participants are also eligible for a matching contribution by the Debtors of between 6% and 8% of the Employees' voluntary contributions and, at the Debtors' discretion, a performance contribution that is based on the Debtors' financial performance.  In total, the Debtors contributed approximately $24.0 million in 2015 on account of such matching and estimate that approximately $775,000 of unmatched contributions are due as of the Petition Date.[9]

26.     The PW 401(k) Plan is a voluntary, qualified, defined contribution plan for current Employees represented by the UMWA under the Western Surface Agreement of 2013 who are or were employed by PWCC, Big Sky Coal Company or Seneca Coal Company.  The PW 401(k) Plan is subject to the provisions of ERISA.  The PW 401(k) Plan allows participants to invest in, among other things, a selection of mutual funds and common/collective trusts.  Each year, participants may contribute from 1% to 50% of their eligible compensation to the PW 401(k) Plan.  Certain participants are also eligible for a limited matching contribution by the Debtors if such participants defer certain Paid Time Off; however, matching by the Debtors is de minimis given the amount of Paid Time Off deferrals.

---

[9]     In 2015, the Debtors also contributed PEC common stock with a value of approximately $19.5 million to the PIC Qualified 401(k).

27.     By this Motion, the Debtors seek authority, but not direction, to:

(i) continue the 401(k) Plans postpetition and (ii) pay amounts owed as of the Petition Date under

the 401(k) Plans.

Temporary Workers

28.     From time to time, in addition to Employees, the Debtors retain

independent contractors and various staffing agencies (together, the "Temporary Workers") who

are engaged on an "as-needed" or project basis to augment the Debtors' Employees.  Currently,

Temporary Workers are comprised of approximately 32 individuals and approximately 20

staffing agencies that assist with, among other things, certain legal, clerical, field technical,

maintenance, mining production, safety and related services.  These are critical functions within

the Debtors' businesses and are necessary for the Debtors' day-to-day operations.  Employees

would not be able to do their jobs in the absence of such Temporary Workers.  Accordingly, the

Debtors seek authority, but not direction, to pay all outstanding obligations and costs related to

Temporary Workers so that they continue to provide uninterrupted service to the Debtors.

29.     The remuneration and length of employment of Temporary Workers

depends on the terms of the applicable agreement between the Debtors and the Temporary

Workers.  As of the Petition Date, based on 2015 actual expenditures for Temporary Workers,

the Debtors estimate that approximately $900,000 is owed on account of accrued and unpaid

obligations related to the Temporary Workers.

Non-Insider Severance Program

30.     If it is necessary to separate a non-Insider salaried or hourly Employee

from the workforce in connection with a reduction in force or a voluntary separation program

14

(the "<u>Non-Insider Severance Program</u>"),[10] such Employees are generally provided, among other

things, (a) a lump-sum cash payment; (b) career transition services paid for by the Debtors; (c)

up to 52 weeks of wages and salaries, depending on the length of the Employee's service; and (d)

the continuation[11] of certain COBRA Benefits and certain other Benefit Programs.[12]

      31.    Paying or honoring prepetition amounts owed related to the Non-Insider

Severance Program and maintaining the Non-Insider Severance Program is critical to the

Debtors' ongoing operations.  Employees view the Non-Insider Severance Program as a valuable

benefit and its continuation will further show that it's "business as usual" during the pendency of

these chapter 11 cases.  As of the Petition Date, the Debtors have approximately $240,000 in

unpaid Non-Insider Severance Program amounts due and owing and owe approximately $1.0

million in COBRA Benefits for approximately 260 Employees under the Non-Insider Severance

Program.

<u>Non-Insider Incentive Plans</u>

      32.    To incentivize all Employees to achieve their highest and best

performance for the company (and attract and retain Employees), the Debtors have established

both short and long term incentive plans.  The short term incentive plan is generally for salaried

---

[10]    By this Motion, the Debtors are not seeking to continue severance programs for "<u>Insiders</u>" (as that term is defined in section 101 of the Bankruptcy Code).  The Debtors reserve the right, however, to seek approval of such a program for Insiders, in accordance with section 503(c) of the Bankruptcy Code, through a separate motion.  Additionally, the Debtors are not seeking to pay amounts for any Insider Employee who was terminated prepetition.

[11]    If a separated Employee elects coverage for certain medical benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("<u>COBRA</u>"), it is continued for the balance of the month the Employee is separated plus the three following months at the same cost as they had as an active Employee (collectively, the "<u>COBRA Benefits</u>").  For every month thereafter of the remaining COBRA period, such Employees are responsible for paying the entire cost of the COBRA Benefits.  For other COBRA-eligible benefits such as, among others, dental and vision, a separated Employee is responsible for the full cost of continuing these benefits upon separation.

[12]    Pursuant to the CBA between PWCC and the UMWA, based on operational needs, PWCC may implement an early retirement incentive program for certain members of its represented workforce.  PWCC meets annually with the UMWA to evaluate the need for such a program.  PWCC may make this program available to no less than 3% of represented Employees, but may limit participation in certain job classifications.  Eligibility criteria are established annually.  Notwithstanding the foregoing, all represented Employees aged 70 and over are eligible to participate in this program.  As of the Petition Date, there are two represented Employees that are eligible to participate in this program.  By this Motion, the Debtors request authority, but not direction, to continue this program postpetition.

Employees but includes certain salaried exempt mine Employees.  The long-term incentive plan

is generally limited to Employees at the Director level and above.[13]  Solely with respect to this

Motion, the Debtors seek to:  (a) continue the short term incentive plan for the approximate 480

non-Insider Employees (the "Non-Insider STIP") and (b) continue the long term incentive plan

for the approximate 150 non-Insider Employees (the "Non-Insider LTIP," and together with the

Non-Insider STIP, the "Non-Insider Incentive Plans")).  This is to ensure that eligible non-Insider

Employees are rewarded for their contributions to improve the Debtors' operations.  By this

Motion, the Debtors seek authority to:  (a) pay any prepetition amounts outstanding in

connection with the Non-Insider Incentive Plans, which the Debtors estimate to be

approximately $7.9 million for the 2016 Non-Insider LTIP (and no amounts are due and owing

as of the Petition Date in connection with the 2016 Non-Insider STIP) and (b) continue the non-

Insider Incentive Plans in the ordinary course of business for the balance of these chapter 11

cases.

