IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>　　　　　　　　　　Debtors. | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**DECLARATION OF JULIE A. NADOLNY IN SUPPORT OF CERTAIN REQUESTS
FOR FIRST DAY RELIEF RELATED TO CUSTOMER PROGRAMS**

I, Julie A. Nadolny, make this Declaration under 28 U.S.C. § 1746 and state:

1.　　I am the Vice President, Total Rewards at Peabody Energy Corporation ("Peabody"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have held this position since November 2014 and report directly to Mr. Geoffrey Woodcroff, Acting Senior Vice President for Global Human Resources.  I am responsible for the oversight of all the Debtors' benefit programs, including health and welfare plans, retirement plans as well as executive and broad-base compensation.  I oversee approximately 15 employees and deal with virtually all employee-related issues for the Debtors' U.S. operations.  Given the scope of my operational duties and my 22 year history with the Debtors, I am thoroughly familiar with all aspects of the Debtors' employee-related benefits and programs described Employee Motion (as defined below).

2.　　Prior to holding my current position, I served the Debtors as:  (a) Vice President for Global Benefits from November 2011 to November 2014; (b) Vice President for Benefits from December 2010 to October 2011; (c) Vice President for Benefits, Employee Relations and International Services from April 2008 to November 2010; (d) Vice President for Benefits from

December 2005 to March 2008; (e) Director of Benefits Strategy and Development from February 2003 to November 2005; (f) Director of Compensation and Retirement Plans from July 2000 to January 2003; (g) Manager for Human Resource Strategies from May 1999 to June 2000; (h) Manager for Health and Welfare Plans from October 1997 to May 1999; (i) Manager for Medical and Life Benefits from October 1996 to September 1997; (j) Supervisor for Benefits from February 1994 to September 1996.  In these roles I have implemented a number of key initiatives to ensure programs were competitive while driving significant cost and balance sheet reductions.  Indeed, over the last decade, I was heavily involved in the Debtors' transition to defined contribution type programs (for both retiree healthcare and retirement) from defined benefit programs.

      3.      Prior to my employment by the Debtors, I was the Manager of Health & Welfare Plans at Continental Bank Corporation from September 1989 to February 1994 and a Personnel Generalist at Pyramid Northern Mouldings from September 1986 to September 1989.

      4.      I graduated from University of Illinois at Urbana-Champaign with a Bachelor of Arts in Economics in 1986 and received a Master of Business Administration in 2003 from Washington University in St. Louis.  Also, in September 1993, I was awarded the Certified Employee Benefits Specialist designation by the University of Pennsylvania Wharton School of Business.

      5.      I submit this Declaration in support of the "first-day" relief that the Debtors have requested in the Motion of Debtors and Debtors in Possession for an Order: (I) Authorizing Payment of Prepetition Employee Wages and Benefits; (II) Authorizing Payment and Continuation of Certain Postpetition Employee Wages and Benefits; (III) Authorizing Payment of Costs and Expenses Incident to the Foregoing; (IV) Authorizing Financial Institutions to

Honor and Process Related Checks and Transfers; and (V) Granting Other Related Relief (the "Employee Motion").[1]

6. I am thoroughly familiar with the facts and justifications underlying the Employee Motion. Generally, the requested relief is intended to show Employees that, as best as possible, it will be "business as usual" during this bankruptcy case.

7. Except as otherwise indicated, my testimony in this Declaration is based upon my personal knowledge, my review of business records or knowledge acquired in the ordinary and regular course of my work for the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

***The Debtors' Employees***

8. As of the Petition Date, the Debtors employ approximately 4,554 active full and part time Employees. There are approximately 845 salaried exempt Employees, 108 salaried non-exempt Employees, 3,588 full time hourly Employees and 13 part time hourly Employees. With respect to the full time hourly Employees, approximately 3,290 are not represented and approximately 298 are. The Debtors' represented hourly Employees all work for Debtor Peabody Western Coal Company; their employment is governed by a single collective bargaining agreement between that Debtor and the UMWA District 22.

9. In the ordinary course of the Debtors' businesses, the Debtors also utilize various Temporary Workers. Currently, Temporary Workers are comprised of approximately 32 individuals and approximately 20 staffing agencies that assist with, among other things, certain legal, clerical, field technical, maintenance, mining production, safety and related services. These are critical functions within the Debtors' businesses and are necessary for the Debtors'

---

[1] Capitalized words not otherwise defined herein have the definition ascribed to them in the Employee Motion.

3

day-to-day operations. Employees would not be able to do their jobs in the absence of such Temporary Workers.

