# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>Debtors.[1] | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105(a), 363 AND 503(b)(9) OF THE BANKRUPTCY CODE, FOR INTERIM AND FINAL ORDERS AUTHORIZING THEM TO PAY PREPETITION CLAIMS OF CERTAIN ESSENTIAL SUPPLIERS AND SERVICE PROVIDERS**

Peabody Energy Corporation ("PEC") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court, pursuant to sections 105(a), 363 and 503(b)(9) of title 11 of the United States Code (the "Bankruptcy Code"), for the entry of interim and final orders: (a) authorizing them, in their discretion and subject to the terms and conditions set forth herein, to pay, in the ordinary course of the Debtors' business: (i) certain prepetition claims (collectively, the "Essential Supplier Claims") of the Essential Suppliers (as defined below) relating to goods received by the Debtors more than 20 days before the Petition Date (as defined below) and services received prepetition, in an aggregate amount not to exceed approximately $10.3 million and (ii) certain prepetition claims (collectively, the "20-Day Administrative Claims") of the Essential Suppliers relating to

---

[1]    The Debtors and their employer identification numbers are listed on Schedule 1 attached hereto.  The addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

goods received by the Debtors within 20 days of the Petition Date without limit on the maximum

aggregate amount, as these claims if allowed would be entitled to administrative priority

pursuant to section 503(b)(9) of the Bankruptcy Code; (b) approving a procedure to address

those vendors who repudiate or otherwise refuse to honor their contractual obligations to the

Debtors; and (c) granting certain related relief, and in support thereof, respectfully represent as

follows:[2]

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to

28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States

District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to

28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy

Code.  The Debtors are authorized to continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

3.      Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri.  PEC

was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a

wholly-owned direct or indirect subsidiary of PEC.

4.      PEC is the world's largest private-sector coal company (by volume), with 26

active coal mining operations located in the United States and Australia.  The Debtors' domestic

---

[2]      Copies of the proposed orders will be made available on the Debtors' case website at
http://www.kccllc.net/peabody.

mines produce and sell thermal coal, which is primarily purchased by electricity generators. PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is exported to international customers. As of December 31, 2015, Debtor PEC and its subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements. In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons of proven and probable coal reserves, and the Debtors generated sales of approximately 180 million tons of coal. In addition to its mining operations, the Debtors market and broker coal from other coal producers across the United States, Australia, Europe and Asia.

5.      The Debtors operate in a competitive and highly regulated industry that has experienced strong headwinds and precipitously declining demand and pricing in recent years due to the rise of low priced alternative energy sources – including an abundance of natural gas. Combined with these factors, slowing global economic growth drove a wide range of goods prices lower in 2015 and resulted in the largest broad market decline since 1991. Indeed, demand from electric utilities in the United States alone declined approximately 110 million tons in 2015. These market conditions, in connection with lower realized pricing in the United States and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor subsidiaries' coal sales during 2015. As a result of these challenges, several large United States coal companies have filed for chapter 11 protection in recent years.

6.      A comprehensive description of the Debtors' businesses and operations, capital structure and the events leading to the commencement of these chapter 11 cases can be found in the Declaration of Amy Schwetz, Executive Vice President and Chief Financial Officer of Debtor PEC, in Support of First Day Motions of Debtors and Debtors in Possession

(the "First Day Declaration").   In further support of this Motion and certain other requests for first day relief, the Debtors have filed the Declaration of Paul M. Wagner in Support of Certain Request for First Day Relief Related to Suppliers (the "Supporting Declaration").  Both the First Day Declaration and the Supporting Affidavit were filed contemporaneously herewith and are incorporated herein by reference.

### The Essential Supplier Claims and 20-Day Administrative Claims

*Overview of the Need for Relief*

7.      The Debtors are highly mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  Consequently, the Debtors' managers have made maintaining relationships with their customers one of the Debtors' primary goals as they transition into chapter 11.  Providing seamless delivery of its coal to those customers is key to meeting this goal.  The Debtors' ability to continually deliver coal, in turn, depends on certain vendors providing, without interruption, goods and services to the Debtors.

8.      The Debtors' business of mining and processing coal cannot function without the specially-designed equipment, parts and supplies provided by these not-readily replaceable suppliers.  Many of these suppliers are critical to multiple of the Debtors' mining operations. The Debtors also rely on the daily provision of certain industry-specific services, without which the Debtors would likely have to idle operations.  Further, to continue coal mining and production, the Debtors must receive regular shipments of specialized coal processing chemicals and minerals to their mines and processing facilities.  Even if alternative suppliers chemicals and minerals could be located (which is uncertain), the Debtors likely would incur significant additional costs and delays if forced to suddenly change vendors.  In addition, the Debtors' operations could not continue to function, and would not be able to meet critical safety and

-4-

regulatory requirements, without the continuing services of specialized service providers,

including providers of environmental and engineering services.

9.      The Debtors are making every effort to avoid production and delivery

interruptions and the adverse effects that even a temporary disruption could have on their

businesses.  However, some of these vendors may make threats that, unless paid on account of

their prepetition debt, they will cease to supply the Debtors with the goods and services

necessary to maintain the operation of the Debtors' businesses.  Refusal to deliver goods or

services by any one of those vendors could severely disrupt the production process, jeopardize

critical business relationships and cause the Debtors to incur significant costs in locating and

securing replacement goods and services.  Disruptions to the Debtors' coal production and

delivery operations would have an immediate and harmful impact on revenues while

simultaneously eroding customer relations and goodwill.

10.     Because certain vendors may refuse to perform if the Debtors do not pay for the

good and services those vendors provided prepetition, the Debtors are asking the Court to

provide them with the tools necessary to deal with recalcitrant vendors.  First, the Debtors

request authority to pay prepetition claims of certain vendors that provide the Debtors with

essential goods and services (the "Essential Suppliers").  The Essential Suppliers include

(a) vendors that the Court likely could not compel to provide goods and services to the Debtors

and (b) vendors that provide the debtors with reclamation and remediation services.  The goods

and services that the Essential Suppliers provide to the Debtors are essential to preserving the

value of the Debtors' estates and necessary for the Debtors' successful reorganization.  The

Essential Suppliers, however, may be unwilling or unable to provide their essential goods and

services if the Debtors fail to pay the Essential Suppliers' prepetition claims.  The remaining

Essential Suppliers perform services necessary for the Debtors to comply with their legal and regulatory obligations to reclaim previously mined lands and to remediate the environmental impact of their mining operations.  Any interruption in the services these essential suppliers provide could result in immediate regulatory or legal action (e.g., fines or shutting down mines) against the Debtors by the federal and state agencies overseeing the Debtors' reclamation and remediation obligations.  Accordingly, the Debtors are requesting authority to pay in their discretion:  (a) Essential Supplier Claims in an amount not exceeding the Essential Suppliers Cap (as defined below); and (b) 20-Day Administrative Claims without an aggregate monetary limit as these claims if allowed would be entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

11.    Second, certain other vendors provide goods and services to the Debtors that are also essential to the continual and timely production and delivery of coal upon which the Debtors' viability depends.  The Debtors, however, have concluded that the Court likely can compel these vendors to provide those goods and services if they refuse to do so.  Accordingly, the Debtors' are requesting that the Court approve procedures set forth in paragraph 29 below for resolving disputes with such vendors.  While the Debtors will try to resolve any dispute with these vendors without the Court's assistance, the streamlined procedures will enable the Court to nimbly provide its assistance in the hopefully limited circumstances where it will be necessary.

