UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>                 Debtors. | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**DECLARATION OF PAUL M. WAGNER IN SUPPORT OF
CERTAIN REQUESTS FOR FIRST DAY RELIEF RELATED TO SUPPLIERS**

    I, Paul M. Wagner, make this Declaration under 28 U.S.C. § 1746 and state:

    1.    I am the Vice President for Supply Chain Management Americas at Peabody Energy Corporation ("Peabody"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have over twenty years of supply chain experience specializing in procurement and manufacturing processes through various roles in procurement, engineering, manufacturing and materials management.

    2.    I have been the Vice President for Supply Chain Management Americas since January 2015 and report directly to Kemal Williamson, President Americas.  I am involved with the procurement of in excess of $1.1 billion in goods and services for the Debtors businesses. Given the scope of my operational duties, I am thoroughly familiar with all aspects of the Debtors' day-to-day supply chain management operations.  I am involved in virtually all aspects of the Debtors' supply chain and also ensure compliance with applicable requirements of the Sarbanes-Oxley Act of 2002.

    3.    Prior to holding my current position, I served the Debtors as:  (a) Vice President of Projects, Sourcing and Strategy from January 2014 to January 2015; (b) Vice President for

Supply Chain Management, Australia, from December 2011 to January 2014; (c) Vice President for Capital Equipment and Mining Projects from December 2010 to December 2011; (d) Director of Capital Equipment from December 2009 to December 2010; (e) Director of Projects and Contracts from September 2007 to December 2009; and (f) Purchasing Manager from November 2003 to September 2007.  In these roles I have, among other things, personally negotiated fuel and explosive purchase contracts, managed contracts related to capital equipment and rebuild programs with major original equipment manufacturers, served as a key member of project steering committees, worked to optimize our supply base with key vendors and led the development and implementation of procurement and contracting strategies for the $1.7 billion Australian business platform.  I am familiar with virtually all aspects of the Debtors' supply chain and procurement process given the scope and length of my employment.

4.     Prior to my employment by the Debtors, I held various positions at Tower Automotive, Inc. and VideoJet Technologies, Inc.  At each of these companies, I was primarily responsible for supply chain management and procurement and collectively handled over $100 million annually in the procurement of goods and services for these companies.

5.     I graduated from Purdue University with a Bachelor of Science in Industrial Management in 1991.  I also received a Master of Science, Management and Decision Sciences from St. Louis University in 1994.

6.     I have reviewed the Debtors' motions for authority to pay certain prepetition claims of Lienholders, and Essential Suppliers (as such capitalized terms are defined in the relevant motions filed with the Court today).  I submit this Declaration in support of the "first-day" relief that the Debtors have requested in the:

- Motion of the Debtors and Debtors in Possession, Pursuant to Section 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, for Interim and Final Orders Authorizing Them to Pay Prepetition Claims of Certain Essential Suppliers and Service Providers (the "Essential Supplier Motion"); and

2

- Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, for Interim and Final Orders (I) Authorizing Them to Pay Prepetition Claims of Certain Lien Claimants and (II) Granting Related Relief (the "<u>Lienholder Motion</u>" and, collectively, with the Essential Supplier Motion, the "<u>Supplier Motions</u>").

7. I am thoroughly familiar with the facts and justifications underlying each of the Supplier Motions.  Generally, these motions have been designed and narrowly tailored to meet the goals of:  (a) continuing the Debtors' operations with as little disruption and loss of productivity as possible; (b) maintaining the Debtors' key business relationships so that those relationships can continue without disruption during these chapter 11 cases; and (c) minimizing the adverse business effects of the Debtors' chapter 11 filing by obtaining authority to pay those parties – if necessary – who are in a position to disrupt the Debtors' businesses.

8. Except as otherwise indicated, my testimony in this Declaration is based upon my personal knowledge, my review of business records or my first-hand experience and knowledge acquired in the ordinary and regular course of the Debtors' businesses as to the matters described in this Declaration.  If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

***Description of The Products and Services Supplied to the Debtors***

9. Generally, as detailed below, the Debtors purchase goods, materials, services and supplies related to the Debtors' mining operations.  For example, the Debtors purchase, among other things:  (a) replacement parts, equipment and supplies (such as engines, heavy machinery, vibratory screens, trailers, mining tools and parts for specialized mining equipment and machines); (b) steel-related products (including roof control materials); and (c) chemicals and minerals necessary to the production and processing of coal.  The Debtors also rely on service providers for, among other things, services such as:  (a) the repair and refurbishment of the Debtors' property (either at the provider's own shop or on-site on the Debtors' property);

(b) environmental testing and reclamation-related services; (c) safety-related services (e.g., the installation and maintenance of equipment safety systems) and (d) excavation, earthmoving, maintenance and other construction-related services at the Debtors' mines and other facilities. While the Debtors do not believe they are overly dependent upon any individual supplier, the Debtors believe that these goods and services are indispensable to the smooth functioning of the Debtors' day-to-day operations.

