UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>                  Debtors. | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**DECLARATION OF JAMES A. TICHENOR IN SUPPORT OF THE MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(d), 364(e) AND 365 OF THE BANKRUPTCY CODE, FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING CERTAIN DEBTORS TO CONTINUE SELLING AND CONTRIBUTING RECEIVABLES AND RELATED RIGHTS PURSUANT TO A SECURITIZATION FACILITY; (II) MODIFYING THE AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF**

I, James A. Tichenor, make this Declaration under 28 U.S.C. § 1746 and state:

1.      I am Vice President and Treasurer at Peabody Energy Corporation ("PEC"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have over 23 years of experience in treasury, capital markets and other corporate finance and accounting-related positions.

2.      I have been Vice President and Treasurer at PEC since July 2012 and report directly to Walter Hawkins, Senior Vice President, Finance. I manage global treasury, capital markets activity, insurance programs, surety and self bonding programs, leasing, foreign exchange and fuel hedging, with a staff of 11 people. I am also responsible for global short-term cash forecasting and liquidity management. In my role at PEC I have, among other things, led the negotiations, documentation and closing of complex debt transactions, chaired the committee that oversees the Debtors' foreign exchange and fuel hedging portfolio, and participated in PEC's

annual strategic planning process related to capital structure and financial planning. Given the scope of my responsibilities, I am thoroughly familiar with all aspects of the Debtors' day-to-day financial operations.

3.  Prior to my employment by the Debtors, I held various positions at Solutia Inc., including Vice President and Treasurer, VP Corporate Finance Operations, Assistant Treasurer, Saflex Operations Accounting Manager, Plant Controller and Treasury Analyst. In my roles at Solutia Inc., among other things, I managed global treasury, capital markets activity, risk management and insurance programs, credit, real estate, and U.S. accounts receivable and payable functions. I managed a staff of 33, including six direct reports. Before I was employed by Solutia Inc., I held various accounting positions at Monsanto Company.

4.  I graduated from Truman St. University with a Bachelor of Science in Finance in 1990. I also received a Master of Business Administration in Finance from Washington University in St. Louis in 1992. I am a Certified Treasury Professional as well as a Certified Management Accountant.

5.  I have reviewed the Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 362(d), 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(d), 364(e) and 365 of the Bankruptcy Code, for Entry of Interim and Final Orders: (I) Authorizing Certain Debtors to Continue Selling and Contributing Receivables and Related Rights Pursuant to a Securitization Facility; (II) Modifying the Automatic Stay; and (III) Granting Related Relief (the "Motion").[1] I submit this Declaration in support of the relief that the Debtors have requested in the Motion.

6.  I am thoroughly familiar with the facts and justifications underlying the Motion. Except as otherwise indicated, my testimony in this Declaration is based upon my personal knowledge, my review of business records or my first-hand experience and knowledge acquired

---

[1] Capitalized terms used but not defined in this Declaration have the meanings ascribed to such terms in the Motion.

2

in the ordinary and regular course of the Debtors' businesses as to the matters described in this Declaration. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

*Securitization Facility Overview*

7. Since 2002, the Debtors have maintained an accounts receivable securitization program (the "Securitization Program") through which the Debtors have access to a revolving credit facility (the "Securitization Facility") that currently has a Group Commitment of $180 million. The Debtors maintain the Securitization Facility through P&L Receivables Company, LLC ("P&L Receivables"), a non-Debtor affiliate. P&L Receivables' assets are available, on a first priority secured basis, to satisfy the claims of its creditors (i.e., the financial institution purchasers under the Securitization Facility).

8. As described in further detail below, the Securitization Program was established pursuant to various agreements (as amended, the "Purchase Agreements")[2] executed by and between, among others P&L Receivables, certain of the Debtors and PNC Bank, N.A. ("PNC Bank"). PNC Bank is the administrator of the Securitization Facility (in such capacity, the "Administrator") and also an issuer of letters of credit under the Securitization Facility (in such capacity, the "LC Bank"). As described in further detail below, given the critical importance of the Securitization Facility to the Debtors, in advance of commencing their chapter 11 cases, the Debtors and PNC Bank negotiated amendments (the "Amendments") to the Purchase

---

[2] The Purchase Agreements include the following agreements, before they were amended pursuant to the Amendments (as defined below): (a) the RPA, (b) the PSA, (c) the Contribution Agreement, (d) the Performance Guaranty, (e) the Fee Letter and (f) the Lock-Box Agreement (all as defined below).