33.    The 2016 Non-Insider STIP has three general award metrics:  (a) the

Debtors' achievement of certain overall financial and performance goals, such as, among other

things, meeting or exceeding adjusted EBITDA targets; (b) achieving certain safety targets as set

by the Debtors; and (c) individual performance goals and objectives unique to each non-Insider

Employee as established by and among each Employee, his or her manager and his and her

department.  Under this program and pursuant to applicable laws, these Employees will be paid

the 2016 Non-Insider STIP in two installments: one in August 2016 and a second on or before

March 15, 2017.  The aggregate amount paid under the Non-Insider STIP for calendar year 2015

was approximately $8.5 million, which was approximately 50% of the Non-Insider STIP award

---

[13]    By this Motion the Debtors are not seeking to continue any incentive programs for Insiders.  The Debtors
reserve the right, however, to seek approval for such programs through a separate motion.

that could have been awarded for the calendar year pursuant to the plan.  The Debtors'

management requested, and the Debtors' Board of Directors approved, this decrease in Non-

Insider STIP cash awards in light of market conditions and business performance.  Assuming the

Debtors achieve the Non-Insider STIP metrics during calendar year 2016 and do not reduce the

2016 Non-Insider STIP award, the Debtors estimate that up to approximately $12.3 million may

be paid in connection with the Non-Insider STIP.

34.    In January 2016, in lieu of equity awards pursuant to the Non-Insider

LTIP, the Debtors decided to conserve equity and, in their discretion, award cash of

approximately $7.9 million to 150 Employees as a long-term incentive to be paid out in equal

installments in January 2017, 2018 and 2019.  This cash award was based on a certain percentage

of the Employee's base salary; however, in recognition of their current operating environment,

the Debtors reduced this percentage for each eligible Non-Insider Employee by 25%.  Thus, if a

Non-Insider Employee's award was the equivalent of 20% of his or her salary, that Non-Insider

Employee is instead eligible to receive only 15% of his or her salary.[14]

Mine-Level Incentives

35.    The Debtors provide incentive programs at each of their mines under

which certain eligible Employees are able to receive bonuses for, among other things, safety

(the "Safety Bonus") and productivity (the "Productivity Bonus" and, together with the Safety

Bonus, the "Mine-Level Incentives").  These bonuses are paid on a monthly, quarterly or annual

basis (the "Measurement Period") if such Employees and their mine location achieve specific and

---

[14]    In the ordinary course of the Debtors' businesses, the Debtors typically determine the amount of the Non-Insider LTIP award in January of each calendar year with the next such determination taking place in January 2017.  As described herein, these awards will be paid out in equal installments in January 2018, 2019 and 2020.  The Debtors believe that they have authority under the Bankruptcy Code and other precedent to determine and pay this award on a postpetition basis without an express grant of authority from the Court.  Notwithstanding this authority, out of an abundance of caution, the Debtors request authority to continue the Non-Insider LTIP as described herein to provide further assurances to these Non-Insider Employees that they will continue to be rewarded for their continued service to the Debtors' businesses.

17

challenging safety and production targets for such Measurement Period.  In the aggregate, annual individual Safety Bonuses range from $1,800 to $2,400 and are based on achievement of individual and collective safety targets and the same is true for a Productivity Bonus, which ranges from 5% to 15% of an individual miner's base annual salary for exempt employees or the appropriate imputed hourly rate for nonexempt employees.

36.    Approximately 4,400 Employees are eligible to receive bonuses in connection with the Mine-Level Incentive Plans.  In the aggregate, the Debtors paid Employees approximately $31 million in connection with Mine-Level Incentive Plans during calendar year 2015 and estimate that approximately $4.1 million is due and owing as of the Petition Date. These incentive programs are typical in the coal industry and, more importantly, have been an integral component of the Debtors' compensation package for its mine workers for many years. Accordingly, it is critical that the Debtors be authorized to (a) pay prepetition amounts due and owing under the Mine-Level Incentive Plans and (b) continue their Mine-Level Incentive Plans during these chapter 11 cases.

Non-Insider Retention Awards

37.    To retain seven critical non-insider Employees, the Debtors established retention awards prepetition to ensure that these key Employees are compensated for their valuable skills, knowledge and continued employment by the Debtors (collectively, the "Non-Insider Retention Awards").  These awards were established in the ordinary course of the Debtors' businesses during the summer of 2015 and are one time payments scheduled for payment in either the third or fourth quarter of 2016.  The Debtors estimate that the total amount to be paid to these seven Employees as set forth herein is approximately $415,000.[15]  By this

---

[15]    By this Motion the Debtors are not seeking to continue any retention programs for Insiders.

Motion, the Debtors seek authority, but not direction, to pay all Non-Insider Retention Awards in the ordinary course of their businesses during these chapter 11 cases.

<u>Allowance Programs</u>

38.    The Debtors maintain various allowance and stipend programs (the "<u>Allowance Programs</u>") that are offered to certain Employees, depending on the nature of their work.  An example of such a program is the Debtors' vehicle reimbursement program (the "<u>Vehicle Reimbursement</u>").  The Vehicle Reimbursement program reimburses employees for business related costs (<u>e.g.</u>, vehicle depreciation, insurance, taxes, fees, fuel and maintenance, among other things) associated with Employees using their personal vehicles for work-related activities.  Qualified Employees whose job requirements necessitate the use of a personal vehicle and travel a minimum of 5,000 business miles in a calendar year qualify for a Vehicle Reimbursement.  Such Reimbursements are based on a 75% business usage rate per the IRS guidelines.  During 2015, the Debtors paid approximately $3.3 million related to Vehicle Reimbursement expenses.