10. The Debtors ability to continue operating their business depends on their Employees and Temporary Workers continuing to work for the Debtors. The Employees and Temporary Workers perform a variety of critical functions including, among others, the mining and processing of coal; procurement and supply; sales and marketing; accounting and finance; administration; environmental health, safety and legal compliance; human resources, investor relations and corporate communications; legal; business development; training; and corporate compliance. If a material number of Employees or Temporary Workers were to quit their jobs, the Debtors ability to continue operating their businesses successfully would be impacted negatively.

11. The Employees and Temporary Workers willingness to continue to work for the Debtors is dependent upon their continuous receipt of the compensation the Debtors agreed to provide them. If the Debtors failed to provide their Employees and Temporary Workers with that compensation, many employees likely will quit. Those Employees and Temporary Workers that elect to stay will likely have lower morale resulting in a drop in productivity if they do not receive all their promised compensation. The morale of the remaining Employees and Temporary Workers will decrease further as they are assigned the responsibilities of departing Employees and Temporary Workers. Due to the uncertainties created by these bankruptcies cases, the Debtors will have difficulty hiring new employees to share in the remaining Employees' and Temporary Workers' responsibilities. The resulting increased workload likely will lead to another round of departures, resulting in a vicious cycle of declining morale, performance and more Employee and Temporary Worker departures. Significant attrition and lower productivity may prevent the Debtors from operating their business successfully and could

4

expose the Debtors to potential safety, environmental and legal compliance risks – all of which negatively impact the Debtors' ability to successfully reorganize.

***Employment Compensation***

12.     The Debtors compensate their Employees through wages, salaries, the provision of benefits and other incentive programs. In addition, the Debtors pay directly, or reimburse their Employees for, expenses their Employees incur in connection with carrying out their job responsibilities.

13.     <u>Wages and Salaries.</u>  The Debtors pay wages and salaries to their Employees on a bi-weekly or semi-monthly basis. The bi-weekly payroll for non-St. Louis based salaried and hourly Employees last occurred on March 27, 2016, and the semi-monthly payroll for salaried employees last occurred on March 31, 2016. The Debtors estimate that the average gross monthly payroll, based on actual Wages and Salaries paid to Employees during calendar year 2015, is approximately $34.6 million. As of the Petition Date, the Debtors estimate that they owe approximately $15.5 million in Employee Wages and Salaries, excluding Paid Time Off and other payments on account of Benefit Programs.[2] As of the Petition Date, based on 2015 actual expenditures for Temporary Workers, the Debtors estimate that approximately $900,000 is owed on account of accrued and unpaid obligations related to the Temporary Workers.

14.     In addition to certain monetary forms of compensation, the Debtors provide Employees with other forms of compensation, including, among other things, certain paid time off benefits such as: (a) paid vacation of between ten days and 25 days per year,[3] which is generally calculated based such things as the amount of continual employment with the Debtors

---

[2]     The Debtors believe that none of their current Employees are owed in excess of the $12,850 cap for Employee Wages and Benefit Programs provided for under section 507(a)(4) of the Bankruptcy Code, excluding certain Withholdings and Paid Time Off.

[3]     The Debtors' Powder River Basin Employees are eligible to defer a maximum of 360 hours of vacation time, but must use a minimum of 40 hours of current year vacation time before deferring any remaining, unused hours. Also, the Debtors previously permitted certain Employees to bank unused vacation hours each year. As of the Petition Date, this program and the value of the days are frozen and Employees are no longer able to bank unused vacation hours.

and relevant prior experience (whether with the Debtors or in the industry generally); (b) the use of paid holidays and personal/sick days under certain circumstances; and (c) statutorily required benefits, such as military duty leave, jury duty leave and family and medical leave.  For each eligible Paid Time Off day, Employees are paid their regularly scheduled wages.

15. The Debtors also incur costs incident to various Employee Wages and Salaries, such as payments to parties for charges associated with the administration of the Wages and Salaries and for other costs incident to the provision thereof.  Based on historical data, the Debtors estimate that they incur approximately $175,000 in annual Processing Costs, a portion of which remains unpaid as of the Petition Date.

16. <u>Deductions and Withholdings.</u>  The Debtors deduct from certain Employees' paychecks amounts to, among other things, make contributions to the 401(k) Plans (which, under certain circumstances and subject to certain limitations, are matched by the Debtors), pay the Employee's portion of costs for the Benefit Programs (some of which are paid fully by the Debtors), and make contributions to health savings accounts.  Deductions are generally paid to either third party providers or kept by the Debtors to pay for the Benefit Programs they maintain.  On average, based on actual Deductions during calendar year 2015, the Debtors deduct a total of approximately $6.6 million per month from Employees' paychecks.

17. Taxes are also withheld from Employee paychecks and remitted to the appropriate taxing authorities.  The Debtors must match certain withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance.  In the aggregate, the Debtors estimate that Payroll Taxes total approximately $14.4 million per month, based on actual monthly Payroll Taxes paid during calendar year 2015.  As of the Petition Date, based on historical data, the

6

Debtors estimate that they likely have not yet turned over to the appropriate taxing authorities approximately $1.5 million in Payroll Taxes.