***The Essential Suppliers***

12.    Essential Suppliers generally fall into the following categories:

13.    <u>Suppliers of Safety Goods and Services</u>.  These suppliers provide specialized technology, goods and services that are necessary for the Debtors to maintain safe working conditions at their mines and to comply with governmental safety laws and regulations.  Mine

safety is of paramount importance to the Debtors, the Debtors' employees and governmental mine regulators.  For instance, certain laws and regulations require the Debtors to (a) install and maintain safety systems for their mines and mining equipment and (b) construct barriers or seals in certain portions of their mines.  These safety requirements are subject to strict regulation, including periodic inspections by regulators to ensure the Debtors' compliance.  Further, certain of these goods and services are available only on a single-source basis (i.e., where, due to considerations of price, quality and/or availability, it is impracticable for the Debtors to source such supplies from alternative vendors).

14.      If any suppliers of essential safety goods or services refused to do business with the Debtors, the Debtors (a) would be required to invest significant time in obtaining necessary safety goods and services from alternative providers; (b) could be required to pay significantly more for such goods (assuming alternative suppliers were available) and (c) could be forced to idle mines until replacement safety goods and services are obtained.  The Debtors simply cannot afford the costs and delays they would incur if their existing relationships with suppliers of safety-related goods and services were compromised.

15.      Environmental Service Providers.  These service providers assist the Debtors with certain environmental obligations, such as reclaiming mined land (i.e., restoring formerly-mined land to its pre-mining condition), remediating the environmental impact of mining operations and complying with air and water regulations.  The Debtors are required to undertake such reclamation and remediation activities, and comply with other environmental requirements, under applicable federal and state laws and regulations.  Few companies exist that are qualified to assist the Debtors in satisfying these obligations or undertake reclamation activities on the scale required by the Debtors' operations, and the Debtors' current suppliers of these services

have extensive and highly-specialized knowledge that is essential to providing these necessary environmental services.  Without the continuation of the Debtors' business relationships with their environmental service providers, the Debtors would not be able to maintain compliance with statutory and regulatory requirements.  As a result, federal and state regulators may levy fines or worse, shut down the Debtors' mining operations.

16.    Chemical and Mineral Suppliers.  The Debtors' coal mines depend on regular deliveries of specialized chemicals and minerals used in coal processing.  These chemicals and minerals required by the Debtors are also used to maintain compliance with certain statutory requirements or meet customer specifications on the specific mixture of coal deliveries.

17.    If the Debtors were forced to locate alternative suppliers of coal processing chemicals or minerals, the Debtors would incur burdensome costs because locating the necessary replacement suppliers could cause the Debtors to idle operations or significantly delay the Debtors' processing and sale of coal.  For example, if the Debtors were required to replace certain suppliers of minerals and chemicals, the Debtors may be forced to (a) obtain approval from a range of customers and railroads concerning use of a replacement chemical supplier; (b) obtain new equipment, as certain substitute chemicals are incompatible with certain of the Debtors' current equipment; and (c) pay significantly more for certain minerals and chemicals. For all of these reasons, it is critical that the Debtors' relationships with existing chemical and mineral suppliers are maintained to prevent the idling of mining and coal production operations that would occur if the delivery of these necessary supplies were interrupted.

18.    Suppliers of Specialized Goods and Providers of Specialized Services Required for Coal Production and Processing.  The Debtors have longstanding business relationships with certain suppliers of highly-specialized mining equipment, parts and supplies – such as engines,

heavy machinery, vibratory screens, trailers, mining tools and parts for specialized mining equipment and machines – that are essential to the Debtors' operations.  In many instances, the Debtors have a limited number of suppliers for certain goods and services.  Most of the items that the Debtors purchase from these suppliers are available only from single-source or limited-source suppliers – such as original equipment manufacturers – and many of the Debtors' purchases of such items occur on a one-off basis.  In many cases, the Debtors have worked with their suppliers of mining equipment, parts and supplies over a number of years and, as a result, the Debtors' suppliers have detailed knowledge regarding the Debtors' mines and machinery.

19.     In addition, the Debtors engage specialized service providers needed to operate their mines on a daily basis or otherwise meet customer requirements.  The Debtors engage these service providers typically where the Debtors do not possess the necessary skills or tooling to perform the required tasks (e.g., equipment maintenance or equipment certification in connection with regulatory requirements).  Further, in certain instances, the Debtors hire third parties to ensure compliance with the coal quality provisions set forth in the relevant coal sales contracts.

20.     If the Debtors were required to locate replacement suppliers for this specialized equipment, parts and services, the Debtors (a) would likely incur significant delays; (b) may have to idle equipment, mines or operations due to such delays; and (c) may be required to pay significantly more for the replacement items or services.  It is thus essential that the Debtors maintain their existing business relationships with suppliers of specialized mining equipment, parts and services.

***Necessity of Paying the Essential Suppliers***

21.     All Essential Suppliers provide goods and services necessary to the Debtors' operations and their ability to preserve customer confidence.  The refusal of an Essential

Supplier to ship goods or provide services to the Debtors could have a deleterious impact on the Debtors' ability to successfully transition into these chapter 11 cases and, ultimately, to undertake a successful reorganization.  The absence of any one of these Essential Suppliers' goods or services could interrupt coal production and cause costly delays in the delivery of coal to customers.  As a result, the Debtors could suffer reduced sales, reduced cash flow and a loss of customer confidence.  Moreover, some of the Debtors' Essential Suppliers may have experienced losses in other recent coal industry bankruptcies and may be (a) aware of their market power and their importance to the Debtors' business operations and (b) educated regarding their rights in the chapter 11 context.  This increased awareness and sophistication combined with previous losses may make the Essential Suppliers particularly unwilling to work with or supply the Debtors without receiving payment for the prepetition goods and services supplied to the Debtors.