***The Nature of the Debtors' Products***

10. As discussed in further detail in the Declaration of Amy Schwetz, Executive Vice President and Chief Financial Officer of Debtor PEC, in Support of First Day Pleadings of Debtors and Debtors in Possession, the Debtors are the world's largest private-sector coal company with ownership interests in 26 active coal mining operations located in the United States and Australia. Principally, the Debtors' U.S. mining segments are involved in the mining, preparation and sale of thermal coal. The Debtors' coal supply agreements are primarily with U.S. electricity generators, industrial facilities and steel manufacturers. The Debtors' coal is usually delivered at the mine with transportation cost borne by the purchaser.

11. The Debtors lifeblood is the ability to mine, prepare and sell coal. The market for this product has faced significant headwinds during the months preceding the filing of these chapter 11 cases. The numerous coal company bankruptcies have only exacerbated the stresses on the Debtors' businesses. To combat these headwinds and avoid serious and irreparable harm to the Debtors' operations, it is necessary for the Debtors to ensure that the Lienholders and Essential Suppliers continue to provide the Debtors with goods and services on an uninterrupted basis during these chapter 11 cases.

4

***Ripple Effects Stemming From Nonpayment of Prepetition Supplier Claims***

12. The Debtors and other coal mining companies rely on many of the same suppliers of goods and services. As is well known given the widely-publicized bankruptcy cases of, among others, Patriot Coal Corporation, Alpha Natural Resources, Inc. and Arch Coal, Inc., the Debtors' suppliers of goods and services are under unprecedented levels of stress. Indeed, certain vendors have informed the Debtors that, absent payment for their provision of prepetition goods and services, they will be unable to make payroll and satisfy other expenses. In other instances, certain vendors have informed the Debtors that they have exhausted their lines of credit. In short, certain of the Debtors' suppliers of goods and services will not survive absent the Debtors paying prepetition amounts due and owing.

13. In short, if either of the Debtors' or their customers' businesses are disrupted, it is very difficult to recapture those lost revenues and capacity.

***The Current State of the Debtors' Supply Base***

14. In light of the recent and well-publicized troubles besetting the coal mining industry, it should come as little surprise that the Debtors' supply base — many of whom also supply the parts, supplies and goods to other coal mining companies — is severely agitated given the greatly reduced production volumes and regulatory pressures facing the industry. In the days preceding the filing of these chapter 11 cases, the Debtors have received a number of requests – over two dozen in March 2016 – from various vendors including, among others, "stop ship" threats and demands for adequate assurance. The frequency of these demands increased substantially in the wake of the Debtors' recent 10-K filing. Moreover, many suppliers have shortened or significantly accelerated the Debtors' payment terms or even refused to do business with the Debtors on anything other than a "cash in advance" basis. In many cases, suppliers have explained that their actions are required because they, too, are under significant financial stress.

Although the Debtors heretofore have, with the assistance of certain of their customers, generally been able to persuade their vendors to continue to ship goods and provide essential services (and, thus, have been able to narrowly avoid any significant disruptions), the filing of these chapter 11 cases threatens to further damage supplier relationships that are already extremely fragile. Postpetition, I believe that certain vendors will make threats that, unless paid on account of their prepetition debt, they will cease to supply the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' businesses.

15. In most instances, the Debtors intend to resist these threats and to take action to enforce their purchase orders and other supply agreements including, if necessary, taking vendors that stop shipping to court for their failure to ship. I believe that in the current environment, certain vendors may, in fact, stop shipping and that a means to bring such vendors before the Court to enforce the Debtors' purchase agreements on limited notice may be necessary.

16. In some cases, however, bringing the dispute before the Court may be unavailing or counterproductive, either due to the supplier's own financial fragility or for other business reasons. Accordingly, the Debtors believe that having authority to pay a limited number of vendors' prepetition claims, when the Debtors deem appropriate in the exercise of their business judgment, and subject to appropriate terms and conditions, is important to preserve the value of their businesses.