3

Agreements (as amended, the "Amended Purchase Agreements") that govern the Securitization Facility.[3]

9.  Under the Securitization Program, certain of the Debtors sell certain eligible trade receivables (the "Receivables") that they originate on a revolving basis to PEC, which in turn contributes the Receivables to P&L Receivables. P&L Receivables then sells the Receivables to PNC Bank, as Administrator and Purchaser under the RPA. Generally speaking, after the sale of

---

[3] If the relief requested in the Motion is granted, thereby giving effect to the Amendments, the Amended Purchase Agreements will include the following agreements and instruments, among others:

- that certain Fifth Amended and Restated Receivables Purchase Agreement, dated as of March 25, 2016, by and among P&L Receivables, as Seller, the Servicer, the Sub-Servicers, the various Conduit Purchasers, the Committed Purchasers, the Purchaser Agents and the LC Participants from time to time party thereto (together with the LC Bank, the "Securitization Purchasers"), the Administrator and the LC Bank (as amended pursuant to the Second Amendment thereto, dated as of the Closing Date,[3] in substantially the form attached to the Motion as Exhibit A, and as further amended, restated, supplemented or otherwise modified, the "RPA");

- that certain Amended and Restated Purchase and Sale Agreement, dated as of March 25, 2016, among the Subsidiary Originators and PEC (as amended pursuant to the First Amendment thereto, dated as of the Closing Date, in substantially the form attached to the Motion as Exhibit B, and as further amended, restated, supplemented or otherwise modified from time to time, the "PSA");

- that certain Contribution Agreement, dated as of March 25, 2016, between PEC and P&L Receivables (as amended pursuant to the Third Amendment thereto, dated as of the Closing Date, in substantially the form attached to the Motion as Exhibit C, and as further amended, restated, supplemented or otherwise modified from time to time, the "Contribution Agreement" and, collectively, with the RPA and the PSA, the "Receivables Agreements");

- that certain Amended and Restated Performance Guaranty, dated as of the Closing Date, by PEC in favor of the Administrator for the benefit of the Securitization Purchasers (in substantially the form attached to the Motion as Exhibit D, and as further amended, restated, supplemented or otherwise modified from time to time, the "PEC Performance Guaranty");

- that certain Originator Performance Guaranty, dated as of the Closing Date, by the Subsidiary Originators in favor of the Administrator for the benefit of the Securitization Purchasers (in substantially the form attached to the Motion as Exhibit E, and as further amended, restated, supplemented or otherwise modified from time to time, the "Originator Performance Guaranty");

- that certain Amended and Restated Purchaser Group Fee Letter, dated as of the Closing Date, among P&L Receivables, PEC, PNC Bank as a Purchaser Agent, Administrator and Securitization Purchaser (in substantially the form attached to the Motion as Exhibit F, the "Fee Letter"); and

- that certain Amended and Restated Deposit Account Control Agreement, dated as of March 25, 2016, among P&L Receivables, as Seller, PEC, as Servicer, PNC Bank, as Administrator and Lock-Box Bank.

4

the Receivables, PEC, as Servicer, and certain of the other Debtors, as Sub-Servicers, collect the receivables on behalf of the Purchaser for a nominal servicing fee.

10. During 2015, the total consideration received by certain of the Debtors was approximately $3.7 billion related to Receivables sold under the Securitization Program, including $2.59 billion of cash up front from the sale of the Receivables, an additional $1.09 billion of cash upon the collection of the Receivables and $11.7 million that had not been collected at December 31, 2015. The reduction in accounts receivable as a result of securitization activity was $168.5 million at December 31, 2015.