39.    Other Allowance Programs generally include expenses associated with, among other things, vehicle mileage and use reimbursement for business travel, tools such as repair and maintenance supplies and equipment and clothing, such as coveralls, boots and safety glasses.  In the aggregate, based on 2015 actual expenditures, the Debtors typically incur approximately $50,000 in monthly expenses associated with the Allowance Programs.  Failing to honor these Allowance Programs will likely adversely affect the Employees ability to perform their normal, day-to-day tasks.  Accordingly, the Debtors request authority, but not direction, to both pay amounts due and owing under such programs as of the Petition Date and continue Allowance Programs, as necessary, going forward.

<u>Other Employee Programs</u>

40.     The Debtors provide other miscellaneous benefits to Employees, such as, tuition reimbursements, adoption assistance, charitable matching contributions and international medical and travel security assistance (collectively, the "<u>Other Employee Programs</u>").  The Debtors believe that the amounts owing on the Petition Date related to Other Employee Programs are negligible and that the continuation of these is important to maintaining Employee morale during these chapter 11 cases.  Accordingly, the Debtors request authority, but not direction, to both pay amounts due and owing under such programs as of the Petition Date and continue Other Employee Programs, as necessary, going forward.

### **Argument**

41.     The relief requested herein is warranted under sections 105(a), 363, 507(a)(4), 507(a)(5), 541(b)(7) and 541(d) of the Bankruptcy Code and case law in this District and elsewhere.

***Amounts Owed to Employees Enjoy Priority Status Under the Bankruptcy Code***

42.     Pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, an individual's claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date, and claims against the Debtors for contributions to employee benefit plans arising from services rendered within 180 days before the Petition Date, are each afforded unsecured priority status of $12,850 per employee.  In addition, the costs of administering employee benefits programs also are entitled to priority under section 507(a)(5) of the Bankruptcy Code.  See <u>In re Cardinal Indus., Inc.</u>, 164 B.R. 76, 78 (Bankr. S.D. Ohio 1993) (granting administrative priority to plan administrator of medical and dental insurance plans); <u>Allegheny Int'l, Inc. v. Metro. Life Ins. Co.</u>, 145 B.R. 820, 822-23 (W.D. Pa. 1992) (granting priority status to the prepetition claims of a medical benefits plan

administrator).  See also In re Falcon Prods., Inc., No. 07-01495, 2008 WL 363045, at *10

(Bankr. E.D. Mo. Feb. 8, 2008) (affirming the bankruptcy court's decision that the provider of

employee health benefits was entitled to administrative priority status); accord In re Qualia

Clinical Serv., Inc., No. 09-80629, 2010 WL 1430234, at *3 (Bankr. D. Neb. Feb. 12, 2010)

(granting priority status under section 507(a)(5) to physician's medical malpractice insurance

premiums).  Accordingly, the Debtors believe that many of the Employee Wages and Benefits

and associated administrative costs constitute priority claims under sections 507(a)(4) and

507(a)(5) of the Bankruptcy Code.  To the extent such obligations constitute priority claims, the

Debtors are required to pay such claims in full to confirm a chapter 11 plan.  See

11 U.S.C. § 1129(a)(9)(B).  Thus, granting the relief sought herein would only cause such

Employee claims to be paid in the initial stages of these chapter 11 cases, rather than at the plan

confirmation stage.

       43.    In the instant case, the Debtors believe that the amount owing to or on

account of any particular Employee, excluding certain Withholdings and Paid Time Off, will not

exceed the allowable amount of such priority claims under the Bankruptcy Code.  Thus, payment

of Employee Wages and Benefits pursuant to this Motion will be unlikely to deplete assets

otherwise available to other unsecured creditors under a plan of reorganization.  Likewise,

because certain Employee Wages and Benefits are entitled to priority as described above,

amounts paid on account of such obligations also are not available for distribution to unsecured

creditors.

***Certain Employee Wages and Benefits are Held in Trust or are Excluded From Property of
the Estate and, Thus, Are Not Available for General Distribution to Creditors***

       44.    Deductions and Payroll Taxes, as discussed above, are withheld from

Employee paychecks and are not available for general distribution to the Debtors' creditors

because they are not property of the estate, under both the Bankruptcy Code and trust fund principles.

        45.     Section 541(d) of the Bankruptcy Code provides that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest" becomes property of a debtor's estate only to the extent of the debtor's legal title therein. 11 U.S.C. § 541(d). It is well established that "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'." Begier v. I.R.S., 496 U.S. 53, 59 (1990). The Eighth Circuit has established that a debtor does not have an equitable interest in the property held in trust for another, but rather that the trustee "[holds] bare legal title to the trust res subject to a duty to reconvey it to the rightful owner." See Chiu v. Wong, 16 F.3d 306, 310 (8th Cir. 1994) (allowing plaintiff to impose a constructive trust on former debtor's estate in order to recover amount former debtor had previously invested in failed partnership with the plaintiff). More specifically, taxes collected on behalf of taxing authorities are not property of the estate. See Begier, 496 U.S. at 59 (holding that taxes such as excise taxes, FICA taxes and withholding taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate). Accordingly, such funds are not available for general distribution to a debtor's creditors. Section 541(b)(7) of the Bankruptcy Code similarly provides grounds for granting the relief requested with respect to certain Deductions. Section 541(b)(7) of the Bankruptcy Code, which was enacted in 2005, provides that the following are excluded from the definition of property of the estate:

> any amount —
>
>     a)  withheld by an employer from the wages of employees for payment as contributions: (i) to (I) an employee benefit plan that is subject to [ERISA] or … a governmental plan …; (II) a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or (III) a tax-

> deferred annuity…; or (ii) to a health insurance plan regulated by State law ….
>
> b) received by an employer from employees for payment as contributions: (i) to (I) an employee benefit plan that is subject to [ERISA] or … a governmental plan …; (II) a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or (III) a tax-deferred annuity…; or (ii) to a health insurance plan regulated by State law . . . .