18. Benefit Programs. The Debtors maintain and/or contribute to a number of employee benefit programs. As of the Petition Date, there were approximately 13,200 Employees and additional individuals participating in Benefit Programs, including inactive and disabled Employees and their dependents. These Benefit Programs are self-insured or fully-insured with the costs being (a) paid fully by the Debtors, (b) shared by the Debtors and Employees or (c) fully paid by the Employees, depending on the program. Given the timing elements involved in the receipt and processing of costs and expenses associated with the Benefit Programs, precise dollar estimates are difficult to calculate. Nonetheless, based on 2015 actual Benefit Program costs, the Debtors estimate that approximately $4.6 million, which includes related administrative costs, is due and owing in connection with the Benefit Programs as of the Petition Date. Further, based on 2015 actual expenditures, the Debtors' estimate that the Benefit Program cost, including related administrative costs, going forward will be approximately $10.3 million per month.

19. Expense Reimbursements. The Debtors reimburse Employees for certain reasonable and customary expenses incurred in the scope of their work on behalf of the Debtors. These include, among others, transportation, lodging, meals and other necessary and appropriate miscellaneous business expenses permitted pursuant to the Debtors' policies regarding Reimbursable Expenses.

20. The vast majority of Employees with Reimbursable Expenses participate in the Debtors' purchasing card program with Wells Fargo. In accordance with the Debtors' agreement with Wells Fargo, the Debtors issue to certain Employees a Purchasing Card for (a) business travel and related expenses and (b) various other miscellaneous operating related purchases and

7

non-purchase order purchases needed during the course of business. As of the Petition Date, the Debtors have approximately 775 active Purchasing Cards.

21. Based on information available to the Debtors regarding actual Purchasing Card expenditures during calendar year 2015, the Debtors typically incur approximately $1.0 million in Purchasing Card charges each month. As of the Petition Date, the Debtors estimate that they owe approximately $600,000 on account of appropriate Purchasing Card charges. Pursuant to the Debtors' contract with Wells Fargo, the Debtors were required to provide a letter of credit to Wells Fargo in the amount of approximately $2.0 million on December 11, 2015.

22. Employees also incur certain out-of-pocket Reimbursable Expenses that are not charged to a Purchasing Card. These expenses are incurred by Employees performing duties in the ordinary course of the Debtors' operations. Employees are reimbursed for these expenses after submitting an expense report (with appropriate receipts) that is reviewed and approved by the Debtors. Based on historical information, the Debtors typically have approximately $100,000 in non-Purchase Card Reimbursable Expenses each month, and estimate that approximately $150,000 is due and owing as of the Petition Date to Employees for these expenses.

23. In the ordinary course of business, given the global nature of the Debtors' operations, the Debtors pay or reimburse Employees or certain third parties for relocation and related expatriate expenses incurred at the Debtors' request or for the Debtors' benefit pursuant to established written policies. The Relocation Expenses generally include amounts incurred for immigration support, rental and home finding/purchase/sale assistance, temporary lodging and housing and related expenses, moving expenses, income tax assistance, travel expenses for home finding and home visits, storage, lease termination, sales and marketing assistance and spousal employment assistance. As of the Petition Date, the Debtors estimate that approximately

$91,000 is due and owing to either Employees or third parties in connection with Relocation Expenses. Based on expectations regarding future expenditures, the Debtors estimate that the monthly Relocation Expenses going forward will be approximately $85,000, which amount is largely a result of anticipated expenses related to the preparation of tax related materials.

24. The Debtors also maintain Allowance Programs, which are offered to certain Employees, depending on the nature of their work. An example of such a program is the Debtors' Vehicle Reimbursement program pursuant to which the Debtors reimburses employees for business related costs (e.g., vehicle depreciation, insurance, taxes, fees, fuel and maintenance, among other things) associated with Employees using their personal vehicles for work-related activities. During 2015, the Debtors paid approximately $3.3 million related to Vehicle Reimbursement expenses. Other Allowance Programs generally include expenses associated with, among other things, vehicle mileage and use reimbursement for business travel, tools such as repair and maintenance supplies and equipment and clothing, such as coveralls, boots and safety glasses. In the aggregate, based on 2015 actual expenditures, the Debtors typically incur approximately $50,000 in monthly expenses associated with the Allowance Programs.