22.     Further, certain of the Essential Suppliers may be in precarious financial situations and highly dependent upon the Debtors for their continued viability.  With limited or no access to additional capital, the nonpayment of the Essential Supplier Claims or 20-Day Administrative Claims could result in some of the Essential Suppliers suffering work stoppages or other business disruptions and might ultimately result in such vendors ceasing operations altogether or filing insolvency proceedings.  If that were to occur, the Debtors could potentially suffer damaging interruptions in their supply of essential goods and services.

23.     As detailed in the Supporting Affidavit, the Debtors' management and employees, in consultation with their professionals, have held numerous internal meetings and have exercised high levels of care in reviewing the facts and circumstances of their Essential Suppliers. As a result of these meetings and analysis, the Debtors have identified the vendors (a) that would constitute Essential Suppliers under the descriptions set forth above and (b) the payment of

whom would benefit the Debtors' chapter 11 estates by promoting a successful reorganization. The Debtors intend to require clear prospective commitments from these vendors to supply the Debtors in exchange for, and as a condition to, the payment of the Essential Supplier Claims and/or 20-Day Administrative Claims, as discussed in detail below.

### The Essential Suppliers Cap

24.     The Debtors' management and employees have identified a limited number of vendors and service providers that constitute Essential Suppliers.  The Debtors intend to pay the least amount possible on Essential Supplier Claims and to require postpetition commitments in exchange for, and as a condition to, the payment of Essential Supplier Claims and 20-Day Administrative Claims (as discussed in detail below).  The Debtors therefore seek authority, in their discretion, to the extent permitted by the Debtors' postpetition secured debtor-in-possession financing, to pay Essential Supplier Claims, up to the maximum aggregate amount of approximately $10.3  million (the "Essential Suppliers Cap"), an amount equal to approximately 4.5% of the Debtors' 2015 annual expenditures to the Essential Vendors.  Given the potential impairment to the value of their businesses that could result from nonpayment of any Essential Suppliers, the Debtors submit that the Essential Suppliers Cap is a reasonable and appropriate cap on the expenditure of estate funds.  Additionally, because the 20-Day Administrative Claims if allowed will be entitled to administrative priority pursuant to section 503(b)(9), the Debtors request separate authority to make payments on the 20-Day Administrative Claims without limit on the maximum aggregate amount.

### Conditions on Payment of Essential Supplier and 20-Day Administrative Claims

25.     In an effort to ensure that the prompt payment of each Essential Supplier Claim and 20-Day Administrative Claim provides the Debtors with a benefit to their estates, the Debtors propose that each recipient of a payment upon any portion of an Essential Supplier

Claim or 20-Day Administrative Claim (an "Essential Supplier Payment") be required, to the

extent applicable, to provide the Debtors with:  (a) the continuance of the parties' existing

business relationship, including, but not limited to, the acceptance and fulfillment (including the

production and delivery of goods) of purchase orders and releases under such purchase orders;

(b) other business terms on a postpetition basis (consistent with past practices), including the

pricing of goods and services and the provision of equivalent levels of service, on terms at least

as favorable as those extended prior to the Petition Date, or on such other terms that are

acceptable to the Debtors in their discretion; and (c) the release to the Debtors as requested of

goods (or goods on which services were performed) or other assets of the Debtors in the

Essential Supplier's possession (collectively, the "Customary Trade Terms").  The Customary

Trade Terms shall be applicable throughout the pendency of the Debtors' chapter 11 cases.

26.     If an Essential Supplier accepts an Essential Supplier Payment and fails to provide

the Debtors with the requisite Customary Trade Terms, then:  (a) any Essential Supplier Payment

received by the Essential Supplier will be deemed an unauthorized postpetition transfer under

section 549 of the Bankruptcy Code that the Debtors may (i) recover from the Essential Supplier

in cash or goods or (ii) at the Debtors' option, apply against any outstanding claim (including any

outstanding administrative claim) held by such Essential Supplier; and (b) upon recovery of any

Essential Supplier Payment, the corresponding Essential Supplier Claim or 20-Day

Administrative Claim will be reinstated in the amount recovered by the Debtors.

27.     The Debtors shall implement and provide notice of the conditions set forth in

paragraphs 25 and 26 above as follows:

(a)     The Debtors may require an Essential Supplier to execute an agreement
(a "Trade Agreement") prior to its receipt of an Essential Supplier
Payment that (i) confirms that the Essential Supplier agrees to be bound by
the terms set forth above, (ii) confirms that the Essential Supplier has

received and agrees to be bound by the order granting this Motion and (iii) contains such other terms and conditions as the Debtors believe proper, including confidentiality provisions.

(b)     If no Trade Agreement is executed, any payment pursuant to which an Essential Supplier Payment is made will be accompanied by (i) notice from the Debtors explaining that acceptance of the payment by the Essential Supplier constitutes its agreement to provide the Customary Trade Terms and explaining the consequences of its failure to comply with such agreement and (ii) a copy of the order granting this Motion.

28.     The Debtors will maintain a matrix (the "Essential Supplier Payment Matrix") containing (i) the name of each Essential Supplier that receives an Essential Supplier Payment on account of an Essential Supplier Claim, (ii) the amount of each such payment and (iii) a brief description of the goods or services provided by the Essential Supplier for which the Essential Supplier Payment was made.  The Debtors will provide the Essential Supplier Payment Matrix to (a) the United States Trustee for the Eastern District of Missouri; (b) counsel to any official committee of unsecured creditors that may be appointed in these chapter 11 cases; and (c) counsel to the lenders under the Debtors' proposed debtor in possession secured credit facility; (x) bi-weekly, one week in arrears, until a final order is entered granting the relief requested herein; and (y) monthly, one week in arrears, thereafter.  Recipients of the Essential Supplier Payment Matrix shall keep the Essential Supplier Payment Matrix strictly confidential and shall not disclose the Essential Supplier Payment Matrix or any portion thereof to any individual or entity without the Debtors' prior written consent.

***Request for Approval of Repudiating Vendor Procedures***

29.     Given the vulnerability of the Debtors' business and operations to immediate disruption if certain vital suppliers refuse to provide goods and services, the Debtors seek authority to implement a process to address such vital suppliers that refuse to honor their contractual obligations to ship goods or provide services to the Debtors on a postpetition basis

-13-

(collectively, the "Repudiating Vendors").  As part of the implementation of this process, the

Debtors seek authority to pay, on a conditional basis, certain claims of Repudiating Vendors that

seek to withhold performance on a postpetition basis in an effort to extract the payment of

prepetition claims from the Debtors.  In light of the severity of the disruptions that could be

caused by such refusal, the Debtors seek authority to pay such Repudiating Vendors on a

conditional basis to avoid such disruptions.  If such a payment is made, the Debtors propose that

the following procedures (the "Repudiating Vendor Procedures") be implemented:

    (a)    If a Repudiating Vendor refuses to perform its postpetition obligations pursuant to a contract with one or more of the Debtors because the Debtors have not paid that Repudiating Vendor's prepetition claim, the Debtors are authorized to pay such claim provisionally (and such payment will not count against the Essential Suppliers Cap) (a "Provisional Payment").