***How Those Suppliers Identified for Potential Treatment in the Supplier Motions Can Disrupt the Debtors' Businesses***

### Lienholders

17. The Debtors are seeking the entry of an order authorizing them, in their sole discretion as described in the Lienholder Motion, to pay the prepetition claims of certain parties asserting possessory liens on the Debtors' property (collectively, the "Lienholders"). The

6

Lienholders' claims fall into the following main categories: (a) Shippers and Warehouseman (approximately $1.5 million); and (b) Service Providers (approximately $5.0 million).

18. First, the Shippers and Warehousemen have possession of coal and other goods belonging to the Debtors. Such entities may assert that they have liens on the Debtors' coal and other goods in their possession securing claims for the services they provided prepetition. Based on my experience in this industry and past practices with these entities, I believe that Shippers and Warehouseman will not release the Debtors' coal and other goods to the Debtors (or third parties as directed by the Debtors) if they believe that they will not be paid. This is because the effectiveness of any liens they may have depends on possession of the Debtors' goods. If these Shippers and Warehousemen do not release the Debtors' coal and other goods, it will have a debilitating effect on the Debtors' operations– shipments to customers could be delayed, the Debtors will incur unnecessary costs to replace these goods – and their business reputation and relationships with customers will be irreparably harmed.

19. Second, in the ordinary course of the Debtors' businesses, the Debtors rely on various Service Providers to repair, maintain and service equipment and other machinery necessary for mining or processing coal. These Service Provider take possession of the Debtors' equipment and other machinery and perform these services at the Service Providers' facilities. The Service Providers may assert that they have liens on the Debtors' property in their possession securing claims for the services they provided prepetition. If the Service Providers' prepetition claims are not paid, they likely will not release the Debtors' property to the Debtors. Any liens they may have also depend on possession of the Debtors' property.

20. Based on my experience, Lienholders believe they have a right to maintain possession of the Debtors' property, refuse to perform additional services and assert liens on the Debtors' property. I understand that, as of the Petition Date, the Lienholders could assert liens of

7

approximately $6.5 million against the Debtors' property for the unpaid amounts due and owing. I believe that these Lienholders will not release (nor agree not to assert) liens on the Debtors' property until some or all of their outstanding balances have been paid – regardless of whether all of the payable is related to the lienable work.

### Essential Suppliers

21.     The Debtors' Essential Suppliers are domestic and foreign entities that fall into four primary categories:  (a) suppliers of safety goods and services; (b) environmental service providers; (c) chemical and mineral suppliers; and (d) suppliers of specialized goods, and providers of specialized services, required for coal production and processing.  It is imperative that the Debtors obtain authority to make payments to key domestic and foreign suppliers to preserve their supplier base.  As discussed in further detail below, the Essential Suppliers provide the Debtors with goods, parts, equipment and services that are critical to the continuation of the Debtors' operations.  If the Essential Suppliers refuse to continue to provide these goods and services to the Debtors, the Debtors' coal production, processing and sale operations could be disrupted and even halted.

22.     <u>Suppliers of Safety Goods and Services</u>.  These suppliers provide specialized goods and services that are necessary for the Debtors to maintain safe working conditions at their mines and to comply with governmental laws and safety regulations.  Mine safety is of paramount importance to the Debtors, the Debtors' employees and governmental mine regulators. For instance, to comply with certain laws and regulations, the Debtors must (a) install and maintain safety systems for their mines and mining equipment and (b) construct barriers or seals in certain portions of their mines.  These safety requirements are subject to strict regulation, including periodic inspections by regulators to ensure the Debtors' compliance.  Further, certain of these safety-related goods and services are available only on a single-source basis (<u>i.e.</u>, where,

due to considerations of price, quality and/or availability, it is impracticable for the Debtors to source such supplies from alternative vendors).

23. If any vendors of essential safety goods or services refused to do business with the Debtors, the Debtors (a) would be required to invest significant time in obtaining necessary safety goods and services from alternative providers; (b) could be required to pay significantly more for such goods (assuming alternative suppliers were available); and (c) could be forced to idle mines until replacement safety goods and services are obtained. The Debtors simply cannot afford the costs and delays they would incur if their existing relationships with vendors of safety-related goods and services were compromised.

24. Accordingly, I believe that there is a substantial risk that vendors of these goods and services will demand that their prepetition claims be satisfied before they continue to provide these goods and services to the Debtors. Thus, I believe that authority for the Debtors to pay such vendors' prepetition claims in the Debtors' discretion is necessary to preserve the value of the Debtors' businesses.