11. The Securitization Program is an essential part of the Debtors' capital structure, providing both liquidity and essential letters of credit. Historically, the Debtors utilized the proceeds from the sale of the Receivables as an alternative to short-term borrowings under the Debtors' prepetition credit facility. Thus, the Securitization Program allows the Debtors to effectively manage overall borrowing costs and provides the Debtors with an additional source of working capital. In December 2015, the Debtors began using the Securitization Facility to obtain letters of credit, and that purpose has become the critical use for the Securitization Facility.

*Overview of Securitization Facility Mechanics*

12. <u>Purchase and Sale of Receivables</u>. As noted above, through the Securitization Facility, the Originators, which generate Receivables from the sale of coal or other goods or services, immediately sell those Receivables to PEC, and PEC then contributes these Receivables to P&L Receivables. Under the Securitization Facility, it is my understanding that the transfers from the Originators to PEC and from PEC to P&L Receivables are both intended to be "true sales" and absolute assignments of the Receivables.

5

13. <u>Use of the Facility</u>.  The total size of the Securitization Facility is $180 million.  Financing available under the Securitization Facility at any time is limited by, among other things, the outstanding balance of the eligible Receivables.  Although the Securitization Facility allows the Debtors to obtain both cash advances and letters of credit, the Debtors currently use the Securitization Facility solely to obtain letters of credit.

14. <u>Collection of Receivables, Application of Proceeds</u>.  In connection with the Securitization Facility, the Originators, through the Servicer and Sub-Servicers, have directed their customers to make payments to one of six designated zero-balance lockbox accounts (the "<u>Lockbox Accounts</u>") maintained by P&L Receivables at PNC Bank.  Prior to the Petition Date, the funds in the Lockbox Accounts were deposited in a collateral account (the "<u>LC Collateral Account</u>"), which is controlled by the Administrator, and released into the Debtors' cash management system only after the Debtors deliver a report indicating that the sum of the remaining funds in the LC Collateral Account and the effective borrowing base exceed the aggregate face amount of outstanding letters of credit and cash borrowings.  I understand that this cash flow process will continue on a postpetition basis under the Amended Purchase Agreements.

15. <u>Security Interests</u>.  To secure its obligations under the Amended Purchase Agreements, I understand that P&L Receivables granted to the Administrator (for the benefit of the Securitization Purchasers) a security interest in all of its property, including all Receivables, the Lockbox Accounts, the rights of P&L Receivables under the Purchase Agreements and all proceeds of the foregoing.  I also understand that the Originators and PEC granted back up security interests under the Amended Purchase Agreements as well.  I understand that the purpose of these security interests is to protect the Securitization Purchasers in the event that the

6

sales of Receivables under the Amended Purchase Agreements are not respected as sales, and are instead recharacterized as loans.

*The Need to Continue the Securitization Facility*

16. As noted above, the Debtors use the Securitization Facility to obtain letters of credit, which the Debtors utilize to backstop many of their ordinary course financial obligations. Like other participants in the coal industry, the Debtors' ability to provide letters of credit to third parties is essential to the Debtors' continued operations. Under various state and federal laws, in the ordinary course of the Debtors' businesses, the Debtors are required to provide letters of credit to collateralize various of their obligations, including workers' compensation and environmental obligations. These obligations are owed to, among others, surety bond providers, state and federal regulatory agencies and insurers. If the Debtors are unable to provide and maintain these letters of credit, the Debtors may default on various obligations and / or lose the ability to continue operations.

17. As noted above, given the critical importance of the Securitization Facility to the Debtors, in advance of commencing their chapter 11 cases, the Debtors and PNC Bank negotiated the Amended Purchase Agreements. Pursuant to the Amended Purchase Agreements, the parties to the Securitization Facility have agreed to allow the facility to continue postpetition, subject to certain modifications, including the Debtors' agreement to increase certain pricing elements of the Securitization Facility. I participated significantly in the negotiations surrounding the Amendments and I believe these negotiations were conducted in good faith and at arm's length. I also believe that, if this Court authorizes the Debtors to enter into the Amended Purchase Agreements, the Debtors, P&L Receivables, the Administrator and the Securitization Purchasers will continue to act in good faith as Receivables are sold under the Securitization Facility.