11 U.S.C. § 541(b)(7).

46.     Further, many federal, state and local taxing authorities impose personal liability on the officers and directors of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted.[16]  Accordingly, if these amounts remain unpaid, there is a risk that the Debtors' officers and directors may be subject to lawsuits on account of any such nonpayment during the pendency of these chapter 11 cases.  Such lawsuits obviously would constitute a significant distraction for officers and directors at a time when they should be focused on the Debtors' efforts to (a) stabilize their postpetition business operations and (b) develop and implement a successful reorganization strategy.  To avoid the serious disruption of the Debtors' reorganization efforts that could result from the nonpayment of such obligations, the Debtors seek authority to remit all amounts collected on behalf of the

---

[16]     See, e.g., Colo. Rev. Stat. § 39-21-116.5 ("[a]ll officers of a corporation and all members of a partnership or a limited liability company required to collect, account for, and pay over any tax administered by this article who willfully fail to collect, account for, or pay over such tax or who willfully attempt in any manner to evade or defeat any such tax, or the payment thereof, are subject to, in addition to other penalties provided by law, a penalty equal to one hundred fifty percent of the total amount of the tax not collected, accounted for, paid over, or otherwise evaded."); 35 Ill. Comp. Stat. Ann. 735/3-7(a) ("Any officer or employee of any taxpayer subject to the provisions of a tax Act administered by the Department who has the control, supervision or responsibility of filing returns and making payment of the amount of any trust tax imposed in accordance with that Act and who willfully fails to file the return or make the payment to the Department or willfully attempts in any other manner to evade or defeat the tax shall be personally liable for a penalty equal to the total amount of tax unpaid by the taxpayer including interest and penalties thereon."); N.M. Stat. Ann. § 7-1-72.1 ("Any person other than the taxpayer who willfully causes or attempts to cause the evasion of a taxpayer's obligation to report and pay tax may be assessed a civil penalty in an amount equal to the amount of the tax, penalty and interest attempted to be evaded."). See also Ariz. Dept. of Revenue v. Action Marine, Inc., 181 P.3d 188, 194 (Ariz. 2008) (holding that corporate officers can be held personally liable for failing to remit collected taxes); Hanson v. Colo. Dep't. of Revenue, 140 P.3d 256, 260 (Colo. App. 2006) (holding that Colo. Rev. Stat. § 39-21-116.5 is "only applicable to those corporate officers responsible for tax compliance who willfully fail to collect, account for, or pay taxes").

23

Employees, including prepetition Deductions and Withholdings, to the applicable taxing authorities to the extent that they have not already been remitted.

47.     The relief requested herein should be granted to comply with the clear and unambiguous requirements of section 541 of the Bankruptcy Code.  It should also be granted because these items are either not property of the Debtors' estates or held in trust for the benefit of the appropriate federal, state and local taxing authorities.  Lastly, as outlined herein, granting the relief requested does nothing other than authorize the Debtors to make payments for their intended purpose, which will not adversely affect the Debtors' estates or their creditors.

### *The Requested Relief is Appropriate Pursuant to Section 363 of the Bankruptcy Code*

48.     Section 363(b) of the Bankruptcy Code allows the debtors, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell or lease assets outside the ordinary course of business must be based upon a sound business purpose.  See In re Channel One Commc'ns, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  See also In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (holding that relief was appropriate where payment was needed to "preserve and protect its business and ultimately reorganize, retain its current working employees and maintain positive employee morale"); accord TLP Servs., LLC v. Stoebner (In re Polaroid Corp.), 460 B.R. 740, 741-42 (B.A.P. 8th Cir. 2011) (allowing a trustee, pursuant in part to section 363(b)(1), to use cash collateral to fund efforts to recover funds from third parties); Lionel Corp., 722 F.2d at 1070-71 (requiring a "good business reason" to approve a sale pursuant to section 363(b)); In re W.A. Mallory Co. Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound

business purpose' test when examining § 363(b) sales.") (citing WBQ P'ship v. Va. Dep't of Med.
Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)); In re
Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for
determining a motion pursuant to section 363(b) of the Bankruptcy Code is "a good business
reason").

          49.    Courts in this District and others have consistently been reluctant to
interfere with corporate decisions unless "it is made clear that those decisions are, inter alia,
clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to
the corporation, are made on the basis of inadequate information or study, are made in bad faith,
or are in violation of the Bankruptcy Code."  In re Farmland Indus., Inc., 294 B.R 855, 881
(Bankr. W.D. Mo. 2003) (citing In re United Artists Theatre Co., 315 F.3d 217, 233
(3d Cir. 2003), Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309
(5th Cir. 1985) and In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).
See also Crystalin, L.L.C. v. Selma Props., Inc. (In re Crystalin, L.L.C.), 293 B.R. 455, 463-64
(B.A.P. 8th Cir. 2003) (holding that the business judgment rule may be satisfied "'as long as the
proposed action appears to enhance the debtor's estate'") (quoting Four B. Corp. v. Food Barn
Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 567 n.16 (8th Cir. 1997) (emphasis in
original, internal quotations and alterations omitted)); Food Barn Stores, Inc., 107 F.3d
at 567 n.16 (holding that "[w]here the [debtor's] request is not manifestly unreasonable or made
in bad faith, the court should normally grant approval 'as long as the proposed action appears to
enhance the debtor's estate.'") (quoting Richmond Leasing Co. v. Capital Bank, N.A.,
762 F.2d 1303, 1309 (5th Cir. 1985) (internal alterations and quotations omitted)); Official
Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147

B.R. 650, 656 (S.D.N.Y. 1992) (finding that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence.").