25. <u>Non-Insider Employer Severance</u>. If it is necessary to separate a non-Insider salaried or hourly Employee from the workforce in connection with a reduction in force or a voluntary separation program, such Employees are generally provided, among other things, (a) a lump-sum cash payment; (b) career transition services paid for by the Debtors; (c) up to 52 weeks of wages and salaries, depending on the length of the Employee's service; and (d) the continuation of certain COBRA Benefits and certain other Benefit Programs.[4] As of the Petition

---

[4] Pursuant to the CBA between PWCC and the UMWA, based on operational needs, PWCC may implement an early retirement incentive program for certain members of its represented workforce. PWCC meets annually with the UMWA to evaluate the need for such a program. PWCC may make this program available to no less than 3% of represented Employees, but may limit participation in certain job classifications. Eligibility criteria are established annually. Notwithstanding the foregoing, all represented Employees aged 70 and over are eligible to participate in this program. As of the Petition Date, there are two represented Employees that are eligible to participate in this program. By this Motion, the Debtors request authority, but not direction, to continue this program postpetition.

9

Date, the Debtors have approximately $240,000 in unpaid Non-Insider Severance Program amounts due and owing and owe approximately $1.0 million in COBRA Benefits for approximately 260 Employees under the Non-Insider Severance Program.

26. <u>Non-Insider Retention.</u>  To retain seven critical non-insider Employees, the Debtors established retention awards prepetition to ensure that these key Employees are compensated for their valuable skills, knowledge and continued employment by the Debtors. These awards were established in the ordinary course of the Debtors' businesses during the summer of 2015 and are one time payments scheduled for payment in either the third or fourth quarter of 2016.  The Debtors estimate that the total amount to be paid to these seven Employees is approximately $415,000.

27. <u>Non-Insider Incentive Plans</u>.  To incentivize all Employees to achieve their highest and best performance for the company (and attract and retain Employees), the Debtors have established both short and long term incentive plans.  The short term incentive plan is generally for salaried Employees but includes certain salaried exempt mine Employees.  The long-term incentive plan is generally limited to Employees at the Director level and above.  The aggregate amount paid under the Non-Insider STIP for calendar year 2015 was approximately $8.5 million, which was approximately 50% of the Non-Insider STIP award that could have been awarded for the calendar year pursuant to the plan.  Assuming the Debtors achieve the Non-Insider STIP metrics during calendar year 2016 and do not reduce the 2016 Non-Insider STIP award, the Debtors estimate that up to approximately $12.3 million may be paid in connection with the Non-Insider STIP.

28. In January 2016, in lieu of equity awards pursuant to the Non-Insider LTIP, the Debtors decided to conserve equity and, in their discretion, award cash of approximately $7.9 million to 150 Employees as a long-term incentive to be paid out in equal installments in January

2017, 2018 and 2019.  This cash award was based on a certain percentage of the Employee's base salary; however, in recognition of their current operating environment, the Debtors reduced this percentage for each eligible Non-Insider Employee by 25%.

29.    The Debtors also provide incentive programs at each of their mines under which certain eligible Employees are able to receive a Safety Bonus and a Productivity Bonus.  These bonuses are paid on a monthly, quarterly or annual basis if such Employees and their mine location achieve specific and challenging safety and production targets for such Measurement Period.  In the aggregate, annual individual Safety Bonuses range from $1,800 to $2,400 and are based on achievement of individual and collective safety targets and the same is true for a Productivity Bonus, which ranges from 5% to 15% of an individual miner's base annual salary for exempt employees or the appropriate imputed hourly rate for nonexempt employees.

30.    Approximately 4,400 Employees are eligible to receive bonuses in connection with the Mine-Level Incentive Plans.  In the aggregate, the Debtors paid Employees approximately $31 million in connection with Mine-Level Incentive Plans during calendar year 2015 and estimate that approximately $4.1 million is due and owing as of the Petition Date.

***Immediate Relief and Waiver of Stay are Justified***

31.    The Debtors' ability to pay in their discretion the claims described herein is necessary to prevent immediate and irreparable damage to the Debtors' businesses.  Most of the Employees and Temporary were not advised in advance that the Debtors would be filing these chapter 11 cases.  The filing of the chapter 11 cases will likely raise serious doubt for the Employees and Temporary Workers regarding their future with the Debtors that will only be exacerbated if the Debtors miss payroll or fail provide other agreed to compensation.  Without the relief requested in the Employee Motion being granted immediately, the Debtors will face enhanced risk of losing employees at the outset of these cases.

*Conclusion*

32.     To preserve the value of their businesses, one of the Debtors' principal objectives is to maintain their workforce at the outset of, and throughout, these cases, so the Debtors can continue "business as usual" as best as possible.  For the reasons described herein, the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in the Employee Motion.

                            Peabody Energy Corporation
                            (for itself and on behalf of the other 154 Debtors)

Date:  April 13, 2016                          By: /s/ Julie A. Nadolny
                                                    Julie A. Nadolny
                                                    Vice President