    (b)    If a Repudiating Vendor refuses to perform its postpetition obligations pursuant to a contract with one or more of the Debtors, the Debtors may (whether or not they make the Provisional Payment described above): (i) file a notice (a "Notice of Repudiating Vendor"), substantially in the form attached hereto as Exhibit A, setting forth the Debtors' belief that the vendor is in violation of the Bankruptcy Code through its failure to perform under a prepetition agreement, identifying the name of the vendor, the identity of the agreement in question and, if any Provisional Payments were made, the amounts and dates of such payments; and (ii) seek the entry of an order (an "Order to Show Cause"), substantially in the form attached hereto as Exhibit B, requiring the Repudiating Vendor to appear before the Court and show cause why it should not be found to have willfully violated sections 362 and 365 of the Bankruptcy Code and why it should not be required to return any Provisional Payment made to it by the Debtors plus any accumulated interest.

## Argument

30.    The payment of Essential Supplier Claims and 20-Day Administrative Claims on

the terms described above is warranted under sections 105(a), 363 and 503(b)(9) of the

Bankruptcy Code and case law in this District and elsewhere.

***The Payment of Essential Supplier Claims Is a Permissible and Appropriate Exercise of the Debtors' Business Judgment Under Sections 105(a) and 363(b) of the Bankruptcy Code and the Doctrine of Necessity***

31.     Section 363(b) of the Bankruptcy Code allows the debtors, after notice and hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).  A debtor's decisions to use, sell or lease assets outside the ordinary course of business must be based upon a sound business purpose.  See In re Channel One Commc'ns, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  See also TLP Servs., LLC v. Stoebner (In re Polaroid Corp.), 460 B.R. 740, 741-42 (B.A.P. 8th Cir. 2011) (allowing a trustee, pursuant in part to section 363(b)(1), to use cash collateral to fund efforts to recover funds from third parties); accord Comm. Of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); In re W.A. Mallory Co. Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing WBQ P'Ship v. Va. Dep't of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)); Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (holding that the sale of property of the estate is justified if it is supported by a good business reason); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a motion pursuant to section 363(b) of the Bankruptcy Code is "a good business reason").

32.     Courts in this jurisdiction and others have consistently been reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the

corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003 ) (citing In re United Artists Theatre Co., 315 F.3d 217, 233 (3d Cir. 2003), Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985) and In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)). See also Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.), 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (holding that the business judgment rule may be satisfied "'as long as the proposed action appears to enhance the debtor's estate.'") (quoting Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 567 n.16 (8th Cir. 1997) (emphasis in original, internal quotations and alterations omitted)); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 567 n.16 (8th Cir. 1997) (holding that "[w]here the [debtor's] request is not manifestly unreasonable or made in bad faith, the court should normally grant approval 'as long as the proposed action appears to enhance the debtor's estate'") (quoting Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985) (internal alterations and quotations omitted)); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (finding that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").  Here, the Debtors believe, in their business judgment, that payment of Essential Supplier Claims, in the Debtors' discretion, is sound and prudent.

33.     Further, the Court may authorize payment of the Essential Supplier Claims pursuant to section 105(a) of the Bankruptcy Code and the doctrine of necessity.  Section 105(a) of the Bankruptcy Code empowers a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

11 U.S.C. § 105(a).  The purpose of section 105 of the Bankruptcy Code is to ensure the

bankruptcy court has the power to take whatever action "is appropriate or necessary in aid of the

exercise of [its] jurisdiction."  2 Collier on Bankruptcy ¶ 105.01 (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2015).  "Under [section 105 of the Bankruptcy Code,] the court can

permit pre-plan payment of a pre-petition obligation when essential to the continued operation of

the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing In re Ionosphere

Clubs, Inc., 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989)).

34.     Under the "doctrine of necessity," courts allow the immediate payment of

prepetition claims where such payment is essential to the debtor's continued operations.

See In re Wehrenberg, Inc., 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to

11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such

payments are necessary to the continued operation of the Debtor."); In re United Am., Inc.,

327 B.R. 776, 782 (Bankr. E.D. Va. 2005) (acknowledging the existence of the doctrine of

necessity "because otherwise there will be no reorganization and no creditor will have an

opportunity to recoup any part of its pre-petition claim"); accord In re Boston & Me. Corp.,

634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize

trustees to pay claims for goods and services that are indispensably necessary to the debtors'

continued operation).

35.     The Debtors' ability to pay Essential Supplier Claims, in the Debtors' discretion, is

critical to the ongoing operation of their businesses, as discussed above, and, therefore, necessary

to their successful reorganization.  The specific rationale for considering each category of

suppliers and service providers as essential is set forth in detail above.  In the case of nearly all of

-17-

the Essential Suppliers, if the Debtors lose their supplier relationships, production could be threatened, revenue could suffer and operations may be placed in jeopardy.

36.    The Debtors' mines require regular and reliable delivery of specialized equipment, parts, supplies and services provided by highly-specialized suppliers.  Further, without certain of these supplies and services, the Debtors could not operate or maintain compliance with statutory and regulatory requirements regarding mine safety.  The Debtors also rely on steady deliveries of coal processing chemicals and minerals, without which supplies the Debtors' mines and coal processing facilities could fall idle.  Replacing any of these suppliers would force the Debtors to incur costs and delays they can ill afford.  The Debtors also could not continue to operate without the services provided by their environmental and engineering service providers whose expertise and assistance is necessary for the Debtors to maintain compliance with legal and regulatory mandates regarding mine safety and environmental protection.  Under these circumstances, the Debtors believe that, in their business judgment, authorization to pay Essential Suppliers, under the terms and conditions set forth herein, is necessary to ensure that the Debtors' operations will not suffer interruptions, and to preserve the value of the Debtors' estates.

37.    Absent the relief requested herein, the Debtors' stakeholders may question the Debtors' ability to maintain "business as usual" operations and relationships with their stakeholders during the duration of these chapter 11 cases.  The Debtors' continued success depends on maintaining the confidence of their key stakeholder groups.  Any loss of confidence among these stakeholders could jeopardize important and valuable employee, customer and vendor relationships and harm the Debtors' chapter 11 estates.  Under these circumstances, approval of the requested relief is appropriate and is necessary to avoid irreparable harm to the Debtors' estates.