25. _Environmental Service Providers_. These service providers assist the Debtors with certain environmental obligations, such as reclaiming mined land (_i.e._, restoring formerly-mined land to its pre-mining condition), remediating the environmental impact of mining operations and complying with air and water regulations. The Debtors are required to undertake such reclamation and remediation activities, and comply with other environmental requirements, under applicable federal and state laws and regulations. Few companies exist that are qualified to assist the Debtors in satisfying these obligations or undertake reclamation activities on the scale required by the Debtors' operations, and the Debtors' current vendors of these services have extensive and highly-specialized knowledge and equipment that is essential to providing these necessary environmental services. Without the continuation of the Debtors' business

relationships with their environmental service providers, the Debtors would not be able to maintain compliance with statutory and regulatory requirements. As a result, federal and state regulators may levy fines or worse, attempt to shut down the Debtors mining operations.

26. Accordingly, I believe that vendors of these services may demand payment of their prepetition claims before continuing to provide the environmental services that are necessary to the Debtors' continued operations. While the Debtors intend to resist most of these requests, providing the Debtors authority to pay such vendors prepetition claims in the Debtors' discretion is necessary to prevent operational disruptions.

27. <u>Chemical and Mineral Vendors</u>. The Debtors' coal mines depend on regular deliveries of specialized chemicals and minerals used in coal processing. These chemicals and minerals required by the Debtors are also used to maintain compliance with certain statutory requirements or meet customer specifications on the specific mixture of coal deliveries.

28. The Debtors would incur burdensome costs and delays if forced to locate alternative vendors of minerals or chemicals, because the Debtors may be forced to (a) obtain approval from a range of customers and railroads concerning use of a replacement chemical vendor; (b) obtain new equipment, as certain substitute chemicals are incompatible with certain of the Debtors' current equipment; and (c) pay significantly more for certain minerals and chemicals. For all of these reasons, it is critical that the Debtors' relationships with existing chemical and mineral vendors are maintained to prevent the idling of mining and coal production operations that would occur if the delivery of these necessary supplies were interrupted.

29. Because these minerals and chemicals are crucial to the Debtors' operations, I believe that there is a significant risk that the vendors of these minerals and chemicals will demand that the Debtors satisfy their outstanding prepetition claims before continuing to perform. While the Debtors intend to resist most of these requests, providing the Debtors

10

authority to pay such vendors prepetition claims in the Debtors' discretion is necessary to prevent operational disruptions.

30. **Vendors of Specialized Goods and Providers of Specialized Services Required for Coal Production and Processing**. The Debtors have longstanding business relationships with certain vendors of highly-specialized mining equipment, parts and supplies – such as engines, heavy machinery, vibratory screens, trailers, mining tools and parts for specialized mining equipment and machines – that are essential to the Debtors' operations. In many instances, the Debtors have a limited number of vendors for certain goods and services. Most of the items that the Debtors purchase from these vendors are available only from single-source or limited-source suppliers – such as original equipment manufacturers – and many of the Debtors' purchases of such items occur on a one-off basis. In many cases, the Debtors have worked with their vendors of mining equipment, parts and supplies over a number of years and, as a result, the Debtors' vendors have detailed knowledge regarding the Debtors' mines and machinery.

31. In addition, the Debtors engage specialized service providers needed to operate their mines on a daily basis or otherwise meet customer requirements. The Debtors engage these service providers typically where the Debtors do not possess the necessary skills or tooling to perform the required tasks (e.g., equipment maintenance or equipment certification in connection with regulatory requirements). Further, in certain instances, the Debtors hire third parties to ensure compliance with the coal quality provisions set forth in the relevant coal sales contracts.

32. If the Debtors were required to locate replacement vendors for these specialized equipment, parts and services, the Debtors (a) would likely incur significant delays; (b) may have to idle equipment, mines or operations due to such delays; and (c) may be required to pay significantly more for the replacement items or services. It is thus essential that the Debtors

11

maintain their existing business relationships with vendors of specialized mining equipment, parts and services.

33. While the Debtors intend to resist most of these requests, providing the Debtors authority to pay such vendors prepetition claims in the Debtors' discretion is necessary to prevent operational disruptions

34. <u>Essential Supplier Overview</u>. Thus, for the reasons set forth above, if the Debtors were to lose access to the goods and services provided by (a) the safety goods and services providers; (b) the environmental services providers; (c) the chemical and mineral vendors; and (d) the vendors of specialized goods, and providers of specialized services, required for coal production and processing, the Debtors' operations could be severely disrupted and even halted. Any such disruptions could significantly impact the Debtors' ability to continue producing and processing coal and fulfilling coal sale orders, thereby jeopardizing the value of the Debtors' businesses.