7

18.   In connection with the continuation of the Securitization Facility pursuant to the Amended Purchase Agreements, I understand that the Motion seeks approval to provide the Securitization Purchasers with, among other things, (a) superpriority claims in respect of certain obligations owed by the Debtors under the Amended Purchase Agreements and (b) postpetition liens in the Receivables sold after the Petition Date and certain related collateral.

19.   I believe that this Court should grant the relief requested in the Motion, authorize the Debtors to enter into the Amended Purchase Agreements so as to allow the Securitization Facility to continue postpetition.  Based on my knowledge of the Debtors' businesses and ongoing efforts to maintain value-maximizing financing arrangements, I believe that the Securitization Facility is the most efficient and cost-effective way for the Debtors to maintain the letters of credit issued thereunder.  Accordingly, I believe that allowing the Securitization Facility to continue on the terms set forth in the Amended Purchase Agreements is in the best interests of the Debtors and their estates.

20.   In considering the ramifications of termination of the Securitization Facility, entry into the Amended Purchase Agreements to preserve the value provided by the Securitization Facility is the best option available.  As noted above, like other participants in the coal industry, the Debtors' ability to provide letters of credit to third parties is crucial to the continuation of the Debtors' business operations.  The Debtors do not believe that any alternative funding source is available to fill the void that would be left by termination of the Securitization Facility in the near term, and such financing is completely unavailable on an unsecured basis.[4]  Thus, without the Securitization Facility, the Debtors likely would only be able to obtain such letters of credit on more onerous terms, such as fully cash collateralizing such letters of credit.  Allowing the Securitization Facility to terminate and thus requiring the Debtors to obtain new letters of credit

---

[4] Although the DIP Facility provides for the issuance of letters of credit, the DIP Facility's capacity for such letters of credit was sized on the premise that the ARS Facility would continue postpetition.

8

on worse terms could disrupt the Debtors' operations and could immediately impact the Debtors' liquidity. For example, if the Securitization Facility terminates, the Debtors will lose access to the proceeds paid into the Lockbox Accounts from collections of outstanding Receivables.

21. The Debtors negotiated extensively to obtain the ability to continue the Securitization Facility pursuant to the terms of the Amended Purchase Agreements. The Amended Purchase Agreements contain certain restrictive provisions and increase certain pricing elements of the Securitization Facility, which the Administrator and the Securitization Purchasers have required as a condition to continuation of the Securitization Facility. Allowing the Securitization Facility to continue gives the Debtors the ability to provide and maintain crucial letters of credit on the best terms available. Accordingly, I believe that granting the relief requested in the Motion, and thus allowing the Securitization Facility to continue pursuant to the Amended Purchase Agreements, is in the best interests of the Debtors and their estates.

***The Importance of Immediate Relief and Waiver of Stay***

22. The immediate continuation of the Securitization Facility is necessary to prevent immediate and irreparable damage to the Debtors' businesses. Indeed, without the relief in the Motion continuing the Securitization Facility, the Debtors may face immediate business disruption and a significant loss of liquidity. As noted above, if the Securitization Facility terminates, the Debtors will lose access to the proceeds paid into the Lockbox Accounts from collections of outstanding Receivables, thus cutting off a significant source of cash inflow to the Debtors' estates. Accordingly, the Securitization Facility should be allowed to continue on an immediate basis.

***Conclusion***

23. To preserve the value of their businesses, the Debtors have requested the authority to enter into the Amended Purchase Agreements so as to provide for the continuation of the

Securitization Facility on a postpetition basis.  For the reasons described herein, continuation of the Securitization Facility is in the best interests of the Debtors and their estates and the relief in the Motion should be granted by this Court.

      I respectfully request that all of the relief requested in the Motion be granted along with such other and further relief as is just.

Dated:  April 13, 2016

                                        Peabody Energy Corporation
                                        (for itself and on behalf of the other 154 Debtors)

                                        By: /s/James A. Tichenor_____
                                        James A. Tichenor

10