50.     The uninterrupted continuation of the Debtors' businesses is critical to preserving the value of the estates and maximizing value to all interested parties.  Absent payment of Employee Wages and Benefits outstanding as of the Petition Date, Employees are likely to seek alternative job opportunities.  This would result in a vicious cycle of declining morale, performance and possible Employee departures – all of which negatively impact the Debtors' operations and ability to successfully restructure.  The loss of valuable Employees would be distracting and counterproductive at this critical time, during which the Debtors are stabilizing their operations and restructuring their obligations in these chapter 11 cases.  Thus, honoring Employee Wages and Benefits that accrued prepetition as set forth above will allow the Debtors to retain their workforce and better facilitate Employee support for the Debtors' restructuring efforts.  Accordingly, as outlined in this Motion, the Debtors believe that the requested relief represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm.

51.     In addition, continuation of Employee Wages and Benefits as set forth herein, and the payment of related costs and expenses on a postpetition basis, is appropriate under section 363(c) of the Bankruptcy Code.  Under section 363(c)(1) of the Bankruptcy Code, a debtor may "enter into transactions…and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Here, the continuation of Employee Wages and Benefits, and the payment of related costs and expenses, as set forth herein, on a postpetition basis are ordinary course transactions incident to the day-to-day operations of the Debtors' businesses.  Indeed, a "fundamental characteristic of an 'ordinary' post-

petition business transaction is its similarity to a pre-petition business practice." In re Commercial Mortg. & Fin., Co., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (quoting Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.), 186 B.R. 414, 425 (N.D. Ill. 1995)).  See also Peltz v. Gulfcoast Workstation Grp. (In re Bridge Info. Sys., Inc.), 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003) (holding that a transaction is part of the "ordinary course of business" if it is of the "type that is commonly undertaken within the debtor's industry" so long as interested parties would not "reasonably expect[] the particular debtor in possession to seek court approval before entering into the questioned transaction").  This includes payments to non-Insider Employees that may become due under the Debtors' existing programs and policies, each of which were in place prior to the Petition Date.  Accordingly, the Court should approve the continuation of such programs on a postpetition basis.

### Section 105(a) of the Bankruptcy Code and The Doctrine of Necessity Provides a Basis for Granting the Requested Relief

52.    Finally, section 105(a) of the Bankruptcy Code empowers a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105.  The purpose of section 105 of the Bankruptcy Code is to ensure the bankruptcy court has the power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy ¶ 105.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015).  "Under [section 105 of the Bankruptcy Code,] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing In re Ionosphere Clubs, Inc., 98 B.R. 174, 177 (Bankr S.D.N.Y. 1989)).

53.     In addition, under the "doctrine of necessity," courts allow the immediate payment of prepetition claims where such payment is essential to the debtor's continued operations.  See In re Wehrenberg, Inc., 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor."); In re United Am., Inc., 327 B.R. 776, 782 (Bankr. E.D. Va. 2005) (acknowledging the existence of the doctrine of necessity "because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its prepetition claim"); accord In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation).

54.     The bankruptcy court's exercise of its authority under the "doctrine of necessity" is appropriate to carry out specific statutory provisions of chapter 11, specifically sections 1107(a), 1108 and 363(b)(1) of the Bankruptcy Code, which authorize a debtor in possession to maintain and operate the debtor's business and use estate property outside of the ordinary course of business.  Indeed, a debtor in possession operating a business under "[section] 1107(a) [of the Bankruptcy Code] contains an implied duty of the debtor-in-possession [to act as a fiduciary in order] to protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest.  In re CEI Roofing, Inc., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (internal quotations omitted).  "There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Accordingly, a bankruptcy court's exercise of its authority under section 105(a) of the Bankruptcy Code is appropriate to

28

carry out the central policies underlying chapter 11 – to preserve going concern value and maximize property available to satisfy all creditors.

55.    Thus, in a number of reported cases, debtors have been permitted to pay prepetition wages, salaries and employee benefits, even where those claims are substantial.  See Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 281 (S.D.N.Y. 1987) (authorizing the payment of employee wages and workers' compensation obligations aggregating in excess of $250 million and rejecting appeal of creditor that argued that the debtor should have been required to pay all similarly situated prepetition claimants); In re Gulf Air, Inc., 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989) (authorizing debtor to pay certain prepetition employee claims for wages, health and life insurance and workers' compensation premiums where such payments were in the best interests of creditors, the debtor and the debtor's employees and were essential to a successful reorganization).

56.    The Debtors submit that the relief requested is essential to the Debtors' efforts to reorganize and maximize the value of their businesses and provide value to stakeholders.  Any delay in paying or maintaining Employee Wages and Benefits (including the payment of related administrative obligations) will adversely impact the Debtors' relationships with their Employees and could irreparably impair Employees' morale, dedication, confidence and cooperation.  As noted at the outset of this Motion, both the Debtors' relationship with their Employees and, by extension, the Employees' relationships with the Debtors' customers could be impaired if the relief requested herein is not granted.  It is also possible that without the relief requested, the Debtors' ability to provide superior goods and service will be irreparably damaged. Thus, granting the relief requested herein will go a long way to bolstering the morale of the Employees and ensuring the uninterrupted availability of their services to assist the Debtors in

(a) maintaining a "business as usual" atmosphere to the extent possible and (b) preserving the

Debtors' relationships with a variety of important constituencies, including key customers and

vendors.  Put simply, at this early stage, the Debtors simply cannot risk the potential damage to

their businesses that would inevitably attend any decline in their Employees' morale attributable

to the Debtors' failure to honor, pay and continue the Employee Wages and Benefits as set forth

herein.