38.     Bankruptcy courts in this and other districts have authorized chapter 11 debtors to pay prepetition claims of essential suppliers in numerous other cases.  See, e.g., In re Noranda Aluminum, Inc., No. 16-10083 (Bankr. E.D. Mo. Feb. 10, 2016) (Docket No. 96) (order authorizing the debtors to pay the prepetition claims of essential suppliers); In re Arch Coal, Inc. No. 16-40120 (E.D. Mo. Jan. 13, 2016) (Docket No. 71) (same); accord In re Alpha Natural Res. Inc., No. 15-33896 (Bankr. E.D. Va. Aug. 5, 2015 and Sept. 3, 2015) (Docket Nos. 124 and 351) (interim and final orders authorizing the debtors to pay the prepetition claims of essential suppliers); In re Magnetation LLC, No. 15-50307 (Bankr. D. Minn. May 7, 2015) (Docket No. 62) (order authorizing the debtors to pay prepetition claims of essential suppliers); In re Patriot Coal Corp., No. 15-32450 (Bankr. E.D. Va. May 13, 2015 and June 4, 2015) (Docket Nos. 51 and 236) (interim and final orders authorizing the debtors to pay the prepetition claims of essential suppliers); In re James River Coal Co., No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014 and May 9, 2014) (Docket Nos. 81 and 243) (same); In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. July 16, 2012 and Aug. 2, 2012) (Docket Nos. 88 and 257) (same); In re AMR Corp., No. 11-15463 (Bankr. S.D.N.Y. Nov. 29, 2011 and Dec. 23, 2011) (Docket Nos. 47 and 451) (same); In re Chrysler LLC, No. 09-50002 (Bankr. S.D.N.Y. May 5, 2009 and May 20, 2009) (Docket Nos. 358 and 1318) (same).[3]

***The Payment of 20-Day Administrative Claims Is Authorized Under Sections 503(b)(9) and 363(c) of the Bankruptcy Code***

39.     Under section 503(b)(9) of the Bankruptcy Code, claims for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date are entitled to administrative priority status.  See 11 U.S.C. § 503(b)(9).

---

[3]      Unreported orders cited herein are not attached to this Motion.  Copies of these orders will be made available to the Court or other parties upon request made to the Debtors' counsel.

Accordingly, the Debtors request that payments of 20-Day Administrative Claims not count against the Essential Suppliers Cap.  The Debtors intend to pay 20-Day Administrative Claims of parties if they are Essential Suppliers under the standards set forth above.[4]

40.    Because the 20-Day Administrative Claims are treated under the Bankruptcy Code as administrative claims, the Debtors believe that they could pay 20-Day Administrative Claims during these cases pursuant to sections 503 and 363(c)(1) of the Bankruptcy Code. However, the Debtors also believe that they are not required to reconcile or pay the 20-Day Administrative Claims prior to the conclusion of these cases.

41.    Timely payment of certain of the 20-Day Administrative Claims will preserve the Debtors' valued relationships with certain Essential Suppliers and reduce the chance that the Debtors will face harmful supply disruptions during the initial and most critical phase of the chapter 11 cases.  Accordingly, the Debtors request that, for the avoidance of doubt, the Court enter an order clarifying that the Debtors are authorized, but not required, to pay in their discretion the 20-Day Administrative Claims, or any portion thereof, of any Essential Supplier in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem appropriate.

42.    Courts in this and other districts have approved debtors' payments of such claims in the Debtors' discretion.  See, e.g., In re Noranda Aluminum, Inc., No. 16-10083

---

[4]    Substantially contemporaneously herewith, the Debtors filed the Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105(a) and 503 of the Bankruptcy Code and Bankruptcy Rules 3002 and 3003, For an Order (I) Establishing Procedures to Resolve Claims Arising Under Section 503(b)(9) of the Bankruptcy Code and (II) Granting Related Relief (the "503(b)(9) Motion").  Through the 503(b)(9) Motion, the Debtors request that this Court establish procedures for the filing and payment of claims that are entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  The proposed procedures would allow the Debtors to pay claims entitled to section 503(b)(9) administrative priority held by entities that are not Essential Suppliers and establish an orderly process for the assertion and adjudication of 20-Day Administrative Claims.

(Bankr. E.D. Mo. Feb. 10, 2016) (Docket No. 96) (order authorizing the debtors to pay 20-day administrative claims to certain essential suppliers in their discretion without the need for further court approval); In re Arch Coal, Inc., No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016) (Docket No. 71) (same); accord In re Great Atl. & Pac. Tea Co., No. 15-23007 (Bankr. S.D.N.Y. July 20, 2015 and Aug. 11, 2015) (Docket Nos. 61 and 503) (interim and final orders authorizing the debtors to pay 20-day administrative claims in their discretion without the need for further court approval); In re Patriot Coal Corp., No. 15-32450 (Bankr. E.D. Va. May 13, 2015 and June 4, 2015) (Docket Nos. 51 and 236) (same); In re James River Coal Co., No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014 and May 9, 2014) (Docket Nos. 81 and 243) (same); In re AMF Bowling Worldwide, Inc., No. 12-36495 (Bankr. E.D. Va. Nov. 14, 2012) (Docket No. 57) (order authorizing the debtors to pay 20-day administrative claims in their discretion without the need for further court approval); In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. July 16, 2012 and Aug. 2, 2012) (Docket Nos. 88 and 257) (interim and final orders authorizing the debtors to pay 20-day administrative claims in their discretion without the need for further court approval); In re Chrysler LLC, No. 09-50002 (Bankr. S.D.N.Y. May 5, 2009 and May 20, 2009) (Docket Nos. 358 and Docket No. 1318) (same).

***The Repudiating Vendor Procedures Should Be Authorized***

43.    The Debtors further request authorization to implement the Repudiating Vendor Procedures.  A number of the Debtors' suppliers, including some of the Debtors' largest suppliers, are parties to supply agreements with the Debtors.  "After a debtor commences a Chapter 11 proceeding, but before executory contracts are assumed or rejected under § 365(a), those contracts remain in existence, enforceable by the debtor but not against the debtor."  United States ex rel U.S. Postal Serv. v. Dewey Freight Sys., Inc., 31 F.3d 620, 624 (8th Cir. 1994).  See

also City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1226 (6th Cir. 1995)

("[Section 365] provides a means whereby a debtor can force others to continue to do business

with it when the bankruptcy filing might otherwise make them reluctant to do so . . . thus . . .

making the debtor's rehabilitation more likely.") (quoting Richmond Leasing Co. v. Capital Bank,

N.A., 762 F.2d 1303, 1310 (5th Cir. 1985)); CIT Commc'ns Fin. Corp. v. Midway Airlines Corp.