35. The aggregate amount of Essential Supplier Claims that I believe the Debtors may have to pay during the entirety of these cases pursuant to the Essential Supplier Motion is approximately $10.3 million. Authority to pay the prepetition amounts owing to the Essential Suppliers for the Essential Supplier Claims up to this amount and without limit on the maximum aggregate amount paid regarding the 20-Day Administrative Claims is necessary to prevent immediate and irreparable harm to the Debtors' chapter 11 estates in the first 20 days of these cases. Regardless of the amounts approved by the Court, I understand that the amount available to be paid may be less due to constraints under any postpetition financing facility that is approved.

*The Selection Process*

36. To determine which creditors would be considered for potential payment under the Supplier Motions, my staff and I, with the Debtors' outside advisors, went through a rigorous vetting process.

37. First, the Debtors and our outside advisors spent dozens of hours evaluating all aspects of the Debtors' various vendor relationships and a wealth of supplier specific data. Based on this data, we divided the vendors into the categories discussed above. Then we evaluated each vendor and service provider, based on, among other things, the following information: (a) whether a given vendor or service provider was party to a contract with the Debtors or whether they were involved in one-off spot purchases; (b) the state of the Debtors' relationship with each vendor and service provider; (c) whether the Debtors' use of a given vendor or service provider was directed by their customers; (d) whether the Debtors were seeking to send new business to a vendor or service provider that such entity might be hesitant to take due to the financial condition of the Debtors; (e) the extent to which the Debtors were dependent on any given vendor or service provider (and vice versa); (f) the size of the Debtors' normal annual spend with respect to each entity; (g) the economic well-being of each vendor and service provider; (h) the Debtors' ability to re-source a vendor and service provider; and (i) the extent to which a vendor or service provider could disrupt the Debtors' businesses by withholding goods or services.

38. These considerations were discussed at a series of meetings held preceding the filing of the Debtors' chapter 11 cases. At these meetings the Debtors and our outside advisors evaluated each vendor in light of the foregoing criteria and challenged the assumptions for each vendor so as to determine which vendors and service suppliers could be considered to be essential. Based on these meetings and discussions, we collectively determined which vendors

and service providers would be considered essential and included within the scope of the Supplier Motions. Further, we collectively determined and estimated any outstanding payables to these vendors and service providers to arrive at the estimates stated in the Supplier Motions.

***Enforcement and Monitoring***

39. I believe that certain amounts will have to be spent on prepetition claims to keep goods and services flowing and to avoid a disruption of the Debtors' businesses.

40. To protect the Debtors' businesses and cash flow, it is my understanding that any claimant receiving funds under any of the Supplier Motions would be required to extend normalized trade credit and provide other business terms on a postpetition basis (consistent with past practices) as the quid pro quo for payment of some or all of their claims. Lienholders would also be required to, as applicable, release liens upon request of the Debtors. I further understand that, if a claimant accepts payment and fails to continue to supply the Debtors with the requisite trade terms, the Debtors may seek to recover the payment from the vendor in this Court. I, or someone at my direction, will monitor and account for any payments made pursuant to any of the Supplier Motions.

41. Because of the various long-term agreements to which the Debtors are party and the terms and conditions of the Debtors' purchase orders, many of the vendors to the Debtors have a contractual obligation to supply the Debtors. If vendors with such obligations require payment on their prepetition claims as a condition for performing under its contract, the Debtors may seek relief from this Court to require these vendors to ship products to the Debtors.

42. In any event, the Debtors are putting in place a centralized process designed to ensure all spending decisions that are not de minimis will have to be approved by me personally or my superiors, and the invoice approval process will be tightly controlled and supervised by me, my key managers and, as applicable, our outside advisors.

*The Importance of Immediate Relief and Waiver of Stay*

43. The Debtors' ability to pay in their discretion the claims described herein is necessary to prevent the immediate and irreparable damage to the Debtors' businesses. Indeed, without the relief requested in the Supplier Motions, the Debtors risk not being able to maintain their operations in the normal course or not receiving the benefits of indispensible goods and services as needed during the initial weeks of these chapter 11 cases.

*Conclusion*

44. To preserve the value of their businesses, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these chapter 11 cases by minimizing the adverse impact of the chapter 11 filings on the Debtors' operations. For the reasons described herein, the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the Supplier Motions.

I respectfully request that all of the relief requested in the Suppler Motions be granted along with such other and further relief as is just.

Peabody Energy Corporation
(for itself and on behalf of the other 154 Debtors)

Date: April 13, 2016    By: /s/ Paul M. Wagner
Paul M. Wagner
Vice President