57.    Bankruptcy courts in this District and elsewhere have granted similar

relief in numerous other cases.  See, e.g., In re Noranda Aluminum, Inc., No. 16-10083

(Bankr. E.D. Mo. Feb. 9, 2016) (Docket No. 78) (order granting debtors' motion to pay

prepetition wages, compensation and employee benefits in the ordinary course of business,

among other things); In re Arch Coal, Inc., No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016)

(Docket No. 57) (granting first-day motion authorizing debtors to pay prepetition wages, salaries,

employee benefits and other compensation, and to maintain employee benefit programs, among

other things); In re Bakers Footwear Grp., Inc., No. 12-49658 (Bankr. E.D. Mo. Oct. 10, 2012)

(Docket No.  82) (granting first-day motion authorizing payment of prepetition wages, salaries,

reimbursable employee business expenses and obligations relating to medical and employee

benefit plans, among other things); In re US Fidelis, Inc., No. 10-41902 (Bankr. E.D. Mo.

Mar 9, 2010) (Docket No. 29) (same); accord In re Alpha Natural Res., Inc., No. 15-33896

(Bankr. E.D. Va. Sept. 3, 2015) (Docket No. 356) (final order); In re Molycorp, No. 15-11357

(Bankr. D. Del. June 26, 2015 and July 17, 2015) (Docket Nos. 82 and 223) (interim and final

orders); In re Walter Energy, Inc., No. 15-02741 (Bankr. N.D. Ala. July 15, 2015)

(Docket No. 61) (final order); In re Patriot Coal Corp., No. 15-32450 (Bankr. E.D. Va.

June 4, 2015) (Docket No. 243) (final order); In re James River Coal Co., No. 14-31848

(Bankr. E.D. Va. Apr. 10, 2014 and May 9, 2014) (Docket Nos. 78 and 239) (interim and final

orders); In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. July 10, 2012 and

Aug. 2, 2012) (Docket Nos. 33 and 253) (interim and final orders).[17]

**Authority for Banks to Honor and
Pay Checks Issued to Pay Approved Prepetition Amounts**

58.    The Debtors also request that the Banks be authorized, when requested by

the Debtors, to receive, process, honor and pay any and all checks presented for payment of, and

to honor all fund transfer requests made by the Debtors related to Employee Wages and Benefits,

whether such checks were presented or fund transfer requests were submitted prior to or after the

Petition Date, provided that sufficient funds are available and standing in the Debtors' credit in

the applicable accounts to cover such checks and fund transfers.  The Debtors represent that

these checks are drawn on identifiable disbursement accounts and can be readily identified as

relating directly to the authorized payment of such prepetition liabilities.  Accordingly, the

Debtors believe that checks other than those relating to authorized payments will not be honored

inadvertently.  Any such financial institution may rely on the representations of such Debtors as

to which checks are issued or wire transfers are made and authorized to be paid in accordance

with this Motion without any duty of further inquiry and without liability for relying on such

representations.

**Reservation of Rights**

59.    Nothing contained herein or in the proposed order is intended or should be

construed as:  (a) an admission as to the validity or priority of any claim against the Debtors;

(b) a waiver of the Debtors' or any party in interest's rights to dispute any claim on any grounds;

(c) a promise to pay any claim; (d) an implication or admission that any particular claim against

---

[17]    Unreported orders cited herein are not attached to this Motion.  Copies of these orders will be made
available to the Court or other parties upon request made to the Debtors' counsel.

the Debtors is a claim of a type that, by this Motion, the Debtors seek authority to pay; or (e) a request to assume or reject any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.  The Debtors expressly reserve the right to contest any claims related to the Employee Wages and Benefits under applicable bankruptcy and non-bankruptcy law.

### Requests for Immediate Relief and Waiver of Stay

60.    Pursuant to Bankruptcy Rules 6003(b) and 6004(h), the Debtors seek entry of an order granting the relief requested by this Motion and, to the extent it applies, a waiver of any stay of the effectiveness of such orders.

61.    Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting … a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate including a motion to pay all or part of a claim that arose before the filing of the petition."  Fed. R. Bankr. P. 6003(b).  In other words, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the Court may authorize the relief prior to the twenty second day following the Petition Date.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

62.    As set forth above and in the First Day Declaration, it is vital that the court grant the relief requested herein and the Debtors submit that ample cause exists to justify:  (a) the immediate entry of order granting the relief sought herein pursuant to Bankruptcy Rule 6003(b),

to the extent it applies, and (b) a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies, with respect to the order.

## Notice

63.     Notice of this Motion has been given to: (a) Davis Polk & Wardwell LLP and Bryan Cave LLP as counsel to Citibank, N.A. as Administrative Agent for the First Lien Secured Credit Facility and the Debtors' proposed debtor in possession secured credit facility; (b) Brown Rudnick LLP, as counsel to Wilmington Savings Fund Society, FSB as prospective trustee and collateral agent for the Secured Second Lien Notes; (c) Foley & Lardner LLP, as counsel to Wilmington Trust Company as prospective Indenture Trustee for the Unsecured Notes;[18] (d) Robinson & Cole LLP, as counsel to U.S. Bank as resigning trustee and collateral agent for the Second Lien Notes, the Unsecured Notes and the Convertible Notes;[19] (e) counsel to any ad hoc committees; (f) the Debtors' 50 largest unsecured creditors; (g) Mayer Brown LLP, as counsel to PNC Bank, N.A., as Administrator under the Debtors' prepetition accounts receivable securitization facility; (h) the United Mine Workers of America; (i) the Office of the United States Trustee for the Eastern District of Missouri; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Department of the Interior; (m) the United States Department of Labor; (n) the United States Attorney's Office for the Eastern District of Missouri; and (o) Pension Benefit Guaranty Corporation (collectively, the "Notice Parties").  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

---

[18]     These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; and the (iv) 7.875% Senior Notes due November 2026.

[19]     These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; (iv) 7.875% Senior Notes due November 2026; and the (v) Convertible Junior Subordinated Debentures due December 2066.