(In re Midway Airlines Corp.), 406 F.3d 229, 234 (4th Cir. 2005) (stating that the trustee can

force a lessor "to continue performing under the lease."); In re Gilbertson's Rests. LLC, No. 04-

00385, 2004 WL 1724880, at *2 (Bankr. N.D. Iowa May 25, 2004) (same); Gwinnett Prado, L.P.

v. Rhodes, Inc. (In re Rhodes, Inc.), 321 B.R. 80, 91 (Bankr. N.D. Ga. 2005) ("As a general

proposition, the non-debtor party to an unexpired lease or other executory contract is obliged to

perform it until it is assumed or rejected."); In re Nat'l Steel Corp., 316 B.R. 287, 305 (Bankr.

N.D. Ill. 2004) (stating that "most courts agree that before an executory contract is assumed or

rejected under § 365(a), that contract continues to exist, enforceable by the debtor-in-possession,

but not enforceable against the debtor-in-possession."); Interstate Gas Supply, Inc. v. Wheeling

Pittsburgh Steel Corp. (In re Pittsburgh-Canfield Corp.), 283 B.R. 231, 238

(Bankr. N.D. Ohio 2002) ("Until an executory contract has been rejected, generally a non-debtor

must continue to perform.  This Court has previously stated that post-petition:  'the non-debtor

party cannot terminate the contract by reason of the debtor's defaults thereunder. . . It . . . follows

that the non-debtor party cannot unilaterally elect to cease performance on an executory contract

prior to its assumption or rejection.'") (internal quotations and citations omitted; modifications in

original); Krafsur v. UOP (In re El Paso Refinery, L.P.), 196 B.R. 58, 72 (Bankr. W.D. Tex.

1996) ("[T]he [Bankruptcy] Code places an independent duty on the non-debtor to continue the

performance of an executory contract until it is assumed or rejected . . . . <u>Whether the debtor performs or not, the non-debtor must perform until assumption or rejection</u>.") (emphasis added).[5]

44.     Notwithstanding the above, it is expected that some contract parties – <u>i.e.</u>, the Repudiating Vendors – may threaten to refuse to perform their contractual obligations unless the Debtors first pay their prepetition claims.  In light of the severity of the disruptions that could be caused by such refusal, the Debtors seek authority for approval of the Repudiating Vendor Procedures as set forth herein.

45.     Bankruptcy Courts in this and other districts have granted relief similar to that requested herein with respect to the Repudiating Vendor Procedures.  <u>See</u>, <u>e.g.</u>, <u>In re Noranda Aluminum, Inc.</u>, No. 16-10083 (Bankr. E.D. Mo. Feb. 11, 2016) (Docket No. 102) (order authorizing debtors to employ procedures to ensure counterparty compliance with certain Bankruptcy Code protections); <u>In re Arch Coal, Inc.</u>, No. 16-40120 (Bankr. E.D. Mo. Jan. 13, 2016) (Docket No. 71) (same); <u>accord</u> <u>In re Alpha Natural Res, Inc.</u>, No. 15-33896 (Bankr E.D. Va. Aug. 5, 2015 and Sept. 3, 2015) (Docket Nos. 124 and 351) (interim and final orders authorizing similar "repudiating vendor procedures"); <u>In re Great Atl.& Pac. Tea Co.</u>, No. 15-23007 (Bankr. S.D.N.Y. July 20, 2015 and Aug. 11, 2015) (Docket Nos. 61 and 503) (same); <u>In re Hostess Brands, Inc.</u>, No. 12-22052 (Bankr. S.D.N.Y. Jan. 13, 2012 and Jan. 27, 2012) (Docket Nos. 76 and 196) (same); <u>In re OTC Holdings Corp.</u>, No. 10-12636 (Bankr. D. Del. Aug. 27, 2010 and Sept. 17, 2010) (Docket Nos. 56 and 105) (same); <u>In re Chrysler LLC</u>, No. 09-50002 (Bankr. S.D.N.Y. May 5, 2009 and May 20, 2009) (Docket

---

[5]     In addition, a refusal by a nondebtor to perform postpetition under a prepetition executory contract also may be a violation of the automatic stay, pursuant to section 362 of the Bankruptcy Code.  <u>See generally</u> 3 <u>Collier on Bankruptcy</u> ¶ 362.03[5][a] (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2015) ("As property of the estate, the debtor's interests in . . . [executory] contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3).").

Nos. 358 and 1318) (same); In re Cooper-Standard Holdings Inc., No. 09-12743 (Bankr. D. Del. Aug. 5, 2009 and Sept. 1, 2009) (Docket Nos. 42 and 166) (same).  See also In re Patriot Coal Corp., No. 15-32450 (Bankr. E.D. Va. May 13, 2015 and June 4, 2015) (Docket Nos. 51 and 236) (entering interim and final orders authorizing debtors to employ procedures to ensure critical vendors continue performing contractual obligations); In re James River Coal Co., No. 14-31848 (Bankr. E.D. Va. Apr. 10, 2014 and May 9, 2014) (Docket Nos. 81 and 243) (same); In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. July 16, 2012 and Aug. 2, 2012) (Docket Nos. 88 and 257) (same).

**Request for Authority for Banks to Honor and Pay Checks and**
**Funds Transfers Related to Essential Supplier Claims and 20-Day Administrative Claims**

46.     In addition, by this Motion, the Debtors request that all applicable banks and other financial institutions (collectively, the "Banks") be authorized, when requested by the Debtors, to the extent permitted by the Debtors' postpetition secured debtor-in-possession financing, to receive, process, honor and pay any and all checks presented for payment of and to honor all fund transfer requests made by the Debtors related to Essential Supplier Claims or 20-Day Administrative Claims, whether such checks were presented or fund transfer requests were submitted prior to or after the Petition Date, provided that sufficient funds are available and standing in the Debtors' credit in the applicable accounts to cover such checks and fund transfers. The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payments of Essential Supplier Claims or 20-Day Administrative Claims.  Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.  Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers

are made and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for relying on such representations.

## Requests for Immediate Relief and Waiver of Stay

47.    Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek the entry of orders granting the relief requested by this Motion on an interim and final basis and, to the extent it applies, a waiver of any stay of the effectiveness of such orders.

48.    Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate including a motion to pay all or part of a claim that arose before the filing of the petition." Fed. R. Bankr. P. 6003(b).  In other words, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the Court may authorize the relief prior to the twenty second day following the Petition Date.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

49.    As set forth above, in the First Day Declaration and in the Supporting Declaration, it is vital that court grant the relief requested herein and the Debtors submit that ample cause exists to justify:  (a) the immediate entry of an Interim Order granting the interim relief sought herein pursuant to Bankruptcy Rule 6003(b) to the extent it applies; and (b) a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies, with respect to the order.