## **No Prior Request**

64.     No prior request for the relief sought in this Motion has been made to this

Court or any other court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an order, substantially in the form submitted to the Court, granting the relief requested herein; and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: April 13, 2016
      St. Louis, Missouri

Respectfully submitted,

/s/ Steven N. Cousins
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
 St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 612-2239
Email:  scousins@armstrongteasdale.com
Email:  sehlers@armstrongteasdale.com

Heather Lennox (*pro hac vice* pending)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Email:  hlennox@jonesday.com

Amy Edgy (*pro hac vice* pending)
Daniel T. Moss (*pro hac vice* pending)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Email:  aedgy@jonesday.com
Email:  dtmoss@jonesday.com

*Proposed Attorneys for Debtors
and Debtors in Possession*

35

## SCHEDULE 1

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 1. | Peabody Energy Corporation | 13-4004153 |
| 2. | American Land Development, LLC | 20-3405570 |
| 3. | American Land Holdings of Colorado, LLC | 26-3730572 |
| 4. | American Land Holdings of Illinois, LLC | 30-0440127 |
| 5. | American Land Holdings of Indiana, LLC | 20-2514299 |
| 6. | American Land Holdings of Kentucky, LLC | 20-0766113 |
| 7. | American Land Holdings of New Mexico, LLC | 32-0478983 |
| 8. | American Land Holdings of West Virginia, LLC | 20-5744666 |
| 9. | Arid Operations, Inc. | 84-1199578 |
| 10. | Big Ridge, Inc. | 37-1126950 |
| 11. | Big Sky Coal Company | 81-0476071 |
| 12. | Black Hills Mining Company, LLC | 32-0049741 |
| 13. | BTU Western Resources, Inc. | 20-1019486 |
| 14. | Caballo Grande, LLC | 27-1773243 |
| 15. | Caseyville Dock Company, LLC | 20-8080107 |
| 16. | Central States Coal Reserves of Illinois, LLC | 43-1869432 |
| 17. | Central States Coal Reserves of Indiana, LLC | 20-3960696 |
| 18. | Century Mineral Resources, Inc. | 36-3925555 |
| 19. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 |
| 20. | COALSALES II, LLC | 43-1610419 |
| 21. | Colorado Yampa Coal Company, LLC | 95-3761211 |
| 22. | Conservancy Resources, LLC | 20-5744701 |
| 23. | Cottonwood Land Company | 43-1721982 |
| 24. | Cyprus Creek Land Company | 73-1625890 |
| 25. | Cyprus Creek Land Resources LLC | 75-3058264 |
| 26. | Dyson Creek Coal Company, LLC | 43-1898526 |
| 27. | Dyson Creek Mining Company, LLC | 20-8080062 |
| 28. | El Segundo Coal Company, LLC | 20-8162824 |
| 29. | Empire Land Holdings, LLC | 61-1742786 |
| 30. | Falcon Coal Company, LLC | 35-2006760 |
| 31. | Four Star Holdings, LLC | 30-0885825 |
| 32. | Francisco Equipment Company, LLC | 37-1805119 |
| 33. | Francisco Land Holdings Company, LLC | 36-4831111 |
| 34. | Francisco Mining, LLC | 30-0922117 |
| 35. | Gallo Finance Company, LLC | 43-1823616 |
| 36. | Gold Fields Chile, LLC | 13-3004607 |
| 37. | Gold Fields Mining, LLC | 36-2079582 |
| 38. | Gold Fields Ortiz, LLC | 22-2204381 |
| 39. | Hayden Gulch Terminal, LLC | 86-0719481 |
| 40. | Highwall Mining Services Company | 20-0010659 |
| 41. | Hillside Recreational Lands, LLC | 32-0214135 |
| 42. | HMC Mining, LLC | 43-1875853 |
| 43. | Illinois Land Holdings, LLC | 26-1865197 |
| 44. | Independence Material Handling, LLC | 43-1750064 |
| 45. | James River Coal Terminal, LLC | 55-0643770 |
| 46. | Juniper Coal Company, LLC | 43-1744675 |
| 47. | Kayenta Mobile Home Park, Inc. | 86-0773596 |
| 48. | Kentucky Syngas, LLC | 26-1156957 |
| 49. | Kentucky United Coal, LLC | 35-2088769 |
| 50. | Lively Grove Energy, LLC | 20-5752800 |
| 51. | Lively Grove Energy Partners, LLC | 26-0180403 |
| 52. | Marigold Electricity, LLC | 26-0180352 |
| 53. | Midco Supply and Equipment Corporation | 43-6042249 |
| 54. | Midwest Coal Acquisition Corp. | 20-0217640 |
| 55. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 |