**Reservation of Rights**

50.     Nothing contained herein or in the proposed Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity or priority of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim against the Debtors is an Essential Supplier Claim or a 20-Day Administrative Claim; or (e) a request to assume or reject any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.  The Debtors expressly reserve the right to contest any Essential Supplier Claim or 20-Day Administrative Claim under applicable bankruptcy and non-bankruptcy law.

**Notice**

51.     Notice of this Motion has been given to: (a) Davis Polk & Wardwell LLP and Bryan Cave LLP as counsel to Citibank, N.A. as Administrative Agent for the First Lien Secured Credit Facility and the Debtors' proposed debtor in possession secured credit facility; (b) Brown Rudnick LLP, as counsel to Wilmington Savings Fund Society, FSB as prospective trustee and collateral agent for the Secured Second Lien Notes; (c) Foley & Lardner LLP, as counsel to Wilmington Trust Company as prospective Indenture Trustee for the Unsecured Notes;[6] (d) Robinson & Cole LLP, as counsel to U.S. Bank as resigning trustee and collateral agent for the Second Lien Notes, the Unsecured Notes and the Convertible Notes;[7] (e) counsel to any ad hoc committees; (f) the Debtors' 50 largest unsecured creditors; (g) Mayer Brown LLP, as counsel to

---

[6]     These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; and the (iv) 7.875% Senior Notes due November 2026.

[7]     These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; (iv) 7.875% Senior Notes due November 2026; and the (v) Convertible Junior Subordinated Debentures due December 2066.

PNC Bank, N.A., as Administrator under the Debtors' prepetition accounts receivable securitization facility; (h) the United Mine Workers of America; (i) the Office of the United States Trustee for the Eastern District of Missouri; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Department of the Interior; (m) the United States Department of Labor; (n) the United States Attorney's Office for the Eastern District of Missouri; and (o) Pension Benefit Guaranty Corporation (collectively, the "Notice Parties").  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

**<u>No Prior Request</u>**

52.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter an interim order, substantially in the form submitted to the Court, granting the relief requested herein on an interim basis; (ii) enter a final order, substantially in the form submitted to the Court, granting the relief requested herein; and (iii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: April 13, 2016
     St. Louis, Missouri

Respectfully submitted,

 /s/ Steven N. Cousins
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 612-2239
Email: scousins@armstrongteasdale.com
Email: sehlers@armstrongteasdale.com

Heather Lennox (*pro hac vice* pending)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: hlennox@jonesday.com

Amy Edgy (*pro hac vice* pending)
Daniel T. Moss (*pro hac vice* pending)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: aedgy@jonesday.com
Email: dtmoss@jonesday.com

*Proposed Attorneys for Debtors
and Debtors in Possession*

## SCHEDULE 1

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 1. | Peabody Energy Corporation | 13-4004153 |
| 2. | American Land Development, LLC | 20-3405570 |
| 3. | American Land Holdings of Colorado, LLC | 26-3730572 |
| 4. | American Land Holdings of Illinois, LLC | 30-0440127 |
| 5. | American Land Holdings of Indiana, LLC | 20-2514299 |
| 6. | American Land Holdings of Kentucky, LLC | 20-0766113 |
| 7. | American Land Holdings of New Mexico, LLC | 32-0478983 |
| 8. | American Land Holdings of West Virginia, LLC | 20-5744666 |
| 9. | Arid Operations, Inc. | 84-1199578 |
| 10. | Big Ridge, Inc. | 37-1126950 |
| 11. | Big Sky Coal Company | 81-0476071 |
| 12. | Black Hills Mining Company, LLC | 32-0049741 |
| 13. | BTU Western Resources, Inc. | 20-1019486 |
| 14. | Caballo Grande, LLC | 27-1773243 |
| 15. | Caseyville Dock Company, LLC | 20-8080107 |
| 16. | Central States Coal Reserves of Illinois, LLC | 43-1869432 |
| 17. | Central States Coal Reserves of Indiana, LLC | 20-3960696 |
| 18. | Century Mineral Resources, Inc. | 36-3925555 |
| 19. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 |
| 20. | COALSALES II, LLC | 43-1610419 |
| 21. | Colorado Yampa Coal Company, LLC | 95-3761211 |
| 22. | Conservancy Resources, LLC | 20-5744701 |
| 23. | Cottonwood Land Company | 43-1721982 |
| 24. | Cyprus Creek Land Company | 73-1625890 |
| 25. | Cyprus Creek Land Resources LLC | 75-3058264 |
| 26. | Dyson Creek Coal Company, LLC | 43-1898526 |
| 27. | Dyson Creek Mining Company, LLC | 20-8080062 |
| 28. | El Segundo Coal Company, LLC | 20-8162824 |
| 29. | Empire Land Holdings, LLC | 61-1742786 |
| 30. | Falcon Coal Company, LLC | 35-2006760 |
| 31. | Four Star Holdings, LLC | 30-0885825 |
| 32. | Francisco Equipment Company, LLC | 37-1805119 |
| 33. | Francisco Land Holdings Company, LLC | 36-4831111 |
| 34. | Francisco Mining, LLC | 30-0922117 |
| 35. | Gallo Finance Company, LLC | 43-1823616 |
| 36. | Gold Fields Chile, LLC | 13-3004607 |
| 37. | Gold Fields Mining, LLC | 36-2079582 |
| 38. | Gold Fields Ortiz, LLC | 22-2204381 |
| 39. | Hayden Gulch Terminal, LLC | 86-0719481 |
| 40. | Highwall Mining Services Company | 20-0010659 |
| 41. | Hillside Recreational Lands, LLC | 32-0214135 |
| 42. | HMC Mining, LLC | 43-1875853 |
| 43. | Illinois Land Holdings, LLC | 26-1865197 |
| 44. | Independence Material Handling, LLC | 43-1750064 |
| 45. | James River Coal Terminal, LLC | 55-0643770 |
| 46. | Juniper Coal Company, LLC | 43-1744675 |
| 47. | Kayenta Mobile Home Park, Inc. | 86-0773596 |
| 48. | Kentucky Syngas, LLC | 26-1156957 |
| 49. | Kentucky United Coal, LLC | 35-2088769 |
| 50. | Lively Grove Energy, LLC | 20-5752800 |
| 51. | Lively Grove Energy Partners, LLC | 26-0180403 |
| 52. | Marigold Electricity, LLC | 26-0180352 |
| 53. | Midco Supply and Equipment Corporation | 43-6042249 |
| 54. | Midwest Coal Acquisition Corp. | 20-0217640 |
| 55. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 |