-1-

|  | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 56. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 |
| 57. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 |
| 58. | Moffat County Mining, LLC | 74-1869420 |
| 59. | Mustang Energy Company, LLC | 43-1898532 |
| 60. | New Mexico Coal Resources, LLC | 20-3405643 |
| 61. | NM Equipment Company, LLC | 36-4821991 |
| 62. | Pacific Export Resources, LLC | 27-5135144 |
| 63. | Peabody America, LLC | 93-1116066 |
| 64. | Peabody Archveyor, L.L.C. | 43-1898535 |
| 65. | Peabody Arclar Mining, LLC | 31-1566354 |
| 66. | Peabody Asset Holdings, LLC | 20-3367333 |
| 67. | Peabody Bear Run Mining, LLC | 26-3582291 |
| 68. | Peabody Bear Run Services, LLC | 26-3725923 |
| 69. | Peabody Caballo Mining, LLC | 83-0309633 |
| 70. | Peabody Cardinal Gasification, LLC | 20-5047955 |
| 71. | Peabody China, LLC | 43-1898525 |
| 72. | Peabody Coalsales, LLC | 20-1759740 |
| 73. | Peabody COALTRADE International (CTI), LLC | 20-1435716 |
| 74. | Peabody COALTRADE, LLC | 43-1666743 |
| 75. | Peabody Colorado Operations, LLC | 20-2561644 |
| 76. | Peabody Colorado Services, LLC | 26-3723774 |
| 77. | Peabody Coulterville Mining, LLC | 20-0217834 |
| 78. | Peabody Development Company, LLC | 43-1265557 |
| 79. | Peabody Electricity, LLC | 20-3405744 |
| 80. | Peabody Employment Services, LLC | 26-3730348 |
| 81. | Peabody Energy Generation Holding Company | 73-1625891 |
| 82. | Peabody Energy Investments, Inc. | 68-0541702 |
| 83. | Peabody Energy Solutions, Inc. | 43-1753832 |
| 84. | Peabody Gateway North Mining, LLC | 27-2294407 |
| 85. | Peabody Gateway Services, LLC | 26-3724075 |
| 86. | Peabody Holding Company, LLC | 74-2666822 |
| 87. | Peabody Holdings (Gibraltar) Limited | 20-5543587 |
| 88. | Peabody IC Funding Corporation | 46-2326991 |
| 89. | Peabody IC Holdings, LLC | 30-0829603 |
| 90. | Peabody Illinois Services, LLC | 26-3722638 |
| 91. | Peabody Indiana Services, LLC | 26-3724339 |
| 92. | Peabody International Investments, Inc. | 26-1361182 |
| 93. | Peabody International Services, Inc. | 20-8340434 |
| 94. | Peabody Investments Corp. | 20-0480084 |
| 95. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 |
| 96. | Peabody Midwest Management Services, LLC | 26-3726045 |
| 97. | Peabody Midwest Mining, LLC | 35-1799736 |
| 98. | Peabody Midwest Operations, LLC | 20-3405619 |
| 99. | Peabody Midwest Services, LLC | 26-3722194 |
| 100. | Peabody Mongolia, LLC | 20-8714315 |
| 101. | Peabody Natural Gas, LLC | 43-1890836 |
| 102. | Peabody Natural Resources Company | 51-0332232 |
| 103. | Peabody New Mexico Services, LLC | 20-8162939 |
| 104. | Peabody Operations Holding, LLC | 26-3723890 |
| 105. | Peabody Powder River Mining, LLC | 43-0996010 |
| 106. | Peabody Powder River Operations, LLC | 20-3405797 |
| 107. | Peabody Powder River Services, LLC | 26-3725850 |
| 108. | Peabody PowerTree Investments, LLC | 20-0116980 |
| 109. | Peabody Recreational Lands, L.L.C. | 43-1898382 |
| 110. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 |
| 111. | Peabody Rocky Mountain Services, LLC | 20-8162706 |
| 112. | Peabody Sage Creek Mining, LLC | 26-3730653 |
| 113. | Peabody School Creek Mining, LLC | 20-3585831 |

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 114. | Peabody Services Holdings, LLC | 26-3726126 |
| 115. | Peabody Southwest, LLC | 20-5744732 |
| 116. | Peabody Southwestern Coal Company, LLC | 43-1898372 |
| 117. | Peabody Terminal Holding Company, LLC | 26-1087861 |
| 118. | Peabody Terminals, LLC | 31-1035824 |
| 119. | Peabody Trout Creek Reservoir LLC | 30-0746873 |
| 120. | Peabody Twentymile Mining, LLC | 26-3725223 |
| 121. | Peabody Venezuela Coal Corp. | 43-1609813 |
| 122. | Peabody Venture Fund, LLC | 20-3405779 |
| 123. | Peabody-Waterside Development, L.L.C. | 75-3098342 |
| 124. | Peabody Western Coal Company | 86-0766626 |
| 125. | Peabody Wild Boar Mining, LLC | 26-3730759 |
| 126. | Peabody Wild Boar Services, LLC | 26-3725591 |
| 127. | Peabody Williams Fork Mining, LLC | 20-8162742 |
| 128. | Peabody Wyoming Gas, LLC | 20-5744610 |
| 129. | Peabody Wyoming Services, LLC | 26-3723011 |
| 130. | PEC Equipment Company, LLC | 20-0217950 |
| 131. | PG INVESTMENTS SIX, L.L.C. | 43-1898530 |
| 132. | Point Pleasant Dock Company, LLC | 20-0117005 |
| 133. | Pond River Land Company | 73-1625893 |
| 134. | Porcupine Production, LLC | 43-1898379 |
| 135. | Porcupine Transportation, LLC | 43-1898380 |
| 136. | Riverview Terminal Company | 13-2899722 |
| 137. | Sage Creek Holdings, LLC | 26-3286872 |
| 138. | Sage Creek Land & Reserves, LLC | 38-3936826 |
| 139. | School Creek Coal Resources, LLC | 20-2902073 |
| 140. | Seneca Coal Company, LLC | 84-1273892 |
| 141. | Seneca Property, LLC | 36-4820253 |
| 142. | Shoshone Coal Corporation | 25-1336898 |
| 143. | Southwest Coal Holdings, LLC | 37-1794829 |
| 144. | Star Lake Energy Company, L.L.C. | 43-1898533 |
| 145. | Sugar Camp Properties, LLC | 35-2130006 |
| 146. | Thoroughbred Generating Company, L.L.C. | 43-1898534 |
| 147. | Thoroughbred Mining Company LLC. | 73-1625889 |
| 148. | Twentymile Coal, LLC | 95-3811846 |
| 149. | Twentymile Equipment Company, LLC | 38-3982017 |
| 150. | Twentymile Holdings, LLC | 38-3937156 |
| 151. | United Minerals Company, LLC | 35-1922432 |
| 152. | West Roundup Resources, LLC | 20-2561489 |
| 153. | Wild Boar Equipment Company, LLC | 32-0488114 |
| 154. | Wild Boar Land Holdings Company, LLC | 36-4831131 |