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 56. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 |
| 57. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 |
| 58. | Moffat County Mining, LLC | 74-1869420 |
| 59. | Mustang Energy Company, LLC | 43-1898532 |
| 60. | New Mexico Coal Resources, LLC | 20-3405643 |
| 61. | NM Equipment Company, LLC | 36-4821991 |
| 62. | Pacific Export Resources, LLC | 27-5135144 |
| 63. | Peabody America, LLC | 93-1116066 |
| 64. | Peabody Archveyor, L.L.C. | 43-1898535 |
| 65. | Peabody Arclar Mining, LLC | 31-1566354 |
| 66. | Peabody Asset Holdings, LLC | 20-3367333 |
| 67. | Peabody Bear Run Mining, LLC | 26-3582291 |
| 68. | Peabody Bear Run Services, LLC | 26-3725923 |
| 69. | Peabody Caballo Mining, LLC | 83-0309633 |
| 70. | Peabody Cardinal Gasification, LLC | 20-5047955 |
| 71. | Peabody China, LLC | 43-1898525 |
| 72. | Peabody Coalsales, LLC | 20-1759740 |
| 73. | Peabody COALTRADE International (CTI), LLC | 20-1435716 |
| 74. | Peabody COALTRADE, LLC | 43-1666743 |
| 75. | Peabody Colorado Operations, LLC | 20-2561644 |
| 76. | Peabody Colorado Services, LLC | 26-3723774 |
| 77. | Peabody Coulterville Mining, LLC | 20-0217834 |
| 78. | Peabody Development Company, LLC | 43-1265557 |
| 79. | Peabody Electricity, LLC | 20-3405744 |
| 80. | Peabody Employment Services, LLC | 26-3730348 |
| 81. | Peabody Energy Generation Holding Company | 73-1625891 |
| 82. | Peabody Energy Investments, Inc. | 68-0541702 |
| 83. | Peabody Energy Solutions, Inc. | 43-1753832 |
| 84. | Peabody Gateway North Mining, LLC | 27-2294407 |
| 85. | Peabody Gateway Services, LLC | 26-3724075 |
| 86. | Peabody Holding Company, LLC | 74-2666822 |
| 87. | Peabody Holdings (Gibraltar) Limited | 20-5543587 |
| 88. | Peabody IC Funding Corporation | 46-2326991 |
| 89. | Peabody IC Holdings, LLC | 30-0829603 |
| 90. | Peabody Illinois Services, LLC | 26-3722638 |
| 91. | Peabody Indiana Services, LLC | 26-3724339 |
| 92. | Peabody International Investments, Inc. | 26-1361182 |
| 93. | Peabody International Services, Inc. | 20-8340434 |
| 94. | Peabody Investments Corp. | 20-0480084 |
| 95. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 |
| 96. | Peabody Midwest Management Services, LLC | 26-3726045 |
| 97. | Peabody Midwest Mining, LLC | 35-1799736 |
| 98. | Peabody Midwest Operations, LLC | 20-3405619 |
| 99. | Peabody Midwest Services, LLC | 26-3722194 |
| 100. | Peabody Mongolia, LLC | 20-8714315 |
| 101. | Peabody Natural Gas, LLC | 43-1890836 |
| 102. | Peabody Natural Resources Company | 51-0332232 |
| 103. | Peabody New Mexico Services, LLC | 20-8162939 |
| 104. | Peabody Operations Holding, LLC | 26-3723890 |
| 105. | Peabody Powder River Mining, LLC | 43-0996010 |
| 106. | Peabody Powder River Operations, LLC | 20-3405797 |
| 107. | Peabody Powder River Services, LLC | 26-3725850 |
| 108. | Peabody PowerTree Investments, LLC | 20-0116980 |
| 109. | Peabody Recreational Lands, L.L.C. | 43-1898382 |
| 110. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 |
| 111. | Peabody Rocky Mountain Services, LLC | 20-8162706 |
| 112. | Peabody Sage Creek Mining, LLC | 26-3730653 |
| 113. | Peabody School Creek Mining, LLC | 20-3585831 |

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 114. | Peabody Services Holdings, LLC | 26-3726126 |
| 115. | Peabody Southwest, LLC | 20-5744732 |
| 116. | Peabody Southwestern Coal Company, LLC | 43-1898372 |
| 117. | Peabody Terminal Holding Company, LLC | 26-1087861 |
| 118. | Peabody Terminals, LLC | 31-1035824 |
| 119. | Peabody Trout Creek Reservoir LLC | 30-0746873 |
| 120. | Peabody Twentymile Mining, LLC | 26-3725223 |
| 121. | Peabody Venezuela Coal Corp. | 43-1609813 |
| 122. | Peabody Venture Fund, LLC | 20-3405779 |
| 123. | Peabody-Waterside Development, L.L.C. | 75-3098342 |
| 124. | Peabody Western Coal Company | 86-0766626 |
| 125. | Peabody Wild Boar Mining, LLC | 26-3730759 |
| 126. | Peabody Wild Boar Services, LLC | 26-3725591 |
| 127. | Peabody Williams Fork Mining, LLC | 20-8162742 |
| 128. | Peabody Wyoming Gas, LLC | 20-5744610 |
| 129. | Peabody Wyoming Services, LLC | 26-3723011 |
| 130. | PEC Equipment Company, LLC | 20-0217950 |
| 131. | PG INVESTMENTS SIX, L.L.C. | 43-1898530 |
| 132. | Point Pleasant Dock Company, LLC | 20-0117005 |
| 133. | Pond River Land Company | 73-1625893 |
| 134. | Porcupine Production, LLC | 43-1898379 |
| 135. | Porcupine Transportation, LLC | 43-1898380 |
| 136. | Riverview Terminal Company | 13-2899722 |
| 137. | Sage Creek Holdings, LLC | 26-3286872 |
| 138. | Sage Creek Land & Reserves, LLC | 38-3936826 |
| 139. | School Creek Coal Resources, LLC | 20-2902073 |
| 140. | Seneca Coal Company, LLC | 84-1273892 |
| 141. | Seneca Property, LLC | 36-4820253 |
| 142. | Shoshone Coal Corporation | 25-1336898 |
| 143. | Southwest Coal Holdings, LLC | 37-1794829 |
| 144. | Star Lake Energy Company, L.L.C. | 43-1898533 |
| 145. | Sugar Camp Properties, LLC | 35-2130006 |
| 146. | Thoroughbred Generating Company, L.L.C. | 43-1898534 |
| 147. | Thoroughbred Mining Company LLC. | 73-1625889 |
| 148. | Twentymile Coal, LLC | 95-3811846 |
| 149. | Twentymile Equipment Company, LLC | 38-3982017 |
| 150. | Twentymile Holdings, LLC | 38-3937156 |
| 151. | United Minerals Company, LLC | 35-1922432 |
| 152. | West Roundup Resources, LLC | 20-2561489 |
| 153. | Wild Boar Equipment Company, LLC | 32-0488114 |
| 154. | Wild Boar Land Holdings Company, LLC | 36-4831131 |