# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>Peabody Energy Corporation, <u>et al.</u>,<br><br>Debtors.[1] | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507(b) AND BANKRUPTCY RULES 4001(b) AND (c), FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO <u>PREPETITION SECURED PARTIES; AND (III) SCHEDULING A FINAL HEARING</u>

Peabody Energy Corporation ("<u>PEC</u>" or "<u>Borrower</u>") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") hereby move this Court, pursuant to sections 105, 361, 362, 363, 364 and 507(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), for entry of interim and final orders: (a) authorizing the Debtors to obtain senior secured postpetition financing on a priming basis; (b) authorizing the Debtors to use Cash Collateral (as defined below); (c) granting liens and providing superpriority claims with respect to such postpetition financing; (d) approving the form of adequate protection to be provided by the Debtors; (e) modifying the automatic stay to the extent necessary to effectuate the terms of the DIP Orders; (f) scheduling a final hearing to consider entry of the

---

[1] The Debtors and their employer identification numbers are listed on Schedule 1 attached hereto. The addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

Final Order; and (g) granting related relief in connection with the DIP Financing (as defined below), and in support thereof, respectfully represent as follows:[2]

Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Background

2.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri.  PEC was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a wholly-owned direct or indirect subsidiary of PEC.

4.      PEC is the world's largest private-sector coal company (by volume), with 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators.  PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is exported to international customers.  As of December 31, 2015, Debtor PEC and its

---

[2]      A copy of the proposed order will be made available on the Debtors' case website at http://www.kccllc.net/peabody.

subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements.  In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons of proven and probable coal reserves, and the Debtors generated sales of approximately 180 million tons of coal.  In addition to its mining operations, the Debtors market and broker coal from other coal producers across the United States, Australia, Europe and Asia.

5.    The Debtors operate in a competitive and highly regulated industry that has experienced strong headwinds and precipitously declining demand and pricing in recent years due to the rise of low priced alternative energy sources – including an abundance of natural gas.  Combined with these factors, slowing global economic growth drove a wide range of goods prices lower in 2015 and resulted in the largest broad market decline since 1991.  Indeed, demand from electric utilities in the United States alone declined approximately 110 million tons in 2015.  These market conditions, in connection with lower realized pricing in the United States and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor subsidiaries' coal sales during 2015.  As a result of these challenges, several large United States coal companies have filed for chapter 11 protection in recent years.

6.    A comprehensive description of the Debtors' businesses and operations, capital structure and the events leading to the commencement of these chapter 11 cases can be found in (a) the Declaration of Amy Schwetz, Executive Vice President and Chief Financial Officer of Debtor PEC, in Support of First Day Motions of Debtors and Debtors in Possession (the "First Day Declaration") and (b) the Declaration of Carlin Adrianopoli in Support of Certain First Day Motions (the "Adrianopoli Declaration"), which were filed contemporaneously herewith and are incorporated herein by reference.  In further support of this Motion, the Debtors

also incorporate herein by reference the Declaration of Tyler W. Cowan in Support of Motion of

the Debtors and Debtors in Possession, Pursuant to Bankruptcy Code Sections 105, 361, 362,

363, 364 and 507(b) and Bankruptcy Rules 4001(b) and (c), for Interim and Final Orders

(I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral;

(II) Granting Adequate Protection to Prepetition Secured Parties; and (III) Scheduling a Final

Hearing (the "Cowan Declaration").[3]

       7.    To operate their businesses, preserve value and pursue their restructuring

goals, the Debtors require access to the proposed DIP Facilities and the use of Cash Collateral.

Through the DIP Facilities and the use of Cash Collateral, the Debtors will have access to

the necessary funding to (a) continue the day-to-day operations of their businesses, (b) comply

with regulatory obligations, (c) develop and implement a long term business plan and (d) fund

these chapter 11 cases.  The DIP Financing in particular signals to the Debtors' vendors,

suppliers, customers and employees that the Debtors will continue to meet their commitments

during these cases.  Likewise, the proposed DIP Financing will help provide governmental

agencies with confidence that the Debtors will have funding for their reclamation and similar

obligations on a go-forward basis.  The DIP Financing, together with the consensual use of Cash

Collateral, provides the Debtors with their best opportunity to maintain their current operations

and implement a successful restructuring for the benefit of their creditors.

       8.    As a result, the Debtors seek authorization to obtain postpetition financing

and use Cash Collateral pursuant to the terms set forth in (a) this Motion; (b) the Superpriority

---

[3]    The Cowan Declaration is attached hereto as Exhibit A.

Secured Debtor-in-Possession Credit Agreement attached hereto as Exhibit B (the "DIP Credit Agreement"); (c) the Interim Order; and (d) after a final hearing, the Final Order (together with the Interim Order, the "DIP Orders"). The Debtors anticipate that they will access the DIP Facilities immediately upon the entry of, and on the terms set forth in, the Interim Order.

9.      Notably, the lenders under the DIP Financing include not just Pre-Petition Secured Lenders, but also significant holders of the Debtors' prepetition second lien and unsecured notes. The Debtors believe that this fairly unprecedented DIP Financing structure – where creditors with divergent claims and interests are jointly participating in the financing – evidences their major stakeholders' support for this the DIP Facilities and the broader restructuring process.

## Relief Requested

10.     By this Motion, the Debtors seek entry of the DIP Orders:

(a) **DIP Financing**: authorizing the Borrower to obtain postpetition financing (the "DIP Financing"), and for certain of the other Debtors (other than Peabody Holdings (Gibraltar) Limited, Peabody IC Holdings, LLC and Peabody IC Funding Corp.) (the "Debtor Guarantors" and, together with the Borrower and Peabody Holdings (Gibraltar) Limited as pledgor under the DIP Documents (as defined below), the "Debtor Loan Parties" and collectively with nondebtor Global Center for Energy and Human Development, LLC ("Global Center"), the "DIP Loan Parties"), to guaranty the Borrower's obligations in connection with the DIP Financing, consisting of, (a) a senior secured superpriority non-amortizing term loan in the aggregate principal amount of up to $500,000,000 (the "Term Loan Facility"), (b) a cash collateralized letter of credit facility in the aggregate amount of up to $100,000,000 (the "L/C Facility" and together with the Term Loan Facility and the Bonding Accommodation Facility (as defined below), the "DIP Facilities") and (c) an accommodation facility for Bonding Requests[4] by Bonding

---

[4]  "Bonding Request" means any demand, request or requirement of any Governmental Authority for any surety bond, letter of credit or other financial assurance pursuant to any Mining Law, Reclamation Law or Environmental Law, or any related Permit, in each case, to the extent such surety bond, letter of credit or other financial assurance is to satisfy or replace an obligation for which the Borrower or any of its

Beneficiaries (as defined in the Interim Order) in the form of (or in any combination of) (i) the Bonding Carve Out (as defined below) and/or (ii) the issuance of letters of credit under the DIP Credit Agreement secured by cash collateral (the "Bonding Letters of Credit" and, together with the Bonding Carve Out, the "Bonding Accommodation Facility"), in an aggregate stated amount (the "Bonding Accommodation Cap") of up to $200,000,000, in each case subject to the terms set forth in the DIP Credit Agreement, from Citibank, N.A. ("Citi"), acting as administrative agent and L/C Issuer (in such capacities and together with any respective successor thereto, the "DIP Agent") for itself and the lenders (the "DIP Lenders") from time to time party to the DIP Credit Agreement, in each case to be arranged by Citigroup Global Markets Inc. (the "Lead Arranger").

**(b)  DIP Documents**:  authorizing the Debtors to execute and enter into, and to cause Global Center to execute and enter into, the DIP Credit Agreement and any exhibits attached thereto, all related or ancillary documents and agreements, including all security and pledge agreements and any mortgages contemplated thereby (collectively, and together with the separate letter agreements between any and all DIP Loan Parties, on one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing, in each case, as may be amended, supplemented or otherwise modified pursuant to their respective terms, the "DIP Documents") and to perform all such other and further acts as may be required in connection with the DIP Documents;

**(c)  Adequate Protection**:  the granting of adequate protection in the form of the Adequate Protection Obligations and Adequate Protection Liens (as each is defined below) solely to (a) the lenders (the "Pre-Petition Credit Agreement Lenders") and other Secured Parties (as defined in the Interim Order) under or in connection with that certain Amended and Restated Credit Agreement, dated as of September 24, 2013 (as heretofore amended, supplemented or otherwise modified in accordance with the terms thereof, including pursuant to that certain Omnibus Amendment Agreement, dated as of February 5, 2015, the "Pre-Petition Credit Agreement"), by and among the Borrower, the lenders and letter of credit issuers party thereto, Citi as administrative agent (in such capacity and together with any successor thereto, the "Pre-Petition Agent") and the other agents and arrangers party thereto, that certain Pledge and Security Agreement (the "Pre-Petition Security Agreement"), dated as of February 5, 2015, by and among the Borrower,

---

(continued…)

Restricted Subsidiaries (with respect to operations in the United States) is self-bonded as of the Closing Date.

the Pre-Petition Guarantors (as defined below), and Citi as administrative agent, and that certain Amended and Restated Pledge Agreement, dated as of September 24, 2013 (the "Pre-Petition Pledge Agreement" and, collectively with the Pre-Petition Credit Agreement, the Pre-Petition Security Agreement, and the guaranties, mortgages and pledges and all other documentation executed in connection therewith (including, for these purposes, any Swap Contracts or Cash Management Agreements (each as defined in the Pre-Petition Credit Agreement) and the documents governing such arrangements, the "Existing Credit Documents"), among Peabody Investments Corp. and Citi, as administrative agent; and (b) the other Secured Parties (as defined in the Pre-Petition Credit Agreement) under the Existing Credit Documents (together with the Pre-Petition Credit Agreement Lenders, the "Pre-Petition Lenders" and, collectively with the Pre-Petition Agent, the "First Lien Secured Parties"); and (c) the holders (the "Second Lien Noteholders") of the 10% Senior Secured Second Lien Notes due 2022 (the "Second Lien Notes") issued under or in connection with (x) that certain Indenture, dated as of March 16, 2015 (as heretofore amended, supplemented or otherwise modified in accordance with the terms thereof, the "Second Lien Notes Indenture" and together with the security agreements, guaranties, mortgages, pledges and all other documentation executed in connection therewith, the "Existing Second Lien Indenture Documents" and, together with the Existing Credit Documents, the "Existing Secured Agreements"), by and among the Borrower, the subsidiary guarantors party thereto, and U.S. Bank, National Association, as trustee and collateral agent (in such capacities, and together with any successor trustee, the "Second Lien Notes Trustee" and, together with Second Lien Noteholders, the "Second Lien Secured Parties" and, collectively with the First Lien Secured Parties, the "Pre-Petition Secured Parties"), whose liens and security interests are being primed by the DIP Financing;

(e) **Cash Collateral**:  the Debtor Loan Parties to continue to use Cash Collateral and all other Pre-Petition Collateral (as defined below) in which any of the Pre-Petition Secured Parties has an interest, and the granting of adequate protection in the form of the Adequate Protection Obligations and the Adequate Protection Liens to the Pre-Petition Secured Parties, as applicable, with respect to, *inter alia*, such use of their Cash Collateral and all use and diminution in the value of such Cash Collateral and the Pre-Petition Collateral, as applicable;

(f) **Debtor Stipulations**:  approving of certain stipulations in paragraph 4 of the Interim Order by the Debtors with respect to the Existing Secured Agreements and the liens and security interests arising therefrom;

(g) **Grant of DIP Lender Superpriority Claims**:  granting of superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof (including, subject only to and effective upon entry of the Final Order (as defined below), any Avoidance

Proceeds (as defined below)), subject to the Fees Carve Out (as defined below) and the Bonding Carve Out (to the extent provided herein);

**(h)  506(c) Limitation**:  subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

**(j)  Interim Hearing**:  pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of an order granting the Motion on an interim basis (as entered on the docket, the "Interim Order") (a) authorizing the Borrower, on an interim basis, to borrow or obtain letters of credit from the DIP Lenders (and incur bonding obligations) under or as permitted by the DIP Documents up to an aggregate principal or face amount not to exceed (i) $200,000,000 under the Term Loan Facility, (ii) $100,000,000 under the L/C Facility and (iii) $200,000,000 under the Bonding Letters of Credit (including any attorney's, accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Existing Credit Documents), amounts, charges, costs, indemnities and other obligations incurred in connection therewith provided for in the Interim Order, Final Order or DIP Documents and subject to any limitations of borrowings under the DIP Documents) to provide operating cash for the Debtors and bonding and letter of credit capacity for the Debtors' businesses, (b) authorizing the Debtors' continued use of Cash Collateral and all other Pre-Petition Collateral, and (c) granting adequate protection in the form of the Adequate Protection Obligations and the Adequate Protection Liens;

**(k)  Final Hearing**:  scheduling a final hearing (the "Final Hearing") to be held within 45 days of the entry of this Interim Order to consider entry of a final order (the "Final Order"); and

**(l)  Other Relief**:  granting the other relief set forth in the Interim Order and the Final Order.

## Background

## I.    Overview of the Debtors' Prepetition Capital Structure[5]

11.    As of the Petition Date, the Debtors had approximately $8.8 billion in debt,

---

[5]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

as follows:

- **Primary Secured Debt**.  $4.3 billion in secured obligations[6], consisting of:

  o **Pre-Petition Credit Agreement**:  (a) $1.65 billion revolving credit facility (the "Revolving Credit Facility") and (b) $1.2 billion term loan facility (the "Term Loan Facility") issued pursuant to the Pre-Petition Credit Agreement.  As of the Petition Date, the Debtors had drawn down approximately $947 million and had posted approximately $675 million in letters of credit under the Revolving Credit Facility[7];

  o **Swap Obligations:**  As of March 31, 2016, the Debtors had foreign currency and fuel transactions outstanding under their prepetition International Swaps and Derivatives Association ("ISDA") Master Agreements – forms published by ISDA, the swap industry's association, in the approximate notional amounts of $1.1 billion (foreign currency) and $271 million (for fuel), respectively, which are generally considered "Swap Obligations," as that term is defined in the Pre-Petition Credit Agreement.  "Swap Obligations," to the extent valid and in a net liability position, are first lien obligations secured by collateral and all property that is subject to liens under the Pre-Petition Credit Agreement;[8]

  o **Second Lien Notes:**  $1.0 billion in principal amount of 10.00% senior secured second lien notes issued on March 16, 2015 by PEC, due in March 2022 (the "Second Lien Notes"), which are secured by a second-priority lien on all the assets that secure the Debtors' obligations under the Pre-Petition Credit Agreement, subject to permitted liens and other limitations;

- **Long-Term Unsecured Debt**.  $4.5 billion in unsecured indebtedness, consisting of approximately:

  o **2018 Notes:**  $1.5 billion in principal amount of 6.00% senior notes issued in November 2011 by PEC, due in November 2018;

---

[6]     This amount includes the amount outstanding on the A/R Securitization Facility (as defined below).  Although the A/R Securitization Facility is administered through a wholly-owned, bankruptcy-remote subsidiary, P&L Receivables, to the extent transfers of receivables are recharacterized as an extension of credit rather than true sales, the Debtors party to the A/R Securitization Facility have granted first priority security interests and liens on the receivables in favor of the administrator of the A/R Securitization Facility.

[7]     Balance subject to currency fluctuations due to letters of credit being issued in both US dollars and Australian dollars.

[8]     Part of the $4.3 billion in secured indebtedness reflects the mark to market liability rather than notional amount of the swap obligation.  As of April 11, 2016, the mark to market liability was approximately $171 million for foreign currency and approximately $128 million for fuel.

- o **2020 Notes:** $650 million in principal amount of 6.50% senior notes issued in August 2010 by PEC, due in September 2020;

- o **2021 Notes:** $1.3 billion in principal amount of 6.25% senior notes issued in November 2011 by PEC, due in November 2021;

- o **2026 Notes:** $250 million in principal amount of 7.785% senior notes issued in October 2006 by PEC, due in November 2026;

- o **2066 Notes:** $732.5 million in principal amount of convertible junior subordinated debentures by PEC, due in December 2066; and

- o **Other**: $22 million in, among other things, capital lease obligations.

- **A/R Securitization Facility**: The Debtors have an accounts receivable securitization program (the "A/R Securitization Facility") with PNC Bank, National Association (the "Administrator") with a maximum capacity of $180 million through a wholly-owned, bankruptcy remote non-debtor subsidiary P&L Receivables Company, LLC ("P&L Receivables"), under which there is no available capacity.

Additional information about the Debtors' secured debt and receivables financing is below:

A.    **Prepetition Secured Debt Obligations**

*<u>The Pre-Petition Credit Agreement</u>*

12.    On February 5, 2015, the Debtors entered into the Omnibus Amendment Agreement related to the Pre-Petition Credit Agreement that provided the Debtors with enhanced financial flexibility in exchange for the pledge of certain collateral and, among other things, amended negative covenants, lien covenants, financial maintenance covenants and additional mandatory prepayment provisions. As noted above, the Pre-Petition Credit Agreement provides for a $1.65 billion Revolving Credit Facility and a $1.20 billion Term Loan Facility. All obligations under the Pre-Petition Credit Agreement are guaranteed by the Debtors other than PEC and are secured by (i) a pledge of 65% of the stock of Debtor Peabody Investments (Gibraltar) Limited, a holding company for the Debtors' Australian operations; (ii) a pledge of the stock of Debtor Peabody IC Funding Corp., a holding company whose sole asset is

intercompany debt, which had a book value of $5.4 billion as of September 30, 2015, owed to it

by Peabody Holdings (Gibraltar) Limited and (iii) substantially all of the Debtors' U.S. assets

and 65% of the equity interests of their first-tier foreign subsidiaries, subject to certain

exceptions.  These exceptions include, among others, (a) motor vehicles or other assets with

certificates of title with a net book value of less than $1 million, (b) commercial tort claims

where the amount of the net proceeds claimed is less than $10,000,000, (c) contracts and related

contract assets, (d) letter of credit rights, (e) right, title or interest in the receivables assets in the

A/R Securitization Facility, (f) certain real property interests that are not material real property,

(g) certain trademark applications and (h) certain equity interests of foreign subsidiaries, non-

wholly owned subsidiaries, non-profits and similar entities.

13.    The Term Loan Facility has a maturity date of September 24, 2020, and the

principal amount of the Term Loan Facility is subject to quarterly amortization payments equal

to 0.25% of outstanding principal each quarter through June 30, 2020.  The Revolving Credit

Facility has a maturity date the earlier of (a) September 24, 2018 or (b) 91 days prior to the

maturity date of the 6.00% Senior Notes due 2018.

14.    All borrowings under the Term Loan Facility and the Revolving Credit Facility

(other than swing line borrowings and borrowings denominated in currencies other than U.S.

dollars) bear interest, at PEC's option, at either: (a) a base rate equal to the highest of (i) the

Federal Funds Rate plus 0.50%, (ii) the one-month eurocurrency rate plus 1.0% and (iii) the

annual rate of interest in effect for that day as publicly announced by the administrative agent as

its "prime rate" (subject, in each case, to a floor of 2.00%); or (b) a eurocurrency rate for the

relevant interest period (which will be one, two, three or six months or, subject to availability,

one or two weeks or twelve months, as selected by PEC) (subject to a floor of 1.00%), plus (1) in

the case of term loan borrowings, 2.25% per year for borrowings bearing interest at the base rate

and 3.25% per year for borrowings bearing interest at the eurocurrency rate or (2) in the case of

revolving credit borrowings, a rate dependent on the ratio of PEC's debt as compared to PEC's

adjusted consolidated EBITDA ranging from 0.75% to 1.50% per year for borrowings bearing

interest at the base rate and from 1.75% to 2.50% per year for borrowings bearing interest at the

eurocurrency rate.

15.     In February 2016, the Debtors borrowed approximately $945 million

under the Revolving Credit Facility, which represented the then-remaining undrawn available

amount.  As of the Petition Date, the Debtors had approximately $675 million outstanding in

letters of credit under the Revolving Credit Facility.

**_The Second Lien Notes_**

16.     On March 26, 2015, PEC completed the offering of the Second Lien Notes

to fund the purchase of their 7.375% Senior Notes that were due in November 2016 (the "2016

Notes") and to redeem the aggregate principal amount of the 2016 Notes that was not tendered in

the tender offer.  The Debtors pay interest on the Second Lien Notes semi-annually on March 15

and September 15 of each year until March 15, 2022.  These notes may be redeemed at any time

on or after March 18, 2018, at the redemption prices specified in the related indenture and, prior

to that date, a redemption price equal to 100% of the principal amount of the Second Lien Notes

being redeemed plus a make whole premium, in addition to any accrued and unpaid interest.

Prior to March 15, 2018, the Debtors may also redeem up to 35% of the aggregate principal

amount of the Second Lien Notes with the net cash proceeds from certain equity offerings.  The

Second Lien Notes are secured by a second-priority lien on all the assets that secure the Debtors'

obligations under the Pre-Petition Credit Agreement, subject to permitted liens and other

limitations.

    **B.**    **A/R Securitization Facility**

    17.    The Debtors have an accounts receivable securitization program with a maximum capacity of $180 million, under which there is no available capacity.  The Debtors utilize proceeds from the sale of their accounts receivable as an alternative to short-term borrowings under the Revolving Credit Facility.  The A/R Securitization Facility operates through a series of true sales of the receivables by certain of the Debtors to PEC, which in turn sells the receivables to P&L Receivables, which in turn obtains letters of credit secured by the receivables pool.  Under the A/R Securitization Facility, the transfer of the receivables has also been perfected by filing UCC financing statements, to the extent these transfers are recharacterized as an extension of credit rather than true sales. In that eventuality, the Debtors party to the A/R Securitization Facility have granted first lien security interests and liens on the receivables, and the proceeds therefrom, in favor of the Administrator and the securitization purchasers.  Subsequent to amendments to the A/R Securitization Facility entered into on March 25, 2016, the parties to the A/R Securitization Facility have agreed to allow the facility to continue postpetition.

**II.**    **The Debtors' Reclamation/Bonding Obligations**

    18.    The Debtors' reclamation obligations (the "Reclamation Obligations") arise pursuant to the federal Surface Mining Control and Reclamation Act of 1977 and similar state statutes, which generally require that property upon which mining operations have been conducted be restored in accordance with specified standards and an approved reclamation plan. Standards for mine reclamation have been established by various state and federal regulatory agencies and dictate the reclamation requirements at the Debtors' mining properties.  The

Debtors' reclamation obligations consist principally of costs necessary to (a) reclaim refuse and slurry ponds, (b) reclaim mining areas, (c) seal portals at underground mines and (d) treat water used in mining operations.

19.    The primary methods the Debtors use to meet their Reclamation Obligations are to post self-bonds supported by parent guarantees (i.e., self bond), provide a third-party surety bond or provide bank guarantees or other letters of credit (to support the third-party surety bonds).  As of the Petition Date, the Debtors had posted third-party surety bonds in favor of the applicable government agencies and other third parties with respect to their Reclamation Obligations and other obligations in the following states and in the following approximate amounts:  Arizona ($294 million); Colorado ($31 million); Illinois ($63 million); Indiana ($11 million); Montana ($5 million); and Pennsylvania ($17 million).[9]  The vast majority of surety bonds relate to the Debtors' Reclamation Obligations.  In four states, however, as of the Petition Date, the Debtors maintained the privilege of self-bonding for their Reclamation Obligations.  These states, and each state's bonded amount, are approximately: Wyoming ($728 million); New Mexico ($181 million); Illinois ($92 million); and Indiana ($147 million).  The Debtors' ability to self-bond reduces their costs of providing financial assurances to applicable government agencies for the Debtors' Reclamation Obligations.

20.    As of the Petition Date, the Debtors' aggregate accrued Reclamation Obligations – based on a variety of assumptions tied to the Debtors' existing operations and mine

---

[9]    The Arizona bonds are posted with the OSM and BLM.  The majority of the surety bond obligation amounts in Illinois and Pennsylvania consist of indemnifications of third party companies.  As a result, the Debtors' obligations in these instances are with the surety companies, not the states.

plans that may change in light of actual events – are approximately $723 million globally, with approximately $25 million  of planned expenditures expected to occur within one year.

**The Debtors' Immediate Need for Access to the DIP Financing and Cash Collateral**

21.    The Debtors' businesses are cash intensive, with significant daily costs to produce and ship coal to customers, satisfy obligations to employees, maintain the safety of their mines and other facilities and fulfill environmental and other regulatory requirements.  As such, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value and pursue their restructuring goals.  The Debtors, in consultation with their proposed financial advisor, FTI Consulting, Inc. ("FTI"), have reviewed and analyzed the Debtors' projected cash needs and have prepared a 13-week projection (as updated and amended from time to time, the "13-Week Projection") outlining the Debtors' postpetition cash needs in the initial 13 weeks of these cases.[10]  The Debtors believe that the 13-Week Projection is an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations—including administrative expenses in these chapter 11 cases—and is reasonable and appropriate under the circumstances.

22.    Immediate and ongoing access to funding under the DIP Facilities will demonstrate to customers, employees, vendors, suppliers and other key constituencies that the Debtors have sufficient resources available to meet their obligations in the ordinary course during these cases.  Further, the DIP Financing will provide the Debtors with substantial ongoing ability to post new letters of credit and fund significant bonding obligations in connection with

---

[10]    A copy of the initial 13-Week Projection is attached hereto as Exhibit C.

their operations.  Absent funds available under the DIP Financing, access to Cash Collateral and the cooperation of key business partners at this critical early stage, the Debtors could (a) face a devastating interruption in their businesses; (b) risk regulatory noncompliance, which could adversely impact their ability to obtain or maintain permits and licenses critical to operations; (c) undermine the support of important groups on whom the Debtors' businesses and restructuring depend, which, in turn, would hinder their ability to maximize the value of their estates; and (d) be forced to modify their operations in a significant and adverse manner, which the Debtors believe could hamper their ability to maximize the value of their estates.

23.     Thus, the Debtors seek to borrow on an interim basis (a) up to $200,000,000 million under the Term Loan Facility on an interim basis; (b) up to $100,000,000 under the L/C Facility; and (c) up to $200,000,000 under the Bonding Accommodation Facility. The Debtors will use these funds to (a) continue the day-to-day operations of their businesses, (b) comply with regulatory obligations, (c) develop and implement a long term business plan and (d) adequately fund these chapter 11 cases.  Moreover, immediate access to the Bonding Accommodation Facility under the DIP Financing is needed to give the Debtors the ability to provide financial assurances with respect to their reclamation bonding obligations to states in which the Debtors were self-bonded prior to the Petition Date that may arise in the course of their businesses.  Access to this bonding capacity is important for the Debtors to conduct their businesses, comply with applicable law and preserve value for stakeholders.

24.     In sum, without the relief requested in the Motion, the Debtors would suffer substantial, irreparable and ongoing harm.  Accordingly, the Debtors' need for access to postpetition financing and the use of Cash Collateral on the terms set forth in the DIP Credit Agreement and the DIP Orders is immediate and urgent.

-16-

## Summary of Principal Terms of DIP Financing

25.   In accordance with Bankruptcy Rules 4001(b), 4001(c) and 4001(d),

the following is a summary of the significant terms of the DIP Credit Agreement and the DIP

Orders:

| Material Terms of DIP Financing[11] | | |
|---|---|---|
| **Parties to DIP Credit Agreement**<br><br>Fed. R. Bank. P. 4001(c)(1)(B) | Borrower: | Peabody Energy Corporation |
| | Guarantors: | The U.S. Debtor subsidiaries of Peabody Energy Corporation (other than Peabody Holdings (Gibraltar) Limited, Peabody IC Holdings, LLC and Peabody IC Funding Corporation) and nondebtor Global Center for Energy and Human Development, LLC ("Global Center"). |
| | Additional Pledgor: | Peabody Holdings (Gibraltar) Limited |
| | DIP Agent: | Citibank, N.A. |
| | Lead Arranger: | Citigroup Global Markets, Inc. |
| | DIP Lenders: | The financial institutions from time to time party to the DIP Credit Agreement (the "DIP Lenders"). An aggregate principal amount of $60 million of the Term Loan Facility (as defined below) shall be made available to funds managed by Centerbridge Partners, Aurelius Capital Management, Elliott Management Corporation and Capital Research and Management Company (the "Unsecured DIP Lenders"). |
| **Maturity and Termination Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The termination date with respect to the DIP Facilities (the "Maturity Date") shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) 45 days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 45-day period (as such period may be extended with the consent of the Required Lenders), (c) the substantial consummation of a plan of | |

---

[11]   Capitalized terms used in this summary not otherwise defined herein will have the meanings given to them in the DIP Credit Agreement or the Interim Order, as applicable.  This summary is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement or the Interim Order, as applicable. To the extent there exists any inconsistency between this summary and the provisions of the DIP Credit Agreement or the Interim Order, the provisions of the DIP Credit Agreement or the Interim Order, as applicable, shall control.

| | reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the acceleration of the loans and the termination of commitments with respect to the DIP Facilities in accordance with the DIP Loan Documents (as defined below) and (e) a sale of all or substantially all of the assets of the Borrower (or the Borrower and the Guarantors) pursuant to Section 363 of the Bankruptcy Code.<br><br>"Scheduled Termination Date" means the date that is 12 months after the Closing Date (as defined below); *provided* that such date may, at the election of the Borrower, be extended by up to an additional 6 months so long as, at the time such extension shall become effective, (w) there shall exist no default under the DIP Loan Documents, (x) the representations and warranties of the DIP Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such extension, (y) the Borrower shall have paid or caused to be paid to the DIP Agent for the account of each DIP Lender an extension fee in an amount equal to 2.50% of such DIP Lender's outstanding exposure under the Term Loan Facility at such time and (z) the Borrower shall have delivered to the DIP Agent an updated DIP budget covering the additional period to be effected by such extension.<br><br>**DIP Credit Agreement §§ 1.01; 2.14.** |
|---|---|
| **Purpose/Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | For working capital and general corporate purposes of the DIP Loan Parties and their subsidiaries, to cash collateralize letters of credit under the L/C Facility or Bonding L/C Facility and to pay fees and expenses incurred in connection with the transactions contemplated by the DIP Loan Documents; *provided* that no letter of credit shall be issued under the L/C Facility (or the Bonding L/C Facility) the purpose of which would be to replace or backstop any letter of credit outstanding under the Pre-Petition Credit Agreement.<br><br>**DIP Credit Agreement §§ 2.03(a)(i); 5.21.** |
| **Commitments**<br><br>Fed. R. Bankr. P. [4001] (c)(1)(B) | Term Loan: A senior secured superpriority non-amortizing term loan facility in an aggregate principal amount of $500 million (the "Term Loan Facility"; the loans made thereunder, the "Loans") to be made available to the Borrower, $200 million of which will be available at Closing after the entry of the Interim Order (as defined below) and $300 million of which will be available after the entry of the final order of the Bankruptcy Court authorizing the DIP Facilities in substantially the form of the Interim Order (as defined below), with only such modifications as are satisfactory to the DIP Agent (the "Final Order").<br><br>L/C Facility:  A letter of credit facility in the amount of $100 million for new letters of credit that shall be cash collateralized in an amount equal to 102% of the face amount [12] of letters of credit issued thereunder (the "L/C Facility"); provided that letters of credit issued under the L/C Facility (each, an "L/C Facility Letter of |

---

[12]     Letters of Credit outstanding after the Maturity Date of the DIP Facilities must be cash-collateralized at 105% of the face amount of such Letters of Credit.

| | Credit" and each issuer thereof, an "L/C Issuer") shall not be issued to replace or backstop any outstanding letters of credit issued under the Pre-Petition Credit Agreement.<br><br>Bonding Accommodation Facility:  $200,000,000, consisting of (i) a carve-out from the Collateral  with superpriority claim status, subject only to the Fees Carve-Out, entitling the authority making any Bonding Request to receive proceeds of Collateral first in priority before distribution to any DIP Lender or other prepetition secured creditor (the "Bonding Carve-Out"); and/or (ii) a letter of credit facility (the "Bonding L/C Facility and, together with the Bonding Carve-Out, the "Bonding Accommodation Facility") which shall be cash collateralized in an amount equal to 102% of the face amount of letters of credit issued under the Bonding L/C Facility (each, a "Bonding Letter of Credit" and, together with the L/C Facility Letters of Credit, the "Letters of Credit").<br><br>Notwithstanding anything to the contrary set forth herein, the aggregate face amount of all Letters of Credit at any time outstanding shall not be permitted to exceed $50 million, which maximum amount shall not be permitted to be amended or waived without the consent of the Required Lenders (as defined in the DIP Credit Agreement).<br><br>**DIP Credit Agreement §§ 2.01; 2.03.** |
|---|---|
| **Interest Rates**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Base Rate Interest:  Base Rate + 8.0%; OR<br><br>LIBO Rate Interest:  LIBOR + 9.0% (Subject to LIBOR Floor of 1.0%)<br><br>Default Interest:  An additional 2.0% per annum<br><br>**DIP Credit Agreement § 2.08.** |
| **Fees**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Upfront Fee: 5.0% of each DIP Lender's commitment under the Term Loan Facility<br><br>L/C Facility Fee: 0.25% on the outstanding face amount of each L/C Facility Letter of Credit<br><br>Bonding Letter of Credit Fronting Fee: 0.25% on the outstanding face amount of each Bonding Letter of Credit<br><br><br>Term Facility Exit Fronting Fee:  2.0%, payable upon all prepayments or repayments<br><br>**DIP Credit Agreement §§ 2.03(j); 2.09.**<br><br>The Debtors are also responsible for certain additional fees as set forth in the confidential fee letter attached under seal as Exhibit E. |
| **Conditions to Effectiveness/Closing**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | **Conditions Precedent for Effectiveness**<br>The conditions precedent to effectiveness of the DIP Credit Agreement include the usual and customary conditions for financings of this type, including, among other things:<br>• Entry of the Interim Order not later than five business days following Petition Date; |

| | |
|---|---|
| | • Payment of fees payable on or before the Closing Date;<br>• Receipt by the Arranger and DIP Agent of (i) monthly projections for the 12 months after the closing date under the DIP Loan Documents (the "Closing Date") and (ii) a cash flow forecast for the 13-week period ending after Closing Date; and<br>• The A/R Securitization Facility shall have been amended on terms substantially consistent with those in effect as of the Closing Date to permit such facility to continue to operate during the course of the Cases and to provide maturity date that is not earlier than the Scheduled Termination Date (or a new or replacement receivables securitization facility reasonably satisfactory to the DIP Agent shall have become effective).<br><br>**DIP Credit Agreement § 4.01.** |
| **Lien, and Priorities**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | DIP Superpriority Claim<br><br>In the case of each DIP Loan Party that is a Debtor, the obligations of the Borrower under the DIP Facilities, and the obligations of each Guarantor in respect of its guarantee of such obligations, shall, subject to the Fees Carve-Out (as defined below), at all times pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Case of such DIP Loan Party (the "DIP Superpriority Claims");<br><br>**Interim Order ¶ 7.**<br><br>Collateral<br><br>"Collateral" means all owned or hereafter acquired assets and property of the DIP Loan Parties (including, without limitation, inventory, accounts receivable (if any), real property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to customary exceptions to be agreed but to include without limitation, for the avoidance of doubt, all cash and cash equivalents of the DIP Loan Parties and any intercompany loans held by the DIP Loan Parties, subject, in the case of liens on the equity interests of P&L Receivables Company, LLC and any intercompany notes issued in connection with the A/R Facility Amendment, to intercreditor arrangements with the A/R Agent. Notwithstanding the foregoing, all "Receivables Assets" (as defined in the Pre-Petition Credit Agreement) sold or otherwise transferred to P&L Receivables Company, LLC in connection with the A/R Facility Agreement shall not constitute Collateral; *provided* that any such assets that are reconveyed to the DIP Loan Parties pursuant to the terms of the documentation governing the A/R Facility shall become Collateral.<br><br>**DIP Credit Agreement § 1.01.**<br><br>DIP Liens<br><br>In the case of each DIP Loan Party that is a Debtor, the obligations of the Borrower under the DIP Facilities, and the obligations of each Guarantor in respect of its guarantee of such obligations, shall, subject to the Fees Carve-Out (as defined below), at all times: |

1.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest and lien on the Collateral of such DIP Loan Party (i) to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (ii) with respect to the Interim Order, excluding claims and causes of action under Chapter 5 of the Bankruptcy Code and proceeds thereof (collectively "Avoidance Actions") (it being understood that the Final Order shall grant a perfected security interest in proceeds of successful Avoidance Actions for the benefit of the DIP Facilities);

2.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior-priority security interest and lien on the Collateral of such DIP Loan Party to the extent that such Collateral is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing liens that secure obligations of such DIP Loan Party under (i) the Pre-Petition Credit Agreement or (ii) the Second Lien Notes Indenture, which existing liens will be primed by the liens described in clause (d) below), junior to the priority of such liens in favor of such third parties; and

3.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming security interest and lien on the Collateral of such DIP Loan Party (such security interest and lien, the "Priming Lien")

in each case to the extent that such Collateral is subject to existing liens that secure the obligations of such DIP Loan Party under (i) the Pre-Petition Credit Agreement or (ii) the Second Lien Notes Indenture (collectively, the "Primed Liens").

The Priming Lien (a) shall be senior in all respects to the interests in such property of (i) the Pre-Petition Lenders under the Pre-Petition Credit Agreement and of the other "secured parties" referenced therein) (the "Pre-Petition Credit Agreement Primed Parties") and the related security documents and (ii) the holders of the Second Lien Notes (the "Second Lien Notes Primed Parties") under the Second Lien Notes Indenture and the related security agreements and (b) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens. The Primed Liens shall be primed by and made subject and subordinate to the Priming Liens, but the Priming Liens shall not prime liens, if any, to which the Primed Liens are subject at the time of the commencement of the Cases (other than any such liens that are themselves Primed Liens).

All of the liens described above shall be effective and perfected upon entry of the Interim Order.

In addition, in the case of Global Center, the obligations in respect of its guarantee of the Borrower's obligations under the DIP Facilities shall be secured by a perfected first-priority (subject to certain exceptions) security interest and

| | |
|---|---|
| | lien on its Collateral; provided that the DIP Facilities shall not be secured by, and the DIP Lenders shall not have a lien on, the Designated Global Center Account or any of the funds therein.<br><br>**DIP Credit Agreement § 2.19; Interim Order ¶ 8.** |
| **Adequate Protection**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | Adequate Protection<br><br>   **i.**    **Pre-Petition Credit Agreement Primed Parties:**<br><br>Pursuant to Sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the parties to Pre-Petition Credit Agreement whose liens will be primed as described above, and whose collateral (including cash collateral) will be authorized for use by the DIP Loan Parties (collectively, the "<u>Pre-Petition Credit Agreement Primed Parties</u>"), will receive as adequate protection on account of their first priority liens under the Pre-Petition Credit Agreement and for the use of cash collateral the following (collectively, the "<u>Senior Lender Adequate Protection Obligations</u>"):<br><br>     a.   <u>Interest Payments</u>:  current cash payment of (i) non-default rate interest (in respect of outstanding principal amounts of loans and on the capitalized secured hedge portfolio) and (ii) reasonable fees and expenses of professionals, in the case of (i), subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest); *provided* that if, at any time following the Closing Date, Liquidity (as defined below) or projected Liquidity (according to the most recently delivered 13-week cash flow forecast) shall be less than $400 million, the Borrower shall either (x) agree with the Pre-Petition Credit Agreement Primed Parties that it shall cease making any cash payments described clause (i) of this paragraph (a) until such time as such condition no longer exists or (y) petition the Bankruptcy Court for the relief described in the foregoing clause (x);<br><br>     b.   <u>Replacement Liens</u>:  To the extent of diminution in the value of their collateral, as provided in the Bankruptcy Code, replacement or, if applicable, new liens on the Collateral that are junior to the liens securing the DIP Facilities (in the same relative priority as the Pre-Petition Facilities) but senior to the adequate protection liens granted to the Second Lien Notes Primed Parties as described below (the "<u>Senior Lender Adequate Protection Liens</u>");<br><br>     c.   <u>507(b) Claims</u>:  To the extent of diminution in the value of their collateral, as provided in the Bankruptcy Code, superpriority claims as provided for in Section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims;<br><br>     d.   <u>Principal Property Cap Decree</u>: A decree in the Interim Order and the Final Order that, after the Petition Date, the "<u>Principal Property Cap</u>" (as defined in the Pre-Petition Credit Agreement) |

shall be neither increased nor reduced (it being understood that except as set forth in this sentence, the rights of all parties shall be reserved with respect to the CNTA Dispute, [13] including the interpretation and calculation of the Principal Property Cap.

e. <u>Reporting Requirements</u>:  Delivery of all reports and notices set forth under "<u>Financial Reporting Requirements</u>" and "<u>Other Reporting Requirements</u>" below, in each case when and as required under the DIP Facilities; and

f. <u>First Lien Adequate Protection Milestones</u>:  Certain of the Bankruptcy Milestones as defined below will constitute "<u>First Lien Adequate Protection Milestones</u>"

*provided* that (x) the adequate protection package described in the above paragraphs (a) through (e) may be amended, modified or terminated and (y) the First Lien Adequate Protection Milestones may be amended, modified or extended, in each case, as to the First Lien Secured Parties only by order of the Bankruptcy Court or the prior written consent of the First Lien Secured Parties holding greater than 50% of the aggregate principal amount of outstanding loans and participations in outstanding letters of credit under the Pre-Petition Credit Agreement; provided, however, that nothing herein shall be read to impact the rights of any other constituencies, including the Unsecured DIP Lenders, to object to any such amendments or modifications.

**DIP Credit Agreement § 2.19; Interim Order ¶ 13.**

ii.      **Second Lien Notes Primed Parties:**

The Second Lien Secured Parties will receive, pursuant to Sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in the value of their respective interests in the Pre-Petition Collateral including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Second Lien Noteholders' security interests and liens in the Pre-Petition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy.  As adequate protection, the Second Lien Secured Parties shall be granted the following (collectively, the "<u>Noteholder Adequate Protection Obligations</u>" and, together with the Senior Lender Adequate Protection Obligations, the "<u>Adequate Protection</u>

---

[13]      "CNTA Dispute" means a dispute concerning Section 6.16(g) of the Pre-Petition Credit Agreement and any issues related thereto, including the identities of the mines that are Principal Properties as of the Petition Date.  The Unsecured DIP Lenders shall have standing to be heard in connection with the CNTA Dispute. The Debtors have not yet taken a position on the merits of the CNTA Dispute.

Obligations"):

Second Lien Noteholder Adequate Protection Liens.  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Second Lien Notes Primed Parties whose liens will be primed as described above, and whose cash collateral will be authorized for use by the DIP Loan Parties, will be entitled to receive, as adequate protection, replacement or, if applicable, new liens on the Collateral subject and subordinate only to (i) the DIP Liens, and any liens on the Collateral to which such liens so granted to the DIP Agent are junior; (ii) the Senior Lender Adequate Protection Liens, (iii) the Fees Carve-Out, (iv) the Bonding Carve Out, (v) the A/R Securitization Facility Superpriority Claim and (vi) the Pre-Petition Lender Security Interests (the "Noteholder Adequate Protection Liens" and together with the Senior Lender Adequate Protection Liens, the "Adequate Protection Liens"), solely to the extent of the aggregate diminution in value of their liens.  For the avoidance of doubt, the Second Lien Notes Primed Parties will not receive cash payments for interest or reimbursement of professional fees.

**DIP Credit Agreement § 2.19; Interim Order ¶ 14.**

**iii.      Other Adequate Protection**

In addition, the Final Order shall provide for customary prepetition secured lender protections for the DIP Lenders and Pre-Petition Lenders including, but not limited to, protections regarding sections 506(c) and 552(b) of the Bankruptcy Code, the equitable doctrine of marshaling and limitations on the use of collateral.

**Interim Order ¶¶ 10; 11.**

| | |
|---|---|
| **Covenants**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Affirmative Covenants:  Usual and customary for financings of this type, including, without limitation, (i) financial statements, (ii) preservation of existence, (iii) payment of liabilities, including taxes, (iv) maintenance of insurance, (v) maintenance of properties and leases, (vi) inspection rights, (vii) keeping of records and books of accounts, (viii) compliance with all applicable laws, (ix) use of proceeds, (x) additional guarantors, (xi) preparation of environmental reports, (xii) certain long-term liabilities and environmental reserves, (xiii) covenant to give security, (xiv) covenant regarding efforts to obtain credit ratings, (xv) covenants regarding Global Center, (xvi) certain case milestones (as described in more detail below) and (xvii) reporting requirements, including delivery of financial statements and compliance certificates.<br><br>**DIP Credit Agreement Article VI.**<br><br>Negative Covenants: Usual and customary for financings of this type, including, without limitation, restrictions on (i) liens, (ii) investments, (iii) indebtedness, (iv) fundamental changes, including mergers and transfers of substantially all assets, (v) asset dispositions, (vi) restricted payments, (vii) changes in nature of business, (viii) burdensome agreements, (ix) transactions with affiliates, (x) use of proceeds, , (xi) negative pledge clauses, (xii) modifications of organizational documents and |

|  | other indebtedness, (xiii) bonding superpriority claims, (xiv) the activities of Global Center and (xv) anti-terrorism laws and sanctions.<br><br>**DIP Credit Agreement Article VII.**<br><br>Financial Covenants.<br><br>    a.   Capital Expenditures.<br><br>          i.   Maximum Cumulative Capital Expenditures.  Make any Capital Expenditure, except for Capital Expenditures not exceeding, in a cumulative amount for the Borrower and the other Loan Parties on a consolidated basis, beginning on April 1, 2016 and ending on May 31, 2016 and each month end thereafter through March 31, 2017, the maximum amount set forth for each such period in the DIP Credit Agreement;<br><br>          ii.   Trailing Twelve Months Capital Expenditures.  Make any Capital Expenditure, except for Capital Expenditures not exceeding, in a cumulative amount for the Borrower and the other Loan Parties on a consolidated basis for any trailing twelve-month period ending on April 30, 2017 and each month end thereafter, the maximum amount set forth for such period in the DIP Credit Agreement.<br><br>    b.   Minimum Liquidity.  Beginning with the first Friday that is at least two (2) Business Days after the Final Order Entry Date (the "Liquidity Test Start Date"), permit Consolidated Liquidity, as of the close of business on Friday of any week to be less than the Minimum Liquidity Amount.<br><br>    c.   Minimum Consolidated EBITDA.<br><br>          i.   Minimum Cumulative Consolidated EBITDA.  Permit the cumulative Consolidated EBITDA of the Borrower and the other Loan Parties, for any period beginning on April 1, 2016 and ending on May 31, 2016 and each month end thereafter through March 31, 2017, the minimum amount set forth for each such period in the DIP Credit Agreement; and<br><br>          ii.   Minimum Trailing Twelve-Month Consolidated EBITDA.  Permit Consolidated EBITDA of the Borrower and the other Loan Parties for any trailing twelve-month period ending on April 30, 2017 and each month end thereafter, the minimum amount set forth for such period in the DIP Credit Agreement.<br><br>**DIP Credit Agreement § 7.11.** |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The following constitute Events of Default under the DIP Credit Agreement:<br><br>    a.   The Borrower or any other DIP Loan Party fails to pay (i) when and as required to be paid herein any amount of principal of any Loan or any L/C Obligation, or (ii) within five (5) days after the same becomes due, any interest on any Loan or on any L/C |

Obligation, or any fee due hereunder, any other amount payable hereunder or under any other Loan Document;

b. <u>Specific Covenants</u>.  The Borrower fails to perform or observe any term, covenant or agreement relating to (i) notice of any Default or Event of Default, (ii) use of proceeds, (iii) additional guarantors, (iv) covenant to give security, (v) Global Center or (vi) any negative covenants in Article VII of the DIP Credit Agreement;

c. <u>Other Defaults</u>.  Any DIP Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days (or in the case of the provision of (i) financial statements under Section 6.01 of the DIP Credit Agreement; (ii) certain audit and compliance certificates, proxy statements, requested business or financial information under Section 6.02 of the DIP Credit Agreement; (iii) the Final Order, Reorganization Plan and other documents relating to the Chapter 11 Cases; (iv) the Cash Flow Projections; (v) the DIP budget; or (vi) certain schedules of Liens, Investments and material Indebtedness, ten (10) days or (ii) in the case of deliveries of a 13-Week Projection or certificate of Consolidated Liquidity, three (3) days);

d. <u>Cross-Default</u>.  (i) Any default or event of default or other condition shall occur with respect to any Indebtedness having an aggregate principal amount in excess of the $10,000,000 of the Borrower or any other DIP Loan Party, the effect of which is to enable or permit (with all applicable grace periods having expired) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause such Indebtedness to become due, or require the prepayment, repurchase, redemption or defeasance thereof, prior to scheduled maturity, or such Indebtedness shall become due and payable prior to its stated maturity or (ii) the Borrower or any other DIP Loan Party shall default in its obligation to make any payment (including at final maturity) with respect to any such Indebtedness; <u>provided</u> that this clause (e) shall not apply to (x) any Indebtedness outstanding hereunder and any Indebtedness of any Debtor that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor) or (y) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness;

e. <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other DIP Loan Party in the DIP Credit Agreement, in any other DIP Document, or in any document delivered in connection therewith shall be incorrect or misleading in any material respect when made or deemed made;

f. <u>Insolvency Proceedings, Etc</u>.  An involuntary proceeding shall be commenced or a voluntary or involuntary petition shall be filed in

a court of competent jurisdiction seeking (i) relief in respect of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date, or of a substantial part of the assets of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii)  the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date or for a substantial part of the assets of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date or (iii) the winding-up or liquidation of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date (except in a transaction permitted by Section 7.04); and, in the case of any such involuntary proceeding or petition, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

g.    <u>Inability to Pay Debts; Attachment</u>.  (i) The Borrower or any Restricted Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts as they become due (excluding, in the case of any Debtor, pre-petition liabilities), or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any substantial part of the property of any such Person and is not released, vacated or fully bonded within sixty (60)  days after its issue or levy;

h.    <u>Judgments</u>.  (i) The failure by the Borrower or any Restricted Subsidiary to pay one or more final judgments aggregating in excess of $10,000,000 (which, in the case of the Debtors only, arose post-petition), which judgments are not discharged, bonded or effectively waived or stayed for a period of thirty (30) consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets of the Borrower or any Subsidiary to enforce any such judgment or (ii) judgments and/or orders shall have been rendered against the Debtors or any other Loan Party (which, in the case of the Debtors arose following the Petition Date (or, if later, the date on which such Person became a Debtor), which shall cause or would be reasonably expected to cause, a Material Adverse Effect;

i.    <u>ERISA</u>.  The occurrence of any of the following events that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect: (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in an actual obligation to pay money of the Borrower or a Subsidiary under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in excess of $10,000,000 (in the aggregate for all such events) and such obligation is not reduced, overturned or settled for a lesser amount (such that all such settlement payments during

the term of this Agreement do not exceed $10,000,000 (when combined with all other amounts paid not by way of settlement)) within five (5) days of the occurrence of such event, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan;

j.    Invalidity of DIP Loan Documents.  Any DIP Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or Payment In Full, ceases to be in full force and effect; or any DIP Loan Party or any other Person contests in any manner the validity or enforceability of any DIP Loan Document; or any DIP Loan Party denies that it has any or further liability or obligation under any DIP Loan Document, or purports to revoke, terminate or rescind any DIP Loan Document; or any Security Document ceases to create a valid Lien with the priority required thereby on the Collateral covered thereby (other than as expressly permitted thereunder or solely as a result of the acts or omissions of the DIP Agent (including failure to maintain possession of any stock certificates, or other instruments delivered to it under any Security Document));

k.    Change of Control.  There occurs any Change of Control;

l.    Dismissal; Conversion.  (i) any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of the Cases of the Debtors under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders or (ii) a trustee under Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof (or the DIP Loan Parties or their Affiliates shall have acquiesced to the entry of such order) unless consented to by the Required Lenders;

m.    Superpriority Claims.  Except with respect to applications in respect of the A/R Interim Order and the A/R Final Order, an application shall be filed by any Debtor for the approval of any other Superpriority Claim, or an order of the Bankruptcy Court shall be entered granting any other Superpriority Claim (other than the Fees Carve-Out), in any of the Cases of the Debtors that is pari passu with or senior to the claims of the DIP Agent, the L/C Issuer and the Lenders against the Borrower or any other DIP Loan Party hereunder or under any of the other Loan Documents, or there shall arise or otherwise be granted any such pari passu or senior Superpriority Claim, in each case other than Bonding Superpriority Claims to the extent expressly permitted by the DIP Loan Documents or consented to by the DIP Agent (acting with

the consent of the Required Lenders);

n.  <u>Stay Relief</u>.  the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $10,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

o.  <u>Orders; Actions</u>.  (i) the Final Order Entry Date shall not have occurred by the date that is forty-five (45) days following the Interim Order Entry Date (or such later date as is agreed by the Required Lenders); (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order or the Borrower or any Subsidiary of the Borrower shall apply for the authority to do so, in each case in a manner that is adverse to the DIP Agent or the Lenders, without the prior written consent of the DIP Agent and the Required Lenders; (iii) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral (as defined in the Orders) by the DIP Loan Parties (and such order's remaining unstayed for more than three business days) and the DIP Loan Parties shall have not obtained use of cash collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the DIP Agent; (iv) the Interim Order (prior to the entry of the Final Order) or Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral described therein or the Final Order shall cease to be in full force and effect; (v) any of the DIP Loan Parties or any Subsidiary of the Borrower shall fail to comply with the Orders in any material respect; (vi) other than with respect to the Fee Carve-Out or the Bonding Carve-Out, a final non-appealable order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders; (vii) the Final Order shall not authorize the borrowing by the Borrower of the full amount of the Commitments provided for hereunder; (viii) the entry of an order in the Cases seeking to obtain financing pursuant to Section 364 of the Bankruptcy Code (other than the Facilities), unless such financing would (and actually does) repay in full in cash all Obligations and terminates all Commitments upon the consummation thereof; (ix) any order shall be entered in the Cases providing adequate protection, other than the Interim Order or Final Order (as applicable) or pursuant to any "first day" or "second day" order or any other order reasonably acceptable to the DIP Agent; or (x) the Borrower or any of its Subsidiaries shall take any action in support of the items referred to in the foregoing clauses (viii)-(x);

p.  <u>Pre-Petition Payments</u>.  Except as permitted by the Orders or as otherwise agreed to by the DIP Agent and the Required Lenders and permitted by the Bankruptcy Court, any Debtor shall make

any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with the "first day" or "second day" orders of the Bankruptcy Court reasonably satisfactory to the DIP Agent or by other orders entered by the Bankruptcy Court and reasonably acceptable to the DIP Agent or as otherwise permitted by, and expressly set forth in, the U.S. Business Plan;

q.  Collateral.  Use of Collateral by the Borrower or any of its Subsidiaries, including, without limitation, cash collateral, in a manner inconsistent with the most recently delivered budget or forecast submitted in connection with the Borrower's application for any cash collateral order;

r.  Adverse Actions.  The DIP Loan Parties or any of their Subsidiaries, or any Person claiming by or through the DIP Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the DIP Agent or any Lender or L/C Issuer (in any of their respective capacities as such) relating to the Facilities, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against the DIP Agent, Lender or L/C Issuer;

s.  Reorganization Plan.  A Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the DIP Loan Parties or any of their Subsidiaries shall file, propose, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order;

a.  Supporting Actions.  Any DIP Loan Party or any of their Subsidiaries shall take any action in support of any matter set forth in paragraphs (l), (m), (n), (o), (p), (r), (t) or (u) above or any other Person shall do so and such application is not contested in good faith by the DIP Loan Parties and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the DIP Agent (with the consent of the Required Lenders) consents to such action;

b.  Material Leases.  Any Material Lease is terminated by the lessor of such Material Leased Real Property and such termination is not (i) being contested in good faith by appropriate proceedings diligently conducted or (ii) stayed in its effectiveness by the Bankruptcy Code by virtue of the commencement of the Cases or by the Bankruptcy Court, except in each case as could not reasonably be expected to have a Material Adverse Effect;

|  |  |
|---|---|
|  | c. <u>Asset Sales</u>. The Borrower or any other Debtor shall file a motion seeking authority to consummate the sale of assets of any DIP Loan Party (other than any such sale that is permitted under the Loan Documents) pursuant to Section 363 of the Bankruptcy Code having a value in excess of $15,000,000, without the consent of the DIP Agent and the Required Lenders, or the Borrower or any other Debtor shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the DIP Loan Parties (unless such sale would result in the repayment in full in cash of all Obligations upon the consummation thereof);<br><br>d. <u>Intercompany Credit Agreement</u>. The Intercompany Credit Agreement ceases to be the valid and binding obligation of any obligor thereunder (except to the extent as a result of an Insolvency Event or similar proceeding), or Global Center or any obligor under the Intercompany Loan Agreement so asserts or contests in any manner the validity or enforceability of the Intercompany Credit Agreement (except in each case as a result of the termination of the commitments thereunder and the repayment in full in cash of the obligations thereunder); or Global Center or any obligor under the Intercompany Loan Agreement denies that any obligor thereunder has any or further liability or obligation under the Intercompany Credit Agreement or any related document (including any collateral or security document) (except on account of payment in cash in full of all obligations); or any collateral or security document related thereto ceases to create a valid Lien with the priority required thereby on all or substantially all of the collateral covered thereby; or<br><br>e. <u>Global Center</u>. The Borrower shall cease to own, directly or indirectly, 100% of the outstanding Equity Interests of Global Center.<br><br>**DIP Credit Agreement § 9.01.** |
| **<u>Bankruptcy Milestones</u>** | The milestones required under the DIP Loan Documents consist of the following:<br><br>• Not later than 120 days following the Petition Date, delivery of the U.S. Business Plan and the Australian Business Plan<br><br>• Not later than 180 days following the Petition Date, the Bankruptcy Court shall have entered a final determination of the "Principal Property Cap" and which of the Borrower's U.S. Mine complexes are "Principal Properties", *provided* that a declaratory judgment action seeking such a determination shall be commenced by the Borrower (without prejudice to the rights of any party-in-interest to commence such a declaratory judgment action or any |

| | |
|---|---|
| | other proceeding) by the date that is 30 days after the Petition Date. <ul><li>Not later than 210 days following the Petition Date, the filing of an Acceptable Reorganization Plan[14] and related disclosure statement</li><li>Not later than 270 days, entry of an order approving a disclosure statement for an Acceptable Reorganization Plan.</li><li>Not later than 330 days following the Petition Date, the entry of an order confirming an Acceptable Reorganization Plan.</li><li>Not later than 360 days following the Petition Date, effectiveness of an Acceptable Reorganization Plan.</li></ul>**DIP Credit Agreement § 6.19.** |
| **Acknowledgements**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | The proposed Interim Order contains stipulations by the Debtors as to (a) the validity of the liens and claims of the Pre-Petition Lenders and the Second Lien Noteholders; (b) the enforceability of the intercreditor agreement among the Borrower, the Pre-Petition Guarantors and the Second Lien Secured Parties (the "ICA"); or (c) the lack of existence of any causes of action by the Debtors against the Pre-Petition Secured Parties.[15]  The Debtors further stipulate to the release and discharge of the Pre-Petition Secured Parties and their Representatives from any liabilities arising prior to the Petition Date arising out of or relating to certain agreements.<br><br>**Interim Order ¶ 4.** |
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The proposed Interim Order specifies that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents (including any cash dominion as provided for in the DIP Documents) and to exercise all rights and remedies under the DIP Documents; |

---

[14]     "Acceptable Reorganization Plan" means a Reorganization Plan that (i) provides for the termination of the Commitments and the payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations for which no claims have been asserted) on the Consummation Date of such Reorganization Plan and (ii) provides for customary releases of the DIP Agent, the DIP Lenders and the L/C Issuer and each of their respective Representatives (in each case, in their respective capacities as such), from any and all claims against the DIP Agent, the DIP Lenders and the DIP L/C Issuer in connection with this Agreement or the Cases to the fullest extent permitted by the Bankruptcy Code and applicable law.

[15]     Notwithstanding anything to the contrary herein or in the Interim Order, nothing in the above-referenced stipulations by the Debtors prejudices the rights, claims or defenses, including any party in interest's claims, rights and defenses with respect to the CNTA Dispute (as defined in the DIP Credit Agreement) or whether any cash as of the Petition Date constitutes the Debtors' cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code).  The Pre-Petition Secured Parties, the Debtors and all other parties in interest reserve all rights, claims and defenses with respect to the CNTA Dispute and whether any cash as of the Petition Date constitutes the Debtors' cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code).

|  | *provided*, that any such rights and remedies that are exercisable only upon an Event of Default (other than the giving of any notice, including the Fees Carve Out Trigger Notice) shall require the giving of five Business Days' prior written notice via email to the Debtors and their lead counsel. |
|  | **Interim Order ¶ 9(b).** |
| **Fees Carve Out** | The "Fees Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the official committee of unsecured creditors in the Cases (the "Creditors' Committee"), if any, whose retention is approved by the Bankruptcy Court pursuant to Section 327 and 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), which shall be paid to the extent allowed by the Bankruptcy Court, that are incurred (A) at any time before delivery by the DIP Agent of a Fees Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Fees Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"), which shall be paid to the extent allowed by the Bankruptcy Court; and (B) after the occurrence (the "Trigger Date") and during the continuance of an event of default under the DIP Loan Documents and delivery of notice (the "Fees Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $7.5 million (the amount set forth in this clause (iii)(B) being the "Post-EoD Fees Carve-Out Amount"); provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (iii)(A) or (iii)(B) above, on any grounds.<br><br>Notwithstanding the foregoing, the Fees Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the Lenders, the DIP Agent, the Pre-Petition Lenders or the Second Lien Noteholders (whether in such capacity or otherwise) or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Loan Documents, the Pre-Petition Credit Agreement or the Second Lien Notes, including, in each case, without limitation, for lender liability or pursuant to Section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Lenders or the DIP Agent; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' or the DIP Agent's assertion, enforcement or realization upon any Collateral in accordance with the DIP Loan Documents and the Final Order other than to seek a determination that an event of default has not occurred or is not continuing; or (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Fees Carve-Out shall be senior to all liens and claims |

| | |
|---|---|
| | securing the DIP Loan Documents, any adequate protection liens, if any, and the superpriority claims, and any and all other liens or claims securing the DIP Facilities (it being understood and agreed that the Fees Carve-Out shall not apply to the cash-collateralized Bonding Letters of Credit or the cash-collateralized L/C Facility Letters of Credit).<br><br>**DIP Credit Agreement § 1.01; Interim Order ¶ 7.** |
| **Lease Protections** | To the extent liens and consents are not available with respect to Material Leases (as defined below), the following protections will apply:<br><br>1. Thirty days' advance notice to the DIP Agent is necessary for any rejection of a Material Lease (or, during the continuance of an event of default, a Real Property Lease) pursuant to Section 365 of the Bankruptcy Code, during which 30 days the DIP Agent shall be permitted to find an acceptable (in the DIP Agent's good faith and reasonable discretion) replacement lessee (which may include the DIP Agent or its affiliates) and compel the Borrower to assume and assign that lease to such replacement lessee of the DIP Agent's choosing.<br><br>2. Upon an event of default under the DIP Loan Documents, the DIP Agent may compel the Borrower to assume and assign any Real Property Lease, pursuant to Section 365 of the Bankruptcy Code, to a replacement lessee of the DIP Agent's choosing , or as collateral securing the DIP Facilities.<br><br>3. The DIP Agent may credit bid amounts outstanding under the DIP Facilities at any sale or assignment of any Real Property Lease, including sales or assignments compelled by the DIP Agent.<br><br>4. Any order of the Bankruptcy Court approving assumption of any Real Property Lease must specifically provide that the Borrower shall be authorized to assign such lease pursuant to and enjoy the protections of Section 365(f) of the Bankruptcy Code.<br><br>5. If, in connection with any compelled assumption of a lease, the Borrower must cure monetary defaults under that lease, the DIP Agent may pay cure costs with funds posted to any collateral account established under the DIP Facilities.<br><br>"Material Lease" shall mean any Real Property Lease or other contractual obligations in respect of Material Leased Real Property.<br><br>"Material Leased Real Property" means any Real Property subject to a Real Property Lease with a DIP Loan Party, as lessee, with annual minimum royalties, rents or any similar payment obligations in excess of $1 million in the most recently ended fiscal year.<br><br>"Real Property Lease" means any lease, license, letting, concession, occupancy agreement, sublease, farm-in, farm-out, joint operating agreement, easement or right of way to which such Person is a party and is granted a possessory interest in or a right to use or occupy all or any portion of the Real Property (including, without limitation, the right to extract coal, minerals oil, natural gas and other hydrocarbons and their constituents from any portion of Real Property not owned in fee by such |

| | |
|---|---|
| | Person) and every amendment or modification thereof, including with respect to the DIP Loan Parties, without limitation, the leases with respect to Real Property and any contractual obligation with respect to any of the foregoing.<br><br>"Real Property" means, collectively, all right, title and interest of the Borrower (including, without limitation, any leasehold, mineral estate, or Coal, oil, natural gas or other hydrocarbon and their constituents leasehold) in and to any and all parcels of real property owned or operated by the Borrower, whether by lease, license or other use agreement, together with, in each case, all Improvements and appurtenant fixtures (including, without limitation, all preparation plants or other Coal processing facilities and loadout and other transportation facilities), easements and other property and rights incidental to the ownership, lease or operation thereof.<br><br>**DIP Credit Agreement § 8.01; Interim Order ¶ 17.** |
| **Foreign Funding** | Funding of foreign operations by Global Center shall be capped at $250 million, subject to increase by an additional $200 million with the consent of the Supermajority Lenders, and must be provided in the form of a new secured intercompany loan.  Global Center shall not be permitted to (i) incur any liens or any indebtedness, (ii) amend or waive the Global Center Intercompany Loan in any manner that would (A) release or subordinate the liens on more than 50% of the collateral thereunder or (B) forgive or reduce the principal amount of any loans thereunder or subordinate in right of payment a material portion of such loans or (iii) engage in any business other than (A) holding cash contributed to Global Center pre-petition by the Borrower and (B) lending such funds to the Borrower's foreign operations in the form of the Global Center Intercompany Loan.  For the avoidance of doubt, (x) the equity interests of Global Center will be pledged as collateral for the DIP Facilities and (y) no liens shall be granted for the benefit of the Pre-Petition Lenders on the cash held by Global Center or on the equity interests of Global Center.  Global Center shall be required to fund foreign operations exclusively from amounts held in the Designated Global Center Account before providing any such funding from any other source. |

Argument

## I.    Entry into the DIP Financing Is an Exercise of the Debtors' Sound Business Judgment.

26.    As described above, after appropriate investigation and analysis,

the Debtors' management has concluded that the DIP Financing is the best option available under

the circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business

judgment on most business decisions, including the decision to borrow money, unless such

decision is arbitrary and capricious.  See In re Farmland Indus., Inc., 294 B.R. 855, 879 (Bankr.

W.D. Mo. 2003) (articulating that approval of postpetition financing requires, *inter alia*, an

exercise of "sound and reasonable business judgment"); see also In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); cf. In re Filene's Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (stating "[t]ransactions under § 363 must be based upon the sound business judgment of the debtor or trustee.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

27.    Courts have noted that the business judgment test is not an onerous standard.  See Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC), 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003).  Moreover, "[u]nder the 'business judgment' rule, the management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code."  In re Farmland Indus., Inc., 294 B.R. at 881 (citing In re United Artists Theatre Co., 315 F.3d 217, 233 (3d Cir. 2003), Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985) and In re Defender Drug Stores, Inc.,

145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).  As such, courts have reasoned that, "[b]usiness

judgments should be left to the board room and not to [the] Court."  In re Farmland Indus., Inc.,

294 B.R. at 881 (citation omitted).

28.    Courts recognize that a debtor is entitled (if not required) to consider non-

economic benefits offered by a proposed postpetition facility when exercising its business

judgment:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of the financing must be evaluated, including noneconomic
> elements such as the timing and certainty of closing, the impact on
> creditor constituencies and the likelihood of a successful
> reorganization.

In re ION Media Networks, Inc., No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y.

Jul. 6, 2009).

29.    The Debtors' determination to enter into the DIP Financing represents an

appropriate exercise of their sound business judgment and should be approved.  The Debtors

intend to use their time in chapter 11 to develop and implement a business plan to address the

challenges faced by the Debtors, de-leverage their balance sheet and reorganize in a manner that

maximizes value for stakeholders.  As noted above, the Debtors believe they have certain

business advantages and can position themselves advantageously as coal markets ultimately

stabilize and improve.  Faced with the unprecedented turmoil that has ravaged the coal industry,

the Debtors need time to develop and implement a new business plan within the breathing spell

of bankruptcy.  Further, because of the cash costs associated with the Debtors' businesses, the

Debtors also require access to both new capital and existing Cash Collateral to meet their

business obligations as they complete the chapter 11 process.  Absent cash for operations and to fund these cases, the Debtors will be unable to achieve their restructuring goals for the benefit of their estates and creditors.

30.     The Debtors worked closely with Lazard and FTI, as well as their other advisors, to determine the cash needs of their businesses for the chapter 11 process.  The Debtors then negotiated the various components of the DIP Facilities with the DIP Lenders at arm's length and in good faith.  The Debtors determined that the resulting DIP Financing was the best available alternative and provided sufficient access to capital needed to operate their businesses, pursue their restructuring goals and fund these cases.

31.     The DIP Financing also demonstrates the support of the Debtors' senior lenders and major second lien and unsecured noteholders for the DIP Financing and the broader restructuring process and will provide confidence to vendors, suppliers, customers, employees, other business partners and governmental agencies that the Debtors can continue to meet their commitments during these chapter 11 cases.  Indeed, the participation in the DIP Financing by an ad hoc group of the Debtors' second lien unsecured noteholders further demonstrates confidence in the Debtors' ability to reorganize and of key stakeholders to achieve consensus regarding the path forward.

32.     In light of the Debtors' overall circumstances, the Debtors believe that they could not obtain postpetition financing from another lending source on terms equal or superior to the DIP Financing.  As such, and as further described in the First Day Declaration, the Cowan Declaration and the Adrianopoli Declaration, the Debtors' decision to enter into the DIP Financing is a sound exercise of the Debtors' business judgment.  Accordingly, the Court should grant the Debtors authority to enter into the DIP Financing and obtain funds from the DIP

Lenders on the secured, administrative superpriority basis described herein.

## II. The Debtors Should Be Authorized to Obtain DIP Financing Under Section 364 of the Bankruptcy Code.

33.    It is essential to the success of the Debtors' chapter 11 cases that the Debtors obtain access to sufficient postpetition financing and use of Cash Collateral. The preservation of estate assets, the Debtors' continuing viability and their ability to reorganize successfully and maximize value for stakeholders depends heavily upon the approval of the relief requested herein.

34.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. See 11 U.S.C. § 364.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, secured by a junior lien on encumbered property or a combination of the foregoing.  See 11 U.S.C. § 364(c).[16]  In addition,

---

[16]    Section 364(c) of the Bankruptcy Code provides as follows:

(c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

pursuant to section 364(d) of the Bankruptcy Code,[17] a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (i.e., a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

35.    The Debtors propose to obtain financing that will "prime" the Debtors' prepetition liens securing the Pre-Petition Credit Agreement and the Second Lien Notes. Therefore, the approval of the DIP Financing is governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

### A.    The Debtors Have Satisfied the Conditions Under Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis.

36.    Section 364(c) of the Bankruptcy Code authorizes a debtor to incur credit with priority over administrative claims, secured by junior liens on encumbered property or first priority liens on unencumbered property.  To incur credit on this basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re

---

[17]    Section 364(d) of the Bankruptcy Code provides as follows:

> (d)(1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> > (A)        the trustee is unable to obtain such credit otherwise; and
> >
> > (B)        there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2)    In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to

seek credit from every possible lender before concluding that such credit is unavailable." Id.; see

also In re Ames Dep't Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that debtor made

a reasonable effort to secure financing where it approached four lending institutions, was rejected

by two, and selected the least onerous financing option from the remaining two lenders).

Moreover, where few lenders are likely to be able and willing to extend the necessary credit to

the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an

exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga.

1989).

   37. The Debtors have determined that they are not able to secure sufficient

funding on an unsecured or junior lien basis. The Debtors' Pre-Petition Lenders have liens on the

majority of the Debtors' assets, and the Debtors are facing a difficult coal market requiring the

significant use of cash to operate and preserve the value of the Debtors' businesses as they pursue

a restructuring. Although the Debtors have some material unencumbered assets, the Debtors,

with the advice of Lazard, have determined that these unencumbered non-cash assets alone

would be insufficient to support financing adequate for the Debtors' needs, including their

potential needs to provide financial assurances to state regulatory authorities with respect to their

reclamation obligations. See Cowan Declaration ¶¶ 18-20. Likewise, with the advice of Lazard,

the Debtors determined that sufficient capital could not be raised on an unsecured basis or on a

junior lien basis, even in combination with the Debtors' unencumbered non-cash assets. The

Debtors further require access to Cash Collateral, and the agreements relating to DIP Financing

provides the Debtors with the ability to use Cash Collateral and provide adequate protection to the Pre-Petition Lenders on a consensual basis.

38.     Based upon market conditions and the Debtors' financial condition, the Debtors, in consultation with their advisors, determined that the Pre-Petition Lenders were best situated to provide a comprehensive financing package on the most favorable terms.  Specifically, in addition to significant additional funding, the Pre-Petition Lenders are able to provide access to existing Cash Collateral, as well as the most attractive Bonding Accommodation Facility from the perspective of state regulatory bodies, and are able to provide consent to a priming financing facility.

39.     Given the Debtors' forecasted liquidity situation, in March 2016, Lazard commenced a marketing process designed to attract financing from a focused set of potential lenders with the sophistication and capacity to provide the Debtors with debtor-in-possession financing in a relatively short period of time.  Lazard structured its marketing efforts in light of its preliminary assessment of the Debtors' existing capital structure and the Debtors' anticipated financing and bonding accommodation needs.  The marketing and selection process also was geared towards promoting competition among potential lenders and obtaining financing on the best terms available to fit the Debtors' anticipated needs.

40.     Lazard and the Debtors specifically focused their marketing efforts on the organized creditor groups that were involved in the discussions regarding an out of court restructuring and negotiations regarding potential prepetition financing.  Lazard also contacted six third party lenders (the "Third Party Lenders") regarding the possibility of providing DIP financing on (a) a non-consensual priming basis, (b) on a junior-secured basis or (c) secured by unencumbered non-cash assets.  None of the Third Party Lenders expressed any interest in

pursuing such financing.  These discussions, although productive and informative, ultimately

reinforced the Debtors' view that no sufficient credit was otherwise available on an unsecured

basis or secured only by junior liens or liens on unencumbered property.  See Cowan

Declaration ¶ 25.

      **B.**      **The Debtors Should Be Authorized to Obtain Priming Liens Under**
               **Section 364(d) of the Bankruptcy Code.**

      41.      Section 364(d)(1) authorizes the Debtors to obtain postpetition credit on a

priming basis, if the Debtors are unable to obtain sufficient credit and the interests of

nonconsenting lien holders are adequately protected.  11 U.S.C. § 364(d)(1).  Here, the Pre-

Petition Lenders and the Second Lien Noteholders have consented to, or have agreed to consent

to, the priming liens proposed under the DIP Facility.

      42.      Courts have identified a number of factors that support a debtor's

determination to obtain credit secured by a "priming" lien, including:

      (a)      whether the party subject to a priming lien has consented to such treatment;

      (b)      whether alternative financing is available on any other basis (i.e., whether any
              better offers, bids or timely proposals are before the court);

      (c)      whether the proposed financing is necessary to preserve estate assets and is
              necessary, essential, and appropriate for continued operation of the debtor's
              business;

      (d)      whether the terms of the proposed financing are reasonable and adequate given
              the circumstances of both the debtor and proposed lender(s); and

      (e)      whether the proposed financing agreement was negotiated in good faith and at
              arm's length and entry therein is an exercise of sound and reasonable business
              judgment and in the best interest of the debtor's estate and its creditors.

See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. at 37-39; Bland v. Farmworker Creditors, 308

B.R. 109, 113-14 (S.D. Ga. 2003); In re Barbara K. Enter. Inc., No. 08-11474, 2008 WL

2439649 at *13 (Bankr. S.D.N.Y. Jun. 16, 2008); see also 3 COLLIER ON BANKRUPTCY ¶ 364.05

(Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

43.    The Debtors respectfully submit that the DIP Financing is appropriate

under this analysis and the facts of these chapter 11 cases.  First, priming here is consensual.

With respect to the Pre-Petition Credit Agreement, the Pre-Petition Lenders have affirmatively

consented to the priming features of the DIP Financing and have actively participated in

facilitating the new DIP Financing.  Moreover, under the terms of the intercreditor agreement

governing holders of debt under the Pre-Petition Credit Agreement and holders of Second Lien

Notes (the "ICA")[18], the Second Lien Noteholders have agreed to consent to this priming once

the consent of the Pre-Petition Lenders is given.  ICA § 6.01.  Thus, a majority of the holders of

almost $3 billion in debt have agreed to be primed by the DIP Financing.

44.    Second, the Debtors and their advisors have determined that the DIP

Financing is the only alternative readily available that can satisfy their financing needs in these

cases and permit them to pursue a restructuring within chapter 11.  The Debtors conducted

extensive, arm's-length negotiations with the DIP Lenders regarding the terms of the DIP

Facilities.  The Debtors are only able to obtain these negotiated terms by agreement to provide

first priority priming liens.  The Debtors do not believe, moreover, that the financing necessary

to fund these chapter 11 cases and pursue the Debtors' restructuring goals is available from other

parties on comparable terms.

---

[18]    "ICA" refers specifically to that certain First Lien/Second Lien Intercreditor Agreement among Peabody
Energy Corporation, as Borrower, Citibank, N.A. as Senior Representative for the Pre-Petition Credit
Agreement Secured Parties and U.S. Bank National Association, as the Second Priority Representative for
the Second Lien Indenture Secured Parties, dated March 16, 2015.  A copy of the ICA is attached hereto as
Exhibit D.

45.     Third, as set forth in detail in the Cowan Declaration and the Adrianopoli Declaration, the Debtors require immediate access to the DIP Financing, along with the use of Cash Collateral, to provide adequate liquidity for the operation and maintenance of the Debtors' assets.  The Debtors' access to the DIP Financing will benefit all stakeholders by facilitating the Debtors' efforts to preserve and enhance the value of the Debtors' assets.

46.     Fourth, as set forth herein and in the Cowan Declaration, the Debtors and the DIP Lenders negotiated the DIP Financing in good faith and at arm's-length.  The Debtors' entry into the DIP Financing is an exercise of their sound business judgment and is in the best interests of their estates, creditors and other parties in interest.

47.     Fifth, and as discussed more fully below, the Debtors will provide adequate protection for the Pre-Petition Secured Parties' interests, including replacement liens and claims.

**C.     The Debtors' Proposed Adequate Protection Should Be Approved.**

48.     Parties with an interest in cash collateral or collateral that may be used to secure postpetition financing are entitled to adequate protection.  11 U.S.C. § 363(e).  In addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  11 U.S.C. § 364(d)(1)(B).  Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  See, e.g., In re Martin, 761 F.2d 472, 474-76 (8th Cir. 1985); In re Satcon Tech. Corp., No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012).

49.     At the same time, it is well-recognized that "adequate protection" is not equivalent to "absolute protection."  In re Beker Indus., Inc., 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard.").  Further, "[i]n order to encourage reorganization, the courts must be flexible in applying the adequate protection standard" as long as such flexibility does "not operate to the detriment of the secured creditor's interest."  In re Martin, 761 F.2d at 476.

50.     The Interim DIP Order provides for adequate protection for the Pre-Petition Secured Parties that is customary for financings of this type.  As discussed in greater detail in the summary chart of the DIP Financing terms above, these adequate protection provisions include superpriority administrative claims, cash payments of interest and replacement liens.

51.     Courts in this district and other districts within the Eighth Circuit routinely approve similar forms of adequate protection to those contemplated in the DIP Orders and the DIP Credit Agreement.  See, e.g., In re Arch Coal, Inc., Case No. 16-41020-705 (CER) (Bankr. E.D. Mo. Jan. 15, 2016 and Feb. 25, 2016) (granting, inter alia, priming and replacement liens, superpriority claims and certain adequate protection payments in connection with DIP financing and use of cash collateral on interim and final bases); In re Bakers Footwear Grp., Inc., Case No. 12-49658-705 (CER) (Bankr. E.D. Mo. Oct. 5, 2012 and Nov. 5, 2012) (same); In re Duke and King Acquisition Corp., Case No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); In re Otter Tail AG Enters., LLC, 2009 Bankr. LEXIS 5352, at *10–11 (Bankr. D. Minn. Nov. 20, 2009) (granting, *inter alia*, adequate protection liens and entitlement to superpriority claims under section 507(b) and certain adequate protection payments for the use of cash collateral); In re

Polaroid Corp., Case No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) (authorizing

replacement liens to prepetition secured creditors for the use of cash collateral).[19]

52.    The Debtors submit that the foregoing adequate protection package is

consistent with what is customarily granted to parties whose prepetition liens on a debtor's assets

are primed by liens granted to lenders providing debtor-in-possession financing.  In addition,

these parties have consented to, or have agreed to consent to, the priming of their interests on

these terms.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders.**

53.    In connection with the DIP Financing, the Debtors have agreed, subject to

Court approval, to pay certain fees to the DIP Lenders and the DIP Agent.  In particular,

the Debtors have agreed to pay (a) an upfront fee of 5.0% of each DIP Lender's commitment

under the Term Loan Facility; (b) a L/C Facility Fee equal to 0.25% on the on the outstanding

face amount of each L/C Facility Letter of Credit; (c) a Bonding Letter of Credit Fronting Fee

equal to 0.25% on the outstanding face amount of each Bonding Letter of Credit; and (d) a Term

Facility Exit Fronting Fee equal to 2.0% payable upon all prepayments or repayments under the

DIP Credit Agreement.  The Debtors have also agreed to pay certain fees to the DIP Agent

pursuant to that certain Arrangement, Structuring and Agency Fee Letter (the "Fee Letter"),

dated April 11, 2016, between PEC and Citigroup Global Markets, Inc., the terms of which are

confidential.  The Debtors have filed a motion contemporaneously herewith seeking authority to

---

[19]    Unreported orders cited herein are not attached to this Motion.  Copies of these orders will be made
available to the Court or other parties upon request made to the Debtors' counsel.

file the Fee Letter under seal with the Court and to share the fee letter with certain other parties in interest on a confidential basis.

54.     The fees that the Debtors have agreed to pay, together with the other provisions of the DIP Facilities, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facilities available.  The Debtors considered the fees when determining in their business judgment that the DIP Financing constituted the best terms on which the Debtors could obtain the necessary postpetition financing.  The Debtors also submit that the fees are in line with transactions of this type, and should be approved upon the facts and circumstances of these cases.  See Cowan Declaration ¶¶ 38-39.

55.     In addition, subject to entry of the Final Order, the Debtors have agreed to pay certain fees and expenses of such Unsecured DIP Lenders' professionals in the first 12 months of the Cases, not to exceed $500,000 per month (subject to unlimited carry-forwards of unused amounts) with an additional allowed administrative claim of up to $6,000,000 for fees and expenses in excess of the aggregate monthly cap.  In the Debtors' business judgment, payment of these fees was and is necessary both for the Unsecured DIP Lenders' to facilitate a stable commencement to these chapter 11 cases by bringing significant constituencies of both the Debtors' secured and unsecured creditors to the bargaining table at the very outset of these chapter 11 cases.

**IV.     The Scope of the Fees Carve-Out is Appropriate.**

56.     The DIP Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  See In re Tenney Vill. Co., 104 B.R. 562, 568-

69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees).

57.     Instead, the proposed DIP Financing and the proposed Interim Order provide generally that the security interests and superpriority administrative expense claims granted by the Debtors are subject to the Fees Carve-Out, which provides for (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the official committee of unsecured creditors in these chapter 11 cases (the "Creditors' Committee"), if any, whose retention is approved by the Bankruptcy Court pursuant to Section 327 and 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), which shall be paid to the extent allowed by the Bankruptcy Court, that are incurred (A) at any time before delivery by the DIP Agent of a Fees Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Fees Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"), which shall be paid to the extent allowed by the Bankruptcy Court; and (B) after the occurrence (the "Trigger Date") and during the continuance of an event of default under the DIP Loan Documents and delivery of notice (the "Fees Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $7.5 million. In Ames Department Stores, the bankruptcy court found that such "carve-outs" are not only

reasonable but are necessary to ensure that official committees and debtors' estates are adequately assisted by counsel and other professionals. In re Ames Dep't Stores, 115 B.R. at 40.

58. Moreover, courts in this and other districts routinely approve carve-outs similar to the Carve Out contemplated in this Motion and the DIP Credit Agreement. See, e.g., In re Arch Coal, Inc., Case No. 16-41020-705 (CER) (Bankr. E.D. Mo. February 25, 2016) (providing that certain security interests, liens and superpriority administrative expense claims are subject to a carve-out for certain fees and expenses); In re US Fidelis, Inc., 2010 Bankr. LEXIS 5837, at *18 (Bankr. E.D. Mo. May 28, 2010) (same); In re Genmar Holdings, Inc., Case No. 09-43537 (DDO) (Bankr. D. Minn. July 1, 2009) (same); In re Trilogy Dev. Co., 2009 Bankr. LEXIS 5178, at *18–19 (Bankr. W.D. Mo. July 14, 2009) (granting certain superpriority administrative expense claims subject to certain fees); In re AMF Bowling Worldwide, Inc., Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012) (providing that certain security interests, liens, superpriority administrative expense claims and adequate protection payments are subject to a carve-out for certain fees and expenses); In re The Great Atl. & Pac. Tea Co., Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (providing that certain security interests, liens and superpriority administrative expense claims are subject to a carve-out for certain fees and expenses).

59. The security interests and superpriority administrative expense claims granted by the Debtors are further subject to the Bonding Carve Out, which is a carve-out from the collateral under the Pre-Petition Credit Agreement with superpriority claim status, subject only to the Fees Carve-Out (as defined herein), entitling authorities in states in which the Debtors were self-bonded prior to the Petition Date that make any bonding requests for reclamation to receive proceeds of collateral first in priority before distribution to any lender or other prepetition

secured creditor.  The Debtors submit that the Bonding Carve Out is appropriate and in the best

interests of the Debtors' estates, given that the Debtors' business depends upon maintaining

regulatory compliance with state bonding requirements for reclamation.

**V.    The Debtors' Request for Use of Cash Collateral.**

60.    By this Motion, the Debtors also request authority to use Cash Collateral

on the terms set forth in the proposed DIP Orders.  The Debtors submit that this use of Cash

Collateral is authorized pursuant to section 363(c) of the Bankruptcy Code.

61.    Section 363(c) of the Bankruptcy Code provides as follows:

(1)    If the business of the debtor is authorized to be operated
under section 721, 1108, 1203, or 1304 of this title and
unless the court orders otherwise, the trustee may enter into
transactions, including the sale or lease of property of the estate, in
the ordinary course of business, without notice or a hearing, and
may use property of the estate in the ordinary course of business
without notice or a hearing.

(2)    The trustee may not use, sell, or lease cash collateral under
paragraph (1) of this subsection unless—

(a)    each entity that has an interest in such cash
collateral consents; or

(b)    the court, after notice and a hearing, authorizes such
use, sale, or lease in accordance with the provisions of this
section.

11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code further provides, in pertinent part,

that "on request of an entity that has an interest in property . . . proposed to be used, sold, or

leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use,

sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

62.    The Debtors must maintain sufficient access to cash to continue to operate

their businesses as a going concern for the direct benefit of all stakeholders and to develop and

implement their plans to reorganize.  It is, therefore, essential to the success of the Debtors'

chapter 11 cases that the Debtors immediately obtain authority to use Cash Collateral.  The

preservation of estate assets, the Debtors' continuing viability and their ability to maximize value

for stakeholders successfully, thus, depend heavily upon the expeditious approval of the relief

requested herein.  Moreover, in connection with the DIP Financing, the Pre-Petition Lenders and

the Second Lien Noteholders have consented, or have agreed to consent to, to the Debtors' use of

Cash Collateral.  ICA § 6.01.  The Debtors, therefore, seek immediate authority to access the

DIP Facilities on an interim basis as set forth in this Motion and in the Interim Order to prevent

immediate and irreparable harm to their estates pending the Final Hearing pursuant to

Bankruptcy Rules 4001(b).

## IV.    Request for Modification of the Automatic Stay

63.    The Debtors seek a modification of the automatic stay imposed by

operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of

the DIP Credit Agreement as described above.  Such stay modification provisions are customary

features of postpetition financing facilities in both the Eastern District of Missouri and other

districts and, in the Debtors' business judgment, are reasonable under the circumstances.  See,

e.g., In re Arch Coal, Inc., Case No. 16-41020-705 (CER) (Bankr. E.D. Mo. Jan. 15, 2016); In re

Bakers Footwear Group, Inc., Case No. 12-49658-705 (CER) (Bankr. E.D. Mo. Nov. 5, 2012);

see also In re Alpha Nat'l Res., Inc., Case No. 15-33896 (KRH) (Bankr. E.D. Va. Sept. 17, 2015);

In re Patriot Coal Corp., Case No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015); In re James

River Coal Co., Case No. 14-31848 (KRH) (Bankr. E.D. Va. May 9, 2014); In re Patriot Coal

Corp., Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012).  Accordingly, the Debtors

respectfully request that this Court modify the automatic stay to the extent contemplated by the DIP Financing and the proposed Interim Order.

## V.　　The Parties Have Proceeded in Good Faith

64.　　The terms and conditions of the DIP Financing and the use of Cash Collateral are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any Interim Order or Final Order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## VI.　　Request for Final Hearing

65.　　Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 30 days from the Petition Date as the Final Hearing.

66.　　The Debtors request that they be authorized to serve a copy of the Interim Order, which fixes the time and date for filing objections, by first class mail on the notice parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy 4001(c)(2).

### Requests for Immediate Relief and Waiver of Stay

67.　　Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek entry of orders granting the relief requested by this Motion on an interim and final basis and, to the extent it applies, a waiver of any stay of the effectiveness of such orders.

68.    Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting … a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate including a motion to pay all or part of a claim that arose before the filing of the petition." Fed. R. Bankr. P. 6003(b).  In other words, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the Court may authorize the relief prior to the twenty-second day following the Petition Date.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

<u>Notice</u>

69.    Notice of this Motion has been given to: (a) Davis Polk & Wardwell LLP and Bryan Cave LLP as counsel to Citibank, N.A. as Administrative Agent for the First Lien Secured Credit Facility and the Debtors' proposed debtor in possession secured credit facility; (b) Brown Rudnick LLP, as counsel to Wilmington Savings Fund Society, FSB as prospective trustee and collateral agent for the Secured Second Lien Notes; (c) Foley & Lardner LLP, as counsel to Wilmington Trust Company as prospective Indenture Trustee for the Unsecured Notes;[20] (d) Robinson & Cole LLP, as counsel to U.S. Bank as resigning trustee and collateral

---

[20]    These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; and the (iv) 7.875% Senior Notes due November 2026.

agent for the Second Lien Notes, the Unsecured Notes and the Convertible Notes;[21] (e) counsel

to any ad hoc committees; (f) the Debtors' 50 largest unsecured creditors; (g) Mayer Brown LLP,

as counsel to PNC Bank, N.A., as Administrator under the Debtors' prepetition accounts

receivable securitization facility; (h) the United Mine Workers of America; (i) the Office of the

United States Trustee for the Eastern District of Missouri; (j) the Internal Revenue Service;

(k) the Securities and Exchange Commission; (l) the United States Department of the Interior;

(m) the United States Department of Labor; (n) the United States Attorney's Office for the

Eastern District of Missouri; and (o) Pension Benefit Guaranty Corporation (collectively, the

"Notice Parties").  In light of the nature of the relief requested, the Debtors submit that no further

notice is necessary.

No Prior Request

70.    No prior request for the relief sought in this Motion has been made to this

or any other Court in connection with these chapter 11 cases.

---

[21]    These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due
September 2020; (iii) 6.25% Senior Notes due September 2021; (iv) 7.875% Senior Notes due
November 2026; and the (v) Convertible Junior Subordinated Debentures due December 2066.

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the Interim Order, substantially in the form submitted to the Court, granting the relief requested herein on an interim basis; (ii) enter the Final Order, substantially in the form submitted to the Court, granting the relief requested herein on a final basis; and (iii) grant such other and further relief to the Debtors as the Court may deem just proper.

Dated: April 13, 2016
          St. Louis, Missouri

Respectfully submitted,

_____/s/ Steven N. Cousins_____
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
Telephone: (314) 621-5070
Facsimile: (314) 621-5065
Email: scousins@armstrongteasdale.com
Email: sehlers@armstrongteasdale.com

Heather Lennox (*pro hac vice* pending)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: hlennox@jonesday.com

Amy Edgy (*pro hac vice* pending)
Daniel T. Moss (*pro hac vice* pending)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: aedgy@jonesday.com
Email: dtmoss@jonesday.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

## SCHEDULE 1

| | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 1. | Peabody Energy Corporation | 13-4004153 |
| 2. | American Land Development, LLC | 20-3405570 |
| 3. | American Land Holdings of Colorado, LLC | 26-3730572 |
| 4. | American Land Holdings of Illinois, LLC | 30-0440127 |
| 5. | American Land Holdings of Indiana, LLC | 20-2514299 |
| 6. | American Land Holdings of Kentucky, LLC | 20-0766113 |
| 7. | American Land Holdings of New Mexico, LLC | 32-0478983 |
| 8. | American Land Holdings of West Virginia, LLC | 20-5744666 |
| 9. | Arid Operations, Inc. | 84-1199578 |
| 10. | Big Ridge, Inc. | 37-1126950 |
| 11. | Big Sky Coal Company | 81-0476071 |
| 12. | Black Hills Mining Company, LLC | 32-0049741 |
| 13. | BTU Western Resources, Inc. | 20-1019486 |
| 14. | Caballo Grande, LLC | 27-1773243 |
| 15. | Caseyville Dock Company, LLC | 20-8080107 |
| 16. | Central States Coal Reserves of Illinois, LLC | 43-1869432 |
| 17. | Central States Coal Reserves of Indiana, LLC | 20-3960696 |
| 18. | Century Mineral Resources, Inc. | 36-3925555 |
| 19. | Coal Reserve Holding Limited Liability Company No. 1 | 43-1922737 |
| 20. | COALSALES II, LLC | 43-1610419 |
| 21. | Colorado Yampa Coal Company, LLC | 95-3761211 |
| 22. | Conservancy Resources, LLC | 20-5744701 |
| 23. | Cottonwood Land Company | 43-1721982 |
| 24. | Cyprus Creek Land Company | 73-1625890 |
| 25. | Cyprus Creek Land Resources LLC | 75-3058264 |
| 26. | Dyson Creek Coal Company, LLC | 43-1898526 |
| 27. | Dyson Creek Mining Company, LLC | 20-8080062 |
| 28. | El Segundo Coal Company, LLC | 20-8162824 |
| 29. | Empire Land Holdings, LLC | 61-1742786 |
| 30. | Falcon Coal Company, LLC | 35-2006760 |
| 31. | Four Star Holdings, LLC | 30-0885825 |
| 32. | Francisco Equipment Company, LLC | 37-1805119 |
| 33. | Francisco Land Holdings Company, LLC | 36-4831111 |
| 34. | Francisco Mining, LLC | 30-0922117 |
| 35. | Gallo Finance Company, LLC | 43-1823616 |
| 36. | Gold Fields Chile, LLC | 13-3004607 |
| 37. | Gold Fields Mining, LLC | 36-2079582 |
| 38. | Gold Fields Ortiz, LLC | 22-2204381 |
| 39. | Hayden Gulch Terminal, LLC | 86-0719481 |
| 40. | Highwall Mining Services Company | 20-0010659 |
| 41. | Hillside Recreational Lands, LLC | 32-0214135 |
| 42. | HMC Mining, LLC | 43-1875853 |
| 43. | Illinois Land Holdings, LLC | 26-1865197 |
| 44. | Independence Material Handling, LLC | 43-1750064 |
| 45. | James River Coal Terminal, LLC | 55-0643770 |
| 46. | Juniper Coal Company, LLC | 43-1744675 |
| 47. | Kayenta Mobile Home Park, Inc. | 86-0773596 |

|     | Debtor's Name | Debtor's EIN Number |
|-----|---------------|---------------------|
| 48. | Kentucky Syngas, LLC | 26-1156957 |
| 49. | Kentucky United Coal, LLC | 35-2088769 |
| 50. | Lively Grove Energy, LLC | 20-5752800 |
| 51. | Lively Grove Energy Partners, LLC | 26-0180403 |
| 52. | Marigold Electricity, LLC | 26-0180352 |
| 53. | Midco Supply and Equipment Corporation | 43-6042249 |
| 54. | Midwest Coal Acquisition Corporation | 20-0217640 |
| 55. | Midwest Coal Reserves of Illinois, LLC | 20-3960648 |
| 56. | Midwest Coal Reserves of Indiana, LLC | 20-3405958 |
| 57. | Midwest Coal Reserves of Kentucky, LLC | 20-3405872 |
| 58. | Moffat County Mining, LLC | 74-1869420 |
| 59. | Mustang Energy Company, LLC | 43-1898532 |
| 60. | New Mexico Coal Resources, LLC | 20-3405643 |
| 61. | NM Equipment Company, LLC | 36-4821991 |
| 62. | Pacific Export Resources, LLC | 27-5135144 |
| 63. | Peabody America, LLC | 93-1116066 |
| 64. | Peabody Archveyor, L.L.C. | 43-1898535 |
| 65. | Peabody Arclar Mining, LLC | 31-1566354 |
| 66. | Peabody Asset Holdings, LLC | 20-3367333 |
| 67. | Peabody Bear Run Mining, LLC | 26-3582291 |
| 68. | Peabody Bear Run Services, LLC | 26-3725923 |
| 69. | Peabody Caballo Mining, LLC | 83-0309633 |
| 70. | Peabody Cardinal Gasification, LLC | 20-5047955 |
| 71. | Peabody China, LLC | 43-1898525 |
| 72. | Peabody Coalsales, LLC | 20-1759740 |
| 73. | Peabody COALTRADE International (CTI), LLC | 20-1435716 |
| 74. | Peabody COALTRADE, LLC | 43-1666743 |
| 75. | Peabody Colorado Operations, LLC | 20-2561644 |
| 76. | Peabody Colorado Services, LLC | 26-3723774 |
| 77. | Peabody Coulterville Mining, LLC | 20-0217834 |
| 78. | Peabody Development Company, LLC | 43-1265557 |
| 79. | Peabody Electricity, LLC | 20-3405744 |
| 80. | Peabody Employment Services, LLC | 26-3730348 |
| 81. | Peabody Energy Generation Holding Company | 73-1625891 |
| 82. | Peabody Energy Investments, Inc. | 68-0541702 |
| 83. | Peabody Energy Solutions, Inc. | 43-1753832 |
| 84. | Peabody Gateway North Mining, LLC | 27-2294407 |
| 85. | Peabody Gateway Services, LLC | 26-3724075 |
| 86. | Peabody Holding Company, LLC | 74-2666822 |
| 87. | Peabody Holdings (Gibraltar) Limited | 20-5543587 |
| 88. | Peabody IC Funding Corporation | 46-2326991 |
| 89. | Peabody IC Holdings, LLC | 30-0829603 |
| 90. | Peabody Illinois Services, LLC | 26-3722638 |
| 91. | Peabody Indiana Services, LLC | 26-3724339 |
| 92. | Peabody International Investments, Inc. | 26-1361182 |
| 93. | Peabody International Services, Inc. | 20-8340434 |
| 94. | Peabody Investments Corporation | 20-0480084 |
| 95. | Peabody Magnolia Grove Holdings, LLC | 61-1683376 |
| 96. | Peabody Midwest Management Services, LLC | 26-3726045 |
| 97. | Peabody Midwest Mining, LLC | 35-1799736 |
| 98. | Peabody Midwest Operations, LLC | 20-3405619 |
| 99. | Peabody Midwest Services, LLC | 26-3722194 |
| 100. | Peabody Mongolia, LLC | 20-8714315 |
| 101. | Peabody Natural Gas, LLC | 43-1890836 |

|  | Debtor's Name | Debtor's EIN Number |
|---|---|---|
| 102. | Peabody Natural Resources Company | 51-0332232 |
| 103. | Peabody New Mexico Services, LLC | 20-8162939 |
| 104. | Peabody Operations Holding, LLC | 26-3723890 |
| 105. | Peabody Powder River Mining, LLC | 43-0996010 |
| 106. | Peabody Powder River Operations, LLC | 20-3405797 |
| 107. | Peabody Powder River Services, LLC | 26-3725850 |
| 108. | Peabody PowerTree Investments LLC | 20-0116980 |
| 109. | Peabody Recreational Lands, L.L.C. | 43-1898382 |
| 110. | Peabody Rocky Mountain Management Services, LLC | 26-3725390 |
| 111. | Peabody Rocky Mountain Services, LLC | 20-8162706 |
| 112. | Peabody Sage Creek Mining, LLC | 26-3730653 |
| 113. | Peabody School Creek Mining, LLC | 20-3585831 |
| 114. | Peabody Services Holdings, LLC | 26-3726126 |
| 115. | Peabody Southwest, LLC | 20-5744732 |
| 116. | Peabody Southwestern Coal Company, LLC | 43-1898372 |
| 117. | Peabody Terminal Holding Company, LLC | 26-1087861 |
| 118. | Peabody Terminals, LLC | 31-1035824 |
| 119. | Peabody Trout Creek Reservoir LLC | 30-0746873 |
| 120. | Peabody Twentymile Mining, LLC | 26-3725223 |
| 121. | Peabody Venezuela Coal Corporation | 43-1609813 |
| 122. | Peabody Venture Fund, LLC | 20-3405779 |
| 123. | Peabody-Waterside Development, L.L.C. | 75-3098342 |
| 124. | Peabody Western Coal Company | 86-0766626 |
| 125. | Peabody Wild Boar Mining, LLC | 26-3730759 |
| 126. | Peabody Wild Boar Services, LLC | 26-3725591 |
| 127. | Peabody Williams Fork Mining, LLC | 20-8162742 |
| 128. | Peabody Wyoming Gas, LLC | 20-5744610 |
| 129. | Peabody Wyoming Services, LLC | 26-3723011 |
| 130. | PEC Equipment Company, LLC | 20-0217950 |
| 131. | PG INVESTMENTS SIX, L.L.C. | 43-1898530 |
| 132. | Point Pleasant Dock Company, LLC | 20-0117005 |
| 133. | Pond River Land Company | 73-1625893 |
| 134. | Porcupine Production, LLC | 43-1898379 |
| 135. | Porcupine Transportation, LLC | 43-1898380 |
| 136. | Riverview Terminal Company | 13-2899722 |
| 137. | Sage Creek Holdings, LLC | 26-3286872 |
| 138. | Sage Creek Land & Reserves, LLC | 38-3936826 |
| 139. | School Creek Coal Resources, LLC | 20-2902073 |
| 140. | Seneca Coal Company, LLC | 84-1273892 |
| 141. | Seneca Property, LLC | 36-4820253 |
| 142. | Shoshone Coal Corporation | 25-1336898 |
| 143. | Southwest Coal Holdings, LLC | 37-1794829 |
| 144. | Star Lake Energy Company, L.L.C. | 43-1898533 |
| 145. | Sugar Camp Properties, LLC | 35-2130006 |
| 146. | Thoroughbred Generating Company, L.L.C. | 43-1898534 |
| 147. | Thoroughbred Mining Company LLC | 73-1625889 |
| 148. | Twentymile Coal, LLC | 95-3811846 |
| 149. | Twentymile Equipment Company, LLC | 38-3982017 |
| 150. | Twentymile Holdings, LLC | 38-3937156 |
| 151. | United Minerals Company LLC | 35-1922432 |
| 152. | West Roundup Resources, LLC | 20-2561489 |
| 153. | Wild Boar Equipment Company, LLC | 32-0488114 |
| 154. | Wild Boar Land Holdings Company, LLC | 36-4831131 |

**<u>Exhibit A</u>**

Cowan Declaration

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>         Debtors. | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**DECLARATION OF TYLER W. COWAN IN SUPPORT
OF MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION,
PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364 AND 507(b)
AND BANKRUPTCY RULES 4001(b) AND (c), FOR INTERIM AND FINAL ORDERS (I)
AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B)
TO UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES; AND (III) SCHEDULING A FINAL HEARING**

I, Tyler W. Cowan, being duly sworn, state the following under penalty of perjury:

1. I am a Managing Director at Lazard Frères & Co. LLC ("Lazard"), the U.S. operating subsidiary of a preeminent international financial advisory and asset management firm founded in 1848. Lazard operates in forty-three cities across twenty-seven countries, including my office location at 190 South LaSalle St., Floor 31, Chicago, Illinois, 60603.

2. Having been retained in July 2015 to provide general restructuring and strategic advice, Lazard is the proposed investment banker for Peabody Energy Corporation ("PEC") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      I submit this Declaration in support of the *Motion of the Debtors and Debtors in Possession, Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, 364 and 507(b) and Bankruptcy Rules 4001(b) and (c), for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; and (III) Scheduling a Final Hearing* (the "Motion").[1]

4.      Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Lazard employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors and/or (e) my opinion based upon my experience.  If called to testify, I could and would testify to each of the facts set forth herein on that basis.

## Qualifications

5.      Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years.  Lazard has dedicated professionals who provide restructuring services to its clients.  The current vice chairmen, managing directors, directors, vice presidents, associates and analysts of Lazard have extensive experience working with financially troubled companies and creditors thereof in complex financial restructurings out-of-court and in chapter 11 proceedings.  Lazard and its principals have been involved as advisors to debtors, creditors, equity constituencies and government agencies in numerous reorganization

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

cases.  Since 1990, Lazard's professionals have been involved in over 250 restructurings,
representing well over $1 trillion in debtor liabilities.

6.     Since joining Lazard in 2003, I have advised companies and creditors,
including in situations involving coal and metals and mining companies, with respect to in-court
and out-of-court restructurings, recapitalizations and reorganizations.   I have also advised
companies regarding capital raises, mergers, acquisitions and divestitures.  I have been involved
in a variety of restructuring engagements including, among others, Alpha Natural Resources
(advisor to Rice Energy, the stalking horse bidder for certain gas assets), Atlas Iron, Cengage
Learning, Chassix, Dex Media (formerly R.H. Donnelley), Energy Future Holdings (advisor to
the TCEH Creditors' Committee), The Great Atlantic & Pacific Tea Company, Hostess (advisor
to secured lenders), Local Insight Media, Longview Power/Mepco, Patriot Coal (advisor to PEC),
United States Enrichment Corp., Walter Energy (advisor to first lien lenders) and Westgate
Resorts.  Pursuant to these engagements, I have worked on a variety of financings for troubled
companies, including a number of debtor-in-possession financings.  Additionally, I have
provided testimony in the following bankruptcy cases: In re Walter Energy, Inc., No. 15-02741
(TOM) (Bankr N.D. Ala. Dec. 1, 2015), In re Chassix Holdings, Inc., No. 15-10578 (Bankr.
S.D.N.Y. Mar. 12, 2015); In re Longview Power, LLC, No. 13-12211 (BLS) (Bankr. D. Del.
Sept. 24, 2013); and In re Great Atl. & Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Jan. 13,
2011).  Prior to joining Lazard in 2003, I attended Northwestern University where I graduated
with a Bachelor of Science in engineering.

7.     In July 2015, the Debtors retained Lazard as their investment banker in
connection with the Debtors' efforts to restructure their capital structure.  Since that time,
members of my team and I have worked closely with the Debtors' management and other

3

professionals to be retained by the Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") in the analysis of the Debtors' business affairs, assets, financial position, contractual arrangements and various proposed strategic transactions.  Pursuant to this work, the Lazard team (including me) has become well-acquainted with the Debtors' capital structure, liquidity needs and business operations.  In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives and restructuring options.  I have participated in negotiations between the Debtors and their creditors and other parties in interest. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions and the potential impact of various proposed transactions, including comparing alternative debtor-in-possession financing proposals.  Finally, I have participated in numerous meetings with the Debtors' board of directors to keep the board apprised of the restructuring process and to provide advice regarding strategic alternatives, including seeking protection under chapter 11 of the Bankruptcy Code.

8.    I am not being compensated specifically for this testimony other than through payments received by Lazard as a professional proposed to be retained by the Debtors.

**The Debtors' Efforts to Restructure Out-of-Court**

9.    The domestic coal industry has faced a number of challenges in recent years, including, among others, declining demand, declining prices, low natural gas prices and increased regulatory hurdles.  Slowing global economic growth drove a wide range of resources and energy prices lower in 2015, resulting in the largest broad market decline for these products since 1991.  Over the past five years, according to the Energy Information Administration, coal's share of total U.S. electricity generation has fallen from approximately 42% in 2011 to approximately 33% in 2015, with 2015 having the lowest amount of generation from coal power

4

plants since 1984.  Furthermore, coal production is estimated to have fallen approximately 110 million short tons to approximately 900 million short tons in the U.S. in 2015, the lowest levels in nearly 30 years.

        10.      The Debtors have a highly leveraged capital structure that includes, as of the Petition Date:

- $4.3 billion of secured obligations consisting of:

  - **Pre-Petition Credit Agreement**:  (a) $1.65 billion revolving credit facility (the "Revolving Credit Facility") and (b) $1.2 billion term loan facility (the "Term Loan Facility") issued pursuant to the Pre-Petition Credit Agreement. As of the Petition Date, the Debtors had drawn down approximately $947 million and had posted approximately $675 million in letters of credit under the Revolving Credit Facility[2];

  - **Swaps Obligations:**  As of March 31, 2016, the Debtors had foreign currency and fuel transactions outstanding in the approximate notional amounts of $1.1 billion (foreign currency) and $271 million (for fuel), respectively, which are generally considered "Swap Obligations," as that term is defined in the Pre-Petition Credit Agreement.  "Swap Obligations," to the extent valid and in a net liability position, are first lien obligations secured by collateral and all property that is subject to liens under the Pre-Petition Credit Agreement;[3]

  - **Second Lien Notes**: $1.0 billion in principal amount of 10.00% senior secured second lien notes issued on March 16, 2015 by PEC, due in March 2022 (the "Second Lien Notes"), which are secured by a second-priority lien on all the assets that secure the Debtors' obligations under the Pre-Petition Credit Agreement, subject to permitted liens and other limitations;

---

[2]      Balance subject to currency fluctuations due to certain letters of credit being issued in Australian dollars.

[3]      Part of the $4.3 billion in secured obligations reflects the mark to market liability associated with the swap obligations.  As of April 11, 2016, the mark to market liability was approximately $171 million for foreign currency swaps and approximately $128 million for fuel swaps.

5

- o **A/R Securitization Facility**: The Debtors' accounts receivable securitization program (the "A/R Securitization Facility") has a maximum capacity of $180 million, subject to eligible accounts receivable.[4]

- $4.5 billion of unsecured indebtedness, consisting of approximately:

  - o **2018 Notes:** $1.5 billion in principal amount of 6.00% senior notes issued in November 2011 by PEC, due in November 2018 (the "2018 Unsecured Notes");

  - o **2020 Notes**: $650 million in principal amount of 6.50% senior notes issued in August 2010 by PEC, due in September 2020;

  - o **2021 Notes**: $1.3 billion in principal amount of 6.25% senior notes issued in November 2011 by PEC, due in November 2021;

  - o **2026 Notes**: $250 million in principal amount of 7.785% senior notes issued in October 2006 by PEC, due in November 2026;

  - o **2066 Notes**: $732.5 million in principal amount of convertible junior subordinated debentures issued in December 2006 by PEC, due in December 2066; and

  - o **Other:** $22 million in, among other things, capital lease obligations.

11.    After several months of working with the Debtors to assess various transaction alternatives, Lazard and the Debtors began discussions with certain of the Debtors' major creditor and stakeholder groups regarding a potential out-of-court restructuring.  These stakeholder groups included (a) Citibank, N.A. ("Citi"), as administrative agent under the Pre-Petition Credit Agreement, (b) an ad hoc group of bondholders with significant holdings of the Debtors' 2018 Unsecured Notes, (c) an ad hoc group of bondholders with significant holdings of the Debtors' second lien and unsecured notes and (d) a significant term loan lender.

---

[4]    Although the A/R Securitization Facility is administered through a wholly-owned, bankruptcy-remote subsidiary, P&L Receivables, to the extent transfers of receivables are recharacterized as an extension of credit rather than true sales, the Debtors party to the A/R Securitization Facility have granted first priority security interests and liens on the receivables in favor of the administrator of the A/R Securitization Facility.

12.     In October 2015, the Debtors and Lazard began discussions with several significant holders of the Debtors' 2018 Unsecured Notes (the "2018 Noteholder Group") that had entered into non-disclosure agreements with the Debtors for the purpose of exploring a strategy to address the Debtors' obligations under such 2018 Unsecured Notes.  The Debtors chose to focus initial discussions on the 2018 Unsecured Notes, as such notes were (a) the next series of notes to mature, (b) had a principal amount outstanding of approximately $1.5 billion, and (c) relief with respect thereto was critical to alleviating financial pressures on the Debtors.

13.     The discussions and negotiations with the 2018 Noteholder Group centered on a number of potential exchange offer structures, some of which involved raising new debt financing.  Ultimately, the Debtors and the 2018 Noteholder Group exchanged formal term sheets that contemplated an exchange of the 2018 Unsecured Notes for a combination of (a) secured notes issued by a subsidiary that did not guarantee any of the Debtors' existing debt; (b) two series of new secured first lien notes; and (c) common stock.  These proposed transactions would have been conditioned upon the receipt of a certain amount of asset sale proceeds, among other terms.  In mid-January 2016, following substantial declines in the trading prices for the Debtors' debt and equity securities, and after thorough review and analysis, the Debtors and their advisors, including Lazard, determined that an exchange transaction that only targeted the 2018 Unsecured Notes would not maximize value for the Debtors and their stakeholders.  Accordingly, the Debtors, based upon the advice of Lazard and their other advisors, decided to terminate negotiations with the 2018 Noteholder Group.  The last drafts of the term sheet proposals were filed as an Exhibit on SEC Form 8-K filed on January 22, 2016.

14.     Subsequent to the cessation of negotiations with the 2018 Noteholder Group in mid-January 2016, the Debtors and Lazard commenced negotiations with an ad hoc

7

group of second lien and unsecured noteholders that had entered into non-disclosure agreements with the Debtors.  These discussions centered around various potential out-of-court restructuring transactions, including:  (a) a cash tender offer for certain of the existing second lien and unsecured notes and (b) the exchange of certain of the existing second lien and unsecured notes for new debt securities issued by the Debtors or by certain other PEC subsidiaries that are not guarantors under the Debtors' outstanding debt.  These proposed transactions would have been conditioned upon the receipt of certain asset sale proceeds, among other terms.

15.     Concurrent with these negotiations, the Debtors pursued the closing of the sale of certain New Mexico and Colorado assets to Bowie Resource Partners.  The Debtors entered into an agreement with Bowie Resource Partners in November 2015 to sell the assets for $358 million (the "Four Star Transaction").  After continued negotiations, it became apparent that the sale would not successfully close during the first fiscal quarter of 2016, and the Debtors would not benefit from the liquidity that would have been provided by the sale proceeds.  Such anticipated liquidity was critical to the viability of an out-of-court restructuring strategy.  After months of negotiations involving various potential out-of-court exchange offer structures and new money financings, and upon the realization that the Four Star Transaction would likely not close on schedule, the Debtors, in connection with Lazard and their other advisors, determined that their various potential out-of-court restructuring strategies (a) were not feasible for the Debtors over the long term and (b) would not otherwise maximize value for the Debtors' stakeholders.  Subsequent to this determination, the Debtors and their advisors, including Lazard, focused their efforts on devising a restructuring strategy to be implemented through these Chapter 11 Cases.

8

### The Debtors' Need For DIP Financing and the Use of Cash Collateral

16.    In March 2016, the Debtors began to explore in earnest whether a chapter

11 filing could help address their overleveraged capital structure.  Accordingly, the Debtors and

their advisors, including Lazard, turned their attention to seeking debtor-in-possession financing

("DIP Financing") that would provide the Debtors with sufficient liquidity to operate during the

pendency of these Chapter 11 Cases.  Lazard worked with the Debtors and FTI Consulting

("FTI") to analyze the Debtors' cash flows and to determine the amount of DIP Financing needed

to operate their business during these Chapter 11 Cases.  Based on this analysis, Lazard

concluded that the Debtors would require DIP Financing and access to cash collateral to finance

their operations during these Chapter 11 Cases.  In light of (a) the challenging industry

environment, (b) the Debtors' long-term liquidity requirements, (c) the projected cash losses

associated with the Debtors' domestic and foreign businesses and (d) the Debtors' highly

leveraged prepetition capital structure that included a substantial amount of secured indebtedness,

the Debtors' options with respect to DIP Financing were limited.

17.    As a general matter, it is extremely challenging for coal companies in

bankruptcy to raise postpetition financing given the current state of the coal markets, as well as

the fact that (a) many traditional investment banks have adopted "no-coal" policies that preclude

them from providing capital to coal companies and (b) many other non-traditional financial

institutions, including hedge funds, have lost considerable money investing in the coal sector

over the last two years and are, therefore, hesitant to invest additional capital in the sector.

Although each of the major coal companies that have filed for bankruptcy within the last two

years, including Alpha Natural Resources, Inc., Arch Coal, Inc., James River Coal Company,

Patriot Coal Corporation, and Walter Energy Co., have successfully raised debtor-in-possession

9

financing to fund their respective chapter 11 cases, there was or continues to be risk that the debtor-in-possession financings in those cases would be impaired and/or not repaid in cash at emergence.  Accordingly, potential capital providers to bankrupt coal companies are taking an increasingly conservative view when considering whether to provide DIP Financing.  Indeed, very few of the Debtors' prepetition secured lenders have chosen to participate in the Debtors' DIP Financing.

18.     In considering the Debtors' potential alternatives to finance these Chapter 11 Cases, the Debtors, with the assistance of Lazard, determined that the Debtors' unencumbered assets alone would not be sufficient to provide the necessary funding for the Debtors to implement a long-term restructuring plan.  Conservatively, Lazard concluded that the Debtors' unencumbered non-cash assets, namely certain of the Debtors' New Mexico and Colorado assets that the Debtors had intended to sell under the Four Star Transaction, might support approximately $150 - $200 million in incremental liquidity from the proceeds of new borrowings. With cash losses of the Debtors projected to exceed that figure by year end, access to cash collateral and additional financing would be required to finance a longer-term restructuring of the Debtors.

19.     Furthermore, DIP Financing collateralized by the Debtors' unencumbered non-cash assets would not provide the Debtors with a viable alternative to address their obligations to provide financial assurances to various state regulatory bodies.  In the chapter 11 cases involving both Alpha Natural Resources, Inc. and Arch Coal, Inc., both companies reached a consensual settlement with applicable state regulatory bodies regarding their requirements to provide financial assurances by providing a combination of (a) a superpriority administrative claim pursuant to a debtor-in-possession financing carve-out and (b) cash collateralized letters of

credit pursuant to a bonding accommodation facility.  With respect to the Debtors, implementing

a sufficiently attractive bonding accommodation facility would require the priming of the

Prepetition Secured Parties; while issuing new letters of credit would require the Debtors to raise

sufficient funds to cash-collateralize such letters of credit.  Lazard determined, in consultation

with the Debtors, that a superpriority administrative claim with respect to the unencumbered

non-cash assets alone would not be sufficiently attractive to the various state regulatory bodies to

address the Debtors' obligations to provide financial assurances during these Chapter 11 Cases.

20.     Lazard determined, however, that, if the Debtors were to secure

postpetition financing using only unencumbered non-cash assets, it would be difficult—if not

impossible—to reach a consensual agreement with the Debtors' Prepetition Secured Parties

regarding use of their cash collateral and/or a priming of their prepetition liens with respect to a

superpriority administrative claim to address the Debtors' obligations to provide financial

assurances.  In that scenario, it would be difficult, time consuming, expensive and extremely

risky to pursue any postpetition financing solution that (a) would likely require litigation with

respect to adequate protection for the Prepetition Secured Parties and/or (b) would seek to prime

the Prepetition Secured Parties on a nonconsensual basis.

21.     The uncertainty of any such contested process would create substantial

risk of damage to the Debtors' businesses and could leave the Debtors underfinanced or without

financing altogether, as well as without a bonding accommodation facility to address the

Debtors' obligations to provide financial assurances on a postpetition basis.  The Debtors'

businesses are cash intensive, with significant daily costs to produce and ship coal to customers,

satisfy obligations to employees, maintain the safety of their mines and other facilities and fulfill

environmental and other regulatory requirements.  Litigation regarding (a) the non-consensual

11

priming of the liens of the Prepetition Secured Parties or (b) the scope of adequate protection required for such Prepetition Secured Parties at the very outset of these Chapter 11 Cases could prove devastating to the Debtors business operations and financial performance. Furthermore, any inability to address the Debtors' obligations on a post-petition basis to provide financial assurances to various state regulatory bodies could put the Debtors' mining permits at risk.

22.     In consultation with the Debtors and their other advisors, Lazard concluded that the current state of the coal and broader financing markets made it prudent to secure adequate financing for the pendency of these Chapter 11 Cases utilizing all of the Debtors' available assets, including an agreement with the Prepetition Secured Parties on the consensual use of cash collateral, if an appropriate financing facility and reasonable cash collateral agreement could be obtained. The Debtors and Lazard determined that a delay in obtaining postpetition financing and/or a bonding accommodation facility and having no agreement on the consensual use of cash collateral could put the Debtors at risk that they would not be able to obtain the necessary financing or facilities on as favorable terms, or at all, at a future date. This could undermine the Debtors' ability to pursue their restructuring in a manner that maximizes value for all stakeholders.

## The Debtors' Efforts to Obtain Postpetition Financing

23.     In March 2016, Lazard, in coordination with the Debtors' other advisors, commenced a formal process to raise DIP Financing to fund the Debtors' potential Chapter 11 Cases. At the outset of this process, the Debtors focused on raising postpetition financing that would address their principal goals and objectives, including, among others (a) raising sufficient new capital to finance the Debtors' Chapter 11 Cases, (b) raising a bonding accommodation facility to address the Debtors' substantial obligations to provide financial assurances during the

12

Chapter 11 Cases, (c) preventing any prejudice to the rights of the Debtors or any interested creditor group with respect to any dispute regarding the terms of section 6.16 of the Prepetition Credit Agreement, as well as whether certain of the Debtors' cash is unencumbered, (d) ensuring that value is not transferred from one creditor constituency to another creditor constituency pursuant to the DIP Financing (*i.e.*, a roll-up of any prepetition claims) and (e) maximizing the chances of the Debtors' having a "soft-landing" in chapter 11 by minimizing the amount of litigation at the outset of these Chapter 11 Cases to the extent possible.

24.    In mid-March 2016, three organized creditor groups each submitted proposed terms for potential DIP Financing to Lazard and the Debtors: (a) Citi and certain lenders under the Debtors' Pre-Petition Credit Agreement (collectively, the "First Lien Steering Committee"); (b) a significant holder of term loans under the Pre-Petition Credit Agreement (the "Term Loan Lender"); and (c) an ad hoc group of bondholders with significant holdings of the Debtors' second lien and unsecured notes (the "Ad Hoc Bondholder Group").  Further, in late March 2016, the Term Loan Lender and the Ad Hoc Bondholder Group submitted a joint proposal for DIP Financing (in such capacity, the "Joint Lenders").

25.    During the DIP Financing process, I also contacted six sophisticated third-party financing sources who have extensive experience in extending debtor-in-possession financing.  Given the anticipated difficulty in priming the Prepetition Secured Parties and the costs and risks of such litigation (which, based on my experience and in consultation with the Debtors, I believed would be imprudent and damaging), I principally focused my financing requests on potential interest in providing financing either (a) on an unsecured or junior lien basis or (ii) on a secured basis solely with respect to the Debtors' unencumbered assets.  None of

13

the six financing sources contacted expressed an interest in providing financing to the Debtors on these or any other terms.

26.    Since receiving the DIP Financing proposals referenced above, the Debtors and Lazard have engaged in extensive discussions and negotiations, some of which were in-person, with each of the potential DIP lenders.  For approximately two weeks, the Debtors and Lazard negotiated the term sheets with the First Lien Steering Committee and the Joint Lenders. On or around April 1, 2016, Lazard requested that each group provide a revised term sheet that would be used as the basis to decide which group the Debtors would select to be their DIP lenders.  On April 3, 2016, the Debtors received proposals from both the First Lien Steering Committee and the Joint Lenders.

27.    After careful review of these proposals, it was evident to the Debtors and their advisors, including Lazard, that (a) the DIP Financing proposed by the First Lien Steering Committee was significantly more advantageous to the Debtors than the DIP Financing proposed by the Joint Lenders (the "Alternative DIP Proposal"), and (b) the DIP Financing proposed by the First Lien Steering Committee would better assist the Debtors in their efforts to achieve their postpetition financing goals.  Therefore, the Debtors decided it was most appropriate to continue negotiations exclusively with respect to the DIP Financing as proposed by the First Lien Steering Committee.  At that time, the Debtors also encouraged the Joint Lenders to engage with the First Lien Steering Committee regarding their potential participation in the DIP Financing as proposed by the First Lien Steering Committee.  While unusual, the First Lien Steering Committee had expressed to the Debtors a potential willingness to allow the Joint Lenders to participate in their DIP Financing.

14

28.    Since April 4, 2016, the Debtors and their advisors, including Lazard, have been engaged in hard fought negotiations with the First Lien Steering Committee regarding DIP Financing.  Ultimately, after extensive negotiations, the Debtors entered into an agreement with the First Lien Steering Committee pursuant to the terms and conditions described in the Motion to provide DIP Facilities in the form of (a) a $500 million Term Loan Facility to provide incremental liquidity to the Debtors for their business needs, including the funding of cash collateralized letters of credit; (b) a $100 million L/C Facility that enables the Debtors to issue cash collateralized letters of credit (subject to certain limitations described in the Motion); and (c) a $200 million Bonding Accommodation Facility to provide superpriority administrative claims and/or letters of credit (subject to certain limitations described in the Motion) to address the Debtors' obligations to provide financial assurances on a postpetition basis.  Further, the DIP Facilities will provide the Debtors with the use of Cash Collateral of the Prepetition Secured Parties, as well as the continued access to the A/R Securitization Facility, which will permit the Debtors to continue to post certain letters of credit in the ordinary course of business.

29.    After reaching agreement in principal with the First Lien Steering Committee regarding DIP Financing, the Debtors and their advisors, including Lazard, turned their attention to negotiating with the First Lien Steering Committee to allow the Ad Hoc Bondholder Group to participate in the DIP Financing.  Following several days of extensive negotiations among the Debtors, the First Lien Steering Committee and the Ad Hoc Bondholder Group, the parties reached agreement with respect to the terms of the Ad Hoc Bondholder Group's participation.  Having the Ad Hoc Bondholder Group participate as minority lenders in the DIP Facilities is beneficial to the Debtors as it reduces the likely litigation with respect to the

15

DIP Financing (the Ad Hoc Bondholder Group and its constituents have agreed not to object to the DIP Facilities), and helps facilitate a "soft landing" of the Debtors in Chapter 11.

30.     The terms of the DIP Facilities also demonstrate the support of the Prepetition Secured Parties and the Ad Hoc Bondholder Group for the Debtors and the overall restructuring process and will provide confidence to vendors, suppliers, customers, employees, other business partners and governmental agencies that the Debtors can continue to meet their commitments during these Chapter 11 Cases.  Immediate and ongoing access to funding under the DIP Facilities will demonstrate to customers, employees, vendors, suppliers and other key constituencies that the Debtors have sufficient resources available to meet their obligations in the ordinary course during these Chapter 11 Cases.

31.     Further, the DIP Facilities will provide the Debtors with substantial ongoing ability to post letters of credit through a $100 million L/C Facility and address significant reclamation bonding obligations in connection with their operations during these Chapter 11 Cases through a $200 million Bonding Accommodation Facility.  The Debtors, in the ordinary course of their businesses and on a regular basis, are required to provide financial assurances, either through third-party surety bond providers or under certain "self-bonding" guidelines, to various third parties to secure the Debtors' payment or performance of certain obligations.   The failure to provide such financial assurances could jeopardize the Debtors' business by causing them to be in violation of applicable law, and therefore preventing the Debtors from continuing mining operations.

32.     The DIP Credit Agreement contains certain milestones ("Milestones") that the Debtors must meet throughout these Chapter 11 Cases, and a failure to meet such Milestones constitutes an event of default under the DIP Credit Agreement.  These Milestones were heavily

16

negotiated and required by the DIP Lenders as a condition to the DIP Facilities.  The Debtors and

their advisors, including Lazard, believe the Milestones are fair, appropriate and achievable and,

by providing 210 days to file a plan of reorganization, will permit sufficient time for the Debtors

to pursue a restructuring that maximizes value for their stakeholders.

33.     In consultation with the Debtors and their other advisors, Lazard

concluded that the proposed financing from the DIP Lenders reflected in the DIP Credit

Agreement and the Interim and Final Orders (a) is fair and appropriate, (b) meets the Debtors'

business and financing needs for these Chapter 11 Cases, (c) provides the most cost-effective and

beneficial financing to the Debtors and (d) is the best option available to finance the restructuring

process and allow the Debtors to pursue their restructuring goals and maximize value in these

Chapter 11 Cases.

### The Terms of the DIP Facilities
### Are More Advantageous than the Alternative DIP Proposal Available to the Debtors

34.     After having engaged in discussions with the First Lien Steering

Committee, the Ad Hoc Bondholder Group and the Joint Lenders, and based on the Debtors' and

Lazard's in-depth analysis of the proposals that were received, and based upon the Debtors'

prepetition capital structure and current financial condition, I believe the terms of the DIP

Facilities are more advantageous to the Debtors than the Alternative DIP Proposal, and are

therefore in the best interests of the Debtors' estates.

35.     In comparing the DIP Facilities and the Alternative DIP Proposal, the

Debtors, informed by the advice of their advisors, including Lazard, determined that the DIP

Facilities were superior to the Alternative DIP Proposal for several reasons, among others:

(a)     Greater Certainty of Access to New Capital to Fund Operations.
        The DIP Facilities provide more certain access to financing to fund the

17

business than the Alternative DIP Proposal.  As mentioned above, the DIP Facilities likely will facilitate a consensual priming of the Pre-Petition Credit Agreement.  Conversely, $200 million of the DIP term loan facility pursuant to the Alternative DIP Proposal was conditioned on final court approval of the non-consensual priming of the Pre-Petition Credit Agreement with respect to Principal Properties.  Such priming would almost certainly be litigated by the secured lenders under the Pre-Petition Credit Agreement, and therefore the Alternative DIP Proposal would have presented greater risks regarding timely access to financing on a postpetition basis.

(b)     <u>Greater Certainty of Access to the Bonding Accommodation Facility</u>. The DIP Facilities enable faster and more certain access to a facility for the Debtors to address their postpetition reclamation bonding obligations, which are critical to the Debtors' continued U.S. operations.  The DIP Facilities include a Bonding Accommodation Facility that is carved-out from collateral composed of substantially all the Debtors' assets.  The bonding accommodation facility in the Alternative DIP Proposal was conditioned on final court approval of the non-consensual priming of the Pre-Petition Credit Agreement with respect to Principal Properties.  Such priming would almost certainly be litigated by the secured lenders under the Pre-Petition Credit Agreement, and therefore the Alternative DIP Proposal would have presented greater risks regarding timely access to the bonding accommodation facility.  Furthermore, the Alternative DIP Proposal would have limited the scope of such collateral carve-out for the bonding accommodation facility to only those assets on which the Alternative DIP Proposal had a senior or priming lien.  In summary, the Alternative DIP Proposal offered much less certainty regarding access to the bonding accommodation facility early in these Chapter 11 Cases. Under such circumstances, early demands for bonding assurances from regulators could materially impair the Debtors' liquidity, as the Debtors likely would have no choice under such circumstances other than to post

18

either cash or cash collateralized letters of credit, both of which would impact the Debtors' liquidity.

(c) <u>Less Likely to Induce Significant Litigation.</u>  The DIP Facilities are less likely to induce significant litigation early in the Debtors' Chapter 11 Cases as compared to the Alternative DIP Proposal.  The support of the First Lien Steering Committee likely will result in the consensual priming of the Pre-Petition Credit Agreement by the DIP Facilities, as well as the consensual use of cash collateral.  The Alternative DIP Proposal would have precipitated significant litigation with the Prepetition Secured Parties regarding the nature and extent of the Debtors' unencumbered assets and the use of cash collateral, among other potential matters.  Such litigation would likely entail significant delay, expense and uncertainty regarding the DIP Facilities, an important component of the Debtors' ability to successfully reorganize in these Chapter 11 Cases.

(d) <u>Less Onerous on Operations.</u>  Unlike the Alternative DIP Proposal, the DIP Facilities do not require the operationally onerous allocation of certain payments to various categories of collateral for the debtor-in-possession financing.

(e) <u>Lower All-In Cost Regarding Interest Rate and Fees.</u>  The DIP Facilities are less expensive for the Debtors than the Alternative DIP Proposal with respect to the all-in cost, including both the interest rate and any fees.  Notably, the Alternative DIP Proposal included an equity fee that would have entitled those DIP lenders to 10% of the equity in the reorganized company.  Lazard does not believe this equity fee is comparable to the terms of other recent debtor-in-possession financings, including those in the coal and broader metals and mining industries, and would have been prohibitively expensive.  Furthermore, the equity fee component of the Alternative DIP Proposal would likely increase the odds of substantial litigation on the first day of the Chapter 11 Cases as such a fee could

19

potentially be worth tens of millions of dollars.  The chart below shows that the interest rates and fees proposed under the DIP Facilities are generally equivalent to or more favorable to the Debtors than those that would have been incurred under the Alternative DIP Proposal:

| DIP Facilities | Alternative DIP Proposal |
|---|---|
| • Interest Rate: Loans will bear interest, at the option of the Debtors, at either:<br>(i) the Base Rate[5] plus 8.00%; or<br>(ii) the LIBO Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to a 1.00% LIBOR Floor, plus 9.00%<br><br>• Commitment Fee: 5.00%<br><br>• Exit Fee: 2.00%<br><br>• Extension Fee: 2.50% to extend the maturity from 12 months to 18 months<br><br>• Bonding L/C Fees: 0.25% on the face amount of each bonding letter of credit<br><br>• L/C Facility Fees: 0.25% on the face amount of each letter of credit | • Rate: LIBOR plus 8.50%, paid in kind with a LIBOR floor of 1.00%<br><br>• Commitment Fee: 5.00% paid in kind<br><br>• Undrawn Fee: 5.00% paid in kind<br><br>• Equity Fee: 10.00% of the common equity of the reorganized company<br><br>• Extension Fee: 3.00% paid in kind to extend the maturity from 15 months to 18 months<br><br>• Bonding L/C Fees: 0.25% on the face amount of each bonding letter of credit<br><br>• L/C Facility Fees: 0.25% on the face amount of each letter of credit |

36.     Thus, in addition to satisfying the Debtors' liquidity needs, the DIP Facilities provide substantial benefits specific to the Debtors in these Chapter 11 Cases.

## Arm's Length and Good Faith

37.     Based on the information available to me, and my observations during the course of the negotiations over the DIP Facilities, it is my opinion that the terms and conditions of the DIP Facilities (i) were negotiated by the parties in good faith and at arm's-length, (ii) are

---

[5]     "Base Rate" means the highest of (i) Citibank, N.A.'s base rate, (ii) the Federal Funds Effective Rate plus 1/2 of 1% and (iii) the LIBO Rate for an interest period of one month (giving effect to the LIBOR Floor) plus 1.00%.

20

more advantageous to the Debtors than any other proposal available to the Debtors under current market conditions and (iii) are in the best interests of the Debtors' estates.

### The Terms of the DIP Facilities Are Reasonable and Should be Approved

38.     Based on my experience, the proposed DIP Facilities are reasonable given current market conditions, the Debtors' circumstances and the terms of the Debtors' Pre-Petition Credit Agreement.  I believe that the economic terms of the proposed DIP Facilities are competitive and within the range of other large DIP facilities in recent years.  More specifically, the interest rate and fees are generally consistent with the debtor-in-possession financing in the three most recent chapter 11 cases involving large coal companies, including Alpha Natural Resources, Inc., Arch Coal, Inc. and Walter Energy Co., as well as other recent chapter 11 cases involving companies in the broader metals and mining sector, among other industries.

39.     I believe the fees and expenses in the proposed DIP Facilities are reasonable, and the financing under the DIP Facilities is the best option currently available to the Debtors.  Based on the forecasts of the Debtors' management, I also believe that the DIP Facilities will provide the Debtors with sufficient liquidity (i) to continue operating, (ii) to develop and implement a strategic long-term business plan for both its U.S. and foreign businesses and (iii) to pursue their restructuring goals.  As such, the terms of the DIP Facilities are in the best interests of the Debtors' estates.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 13, 2016
        Chicago, Illinois

                                        /s/  Tyler W. Cowan
                                        Tyler W. Cowan
                                        Managing Director
                                        Lazard

21

**<u>Exhibit B</u>**

DIP Credit Agreement

FILING VERSION: APRIL 13, 2016

---

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**
dated as of April [•], 2016

among

**PEABODY ENERGY CORPORATION,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Borrower,

**THE SUBSIDIARIES OF PEABODY ENERGY CORPORATION
FROM TIME TO TIME PARTY HERETO,**
certain of which are Debtors and Debtors-in-Possession
under Chapter 11 of the Bankruptcy Code,
as Guarantors,

**THE LENDERS FROM TIME TO TIME PARTY HERETO**,

and

**CITIBANK, N.A.,**
as Administrative Agent and L/C Issuer

---

**CITIGROUP GLOBAL MARKETS INC.**

as Sole Lead Arranger and Book Runner

---

# TABLE OF CONTENTS

<u>Section</u>                                                                                                      <u>Page</u>

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ...................................................1
    1.01    Defined Terms ............................................................................1
    1.02    Other Interpretive Provisions .........................................40
    1.03    Accounting Terms ........................................................40
    1.04    [Reserved.] ..................................................................41
    1.05    [Reserved.] ..................................................................41
    1.06    [Reserved.] ..................................................................41
    1.07    Times of Day ...............................................................41
    1.08    Letter of Credit Amounts .............................................41

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ...................................41
    2.01    Commitments; Bonding Accommodations; L/C Facility .....................41
    2.02    Borrowings, Conversions and Continuations of the Loans ................42
    2.03    Letters of Credit ..........................................................44
    2.04    Cash Collateralized Letter of Credit Accounts. .........................50
    2.05    Prepayments. ...............................................................52
    2.06    Termination or Reduction of Commitments. ...............................54
    2.07    Repayment of Loans ......................................................54
    2.08    Interest. ......................................................................54
    2.09    Fees ...........................................................................55
    2.10    Computation of Interest and Fees ......................................55
    2.11    Evidence of Debt. .........................................................56
    2.12    Payments Generally; Administrative Agent's Clawback ..................56
    2.13    Pro Rata; Sharing of Payments by Lenders ............................58
    2.14    Facility Extension Option ...............................................58
    2.15    [Reserved] ..................................................................59
    2.16    [Reserved] ..................................................................59
    2.17    [Reserved] ..................................................................59
    2.18    Defaulting Lenders .......................................................59
    2.19    Priority and Liens .........................................................60
    2.20    No Discharge; Survival of Claims ......................................62
    2.21    Payment of Obligations. ................................................62

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY ...................................62
    3.01    Taxes ........................................................................62
    3.02    Illegality .....................................................................65
    3.03    Inability to Determine Rates ...........................................66
    3.04    Increased Costs; Reserves on Eurocurrency Rate Loans ..............66
    3.05    Compensation for Losses ...............................................69
    3.06    Mitigation Obligations; Replacement of Lenders .....................69
    3.07    Survival .....................................................................70

ARTICLE IV CONDITIONS PRECEDENT ................................................................70
    4.01   Closing Date ..................................................................................70
    4.02   Conditions to all Credit Extensions ...........................................74

ARTICLE V REPRESENTATIONS AND WARRANTIES ......................................76
    5.01   Existence, Qualification and Power .............................................76
    5.02   Authorization; No Contravention ................................................77
    5.03   Governmental Authorization ........................................................77
    5.04   Binding Effect ..............................................................................77
    5.05   Financial Statements; No Material Adverse Effect .....................77
    5.06   Litigation ......................................................................................78
    5.07   No Default ....................................................................................78
    5.08   Ownership and Identification of Property ...................................78
    5.09   Environmental Compliance ..........................................................79
    5.10   Insurance ......................................................................................80
    5.11   Taxes ............................................................................................80
    5.12   ERISA Compliance ......................................................................80
    5.13   Subsidiaries ..................................................................................81
    5.14   Margin Regulations; Investment Company Act ..........................81
    5.15   Disclosure ....................................................................................81
    5.16   Compliance with Laws ................................................................81
    5.17   Anti-Terrorism Laws and Sanctions ...........................................81
    5.18   Intellectual Property; Licenses, Etc. ...........................................82
    5.19   Security Documents ......................................................................83
    5.20   Mines ............................................................................................83
    5.21   Use of Proceeds ...........................................................................83

ARTICLE VI AFFIRMATIVE COVENANTS ..........................................................84
    6.01   Financial Statements ....................................................................84
    6.02   Certificates; Other Information ....................................................85
    6.03   Notices ..........................................................................................87
    6.04   Payment of Tax Obligations ........................................................88
    6.05   Preservation of Existence .............................................................88
    6.06   Maintenance of Properties ............................................................88
    6.07   Maintenance of Insurance .............................................................88
    6.08   Compliance with Laws ................................................................89
    6.09   Books and Records .......................................................................89
    6.10   Inspection Rights .........................................................................89
    6.11   Use of Proceeds ...........................................................................89
    6.12   Additional Guarantors .................................................................90
    6.13   [Reserved] ....................................................................................90
    6.14   Preparation of Environmental Reports ........................................90
    6.15   Certain Long Term Liabilities and Environmental Reserves ......90
    6.16   Covenant to Give Security ...........................................................90
    6.17   Compliance with Leases ..............................................................93
    6.18   First and Second Day Orders .......................................................93
    6.19   Milestones ....................................................................................93

6.20 Ratings ...............................................................................................................95

ARTICLE VII NEGATIVE COVENANTS..................................................................................96
7.01 Liens....................................................................................................................96
7.02 Investments.........................................................................................................98
7.03 Indebtedness......................................................................................................100
7.04 Fundamental Changes.......................................................................................100
7.05 Dispositions.......................................................................................................101
7.06 Restricted Payments..........................................................................................102
7.07 Change in Nature of Business...........................................................................103
7.08 Transactions with Affiliates..............................................................................103
7.09 [Reserved.].........................................................................................................104
7.10 Use of Proceeds.................................................................................................104
7.11 Financial Covenants..........................................................................................104
7.12 Limitation on Negative Pledge Clauses or Restrictions on Subsidiary
     Distributions.....................................................................................................106
7.13 Restrictions on Peabody IC Funding and Peabody IC Holdings. .....................107
7.14 Restrictions on Peabody Holdings (Gibraltar) Limited and Peabody
     Investments (Gibraltar) Limited ......................................................................107
7.15 Bonding Superpriority Claims...........................................................................107
7.16 Organizational Documents; Subordinated Indebtedness ..................................107
7.17 Restrictions on Global Center and Global Center Funding Account.................107
7.18 Anti-Terrorism Laws; Sanctions.......................................................................108
7.19 Sanctions. ..........................................................................................................108

ARTICLE VIII REAL PROPERTY LEASES ..............................................................................108
8.01 Special Rights with Respect to Real Property Leases. ......................................108

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ..........................................................111
9.01 Events of Default ...............................................................................................111
9.02 Remedies Upon Event of Default ......................................................................116
9.03 Application of Funds..........................................................................................116

ARTICLE X ADMINISTRATIVE AGENT .................................................................................118
10.01 Appointment and Authority ...............................................................................118
10.02 Rights as a Lender..............................................................................................118
10.03 Exculpatory Provisions ......................................................................................118
10.04 Reliance by Administrative Agent .....................................................................119
10.05 Delegation of Duties ..........................................................................................119
10.06 Resignation of Administrative Agent .................................................................119
10.07 Non-Reliance on Administrative Agent and Other Lenders...............................121
10.08 No Other Duties, Etc..........................................................................................121
10.09 Administrative Agent May File Proofs of Claim; Credit Bidding......................121
10.10 Guaranty and Collateral Matters........................................................................123
10.11 Withholding Tax ................................................................................................123
10.12 Collateral Matters...............................................................................................123

**ARTICLE XI MISCELLANEOUS** ...................................................................................124

11.01    Amendments, Etc. ...............................................................................124
11.02    Notices; Effectiveness; Electronic Communication ...........................126
11.03    No Waiver; Cumulative Remedies .....................................................128
11.04    Expenses; Indemnity; Damage Waiver................................................128
11.05    Payments Set Aside.............................................................................130
11.06    Successors and Assigns.......................................................................130
11.07    Treatment of Certain Information; Confidentiality..............................133
11.08    Right of Setoff....................................................................................134
11.09    Interest Rate Limitation .....................................................................135
11.10    Counterparts; Integration; Effectiveness; Orders Control ..................135
11.11    Survival of Representations and Warranties.......................................135
11.12    Severability .......................................................................................136
11.13    Replacement of Lenders .....................................................................136
11.14    Governing Law; Jurisdiction; Etc. .....................................................137
11.15    Waiver of Jury Trial...........................................................................138
11.16    PATRIOT Act Notice .........................................................................138
11.17    Time of the Essence ...........................................................................138
11.18    Judgment Currency ............................................................................138
11.19    No Advisory or Fiduciary Responsibility ...........................................139
11.20    [Reserved]...........................................................................................139
11.21    Release of Liens and Release from Guaranty Obligations ..................139
11.22    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ..........141
11.23    Original Issue Discount......................................................................141
11.24    THE LOANS MAY BE ISSUED WITH ORIGINAL ISSUE DISCOUNT
         FOR UNITED STATES FEDERAL INCOME TAX PURPOSES.  THE
         ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE
         DATE AND YIELD TO MATURITY OF THE LOANS MAY BE
         OBTAINED BY WRITING TO THE BORROWER AND THE
         ADMINISTRATIVE AGENT AT ITS ADDRESS SPECIFIED HEREIN........141

**ARTICLE XII GUARANTY** ...........................................................................................141

12.01    Guaranty.............................................................................................141
12.02    Right of Contribution .........................................................................142
12.03    Amendments, etc. with Respect to Obligations ..................................142
12.04    Guaranty Absolute and Unconditional................................................143
12.05    Reinstatement......................................................................................143
12.06    [Reserved] ...........................................................................................144
12.07    Remedial Provisions ...........................................................................144
12.08    No Waiver; Enforcement; Indemnification. ........................................144
12.09    Agreement to Pay; Subrogation. .........................................................144
12.10    Information .........................................................................................146

**SCHEDULES**

| | |
|---|---|
| 1.01 | Guarantors |
| 2.01 | Commitments |
| 5.08(b) | Certain Fee Owned Real Property |
| 5.08(c) | Certain Leased Real Property |
| 5.08(d) | Real Property with Buildings |
| 5.09 | Environmental Matters |
| 5.13 | Restricted Subsidiaries |
| 5.18 | Intellectual Property |
| 5.20 | Mines |
| 7.05 | Specified Dispositions |
| 11.02 | Administrative Agent's Office; Certain Addresses for Notices |
| 11.06 | Processing and Recordation Fees |

**EXHIBITS**

**Form of:**

| | |
|---|---|
| A | Borrowing Notice |
| B | Joinder Agreement |
| C | Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Interim Order |
| G | Security Agreement |
| H | 13-Week Projection |

v

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "<u>Agreement</u>") is entered into as of April [•], 2016, among PEABODY ENERGY CORPORATION, a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "<u>Borrower</u>"), the GUARANTORS from time to time party hereto, certain of which are Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code, the L/C ISSUER party hereto, each lender from time to time party hereto (collectively, the "<u>Lenders</u>" and, individually, a "<u>Lender</u>") and CITIBANK, N.A., as Administrative Agent.

WHEREAS, on April [•], 2016 (the "<u>Petition Date</u>"), the Borrower, each of the Guarantors (excluding Global Center) (such terms, and each other capitalized term used but not defined in these recitals having the meaning set forth in Section 1.01) (collectively, and together with any other Affiliates of the Borrower that become debtors in the Cases, the "<u>Debtors</u>") and certain other Affiliates of the Borrower filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the case of the Borrower and the Guarantors that are Debtors, each a "<u>Case</u>" and collectively, the "<u>Cases</u>" [•][1]) and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lenders provide it with (i) a term loan facility in an aggregate principal amount not to exceed $500,000,000 under this Agreement, (ii) a cash collateralized letter of credit facility in an aggregate principal amount not to exceed $100,000,000 (subject to the conditions set forth herein) under this Agreement, which shall be in the form of L/C Facility Letters of Credit issued under this Agreement secured by cash collateral, and (iii) a bonding accommodation facility in an aggregate principal amount not to exceed $200,000,000, all or a portion of which may (subject to the conditions set forth herein) take the form of the issuance of Letters of Credit issued under this Agreement secured by cash collateral. All of the Borrower's obligations under the Facilities are to be guaranteed by the Guarantors. The Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

WHEREAS, subject to <u>Section 11.10</u>, the respective priorities of the Facilities with respect to the Collateral shall be as set forth herein and in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**. As used in this Agreement, the following terms have the meanings set forth below:

---

[1] NTD: insert reference to case number once obtained.

"13-Week Projection" means a projected statement of sources and uses of cash for the Borrower and the other Debtors on a weekly basis for the following 13 calendar weeks, including the anticipated uses of the Facilities for each week during such period, in substantially the form of Exhibit H hereto.  As used herein, "13-Week Projection" shall initially refer to the initial 13-Week Projection delivered in accordance with Section 4.01(a)(ix) and thereafter shall refer to the most recent 13-Week-Projection delivered by the Borrower in accordance with Section 6.02(f).

"2022 Second Lien Notes" means the Borrower's 10% Senior Secured Second Lien Notes due 2022 in an aggregate outstanding principal amount of $1,000,000,000 issued pursuant to the Second Lien Notes Indenture.

"Acceptable Reorganization Plan" means a Reorganization Plan that (i) provides for the termination of the Commitments and the payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations for which no claims have been asserted) on the Consummation Date of such Reorganization Plan and (ii) provides for customary releases of the Administrative Agent, the Lenders and the L/C Issuer and each of their respective Representatives (in each case, in their respective capacities as such), from any and all claims against the Administrative Agent, the Lenders and the L/C Issuer in connection with this Agreement or the Cases to the fullest extent permitted by the Bankruptcy Code and applicable law.

"Accounting Change" means changes in accounting principles after the Closing Date required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board or, if applicable, the Securities and Exchange Commission.

"Additional Credit" has the meaning specified in Section 4.02(b).

"Administrative Agent" means Citibank, N.A. in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and account as set forth on Schedule 11.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties" has the meaning specified in Section 11.02(c).

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" has the meaning specified in the introductory paragraph to this Agreement.

"Agreement Currency" has the meaning specified in Section 11.18.

2

"Anti-Terrorism Laws" has the meaning specified in Section 5.17(a).

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the tenth decimal place) of the Term Loan Facility represented by (i) until the Closing Date, such Lender's respective Commitments and (ii) thereafter, the aggregate principal amount of such Lender's Loans then outstanding.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means a percentage per annum equal to (i) 9.00% for Eurocurrency Rate Loans and (ii) 8.00% for Base Rate Loans.

"Applicable Subsidiary" has the meaning specified in Section 9.01(f).

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"A/R Facility" means that certain Fifth Amended and Restated Receivables Purchase Agreement, dated as of March 25, 2016, by and among P&L Receivables Company, LLC, as seller, the Borrower, as initial servicer, the sub-servicers party thereto, PNC Bank, National Association, as administrator and LC bank and the other parties thereto, as amended by the First Amendment to the Fifth Amended and Restated Receivables Purchase Agreement, dated as of April [12], 2016 and the Second Amendment to the Fifth Amended and Restated Receivables Purchase Agreement, dated on or about the date of the A/R Interim Order, by and among P&L Receivables Company, LLC, as seller, the Borrower, as servicer, the sub-servicers party thereto, and PNC Bank, National Association, as administrator and as the sole purchaser agent, committed purchaser, LC bank and LC participant, and the other agreements related thereto.

["A/R Interim Order" means an order of the Bankruptcy Court approving A/R Facility (including the First and Second Amendments thereto), entered on an interim basis and substantially in the form approved by Administrative Agent on or prior to the Petition Date, with changes to such form as are reasonably satisfactory to the Administrative Agent.

"A/R Final Order" means an order of the Bankruptcy Court substantially in the form of the A/R Interim Order, with such changes as are reasonably satisfactory to the Administrative Agent, approving the A/R Facility (including the First and Second Amendments thereto) on a final basis.][2]

"Arranger" means Citigroup Global Markets Inc., as sole lead arranger and book runner.

"As-Extracted Collateral" has the meaning specified in the UCC.

"Asset Sale" means any Disposition of any property of the Borrower or any other Loan Party to any Person that is not a Loan Party pursuant to Section 7.05(a) (other than any such

_____

[2] NTD:  definitions to be further developed upon review of related documents by DPW team.

Disposition (or series of related Dispositions) that generates Net Proceeds of less than $500,000 for such Disposition and $10,000,000 in the aggregate for all such Dispositions), Section 7.05(h) or Section 7.05(k).

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.06(b), and accepted by the Administrative Agent) in substantially the form of Exhibit E or any other form approved by the Administrative Agent, in accordance with Section 11.06(b).

"Attributable Indebtedness" means, on any date, in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements–2015" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2015, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"Australian Business Plan" has the meaning specified in Section 6.19(b).

"Auto-Extension Letter of Credit" has the meaning specified in Section 2.03(b)(iii).

"Auto-Reinstatement Letter of Credit" has the meaning specified in Section 2.03(b)(iv).

"Automatic Rejection Date" means, with respect to any particular lease, the final day of the 120-day period (or, if extended by the Bankruptcy Court, 210-day period or such other date as the Bankruptcy Court may order) provided for in Section 365(d)(4) of the Bankruptcy Code for the Debtors to assume leases in the Cases.

"Avoidance Action" means the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 *et seq*.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Missouri or any other court having jurisdiction over the Cases from time to time.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the Eurocurrency Rate for a one month Interest Period beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, and (c) the rate of interest in effect for such day as publicly announced from time to time by Administrative Agent as its "prime rate." The "prime rate" is a rate set by Administrative Agent based upon various factors including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above or below such announced rate. Any change in such rate announced by the Administrative Agent shall take effect at the opening of business on the day specified in the public announcement of such change. In no event, notwithstanding the rate determined pursuant to the foregoing, shall the Base Rate be less than 2.00%.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Bonding Accommodation Cap" means $200,000,000.

"Bonding Accommodation Facility" means the bonding accommodation facility provided (or permitted to exist) hereunder consisting of (i) the Bonding Carve-Out and (ii) the Bonding Facility Letters of Credit.

"Bonding Beneficiary" means any Governmental Authority that is or would be a beneficiary of any Surety Bond, letter of credit or other financial assurance that is the subject of a Bonding Request.

"Bonding Carve-Out" means a carve-out from the Collateral in respect of the Bonding Superpriority Claim Amount with Superpriority Claim status, and not subject to the Fees Carve-Out, entitling the authority making any applicable Bonding Request to receive proceeds of Collateral (other than Bonding L/C Collateral and L/C Facility Collateral) first in priority before distribution to any Lender.

"Bonding Facility L/C Issuer" has the meaning specified in the definition of "L/C Issuer".

"Bonding Facility Letter of Credit" means any irrevocable letter of credit issued pursuant to Section 2.03, which letter of credit shall be (i) a standby letter of credit, (ii) denominated in Dollars and (iii) otherwise in such form as may be reasonably approved from time to time by the Administrative Agent and the applicable L/C Issuer; provided that, a Bonding Facility Letter of Credit shall be issued only in connection with the Bonding Accommodation Facility.

"Bonding Facility Letter of Credit Account" means the account established by the Administrative Agent for the benefit of the Borrower pursuant to Section 2.04(b) under the sole and exclusive control of the Administrative Agent.

"Bonding Facility Letter of Credit Deposit Amount" means, at any time, the total amount on deposit in the Bonding Facility Letter of Credit Account pursuant to the terms of this Agreement. The Bonding Facility Letter of Credit Deposit Amount may be reduced or otherwise adjusted from time in accordance with the terms of this Agreement.

"Bonding Facility Letter of Credit Expiration Date" means the earlier of the day that is five (5) days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the preceding Business Day).

"Bonding L/C Collateral" means cash collateral deposited in the Bonding Facility Letter of Credit Account and any interest thereon.

"Bonding L/C Exposure" shall mean, at any time, the sum of (i) the aggregate undrawn face amount of all Bonding Facility Letters of Credit then outstanding, plus (ii) all amounts theretofore drawn under Bonding Facility Letters of Credit and not yet reimbursed.

"Bonding Request" means any demand, request or requirement of any Governmental Authority for any surety bond, letter of credit or other financial assurance pursuant to any Mining Law, Reclamation Law or Environmental Law, or any related Permit, in each case, to the extent such surety bond, letter of credit or other financial assurance is to satisfy or replace an obligation for which the Borrower or any of its Restricted Subsidiaries (with respect to operations in the United States) is self-bonded as of the Closing Date.

"Bonding Superpriority Claim" means a Superpriority Claim, granted solely in favor of a Bonding Beneficiary to satisfy a Bonding Request.

"Bonding Superpriority Claim Amount" means, at any time, the aggregate amount of all Bonding Superpriority Claims granted on or following the Petition Date and at or prior to such time.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means a borrowing consisting of simultaneous Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Lenders pursuant to Section 2.01.

"Borrowing Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other or (c) a continuation of Eurocurrency Rate Loans, in each case, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"Building" means a "building" or "mobile home" as defined in 12 CFR Chapter III, Section 339.2.

"Business" has the meaning specified in Section 5.09(b).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York, New York.

"Capital Expenditures" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset that are or are required

to be included as capital expenditures on a consolidated statement of cash flows of such Person (excluding normal replacements and maintenance which are properly charged to current operations in accordance with GAAP), but excluding (i) expenditures made in connection with the replacement, substitution or restoration of property in connection with Casualty and Condemnation Awards and (ii) the purchase price of equipment that is purchased substantially contemporaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"Capital Lease Obligations" means of any Person as of the date of determination, the aggregate liability of such Person under Financing Leases reflected on a balance sheet of such Person under GAAP.

"Case" or "Cases" has the meaning specified in the recitals hereof.

"Casualty and Condemnation Award" means casualty insurance settlements and condemnation awards resulting from any loss, damage, destruction or condemnation of any assets of the Borrower or any other Loan Party.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request or directive (whether or not having the force of law) by any Governmental Authority required to be complied with by any Lender. For purposes of this definition, (x) the Dodd-Frank Act and any rules, regulations, orders, requests, guidelines and directives adopted, promulgated or implemented in connection therewith, and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been adopted, issued, promulgated or implemented after the Closing Date, but shall be included as a Change in Law only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy and other requirements similar to those described in Sections 3.04(a) and (b) generally on other similarly situated borrowers of loans under United States credit facilities.

"Change of Control" means an event or series of events by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934), directly or indirectly, of 35% or more of the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis.

"Claiming Guarantor" has the meaning specified in Section 12.09(c).

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 4.01 or Section 11.01 (as applicable).

"CNTA Dispute" has the meaning specified in Section 6.19(c).

"Coal" means all types of solid naturally occurring hydrocarbons (other than oil shale or Gilsonite), including bituminous and sub-bituminous coal, and lignite.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise).

"Collateral" means all of the "Collateral" as defined in any Security Document or in the Interim Order or the Final Order (including all Real Property of any Borrower or other Loan Party) and all of the other property that is or becomes subject to Liens in favor of the Administrative Agent for the Secured Parties under the Loan Documents, the Interim Order or the Final Order; provided that Collateral shall exclude any Excluded Assets.

"Commitment" means, as to each Lender, its obligation to make Loans to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of Commitments as of the Closing Date is $500,000,000.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Consolidated EBITDA" means, as of the last day of any period, Consolidated Net Income for such period plus, without duplication, (i) consolidated interest expense, determined in accordance with GAAP, (ii) to the extent deducted in computing such Consolidated Net Income, the sum of all income, franchise or similar taxes, (iii) depreciation, depletion and amortization of property, plant, equipment and intangibles, (iv) any debt extinguishment costs, (v) any amount of asset retirement obligations expense and (vi) transaction costs, fees and expenses incurred during such period in connection with any acquisition or disposition not prohibited hereunder or any issuance of debt or equity securities by the Borrower or any Loan Party, in each case, for such period.

"Consolidated Liquidity" means, on any date, the aggregate amount of all cash and Permitted Investments held by the Loan Parties (excluding (i) any cash or Permitted Investments that are restricted, (ii) any cash or Permitted Investments constituting Bonding L/C Collateral or L/C Facility Collateral; provided that, solely for purposes of determining compliance with Section 7.11(b) or whether a Liquidity Preservation Trigger has occurred or is continuing, Bonding L/C Collateral, L/C Facility Collateral and cash and other Permitted Investments subject to Liens permitted under Section 7.01(f)(ii), to the extent and in an amount not exceeding $50,000,000 in the aggregate shall be included in the definition of Consolidated Liquidity and (iii) any cash or Permitted Investments held by Global Center).

"Consolidated Net Income" means, for any period, for the Loan Parties on a consolidated basis, the net income attributable to common stockholders of the Borrower and the other Loan Parties for that period, determined in accordance with GAAP, excluding, without duplication, (a) [reserved], (b) extraordinary or non-recurring gains and losses or expenses or charges relating to restructuring or the Cases, (c) income or losses from discontinued operations or disposal of discontinued operations or costs and expenses associated with the closure of any mines (including any reclamation or disposal obligations), (d) any non-cash impairment charges resulting from the application of ASC 320 Investments-Debt and Equity Securities, ASC 323 Investments-Equity Method and Joint Ventures, ASC 350 Intangibles—Goodwill and Other and ASC 360 Property, Plant and Equipment and any future or similar ASC standards relating to impairment, (e) net unrealized gains or losses resulting in such period from non-cash foreign currency remeasurement gains or losses, (f) net unrealized gains or losses resulting in such period from the application ASC 815 Derivatives and Hedging, in each case, for such period, (g) non-cash charges including non-cash charges due to cumulative effects of changes in accounting principles, (h) any net income (or loss) of a Loan Party for such period that is accounted for by the equity method of accounting to the extent included therein and (i) to the extent not excluded pursuant to the preceding clause (f), any fees, expenses, gains and losses relating to hedging arrangements in effect as of April 1, 2016.

"Consummation Date" means the date of the substantial consummating (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date thereof) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Copyright Security Agreement" means the Copyright Security Agreement, substantially in the form attached to the Security Agreement or such other form reasonably acceptable to the Administrative Agent and the Borrower, by certain Loan Parties in favor of the Administrative Agent, for the benefit of the Secured Parties.

"Credit Extension" has the meaning specified in Section 4.02.

"Creditors' Committee" has the meaning specified in the definition of "Fees Carve-Out".

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Debtors</u>" has the meaning specified in the recitals hereof and shall also include any Affiliate of the Borrower that becomes a "debtor" in the Cases after the date of this Agreement.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means an interest rate equal to (a) the Base Rate <u>plus</u> (b) the Applicable Rate, if any, applicable to Base Rate Loans <u>plus</u> (c) 2% per annum; <u>provided</u>, <u>however</u>, that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including the Applicable Rate) otherwise applicable to such Loan <u>plus</u> 2% per annum.

"<u>Defaulting Lender</u>" means any Lender that (a) has failed to fund any portion of the Loans within three (3) Business Days of the date required to be funded by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's reasonable determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding or a Bail-In Action; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. A Lender that has become a Defaulting Lender because of an event referenced in this definition may cure such status and shall no longer constitute a Defaulting Lender as provided in the last paragraph of <u>Section 2.18</u>.

"<u>Designated Jurisdiction</u>" means any country or territory to the extent that such country or territory itself is, or its government is, the subject of any Sanctions (currently, Crimea, Cuba, Iran, North Korea, Sudan, and Syria).

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Dodd-Frank Act</u>" means the Dodd–Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173) signed into law on July 21, 2010, as amended from time to time.

"<u>Dollar</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia; <u>provided</u> that in no event shall any

Excluded Entity or any Subsidiary that is a Subsidiary of a Foreign Subsidiary be considered a "Domestic Subsidiary" for purposes of the Loan Documents.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) a Lender, or any affiliate of, or Approved Fund with respect to, a Lender or (b) any commercial bank, insurance company, investment or mutual fund or other entity that extends credit or buys loans in the ordinary course of its business; provided that Eligible Assignee shall not include (i) any natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person) or (ii) any Loan Party or any Subsidiary or Affiliate of a Loan Party.

"Eligible L/C Issuer" means a Lender, an Affiliate of a Lender or any other financial institution, in each case, that is either domiciled in the United States or a Foreign Lender with a branch office in the United States and, in each case, has a long term unsecured debt investment grade rating, agrees to act as an L/C Issuer hereunder and, if replacing an existing L/C Issuer, agrees to replace the existing L/C Issuer in accordance with the terms of this Agreement.

"Environmental Laws" means any and all applicable current and future federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions or common law causes of action relating to (a) protection of the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface, water, ground water, or land, (b) human health as affected by Hazardous Materials, (c) Reclamation Laws and (d) mining operations and activities to the extent relating to environmental protection or reclamation, including the Surface Mining Control and Reclamation Act, any state analogues thereof and any regulations relating thereto, provided that "Environmental Laws" do not include any laws relating to worker or retiree benefits, including benefits arising out of occupational diseases.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous

Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permits" means any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any applicable Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination (but excluding any debt security that is convertible into, or exchangeable for, Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure to meet the minimum funding standards of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (d) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (e) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (f) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (h) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a)

of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (k) the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Pension Plan; or (l) the occurrence of any Foreign Plan Event.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurocurrency Rate" means, for any Interest Period (a) with respect to a Eurocurrency Rate Loan, the rate per annum equal to (i) LIBOR as published by ICE Benchmark Administration Limited or any successor rates thereto if ICE Benchmark Administration Limited is no longer making such rates available for deposits in Dollars (as published by Reuters (or another commercially available source providing quotations of ICE LIBOR as designated by Administrative Agent from time to time)), for a period equal to such Interest Period at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (ii) if LIBOR is not available for such Interest Period, the Interpolated Screen Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period and (b) with respect to a determination of "Base Rate" (pursuant to clause (b) of its definition), LIBOR for a one month Interest Period as published by ICE Benchmark Administration Limited or any successor rates thereto if ICE Benchmark Administration Limited is no longer making such rates available for deposits in Dollars (as reflected on the applicable Reuters screen page) at approximately 11:00 a.m., London time on each Business Day on which the Base Rate is being determined.  In no event, with respect to the Loans issued on the Closing Date, notwithstanding the rate determined pursuant to the foregoing, shall the Eurocurrency Rate be less than 1.00%.

"Eurocurrency Rate Loan" means a Loan that bears interest at a rate based on the Eurocurrency Rate.  Eurocurrency Rate Loans may be denominated in Dollars.

"Event of Default" has the meaning specified in Section 9.01.

"Executive Order" has the meaning specified in Section 5.17(a).

"Excess Proceeds" has the meaning specified in Section 2.05(d).

"Excluded Assets" means

(a)      any assets to the extent that and for so long as the grant of a security interest therein would be prohibited by, cause a default under, result in a breach of or otherwise violate applicable law or any organizational documents or any contractual or lease provisions or give another party any rights of termination or acceleration or any rights to obtain a Lien to secure obligations owing to such party (excluding, in all cases, any such restrictions contained in any Existing Debt Documents or in the Intercompany Credit Agreement on Global Center's ability to grant security over its rights thereunder in favor of the Lenders (or in either case any security agreement or other agreement related thereto)); provided that this clause (i) will not apply to restrictions overridden or rendered unenforceable by the Bankruptcy Code or the UCC anti-

assignment provisions or by other applicable law or as a result of the Cases or, to the extent this clause (a) was applicable because the grant of a security interest would violate applicable law, if there is a change of law that would result in a grant of a security interest no longer violating applicable law; provided, further, that upon the removal of all restrictions specified in this clause (a) or upon such change in law, as may be applicable, the exclusion set forth in this clause (a) shall no longer apply;

(b)      any assets owned directly or indirectly by (i) a Subsidiary that is a CFC, (ii) a FSHCO, including, in each case the Equity Interests in any Subsidiary of such Subsidiary or such FSHCO and (iii) any Subsidiary that is not a Loan Party;

(c)      the Equity Interests of Peabody Holdings (Gibraltar) Limited and any Equity Interests in excess of 65% of the Voting Stock of (i) any Foreign Subsidiary that is a CFC or (ii) any FSHCO;

(d)      any right, title or interest in (i) Receivables Assets sold, pledged or financed pursuant to the A/R Facility, and all of a Subsidiary's and any Loan Party's rights, interests and claims under the A/R Facility, in each case to the extent not subsequently re-conveyed to a Loan Party in accordance with the terms of the A/R Facility or following the termination thereof or (ii) the Global Center Funding Account and up to $250,000,000 (plus the amount of any interest or other income accruing thereon) of funds on deposit therein (it being understood that any amount in excess of, or in addition to, the initial $250,000,000 funded to the Global Center Funding Account shall not constitute an Excluded Asset notwithstanding that the Global Center Funding Account is an Excluded Asset);

(e)      any "intent-to-use" application for registration of a Trademark (as defined in the Security Agreement) filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto; and

(f)      Equity Interests in any captive insurance Subsidiary;

provided that the Collateral shall include the replacements, substitutions, products and proceeds of any of the foregoing unless such replacements, substitutions, products or proceeds also constitute Excluded Assets.

"Excluded Entities" means P&L Receivables Company, LLC, Sterling Centennial Missouri Insurance Corp. and Newhall Funding Company, but in each case so long as such Persons do not engage in any material business other than the business conducted by such Persons on the Petition Date.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to a Recipient or required to be deducted or withheld from payment to a Recipient, (a) branch profits taxes or taxes imposed on or measured by its net income (however denominated), and franchise taxes imposed on it, in each case imposed (i) as a result of the Recipient being organized under the laws of, or having its principal office in or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii)

that are Other Connection Taxes, (b) other than in the case of an assignee pursuant to a request by the Borrower under <u>Section 11.13</u>, any United States tax that is imposed on amounts payable to a Lender under the law applicable at the time such Lender acquires an interest in a Loan or Commitment (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of the designation of a new Lending Office (or assignment) to receive additional amounts from the applicable Loan Party with respect to such tax pursuant to <u>Section 3.01(a)</u>, <u>(c)</u> Taxes attributable to such Lender's failure to comply with <u>Section 3.01(e)</u> and <u>(d)</u> any U.S. federal withholding taxes imposed under FATCA.

"<u>Existing Credit Agreement</u>" means the Amended and Restated Credit Agreement dated as of September 24, 2013 and amended as of February 5, 2015 (as further amended from time to time) among the Borrower, the lenders party thereto (the "<u>Existing Credit Agreement Lenders</u>") and Citibank, N.A., as administrative agent (in such capacity, the "<u>Existing Credit Agreement Agent</u>"), swing line lender and L/C issuer.

"<u>Existing Credit Agreement Agent</u>" has the meaning specified in the definition of "Existing Credit Agreement".

"<u>Existing Credit Agreement Lenders</u>" has the meaning specified in the definition of "Existing Credit Agreement".

"<u>Existing Credit Agreement Required Lenders</u>" means the "Required Lenders" as defined in the Existing Credit Agreement.

"<u>Existing Debt Documents</u>" means the "Loan Documents" as defined in the Existing Credit Agreement, as in effect on the Petition Date, the "Second Lien Documents" as defined in the Existing Second Lien Notes Indenture, as in effect on the Petition Date and the Existing Unsecured Notes Indenture, as in effect on the Petition Date.

"<u>Existing Second Lien Notes</u>" means the 2022 Second Lien Notes outstanding on the Petition Date.

"<u>Existing Second Lien Notes Indenture</u>" means the Indenture, dated as of March 16, 2015, among the Borrower, the subsidiary guarantors party thereto and U.S. Bank National Association (or any successor thereto), as trustee and collateral agent (in such capacities, the "<u>Existing Second Lien Notes Trustee</u>").

"<u>Existing Second Lien Notes Trustee</u>" has the meaning specified in the definition of "Existing Second Lien Notes Indenture".

"<u>Existing Secured Debt</u>" means (i) all obligations owing with respect to the Existing Credit Agreement and (ii) the Existing Second Lien Notes.

"<u>Existing Unsecured Notes Indenture</u>" means (i) the Indenture, dated as of March 19, 2004 (as supplemented by the eleventh supplemental indenture, dated as of October 12, 2006, and the thirty-third supplemental indenture, dated as of August 25, 2010), among the Borrower, the subsidiary guarantors party thereto and U.S. Bank National Association (or any successor thereto), as trustee, (ii) the Indenture, dated as of November 15, 2011, among the Borrower, the

subsidiary guarantors party thereto and U.S. Bank National Association (or any successor thereto), as trustee and (iii) the Indenture, dated as of December 20, 2006 (as supplemented by the first supplemental indenture, dated as of December 20, 2006), among the Borrower and U.S. Bank National Association (or any successor thereto), as trustee.

"Extension DIP Budget" means the monthly projections for the Borrower and the other Debtors for the six (6) months following the Stated Maturity Date (prior to giving effect to any Facility Extension Option), dated as of a date not more than fifteen (15) days prior to the Stated Maturity Date (prior to giving effect to any Facility Extension Option) and in substantially the same form as the Initial DIP Budget.

"Facility" means the Term Loan Facility, the L/C Facility and the Bonding Accommodation Facility, individually or collectively as the context may require.

"Facility Extension Option" has the meaning specified in Section 2.13.

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller, determined in good faith by (i) a Financial Officer of the Borrower for transactions in which the aggregate consideration is less than $15,000,000 and (ii) the Board of Directors of the Borrower for transactions in which the aggregate consideration is at, or in excess of, $15,000,000.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any intergovernmental agreements (or related legislation or official administrative rules or practices) implementing the foregoing.

"FCPA" has the meaning specified in Section 5.17(c).

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Fee Letter" means that certain Arrangement, Structuring and Agency Fee Letter dated as of April 11, 2016 by and among the Borrower and Citigroup Global Markets Inc., as amended from time to time.

"Fees Carve-Out" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section

#88215025v32

16

1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or the official committee of unsecured creditors in the Cases (the "Creditors' Committee"), if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), which shall be paid to the extent allowed by the Bankruptcy Court, that are incurred (A) at any time before delivery by the Administrative Agent of a Fees Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court (by interim order or final order) or payable by the Debtors prior to or after delivery of a Fees Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"), subject to any limits imposed by the Interim Order or Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any prepetition secured parties; plus (B) after the occurrence (the "Fees Carve-Out Trigger Date") and during the continuance of an Event of Default and delivery of notice  thereof (the "Fees Carve-Out Trigger Notice") (which notice may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, Professional Fees in an aggregate amount not to exceed the amount set forth in the Interim Order or the Final Order, as applicable (the amount set forth in this clause (iii)(B) being the "Post-EoD Fees Carve-Out Amount"); provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (iii)(A) or (iii)(B) above, on any grounds. So long as the Carve-Out Trigger Notice shall not have been delivered, the Fees Carve-Out shall not be reduced by the payment of Professional Fees allowed at any time by the Bankruptcy Court (by interim order or final order).

Notwithstanding the foregoing, the Fees Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the Lenders, the Administrative Agent, the Existing Credit Agreement Agent, the Existing Credit Agreement Lenders, the Existing Second Lien Notes Trustee or the holders of Existing Second Lien Notes (whether in such capacity or otherwise), or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the Loan Documents, the Existing Credit Agreement or the Existing Second Lien Notes Indenture, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Lenders or the Administrative Agent; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' or the Administrative Agent's assertion, enforcement or realization upon any Collateral in accordance with the Loan Documents and the Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing; or (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Orders, the Fees Carve-Out shall be senior to all claims under the Loan Documents and to all

liens securing the Obligations (except with respect to claims of the Bonding Facility L/C Issuer to amounts held in the Bonding Facility Letter of Credit Account and with respect to the L/C Facility L/C Issuer to amounts held in the L/C Facility Letter of Credit Account), adequate protection liens, if any, to the extent of any diminution in the value of the collateral of the holders of Permitted Liens, and the superpriority claims, and any and all other liens or claims securing the Facilities.

"Fees Carve-Out Trigger Date" has the meaning specified in the definition of "Fees Carve-Out".

"Fees Carve-Out Trigger Notice" has the meaning specified in the definition of "Fees Carve-Out".

"Final Order" has the meaning specified in Section 4.02(b).

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Officer" of any Person means the Chief Financial Officer, Senior Vice President – Finance, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such Person.

"Financing Lease" means any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee; provided that, any operating lease that is required to be treated as a capital lease in accordance with GAAP as a result of any Accounting Change shall not be deemed a Financing Lease for purposes of this Agreement.

"Foreign Lender" means any Lender that is not a "United States person" as defined in section 7701(a)(30) of the Code.

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States and paid through a non-United States payroll.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable law, within the time permitted by Law for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, in each case, which could reasonably be expected to have a Material Adverse Effect, or (e) the occurrence of any transaction with respect to a Foreign Plan that is prohibited under any applicable law and that

could reasonably be expected to result in the incurrence of any liability by any Loan Party, or the imposition on any Loan Party of any fine, excise tax or penalty with respect to a Foreign Plan resulting from any noncompliance with any applicable law, in each case which could reasonably be expected to have a Material Adverse Effect.

"Foreign Subsidiary" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any State thereof or the District of Columbia and any Subsidiary thereof.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Fee" has the meaning specified in Section 2.03(j).

"FSHCO" means any Domestic Subsidiary that owns (directly or through its Subsidiaries) no material assets other than the Equity Interests of one or more Foreign Subsidiaries that are CFCs.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles, which are applicable to the circumstances as of the date of determination.  The sources of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in conformity with GAAP in the United States, are set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

"Global Center" means Global Center for Energy and Human Development, LLC, a Delaware limited liability company.

"Global Center Controlled Account" means that certain deposit account or accounts of Global Center held at Commerce Bank and identified to the Administrative Agent as such, together with such other deposit accounts of Global Center identified to the Administrative Agent as such after the Closing Date as being a "Global Center Controlled Account".

"Global Center Funding Account" means that certain deposit account or accounts of Global Center held at TD Bank, N.A. and identified to the Administrative Agent as such, together with such other deposit accounts of Global Center identified to the Administrative Agent as such after the Closing Date as being a "Global Center Funding Account".

"Governmental Authority" means the government of the United States or any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

#88215025v32

"Guarantee" means, as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) to the extent the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation in order to induce the creation of such obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, reimbursement obligations under letters of credit and any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee obligation shall not include (i) indemnification or reimbursement obligations under or in respect of Surety Bonds, (ii) ordinary course performance guarantees by any Loan Party of the obligations (other than for the payment of borrowed money) of any other Loan Party and (iii) endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, on the Closing Date, those Domestic Subsidiaries of the Borrower listed on Schedule 1.01, and thereafter after shall also include any Domestic Subsidiary of the Borrower that shall become a Guarantor hereunder pursuant to Section 6.12 (and for the avoidance of doubt, shall not include (i) any Subsidiary released from its obligations as a Guarantor pursuant to Section 11.21 or (ii) Peabody IC Funding Corp., Peabody IC Holdings, LLC, Peabody Holdings (Gibraltar) Limited and Peabody Investments (Gibraltar) Limited).

"Hazardous Materials" means (i) any explosive or radioactive substances or wastes and (ii) any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under, or that could reasonably be expected to give rise to liability under, any applicable Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any coal ash, coal combustion by-products or waste, boiler slag, scrubber residue or flue desulphurization residue.

"Honor Date" has the meaning specified in Section 2.03(c)(i).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      all obligations of such Person arising under bankers' acceptances issued for the account of such Person;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade payables and accrued expenses, but not any refinancings, extensions, renewals or replacements thereof, incurred in the ordinary course of business and maturing within 365 days after the incurrence thereof, (ii) obligations under federal coal leases and (iii) obligations under coal leases which may be terminated at the discretion of the lessee and (iv) obligations for take-or-pay arrangements);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      Capital Lease Obligations (other than obligations in connection with the IRBs);

(g)      the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of standby letters of credit, but not trade letters of credit, but only to the extent such standby letters of credit have been drawn upon and not reimbursed thereafter within thirty (30) days; and

(h)      all Guarantees of such Person in respect of any of the foregoing Indebtedness of any other Person (but excluding any performance and completion Guarantees of such Person).

The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of any Capital Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.  The amount of any indebtedness of a Joint Venture secured by a Lien on property owned or being purchased by the Borrower or its Restricted Subsidiaries as of any date shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the indebtedness that is secured by such Lien and (b) the maximum amount for which the Borrower or its Restricted Subsidiaries may be liable (which may be determined with reference to the fair market value of the property securing such indebtedness as reasonably determined by the Borrower in good faith) pursuant to the terms of such indebtedness.  Except as set forth in the sentence immediately above, the amount of indebtedness of any Joint Venture, which is attributable to the Borrower or any Restricted Subsidiary, shall be deemed to equal the amount of indebtedness that would be attributable to the Borrower or any Restricted Subsidiary in accordance with GAAP.

"Indemnified Taxes" means (a) Taxes, other than (i) Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Loan Document and (b) to the extent not otherwise described in (a), (ii) Other Taxes.

"Indemnitees" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

"Initial DIP Budget" means the monthly projections for the Borrower and the other Debtors for the twelve (12) months following the Closing Date, dated as of a date not more than five (5) Business Days prior to the Closing Date and in form customary for "DIP budgets".

"Initial Lenders" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders; provided that any such bank, financial institution or other institutional lender shall cease to be an Initial Lender on any date on which it ceases to have a Commitment or an outstanding Loan.

"Intercompany Credit Agreement" means the Credit Agreement, dated as of April [●], 2016 among Global Center, as lender, Peabody Energy Australia Coal Pty Ltd ACN 001 401 663 and the other borrowers and guarantors party thereto, as in effect on the Petition Date or as amended to the extent permitted hereunder.

"Interest Payment Date" means (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided, however, that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Period" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, or, if available to all Lenders making such Eurocurrency Rate Loan, twelve months thereafter, as selected by the Borrower in its Borrowing Notice, or, as otherwise contemplated by the first proviso of Section 2.02(a); provided that:

(i)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)    any Interest Period, with a period longer than one month and that is not a period otherwise agreed by the Lenders pursuant to the first proviso of Section 2.02(a), that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)    with respect to each Facility, no Interest Period shall extend beyond its applicable Maturity Date.

"Interim Order" means an order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) approving the Loan Documents on an interim basis and in the form set forth as Exhibit F, with changes to such form as are satisfactory to the Administrative Agent, in its sole discretion.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Interpolated Screen Rate" means, in relation to the Eurocurrency Rate, the rate which results from interpolating on a linear basis between (a) the applicable LIBOR for the longest period (for which that LIBOR is available) which has a shorter period than the relevant Interest Period and (b) the applicable LIBOR for the shortest period (for which LIBOR is available) which has a longer period than the relevant Interest Period, each at approximately 11:00 a.m., London Time, two (2) Business Days prior to the commencement of such Interest Period.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or other securities of another Person, (b) a loan, advance (excluding intercompany liabilities incurred in the ordinary course of business in connection with the cash management operations of the Borrower and any Loan Party) or capital contribution to, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be (i) the amount actually invested, as determined immediately prior to the time of each such Investment, without adjustment for subsequent increases or decreases in the value of such Investment minus (ii) the amount of dividends or distributions received in connection with such Investment and any return of capital and any payment of principal received in respect of such Investment that in each case is received in the form of Permitted Investments.

"IP Rights" has the meaning specified in Section 5.18.

"IP Security Agreements" means the Copyright Security Agreement, the Trademark Security Agreement and the Patent Security Agreement.

"IRBs" means the City of St. Louis, Missouri Taxable Industrial Development Revenue Bonds (Peabody Energy Corporation Project), Series 2010, in an aggregate principal amount not to exceed $60,000,000, as evidenced by that certain Trust Indenture, dated as of March 1, 2011, between the City of St. Louis, Missouri and U.S. Bank, National Association, St. Louis, Missouri.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (as the same may be amended from time to time).

"Issuer Documents" means with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable L/C Issuer and the Borrower (or any Subsidiary) or in favor such L/C Issuer and relating to any such Letter of Credit.

"Joinder Agreement" has the meaning specified in Section 6.12.

"Joint Venture" means any Person (a) other than a Subsidiary in which the Borrower or its Subsidiaries hold an ownership interest or (b) which is an unincorporated joint venture of the Borrower or any Subsidiary.

"Judgment Currency" has the meaning specified in Section 11.18.

"Laws" means, as to any Person, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, and determinations of arbitrators or courts or other Governmental Authorities, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Disbursements" means disbursements made by the applicable L/C Issuer on account of any drawing under any L/C Facility Letter of Credit or any Bonding Facility Letter of Credit or any combination thereof, as the context may require.

"L/C Facility" means the cash collateralized letter of credit facility provided (or permitted to exist) hereunder consisting of the L/C Facility Letters of Credit.

"L/C Facility Cap" means $100,000,000.

"L/C Facility Collateral" means cash collateral deposited in the L/C Facility Letter of Credit Account and any interest thereon.

"L/C Facility L/C Exposure" means, at any time, the sum of (i) the aggregate undrawn face amount of all L/C Facility Letters of Credit then outstanding, plus (ii) all amounts theretofore drawn under L/C Facility Letters of Credit and not yet reimbursed.

"L/C Facility L/C Issuer" has the meaning specified in the definition of "L/C Issuer".

"L/C Facility Letter of Credit" means any irrevocable letter of credit issued pursuant to Section 2.03(a)(i)(A), which letter of credit shall be (i) a standby letter of credit, (ii) denominated in Dollars and (iii) otherwise in such form as may be reasonably approved from time to time by the Administrative Agent.

"<u>L/C Facility Letter of Credit Account</u>" means the account established by the Administrative Agent for the benefit of the Borrower pursuant to Section 2.04(a) under the sole and exclusive control of the Administrative Agent.

"<u>L/C Facility Letter of Credit Deposit Amount</u>" means, at any time, the total amount on deposit in the L/C Facility Letter of Credit Account pursuant to the terms of this Agreement. The L/C Facility Letter of Credit Deposit Amount may be reduced or otherwise adjusted from time in accordance with the terms of this Agreement.

"<u>L/C Facility Letter of Credit Expiration Date</u>" means the earlier of the day that is five days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the preceding Business Day).

"<u>L/C Issuer</u>" means, as the context may require:  (a) in the case of the Bonding Facility Letters of Credit, Citibank, N.A. (in such capacity, the "<u>Bonding Facility L/C Issuer</u>"), (b) in the case of the L/C Facility Letters of Credit, Citibank, N.A. (in such capacity, the "<u>L/C Facility L/C Issuer</u>") or (c) collectively, all of the foregoing.  An L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"<u>L/C Obligations</u>" means, as at any date of determination and for any Type of Letter of Credit, the aggregate amount available to be drawn under all outstanding Letters of Credit of such Type.  For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.08</u>. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"<u>Lender</u>" has the meaning specified in the introductory paragraph hereto, and shall include, collectively, (a) at any time on or prior to the Closing Date, any Lender that has a Commitment at such time and (b) at any time after the Closing Date, any Lender that holds Loans at such time.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Letter of Credit</u>" means any L/C Facility Letter of Credit or any Bonding Facility Letter of Credit.

"<u>Letter of Credit Application</u>" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"<u>Letter of Credit Expiration Date</u>" means the L/C Facility Letter of Credit Expiration Date or the Bonding Facility Letter of Credit Expiration Date, as the context may require.

"LIBOR" has the meaning specified in the definition of "Eurocurrency Rate".

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Financing Lease having substantially the same economic effect as any of the foregoing).

"Liquidity Preservation Period" any period during which a Liquidity Preservation Trigger has occurred and is continuing.

"Liquidity Preservation Trigger" means at any time, the occurrence of either (i) the most recently delivered certificate or notice delivered in accordance with Section 6.02(h) demonstrating that Consolidated Liquidity as of the end of the relevant Business Day is less than the Minimum Liquidity Reporting Trigger or (ii) the most recently delivered 13-Week Projection delivered in accordance with Section 6.02(f) demonstrating that Consolidated Liquidity is projected to be less than the Minimum Liquidity Reporting Trigger on any day during the period covered by such 13-Week Projection.

"Liquidity Test Start Date" has the meaning specified in Section 7.11(b).

"Loan" means an extension of credit by a Lender to the Borrower under Section 2.01.

"Loan Documents" means this Agreement, each Note, each Joinder Agreement, each Issuer Document, the Fee Letter and each Security Document.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means a material adverse effect upon (a) the business, operations, properties, assets or financial condition of the Borrower and the Domestic Subsidiaries taken as a whole (in each case other than as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Cases, including, without limitation, the receipt of a going concern qualification or loss of self-bonding), (b) the ability of the Loan Parties to perform their respective material obligations under the Loan Documents or (c) the validity or enforceability of this or any of the other Loan Documents or the rights or remedies of the Agents or the Lenders hereunder or thereunder.

"Material Lease" means any Real Property Lease or other Contractual Obligation in respect of Material Leased Real Property.

"Material Leased Real Property" means any Real Property subject to a Real Property Lease with a Loan Party, as lessee, with annual minimum royalties, rents or any similar payment obligations by the lessee, in excess of $1,000,000 in the most recently ended fiscal year.

"Material Owned Real Property" means any Real Property owned or acquired in fee by any Loan Party having a book value in excess of $5,000,000.

"Material Real Property" means the Material Leased Real Property or the Material Owned Real Property, as the context may require.

"Maturity Date" means the earliest of (a) April [__], 2017[3], as may be extended pursuant to Section 2.14 (the "Stated Maturity Date"), (b) the date of termination in whole of all of the Commitments pursuant to Section 2.06 or 9.02, (c) forty-five (45) days after the Interim Order Entry Date if the Final Order has not been entered prior to the expiration of such 45-day period (provided that the time period set forth in this clause (c) may be extended with the consent of the Required Lenders (but in no event to a date later than sixty (60) days following the Interim Order Entry Date)), (d) the sale of all or substantially all of the assets of the Borrower (or the Borrower and the Loan Parties) pursuant to Section 363 of the Bankruptcy Code, and (e) the Consummation Date.

"Maximum Rate" has the meaning specified in Section 11.09.

"Mine" means any excavation or opening into the earth in the United States now and hereafter made from which coal or other minerals are or can be extracted on the Real Property.

"Minimum Liquidity Amount" means $300,000,000 minus the Resource Management Deduction (provided, that for the avoidance of doubt, in no circumstance shall the Minimum Liquidity Amount be less than $250,000,000).

"Minimum Liquidity Reporting Trigger" means $400,000,000 minus the Resource Management Deduction (provided, that for the avoidance of doubt, in no circumstance shall the Minimum Liquidity Reporting Trigger be less than $350,000,000).

"Mining Laws" means any and all applicable federal, state, local and foreign statutes, laws, regulations, guidance, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions or common law causes of action relating to mining operations and activities, or oil, natural gas, minerals, and other hydrocarbons and their constituents production operations and activities.  Mining Laws shall include but not be limited to, the Mineral Lands Leasing Act of 1920, the Federal Coal Leasing Amendments Act, the Surface Mining Control and Reclamation Act, all other land reclamation and use statutes and regulations relating to Coal mining, the Federal Coal Mine Health and Safety Act, the Black Lung Act and the Coal Act, the Mine Safety and Health Act and the Occupational Safety and Health Act, each as amended, and their state and local counterparts or equivalents.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means any mortgages, deeds of trust or similar document (including any fixture filings whether recorded as part of such mortgages or deeds of trust or as separate instruments to the extent necessary in any particular state).

---

[3] NTD:  the date that is 12 months after the Closing Date.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Proceeds</u>" means (a) with respect to any Asset Sale, 100% of the cash and other Permitted Investments actually received by the Borrower or any other Loan Party in connection with such Asset Sale (including any cash received by way of deferred payment (excluding, for avoidance of doubt, royalty payments customary in the mining industry) pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), net of (i) the principal amount, premium or penalty, if any, interest and other amounts of any Indebtedness that is secured by such asset and that is required to be repaid in connection with such Asset Sale (other than Indebtedness under the Loan Documents), (ii) the reasonable or customary out-of-pocket fees and expenses incurred by the Borrower or the other Loan Parties in connection with such Asset Sale (including attorneys' fees, accountants' fees, investment banking fees, real property related fees and charges and brokerage and consultant fees), (iii) all Taxes required to be paid or accrued or reasonably estimated to be required to be paid or accrued as a result thereof and (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (A) related to any of the applicable assets and (B) retained by the Borrower or any other Loan Party including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations; <u>provided</u>, <u>however</u>, that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Asset Sale occurring on the date of such reduction);

(b) with respect to any Casualty and Condemnation Award, 100% of the cash and other Permitted Investments actually received by the Borrower or any other Loan Party in connection with such Casualty and Condemnation Award to the extent not used to repair or replace assets the subject of the Casualty and Condemnation Award within twelve (12) months of the date of receipt of such funds, net of (i) the reasonable or customary out-of-pocket fees and expenses incurred by the Borrower or the other Loan Parties in connection with such Casualty and Condemnation Award (including attorneys' fees, accountants' fees, real property related fees and charges and brokerage and consultant fees) and (ii) all Taxes required to be paid or accrued or reasonably estimated to be required to be paid or accrued as a result thereof; and

(c) with respect to any incurrence, issuance or sale by the Borrower or any other Loan Party of any Indebtedness, 100% of the cash and other Permitted Investments actually received by the Borrower or any other Loan Party in connection with such incurrence, issuance or sale, net of the reasonable or customary out-of-pocket fees and expenses incurred by the Borrower or the other Loan Parties in connection with such incurrence, issuance or sale (including attorneys' fees, accountants' fees and investment banking fees).

"<u>Non-Consenting Lender</u>" has the meaning specified in <u>Section 11.13</u>.

"<u>Non-Extension Notice Date</u>" has the meaning specified in <u>Section 2.03(b)(iii)</u>.

"Non-Reinstatement Deadline" has the meaning specified in Section 2.03(b)(iv).

"Note" means a promissory note made by the Borrower in favor of a Lender and its registered assigns evidencing Loans made by such Lender, substantially in the form of Exhibit C.

"Obligations" means all advances to, and debts, liabilities and obligations of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit and owing to any Lender, L/C Issuer or the Administrative Agent (or any other Person referred to in Article X or any Indemnitee), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising (and including, for the avoidance of doubt, interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding).

"OFAC" has the meaning specified in Section 5.17(b)(iv).

"Orders" means, collectively, the Interim Order and the Final Order.

"Organizational Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-US jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means with respect to any Recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered or performed its obligations or received a payment under, or enforced, received or perfected a security interest under, or engaged in any other transaction pursuant to this Agreement, any Note or any other Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court, intangible, recording, filing, or documentary taxes or any other similar excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 11.13).

"Outstanding Amount" means (a) with respect to Loans on any date, the aggregate outstanding principal thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date and (b) with respect to any L/C Obligations on

any date, the amount of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Rate in the case of any amount denominated in Dollars and (b) an overnight rate determined by the Administrative Agent or the L/C Issuer, as the case may be, in accordance with banking industry rules on interbank compensation.

"Patent Security Agreement" means the Patent Security Agreement, substantially in the form attached to the Security Agreement or such other form reasonably acceptable to the Administrative Agent and the Borrower, by certain Loan Parties in favor of the Administrative Agent, for the benefit of the Secured Parties.

"Participant" has the meaning specified in Section 11.06(d).

"Participant Register" has the meaning specified in Section 11.06(d).

"PATRIOT Act" has the meaning specified in Section 5.17(a).

"Payment in Full" means the time at which no Lender or L/C Issuer shall have (a) any Commitments, any Loan or other Obligations unpaid, unsatisfied or outstanding (other than in respect of contingent obligations, indemnities and expenses related thereto that are not then payable or in existence) and (b) Letters of Credit outstanding that (i) have not been cash collateralized in accordance with the terms of this Agreement or (ii) have not had other arrangements made with respect to them that are reasonably satisfactory to the applicable L/C Issuer.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any successor thereto.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permit" shall mean any and all permits, approvals, registrations, notifications, exemptions and any other regulatory authorization, in each case, from a Governmental Authority having jurisdiction.

"Permitted Asset Swap" means the substantially concurrent purchase and sale, trade-in or exchange of equipment, Real Property or any other property of a nature or type that is used or useful in a Similar Business or a combination of such equipment, real property or any other property and cash or other Permitted Investments between the Borrower or any of its Restricted Subsidiaries and another Person; provided that (i) the Fair Market Value of the equipment, real property or any other property received is at least as great as the Fair Market Value of the

equipment, real property or other property being traded-in or exchanged as determined by the Borrower reasonably and in good faith and (ii) any equipment, Real Property or other property received in exchange for Collateral shall constitute Collateral under the Security Documents and the Orders and shall become subject to the Lien of such Security Document and the Orders upon receipt thereof; provided that any shortfall may be treated as an Investment and shall constitute an Investment for purposes of calculating compliance with Section 7.02.

"Permitted Bonding Purposes" shall mean use of proceeds of the Bonding Accommodation Facility for compliance by any Loan Party (in respect of its operations in the United States) with any Mining Law, Reclamation Law or Environmental Law or any related Permit or any order, rule, determination or decision by a Governmental Authority related to the foregoing.

"Permitted Investments" means:

(a)     Dollars or any other currencies held from time to time in the ordinary course of business;

(b)     securities issued by the United States government or any agency or instrumentality of the United States government having maturities of not more than two (2) years from the date of acquisition;

(c)     certificates of deposit, time deposits, money market deposits and eurodollar time deposits with maturities of two (2) years or less from the date of acquisition, bankers' acceptances with maturities of two (2) years or less and overnight bank deposits, in each case with any domestic commercial bank having capital and surplus in excess of $500,000,000;

(d)     repurchase obligations for underlying securities of the types described in clauses (b), (c) and (f) entered into with any financial institution meeting the qualifications specified in clause (c) above;

(e)     commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and, in each case, maturing within two (2) years after the date of acquisition;

(f)     securities issued or fully guaranteed by any state or commonwealth of the United States, or by any political subdivision or taxing authority thereof, and rated at least Baa3 by Moody's or BBB- by S&P and, in each case, maturing within two (2) years after the date of acquisition;

(g)     mutual funds whose investment guidelines restrict 90% of such funds' investments to those satisfying the provisions of clauses (a) through (f) above;

(h)     money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $500,000,000;

(i)     time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of ½ of 1% of the total assets of the Borrower and its

Subsidiaries, on a consolidated basis, as of the end of the Borrower's most recently completed fiscal year; and

(j)    Indebtedness or preferred stock issued by Persons rated at least A-2 by Moody's or A by S&P.

"Permitted Real Estate Encumbrances" means the following encumbrances which do not, in any case, individually or in the aggregate, materially detract from the value of any Mine subject thereto or interfere with the ordinary conduct of the business or operations of any Loan Party as presently conducted on, at or with respect to such Mine and as to be conducted following the Closing Date:  (a) encumbrances customarily found upon real property used for mining purposes in the applicable jurisdiction in which the applicable Real Property is located to the extent such encumbrances would be permitted or granted by a prudent operator of mining property similar in use and configuration to such Real Property (e.g., surface rights agreements, wheelage agreements and reconveyance agreements); (b) rights and easements of (i) owners of undivided interests in any of the Real Property where the applicable Loan Party or Subsidiary owns less than 100% of the fee interest, (ii) owners of interests in the surface of any Real Property where the applicable Loan Party or Subsidiary does not own or lease such surface interest, (iii) lessees, if any, of coal or other minerals (including oil, gas and coal bed methane) where the applicable Loan Party or Subsidiary does not own such coal or other minerals, and (iv) lessees of other coal seams and other minerals (including oil, gas and coal bed methane) not owned or leased by such Loan Party or Subsidiary; (c) with respect to any Real Property in which the Borrower or any Restricted Subsidiary holds a leasehold interest, terms, agreements, provisions, conditions, and limitations (other than royalty and other payment obligations which are otherwise permitted hereunder) contained in the leases granting such leasehold interest and the rights of lessors thereunder (and their heirs, executors, administrators, successors, and assigns), subject to any amendments or modifications set forth in any landlord consent delivered in connection with a Mortgage; (d) farm, grazing, hunting, recreational and residential leases with respect to which the Borrower or any Restricted Subsidiary is the lessor encumbering portions of the Real Properties to the extent such leases would be granted or permitted by, and contain terms and provisions that would be acceptable to, a prudent operator of mining properties similar in use and configuration to such Real Properties; (e) royalty and other payment obligations to sellers or transferors of fee coal or lease properties to the extent such obligations constitute a lien not yet delinquent; (f) rights of others to subjacent or lateral support and absence of subsidence rights or to the maintenance of barrier pillars or restrictions on mining within certain areas as provided by any mining lease, unless in each case waived by such other person; and (g) rights of repurchase or reversion when mining and reclamation are completed.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereof.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, by any ERISA Affiliate.

"Platform" has the meaning specified in Section 6.02.

"Pledge Agreement – Gib" means a share charge in form and substance consistent with the "Pledge Agreement – Gib" (as defined in the Existing Credit Agreement, as in effect on the Petition Date), with respect to the pledge of 65% of the Equity Interests of Peabody Investments (Gibraltar) Limited.

"Post-EOD Fees Carve-Out Amount" has the meaning specified in the definition of "Fees Carve-Out".

"Prairie State Project" means that certain approximately 1,500 megawatt capacity coal-fired electricity generation plant on a reclaimed Mine site in Washington County, Illinois.

"Pre-Petition Debt" shall mean, collectively, the Indebtedness of each Debtor outstanding and unpaid on the date on which such Person becomes a Debtor.

"Pre-Petition Letter of Credit" means any letter of credit outstanding under the Existing Credit Agreement as of the Petition Date.

"Pre-Petition Payment" shall mean a payment or other transfer (by way of adequate protection, the granting of a Lien or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims) or other pre-petition claims against any Debtor.

"Pre-Trigger Date Fees" has the meaning specified in the definition of "Fees Carve-Out".

"Primed Liens" has the meaning specified in Section 2.19(a).

"Principal Properties" has the meaning specified in the Existing Credit Agreement (as of the date hereof).

"Production Payments" means with respect to any Person, all production payment obligations and other similar obligations with respect to coal and other natural resources of such Person that are recorded as a liability or deferred revenue on the financial statements of such Person in accordance with GAAP.

"Professional Fees" has the meaning specified in the definition of "Fees Carve-Out".

"Professional Persons" has the meaning specified in the definition of "Fees Carve-Out".

"Properties" has the meaning specified in Section 5.09(a).

"Public Lender" has the meaning specified in Section 6.02.

"Real Property" means, collectively, all right, title and interest of the Borrower or any Restricted Subsidiary (including, without limitation, any leasehold, mineral estate, or Coal, oil, natural gas or other hydrocarbon and their constituents leasehold) in and to any and all parcels of

real property owned or operated by the Borrower or any Restricted Subsidiary, whether by lease, license or other use agreement, together with, in each case, all improvements and appurtenant fixtures (including, without limitation, all preparation plants or other Coal processing facilities and loadout and other transportation facilities), easements and other property and rights incidental to the ownership, lease or operation thereof.

"Real Property Lease" means, with respect to any Person and any Real Property, any lease, license, letting, concession, occupancy agreement, sublease, farm-in, farm-out, joint operating agreement, easement or right of way to which such Person is a party and is granted a possessory interest in or a right to use or occupy all or any portion of such Real Property (including, without limitation, the right to extract Coal, minerals oil, natural gas and other hydrocarbons and their constituents from any portion of Real Property not owned in fee by such Person) and every amendment or modification thereof, including with respect to the Loan Parties, without limitation, the leases with respect to Real Property and any Contractual Obligations with respect to any of the foregoing.

"Receivables Assets" means any receivable (whether constituting an account, chattel, paper, instrument or general intangible) from time to time originated, acquired or otherwise owned by the Borrower or any Subsidiary, including, with respect to any receivable:

(a)     all of a Subsidiary's and any Loan Party's interest in any goods (including returned goods) to the extent related to such receivable, and documentation of title evidencing the shipment or storage of any such goods (including any such returned goods),

(b)     all instruments and chattel paper that may evidence such receivable (and to the extent they do not evidence any asset that is not a receivable),

(c)     all other security interests or liens and property subject thereto from time to time purporting to secure payment of such receivable, whether pursuant to the contract related to such receivable or otherwise, together with all UCC financing statements or similar filings related thereto,

(d)     solely to the extent applicable to such receivable, the rights, interests and claims under the contracts and all guarantees, indemnities, insurance and other agreements (including the related contract) or arrangements of whatever character from time to time supporting or securing payment of such receivable or otherwise relating to such receivable whether pursuant to the contract related to such receivable or otherwise,

(e)     all funds that are received or deemed received by a Loan Party or Subsidiary in payment of any amounts owed in respect of such receivable (including, without limitation, purchase price, finance charges, fees, interest and all other charges) or are applied to amounts owed in respect of such receivable (including, without limitation, insurance payments and net proceeds of sale or other disposition of repossessed goods or other collateral or property of the related obligor or any other person directly or indirectly liable for the payment of any such receivable and available to be applied thereon),

(f)        the lock-box accounts designated solely as the accounts to receive the proceeds of such receivables and all amounts on deposit therein, and all certificates and instruments, if any, from time to time evidencing such lock-box accounts and amounts on deposit therein,

(g)        all monies due or to become due with respect to any of the foregoing,

(h)        all collections, proceeds and products of any of the foregoing, as defined in the UCC, that are received or are receivable by a Loan Party or Subsidiary, and

(i)        all books and records to the extent related to any of the Receivables Assets.

"Recipient" means (a) the Administrative Agent, (b) any Lender and (c) any L/C Issuer, as applicable.

"Reclamation Laws" means all Laws relating to mining reclamation or reclamation liabilities applicable to the Borrower and the Restricted Subsidiaries including the Surface Mining Control and Reclamation Act of 1977, as amended, and its state and local counterparts or equivalents, including those applicable in Arizona, Colorado, Illinois, Indiana, New Mexico and Wyoming, and any regulations promulgated to any of the foregoing.

"Register" has the meaning specified in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, attorneys and advisors of such Person and of such Person's Affiliates.

"Reorganization Plan" means a plan of reorganization or liquidation in any or all of the Cases of the Debtors.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Loans, a Borrowing Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"Required Initial Lenders" means, at any time, the Initial Lenders that would otherwise constitute the Required Lenders had the Closing Date occurred at such time.

"Required Lenders" means, at any time, (i) Lenders having (a) Loans outstanding and (b) Commitments, that, taken together, represent more than 50% of the sum of (x) all Loans outstanding at such time and (y) the total Commitments at such time and, in addition (ii) solely with respect to any Tranche Voting Matter, the Required Specified Lenders.  The Loans and Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Specified Lenders" means Specified Lenders having (a) Loans outstanding and (b) Commitments, that, taken together, represent more than 50% of the sum of (x) all Loans

outstanding at such time and held by Specified Lenders and (y) the total Commitments at such time of all Specified Lenders.  The Loans and Commitments of any Specified Lenders that are Defaulting Lenders shall be disregarded in determining Required Specified Lenders at any time.

"Requirement of Law" means as to any Person, the Organizational Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resource Management Property" means any Real Property owned in fee by any Loan Party, which is classified as "Resource Management" in the Initial DIP Budget (or Extension DIP Budget, as applicable).

"Resource Management Deduction" means at any time the amount of all prepayments required to be made (and so made) following the Closing Date and at or prior to such time pursuant to Section 2.05(b), on account all Dispositions (since the Petition Date) of Resource Management Properties, but only to the extent such Dispositions were not included in the Initial DIP Budget (or Extension DIP Budget, as applicable); provided, however, that notwithstanding the foregoing, in no event shall the Resource Management Deduction be an amount greater than $50,000,000.

"Responsible Officer" means the chief executive officer, president or any vice president of the Borrower or any applicable Subsidiary and, in addition, any Person holding a similar position or acting as a director or managing director with respect to any other Foreign Subsidiary of the Borrower or, with respect to financial matters, a Financial Officer.

"Restricted Payment" has the meaning specified in Section 7.06.

"Restricted Subsidiary" means (x) any Domestic Subsidiary of the Borrower or any other Loan Party and (y) each of Peabody Holdings (Gibraltar) Limited and Peabody Investments (Gibraltar) Limited, but excluding, for all purposes, all Excluded Entities.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanctions" means any sanctions administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, or Her Majesty's Treasury.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders and the L/C Issuer.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the Public

Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"Security Agreement" means that certain Pledge and Security Agreement, dated as of the date hereof, substantially in the form of Exhibit G or such other form reasonably acceptable to the Administrative Agent and the Borrower, among the Loan Parties and Citibank, N.A. (in its capacities specified therein).

"Security Documents" means, collectively, the Security Agreement, the Pledge Agreement - Gib, the IP Security Agreements, the Mortgages, the Orders, each of the pledge agreements and supplements thereto, security agreements and supplements thereto, and other similar agreements delivered to Administrative Agent and Lenders pursuant to Section 6.16, and any other documents, agreements or instruments that grant or purport to grant a Lien on any assets of the Borrower or any other Loan Party in favor of the Administrative Agent to secure the Obligations. The other Security Documents shall supplement, and not limit, any granting of collateral or security pursuant to the Orders.

"Similar Business" means coal production, coal mining, coal gasification, coal liquifaction, coal-to-chemical conversions, other BTU conversions, coal brokering, coal transportation, Mine development, electricity generation, power/energy sales and other energy related businesses, coal supply contract restructurings, ash disposal, environmental remediation, coal and coal bed methane exploration, production, marketing, transportation and distribution, real estate development and other related businesses, and activities of the Borrower and its Restricted Subsidiaries as of the date hereof and any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"Specified Lenders" means entities managed by Aurelius Capital Management, Elliott Management Corporation, Capital Research and Management Company and Centerbridge Partners, L.P. (as such funds are identified to the Administrative Agent by such named institutions).

"Stated Maturity Date" has the meaning specified in the definition of "Maturity Date".

"Subordinated Indebtedness" means any Indebtedness of the Borrower and its Restricted Subsidiaries that is contractually subordinated to the Indebtedness under the Loan Documents.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned directly, or indirectly through one or more intermediaries, or both, by such Person (it being understood that neither Middlemount Coal Pty Ltd nor any of its subsidiaries shall constitute a Subsidiary of the Borrower or its Subsidiaries hereunder unless the Borrower shall elect in a writing delivered to the Administrative Agent, based on a change in the voting powers of the shareholders of Middlemount Coal Pty Ltd, that Middlemount Coal Pty Ltd or any of its subsidiaries shall constitute a Subsidiary of the Borrower or its Subsidiaries

hereunder).    Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Supermajority Lenders" means, at any time (i) Lenders having (a) Loans outstanding and (b) Commitments that, taken together, represent more than 75% of the sum of (x) all Loans outstanding at such time and (y) the total Commitments at such time and, in addition (ii) solely with respect to any Tranche Voting Matter, the Required Specified Lenders.  The Loans and Commitments of any Defaulting Lender shall be disregarded in determining Supermajority Lenders at any time.

"Superpriority Claim" means a claim against any Debtor in any of the Cases which is an administrative expenses claim having priority over any or all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code.

"Surety Bonds" means surety bonds obtained by the Borrower or any Restricted Subsidiary in the ordinary course of business consistent with past practice and the indemnification or reimbursement obligations of the Borrower or such Restricted Subsidiary in connection therewith.

"Swap Contract" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement (it is understood that the foregoing does not encompass any right of a Person to 'put' an asset to another Person that arises in connection with any acquisition agreement or disposition agreement).

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any valid netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender) (it being understood that any such termination values and marked-to-market values shall take into account any assets posted as collateral or security for the benefit of a party to the Swap Contract).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Commitment Fee" has the meaning specified in Section 2.09(b).

"Term Commitment Fee Percentage" has the meaning specified in Section 2.09(b).

"Term Exit Fee" has the meaning specified in Section 2.09(c).

"Term Exit Fee Percentage" has the meaning specified in Section 2.09(c).

"Term Loan Facility" means, at any time, the aggregate principal amount of the Loans of all Lenders outstanding at such time.

"Trademark Security Agreement" means the Trademark Security Agreement, substantially in the form attached to the Security Agreement or such other form reasonably acceptable to the Administrative Agent, by certain Loan Parties in favor of the Administrative Agent, for the benefit of the Secured Parties.

"Tranche Voting Matter" means any amendment, modification or waiver of any Loan Document that would (i) add or change any provision relating to or involving determinations or other matters in respect of the "Principal Property Cap" (as defined in the Existing Credit Agreement) or the CNTA Dispute, (ii) change any provision relating to expense reimbursement in respect of the Specified Lenders (as provided hereunder), (iii) expressly affect the Specified Lenders (in their capacity as Lenders) directly, materially, adversely and disproportionately in relation to the other Lenders that are not Specified Lenders or (iv) amend the definition of "Tranche Voting Matter".

"Type" means (x) with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan and (y) with respect to a Letter of Credit, its character as an L/C Facility Letter of Credit or a Bonding Facility Letter of Credit.

"UCC" means the Uniform Commercial Code as in effect in the applicable state of jurisdiction.

"Unfunded Pension Liability" means the excess of a Pension Plan's accrued benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "US" mean the United States of America.

"Unrestricted Subsidiary" means any Subsidiary of the Borrower that is not a Restricted Subsidiary; provided that in no event shall any of Peabody Investments Corporation, Peabody IC Funding Corp., Peabody Holdings (Gibraltar) Limited, Peabody Investments (Gibraltar) Limited or Global Center be an Unrestricted Subsidiary.

"U.S. Business Plan" has the meaning specified in Section 6.19(a).

"Voting Stock" means, with respect to any Person, such Person's Equity Interest having the right to vote for the election of directors of such Person under ordinary circumstances.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof", "hereto" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) all references to "wholly-owned" when referring to a Subsidiary of the Borrower shall mean a Subsidiary of which all of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned directly or indirectly by the Borrower or another wholly-owned Subsidiary of the Borrower, (vi) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03    Accounting Terms**.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements–2015, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any Accounting Change would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such Accounting Change as if such Accounting Change has not been made (subject to the approval of the Required Lenders); provided that, until so amended, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

**1.04**    **[Reserved.]**.

**1.05**    **[Reserved.]**.

**1.06**    **[Reserved.]**.

**1.07**    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

**1.08**    **Letter of Credit Amounts**.  Unless otherwise specified herein, the amount of any Letter of Credit shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

**2.01**    **Commitments; Bonding Accommodations; L/C Facility**.

(a)    Term Loan Facility.  Subject to the terms and conditions set forth herein and in the Orders, each Lender severally agrees to make a term loan (a "Loan") to the Borrower in Dollars on any Business Day on or after the Closing Date and prior to the date that is two (2) Business Days following the Final Order Entry Date in two Borrowings, in an aggregate principal amount not to exceed the amount of such Lender's Commitment.  For the avoidance of doubt, any Commitments (x) shall be reduced dollar for dollar at the time of funding of any Loans thereunder and (y) shall terminate (which termination shall be subject to Section 2.09(c) to the extent applicable) on the earlier of (i) the second Borrowing hereunder and (ii) the date that is two (2) Business Days following the Final Order Entry Date (or if earlier, the Maturity Date). The Borrowings pursuant to the two Borrowings referred to in the preceding sentence shall be in

an aggregate principal amount of not less (or more) than $500,000,000 and shall consist of Loans of the same Type made on the same day by the Lenders ratably according to their respective Commitments; provided that (x) the first Borrowing shall be in the amount authorized by the Bankruptcy Court in the Interim Order (which shall be not less (or more) than $200,000,000) and (y) the second Borrowing shall be in an amount equal to the difference between (i) the lesser of (A) the full amount authorized by the Bankruptcy Court in the Final Order and (B) the aggregate amount of Commitments then outstanding and (ii) the amount of the first Borrowing.  Loans prepaid or repaid may not be reborrowed.  Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(b)    Bonding Accommodations.  Subject to the terms and conditions set forth herein and in the Orders, the Lenders agree to permit (x) the existence of Bonding Superpriority Claims in an amount, and subject to the conditions, set forth in the applicable provisions of Section 4.02 and (y) the issuance of Bonding Facility Letters of Credit in accordance with Section 2.03.

(c)    L/C Facility Letters of Credit.  Subject to the terms and conditions set forth herein and in the Orders, the Lenders agree to permit the issuance of L/C Facility Letters of Credit in accordance with Section 2.03.

**2.02    Borrowings, Conversions and Continuations of the Loans**.

(a)    Each Borrowing, each conversion of Loans from one Type to the other and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than 12:00 p.m., New York City time, (i) three Business Days prior to the requested date of any Borrowing, of conversion to or continuation of Eurocurrency Rate Loans and (ii) on the requested date of any Borrowing of Base Rate Loans; provided, however, that if the Borrower wishes to request Eurocurrency Rate Loans having an Interest Period other than one, two, three, or six months or, to the extent available to all Lenders making such Eurocurrency Rate Loans, twelve months in duration as provided in the definition of "Interest Period", the applicable notice must be received by the Administrative Agent not later than 12:00 p.m., New York City time, four Business Days prior to the requested date of such Borrowing, conversion or continuation of Eurocurrency Rate Loans, whereupon the Administrative Agent shall give prompt notice to the Lenders of such request and determine whether the requested Interest Period is acceptable to all of them.  Not later than 12:00 p.m., New York City time, three Business Days before the requested date of such Borrowing, conversion or continuation of Eurocurrency Rate Loans, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the applicable requested Interest Period referenced in the above proviso has been consented to by all the Lenders.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Borrowing Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.   Except as provided in Sections 2.03(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Borrowing Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans

from one Type to the other or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto. All Loans shall be made in Dollars. If the Borrower fails to specify a Type of Loan in a Borrowing Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans, as applicable, in any such Borrowing Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)      Following receipt of a Borrowing Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage under the applicable Term Loan Facility of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans as described in the preceding subsection. In the case of a Borrowing, each applicable Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 2:00 p.m., New York City time, on the Business Day specified in the applicable Borrowing Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)      Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan. During the existence of an Event of Default, no Loans may be requested as, converted to or continued as Eurocurrency Rate Loans if the Required Lenders or the Administrative Agent so notify the Borrower.

(d)      The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)      After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than five (5) Interest Periods in effect hereunder.

**2.03    Letters of Credit**.

(a)    General.

(i)    Subject to the terms and conditions set forth herein and in the Orders, (A) each L/C Facility L/C Issuer agrees (1) from time to time on any Business Day during the period from the Closing Date until the L/C Facility Letter of Credit Expiration Date, to issue L/C Facility Letters of Credit for the account of the Borrower or any Restricted Subsidiary, and to amend or extend L/C Facility Letters of Credit previously issued by it, in accordance with Section 2.03(b) and (2) to honor drawings under the L/C Facility Letters of Credit; and (B) each Bonding Facility L/C Issuer agrees (1) from time to time on any Business Day during the period from the Closing Date until the Bonding Facility Letter of Credit Expiration Date, to issue Bonding Facility Letters of Credit for the account of the Borrower or any Restricted Subsidiary, and to amend or extend Bonding Facility Letters of Credit previously issued by it, in accordance with Section 2.03(b) and (2) to honor drawings under the Bonding Facility Letters of Credit; provided that (x) after giving effect to any L/C Credit Extension with respect to any L/C Facility Letter of Credit, (I) the L/C Facility Letter of Credit Deposit Amount shall not be less than 102% of the L/C Facility L/C Exposure at such time and (II) the L/C Facility L/C Exposure at such time shall not exceed the L/C Facility Cap, (y) after giving effect to any Bonding Facility Letter of Credit, (I) the Bonding Facility Letter of Credit Deposit Amount shall not be less than 102% of the Bonding L/C Exposure at such time and (II) the Bonding L/C Exposure at such time, together with the Bonding Superpriority Claim Amount at such time, shall not exceed the Bonding Accommodation Cap and (z) after giving effect to an L/C Credit Extension, the aggregate amount of all Bonding L/C Exposure and all L/C Facility L/C Exposure shall not exceed (x) $50 million minus (y) the aggregate amount of cash and other Permitted Investments then subject to Liens permitted under Section 7.01(f)(ii).  Each request by the Borrower or any Restricted Subsidiary for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the applicable conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit of the same Type that have expired or that have been drawn upon and reimbursed. Notwithstanding anything to the contrary herein, no Letter of Credit shall be issued to backstop or replace any Pre-Petition Letter of Credit.

(ii)    No L/C Issuer shall issue any Letter of Credit of any Type if:

(A)    subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance or last extension; or

(B)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date applicable to such Type of Letter of Credit; provided, however, that notwithstanding the foregoing, if the other conditions to issuance are then

satisfied, the applicable L/C Issuer shall be required to issue a Letter of Credit (prior to the Letter of Credit Expiration Date) having a expiry date that is later than the Letter of Credit Expiration Date (but in no event later than the date that is twelve (12) months from the Letter of Credit Expiration Date then in effect); provided, further that, until the Maturity Date, such Letters of Credit shall be cash collateralized in an amount equal to 102% of the relevant Letter of Credit amount, and after the Maturity Date, such Letters of Credit shall be cash collateralized (as otherwise provided for hereunder) in the amount of 105% of the relevant Letter of Credit amount) and all obligations in this Agreement to cash collateralize Letter of Credit shall survive the satisfaction or discharge of all other Obligations and the termination of this Agreement or any other Loan Document;

(iii)    No L/C Issuer shall be under any obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or request that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which such L/C Issuer in good faith deems material to it;

(B)    the issuance of such Letter of Credit would violate one or more policies of such L/C Issuer;

(C)    such Letter of Credit is to be denominated in a currency other than Dollars; or

(D)    such Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder or any provisions for automatic extension of its expiry date.

(iv)    The L/C Issuer and the Borrower shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(v)    No L/C Issuer shall be under any obligation to amend any Letter of Credit if (A) such L/C Issuer would not have any obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(vi)    The L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article X with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed

to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article X included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

(b)      Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.

(i)      Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the applicable L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by such L/C Issuer and the Administrative Agent not later than 11:00 a.m., New York City time, at least three (3) Business Days (or such later date and time as the Administrative Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer:  (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the applicable L/C Issuer may reasonably require.  In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the applicable L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the applicable L/C Issuer may reasonably require. Additionally, the Borrower shall furnish to the applicable L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as such L/C Issuer or the Administrative Agent may reasonably require.

(ii)      Promptly after receipt of any Letter of Credit Application, the applicable L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof.  Unless such L/C Issuer has received written notice from the Administrative Agent or any Loan Party, at least one (1) Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices.

(iii)    If the Borrower so requests in any applicable Letter of Credit Application, an L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "<u>Auto-Extension Letter of Credit</u>"); <u>provided</u> that any such Auto-Extension Letter of Credit must permit the applicable L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "<u>Non-Extension Notice Date</u>") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the applicable L/C Issuer, the Borrower shall not be required to make a specific request to the applicable L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the applicable L/C Issuer may permit the extension of such Letter of Credit at any time to an expiry date not later than the applicable Letter of Credit Expiration Date (or such later date referred to in <u>Section 2.03(a)(ii)(B)</u>; <u>provided</u>, <u>however</u>, that the applicable L/C Issuer shall not permit any such extension if (A) such L/C Issuer has determined that it would not be permitted, or would have no obligation at such time, to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause (ii) or (iii) of <u>Section 2.03(a)</u>), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Non-Extension Notice Date from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in <u>Section 4.02</u> is not then satisfied, and in each such case directing the applicable L/C Issuer not to permit such extension.

(iv)    If the Borrower so requests in any applicable Letter of Credit Application, an L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that permits the automatic reinstatement of all or a portion of the stated amount thereof after any drawing thereunder (each, an "<u>Auto-Reinstatement Letter of Credit</u>"). Unless otherwise directed by the applicable L/C Issuer, the Borrower shall not be required to make a specific request to such L/C Issuer to permit such reinstatement. Once an Auto-Reinstatement Letter of Credit has been issued, except as provided in the following sentence, the applicable L/C Issuer may reinstate all or a portion of the stated amount thereof in accordance with the provisions of such Letter of Credit. Notwithstanding the foregoing, if such Auto-Reinstatement Letter of Credit permits the applicable L/C Issuer to decline to reinstate all or any portion of the stated amount thereof after a drawing thereunder by giving notice of such non-reinstatement within a specified number of days after such drawing (the "<u>Non-Reinstatement Deadline</u>"), the applicable L/C Issuer shall not permit such reinstatement if it has received a notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Non-Reinstatement Deadline from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in <u>Section 4.02</u> is not then satisfied (treating such reinstatement as an L/C Credit Extension for purposes of this clause) and, in each case, directing the applicable L/C Issuer not to permit such reinstatement.

(v)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)   <u>Drawings and Reimbursements</u>.

(i)   Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the applicable L/C Issuer shall notify the Borrower and the Administrative Agent thereof.  The Borrower shall reimburse the applicable L/C Issuer in Dollars through the Administrative Agent in an amount equal to the amount of such drawing on the date on which the Borrower receives notice of any payment by such L/C Issuer under a Letter of Credit, if the Borrower receives notice by 12:00 p.m., New York City time, or on the next Business Day if notice is not received by such time (each such date, an "<u>Honor Date</u>"); <u>provided</u> that (x) in the case of L/C Facility Letters of Credit, the Borrower's obligation to reimburse the applicable L/C Facility L/C Issuer with respect to such drawing shall first be satisfied by funds withdrawn by the Administrative Agent from the L/C Facility Letter of Credit Account and transferred to such L/C Facility L/C Issuer in accordance with <u>Section 2.04(a)(iii)</u> (and the Borrower hereby irrevocably authorizes and instructs the Administrative Agent to make such withdrawals and transfers) and (y) in the case of Bonding Facility Letters of Credit, the Borrower's obligation to reimburse the applicable Bonding Facility L/C Issuer with respect to such drawing shall first be satisfied by funds withdrawn by the Administrative Agent from the Bonding Facility Letter of Credit Account and transferred to such Bonding Facility L/C Issuer in accordance with <u>Section 2.04(a)(iii)</u> (and the Borrower hereby irrevocably authorizes and instructs the Administrative Agent to make such withdrawals and transfers).

(d)   [Reserved].

(e)   <u>Obligations Absolute</u>.  The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit shall be absolute, unconditional and irrevocable under all circumstances, including the following:

(i)   any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)   the existence of any claim, counterclaim, setoff or defense to payment that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), such L/C Issuer or any Lender, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)   any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit, except to the extent caused by such L/C Issuer's gross negligence or willful misconduct;

(iv)    any payment by such L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit, so long as such L/C Issuer shall have determined in the absence of gross negligence or willful misconduct, in good faith and in accordance with the standard of care specified in the Uniform Commercial Code of the State of New York, that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment appear on their face to be in conformity with such Letter of Credit; or

(v)    any other action taken or omitted to be taken by such L/C Issuer under or in connection with any Letter of Credit or the related drafts or documents, whether or not similar to any of the foregoing, if done in the absence of gross negligence or willful misconduct, in good faith and in accordance with the standards of care specified in the Uniform Commercial Code of the State of New York.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will promptly notify the applicable L/C Issuer.  The Borrower shall be conclusively deemed to have waived any such claim against such L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)    <u>Role of L/C Issuer</u>.  Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, no L/C Issuer shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Person for (i) any action taken or omitted in the absence of gross negligence or willful misconduct or (ii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; <u>provided</u>, <u>however</u>, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. Notwithstanding anything to the contrary herein, the Borrower may have a claim against an L/C Issuer, and such L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such L/C Issuer's willful misconduct or gross negligence or such L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary or transferee of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     [Reserved].

(h)     <u>Applicability of ISP.</u>  Unless otherwise expressly agreed by the applicable L/C Issuer and the Borrower when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), the rules of the ISP shall apply to each standby Letter of Credit.

(i)     [Reserved].

(j)     <u>Fronting Fees and Documentary and Processing Charges Payable to L/C Issuer.</u> The Borrower shall pay directly to the L/C Issuer for its own account, in Dollars, a fronting fee with respect to each Letter of Credit issued by such L/C Issuer at the rate of 0.25% per annum on the face amount drawn under each such Letter of Credit, computed on the daily amount available to be drawn under such Letter of Credit on a quarterly basis in arrears (any such fronting fee, a "<u>Fronting Fee</u>").  Fronting Fees shall be due and payable ten (10) Business Days after the last day of March, June, September and December in respect of the most recently ended quarterly period (or portion thereof, in the case of the first payment) commencing with the first such date to occur after the issuance of such Letter of Credit, on each applicable Letter of Credit Expiration Date (or applicable later date referred to in <u>Section 2.03(a)(ii)(B)</u>) and thereafter on demand; <u>provided</u> that it shall not be a breach of this provision if the Borrower shall fail to timely pay any such quarterly fee as the direct result of not having received an invoice from the L/C Issuer, but only if when subsequently received by the Borrower, the Borrower pays such invoiced fee within two (2) Business Days after receipt thereof.   For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with <u>Section 1.08</u>.  In addition, the Borrower shall pay directly to the L/C Issuer for its own account, in Dollars, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges shall be due and payable on demand and shall be nonrefundable.

(k)     <u>Conflict with Issuer Documents.</u>  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(l)     <u>Letters of Credit Issued for Restricted Subsidiaries.</u>  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Restricted Subsidiary, the Borrower shall be obligated to reimburse the L/C Issuer hereunder for any and all drawings under such Letter of Credit.   The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Restricted Subsidiaries.

**2.04    Cash Collateralized Letter of Credit Accounts.**

(a)     <u>L/C Facility Letter of Credit Account</u>.

(i)     <u>Establishment of L/C Facility Letter of Credit Account.</u> Subject to the terms and conditions set forth herein and in the Orders, the Borrower shall establish the L/C Facility Letter of Credit Account.  Amounts on deposit in the L/C Facility Letter of

Credit Account shall be invested, or caused to be invested, by the Administrative Agent as set forth in subsection (iv) below.

(ii)    Deposits in L/C Facility Letter of Credit Account.  The L/C Facility Letter of Credit Account shall be funded by the Borrower from time to time in an amount not to exceed 102% of the L/C Facility Cap (except as required pursuant to Section 2.03(a)(ii)(B)).

(iii)    Withdrawals from and Closing of L/C Facility Letter of Credit Account. Amounts on deposit in the L/C Facility Letter of Credit shall be withdrawn and distributed as follows:

(A)    on any date on which the applicable L/C Issuer is to be reimbursed by the Borrower for any payment made by such L/C Issuer with respect to an L/C Facility Letter of Credit, the Administrative Agent shall, unless the Borrower shall have so reimbursed such L/C Issuer in cash in accordance with Section 2.03(c), withdraw from the L/C Facility Letter of Credit Account an amount equal to the amount of such payment, and make such amount available to such L/C Issuer;

(B)    amounts in the L/C Facility Letter of Credit Account may be withdrawn by the Borrower so long as (i) no Default has occurred and is continuing or would result therefrom, (ii) the Borrower shall have delivered to the Administrative Agent a certificate executed by a Financial Officer to the foregoing effect and (iii) after giving effect to such withdrawal, the L/C Facility Letter of Credit Deposit Amount would not be less than 102% of the L/C Facility L/C Exposure at such time (except as required pursuant to Section 2.03(a)(ii)(B)); and

(C)    upon the Maturity Date and the expiration or cancellation of all outstanding L/C Facility Letters of Credit (or the establishment of a "backstop" letter of credit or other cash collateralization thereof at 105% pursuant to arrangements reasonably satisfactory to the applicable L/C Issuer), the Administrative Agent (x) shall withdraw from the L/C Facility Letter of Credit Account the aggregate amount then on deposit therein and apply such funds to repay the Obligations as set forth herein.

(iv)    Investment of L/C Facility Letter of Credit Deposit Amount.  The Administrative Agent shall, on behalf of the Borrower, invest the L/C Facility Letter of Credit Deposit Amount in an account or investment reasonably acceptable to the Borrower and the Administrative Agent (which the Administrative Agent may require to be an account managed by the Administrative Agent or its Affiliates).

(b)    Bonding Facility Letter of Credit Account.

(i)    Establishment of Bonding Facility Letter of Credit Account.  Subject to the terms and conditions set forth herein and in the Orders the Borrower may establish the Bonding Facility Letter of Credit Account.  Amounts on deposit in the Bonding Facility Letter of Credit Account shall be invested, or caused to be invested, by the Administrative Agent as set forth in subsection (iv) below.

(ii)     Deposits in Bonding Facility Letter of Credit Account.  From time to time following the date on which the Bonding Facility Letter of Credit Account is established, the Borrower may make deposits to the Bonding Facility Letter of Credit Account; provided that the Borrower shall not be permitted to deposit any amounts to the Bonding Facility Letter of Credit Account if as a result thereof the sum of (x) the aggregate amount of all deposits made to the Bonding Facility Letter of Credit Account plus (y) the Bonding Superpriority Claim Amount would exceed the sum of (i) the Bonding Accommodation Cap plus (ii) an amount equal to 2% of the Bonding L/C Exposure at such time (except as required pursuant to Section 2.03(a)(ii)(B)).

(iii)     Withdrawals from and Closing of Bonding Facility Letter of Credit Account.  Amounts on deposit in the Bonding Facility Letter of Credit Account shall be withdrawn and distributed as follows:

(A)     on any date on which the applicable L/C Issuer is to be reimbursed by the Borrower for any payment made by such L/C Issuer with respect to a Bonding Facility Letter of Credit, the Administrative Agent shall, unless the Borrower shall have so reimbursed such L/C Issuer in cash in accordance with Section 2.03(c), withdraw from the Bonding Facility Letter of Credit Account an amount equal to the amount of such payment, and make such amount available to such L/C Issuer;

(B)     amounts in the Bonding Facility Letter of Credit Account may be withdrawn by the Borrower so long as (i) no Default has occurred and is continuing or would result therefrom, (ii) the Borrower shall have delivered to the Administrative Agent a certificate executed by a Financial Officer to the foregoing effect and (iii) after giving effect to such withdrawal, the Bonding Facility Letter of Credit Deposit Amount would not be less than 102% of the Bonding L/C Exposure at such time (except as required pursuant to Section 2.03(a)(ii)(B)); and

(C)     upon the Maturity Date and the expiration or cancellation of all outstanding Bonding Facility Letters of Credit (or the establishment of a "backstop" letter of credit or other cash collateralization thereof at 105% pursuant to arrangements reasonably satisfactory to the applicable L/C Issuer), the Administrative Agent (x) shall withdraw from the Bonding Facility Letter of Credit Account the aggregate amount then on deposit therein and make such funds available to the Borrower; and (y) shall close the Bonding Facility Letter of Credit Account.

(iv)     Investment of Bonding Facility Letter of Credit Deposit Amount.  The Administrative Agent shall, on behalf of the Borrower, invest the Bonding Facility Letter of Credit Deposit Amount in an account or investment reasonably acceptable to the Borrower and the Administrative Agent (which the Administrative Agent may require to be an account managed by the Administrative Agent or its Affiliates).

**2.05    Prepayments.**

(a)     The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part; provided that (i) such notice must be

received by the Administrative Agent not later than 11:00 a.m., New York City time (or such other later time which is acceptable to the Administrative Agent), (A) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) on the date of prepayment of Base Rate Loans; (ii) any prepayment of Eurocurrency Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, the entire amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if Eurocurrency Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the Term Loan Facility).  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that such notice may be contingent upon the consummation of a refinancing and such notice may otherwise be extended or revoked, in each case, with the requirements of <u>Section 3.05</u> to apply to any failure of the contingency to occur and any such extension or revocation.  Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 2.05(d)</u> and <u>Section 3.05</u>.  Each prepayment of the outstanding Loans pursuant to this <u>Section 2.05(a)</u> shall be paid to the Lenders in accordance with their respective Applicable Percentages in respect of each of the relevant Facilities.

(b)      No later than one (1) Business Day following the receipt by the Borrower or any other Loan Party of Net Proceeds from any incurrence, issuance or sale of Indebtedness not expressly permitted to be incurred or issued pursuant to <u>Section 7.03</u>, the Borrower shall make (or cause to be made) a prepayment of the Loans in an amount equal to the lesser of (x) 100% of such Net Proceeds and (y) the aggregate principal amount of the Loans then outstanding.

(c)      No later than three (3) Business Days following the date on which the Borrower or any other Loan Party receives or is deemed to have received Net Proceeds from any Casualty and Condemnation Award, but subject to applicable reinvestment rights hereunder, the Borrower shall make (or cause to be made) a prepayment of the Loans in an amount equal to the lesser of (x) 100% of such Net Proceeds and (y) the aggregate principal amount of the Loans then outstanding.

(d)      No later than three (3) Business Days following the receipt by the Borrower or any other Loan Party of Net Proceeds from any Asset Sale, the Borrower shall, to the extent that the aggregate amount of Net Proceeds received by the Borrower and the other Loan Parties for all such Asset Sales since the Petition Date exceeds $30,000,000 (the amount of such excess, the "<u>Excess Proceeds</u>"), make (or cause to be made) a prepayment of the Loans in an amount equal to the lesser of (x) 100% of such Excess Proceeds and (y) the aggregate principal amount of the Loans then outstanding.

(e)      Each prepayment of outstanding Loans pursuant to this <u>Section 2.05</u> shall be paid to the Lenders in accordance with their respective Applicable Percentages of the Term Loan Facility.  Any prepayment of a Eurocurrency Rate Loan pursuant to this <u>Section 2.05</u> shall be

accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.

(f)      All prepayments or repayments pursuant to this Section 2.05 shall be accompanied by payment of the Term Exit Fee owing in respect thereof, as set forth in Section 2.09(c).

### 2.06    Termination or Reduction of Commitments.

(a)      Optional.  The Borrower may, upon notice to the Administrative Agent, terminate or from time to time permanently reduce the Commitments in whole or in part; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m., New York City time, three (3) Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof.  The Administrative Agent shall promptly notify the Lenders of any such notice of the foregoing.

(b)      Application of Commitment Reductions; Payment of Fees.  Upon any reduction of the Commitments pursuant to this Section 2.06, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage (in respect of the Term Loan Facility) of such reduction amount.  Any reduction of Commitments pursuant to this Section 2.06 or otherwise shall be accompanied by payment of the Term Exit Fee, as set forth in Section 2.09(c).

(c)      Term Loan Facility Commitments.  The Commitments shall terminate on the Business Day that is two (2) Business Days following the Final Order Entry Date.

### 2.07    Repayment of Loans.  To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.

### 2.08    Interest.

(a)      Subject to the provisions of subsection (b) below, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)      If any amount of principal or interest of any Loan (or any other Obligations) is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after

judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    Fees**.  In addition to certain fees described in <u>Section 2.03(j)</u>, the Borrower shall pay to the Arranger, the Administrative Agent and the Lenders (as applicable), for their respective accounts, in Dollars:

(a)    all fees in the amounts and at the times specified in the Fee Letter;

(b)    to the Administrative Agent, for the account of each Lender, a commitment fee (the "<u>Term Commitment Fee</u>") (which, at the discretion of the Administrative Agent, may take the form of original issue discount) equal to 5.00% (the "<u>Term Commitment Fee Percentage</u>" of (i) the aggregate principal amount of the Loans funded hereunder in respect of the first Borrowing referred to in <u>Section 2.01(a)</u>, which first Term Commitment Fee shall be earned, due and payable on the date of such first Borrowing and calculated by multiplying the Term Commitment Fee Percentage by the aggregate principal amount of Loans funded by such Lender on the on the date of such first Borrowing and (ii) the difference between (A) the full amount of Loans authorized by the Bankruptcy Court in the Final Order and (y) the aggregate amount of the first Borrowing of Loans hereunder, which second Term Commitment Fee shall be earned on the Final Order Entry Date and due and payable no later than the date that is two (2) Business Days following the Final Order Entry Date and calculated by multiplying the Term Commitment Fee Percentage by the aggregate principal amount of such newly authorized Loans; <u>provided</u> that notwithstanding the foregoing, for the avoidance of doubt no applicable original issue discount shall reduce the amount of Obligations required to be prepaid or repaid with respect to the Loans owing hereunder; and

(c)    to the Administrative Agent, for the account of each Lender, an exit fee (the "<u>Term Exit Fee</u>") equal to 2.00% (the "<u>Term Exit Fee Percentage</u>") of the aggregate principal amount of any Loans repaid or prepaid or undrawn Commitments reduced or terminated (other than terminated as a result of a Borrowing) under any provision of this Agreement (and including, for the avoidance of doubt, following any acceleration of the Loans following an Event of Default), which Term Exit Fee shall be earned, due and payable at the time of such prepayment, repayment or reduction in Commitments (as applicable) and calculated by multiplying the Term Exit Fee Percentage by (i) the principal amount of Loans so repaid or prepaid and (ii) the amount of the reduction of such Commitments (as applicable).

All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for appropriate distribution.   Once paid, none of the fees shall be refundable under any circumstances.

**2.10    Computation of Interest and Fees**.  All computations of interest shall be made on the basis of a year of three hundred and sixty (360) days (except that computations of interest determined by reference to the Base Rate when the Base Rate is based on the prime rate shall be made on the basis of a year of three hundred and sixty-five (365) or three hundred and sixty-six (366) days, as the case may be), and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, <u>provided</u> that any Loan that is repaid on the

same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11   Evidence of Debt**. The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender to the Borrower made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans to the Borrower in addition to such accounts or records. Each Lender may attach schedules to a Note and endorse thereon the date, Type (if applicable), amount, currency and maturity of its Loans and payments with respect thereto.

**2.12   Payments Generally; Administrative Agent's Clawback**.

(a)   General. All payments to be made by the Borrower or any other Loan Party shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m., New York City time, on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 3:00 p.m., New York City time, shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)   (i) Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurocurrency Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 2:00 p.m., New York City time, on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable

Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Overnight Rate, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrower; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable L/C Issuer, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the applicable L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or the applicable L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Overnight Rate.

A notice of the Administrative Agent to any Lender or Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to the Borrower as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 11.04(c) are several and not joint.  The failure of any Lender to make any Loan or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to fund its participation or to make its payment under Section 11.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Pro Rata; Sharing of Payments by Lenders**.  Except as otherwise expressly provided in this Agreement, each payment (including each prepayment) by the Borrower on account of principal of and interest on any Loans shall be allocated by the Administrative Agent pro rata according to the respective outstanding principal amounts of such Loans then held by the respective Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest thereon greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the applicable Loans, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(a)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)     the provisions of this Section 2.13 shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

**2.14    Facility Extension Option**.  The Borrower may extend the Stated Maturity Date from April [_], 2017 to a date that is no later than October [_], 2017[4] (the "Facility Extension Option") subject to, and the Stated Maturity Date shall be so extended upon satisfaction of, the following conditions precedent:the Borrower shall provide written notice to the Administrative Agent not more than sixty (60) days and not less than thirty (30) days prior to April [__], 2017[5] of its intention to exercise the Facility Extension Option;

---

[4] NTD:  date that is 18 months from the Closing Date.

[5] NTD:  one year anniversary of the Closing Date.

(b)     the Borrower shall pay, or cause to be paid, a fee to the Administrative Agent, for the account of the Lenders on a ratable basis, equal to 2.50% of the aggregate Loans outstanding on the Stated Maturity Date, which fee shall be paid on or prior to such Stated Maturity Date (prior to giving effect to the Facility Extension Option);

(c)     the conditions stated in Section 4.02(d) and (e) shall be satisfied as of the Stated Maturity Date (prior to giving effect to the Facility Extension Option); and

(d)     the Borrower shall have delivered to the Administrative Agent, for distribution to all Lenders, the Extension DIP Budget covering the requested extension period, which Extension DIP Budget shall demonstrate projected compliance with the covenants contained in Section 7.11 for the duration of the requested extension period.

The Administrative Agent will notify the Borrower and the Lenders immediately upon the effectiveness of the Facility Extension Option.

**2.15    [Reserved]**.

**2.16    [Reserved]**.

**2.17    [Reserved]**.

**2.18    Defaulting Lenders**.  Notwithstanding anything contained in this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)     Reallocation of Loan Payments.  Any payment or prepayment (i) of any portion of the principal amount of Loans of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article IX or otherwise) shall be applied, *first*, to the Loans of other Lenders as if such Defaulting Lender had no Loans outstanding, until such time as the Outstanding Amount of Loans of each Lender shall equal its pro rata share thereof based on its Applicable Percentage (without giving effect to Section 2.18(c)), ratably to the Lenders in accordance with their Applicable Percentages of Loans being repaid or prepaid, *second*, to the then outstanding amounts (including interest thereon) owed under the terms hereof by such Defaulting Lender to the Administrative Agent or (to the extent the Administrative Agent has received notice thereof) to any other Lender, ratably to the Persons entitled thereto, and *third*, the balance, if any, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction, and (ii) of any other amounts thereafter received by the Administrative Agent for the account of such Defaulting Lender (including amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 11.08) to have been paid to such Defaulting Lender and applied on behalf of such Defaulting Lender, *first*, to the liabilities above referred to in item *second* of clause (i) above, *second*, to the matters above referred to in item *third* of clause (i) above, and *third*, the balance, if any, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any of such amounts as are reallocated pursuant to this Section 2.18(a) that are payable or paid (including pursuant to Section 11.08) to such Defaulting Lender shall be deemed paid to such Defaulting Lender and applied by the Administrative Agent on behalf of such Defaulting Lender, and each Lender hereby irrevocably consents thereto.

(b)     [Reserved].

(c)     Defaulting Lender Cure Rights.  A Lender that has become a Defaulting Lender because of an event referenced in the definition of "Defaulting Lender" may cure such status and shall no longer constitute a Defaulting Lender as a result of such event when (i) such Defaulting Lender shall have fully funded or paid, as applicable, all Loans or other amounts required to be funded or paid by it hereunder as to which it is delinquent (together, in each case, with such interest thereon as shall be required to any Person as otherwise provided in this Agreement), (ii) the Administrative Agent and each of the Borrower shall have received a certification by such Defaulting Lender of its ability and intent to comply with the provisions of this Agreement going forward and (iii) each of the Administrative Agent and the Borrower shall have determined (and the Borrower shall have notified the Administrative Agent) that they are satisfied, in their sole discretion, that such Defaulting Lender intends to continue to perform its obligations as a Lender hereunder and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.  No reference in this subsection to an event being "cured" shall by itself preclude any claim by any Person against any Lender that becomes a Defaulting Lender for such damages as may otherwise be available to such Person arising from any failure to fund or pay any amount when due hereunder or from any other event that gave rise to such Lender's status as a Defaulting Lender.

(d)     Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)     fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 2.09; and

(ii)     the Commitment of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 11.01); provided that this clause (ii) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender affected thereby.

**2.19     Priority and Liens**.

(a)     Each of the Loan Parties (other than Global Center) hereby covenants and agrees that upon the entry of, and subject to, an Interim Order (and when applicable, the Final Order) its obligations hereunder and under the Loan Documents:  (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim in the Cases; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien (subject to the terms of the Security Agreement and the Orders) on all of the property of such Loan Parties (but excluding a claim on Avoidance Actions (but including, upon entry of the Final Order, the proceeds of Avoidance Actions)), whether now existing or hereafter acquired, that is not subject to valid, perfected, non-voidable liens in existence at the time of commencement of the Cases or to valid, non-voidable liens in existence at the time of such commencement that are perfected subsequent

to such commencement as permitted by Section 546(b) of the Bankruptcy Code, and on all of its cash maintained in the Bonding Facility Letter of Credit Account and/or the L/C Facility Letter of Credit Account and any investment of the funds contained therein, provided that neither the Bonding Facility Letter of Credit Deposit Amount nor the L/C Facility Letter of Credit Deposit Amount shall be subject to the Fees Carve-Out or the Bonding Carve-Out; (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected junior Lien upon all property of such Loan Parties, other than Excluded Assets, whether now existing or hereafter acquired, that is subject to valid, perfected and non-voidable Liens in existence at the time of the commencement of the Cases or that is subject to valid Liens in existence at the time of the commencement of the Cases that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than certain property that is subject to the existing Liens that secure the Existing Secured Debt, which liens shall be primed by the liens described in the following clause (iv)); and (iv) pursuant to Section 364(d)(l) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected first priority senior priming Lien on all of the property of such Loan Parties, other than Excluded Assets, that is subject to the existing liens (the "Primed Liens") which secure the Existing Secured Debt, all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Administrative Agent, which senior priming Liens in favor of the Administrative Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection Liens  to the extent of any diminution in the value of the collateral of the Permitted Liens as provided in the Interim Order and the Final Order in respect of any of the Primed Liens (i) through (iv) above, subject in each case (other than with respect to the Bonding Facility Letter of Credit Deposit Amount and the L/C Facility Letter of Credit Deposit Amount) to the Fees Carve-Out and as set forth in the Orders.

(b)      As to all Real Property the title to which is held by a Loan Party or the possession of which is held by any such Loan Party pursuant to leasehold interest, such Loan Party hereby assigns and conveys as security, grant a security interest in, hypothecates, mortgages, pledges and sets over unto the Administrative Agent on behalf of the Lenders all of the right, title and interest of such Loan Party in all of such owned Real Property and in all such leasehold interests, together in each case with all of the right, title and interest of such Loan Party in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof.  Such Loan Party acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Administrative Agent on behalf of the Lenders in all of such real property and leasehold interests of such Loan Party shall be perfected without the recordation of any instruments of mortgage or assignment.  Such Loan Party further agrees that, upon the reasonable written request of the Administrative Agent, in the exercise of its business judgment, such Loan Party (i) shall enter into separate fee and leasehold mortgages in recordable form with respect to such properties on terms satisfactory to the Administrative Agent and including customary related deliverables with respect to any Material Real Property owned by it or leased by it, as set forth in Section 6.16(b) and (ii) shall otherwise comply with the requirements of Section 6.16(b) with respect to such Real Property.

(c)      The relative priorities of the Liens described in this Section 2.19 with respect to the Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order) and

the Security Agreement. In accordance with the Interim Order (or, once entered, the Final Order), all of the Liens described in this Section 2.19 shall be effective and perfected upon entry of the Interim Order, without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order.

**2.20    No Discharge; Survival of Claims**. Each of the Loan Parties agrees that (a) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Agents and the Lenders pursuant to the Orders and the Liens granted to the Agents and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

**2.21    Payment of Obligations**. Subject to the last paragraph of Section 9.02, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Loan Parties under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

**3.01    Taxes**.

(a)    Payments Free of Taxes. Any and all payments by or on behalf of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, <u>provided</u> that if any Indemnified Taxes or Other Taxes are required to be withheld or deducted from such payments (as reasonably determined in good faith by the applicable withholding agent), then (i) the sum payable by the applicable Loan Party shall be increased as necessary so that after making all required deductions (after payment of all Indemnified Taxes) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made and (ii) if a Loan Party is the withholding agent, it shall make such deductions and timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower. Without duplication of any obligation set forth in subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law or, at the option of the Administrative Agent, timely reimburse it for the payment of Other Taxes.

(c)    Indemnification by the Borrower. The Borrower shall indemnify the Administrative Agent, each Lender and the L/C Issuer for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent,

62

such Lender or the L/C Issuer, as the case may be, or required to be withheld or deducted from a payment to such Person, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, the applicable Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders.  Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Each Lender that is a "United States person" as defined in section 7701(a)(30) of the Code shall deliver to the Borrower and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the reasonable request of the Borrower or Administrative Agent), two duly completed and executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax.

Without limiting the generality of the foregoing, in the event that the Borrower is resident for tax purposes in the United States, any Foreign Lender holding any Loan to the Borrower shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, to the extent such Foreign Lender is legally entitled to do so), two copies of whichever of the following is applicable or any subsequent version thereof or successor thereto:

(i)    duly completed and executed copies of IRS Form W-8BEN or W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)    duly completed and executed copies of IRS Form W-8ECI or IRS Form W-8IMY (accompanied by any other form or certificate required by this Section 3.01(e)

for each beneficial owner thereof as if such beneficial owner were a Lender), as applicable, relating to all payments to be received by such Foreign Lender hereunder or under any other Loan Document,

(iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of IRS Form W-8BEN or W-8BEN-E, or

(iv)     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed and executed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times as reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for the purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

In the event that, pursuant to Section 11.06(d), a Participant is claiming the benefits of this Section 3.01, such Participant shall provide the forms required above, as if it were a Lender, to the Lender from which the related participation was purchased, and if such Lender is a Foreign Lender, such Lender shall, promptly upon receipt thereof (but in no event later than the next scheduled payment under this Agreement) (i) forward such documentation to the Borrower and the Administrative Agent, together with two duly completed and executed copies of IRS Form W-8IMY, or (ii) provide the Borrower and the Administrative Agent with two duly completed and executed copies of IRS Form W-8IMY certifying that such Lender is a "qualified intermediary."

Without limiting the obligations of the Lenders set forth above regarding delivery of certain forms and documents to establish each Lender's status for U.S. withholding tax purposes, each Lender agrees promptly to deliver to the Administrative Agent or the Borrower, as the Administrative Agent or the Borrower shall reasonably request, on or prior to the Closing Date, and in a timely fashion thereafter (including upon the expiration or obsolescence of any such

forms or documents and promptly after the occurrence of any event requiring a change from the most recent forms previously delivered), such other documents and forms as would reduce or avoid any Indemnified Taxes in respect of all payments to be made to such Lender outside of the U.S. by the Borrower pursuant to this Agreement or otherwise to establish such Lender's status for withholding tax purposes in such other jurisdiction.  Each Lender shall promptly (i) notify the Administrative Agent of any change in circumstances which would modify or render invalid any such claimed exemption or reduction, and (ii) take such steps as shall not be materially disadvantageous to it (including the re-designation of its Lending Office) to avoid any requirement of applicable Laws of any such jurisdiction that the Borrower make any deduction or withholding for taxes from amounts payable to such Lender.

Notwithstanding the foregoing, the completion, execution and submission of any documentation otherwise required by this <u>Section 3.01(e)</u> (other than such documentation set forth in clauses (i), (ii) and (iii) above, and in the paragraph above relating specifically to FATCA) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(f)     Treatment of Certain Refunds.  If the Administrative Agent, any Lender or the L/C Issuer receives a refund with respect to Indemnified Taxes or Other Taxes paid by the Borrower, which in the reasonable discretion and good faith judgment of such Administrative Agent, Lender or L/C Issuer is allocable to such payment, it shall promptly pay such refund to the extent allocable to payment of Indemnified Taxes or Other Taxes to the Borrower, net of all out-of-pocket expenses of such Administrative Agent, Lender or L/C Issuer incurred in obtaining such refund; <u>provided</u>, <u>however</u>, that the Borrower agrees to promptly return such amount, net of any incremental additional costs, to the applicable Administrative Agent, Lender or L/C Issuer, as the case may be, if it receives notice from the applicable Administrative Agent, Lender or L/C Issuer that such Administrative Agent, Lender or L/C Issuer is required to repay such refund to the relevant Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Administrative Agent, any Lender or the L/C Issuer be required to pay any amount to the Borrower pursuant to this paragraph (f) the payment of which would place the Administrative Agent, any Lender or the L/C Issuer in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Administrative Agent, any Lender or the L/C Issuer to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**3.02   Illegality**.  If any Lender determines that as a result of any Change in Law it becomes unlawful, or that any Governmental Authority asserts that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of Dollars in the applicable interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate

Loans, shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurocurrency Rate component of the Base Rate, the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate, in each case, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or convert all such Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurocurrency Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender, which it shall do as promptly as possible, that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurocurrency Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates**.  If the Required Lenders determine that for any reason in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof that (a) adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan or (b) the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (i) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended and (ii) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders, who agree to so instruct the Administrative Agent once the circumstances giving rise to the inability to determine rates no longer exist) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

**3.04    Increased Costs; Reserves on Eurocurrency Rate Loans**.

(a)        Increased Costs Generally.  If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with

or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Eurocurrency Rate contemplated by Section 3.04(e)) or the L/C Issuer; or

(ii)    impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Rate Loans made by such Lender or any Letter of Credit (other than Indemnified Taxes and Other Taxes addressed by Section 3.01 and Excluded Taxes);

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such L/C Issuer of issuing or maintaining any Letter of Credit (or of maintaining its obligation to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon written request of such Lender or the L/C Issuer setting forth in reasonable detail such increased costs, the Borrower will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered; provided that before making any such demand, each Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be materially disadvantageous to it, in its reasonable discretion, in any legal, economic or regulatory manner) to designate a different Eurocurrency lending office if the making of such designation would allow the Lender or its Eurocurrency lending office to continue to perform its obligation to make Eurocurrency Rate Loans or to continue to fund or maintain Eurocurrency Rate Loans and avoid the need for, or reduce the amount of, such increased cost.

(b)    Capital Requirements.  If any Lender or the L/C Issuer reasonably determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time, after submission to the Borrower (with a copy to the Administrative Agent) of a written request therefor setting forth in reasonable detail the change and the calculation of such reduced rate of return, the Borrower will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section, describing the basis therefor and showing the calculation thereof in reasonable detail, and

delivered to the Borrower shall be conclusive, absent manifest error.  The Borrower shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than ninety (90) days prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Additional Reserve Requirements.  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as reasonably determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least ten (10) Business Days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender describing the basis therefor and showing the calculation thereof, in each case, in reasonable detail.  If a Lender fails to give notice ten (10) Business Days prior to the relevant Interest Payment Date, such additional interest or costs shall be due and payable within thirty (30) days from receipt of such notice.

(f)    Certain Rules Relating to the Payment of Additional Amounts.  If any Lender requests compensation pursuant to this Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, such Lender shall either (A) forego payment of such additional amount from the Borrower or (B) reasonably afford the Borrower the opportunity to contest, and reasonably cooperate with the Borrower in contesting, the imposition of any Indemnified Taxes or Other Taxes or other amounts giving rise to such payment; provided that the Borrower shall reimburse such Lender for its reasonable and documented out-of-pocket costs, including reasonable and documented attorneys' and accountants' fees and disbursements incurred in so cooperating with the Borrower in contesting the imposition of such Indemnified Taxes or Other Taxes or other amounts.

**3.05    Compensation for Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower;

(c)    [reserved]; or

(d)    any assignment of a Eurocurrency Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 11.13;

including any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract, but excluding any loss of anticipated profits.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate used in determining the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

**3.06    Mitigation Obligations; Replacement of Lenders**.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (A) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (B) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, if the Borrower is required to pay any additional amount to any Lender or any

Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, if any Lender gives a notice pursuant to <u>Section 3.02</u> or if any Lender is at such time a Defaulting Lender, then the Borrower may replace such Lender in accordance with <u>Section 11.13</u>.

      **3.07**    **Survival**.    The Borrower's obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**ARTICLE IV**
**CONDITIONS PRECEDENT**

      **4.01**    **Closing Date**.    The effectiveness of this Agreement and the obligations of each Initial Lender to make Loans hereunder and the Commitments of the L/C Issuer to issue Letters of Credit hereunder are in each case subject to the satisfaction of the following conditions precedent:

      (a)    The Administrative Agent's receipt of the following, each of which shall be (w) originals, telecopies or electronic copies (followed promptly by originals), (x) properly executed by a duly authorized officer of the signing Loan Party, if and as applicable, (y) dated on or before the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and (z) in form and substance reasonably satisfactory to the Administrative Agent:

      (i)    executed counterparts of this Agreement from each Loan Party, each Initial Lender and the L/C Issuer;

      (ii)    Notes executed by the Borrower in favor of each Lender requesting Notes;

      (iii)    executed counterparts of the Security Agreement from each Loan Party, together with:

      (1)    proper financing statements under the UCC or other applicable law of all jurisdictions that the Administrative Agent may deem necessary or desirable in order to perfect and protect the Liens and security interest created or purported to be created under the Interim Order and the Security Agreement covering the Collateral described therein;

      (2)    to the extent that any Equity Interests pledged pursuant to the Security Agreement is certificated and required to be delivered thereunder, stock certificates for such Equity Interests accompanied by undated stock powers or instruments of transfer executed in blank;

      (3)    IP Security Agreements covering the U.S. federally registered intellectual property listed on the applicable schedules to the Security Agreement, duly executed by each applicable Loan Party;

      (4)    results of recent lien searches with respect to each Loan Party in each jurisdiction where such Loan Party is organized;

(5)        evidence of all insurance required to be maintained pursuant to Section 5.10, and evidence that the Administrative Agent shall have been named as an additional insured or loss payee, as applicable, on all insurance policies covering loss or damage to Collateral and on all liability insurance policies as to which the Administrative Agent has reasonably requested to be so named;

(6)        [reserved];

(7)        copies of all Material Leases of the Loan Parties;

(8)        an executed copy of the Intercompany Credit Agreement (together with all exhibits and schedules thereto) and each of the Security Documents (as defined therein);

(9)        a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to all Real Property that constitutes Collateral on which a Building is located (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto if such Real Property is located in a special flood hazard area); and

(10)        as to any Real Property that constitutes Collateral that is located in a special flood hazard area, a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.10(b) of this Agreement, each of which shall (1) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable); (2) name the Administrative Agent, on behalf of the Secured Parties, as additional insured; (3) (x) identify the addresses of the applicable Real Property located in a special flood hazard area, (y) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (z) provide that the insurer will give the Administrative Agent forty-five (45) days' written notice of cancellation or non-renewal and (4) otherwise be in form and substance satisfactory to the Administrative Agent;

(iv)        such certificates of resolutions or other action, incumbency certificates and/or other certificates of duly authorized officers of each Loan Party and each Restricted Subsidiary party to a Loan Document, in each case, as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each officer of such Loan Party or such Restricted Subsidiary executing the Loan Documents to which such Loan Party or such Restricted Subsidiary is a party;

(v)        copies of the Organizational Documents of each Loan Party (in the case of a certificate or articles of incorporation, formation or organization or equivalent or comparable document, certified as of a recent date by an appropriate government official in the applicable Loan Party's jurisdiction of organization, and in the case of bylaws or an operating agreement or equivalent or comparable document, certified by a secretary, assistant secretary or Responsible Officer of the applicable Loan Party as being true and

correct as of the Closing Date) and such other documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect;

(vi)     the executed opinion of Jones Day, counsel to the Borrower and special New York counsel to the other Loan Parties, addressed to the Administrative Agent and each Lender and dated the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent;

(vii)     [reserved];

(viii)     the executed opinions of local counsel to each of the Loan Parties in each applicable jurisdiction of organization, addressed to the Administrative Agent and each Lender, in form and substance reasonably satisfactory to the Administrative Agent;

(ix)     (A) the initial 13-Week Projection and (B) the Initial DIP Budget;

(x)     [reserved];

(xi)     [reserved];

(xii)     a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, certifying that each of the conditions set forth in Sections 4.01(f), (h) and (i) and Sections 4.02(d) and (e), has been satisfied as of such date;

(xiii)     evidence that the Fee Letter has been executed and delivered to the Administrative Agent; and

(xiv)     executed counterparts of the Pledge Agreement – Gib from Peabody Investments (Gibraltar) Limited;

provided that to the extent that any of the items described in the foregoing clauses (1)-(7) of subpart (iii) (except with respect to subpart (iii) itself, and with respect to any Loan Party that shall not be a Debtor, except with respect to clause (iii)(1)) and subparts (viii) and (xiv), shall not have been received by the Administrative Agent notwithstanding the Borrower's use of its commercially reasonable efforts to provide the same, delivery of such items shall not constitute a condition to the effectiveness of this Agreement and the obligations of each Initial Lender to make Loans hereunder and of the L/C Issuer to issue Letters of Credit hereunder, and the Borrower shall instead cause such items to be delivered to the Administrative Agent not later than sixty (60) days following the Closing Date (or such later date as the Administrative Agent shall agree in its discretion).

(b)     The Petition Date shall have occurred.

(c)      The Interim Order Entry Date shall have occurred not later than five (5) Business Days following the Petition Date.

(d)      All (i) "first day orders" and all related pleadings intended to be entered on or prior to the Interim Order Entry Date (including a "cash management order") shall have been entered by the Bankruptcy Court and shall be reasonably satisfactory in form and substance to the Administrative Agent and (ii) forms of "second day order" filed but not yet entered shall be reasonably satisfactory in form and substance to the Administrative Agent[, it being understood that drafts approved by counsel to the Administrative Agent on or prior to the Petition Date are reasonably satisfactory][6].

(e)      No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(f)      Since December 31, 2015, there shall have been no Material Adverse Effect.

(g)      All necessary governmental and third party consents and approvals necessary in connection with the Facilities and the transactions contemplated hereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Administrative Agent) and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Administrative Agent that restrains, prevents or imposes materially adverse conditions upon the Facilities or the transactions contemplated hereby.

(h)      There shall not occur as a result of, and after giving effect to, the initial extension of credit under the Facilities, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective Domestic Subsidiaries' debt instruments and other material agreements which (i) in the case of the Loan Parties' debt instruments and other material agreements, would permit the counterparty thereto to exercise remedies thereunder (in the case of Loan Parties that are Debtors, on a post-petition basis) or (ii) in the case of debt instruments or other material agreements of any Subsidiary, could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(i)      There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases, any dispute over self-bonding or intercreditor litigation) that could reasonably be expected to have a Material Adverse Effect.

(j)      The amount of the Loans made on the Closing Date shall not exceed the amount authorized by the Interim Order.

(k)      Any fees required to be paid on or before the Closing Date to the Administrative Agent, the Arranger or the Lenders under this Agreement, the Fee Letter or otherwise in connection with the Facilities shall have been paid and, unless waived by the Administrative

---

[6] Brackets to be removed following agreement on acceptable "first days".

Agent, the Arranger or the Lenders, as applicable, and to the extent invoiced at least one (1) Business Day prior to the Closing Date, the Borrower shall have paid all reasonable and documented expenses of the Arranger or the Lenders (including the reasonable and documented fees and expenses of counsel to the Administrative Agent, plus such additional amounts of such reasonable and documented fees and expenses (including filing fees in respect of collateral) as shall constitute its reasonable estimate of such fees and expenses incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent).

(l)　　The Administrative Agent and the Lenders shall be reasonably satisfied with the terms of the Intercompany Credit Agreement, including any security or collateral arrangements in support thereof (it being understood that the drafts of such documents approved by counsel to the Administrative Agent on or prior to the Petition Date are reasonably satisfactory), and the foregoing shall be in full force and effect.

(m)　　The A/R Facility shall have been further amended on terms substantially consistent with those provided to the Administrative Agent prior to the Petition Date and the Bankruptcy Court shall have entered the A/R Interim Order, which A/R Interim Order shall be in full force and effect and not stayed.

(n)　　The Administrative Agent and each Lender that has requested the same shall have received all documentation and other information required by regulatory authorities with respect to the Borrower and the other Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act, that has been requested by the Arranger at least five (5) Business Days prior to the Closing Date.

(o)　　The Global Center Funding Account shall have been established and the Borrower shall have caused $250,000,000 to have been deposited therein.  The Global Center Controlled Account shall have been established and the Borrower shall have caused not less than $200,000,000 to have been deposited therein.

Without limiting the generality of the provisions of Section 10.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02　　Conditions to all Credit Extensions**.  On the date of (x) each Borrowing, (y) each issuance, amendment, extension or renewal or a Letter of Credit and (z) the granting of a Bonding Superpriority Claim (each such event, a "Credit Extension"):

(a)　　The Closing Date shall have occurred.

(b)　　The Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders; provided that if at the time of the making of any Loan or the issuance of any Letter of Credit the aggregate amount of such

Loan or Letter of Credit, together with all the aggregate principal amount of all Loans and Letters of Credit then outstanding, would exceed the amount under the applicable Facility authorized by the Interim Order (such excess amount, the "Additional Credit"), the Administrative Agent and each of the Lenders shall have received a final copy of an order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are satisfactory in form and substance to the Administrative Agent in its sole discretion; provided that any such order that does not approve the full amount of the Term Loan Facility shall not be acceptable to the Administrative Agent; provided further that if any such proposed modification would otherwise constitute a Tranche Voting Matter hereunder and is adverse to the interests of the Specified Lenders (in their capacities as such), the consent of the Required Specified Lenders shall also be required) and authorizing such Additional Credit on a final basis (the "Final Order"), which, in any event, shall have been entered by the Bankruptcy Court no later than the date that is forty-five (45) days following the Interim Order Entry Date (or such later date (but in no event later than sixty (60) days following the Interim Order Entry Date) as approved by the Required Lenders) and at the time of the extension of any Additional Credit the Final Order shall be in full force and effect, and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Administrative Agent and the Required Lenders; and if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the issuance of any Letter of Credit nor the performance by any Loan Party of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(c)     With respect to any Credit Extensions on or after the date of entry of the Final Order, (x) all material "second day orders" and all related pleadings intended to be entered on or prior to the date of entry of the Final Order, including a final cash management order (unless the Administrative Agent shall have consented to a reasonable extension or adjournment), the A/R Final Order and any order establishing procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court, and (y) all pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Administrative Agent, or this condition is waived by the Administrative Agent. [The Administrative Agent acknowledges that the form of such orders substantially in the forms filed on the Petition Date are acceptable.][7]

(d)     The representations and warranties of the Borrower and each other Loan Party contained in each Loan Document to which it is a party shall be true and correct in all material respects (or in all respects if any such representation and warranty is already qualified by materiality) on and as of the date of such Credit Extension or such granting of a Bonding Superpriority Claim, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or in all respects, as the case may be) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section

---

[7] Brackets to be removed following agreement on acceptable "first days".

5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(e)     No Default or Event of Default shall exist, or would result immediately, from such proposed Credit Extension or the application of the proceeds thereof.

(f)     The Administrative Agent and, if applicable, L/C Issuer, shall have received a Request for Credit Extension in accordance with the requirements hereof.

(g)     [Reserved].

(h)     The making of such Loan (or the issuance of such Letter of Credit) shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(i)     In the case of the granting of any Bonding Superpriority Claim, after giving effect thereto the Bonding Superpriority Claim Amount shall not exceed (x) the Bonding Accommodation Cap minus (y) the aggregate face amount of all Bonding Facility Letters of Credit issued hereunder following the Closing Date.

(j)     Solely with respect to the second Borrowing of Loans, the Borrower shall have paid all fees of the Administrative Agent and the Lenders accrued and payable on or prior to the date of the second Borrowing.

Each Request for Credit Extension (other than a Borrowing Notice requesting only a conversion of Loans to the other Type or a continuation of Eurocurrency Rate Loans) submitted by the Borrower and each granting of a Bonding Superpriority Claim shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(b), (d), (e), (h) and (i) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and the Lenders that:

**5.01    Existence, Qualification and Power**.  Each of the Borrower and each of its Restricted Subsidiaries (a) (i) is duly organized or formed and validly existing and (ii) is in good standing under the Laws of the jurisdiction of its incorporation or organization, if such legal concept is applicable in such jurisdiction, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and subject to the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed, and is in good standing (to the extent good standing is an applicable legal concept in the relevant jurisdiction), under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each

case referred to in underline clauses (a)(ii), (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.02    Authorization; No Contravention**.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) have been duly authorized by all necessary corporate or other organizational action and (b) do not and will not (i) contravene the terms of any of such Person's Organizational Documents; (ii) except in respect of or to the extent arising under the Existing Debt Documents, conflict with or result in any breach or contravention of, or the creation of, any Lien (except for any Liens that may arise under the Loan Documents) under, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, other than any such conflict or breach that is rendered inapplicable or unenforceable as a result of the filing of the Cases, or (B) any order, injunction, writ or decree of any Governmental Authority to which such Person or its property is subject or (C) any arbitral award to which such Person or its property is subject; or (iii) violate any Law binding on such Loan Party, except in each case referred to in clauses (b)(ii) or (b)(iii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.03    Governmental Authorization**.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and subject to the terms thereof, (a) no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority and (b) no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with any other Person, in each case, is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for those approvals, consents, exemptions, authorizations or other actions which have already been obtained, taken, given or made and are in full force and effect.

**5.04    Binding Effect**.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and subject to the terms thereof, this Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject, in the case of each Loan Party that is a Debtor, to the entry of the Orders and subject to the terms thereof, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to (i) except in the case of each Loan Party that is a Debtor, applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other Laws relating to or affecting creditors' rights generally, (ii) general principles of equity, regardless of whether considered in a proceeding in equity or at law and (iii) an implied covenant of good faith and fair dealing.

**5.05    Financial Statements; No Material Adverse Effect**.

(a)    The Audited Financial Statements–2015 of the Borrower and its Subsidiaries (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein and (ii) fairly present in all material respects

the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)     [Reserved].

(c)     Since the date of the Audited Financial Statements–2015, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     The Initial DIP Budget and each DIP budget delivered pursuant to Section 6.02(i) (and if applicable, the Extension DIP Budget) and the all 13-Week Projections that have been delivered were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing at the time of delivery of such forecasts (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

**5.06     Litigation**.  Except for the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower threatened, at law, in equity, by or before any Governmental Authority, by or against the Borrower or any of its Restricted Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in public filings with the U.S. Securities and Exchange Commission prior to the Petition Date, as to which, in the case of both (a) and (b), there is a reasonable possibility of an adverse determination and that could reasonably be expected to have a Material Adverse Effect.

**5.07     No Default**.  No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08     Ownership and Identification of Property**.

(a)     The Borrower and its Restricted Subsidiaries have good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, with respect to all Material Leased Real Property: (i) the Borrower and its Restricted Subsidiaries possess all leasehold interests necessary for the operation of the Mines currently being operated by each of them and included or purported to be included in the Collateral pursuant to the Security Documents, except where the failure to possess such leasehold interests could not reasonably be expected to have a Material Adverse Effect, (ii) each of their respective rights under any Real Property Lease necessary for the operation of such Mines are in full force and effect, except to the extent that failure to maintain such Real Property Lease in full force and effect could not reasonably be expected to have a Material Adverse Effect; and (iii) each of the Borrower and its Restricted Subsidiaries possesses all licenses, permits or franchises which are necessary to carry out its

business as presently conducted at any Mine included or purported to be included in the Collateral pursuant to the Security Documents, except where failure to possess such licenses, permits or franchises could not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

(b)    Schedule 5.08(b) lists completely and correctly as of the Closing Date all Material Owned Real Property.

(c)    Schedule 5.08(c) lists completely and correctly as of the Closing Date all Material Leased Property.

(d)    Schedule 5.08(d) lists completely and correctly as of the Closing Date all Real Property on which a Building is located.

**5.09    Environmental Compliance**.  Except as disclosed in the Borrower's most recent annual and quarterly reports filed with the SEC or on Schedule 5.09, or as otherwise could not reasonably be expected to have a Material Adverse Effect:

(a)    The facilities and properties currently or formerly owned, leased or operated by the Borrower, or any of its respective Subsidiaries (the "Properties") do not contain any Hazardous Materials in amounts or concentrations which (i) constitute a violation of, or (ii) could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(b)    None of the Borrower nor any of its respective Subsidiaries has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding compliance with or liability under Environmental Laws with regard to any of the Properties or the business operated by the Borrower, or any of its Subsidiaries (the "Business"), or any prior business for which the Borrower has retained liability under any Environmental Law.

(c)    Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could reasonably be expected to give rise to liability under, any applicable Environmental Law, nor have any Hazardous Materials been generated, treated, stored or disposed of at, or under any of the Properties in violation of, or in a manner that could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(d)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened under any Environmental Law to which the Borrower, or any of its Subsidiaries is or, to the knowledge of the Borrower, will be named as a party or with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other similar administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business.

(e)    There has been no release or threat of release of Hazardous Materials at or from the Properties, or arising from or related to the operations of the Borrower, or any of its Subsidiaries in connection with the Properties or otherwise in connection with the Business, in

violation of or in amounts or in a manner that could reasonably be expected to give rise to liability under any applicable Environmental Laws.

(f)     The Properties and all operations at the Properties are in compliance with all applicable Environmental Laws.

(g)     The Borrower and each of its Subsidiaries has obtained, and is in compliance with, all Environmental Permits required for the conduct of its businesses and operations, and the ownership, occupation, operation and use of its Property, and all such Environmental Permits are in full force and effect.

**5.10    Insurance**.

(a)     The properties of the Borrower and its Restricted Subsidiaries are insured with financially sound and reputable insurance companies which may be Affiliates of the Borrower, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Restricted Subsidiary operates.

(b)     As to any Building located on Real Property and constituting Collateral, all flood hazard insurance policies required hereunder have been obtained and remain in full force and effect, and the premiums thereon have been paid in full.

**5.11    Taxes**.  The Borrower and its Restricted Subsidiaries have filed all applicable US Federal, state, foreign and other material tax returns and reports required to be filed, and have paid all US Federal, state, foreign and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable (other than those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP), except where failure to do any of the foregoing could not reasonably be expected to result in a Material Adverse Effect or to the extent such Tax need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code.

**5.12    ERISA Compliance**.  Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:

(a)     Each Plan is in material compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state Laws (except that with respect to any Multiemployer Plan which is a Plan, such representation is deemed made only to the knowledge of the Borrower), and each Foreign Plan is in material compliance in all respects with the applicable provisions of Laws applicable to such Foreign Plan.

(b)     There has been no nonexempt "prohibited transaction" (as defined in Section 406 of ERISA) or violation of the fiduciary responsibility rules with respect to any Plan.

(c)      (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; and (iii) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries**.    As of the Closing Date, the Borrower has no Restricted Subsidiaries other than those specifically disclosed in Schedule 5.13.

**5.14    Margin Regulations; Investment Company Act**.

(a)      The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)      None of the Borrower, any Person Controlling the Borrower, nor any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**.    No report, financial statement, certificate or other information furnished in writing by the Borrower or any other Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document, taken as whole with any other information furnished or publicly available, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading as of the date when made or delivered; provided that, with respect to any forecast, projection or other statement regarding future performance, future financial results or other future developments, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information was prepared (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

**5.16    Compliance with Laws**.    Except as a result of the filing of the Cases, the Borrower and each Restricted Subsidiary is in compliance in all material respects with the requirements of all Laws (including any zoning, building, ordinance, code or approval or any building or mining permits and all orders, writs, injunctions and decrees applicable to it or to its properties), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**5.17    Anti-Terrorism Laws and Sanctions**.

(a)      No Loan Party and, to the knowledge of the Borrower, no officer, director, employee, broker, agent or Affiliate of any Loan Party is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Uniting

and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "<u>Patriot Act</u>") or any applicable Sanctions.

(b)    No Loan Party, Subsidiary, or any director or officer thereof, and, to the knowledge of the Borrower, no employees, broker, other agent or Affiliate of any Loan Party acting or benefiting in any capacity in connection with the Loans is, or is owned or controlled by one or more persons that are, any of the following:

(i)    a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("<u>OFAC</u>") at its official website or any replacement website or other replacement official publication of such list; or

(v)    a person that is (i) currently the subject or target of any Sanctions or (ii) located, organized or resident in a Designated Jurisdiction.

(c)    No Loan Party, or any director or officer thereof, and, to the knowledge of the Borrower, no employees, agent, when acting on behalf of any Loan Party, or Affiliate of any Loan Party is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the United States Foreign Corrupt Practices Act of 1977, as amended (and the rules and regulations thereunder) (the "<u>FCPA</u>") or any other applicable anti-corruption law, including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, or to any other person, in contravention of the FCPA or any other applicable anti-corruption law and the Borrower, its subsidiaries and, to the knowledge of the Borrower, its affiliates have conducted their businesses in compliance with the FCPA and all other applicable anti-corruption laws in all material respects and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

**5.18    Intellectual Property; Licenses, Etc.**    The Borrower and its Restricted Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "<u>IP Rights</u>") that are reasonably necessary for the operation of their respective businesses, except where the failure to own or possess the right to use such IP Rights could not

reasonably be expected to have a Material Adverse Effect. To the best knowledge of the Borrower, the use of such IP Rights by the Borrower or any Subsidiary does not infringe upon any rights held by any other Person except for any infringement that could not reasonably be expected to have a Material Adverse Effect. Except as specifically disclosed in Schedule 5.18, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which could reasonably be expected to have a Material Adverse Effect.

**5.19    Security Documents**.

(a)      (i) Subject to and upon the entry of the Orders in respect of any Loan Party that is a Debtor, each Security Document (other than each Mortgage), when executed and delivered, is effective to create in favor of the Administrative Agent (for the benefit of the Lenders), a legal, valid and enforceable security interest in the Collateral described therein and the Administrative Agent has been authorized (and is hereby authorized) to make all filings of UCC-1 and As-Extracted Collateral financing statements in the appropriate filing office necessary or desirable to fully perfect its security interest in such Collateral described therein which can be perfected by filing a UCC-1 financing statement in the appropriate filing office (excluding, in each case, Excluded Assets) and (ii) with respect to the security interest created in the Collateral pursuant to each Security Document (other than each Mortgage), upon such filings in the applicable filing offices (or, (i) with respect to possessory Collateral, upon the taking of possession by the Administrative Agent of any such Collateral which may be perfected by possession and (ii) with respect to any Collateral constituting deposit or securities accounts, upon entry into an appropriate control agreement), such security interests will, subject to the existence of non-consensual Liens having priority by operation of law or Liens permitted by Section 7.01, constitute perfected first-priority Liens on, and security interests in, all right, title and interest of the debtor party thereto in the Collateral described therein that can be perfected by filing a UCC-1 or As-Extracted financing statement, as applicable, in each such filing office or by delivery, in the case of possessory Collateral, or by the entry into a control agreement, in the case of deposit or securities accounts.

(b)      Each of the Mortgages (if any), when executed and delivered, will be effective to create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on the Material Real Property described therein and such security interests will constitute, upon such Mortgage being and recorded in the appropriate filing offices, fully perfected Liens on such Material Real Property, subject only to the existence of Liens as permitted by Section 7.01 and having priority by operation of law.

**5.20    Mines**.  Schedule 5.20 sets forth a complete and accurate list of all Mines (including addresses and the owner thereof) owned or operated by the Borrower or any of its Restricted Subsidiaries as of the Closing Date and included or purported to be included in the Collateral pursuant to the Security Documents.

**5.21    Use of Proceeds**.  The Borrower will use the proceeds from Loans and the issuance of Letters of Credit for working capital and general corporate purposes, including for the payment of fees and expenses in connection with the Facilities and the Cases; provided that Bonding Facility Letters of Credit shall be used only for Permitted Bonding Purposes.

#88215025v32

# ARTICLE VI
## AFFIRMATIVE COVENANTS

Until Payment in Full, each Loan Party shall, and shall (except in the case of the covenants set forth in <u>Section 6.01</u>, <u>6.02</u>, and <u>6.03</u>) cause each of their respective Restricted Subsidiaries to:

**6.01    Financial Statements**.  Deliver to the Administrative Agent (for distribution to each Lender), in form and detail reasonably satisfactory to the Administrative Agent:

(a)    within ninety (90) days after the end of each fiscal year of the Borrower (commencing with the fiscal year ended December 31, 2016) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year (in each case together with corresponding consolidating financial statements of (i) the Loan Parties, (ii) all Subsidiaries of the Borrower formed under the laws of Australia and (iii) all other Subsidiaries), setting forth in each case in comparative form (but only in the case of the preceding clause (i)) the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP; such consolidated statements shall be audited and accompanied by a report and opinion of Ernst & Young LLP or another independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or exception as to the scope of such audit;

(b)    within forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower (commencing with the fiscal quarter ended March 31, 2016), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended (in each case together with corresponding consolidating financial statements of (i) the Loan Parties, (ii) all Subsidiaries of the Borrower formed under the laws of Australia and (iii) all other Subsidiaries), setting forth in each case in comparative form (but only in the case of the preceding clause (i)) the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail; such consolidated statements shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)    within twenty (20) days after the end of each fiscal month, commencing with the month ending May 31, 2016, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month (or in the case of May 31, 2016, for the period from the Petition Date through May 31, 2016), and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such period (in each case together with corresponding consolidating financial statements of the Loan Parties), all in reasonable detail; such consolidated statements shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in

shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; provided that to the extent any of the financial information required to be delivered by this Section 6.01(c) is contained in a "Monthly Operating Report" filed with the Bankruptcy Court for the applicable month on or prior to the date specified for compliance in this Section 6.01(c), then the requirements of this Section 6.01(c) shall be deemed satisfied by the timely filing of such "Monthly Operating Report".

As to any information contained in materials furnished pursuant to Section 6.02(c), the Borrower shall not be separately required to furnish such information under clauses (a)-(c) above, but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in clauses (a)-(c) above at the times specified therein.

      **6.02**    **Certificates; Other Information**.  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent:

      (a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent certified public accountants reporting on such financial statements stating that in performing their audit nothing came to their attention that caused them to believe the Borrower failed to comply with the financial covenants set forth in Section 7.11, except as specified in such certificate;

      (b)    concurrently with the delivery of the financial statements referred to in Section 6.01(a), (b) or (c), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower, which shall include detailed computations of the financial covenants;

      (c)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

      (d)    promptly, such additional information regarding the business, financial or corporate affairs of the Borrower or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request;

      (e)    (i) as soon as reasonably practicable in advance of filing with the Bankruptcy Court or delivering to the Creditors' Committee or the U.S. Trustee, as the case may be, the Final Order and all other proposed orders and pleadings related to the Loans and the Loan Documents, any Reorganization Plan and/or any disclosure statement related thereto and (ii) by the earlier of (A) two (2) Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrower or

any of its Subsidiaries or other Indebtedness of the Loan Parties or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure;

(f)     on Friday of every other calendar week, commencing on April 22, 2016, (i) a 13-Week Projection and (ii) a written statement setting forth the amount of cash and Permitted Investments held by Global Center (including in each of the Global Center Funding Account and the Global Center Controlled Account) and the current amount outstanding in respect of the Intercompany Credit Agreement;

(g)     promptly after the same are available, copies of all Cash Flow Projections (as defined in the Intercompany Credit Agreement) provided to Global Center pursuant to the Intercompany Credit Agreement;

(h)     (i) from and after the Liquidity Test Start Date, on Wednesday of each week, a certificate signed by a Financial Officer of the Borrower, setting forth Consolidated Liquidity (as calculated for purposes of compliance with Section 7.11(b)) as of the close of business on the preceding Friday and certifying compliance (or non-compliance, as the case may be), with the covenant contained in Section 7.11(b) and (ii) in addition to the weekly certificate required by the foregoing clause (i), commencing on the day following the Wednesday on which the weekly certificate demonstrates that Consolidated Liquidity (calculated without any adjustments that apply solely for purposes of compliance with Section 7.11(b)) as of the end of the prior Friday is less than the Minimum Liquidity Reporting Trigger, notice thereof, and thereafter (on a daily basis), written notice of the amount of Consolidated Liquidity at the end of each Business Day, until such time as Consolidated Liquidity (calculated without any adjustments that apply solely for purposes of compliance with Section 7.11(b)) is greater than the Minimum Liquidity Reporting Trigger; and

(i)     at the time of each delivery of financial information pursuant to Sections 6.01(a) or (b), a DIP budget in substantially the form of the Initial DIP Budget, covering the period from the time of delivery of such DIP budget through the then in effect Stated Maturity Date.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(c) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 11.02; (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); or (iii) on which such documents are filed for public availability on the SEC's Electronic Data Gathering and Retrieval system.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do

not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender").  The Borrower hereby agrees that so long as the Borrower is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (a) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (b) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, the L/C Issuer and the Lenders to treat the Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (c) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (d) the Administrative Agent and the Arranger shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."  Notwithstanding the foregoing, the Borrower shall not be under any obligation to mark the Borrower Materials "PUBLIC."  In connection with the foregoing, each party hereto acknowledges and agrees that the foregoing provisions are not in derogation of their confidentiality obligations under Section 11.07.

   **6.03**  **Notices**.  Notify the Administrative Agent:

   (a)     promptly, of the occurrence of any Default or Event of Default;

   (b)     promptly, of any event which could reasonably be expected to have a Material Adverse Effect;

   (c)     of the occurrence of any ERISA Event that, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect, as soon as possible and in any event within thirty (30) days after the Borrower knows or has obtained notice thereof;

   (d)     within fifteen (15) days of any Loan Party changing its legal name, jurisdiction of organization or the location of its chief executive office or sole place of business;

   (e)     to the extent that there will be a cancellation or material reduction in amount or material change in coverage for any insurance maintained by the Borrower or any Guarantor, at least ten (10) days prior to such cancellation, reduction or change;

   (f)     promptly following the filing or commencement of, or receipt of any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against the Borrower or any of its Restricted Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, could reasonably be expected to have a Material Adverse Effect; and

   (g)     the incurrence of any Environmental Liability or any contingent liability, in each case affecting the Borrower or any of its Restricted Subsidiaries, that could reasonably be expected to have a Material Adverse Effect;

(h)      promptly, as to any Building located on Real Property and constituting Collateral, any redesignation of any such property on which such Building is located into or out of a special flood hazard area.

Each notice pursuant to clauses (a)-(c) of this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**6.04    Payment of Tax Obligations**.   Except where failure to do so could not reasonably be expected to result in a Material Adverse Effect, pay and discharge all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets (in the case of any Debtor, solely to the extent arising post-petition), unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary.

**6.05    Preservation of Existence**.  Preserve, renew and maintain in full force and effect its legal existence except in a transaction permitted by Section 7.04.

**6.06    Maintenance of Properties**.  (a) Maintain, preserve and protect all of its material properties and material equipment, including Collateral, necessary in the operation of its business in good working order and condition (ordinary wear and tear and damage by fire or other casualty or taking by condemnation excepted), except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)      Keep in full force and effect all of its material leases and other material contract rights, and all material rights of way, easements and privileges necessary or appropriate for the proper operation of the Mines being operated by the Borrower or a Restricted Subsidiary and included or purported to be included in the Collateral by the Security Documents, in the case of leases and other contract rights, (x) subject to an applicable order of the Bankruptcy Court with respect to such leases or other contract rights, (y) excluding such leases or other contract rights rejected under Section 365 and (z) excluding such leases or other contract rights where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance**.  (a) Maintain with financially sound and reputable insurance companies which may be Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Restricted Subsidiary operates, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)      With respect to any Building located on Real Property and constituting Collateral, the Borrower shall and shall cause each appropriate Loan Party to (i) maintain fully paid flood hazard insurance on any such Building that is located in a special flood hazard area, on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 and

(ii) furnish to the Administrative Agent an insurance certificate evidencing the renewal (and payment of renewal premiums therefor) of all such policies prior to the expiration or lapse thereof (or at such other time acceptable to the Administrative Agent). The Borrower shall cooperate with the Administrative Agent's reasonable request for any information reasonably required by the Administrative Agent to comply with The National Flood Insurance Reform Act of 1994, as amended.

**6.08    Compliance with Laws**.  Except as otherwise excused by the Bankruptcy Code with respect to any Loan Party that is a Debtor, comply in all material respects with the requirements of all Laws (including Environmental Laws, the PATRIOT Act, OFAC and the FCPA) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**6.09    Books and Records**.  (a) Maintain proper books of record and account, in which in all material respects full, true and correct entries in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all material requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Restricted Subsidiary, as the case may be.

**6.10    Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom (except to the extent (a) any such access is restricted by a Requirement of Law or (b) any such agreements, contracts or the like are subject to a written confidentiality agreement with a non-Affiliate that prohibits the Borrower or any of its Subsidiaries from granting such access to the Administrative Agent or the Lenders; provided that, with respect to such confidentiality restrictions affecting the Borrower or any of its Restricted Subsidiaries, a Responsible Officer is made available to such Lender to discuss such confidential information to the extent permitted), and to discuss the business, finances and accounts with its officers and independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, provided that the Administrative Agent or such Lender shall give the Borrower reasonable advance notice prior to any contact with such accountants and give the Borrower the opportunity to participate in such discussions.

**6.11    Use of Proceeds**.  Use the proceeds of the Loans and the issuance of Letters of Credit solely for the purposes described in Section 5.21.  The Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person, for the purpose of financing activities of or with any person that is the subject of Sanctions, in a Designated Jurisdiction, or in any manner that would result in a violation by any Person participating in this Loan, whether as Borrower, Lender or Agent, of (i) any Sanctions, (ii) the FCPA or any other anti-corruption law or (iii) any Anti-Terrorism Law.

**6.12    Additional Guarantors**.  At the Borrower's expense, subject to any applicable limitation in any Security Document, the Borrower shall within forty-five (45) days (or such longer period as the Administrative Agent may agree in its reasonable discretion) after (1) the formation or acquisition of any new direct or indirect wholly-owned Domestic Subsidiary by any Loan Party or (2)  any Domestic Subsidiary becoming a wholly-owned Domestic Subsidiary (excluding, for the avoidance of doubt P&L Receivables Company LLC (so long as it does not engage in activities other than the acquisition, financing, sale, pledge and disposition of Receivables Assets (or interests therein) in connection with the A/R Facility and other activities incidental thereto), the Borrower shall:  (a) unless the Administrative Agent otherwise agrees, cause each such wholly-owned Domestic Subsidiary to (x) become a Debtor, (y) execute a joinder to this Agreement in the form attached hereto as Exhibit B (each, a "Joinder Agreement") in order to become a "Guarantor" hereunder and (b) execute all documents and take all related actions required by Section 6.16 of this Agreement; provided that the Borrower need not cause any FSHCO to become a Guarantor if making such FSHCO a Guarantor would result in adverse Tax consequences to the Borrower or its Restricted Subsidiaries.

**6.13    [Reserved]**.

**6.14    Preparation of Environmental Reports**.   If an Event of Default caused by reason of a breach under Section 6.08 or 5.09 with respect to compliance with Environmental Laws shall have occurred and be continuing, at the reasonable request the Administrative Agent, provide, in the case of the Borrower, to the Lenders within sixty (60) days after such request, at the expense of the Borrower, an environmental or mining site assessment or audit report for the Properties which are the subject of such default prepared by an environmental or mining consulting firm reasonably acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Properties and the estimated cost of curing any violation or non-compliance of any Environmental Law.

**6.15    Certain Long Term Liabilities and Environmental Reserves**.  To the extent required by GAAP, maintain adequate reserves for (a) future costs associated with any lung disease claim alleging pneumoconiosis or silicosis or arising out of exposure or alleged exposure to coal dust or the coal mining environment, (b) future costs associated with retiree and health care benefits, (c) future costs associated with reclamation of disturbed acreage, removal of facilities and other closing costs in connection with closing its mining operations and (d) future costs associated with other potential environmental liabilities.

**6.16    Covenant to Give Security**.

(a)    Personal Property including IP of New Guarantors. Concurrently with any Person becoming a Guarantor pursuant to Section 6.12 (or a later date to which the Administrative Agent agrees), cause any such new Guarantor to (i) duly execute and deliver to the Administrative Agent counterparts to the Security Agreement or such other document as the Administrative Agent shall reasonably deem appropriate for such purpose, (ii) to the extent that any Equity Interests in, or owned by, such new Guarantor is required to be pledged pursuant to the Security Agreement, deliver stock certificates, if any, representing such Equity Interests accompanied by undated stock powers or instruments of transfer executed in blank and (iii) to

the extent that any Intellectual Property (as defined in the Security Agreement) owned by a Loan Party is required to be pledged pursuant to the Security Agreement but has not been pledged, deliver any supplements to the IP Security Agreements reasonably requested by the Administrative Agent.

(b)    Real Property of Guarantors. Within sixty (60) days after receipt of the Administrative Agent's reasonable written request pursuant to the last sentence of Section 2.19(b), with respect to any Material Real Property then owned or leased by any Loan Party or a new Guarantor, the Borrower shall deliver to the Administrative Agent or otherwise take the actions described below:

(i)    with respect to Material Owned Real Property, a Mortgage duly executed and acknowledged by such Loan Party, and in form for recording in the recording office where such Material Owned Real Property is located, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof under applicable law, in each case in form and substance reasonably satisfactory to the Administrative Agent;

(ii)    with respect to Material Leased Real Property where the terms of the lease of such Material Leased Real Property (or applicable state law, if such lease is silent on the issue) do not prohibit a mortgage thereof, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent, leasehold mortgages or leasehold deeds of trust, in form and substance satisfactory to the Administrative Agent, securing payment of all the Obligations of the applicable Loan Party under the Loan Documents;

(iii)    to the extent reasonable available, cause the applicable Loan Party to provide the Administrative Agent with a legal description of any Material Owned Real Property or any Material Leased Real Property, as applicable, from which any As-Extracted Collateral will be severed or to which As-Extracted Collateral otherwise relates, together with the name of the record owner of such Material Owned Real Property or Material Leased Real Property, as applicable, the county in which such Material Owned Real Property or Material Leased Real Property, as applicable, is located, accurate real estate descriptions sufficient to locate such real property on the ground and such other information as may be necessary or desirable to file real property related financing statements, deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages and/or leasehold deeds of trust under Section 9-502(b) or 9-502(c) of the UCC or any similar legal requirements;

(iv)    to the extent reasonably available, cause the applicable Loan Party to provide the Administrative Agent with all geological data, reserve data, material existing mine maps, surveys, title insurance policies, title insurance, abstracts and other evidence of title, core hole logs and associated data, Coal measurements, Coal samples, lithologic data, Coal reserve calculations or reports, washability analyses or reports, quality analyses, mine plans, mining permit applications and supporting data, engineering studies and all other information, maps, reports and data in the possession of such Loan Party and relating to or affecting Material Real Property, including the Coal reserves, Coal

ownership, Real Property Leases, mining conditions, mines, and mining plans of such Loan Party as prepared and utilized by such Loan Party in its ordinary course of business;

(v)     a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to all Real Property that constitutes Collateral on which a Building is located (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto if such Real Property is located in a special flood hazard area);

(vi)     as to any Real Property that constitutes Collateral on which a Building is located and that is located in a special flood hazard area, a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.10(b) of this Agreement, each of which shall (1) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable); (2) name the Administrative Agent, on behalf of the Secured Parties, as additional insured; (3) (x) identify the addresses of the applicable Real Property  located in a special flood hazard area, (y) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (z) provide that the insurer will give the Administrative Agent forty-five (45) days' written notice of cancellation or non-renewal and (4) otherwise be in form and substance satisfactory to the Administrative Agent;

(vii)     evidence reasonably acceptable to the Administrative Agent of payment by the Borrower of all search and examination charges, mortgage recording taxes and related charges required for the recording of any Mortgage; and

(viii)     with respect to any such Material Real Property, an opinion of local counsel in form and substance reasonably satisfactory to the Administrative Agent and such other documents, instruments, certificates and materials to the extent reasonably requested by the Administrative Agent, each in form and substance reasonably satisfactory to the Administrative Agent.

(c)     Personal Property including IP Acquired by Borrower or Guarantors.  Within thirty (30) days of the date on which any Compliance Certificate referred to in Section 6.02 is required to be delivered (or a later date to which the Administrative Agent agrees), shall, in the case of the Borrower, or cause any such Restricted Subsidiary otherwise to, (i) to the extent that any Equity Interests in, or owned by, a Loan Party is required to be pledged pursuant to the Security Agreement but has not been pledged, deliver stock certificates, if any, representing such Equity Interests accompanied by undated stock powers or instruments of transfer executed in blank and execute and deliver to the Administrative Agent supplements to the Security Agreement or such other document as the Administrative Agent shall reasonably deem appropriate to pledge any such Equity Interests and (ii) to the extent that any Intellectual Property (as defined in the Security Agreement) owned by a Loan Party is required to be pledged pursuant to the Security Agreement but has not been pledged, deliver any supplements to the IP Security Agreements reasonably requested by the Administrative Agent.

(d)    _Further Assurances_.  Subject to any applicable limitation in any Security Documents, upon request of the Administrative Agent, at the expense of the Borrower, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, the Security Documents, including the filing of financing statements necessary or advisable in the opinion of the Administrative Agent to perfect any security interests created under the Security Documents.

(e)    _Collateral Principles_.  Notwithstanding anything to the contrary in any Loan Document, (i) except as contemplated by the Pledge Agreement – Gib, no actions in any non-U.S. jurisdiction or required by the Requirement of Law of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. (it being understood that, except for the Pledge Agreement – Gib, there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction), (ii) the Administrative Agent in its discretion may grant extensions of time for the creation or perfection of security interests in, and Mortgages on, or taking other actions with respect to, particular assets where it reasonably determines in consultation with the Borrower, that the creation or perfection of security interests and Mortgages on, or taking other actions, cannot be accomplished without undue delay, burden or expense by the time or times at which it would otherwise be required by this Agreement or the Security Documents and (iii) any Liens required to be granted from time to time pursuant to Security Documents and this Agreement on assets of the Loan Parties to secure to the Obligations shall exclude the Excluded Assets.

**6.17    Compliance with Leases**.  Except as otherwise excused by the Bankruptcy Court or as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, make all payments and otherwise perform all obligations in respect of all Material Leases to which any Loan Party is a party, keep such Material Leases in full force and effect and not allow such Material Leases to lapse or be terminated or any rights to renew such Material Lease to be forfeited or cancelled, except or in connection with the rejection of any unexpired lease pursuant to Section 8.01.

**6.18    First and Second Day Orders**.  Cause all proposed "first day" orders and "second day" orders submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Administrative Agent in all respects, it being understood and agreed that the forms of orders approved by the Administrative Agent prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are reasonably acceptable.

**6.19    Milestones**.

(a)    Not later than the date that is one hundred twenty (120) days following the Petition Date, the Borrower shall deliver a 5-year business plan with respect to U.S. operations of the Borrower and its Subsidiaries (the "U.S. Business Plan"), in form and substance reasonably acceptable to the Required Lenders (provided that any such U.S. Business Plan with respect to which the Administrative Agent has provided notice and a copy thereof to the Lenders, in accordance with the notice provisions hereof, and with respect to which Lenders constituting the Required Lenders shall not have notified the Administrative Agent (within five (5) Business

Days of the posting thereof) that such U.S. Business Plan is not reasonably acceptable, shall be deemed reasonably acceptable to the Required Lenders), which U.S. Business Plan shall be prepared on a monthly basis for the fiscal years 2016 and 2017; *provided* that the Borrower shall, not later than the date that is sixty (60) days from the Petition Date, deliver to then Administrative Agent a written update setting forth in reasonable detail the Borrower's progress in formulating the U.S. Business Plan and any material developments with respect thereto with the Petition Date.

(b)     No later than the date that is one hundred twenty (120) days following the Petition Date, the Borrower shall deliver a 5-year business plan with respect to Australian operations of the Borrower and its Subsidiaries (the "<u>Australian Business Plan</u>"), in form and substance reasonably acceptable to the Required Lenders (provided that any such Australian Business Plan with respect to which the Administrative Agent has provided notice and a copy thereof to the Lenders, in accordance with the notice provisions hereof, and with respect to which Lenders constituting the Required Lenders shall not have notified the Administrative Agent (within five (5) Business Days of the posting thereof) that such Australian Business Plan is not reasonably acceptable, shall be deemed reasonably acceptable to the Required Lenders), which Australian Business Plan shall be prepared on a monthly basis for the fiscal years 2016 and 2017 and shall include, without limitation, (i) a determination, if any, of mining complexes or interests thereof of such Australian operations to be sold, assigned, abandoned or otherwise disposed of in connection with the reorganization of the Borrower and the other Loan Parties and (ii) an assessment of the financial impact of the cessation of operations at, or the disposition of, any assets of such Australian operations; *provided* that the Borrower shall, not later than the date that is sixty (60) days from the Petition Date, deliver to then Administrative Agent a written update setting forth in reasonable detail the Borrower's progress in formulating the Australian Business Plan and any material developments with respect thereto with the Petition Date.

(c)     With respect to the CNTA Dispute and the CNTA Issues:

(i)     not later than the date that is thirty (30) days following the Petition Date, the Borrower (without prejudice to the rights of any other Person to commence such an action or any other proceeding) shall commence a declaratory judgment action seeking a determination of the effect of Section 6.16(g) of the Existing Credit Agreement on the extent of the secured claims of the Existing Credit Agreement Lenders under the Existing Credit Agreement in respect of Principal Properties, and which of the U.S. Mine complexes are Principal Properties (such issues, the "<u>CNTA Issues</u>" and such litigation, the "<u>CNTA Dispute</u>"); and

(ii)     not later than the date that is one hundred eighty (180) days following the Petition Date, the Bankruptcy Court shall have entered an order determining the CNTA Issues.

(d)     Not later than the date that is two hundred ten (210) days following the Petition Date, the Debtors shall file with the Bankruptcy Court an Acceptable Reorganization Plan and (y) a disclosure statement with respect thereto.

(e)     Not later than the date that is two hundred seventy (270) days following the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement and solicitation procedures with respect to the Acceptable Reorganization Plan.

(f)     Not later than the date that is three hundred thirty (330) days following the Petition Date, the Bankruptcy Court shall have entered an order confirming an Acceptable Reorganization Plan.

(g)     Not later than the date that is three hundred sixty (360) days following the Petition Date, the "effective date" in respect of the confirmed Acceptable Reorganization Plan shall have occurred.

**6.20    Ratings**. Use commercially reasonable efforts to obtain, prior to the Final Order Entry Date, public ratings (but not any minimum rating) of the Term Loan Facility from each of Moody's and S&P.

**6.21    Schedules**.  Deliver to the Administrative Agent, not later than forty-five (45) days following the Closing Date (or such later date as the Administrative Agent shall agree in its reasonable discretion), schedules setting forth, as of the Petition Date, (i) all Liens on assets of the Borrower and its Restricted Subsidiaries (other than Liens permitted under Section 7.01 (other than Section 7.01(b))), (ii) all Investments held by the Borrower and its Restricted Subsidiaries (other than Investments permitted under Section 7.02 (other than Section 7.02(f)) and (iii) all Indebtedness of the Borrower and its Restricted Subsidiaries having an aggregate principal amount in excess of $25,000,000 (other than Indebtedness permitted under Section 7.03 (other than Section 7.03(b))).

**6.22    Global Center**.  Upon the occurrence and during the continuance of any "Event of Default" (as defined in the Intercompany Credit Agreement) under Section 8.01(i) of the Intercompany Credit Agreement (in each case as the Intercompany Credit Agreement is in effect as of the Petition Date or as modified in a manner not prohibited by Section 7.17(e) and to the extent such Insolvency Event results from the appointment of a voluntary administrator in respect of such Person or any of its assets, and without limiting any rights that Administrative Agent or Lenders may otherwise have, Global Center shall take (and the Borrower shall cause Global Center to take) all actions reasonably requested by the Administrative Agent to protect and enforce Global Center's rights and remedies under the Intercompany Credit Agreement and the security interests in the collateral securing same, including, to the extent it is entitled to do so, appointing a receiver in respect of the assets of the applicable Persons that are the subject the applicable "Insolvency Event" (as defined in the Intercompany Credit Agreement) within five (5) Business Days following request therefor (in each case to the extent not in contravention of applicable local law)).  In the event of the appointment of an administrator with respect to any obligor in respect of the Intercompany Credit Agreement, Global Center shall promptly notify the Administrative Agent in writing of such occurrence (but in no event later than the date that is two (2) Business Days following Global Center or any of its representatives becoming aware of such occurrence).

To the extent Global Center consents to the granting by the Credit Parties (as defined in the Intercompany Creditor Agreement) of any Lien other than any Liens permitted under the

Intercompany Credit Agreement (as in effect on the date hereof), Global Center will provide the Administrative Agent notice five (5) days in advance thereof.

Global Center shall consult with the Administrative Agent and work in good faith to implement the intended collateral and security arrangements securing the obligations under the Intercompany Credit Agreement, as disclosed to and discussed with the Administrative Agent on the date prior to the Petition Date.

**6.23    Adequate Protection Payments**.   During any Liquidity Preservation Period, within five (5) Business Days of the beginning of such Liquidity Preservation Period, the Debtors' shall (i) file with the Bankruptcy Court (x) a stipulation consented to by the Existing Credit Agreement Agent (with the consent of requisite Existing Credit Agreement Lenders) or (y) a motion seeking entry of an order, in either case authorizing the Debtors to cease making the adequate protection payments described in [clause (iii) of paragraph [13(d)] of the Interim Order and, once entered, the corresponding provision of the Final Order] until such time as such Liquidity Preservation Period has ended and (ii) use commercially reasonable efforts to obtain entry by the Bankruptcy Court of such stipulation or order, as applicable, as soon as reasonably practical and in any event within 30 days of the end of the five (5) Business Day period noted above in this Section 6.23.

## ARTICLE VII
## NEGATIVE COVENANTS

Until Payment in Full, the Borrower shall not, nor shall it permit any other Loan Party to, directly or indirectly:

**7.01    Liens**.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the Petition Date;

(c)    Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than sixty (60) days or which are being contested in good faith and by appropriate proceedings;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or (to the extent consistent with past practice) self-insurance arrangements;

(f)      (i) Liens on cash and Permitted Investments to secure the performance of bids, trade contracts and leases (other than Indebtedness), insurance bonds, statutory obligations, appeal bonds, bank guarantees and letters of credit and other obligations of a like nature incurred in the ordinary course of business, (ii) Liens on cash and Permitted Investments to secure obligations under Surety Bonds obtained (x) in the ordinary course of business or (y) as required in connection with the entering into of federal coal leases or under reclamation bonds or (iii) Liens created under or by any turnover trust, in each case to the extent consistent with past practice; provided that (A) neither the aggregate amount of obligations referred to in the preceding clauses (iii) secured thereby, nor the aggregate amount of such deposits and Liens referred to in the preceding clauses (iii) (excluding, in any event, all Bonding L/C Collateral and all amounts in the L/C Facility Letter of Credit Account) shall exceed $2,500,000 and (B) the aggregate amount of cash and Permitted Investments subject to Liens permitted under Section 7.01(f)(ii), together with the aggregate amount of all Bonding L/C Exposure and all L/C Facility L/C Exposure, shall not exceed $50,000,000 at any time;

(g)      easements, rights-of-way, zoning restrictions, other restrictions and other similar encumbrances which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)      Liens securing attachments or judgments (in respect of claims arising after the Petition Date to the extent concerning any Debtor) for the payment of money not constituting an Event of Default under Section 8.01(h) or securing appeal bonds related to such attachments or judgments;

(i)      Liens securing Indebtedness of the Borrower and its Restricted Subsidiaries permitted by Section 7.03 incurred to finance the acquisition of fixed or capital assets; provided that (i) such Liens shall be created within two hundred seventy (270) days of the acquisition of such assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, any other property which may be incorporated with or into that financed property or any after-acquired title in or on such property and proceeds of the existing collateral in accordance with the instrument creating such Lien and (iii) the principal amount of Indebtedness secured by any such Lien shall at no time exceed 100% of the original purchase price of such property at the time it was acquired;

(j)      [reserved];

(k)      Liens on the property of the Borrower or any of its Restricted Subsidiaries, as a tenant under a lease or sublease entered into in the ordinary course of business by such Person, in favor of the landlord under such lease or sublease, securing the tenant's performance under such lease or sublease, as such Liens are provided to the landlord under applicable law and not waived by the landlord;

(l)      Liens (including those arising from precautionary UCC financing statement filings) with respect to bailments, operating leases or consignment or retention of title arrangements entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business;

(m)      [reserved];

(n)      (i) Production Payments, royalties, dedication of reserves under supply agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties or (ii) cross charges, Liens or security arrangements entered into in respect of a Joint Venture for the benefit of a participant, manager or operator of such Joint Venture, in the case of each of (i) and (ii), consistent with past practice of the Loan Parties and normal practices in the mining industry;

(o)      leases, subleases, licenses and rights-of-use granted to others incurred in the ordinary course of business and that do not materially and adversely affect the use of the property encumbered thereby for its intended purpose;

(p)      (i) Liens in favor of a banking institution arising by operation of law or any contract encumbering deposits (including the right of setoff) held by such banking institutions incurred in the ordinary course of business and which are within the general parameters customary in the banking industry or (ii) contractual rights of setoff to the extent constituting Liens;

(q)      [reserved];

(r)      Liens on (x) receivables and rights related to such receivables created pursuant to the A/R Facility and (y) the Equity Interests of P&L Receivables Company, LLC granted pursuant to the A/R Facility;

(s)      [reserved];

(t)      [reserved];

(u)      Permitted Real Estate Encumbrances;

(v)      [reserved]; and

(w)      Liens on assets of the Borrower and its Restricted Subsidiaries securing (1) Swap Contracts and (2) obligations other than Indebtedness, in an aggregate principal amount not to exceed $2,500,000 pursuant to this clause (w).

**7.02    Investments**.  Make any Investments, except:

(a)      Investments held by the Borrower or such Restricted Subsidiary in the form of Permitted Investments;

(b)      advances to officers, directors and employees of the Borrower and Subsidiaries in an aggregate amount not to exceed $1,000,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and

Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)    Investments (including debt obligations and Equity Interests) received in satisfaction of judgments or in connection with the bankruptcy or reorganization of suppliers and customers of the Borrower and its Restricted Subsidiaries and in settlement of delinquent obligations of, and other disputes with, such customers and suppliers arising in the ordinary course of business;

(e)    Investments pursuant to the terms of the A/R Facility that are customary for facilities of such type;

(f)    Investments in existence on the Petition Date;

(g)    (i) promissory notes and other similar non-cash consideration received by the Borrower and its Subsidiaries in connection with Dispositions not otherwise prohibited under this Agreement and (ii) Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Borrower and its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer, (B) litigation, arbitration or other disputes or (C) the foreclosure with respect to any secured investment or other transfer of title with respect to any secured investment;

(h)    [reserved];

(i)    Swap Contracts permitted under Section 7.03(e);

(j)    Intercompany loans made by Global Center to Foreign Subsidiaries pursuant to the Intercompany Credit Agreement using amounts held in the Global Center Funding Account; provided that the aggregate outstanding principal amount (not including capitalized interest thereon) of all such loans shall not exceed $250,000,000 at any one time (which amount shall be subject to increase by up to $200,000,000 with the written consent of the Supermajority Lenders);

(k)    Investments by (i) the Borrower or any Restricted Subsidiary in any other Loan Party (other than Global Center) or (ii) any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is not a Loan Party; provided that, if the Investment is in the form of Indebtedness, such Indebtedness must be permitted pursuant to Section 7.03(f); and

(l)    Investments by the Borrower or any Restricted Subsidiary in Joint Ventures, only so long as such Investment, when aggregated with all other Investments made to date under this Section 7.02(l) and all Investments made to date under Section 7.02(m), shall not result in the Investments exceeding $2,500,000; and

(m)    Investments (other than in any Foreign Subsidiary) by the Borrower or any Restricted Subsidiary, when aggregated with all other Investments made or deemed made to date under this Section 7.02(m) and all Investments made to date under Section 7.02(l), in an aggregate amount not in excess of $2,500,000.

Notwithstanding the foregoing, neither the Borrower nor any Restricted Subsidiary shall make any Investment in any Excluded Entity, except as permitted pursuant to Section 7.02(e).

**7.03    Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness except:

(a)    Indebtedness arising under the Loan Documents;

(b)    Indebtedness outstanding on the Petition Date;

(c)    to the extent constituting Indebtedness, Bonding Superpriority Claims;

(d)    Guarantees of the Borrower or any Restricted Subsidiary in respect of Indebtedness (other than Indebtedness outstanding on the Petition Date) otherwise permitted hereunder (i) in the case of the Borrower or any other Loan Party, in respect of Indebtedness incurred by any other Loan Party or (ii) in the case of a Restricted Subsidiary that is not a Loan Party, in respect of Indebtedness incurred by any Loan Party or other Restricted Subsidiary that is not a Loan Party;

(e)    Indebtedness in respect of Swap Contracts incurred in the ordinary course of business and consistent with prudent business practice;

(f)    Indebtedness of any Loan Party to any other Loan Party or any other Restricted Subsidiary, provided that such Indebtedness of a Loan Party to a Person that is not a Loan Party shall be subordinated to the Obligations on customary terms;

(g)    Intercompany current liabilities incurred in the ordinary course of business of the Borrower and its Restricted Subsidiaries;

(h)    [reserved];

(i)    Indebtedness incurred in connection with the A/R Facility; provided that the aggregate principal amount of all Indebtedness incurred shall not exceed $180,000,000 at any time outstanding; and

(j)    Additional Indebtedness of the Loan Parties in an amount not to exceed $2,500,000.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of the assets (whether now owned or hereafter acquired) of the Borrower and its Restricted Subsidiaries, taken as a whole, to or in favor of any Person, except that, if no Default exists or would immediately result therefrom:

(a)    any Restricted Subsidiary (other than Global Center) may merge or consolidate with (i) the Borrower, provided that the Borrower shall be the continuing or surviving Person or (ii) any one or more other Restricted Subsidiaries, provided that (A) when any wholly-owned Restricted Subsidiary is merging with another Restricted Subsidiary, the wholly-owned Restricted Subsidiary shall be the continuing or surviving Person, (B) [reserved], (C) [reserved]

and (D) when any Guarantor is merging with any other Restricted Subsidiary, the continuing or surviving Person shall be a Guarantor; provided that in the case of each of the foregoing transactions described in this clause (a), any security interest granted pursuant to the Orders and the Security Documents shall remain in full force and effect;

(b)    any Restricted Subsidiary (other than Global Center) may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then the transferee must be a Loan Party; and

(c)    any transaction that would be permitted as an Investment under Section 7.02 or a Disposition permitted under Section 7.05.

**7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition (other than Dispositions permitted pursuant to Sections 7.01, 7.02(a) through (k) (other than (j)), (n) and (o), 7.04(a) through (b) and 7.06), except:

(a)    Dispositions of surplus, obsolete, used or worn out property or other property that, in the reasonable judgment of the Borrower, is no longer useful in its business;

(b)    Dispositions of inventory in the ordinary course of business;

(c)    Dispositions of the assets set forth on Schedule 7.05;

(d)    Dispositions of Permitted Investments pursuant to transactions permitted under this Agreement or otherwise in the ordinary course of business;

(e)    Dispositions of Receivables Assets pursuant to the A/R Facility;

(f)    (A) the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction and (B) Dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceeding;

(g)    licensing, sublicensing and cross-licensing arrangements granted on a non-exclusive basis involving IP Rights of the Borrower or any Restricted Subsidiary in the ordinary course of business or lapse or abandonment of IP Rights of the Borrower or any Restricted Subsidiary in the ordinary course of business that, in the reasonable judgment of the Borrower, is no longer useful in its business and could not reasonably be expected to result in a Material Adverse Effect;

(h)    Permitted Asset Swaps;

(i)    (A) the grant in the ordinary course of business of any non-exclusive easements, permits, licenses, rights of way, surface leases or other surface rights or interests and (B) any lease, sublease or license of assets (with a Loan Party as the lessor, sublessor or licensor) in the ordinary course of business;

(j)      (i) transfers of condemned property as a result of the exercise of "eminent domain" or other similar policies or (ii) transfers of properties that have been subject to a casualty event or act of god;

(k)      other Dispositions of assets, provided that (A) if the Net Proceeds of any such sale, lease or other disposition of assets in accordance with this Section 7.05(k) shall exceed $5,000,000, the Borrower shall provide a certificate to the Administrative Agent indicating that the requirements of this Section 7.05(k) have been complied with, (B) the Borrower or any of its Restricted Subsidiaries shall receive not less than 85% of the consideration for such Disposition in the form of cash or Permitted Investments (in each case, free and clear of all Liens at the time received), (C) such Disposition shall be made for Fair Market Value, (D) the consideration for such Disposition, when taken in the aggregate with the consideration for all such other Dispositions since the Closing Date made pursuant to this Section 7.05(k) shall not exceed $100,000,000, (E) at the time of any such Disposition, no Default shall exist or would result from such Disposition and (F) with respect to any such Disposition for consideration with a Fair Market Value greater than $5,000,000, the Borrower shall first provide ten (10) days' prior written notice to the Administrative Agent (unless such notice provision is waived by the Administrative Agent);

(l)      any Investment permitted pursuant to Sections 7.02(j), 7.02(l) or 7.02(m), which constitutes a Disposition;

(m)      [reserved];

(n)      [reserved]; and

(o)      any surrender or waiver of contractual rights or the settlement, release, or surrender of contractual rights or other litigation claims in the ordinary course of business or in a manner consistent with past practice.

Notwithstanding any other provision of this Section 7.05, the Borrower shall not, and shall not permit any Subsidiary to, Dispose of (other than to any Loan Party (other than Global Center)) all or a substantial portion of the Equity Interests or all or a substantial portion of the assets of, any of the Subsidiaries that are the subject of that certain purchase and sale agreement, dated as of November 20, 2015, between Four Star Holdings, LLC and Western Megawatt Resources, LLC, without the express consent of the Required Lenders.  Further, no Loan Party shall Dispose of any other material assets or properties to Global Center.

**7.06    Restricted Payments**.  Directly or indirectly:

(a)      declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional shares of Equity Interests of the person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Restricted Subsidiary to purchase or acquire) any shares of any class of its Equity Interests or set aside any amount for any such purpose: or

(b)      except pursuant to and simultaneous with the consummation of an Acceptable Reorganization Plan, prepay, redeem, purchase defease, convert into cash or otherwise satisfy prior to the scheduled maturity in any manner (x) any Indebtedness of the Borrower or any Restricted Subsidiary incurred prior to the Petition Date and (y) any Subordinated Indebtedness;

(all such payments and other actions set forth in these clauses (a) through (b) above being collectively referred to as "Restricted Payments"), other than any Restricted Payment of the type described in clause (a) made by a Restricted Subsidiary of the Borrower to the holders of its Equity Interests on a pro rata basis.

**7.07   Change in Nature of Business**.  Engage in any material line of business other than a Similar Business.

**7.08   Transactions with Affiliates**.  Enter into any transaction of any kind, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate, unless such transaction is (a) not prohibited by this Agreement and (b) upon fair and reasonable terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate.  Notwithstanding the foregoing, the foregoing restrictions shall not apply to the following:

(A)      transactions between or among the Loan Parties (other than Global Center) or between or among Restricted Subsidiaries that are not Loan Parties;

(B)      the payment of reasonable and customary fees and reimbursement of expenses in the ordinary course of business payable to directors of the Borrower or any of its Restricted Subsidiaries or to any Plan, Plan administrator or Plan trustee;

(C)      transactions pursuant to the Intercompany Credit Agreement;

(D)      the arrangements with respect to the procurement of services of directors, officers, independent contractors, consultants or employees in the ordinary course of business and the payment of customary compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and reasonable reimbursement arrangements in connection therewith (in each case consistent with past practice);

(E)      payments to directors and officers of the Borrower and its Restricted Subsidiaries in respect of the indemnification of such Persons in such respective capacities from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, as the case may be, pursuant to the Organizational Documents or other corporate action of the Borrower or its Restricted Subsidiaries, respectively, or pursuant to applicable law (in each case approved by or pursuant to authority delegated by a majority of disinterested members, if any, of the Board of Directors of the Borrower);

(F)      transactions between or among the Borrower and any of its Restricted Subsidiaries on the one hand and any Affiliate on the other in connection with

the Prairie State Project so long as any such transaction is on terms fair and reasonable to the Borrower and such Subsidiary; and

(G)    affiliate transactions effected pursuant to insurance programs or otherwise authorized or approved pursuant to the Interim Order, and, when applicable, the Final Order or any "first day order".

**7.09    [Reserved.].**

**7.10    Use of Proceeds**.  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose or (ii) for any purpose not described in Section 5.21.

**7.11    Financial Covenants**.

(a)    Capital Expenditures.

(i)    Maximum Cumulative Capital Expenditures.    Make any Capital Expenditure, except for Capital Expenditures not exceeding, in a cumulative amount for the Borrower and the other Loan Parties on a consolidated basis, beginning on April 1, 2016 and ending on the date set forth in the table below, in the amount set forth in the table below opposite such period.

| Period | Maximum Cumulative Capital Expenditures |
|---|---|
| May 31, 2016 | $37,200,000 |
| June 30, 2016 | $48,200,000 |
| July 31, 2016 | $56,200,000 |
| August 31, 2016 | $61,600,000 |
| September 30, 2016 | $69,200,000 |
| October 31, 2016 | $81,400,000 |
| November 30, 2016 | $82,700,000 |
| December 31, 2016 | $86,800,000 |
| January 31, 2017 | $94,100,000 |
| February 28, 2017 | $101,700,000 |
| March 31, 2017 | $112,800,000 |

(ii)    Trailing Twelve Months Capital Expenditures.    Make any Capital Expenditure, except for Capital Expenditures not exceeding, in a cumulative amount for the Borrower and the other Loan Parties on a consolidated basis for any trailing twelve-month period, commencing with the trailing twelve-month period ending April 30, 2017.

| Date | Maximum TTM Capital Expenditures |
|---|---|

| | |
|---|---|
| April 30, 2017 | $111,100,000 |
| May 31, 2017 | $99,000,000 |
| June 30, 2017 | $110,300,000 |
| July 31, 2017 | $107,400,000 |
| August 31, 2017 | $115,000,000 |
| September 31, 2017 | $113,900,000 |
| October 31, 2017 | $112,100,000 |

(b)    <u>Minimum Liquidity</u>.  Beginning with the first Friday that is at least two (2) Business Days after the Final Order Entry Date (the "<u>Liquidity Test Start Date</u>"), permit Consolidated Liquidity, as of the close of business on Friday of any week to be less than the Minimum Liquidity Amount.

(c)    <u>Minimum Consolidated EBITDA</u>.

(i)    <u>Minimum Cumulative Consolidated EBITDA</u>.  Permit the cumulative Consolidated EBITDA of the Borrower and the other Loan Parties, for any period beginning on April 1, 2016 and ending on the date set forth in the table below, to be less than the amount set forth in the table below opposite such period.

| Period | Minimum Cumulative Consolidated EBITDA |
|---|---|
| May 31, 2016 | $30,800,000 |
| June 30, 2016 | $49,600,000 |
| July 31, 2016 | $76,400,000 |
| August 31, 2016 | $102,600,000 |
| September 30, 2016 | $129,900,000 |
| October 31, 2016 | $159,300,000 |
| November 30, 2016 | $188,200,000 |
| December 31, 2016 | $225,700,000 |
| January 31, 2017 | $251,800,000 |
| February 28, 2017 | $271,600,000 |
| March 31, 2017 | $286,900,000 |

(ii)    <u>Minimum Trailing Twelve-Month Consolidated EBITDA</u>.  Permit Consolidated EBITDA of the Borrower and the other Loan Parties for any twelve-month trailing period ending on any date set forth in the table below to be less than the amount set forth opposite such period.

| Date | Minimum TTM Consolidated EBITDA |
|---|---|
| April 30, 2017 | $293,900,000 |

| May 31, 2017 | $297,500,000 |
| June 30, 2017 | $301,300,000 |
| July 31, 2017 | $300,000,000 |
| August 31, 2017 | $302,200,000 |
| September 31, 2017 | $301,600,000 |
| October 31, 2017 | $297,000,000 |

**7.12   Limitation on Negative Pledge Clauses or Restrictions on Subsidiary Distributions.**  Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (i) limits the ability of the Borrower or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property to secure the Obligations hereunder or (ii) restricts the payment of dividends or distributions or the making of cash advances by such Guarantor to the Borrower or any Loan Party that is a direct or indirect parent of such Guarantor; provided, however, that the foregoing clause shall not apply to Contractual Obligations which:

(a)   exist on the date hereof;

(b)   [reserved];

(c)   [reserved];

(d)   are restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent that such restrictions apply only to the assets securing such Indebtedness;

(e)   [reserved];

(f)   are customary restrictions contained in any agreement relating to the Disposition of any asset permitted under Section 7.05 pending the consummation of such sale;

(g)   are customary provisions in joint venture agreements and other similar agreements applicable solely to such joint venture or the Equity Interests therein and entered into in the ordinary course of business;

(h)   are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto and are entered into in the ordinary course of business;

(i)   [reserved];

(j)   are customary limitations (including financial maintenance covenants) existing under or by reason of leases entered into in the ordinary course of business;

(k)   are restrictions on cash or other deposits imposed under contracts entered into in the ordinary course of business;

(l)        are customary provisions restricting assignment of any agreements entered into in the ordinary course of business; or

(m)        are restrictions imposed by any agreement relating to the A/R Facility to the extent that such restrictions relate solely to the assets (and any proceeds in respect thereof) that are the subject of the A/R Facility.

**7.13    Restrictions on Peabody IC Funding and Peabody IC Holdings.**  In the case of each of Peabody IC Funding Corp. and Peabody IC Holdings, LLC, permit it to (a) incur any Indebtedness or other liabilities, (b) guarantee, or use its assets to secure (except in the case of other non-consensual Liens arising by operation of Law), the Indebtedness of any other Person, (c) conduct any business (other than as necessary to continue to maintain their existence and comply with Law, as reasonably determined by it or the Borrower) and (d) own any assets except for cash or other Permitted Investments and, in the case of Peabody IC Funding Corp., the existing intercompany note receivable of Peabody IC Holdings, LLC or, in the case of Peabody IC Holdings, LLC, the existing intercompany note receivable of Peabody Holdings (Gibraltar) Limited, as each such note may be amended, restated, modified or replaced, (provided that any changes, taken as a whole, that are adverse to the Lenders shall require consent of the Administrative Agent), and which such notes Peabody IC Funding Corp. and Peabody IC Holdings, LLC, as applicable, shall not transfer or assign.

**7.14    Restrictions on Peabody Holdings (Gibraltar) Limited and Peabody Investments (Gibraltar) Limited**.  In the case of Peabody Holdings (Gibraltar) Limited, permit it to retain any cash other than cash necessary to continue to operate in the ordinary course and comply with Law, as reasonably determined by it or the Borrower.  In the case of Peabody Investments (Gibraltar) Limited, not permit it to amend or waive its Organizational Documents in any manner that could be adverse to the value, perfection or enforceability of the security interest of the Lenders under the Pledge Agreement – Gib.

**7.15    Bonding Superpriority Claims**.   Grant, or permit to exist, any Bonding Superpriority Claim other than in compliance with the applicable provisions of Section 4.02 and the other applicable provisions of this Agreement.

**7.16    Organizational Documents; Subordinated Indebtedness**.  Amend or modify in any manner materially adverse to the Lenders, or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Lenders): (a) the articles or certificate of incorporation or by-laws or partnership agreement or limited liability company operating agreement of the Borrower or any of the Restricted Subsidiaries, except to the extent required by applicable law and notice of such amendment or modification has been provided to the Administrative Agent or (b) any Subordinated Indebtedness.

**7.17    Restrictions on Global Center and Global Center Funding Account**.  In the case of Global Center, (a) incur any Indebtedness for borrowed money or any other material liabilities (other than obligations in respect of the Intercompany Credit Agreement and the other agreements and documents contemplated thereby), (b) guarantee, or use its assets to secure (except in the case of other non-consensual Liens arising by operation of Law), the Indebtedness of any other Person, (c) conduct any business (other than as necessary to continue to maintain its

existence and comply with Law, as reasonably determined by it or the Borrower, and the making of Investments with respect to the Australian operations of Subsidiaries of the Borrower as permitted hereunder), (d) own any material assets except for Permitted Investments and its rights under the Intercompany Credit Agreement and the other agreements and documents contemplated thereby, and the rights and obligations of Global Center in respect of the Intercompany Credit Agreement shall not be transferred or assigned (except as security for the Obligations or as otherwise expressly contemplated by the Loan Documents), (e) amend or waive any provision of (or obligation in respect of) the Intercompany Credit Agreement in any manner that would (i) release or subordinate more than 50% of the collateral thereunder, taken as a whole, or (ii) forgive or reduce the principal amount of any loans thereunder or subordinate in right of payment a material portion of such loans, (f) make any Investments pursuant to Section 7.02(j) using amounts held in any deposit or securities account of Global Center other than the Global Center Funding Account at any time during which any amounts are held in the Global Center Funding Account or (g) enter into any merger or consolidation.  The Borrower shall not, and shall not permit any Restricted Subsidiary to, deposit any amounts in the Global Center Funding Account following the Petition Date.  Except for Investments permitted pursuant to Section 7.02(j) (subject to the consent requirements set forth therein), amounts deposited into the Global Center Controlled Account or any other cash or Permitted Investments of Global Center in any other account shall not, without the written consent of the Supermajority Lenders, be used or withdrawn for any purpose.  For the avoidance of doubt, the provisions of this Section 7.17 shall not restrict Global Center from incurring Obligations under the Loan Documents or taking any action required to be taken by it thereunder.

**7.18    Anti-Terrorism Laws; Sanctions**.  Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any person that is, or any person that is owned or controlled by one or more persons that are, described in Section 5.17(b)(i)-(v), (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law or any Sanctions or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, in each case in any manner that would result in a violation of law by any Person (including, without limitation, any Loan Party or any Lender).

**7.19    Sanctions**.Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any person that is the subject or target of Sanctions or (b) any person that is the subject or target of Sanctions to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the Loans are in violation of law.

## ARTICLE VIII
## REAL PROPERTY LEASES

**8.01    Special Rights with Respect to Real Property Leases**.

(a)        No Loan Party shall, nor shall it permit any of its Subsidiaries to, pursuant to Section 365 of the Bankruptcy Code, reject or otherwise terminate (including, without limitation,

as a result of the expiration of the assumption period provided for in Section 365(d)(4) of the Bankruptcy Code to the extent applicable) (x) a Material Lease or (y) during the continuance of an Event of Default, a Real Property Lease, in each case, without first providing thirty (30) days' prior written notice to the Administrative Agent (unless such notice provision is waived by the Administrative Agent in its sole discretion) during which time the Administrative Agent shall be permitted to find an acceptable (in the Administrative Agent's good faith and reasonable discretion) replacement lessee (which may include the Administrative Agent or its Affiliates) to whom such lease may be assigned.  If a prospective assignee is not found within such 30-day notice period, the Loan Party may proceed to reject such lease.  If such a prospective assignee is timely found, the Loan Parties shall (i) not seek to reject such lease, (ii) promptly withdraw any previously filed rejection motion, (iii) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such lease and assigning it to such prospective assignee and (iv) cure any defaults that have occurred and are continuing under such lease unless the Borrower and the Administrative Agent agree that any such cure obligation is overly burdensome on the cash position of the Debtors with such agreement not to be unreasonably withheld; provided that this Section 8.01(a) shall not apply to Real Property Leases that are rejected (A) as contemplated in the U.S. Business Plan or (B) on the effective date of an Acceptable Reorganization Plan.  For the avoidance of doubt, it is understood and agreed that on or prior to the 30th day prior to the Automatic Rejection Date, the Loan Parties shall have delivered (and hereby agree to deliver) written notice to the Administrative Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through automatic rejection on the Automatic Rejection Date, to the extent applicable) from and after the date of such notice (or, if applicable, notice that the Loan Parties will seek to extend the Automatic Rejection Date as provided in Section 365(d)(4) of the Bankruptcy Code); provided that if the Loan Parties fail to deliver any such notice to the Administrative Agent prior to such date with respect to any such Real Property Lease (or a notice indicating that no such Real Property Leases shall be rejected), the Loan Parties shall be deemed, for all purposes hereunder, to have delivered notice to the Administrative Agent as of such date that it intends to reject all outstanding Real Property Leases.

(b)     If an Event of Default shall have occurred and be continuing, the Administrative Agent may exercise any Debtor's rights pursuant to Section 365(f) of the Bankruptcy Code with respect to any Real Property Lease or group of Real Property Leases and, subject to the Bankruptcy Court's approval after notice and hearing, assign any such Real Property Lease in accordance with Section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts. In connection with the exercise of such rights, the Administrative Agent may (x) find an acceptable (in the Administrative Agent's good faith and reasonable discretion) replacement lessee (which may include the Administrative Agent or its Affiliates) to whom a Real Property Lease may be assigned, (y) hold, and manage all aspects of, an auction or other bidding process to find such reasonably acceptable replacement lessee, and (z) in connection with any such auction, agree, on behalf of the Loan Parties and subject to Bankruptcy Court approval, to a break-up fee or to reimburse fees and expenses of any stalking horse bidder up to an amount not to exceed 3.00% of the purchase price of such Real Property Lease and may make any such payments on behalf of such Loan Party and any amount used by the Administrative Agent to make such payments shall, at the election of the Administrative Agent in its sole discretion be deemed a Borrowing hereunder. Upon receipt of notice that the Administrative Agent elects to exercise its rights under

this Section 8.01(b), the Loan Parties shall promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such Real Property Lease and assigning it to such assignee and cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 8.01(b) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Reorganization Plan.

(c)     If an Event of Default shall have occurred and be continuing, the Administrative Agent shall have the right to direct any Debtor that is a lessee under a Real Property Lease to assign such Real Property Lease to the Administrative Agent, on behalf of the Secured Parties, as collateral for the Obligations and to direct such Debtor lessee to assume such Real Property Lease to the extent assumption is required under the Bankruptcy Code as a prerequisite to such assignment. Upon receipt of notice that the Administrative Agent elects to exercise its rights under this Section 8.01(c), the Loan Parties shall (i) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of, if necessary, assuming such Real Property Lease and assigning it to the Administrative Agent and (ii) cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 8.01(c) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Reorganization Plan.

(d)     Any order or the Bankruptcy Court approving the assumption (but not the assignment) of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to Section 365(f) of the Bankruptcy Code subsequent to the date of such assumption designated by the Administrative Agent.

(e)     No Loan Party shall, nor shall it permit any of its Subsidiaries to, pursuant to Section 365 of the Bankruptcy Code, sell or assign a Real Property Lease without first providing thirty (30) days' prior written notice to the Administrative Agent (unless such notice provision is waived by the Administrative Agent in its sole discretion) or thereafter until Bankruptcy Court approval of a sale or assignment, the Administrative Agent, on behalf of the Secured Parties, shall be permitted to credit bid forgiveness of some or all of the outstanding Obligations in respect of the Term Loan Facility (in an amount equal to at least the consideration offered by any other party in respect of such assignment) as consideration in exchange for any such Real Property Lease. In connection with the exercise of any of the Administrative Agent's rights under Sections 8.01(b) and 8.01(c) to direct or compel a sale or assignment of any Real Property Lease, the Administrative Agent, on behalf of the Secured Parties, shall be permitted to credit bid forgiveness of a portion of the Indebtedness (in an amount equal to at least the consideration offered by any other party in respect of such sale or assignment) outstanding under the Loans in exchange for such Real Property Lease.  Notwithstanding the foregoing, this Section 8.01(e) shall not apply to Real Property Leases that are sold or assigned as expressly set forth in the U.S. Business Plan.

(f)     If any Loan Party is required to cure any monetary default under any Real Property Lease under this Section 8.01, or otherwise in connection with any assumption of such Real Property Lease pursuant to Section 365 of the Bankruptcy Code, and such monetary default is not cured within five (5) Business Days of the receipt by such Loan Party of notice from the

Administrative Agent under Section 8.01(a), (b) or (c) or any other notice from the Administrative Agent requesting the cure of such monetary default, then the Administrative Agent may cure any such monetary default on behalf of such Loan Party and any such payments shall, at the election of the Administrative Agent in its sole discretion and subject to satisfaction of the conditions in Section 4.02, be deemed a Borrowing hereunder.

**ARTICLE IX**
**EVENTS OF DEFAULT AND REMEDIES**

**9.01    Events of Default**.  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein any amount of principal of any Loan or any L/C Obligation, or (ii) within five (5) days after the same becomes due, any interest on any Loan or on any L/C Obligation, or any fee due hereunder, any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 2.19, 6.02(e), 6.03(a), 6.11, 6.12, 6.16, 6.18, 6.19, 6.22 or Article VII; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days (or (i) in the case of Section 6.01(a), 6.01(b), 6.01(c), 6.02(a), 6.02(b), 6.02(c), 6.02(d), 6.02(g), 6.02(i), 6.21, ten (10) days or (ii) in the case of Section 6.02(f), 6.02(h) and 6.23, three (3) days); or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default.  (i) Any default or event of default or other condition shall occur with respect to any Indebtedness having an aggregate principal amount in excess of the $10,000,000 of the Borrower or any other Loan Party, the effect of which is to enable or permit (with all applicable grace periods having expired) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf to cause such Indebtedness to become due, or require the prepayment, repurchase, redemption or defeasance thereof, prior to scheduled maturity, or such Indebtedness shall become due and payable prior to its stated maturity or (ii) the Borrower or any other Loan Party shall default in its obligation to make any payment (including at final maturity) with respect to any such Indebtedness; provided that this clause (e) shall not apply to (x) any Indebtedness outstanding hereunder and any Indebtedness of any Debtor that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor) or (y) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

(f)    Insolvency Proceedings, Etc.  An involuntary proceeding shall be commenced or a voluntary or involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date, or of a substantial part of the assets of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date or for a substantial part of the assets of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date or (iii) the winding-up or liquidation of Global Center or any other Domestic Subsidiary that was formed or acquired after the Petition Date (except in a transaction permitted by Section 7.04); and, in the case of any such involuntary proceeding or petition, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(g)    Inability to Pay Debts; Attachment.  (i) The Borrower or any Restricted Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts as they become due (excluding, in the case of any Debtor, pre-petition liabilities), or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any substantial part of the property of any such Person and is not released, vacated or fully bonded within sixty (60)  days after its issue or levy; or

(h)    Judgments.  (i) The failure by the Borrower or any Restricted Subsidiary to pay one or more final judgments aggregating in excess of $10,000,000 (which, in the case of the Debtors only, arose post-petition), which judgments are not discharged, bonded or effectively waived or stayed for a period of thirty (30) consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets of the Borrower or any Subsidiary to enforce any such judgment or (ii) judgments and/or orders shall have been rendered against the Debtors or any other Loan Party (which, in the case of the Debtors arose following the Petition Date (or, if later, the date on which such Person became a Debtor), which shall cause or would be reasonably expected to cause, a Material Adverse Effect; or

(i)    ERISA.  The occurrence of any of the following events that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect: (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in an actual obligation to pay money of the Borrower or a Subsidiary under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in excess of $10,000,000 (in the aggregate for all such events) and such obligation is not reduced, overturned or settled for a lesser amount (such that all such settlement payments during the term of this Agreement do not exceed $10,000,000 (when combined with all other amounts paid not by way of settlement)) within five (5) days of the occurrence of such event, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or

(j)    <u>Invalidity of Loan Documents</u>.  Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or Payment In Full, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or any Security Document ceases to create a valid Lien with the priority required thereby on the Collateral covered thereby (other than as expressly permitted thereunder or solely as a result of the acts or omissions of the Administrative Agent (including failure to maintain possession of any stock certificates, or other instruments delivered to it under any Security Document)); or

(k)    <u>Change of Control</u>.  There occurs any Change of Control; or

(l)    <u>Dismissal; Conversion</u>.  (i) any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of the Cases of the Debtors under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders or (ii) a trustee under Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof (or the Loan Parties or their Affiliates shall have acquiesced to the entry of such order) unless consented to by the Required Lenders; or

(m)    <u>Superpriority Claims</u>.  Except with respect to applications in respect of the A/R Interim Order and the A/R Final Order, an application shall be filed by any Debtor for the approval of any other Superpriority Claim, or an order of the Bankruptcy Court shall be entered granting any other Superpriority Claim (other than the Fees Carve-Out), in any of the Cases of the Debtors that is <u>pari</u> <u>passu</u> with or senior to the claims of the Administrative Agent, the L/C Issuer and the Lenders against the Borrower or any other Loan Party hereunder or under any of the other Loan Documents, or there shall arise or otherwise be granted any such <u>pari</u> <u>passu</u> or senior Superpriority Claim, in each case other than Bonding Superpriority Claims to the extent expressly permitted hereby; or

(n)    <u>Stay Relief</u>.  the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $10,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(o)    <u>Orders; Actions</u>.  (i) the Final Order Entry Date shall not have occurred by the date that is forty-five (45) days following the Interim Order Entry Date (or such later date as is agreed by the Required Lenders); (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order or the Borrower or any Subsidiary of the Borrower shall apply for the authority to do so, in each case in a manner that is adverse to the

113

Administrative Agent or the Lenders, without the prior written consent of the Administrative Agent and the Required Lenders; (iii) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral (as defined in the Orders) by the Loan Parties and the Loan Parties shall have not obtained use of cash collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Administrative Agent; (iv) the Interim Order (prior to the entry of the Final Order) or Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral described therein or the Final Order shall cease to be in full force and effect; (v) any of the Loan Parties or any Subsidiary of the Borrower shall fail to comply with the Orders in any material respect; (vi) other than with respect to the Fee Carve-Out or the Bonding Carve-Out (as provided for in <u>Section 2.19</u>), a final non-appealable order in the Cases shall be entered (without the consent of the Administrative Agent) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders; (vii) the Final Order shall not authorize the borrowing by the Borrower of the full amount of the Commitments provided for hereunder; (viii) the entry of an order in the Cases seeking to obtain financing pursuant to Section 364 of the Bankruptcy Code (other than the Facilities), unless such financing would (and actually does) repay in full in cash all Obligations and terminates all Commitments upon the consummation thereof; (ix) any order shall be entered in the Cases providing adequate protection, other than the Interim Order or Final Order (as applicable) or pursuant to any "first day" or "second day" order or any other order reasonably acceptable to the Administrative Agent; or (x) the Borrower or any of its Subsidiaries shall take any action in support of the items referred to in the foregoing clauses (viii)-(x); or

(p)     <u>Pre-Petition Payments</u>.  Except as permitted by the Orders or as otherwise agreed to by the Administrative Agent and the Required Lenders and permitted by the Bankruptcy Court, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with the "first day" or "second day" orders of the Bankruptcy Court reasonably satisfactory to the Administrative Agent or by other orders entered by the Bankruptcy Court and reasonably acceptable to the Administrative Agent or as otherwise permitted by, and expressly set forth in, the U.S. Business Plan; or

(q)     [Reserved];

(r)     <u>Collateral</u>.  Use of Collateral by the Borrower or any of its Subsidiaries, including, without limitation, cash collateral, in a manner inconsistent with the most recently delivered budget or forecast submitted in connection with the Borrower's application for any cash collateral order; or

(s)     [Reserved];

(t)     <u>Adverse Actions</u>.  The Loan Parties or any of their Subsidiaries, or any Person claiming by or through the Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any Lender or L/C Issuer (in any of their respective capacities as such) relating to the Facilities, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against the Administrative Agent, Lender or L/C Issuer; or

(u)    Reorganization Plan.    A Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the Loan Parties or any of their Subsidiaries shall file, propose, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order; or

(v)    Supporting Actions.    Any Loan Party or any of their Subsidiaries shall take any action in support of any matter set forth in paragraphs (l), (m), (n), (o), (p), (r), (t) or (u) above or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal, in each case unless the Administrative Agent (with the consent of the Required Lenders) consents to such action; or

(w)    Material Leases.    Any Material Lease is terminated by the lessor of such Material Leased Real Property and such termination is not (i) being contested in good faith by appropriate proceedings diligently conducted or (ii) stayed in its effectiveness by the Bankruptcy Code by virtue of the commencement of the Cases or by the Bankruptcy Court, except in each case as could not reasonably be expected to have a Material Adverse Effect; or

(x)    Asset Sales.    The Borrower or any other Debtor shall file a motion seeking authority to consummate the sale of assets of any Loan Party (other than any such sale that is permitted under the Loan Documents) pursuant to Section 363 of the Bankruptcy Code having a value in excess of $15,000,000, without the consent of the Administrative Agent and the Required Lenders, or the Borrower or any other Debtor shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties (unless such sale would result in the repayment in full in cash of all Obligations upon the consummation thereof); or

(y)    Intercompany Credit Agreement.    The Intercompany Credit Agreement ceases to be the valid and binding obligation of any obligor thereunder (except to the extent as a result of an Insolvency Event or similar proceeding), or Global Center or any obligor under the Intercompany Loan Agreement so asserts or contests in any manner the validity or enforceability of the Intercompany Credit Agreement (except in each case as a result of the termination of the commitments thereunder and the repayment in full in cash of the obligations thereunder); or Global Center or any obligor under the Intercompany Loan Agreement denies that any obligor thereunder has any or further liability or obligation under the Intercompany Credit Agreement or any related document (including any collateral or security document) (except on account of payment in cash in full of all obligations); or any collateral or security document related thereto ceases to create a valid Lien with the priority required thereby on all or substantially all of the collateral covered thereby; or

(z)    Global Center.    The Borrower shall cease to own, directly or indirectly, 100% of the outstanding Equity Interests of Global Center.

**9.02    Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions, subject to the terms of the Orders:

(a)    declare the commitment of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    [reserved];

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law (including the right to credit bid under applicable law and as set forth in Section 10.09);

(e)    require any Loan Party to promptly complete, pursuant to Section 363 and 365 of the Bankruptcy Code, subject to the rights of the Secured Parties to credit bid, an Asset Disposition with respect to its Real Property Leases or any portion thereof in one or more parcels at public or private sales, at any of the Administrative Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the Administrative Agent may deem commercially reasonable; and

(f)    exercise any of its rights with respect to Real Property Leases under Section 8.01;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect any Loan Party that is not a Debtor on the Closing Date, under Debtor Relief Laws of the United States, the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions in respect of such Loan Party shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender; and

provided, further, that with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (d), the Administrative Agent shall provide the Borrower (with a copy to counsel for the Creditors' Committee in the Cases and to the United States Trustee for the Eastern District of Missouri) within five (5) Business Days' written notice prior to taking the action contemplated thereby.

**9.03    Application of Funds**.  After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

#88215025v32

116

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) and amounts payable under <u>Article III</u> payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest and Fees in respect of Letters of Credit) payable to the Lenders and L/C Issuer (in their capacities as such) (including fees, charges and disbursements of counsel to the respective Lenders and L/C Issuer (including fees and time charges for attorneys who may be employees of any Lender or L/C Issuer) and amounts payable under <u>Article III</u>), ratably among them in proportion to the respective amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans ratably among the Lenders in proportion to the respective amounts described in this clause <u>Fourth</u> held by them;

<u>Fifth</u>, to the Administrative Agent for the account of the L/C Issuer, to cash collateralize (to the extent not already cash collateralized in such amount) the L/C Obligations (on a pro rata basis); and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Amounts used to cash collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause <u>Fifth</u> above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired and L/C Disbursements have been paid in cash in full, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Notwithstanding the foregoing, all Bonding L/C Collateral shall first be applied to satisfy or to cash collateralize (or continue to cash collateralize) Obligations in respect of the Bonding Facility Letters of Credit and all L/C Facility Collateral shall first be applied to satisfy or to cash collateralize (or continue to cash collateralize) all Obligations in respect of the L/C Facility Letters of Credit, and in each case, shall thereafter be applied as set forth in this <u>Section 9.03</u>.

**9.04   Post Event of Default Refinancing**.   Upon the occurrence of an Event of Default, the Borrower agrees that it shall enter into good faith negotiations with interested parties in respect of a possible refinancing of the Obligations.

# ARTICLE X
## ADMINISTRATIVE AGENT

**10.01  Appointment and Authority**.  Each of the Lenders and the L/C Issuer hereby irrevocably appoints Citibank, N.A. to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Except with respect to Section 10.06, Section 10.10 and Section 10.12, the provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuer, and neither the Borrower, nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

**10.02  Rights as a Lender**.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**10.03  Exculpatory Provisions**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith

shall be necessary, under the circumstances as provided in Section 11.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or the L/C Issuer.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**10.04   Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.   In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**10.05   Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Administrative Agent.  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

**10.06   Resignation of Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuer and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the approval of the Borrower unless an Event of Default under Section 9.01(g) has occurred or is continuing (such approval not to be unreasonably withheld), to appoint a successor, which shall be a bank

with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  Upon the acceptance of a successor's appointment as the Administrative Agent, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Any resignation by Citibank, N.A. as Administrative Agent pursuant to this Section 10.06 shall also constitute its resignation as L/C Issuer; provided that no such resignation as L/C Issuer shall be effective until the appointment of a successor L/C Issuer that is an Eligible L/C Issuer or, in the case of a successor L/C Issuer that is not an Eligible L/C Issuer is reasonably acceptable to the Borrower (such acceptance not to be unreasonably withheld, delayed or conditioned) (which successor may be the replacement Administrative Agent or another Lender or Affiliate thereof agreeing to assume all such rights, powers, privileges and duties of the retiring L/C Issuer).  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, (b) the resigning L/C Issuer shall be discharged from all of their

respective duties and obligations hereunder or under the other Loan Documents, in its capacity as an L/C Issuer, (c) such successor L/C Issuer shall issue Letters of Credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements reasonably satisfactory to the resigning L/C Issuer and the Borrower (such acceptance not to unreasonably withheld or delayed) to effectively assume the obligations of the resigning L/C Issuer with respect to such Letters of Credit and (d) the Bonding Facility Letter of Credit Account and L/C Facility Letter of Credit Account shall be transferred to accounts held by the successor Administrative Agent that are reasonably acceptable to the Borrower and such accounts held by the successor Administrative Agent as such shall thereafter comprise the "Bonding Facility Letter of Credit Account" and "L/C Facility Letter of Credit Account" hereunder.

**10.07  Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**10.08  No Other Duties, Etc.**  Except as expressly set forth herein, none of the bookmanagers, Arranger or other titles listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the L/C Issuer hereunder.

**10.09  Administrative Agent May File Proofs of Claim; Credit Bidding**.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer and the Administrative Agent under Section 2.03[(i) and] (j), 2.09 and 11.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 2.09 and 11.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses Section 11.01 of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to

the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

**10.10    Guaranty and Collateral Matters.**

(a)    The Lenders and the L/C Issuer irrevocably authorize the Administrative Agent to release any Guarantor from its obligations hereunder in accordance with the terms of <u>Section 11.21</u>.    Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release any Guarantor from its obligations hereunder pursuant to this <u>Section 10.10</u>.

(b)    The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document in accordance with the terms of <u>Section 11.21</u>.    Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property in accordance with this Section.

**10.11    Withholding Tax**.    To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.    Without limiting the provisions of <u>Section 3.01</u>, each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within thirty (30) days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective).    A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.    Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this <u>Section 10.11</u>.    The agreements in this <u>Section 10.11</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all other obligations.

**10.12    Collateral Matters**.    Without limiting the provisions of <u>Sections 10.03</u> and <u>11.04</u>, each Lender hereby consents to Citibank, N.A. and any successor serving in such capacity and agrees not to assert any claim (including as a result of any conflict of interest) against Citibank, N.A., or any such successor, arising from the role of the Administrative Agent or other agent under the Security Documents so long as it is either acting in accordance with the terms of such documents or otherwise has not engaged in gross negligence or willful misconduct.

## ARTICLE XI
## MISCELLANEOUS

**11.01   Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower, or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower, or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent (except, in each case, as set forth in clause (2) below), and (2) the parties to the Fee Letter in the case of the proviso after clause (g) below, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)      extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02) without the written consent of such Lender, except as provided in Section 2.14 or pursuant to clause (c) of the definition of Maturity Date;

(b)      postpone any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them) or any mandatory reduction of the Aggregate Commitments hereunder without the written consent of each Lender directly affected thereby (other than as expressly provided in Section 2.14 or pursuant to clause (c) of the definition of "Maturity Date");

(c)      reduce the principal of, or the stated rate of interest specified herein on any Loan, or (subject to clause (z) of the second proviso to this Section 11.01) any fees or other amounts payable hereunder without the written consent of each Lender directly affected thereby; provided, however, that, without limiting the effect of clauses (h) and (i) below or the proviso directly below, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest or Letter of Credit Fees at the Default Rate;

(d)      change Section 2.13 or Section 9.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender adversely affected thereby;

(e)      amend, waive or otherwise modify Section 7.11 or any defined term used therein (or any component definition thereof for purposes of such Section 7.11) without the written consent of the Supermajority Lenders;

(f)      change any provision of this Section or the definition of "Required Lenders" or "Supermajority Lenders" or any other provision of this Agreement specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender;

(g)      release all or substantially all of the value of the guarantees made by the Guarantors hereunder or all or a material portion of the Collateral, in each case without the written consent of each Lender;

(h)        modify Section 2.14 in a manner that would extend the duration of, or conditions to the exercise of, the Facility Extension Option without the written consent of each Lender;

(i)        permit the incurrence of additional Indebtedness under this Agreement or otherwise increase the principal amount of the Obligations in respect of any Facility (including by increasing the Bonding Accommodation Cap or the L/C Facility Cap) without the written consent of each Lender; provided, however, that any amendment to or waiver of clause (z) of the proviso to the first sentence of Section 2.03(a)(i) or of clause (B) to the proviso of Section 7.01(f) may be effected with the consent of the Required Lenders; provided, further that notwithstanding the foregoing, any increase in the Bonding Accommodation Cap that is accompanied by a simultaneous dollar-for-dollar decrease in the L/C Facility Cap shall only require the consent of the Required Lenders;

(j)        modify Section 2.06(b) without the written consent of each Lender;

(k)        modify or waive any provision of this Agreement in order to permit the incurrence of any financing pursuant to Section 364 of the Bankruptcy Code (other than the Facilities) that would be secured by the Collateral (or any portion thereof) on a pari passu or senior basis with the Obligations or that would benefit from any Superpriority Claim in the Cases that is pari passu or senior to the Superpriority Claims with respect to the Obligations as provided in the Orders, without the written consent of each Lender; or

(l)        modify the second to last sentence of Section 7.17 without the consent of the Supermajority Lenders;

and, provided further, that (x) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (y) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; and (z) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties to the Fee Letter.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (i) the Commitment of such Lender may not be increased or extended, except as provided in Section 2.14 or pursuant to clause (c) of the definition of Maturity Date and (ii) the principal of any Loan owed to such Lender may not be reduced without the consent of such Lender.

Notwithstanding the foregoing, the Borrower and Administrative Agent may amend this Agreement and the other Loan Documents without the consent of any Lender (a) to cure any ambiguity, omission, mistake, error, defect or inconsistency, (b) to add a Guarantor with respect to the Loans or collateral to secure the Loans or (c) to make administrative changes that do not adversely affect the rights of any Lender.

Any such waiver and any such amendment or modification pursuant to this Section 11.01 shall be binding upon the Borrower, the Lenders, the L/C Issuer, the Administrative Agent and

all future holders of the Loans.  In the case of any waiver, the Borrower, the Lenders, the L/C Issuer and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default that is waived pursuant to this Section 11.01 shall be deemed to be cured and not continuing during the period of such waiver.

**11.02   Notices; Effectiveness; Electronic Communication**.

(a)     Notices Generally.   Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by telecopier as follows or sent by electronic communication as provided in subsection (b) below, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Borrower or any other Loan Party, the Administrative Agent or the L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 11.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to Article II if such Lender or the L/C Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to the Administrative Agent or the Borrower hereunder by electronic communications pursuant to procedures approved by the Administrative Agent or the Borrower, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to the Lenders and the L/C Issuer to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have

126

been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      The Platform.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF   MERCHANTABILITY,   FITNESS   FOR   A   PARTICULAR   PURPOSE,   NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall the Borrower or any Agent Party have any liability to the Borrower, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); provided that such waiver shall not limit any Loan Party's reimbursement or indemnification obligations under Sections 11.04(a) or 11.04(b), respectively.

(d)      Change of Address, Etc.  Each of the Borrower, the Administrative Agent and the L/C Issuer may change its address, electronic mail address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent and the L/C Issuer.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)      Reliance by Administrative Agent, L/C Issuer and Lenders.  The Administrative Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Notices) purportedly given by or on behalf of the Borrower, even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**11.03  No Waiver; Cumulative Remedies**.    No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.    The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**11.04  Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses.  The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by (A) the Administrative Agent and its Affiliates (including the reasonable and documented fees, charges and disbursements of counsel for the Administrative Agent and the Arranger and local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Administrative Agent (including, for the avoidance of doubt, the fees and expenses of Davis Polk & Wardwell LLP, Bryan Cave LLP, Henry Davis York, Centerview Partners LLC and Zolfo Cooper LLC and Ferrier Hodgson)) and (B) the Specified Lenders (but limited (x) in the case of legal fees and expenses, to the reasonable fees and expenses of a single law firm of counsel (and one local counsel) to the Specified Lenders, taken as a whole, and (y) in the case of fees and expenses of other advisors, to the reasonable fees and expenses of a single financial advisor to the Specified Lenders, taken as a whole), in the case of each of (A) and (B), in connection with the syndication of the credit facilities provided for herein, the preparation, due diligence, negotiation, execution, delivery, administration and enforcement of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by the L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all costs and expenses of the Administrative Agent and the L/C Issuer and (subject to the limitations set forth in this sentence) the Lenders for all costs and expenses (including attorneys' and financial advisors' fees and expenses incurred by the Administrative Agent and the L/C Issuer and, solely upon and after an Event of Default, attorneys' fees for the Lenders (but only in respect of any Lender or group of Lenders holding, individually or in the aggregate, more than 33.33% of the aggregate Loans and Commitments outstanding at such time)), in each case in connection with (A) the enforcement of this Agreement and the other Loan Documents, including all rights under this Section, (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit and (C) any legal proceeding relating to arising out of the Facilities or the other transactions contemplated by this Agreement and the other Loan Documents.

(b)    Indemnification by the Borrower.   The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), the Arranger, each Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities (including any Environmental Liability) and related reasonable and documented out-of-pocket fees and expenses (including the reasonable documented out-of-

pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary thereof arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration and enforcement of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit) and (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are found in a final, non-appealable judgment by a court of competent jurisdiction to (x) have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for material breach of such Indemnitee's obligations hereunder or under any other Loan Document or (z) result from a dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement or any claims arising out of any act or omission of the Borrower or any of its Affiliates).  This Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Reimbursement by Lenders.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Arranger, the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Arranger, such L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Arranger or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Arranger or L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of <u>Section 2.12(d)</u>.

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against the Borrower and its Affiliates or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof; <u>provided</u> that such waiver shall not limit any

Loan Party's reimbursement or indemnification obligations under Sections 11.04(a) or 11.4(b), respectively.  No Indemnitee referred to in subsection (b) above or the Borrower and its Affiliates shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(e)    Payments.  All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)    Survival.  The agreements in this Section shall survive the resignation of the Administrative Agent, the Arranger and the L/C Issuer, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all Obligations.

**11.05  Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, the Arranger, the L/C Issuer or any Lender, or the Administrative Agent, the Arranger, the L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the Arranger, the L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive Payment in Full and the termination of this Agreement.

**11.06  Successors and Assigns**.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder, except through a transaction permitted hereunder, without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby,

Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Arranger, the L/C Issuer and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that:

(i)    except (a) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it, which amount is less than the applicable minimum transfer amount set forth below, or (b) in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment or the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed); provided, however, that (x) concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met and (y) the consent of the Administrative Agent shall not be required for any assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender;

(ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount, if any, required as set forth in Schedule 11.06 (provided however, that the Administrative Agent may in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and does hereby waive such processing and recordation fee in the case of an assignment by a Lender to an Affiliate of such Lender) and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the closing date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning

Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.01 (subject to the requirements thereof), 3.04, 3.05 and 11.04 with respect to facts and circumstances occurring prior to the closing date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)      Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide).  The Register shall be available for inspection by the Borrower and the L/C Issuer at any reasonable time and from time to time upon reasonable prior notice.  In addition, at any time that a request for a consent for a material or substantive change to the Loan Documents is pending, any Lender may request and receive from the Administrative Agent a copy of the Register.

(d)      Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender, to the extent that it has a consent right hereunder, will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b) (c), and (f) of the first proviso to Section 11.01 that affects such Participant.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment, provided that in the case of Section 3.01, such Participant shall have complied with the requirements of such section (it being understood that the documentation required under Section 3.01 shall be delivered to the

participating Lender to the same extent as if the Participant were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 11.08</u> as though it were a Lender; such Participant agrees to be subject to <u>Section 2.13</u> as though it were a Lender.

Each Lender that sells a participation, acting for this purpose as a non-fiduciary agent (solely for tax purposes) of the Borrower, shall maintain a register for the recordation of the names and addresses of the Participants and principal amount (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and each Loan Party shall treat each Person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(e)    Limitation upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u>, <u>3.04</u> or <u>3.05</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  No Participant shall be entitled to the benefits of <u>Section 3.01</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 3.01(e)</u> as though it were a Lender.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note(s), if any) to secure obligations of such Lender to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

**11.07  Treatment of Certain Information; Confidentiality**.    Each of the Administrative Agent, Arranger, the Lenders and the L/C Issuer agrees to maintain the

confidentiality of the Information (as defined below), except that Information may be disclosed (a) on a need-to-know basis, to its Affiliates and to its Related Parties for the evaluation of, administration of and enforcement of rights under the Loan Documents (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto subject to any other applicable confidentiality arrangements in the Fee Letter, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section and such Information being used for the evaluation of, administration of and enforcement of rights under the Loan Documents, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information becomes publicly available other than as a result of a breach of this Section.

For purposes of this Section, "Information" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Arranger, any Lender or the L/C Issuer on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary, provided that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised reasonable care to protect such Information, and in no event less than the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Arranger, the Lenders and the L/C Issuer acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Laws, including Federal and state securities laws.

**11.08   Right of Setoff**.  Subject to the Order and the final proviso of Section 9.01, upon any amount becoming due and payable hereunder (whether at stated maturity, by acceleration or otherwise), each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of a Loan Party against any and all of the obligations of such Loan Party now or hereafter existing

#88215025v32

134

under this Agreement or any other Loan Document to such Lender or the L/C Issuer, irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document or are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have.  Each Lender and the L/C Issuer agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

 **11.09   Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.   In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

 **11.10   Counterparts; Integration; Effectiveness; Orders Control**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.  To the extent that any specific provision hereof is inconsistent with a specific provision of any of the Orders, the Interim Order or Final Order (as applicable) shall control.

 **11.11   Survival of Representations and Warranties**.   All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.   Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or

any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

**11.12   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.   The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**11.13   Replacement of Lenders**.   If (a) any Lender requests compensation under Section 3.04, (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (c) any Lender is at such time a Defaulting Lender or has given notice pursuant to Section 3.02 or (d) any Lender becomes a "Nonconsenting Lender" (hereinafter defined), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to (and such Lender shall) assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.06), all of its interest, rights and obligations under this Agreement and the related Loan Documents to an assignee selected by the Borrower that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)      the Administrative Agent shall have received the assignment fee specified in Section 11.06(b) (provided however, that the Administrative Agent may in its sole discretion elect to waive such processing and recordation fee in the case of any assignment);

(b)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and outstanding L/C Disbursements that have been drawn, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)      in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)      such assignment does not conflict with applicable Laws, and

(e)      neither the Administrative Agent nor any Lender shall be obligated to be or to find the assignee.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  In the event that (x) the Borrower or the Administrative Agent has requested the Lenders to consent to a departure or

#88215025v32

waiver of any provisions of the Loan Documents or to agree to any amendment thereto and (y) the Required Lenders, as applicable, have agreed to such consent, waiver or amendment, then any such Lender, who does not agree to such consent, waiver or amendment and whose consent would otherwise be required for such departure, waiver or amendment, shall be deemed a "Nonconsenting Lender." Any such replacement shall not be deemed a waiver of any rights that the Borrower shall have against the replaced Lender.

### 11.14   Governing Law; Jurisdiction; Etc.

(a)   GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)   SUBMISSION TO JURISDICTION.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)   WAIVER OF VENUE.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

**11.15  Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**11.16  PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act.

**11.17  Time of the Essence**.  Time is of the essence of the Loan Documents.

**11.18  Judgment Currency**.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "Agreement Currency"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If

the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable law).

**11.19  No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A)the arranging and other services regarding this Agreement provided by the Administrative Agent and the Arranger are arm's-length commercial transactions between the Borrower and their Affiliates, on the one hand, and the Administrative Agent and the Arranger, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, each Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any of the Arranger nor any Lender has any obligation to the Borrower or any of its respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Arranger and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and neither the Administrative Agent nor any of the Arranger has any obligation to disclose any of such interests to the Borrower or its respective Affiliates.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**11.20  [Reserved].**

**11.21  Release of Liens and Release from Guaranty Obligations**. Notwithstanding anything to the contrary in the Loan Documents:

(a)    after Payment in Full, the Collateral shall be automatically released from any Liens created by the Loan Documents, and the Loan Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent, the L/C Issuer, the Lenders and each Loan Party under the Loan Documents shall terminate and each Guarantor shall be released from its obligations hereunder, all without delivery of any instrument or performance of any act by any Person.

(b)    the following Collateral shall be automatically released from the Liens created by the Loan Documents without delivery of any instrument or performance of any act by any Person:

(i)    upon a Disposition of Collateral permitted hereunder, the Disposed of Collateral;

(ii)    [reserved];

(iii)    upon the approval, authorization or ratification in writing by the Required Lenders (or such other percentage of the Lenders whose consent is required by Section 11.01) of the release of any Collateral, such Collateral;

(iv)    upon a release of any Collateral under the terms of each applicable Security Document, such Collateral; or

(v)    upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, the Collateral owned by such Guarantor.

(c)    a Guarantor shall be automatically released from its obligations hereunder without delivery of any instrument or performance of any act by any Person:

(i)    [reserved];

(ii)    upon such Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder;

(iii)    upon the approval, authorization or ratification in writing by the Required Lenders (or such other percentage of the Lenders whose consent is required by Section 11.01); or

(iv)    upon the release of such Guarantor under the terms of this Agreement.

(d)    In connection with any termination or release of Collateral (including of property no longer constituting Collateral by virtue of any property becoming an Excluded Asset pursuant to clause (a) of the definition thereof) from the Liens securing the Obligations or a release of a Guarantor, the Administrative Agent shall:

(i)    in the case of termination or release of Collateral from the Liens securing the Obligations, (A) execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release (including (1) UCC termination statements and (2) in the case of a release of Mortgages, a partial release) and (B) return to the Borrower, the possessory Collateral that is in the possession of the Administrative Agent and is the subject of such release (provided that, upon request by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer certifying that such transaction has been or was consummated in compliance with the Loan Documents), and

(ii)    in the case of a release of a Guarantor, at the Borrower's expense, execute and deliver a written release in form and substance reasonably satisfactory to the Administrative Agent, to evidence the release of the Guarantor promptly upon the reasonable request of the Borrower; and

(e)     any execution and delivery of documents, or the taking of any other action, by the Administrative Agent pursuant to this Section 11.21 shall be without recourse to or warranty by the Administrative Agent.

**11.22   Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**11.23   Original Issue Discount**   THE LOANS MAY BE ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR UNITED STATES FEDERAL INCOME TAX PURPOSES.   THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THE LOANS MAY BE OBTAINED BY WRITING TO THE BORROWER AND THE ADMINISTRATIVE AGENT AT ITS ADDRESS SPECIFIED HEREIN

## ARTICLE XII
### GUARANTY

**12.01   Guaranty.**

(a)     Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Administrative Agent, for the ratable benefit of the Secured Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Loan Parties when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

(b)     Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in

no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in <u>Section 12.02</u>).

(c)     Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this <u>Section 12.01</u> or affecting the rights and remedies of the Secured Parties hereunder.

(d)     The guarantee contained in this <u>Section 12.01</u> shall remain in full force and effect until the Discharge of the Obligations, notwithstanding that from time to time during the term of this Agreement the Borrower may be free from any Obligations.

(e)     No payment made by the Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by any Secured Party from the Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any setoff or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Discharge of the Obligations.

**12.02   Right of Contribution**.   Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.   Each Guarantor's right of contribution shall be subject to the terms and conditions of <u>Section 12.03</u>. The provisions of this <u>Section 12.02</u> shall in no respect limit the obligations and liabilities of any Guarantor to the Secured Parties, and each Guarantor shall remain jointly and severally liable to the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

**12.03   Amendments, etc. with Respect to Obligations**.   Each Guarantor shall remain obligated hereunder notwithstanding that (without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor) any demand for payment of any of the Obligations made by any Secured Party may be rescinded by such Secured Party and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Secured Party, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Secured Party for the payment of the Obligations may be sold, exchanged, waived, surrendered or released.

**12.04   Guaranty Absolute and Unconditional**.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Secured Party upon the guarantee contained in this Article XII or acceptance of the guarantee contained in this Article XII; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Article XII; and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Article XII.  Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Guarantors with respect to the Obligations.  Each Guarantor understands and agrees that the guarantee contained in this Article XII shall be construed as a continuing, absolute and unconditional guarantee of payment and performance and not of collection without regard to (a) the validity or enforceability of (i) this Agreement or any other Loan Document or any of the Obligations or (ii) any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party, (b) any defense, setoff or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against any Secured Party, (c) any acts of any legislative body or governmental authority affecting the Borrower, including but not limited to, any restrictions on the conversion of currency or repatriation or control of funds or any total or partial expropriation of the Borrower's property, or by economic, political, regulatory or other events in the countries where the Borrower is located, or (d) any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower from the Obligations, or of such Guarantor under the guarantee contained in this Article XII (other than a defense of payment or performance), in bankruptcy or in any other instance.  When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any other Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor or any other Person or to realize upon any such guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor or any other Person or any such guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Secured Parties against any Guarantor.   For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

**12.05   Reinstatement**.  The guarantee contained in this Article XII shall, to the extent permissible at law, continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by any Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any

Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

**12.06   [Reserved]**.

**12.07   Remedial Provisions**.  The Administrative Agent may apply all or any part of any proceeds of the guarantee set forth in this Article XII, to payment of the Obligations in such order as set forth in Section 9.03 of this Agreement.  If an Event of Default shall occur and be continuing, the Administrative Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies available to it under any applicable Loan Document or under any applicable law or in equity.

**12.08   No Waiver; Enforcement; Indemnification.**

(a)      None of the Administrative Agent or Lenders shall by any act (except by a written instrument pursuant to Section 11.01), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced to any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Administrative Agent or any Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Administrative Agent or any Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Administrative Agent or Lender would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(b)      Each Guarantor agrees to pay or reimburse each Secured Party for all its reasonable and documented costs and expenses incurred in collecting against such Guarantor under the guarantee contained in this Article XII or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which such Guarantor is a party subject to the expense reimbursement and indemnity obligations of the Borrower pursuant to Section 11.04.

(c)      Each Guarantor agrees to pay, and to save the Administrative Agent, the Lenders and the other Persons referenced in Section 11.04 of this Agreement harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Borrower would be required to do so pursuant to Section 11.04 of this agreement.

(d)      The agreements in this Section 12.08 shall survive Payment in Full.

**12.09   Agreement to Pay; Subrogation.**

(a)      In furtherance of the foregoing and not in limitation of any other right that the Administrative Agent or any other Secured Party has at law or in equity against any Loan Party

by virtue hereof, upon the failure of the Borrower or any other Loan Party to pay any Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Loan Party hereby promises to and will forthwith pay, or cause to be paid, to the Administrative Agent for distribution to the applicable Secured Parties in cash the amount of such unpaid Obligation. Upon payment by any Guarantor of any sums to the Administrative Agent as provided above, all rights of such Loan Party against the Borrower, or other Loan Party or any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Sections 12.09 (b), (c) and (d).

(b)      In addition to all such rights of indemnity and subrogation as the Loan Parties may have under applicable law (but subject to Section 12.09(d)), the Borrower agrees that (i) in the event a payment shall be made by any Guarantor under this Agreement in respect of any Obligation of the Borrower, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the person to whom such payment shall have been made to the extent of such payment and (ii) in the event any assets of any Guarantor shall be sold pursuant to this Agreement or any other Loan Document to satisfy in whole or in part an Obligation of the Borrower, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

(c)      Each Guarantor agrees (subject to Section 12.09(d)) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Obligation or assets of any other Guarantor shall be sold pursuant to any Loan Document to satisfy any Obligation owed to any Secured Party and such other Guarantor (the "Claiming Guarantor") shall not have been fully indemnified by the Borrower as provided in Section 12.09(b), the contributing Guarantor shall indemnify the Claiming Guarantor in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as applicable, in each case multiplied by a fraction of which the numerator shall be the net worth of such contributing Guarantor on the date hereof and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 7.12, the date of the supplement hereto executed and delivered by such Guarantor). Any contributing Guarantor making any payment to a Claiming Guarantor pursuant to this Section 12.09(c) shall be subrogated to the rights of such Claiming Guarantor under Section 12.09(b) to the extent of such payment.

(d)      Notwithstanding any provision of this Agreement to the contrary, all rights of the Loan Parties under Sections 12.09(b) and 12.09(c) and all other rights of indemnity, contribution or subrogation of the Loan Parties under applicable law or otherwise shall be fully subordinated to the indefeasible payment in full in cash of the Obligations. No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 12.09(b) and 12.09(c) (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Loan Party with respect to its obligations hereunder, and each Loan Party shall remain liable for the full amount of the obligations of such Loan Party hereunder. Each Guarantor hereby agrees that all Indebtedness and other monetary obligations owed by it to any other Guarantor or any Subsidiary shall be fully subordinated to the indefeasible payment in full in cash of the Obligations.

**12.10  Information**.  Each Loan Party assumes all responsibility for being and keeping itself informed of the financial condition and assets of the Borrower and each other Loan Party, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Administrative Agent or the other Secured Parties will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

## **Exhibit C**

13-Week Projection

| ($ Millions) | Forecast Week 1 4/22 | Forecast Week 2 4/29 | Forecast Week 3 5/6 | Forecast Week 4 5/13 | Forecast Week 5 5/20 | Forecast Week 6 5/27 | Forecast Week 7 6/3 | Forecast Week 8 6/10 | Forecast Week 9 6/17 | Forecast Week 10 6/24 | Forecast Week 11 7/1 | Forecast Week 12 7/8 | Forecast Week 13 7/15 | Total 13 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts:** | | | | | | | | | | | | | | |
| **Total Receipts** | $   34.3 | $   57.1 | $   52.9 | $   37.4 | $   53.6 | $   65.1 | $   53.1 | $   35.7 | $   53.5 | $   63.9 | $   123.4 | $   54.1 | $   34.7 | $   718.9 |
| | | | | | | | | | | | | | | |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| Payroll & Benefits | (19.1) | (4.8) | (17.3) | (4.7) | (19.2) | (4.4) | (18.6) | (2.7) | (21.2) | (2.4) | (22.8) | (9.5) | (11.7) | (158.4) |
| Other Operating Disbursements | (30.4) | (28.4) | (54.8) | (67.9) | (26.4) | (35.3) | (54.1) | (21.0) | (27.6) | (22.2) | (48.1) | (46.6) | (45.0) | (507.9) |
| **Cash Flow from Operations** | **(15.2)** | **23.8** | **(19.2)** | **(35.2)** | **8.1** | **25.4** | **(19.5)** | **12.1** | **4.7** | **39.3** | **52.5** | **(2.0)** | **(22.0)** | **52.6** |
| | | | | | | | | | | | | | | |
| Capex | (4.0) | (4.0) | (4.0) | (2.6) | (2.6) | (2.6) | (2.6) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (31.4) |
| Cash Interest & Bank Fees | (0.8) | (4.0) | (0.6) | (0.6) | (0.6) | (19.3) | (0.5) | (0.5) | (0.5) | (1.2) | (23.9) | (0.6) | (0.6) | (53.9) |
| Intl. Intercompany Transfers | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Changes in Restricted Cash | 19.2 | 1.3 | 0.9 | 10.6 | 0.2 | (10.7) | (8.9) | 4.9 | (9.2) | (17.5) | (17.3) | 1.8 | 17.2 | (7.6) |
| DIP Financing Proceeds | - | - | - | - | - | 300.0 | - | - | - | - | - | - | - | 300.0 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | **(0.8)** | **17.1** | **(22.9)** | **(27.8)** | **5.0** | **292.7** | **(31.6)** | **14.9** | **(6.5)** | **19.2** | **9.8** | **(2.4)** | **(7.0)** | **259.7** |
| | | | | | | | | | | | | | | |
| **Beginning Cash – Unrestricted** | $   346.0 | $   345.2 | $   362.3 | $   339.4 | $   311.6 | $   316.6 | $   609.3 | $   577.7 | $   592.7 | $   586.1 | $   605.3 | $   615.1 | $   612.7 | $   346.0 |
| Net Cash Flow | (0.8) | 17.1 | (22.9) | (27.8) | 5.0 | 292.7 | (31.6) | 14.9 | (6.5) | 19.2 | 9.8 | (2.4) | (7.0) | 259.7 |
| **Ending Cash – Unrestricted** | $   345.2 | $   362.3 | $   339.4 | $   311.6 | $   316.6 | $   609.3 | $   577.7 | $   592.7 | $   586.1 | $   605.3 | $   615.1 | $   612.7 | $   605.8 | $   605.8 |
| Liquidity Covenant | | | | | | | $   300.0 | $   300.0 | $   300.0 | $   300.0 | $   300.0 | $   300.0 | $   300.0 | $   300.0 |
| **Cushion** | | | | | | | $   277.7 | $   292.7 | $   286.1 | $   305.3 | $   315.1 | $   312.7 | $   305.8 | $   305.8 |

## **Exhibit D**

ICA

EX-10.1 3 d890639dex101.htm EX-10.1

**Exhibit 10.1**

**EXECUTION COPY**

FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT

among

PEABODY ENERGY CORPORATION
as the Borrower,

the other Grantors party hereto,

CITIBANK, N.A.,
as Senior Representative for the
First Lien Credit Agreement Secured Parties,

U.S. BANK NATIONAL ASSOCIATION,
as the Second Priority Representative for the
Second Lien Indenture Secured Parties

and

each additional Representative from time to time party hereto

dated as of March 16, 2015

FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT dated as of March 16, 2015 (as amended, supplemented or otherwise modified from time to time, this "Agreement"), among PEABODY ENERGY CORPORATION, a Delaware corporation (the "Borrower"), the other Grantors (as defined below) party hereto, CITIBANK, N.A., as Representative for the First Lien Credit Agreement Secured Parties (in such capacity and together with its successors in such capacity, the "First Lien Collateral Agent"), U.S. BANK NATIONAL ASSOCIATION, as Representative for the Second Lien Indenture Secured Parties (in such capacity and together with its successors in such capacity, the "Second Lien Collateral Agent"), and each additional Second Priority Representative and Senior Representative that from time to time becomes a party hereto pursuant to Section 8.09.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the First Lien Collateral Agent (for itself and on behalf of the First Lien Credit Agreement Secured Parties), the Second Lien Collateral Agent (for itself and on behalf of the Second Lien Indenture Secured Parties), each additional Senior Representative (for itself and on behalf of the Additional Senior Debt Parties under the applicable Additional Senior Debt Facility) and each additional Second Priority Representative (for itself and on behalf of the Second Priority Debt Parties under the applicable Second Priority Debt Facility) agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Certain Defined Terms. Capitalized terms used but not otherwise defined herein have the meanings set forth in the First Lien Credit Agreement or, if defined in the New York UCC, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below:

"Additional Second Priority Debt" means any Indebtedness (including any Junior Lien Obligations) that is incurred, issued or guaranteed by the Borrower and/or any Guarantor (other than Indebtedness constituting Second Lien Indenture Obligations), which Indebtedness and guarantees are secured by the Second Priority Collateral (or any portion thereof) for which the applicable Additional Second Priority Debt Documents provide that such Indebtedness and guarantees are to be secured by such Second Priority Collateral on a subordinate or junior basis to the Senior Debt Obligations; provided, however, that (i) such Indebtedness is permitted to be incurred, secured and guaranteed on such basis by each then extant Senior Debt Document and Second Priority Debt Document and (ii) unless already a party with respect to that series of Additional Second Priority Debt, the Representative for the holders of such Indebtedness shall have (A) become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof and (B) become a party to the Second Priority Pari Passu Intercreditor Agreement or Junior Lien Intercreditor Agreement, as applicable, pursuant to, and by satisfying the conditions set forth therein; provided further that, if such Indebtedness will be the initial Additional Second Priority Debt incurred by the Borrower, then the Guarantors, the Second Lien Collateral Agent and the Representative for such Indebtedness shall have executed and delivered the Second Priority Pari Passu Intercreditor Agreement or Junior Lien Intercreditor Agreement. Additional Senior Debt shall include any Registered Equivalent Notes and Guarantees thereof by

the Guarantors issued in exchange therefor. The requirements of clause (i) above shall be tested only as of (x) the date of execution of such Joinder Agreement, if pursuant to a commitment entered into at the time of such Joinder Agreement and (y) with respect to any later commitment or amendment to those terms to permit such Indebtedness, as of the date of such commitment and/or amendment. For the avoidance of doubt, notwithstanding the reference to "second priority" in this Additional Second Priority Debt definition, as used in this Agreement, this definition includes both Second Lien Obligations and Junior Lien Obligations.

"Additional Second Priority Debt Documents" means, with respect to any series, issue or class of Additional Second Priority Debt, the loan agreements, the promissory notes, indentures, the Second Priority Collateral Documents or other operative agreements evidencing or governing such Indebtedness.

"Additional Second Priority Debt Facility" means each indenture, loan agreement or other governing agreement with respect to any Additional Second Priority Debt.

"Additional Second Priority Debt Obligations" means, with respect to any series, issue or class of Additional Second Priority Debt, all amounts owing pursuant to the terms of such Additional Second Priority Debt, including, without limitation, the obligation (including guarantee obligations) to pay principal, interest (including interest that accrues after the commencement of a Bankruptcy Case, regardless of whether such interest is an allowed claim under such Bankruptcy Case), letter of credit commissions, reimbursement obligations, charges, expenses, fees, attorneys costs, indemnities and other amounts payable by a Grantor under any Additional Second Priority Debt Document.

"Additional Second Priority Debt Parties" means, with respect to any series, issue or class of Additional Second Priority Debt, the holders of such Indebtedness, the Representative with respect thereto, any trustee or agent therefor under any related Additional Second Priority Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any other Grantor under any related Additional Second Priority Debt Documents.

"Additional Senior Debt" means any Indebtedness that is incurred, issued or guaranteed by the Borrower and/or any Guarantor (other than Indebtedness constituting First Lien Credit Agreement Obligations) which Indebtedness and Guarantees are secured by the Senior Collateral (or a portion thereof) on a pari passu basis with the First Lien Credit Agreement Obligations; provided, however, that (i) such Indebtedness is permitted to be incurred, secured and guaranteed on such basis by each then extant Senior Debt Document and Second Priority Debt Document and (ii) unless already a party with respect to that series of Additional Senior Debt, the Representative for the holders of such Indebtedness shall have (A) executed and delivered this Agreement as of the date hereof or become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof and (B) become a party to the First Lien Intercreditor Agreement pursuant to, and by satisfying the conditions set forth in, Section 5.13 thereof; provided further that, if such Indebtedness will be the initial Additional Senior Debt incurred by the Borrower, then the Guarantors, the First Lien Collateral Agent and the Representative for such Indebtedness shall have executed and delivered the First Lien Intercreditor Agreement. Additional Senior Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Guarantors issued in exchange therefor. The requirements of clause (i) above

-2-

shall be tested only as of (x) the date of execution of such Joinder Agreement, if pursuant to a commitment entered into at the time of such Joinder Agreement and (y) with respect to any later commitment or amendment to those terms to permit such Indebtedness, as of the date of such commitment and/or amendment.

"Additional Senior Debt Documents" means, with respect to any series, issue or class of Additional Senior Debt, the loan agreements, the promissory notes, indentures, the Senior Collateral Documents or other operative agreements evidencing or governing such Indebtedness.

"Additional Senior Debt Facility" means each indenture, loan agreement or other governing agreement with respect to any Additional Senior Debt.

"Additional Senior Debt Obligations" means, with respect to any series, issue or class of Additional Senior Debt, all amounts owing pursuant to the terms of such Additional Senior Debt, including, without limitation, the obligation (including guarantee obligations) to pay principal, interest (including interest that accrues after the commencement of a Bankruptcy Case, regardless of whether such interest is an allowed claim under such Bankruptcy Case), letter of credit commissions, reimbursement obligations, charges, expenses, fees, attorneys costs, indemnities and other amounts payable by a Grantor under any Additional Senior Debt Document.

"Additional Senior Debt Parties" means, with respect to any series, issue or class of Additional Senior Debt, the holders of such Indebtedness, the Representative with respect thereto, any trustee or agent therefor under any related Additional Senior Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Borrower or any Guarantor under any related Additional Senior Debt Documents.

"Agreement" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Bankruptcy Case" means a case under the Bankruptcy Code or any other Bankruptcy Law.

"Bankruptcy Code" means Title 11 of the United States Code, as amended or any similar federal or state law for the relief of debtors.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrower" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Class Debt" has the meaning assigned to such term in Section 8.09.

"Class Debt Parties" has the meaning assigned to such term in Section 8.09.

"Class Debt Representatives" has the meaning assigned to such term in Section 8.09.

-3-

"<u>Collateral</u>" means the Senior Collateral and the Second Priority Collateral.

"<u>Collateral Documents</u>" means the Senior Collateral Documents and the Second Priority Collateral Documents.

"<u>Commission</u>" means the United States Securities and Exchange Commission and any successor agency thereto.

"<u>Debt Facility</u>" means any Senior Facility and any Second Priority Debt Facility.

"<u>Designated Second Priority Representative</u>" means (i) the Second Lien Collateral Agent, until such time as the Second Lien Indenture ceases to be the only Second Priority Debt Facility under this Agreement and (ii) thereafter, the Second Lien Collateral Agent or such other replacement Second Priority Representative designated by the Borrower and/or such other replacement Second Priority Representative in a written notice to the Designated Senior Representative as the "Designated Second Priority Representative" for purposes hereof in accordance with the terms of any Second Priority Pari Passu Intercreditor Agreement and/or Junior Lien Intercreditor Agreement, as applicable.

"<u>Designated Senior Representative</u>" means (i) if at any time there is only one Senior Representative for a Senior Facility with respect to which the Discharge of Senior Obligations has not occurred, such Senior Representative and (ii) at any time when clause (i) does not apply, the Applicable Authorized Representative (as defined in the First Lien Intercreditor Agreement) at such time.

"<u>DIP Financing</u>" has the meaning assigned to such term in Section 6.01.

"<u>Discharge</u>" means, with respect to any Shared Collateral and any Debt Facility, the date on which such Debt Facility and the Senior Obligations or Second Priority Debt Obligations thereunder, as the case may be, are no longer secured by and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Debt Facility. The term "<u>Discharged</u>" shall have a corresponding meaning.

"<u>Discharge of First Lien Credit Agreement Obligations</u>" means, the Discharge of the First Lien Credit Agreement Obligations with respect to Shared Collateral; <u>provided</u> that the Discharge of First Lien Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such First Lien Credit Agreement Obligations with an Additional Senior Debt Facility secured by such Shared Collateral under one or more Additional Senior Debt Documents which has been designated in writing by the First Lien Collateral Agent (under the First Lien Credit Agreement so Refinanced) to the Designated Senior Representative as the "First Lien Credit Agreement" for purposes of this Agreement.

"<u>Discharge of Senior Obligations</u>" means the date on which the Discharge of First Lien Credit Agreement Obligations and the Discharge of all Additional Senior Debt Obligations has occurred.

-4-

"First Lien Cap" means, on any date of determination, the sum of (a) the greater of (i) $3,000,000,000 less the aggregate amount of Senior Obligations prepaid, defeased or retired with the proceeds from any Sale and Lease-Back Transaction, as defined in, and in accordance with, Section 4.10 of the Second Lien Indenture, (ii) 2.50 multiplied by the Consolidated EBITDA (as defined in the Second Lien Indenture as in effect on the date hereof unless modified in a manner that increases the First Lien Cap) as of the last day of the most recently ended period of four consecutive fiscal quarters prior to such date of determination for which financial statements were filed by the Borrower with the Commission and (iii) 25% of Consolidated Net Tangible Assets (as defined in the Second Lien Indenture as in effect on the date hereof unless modified in a manner that increases the First Lien Cap) on the date of such determination and (b) all obligations permitted to be incurred under clause (bb) of the definition of "Permitted Liens" as in effect on the date hereof (unless modified in a manner that increases the First Lien Cap) in the Second Lien Indenture that are not Second Lien Indenture Obligations.

"First Lien Collateral Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement and shall include any successor Collateral Agent under the First Lien Credit Agreement.

"First Lien Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of September 24, 2013, among the Borrower, the lenders from time to time party thereto, Citibank, N.A., as administrative agent, the First Lien Collateral Agent and the other parties thereto, as amended by the Omnibus Amendment Agreement dated as of February 5, 2015 among the Borrower, the lenders from time to time party thereto, Citibank, N.A., as administrative agent, the First Lien Collateral Agent and the other parties thereto and as further amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time and, subject to Section 8.10, shall include any Refinanced First Lien Credit Agreement identified by the Borrower in writing as the First Lien Credit Agreement.

"First Lien Credit Agreement Loan Documents" means the First Lien Credit Agreement and the other "Loan Documents" as defined in the First Lien Credit Agreement.

"First Lien Credit Agreement Obligations" means the "Secured Obligations" as defined in the First Lien Credit Agreement; provided, that if, as of the date of the incurrence of any Additional Senior Debt, the sum of: (1) the aggregate principal amount of Loans of the Borrower then outstanding under the First Lien Credit Agreement; plus (2) unreimbursed amounts in respect of Letters of Credit under the First Lien Credit Agreement, is in excess of the sum of (x) the First Lien Cap plus (y) the amount of any premium on any Indebtedness under the First Lien Credit Agreement in connection with any Refinancing, extension, renewal, restatement, refunding or replacement thereof, plus fees and expenses incurred in connection therewith, (the "Total First Lien Cap Amount"), then only that portion of such Indebtedness and such unreimbursed amounts in respect of Letters of Credit (on a pro rata basis based on the aggregate outstanding principal amount of such Indebtedness and face amount of Letters of Credit not reimbursed) that does not exceed the Total First Lien Cap Amount shall be included in First Lien Credit Agreement Obligations. For the avoidance of doubt, Cash Management Obligations and Swap Obligations shall not be subject to the Total First Lien Cap Amount.

"First Lien Credit Agreement Secured Parties" means the "Secured Parties" as defined in the First Lien Credit Agreement.

-5-

"First Lien Intercreditor Agreement" has the meaning assigned to the term "Pari-Passu Intercreditor Agreement" in the First Lien Credit Agreement.

"Grantors" means the Borrower, the other Guarantors and each of their respective Subsidiaries which has granted a security interest pursuant to any Collateral Document to secure any Secured Obligations. The Grantors existing on the date hereof are listed on the signature pages hereto as Grantors.

"Guarantors" has the meaning assigned to such term in the First Lien Credit Agreement.

"Insolvency or Liquidation Proceeding" means:

(1) any case commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2) any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3) any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"Joinder Agreement" means a supplement to this Agreement in substantially the form of Annex II or Annex III hereof.

"Junior Lien Intercreditor Agreement" has the meaning assigned to such term in the Second Lien Indenture.

"Junior Lien Obligations" has the meaning assigned to such term in the Second Lien Indenture.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any capitalized lease having substantially the same economic effect as any of the foregoing).

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Officer's Certificate" has the meaning provided to such term in Section 8.08.

-6-

"Permitted Refinancing Increase" means, with respect to the Refinancing of any Indebtedness, an amount equal to (a) any premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such Refinancing, (b) any unpaid accrued interest on the Indebtedness being Refinanced, (c) any existing commitments unutilized under the Indebtedness being Refinanced and (d) any amount by which the original principal amount of any Indebtedness has been repaid.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Pledged or Controlled Collateral" has the meaning assigned to such term in Section 5.05(a).

"Post-Petition Interest" means interest, fees, expenses and other charges that pursuant to the Senior Debt Documents or the Second Priority Debt Documents, as applicable, continue to accrue after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under the Bankruptcy Law or in any such Insolvency or Liquidation Proceeding.

"Proceeds" means the proceeds of any sale, collection or other liquidation of Shared Collateral and any payment or distribution made in respect of Shared Collateral in a Bankruptcy Case and any amounts received by any Senior Representative or any Senior Secured Party from a Second Priority Debt Party in respect of Shared Collateral pursuant to this Agreement.

"Recovery" has the meaning assigned to such term in Section 6.04.

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part along with any Permitted Refinancing Increase), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including, in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the Commission.

"Representatives" means the Senior Representatives and the Second Priority Representatives.

"Second Lien Indenture" means that certain Indenture dated as of the date hereof among the Borrower, the Guarantors and U.S. Bank National Association, as trustee and collateral agent, as amended, restated, amended and restated, extended, supplemented or otherwise

-7-

modified from time to time and, subject to <u>Section 8.10</u>, shall include any Refinanced Indenture identified by the Borrower in writing as the Second Lien Indenture.

"<u>Second Lien Indenture Documents</u>" means the Second Lien Indenture and the "Security Documents" as defined in the Second Lien Indenture.

"<u>Second Lien Indenture Obligations</u>" means the Indebtedness incurred and Obligations under (as defined in the Second Lien Indenture) the Second Lien Indenture.

"<u>Second Lien Indenture Secured Parties</u>" means the holders of Second Lien Indenture Obligations, the Second Lien Collateral Agent and the trustee under the Second Lien Indenture.

"<u>Second Lien Obligations</u>" has the meaning assigned to such term in the Second Lien Indenture.

"<u>Second Lien Security Agreement</u>" means the "Security Agreement" as defined in the Second Lien Indenture.

"<u>Second Priority Class Debt</u>" has the meaning assigned to such term in Section 8.09.

"<u>Second Priority Class Debt Parties</u>" has the meaning assigned to such term in Section 8.09.

"<u>Second Priority Class Debt Representative</u>" has the meaning assigned to such term in Section 8.09.

"<u>Second Priority Collateral</u>" means any "Collateral" as defined in any Second Lien Indenture Document or any other Second Priority Debt Document and any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted or required to be granted pursuant to a Second Priority Collateral Document as security for any Second Priority Debt Obligation.

"<u>Second Priority Collateral Documents</u>" means the Second Lien Security Agreement and the other "Security Documents" as defined in the Second Lien Indenture and each of the collateral agreements, security agreements, mortgages, deeds of trust and other instruments and documents executed and delivered by the Borrower or any other Grantor for purposes of providing collateral security for any Second Priority Debt Obligation.

"<u>Second Priority Debt</u>" means any Second Lien Indenture Obligations and any Additional Second Priority Debt.

"<u>Second Priority Debt Documents</u>" means the Second Lien Indenture Documents and any Additional Second Priority Debt Documents.

"<u>Second Priority Debt Facilities</u>" means the Second Lien Indenture and any Additional Second Priority Debt Facilities.

-8-

"Second Priority Debt Obligations" means the Second Lien Indenture Obligations and any Additional Second Priority Debt Obligations.

"Second Priority Debt Parties" means the Second Lien Indenture Secured Parties and any Additional Second Priority Debt Parties.

"Second Priority Enforcement Date" means, with respect to any Second Priority Representative, the date which is 180 days after the occurrence of both (i) an Event of Default (under and as defined in the Second Priority Debt Document for which such Second Priority Representative has been named as Representative) and (ii) the Designated Senior Representative's and each other Representative's receipt of written notice from such Second Priority Representative that (x) such Second Priority Representative is the Designated Second Priority Representative and that an Event of Default (under and as defined in the Second Priority Debt Document for which such Second Priority Representative has been named as Representative) has occurred and is continuing and (y) the Second Priority Debt Obligations of the series with respect to which such Second Priority Representative is the Second Priority Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Second Priority Debt Document; provided that the Second Priority Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred (1) at any time the Designated Senior Representative has commenced and is diligently pursuing any enforcement action with respect to all or any material portion of the Shared Collateral (with prompt written notice of the commencement of such action to be given to such Second Priority Representative) or (2) at any time the Grantor which has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Second Priority Lien" means the Liens on the Second Priority Collateral in favor of Second Priority Debt Parties under Second Priority Collateral Documents.

"Second Priority Pari Passu Intercreditor Agreement" has the meaning assigned to the term "Pari Passu Intercreditor Agreement" in the Second Lien Indenture.

"Second Priority Representative" means (i) in the case of the Second Lien Indenture Obligations or the Second Lien Indenture Secured Parties, the Second Lien Collateral Agent and (ii) in the case of any Second Priority Debt Facility incurred after the date hereof and the Second Priority Debt Parties thereunder, the trustee, administrative agent, collateral agent, security agent or similar agent under such Second Priority Debt Facility that is named as the Representative in respect of such Second Priority Debt Facility in the applicable Joinder Agreement.

"Secured Obligations" means the Senior Obligations and the Second Priority Debt Obligations.

"Secured Parties" means the Senior Secured Parties and the Second Priority Debt Parties.

"Senior Class Debt" has the meaning assigned to such term in Section 8.09.

-9-

"Senior Class Debt Parties" has the meaning assigned to such term in Section 8.09.

"Senior Class Debt Representative" has the meaning assigned to such term in Section 8.09.

"Senior Collateral" means any "Collateral" as defined in any First Lien Credit Agreement Loan Document or any other Senior Debt Document and any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted or required to be granted pursuant to a Senior Collateral Document as security for any Senior Obligations.

"Senior Collateral Documents" means the "Security Documents" as defined in the First Lien Credit Agreement, the First Lien Intercreditor Agreement (upon and after the initial execution and delivery thereof by the initial parties thereto) and each of the collateral agreements, security agreements, mortgages, deeds of trust and other instruments and documents executed and delivered by the Borrower or any other Grantor for purposes of providing collateral security for any Senior Obligation.

"Senior Debt Documents" means the First Lien Credit Agreement Loan Documents and any Additional Senior Debt Documents.

"Senior Facilities" means the First Lien Credit Agreement and any Additional Senior Debt Facilities.

"Senior Lien" means the Liens on the Senior Collateral in favor of the Senior Secured Parties under the Senior Collateral Documents.

"Senior Obligations" means the First Lien Credit Agreement Obligations and any Additional Senior Debt Obligations.

"Senior Representative" means (i) in the case of any First Lien Credit Agreement Obligations or the First Lien Credit Agreement Secured Parties, the First Lien Collateral Agent and (ii) in the case of any Additional Senior Debt Facility and the Additional Senior Debt Parties thereunder, the trustee, administrative agent, collateral agent, security agent or similar agent under such Additional Senior Debt Facility that is named as the Representative in respect of such Additional Senior Debt Facility hereunder or in the applicable Joinder Agreement.

"Senior Secured Parties" means the First Lien Credit Agreement Secured Parties and any Additional Senior Debt Parties.

"Shared Collateral" means, at any time, Collateral in which the holders of Senior Obligations under at least one Senior Facility and the holders of Second Priority Debt Obligations under at least one Second Priority Debt Facility (or their Representatives) hold a security interest at such time (or, in the case of the Senior Facilities, are deemed pursuant to Article II to hold a security interest). If, at any time, any portion of the Senior Collateral under one or more Senior Facilities does not constitute Second Priority Collateral under one or more Second Priority Debt Facilities, then such portion of such Senior Collateral shall constitute Shared Collateral

-10-

only with respect to the Second Priority Debt Facilities for which it constitutes Second Priority Collateral and shall not constitute Shared Collateral for any Second Priority Debt Facility which does not have a security interest in such Collateral at such time.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"<u>Total First Lien Cap Amount</u>" has the meaning assigned to such term in the definition of First Lien Credit Agreement Obligations.

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means, unless otherwise specified, the Uniform Commercial Code as from time to time in effect in the State of New York.

SECTION 1.02. <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive. Any references to the Second Lien Collateral Agent and the trustee under the Second Lien Indenture means such entity as "collateral agent" or "trustee", as applicable, under the Second Lien Indenture and/or the other Second Lien Indenture Documents, and not in any other capacity, including their respective individual capacities.

-11-

## ARTICLE II

### Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01. <u>Subordination</u>.

(a) Notwithstanding the date, time, manner, method or order of filing or recordation of any document or instrument or of grant, attachment or perfection of any Liens granted to any Second Priority Representative or any Second Priority Debt Parties on the Shared Collateral or of any Liens granted to any Senior Representative or any other Senior Secured Party on the Shared Collateral (or any actual or alleged defect in any of the foregoing) and notwithstanding any provision of the UCC, any applicable law, any Second Priority Debt Document or any Senior Debt Document or any other circumstance whatsoever, each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, hereby agrees that (a) any Lien on the Shared Collateral securing any Senior Obligations now or hereafter held by or on behalf of any Senior Representative or any other Senior Secured Party or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall have priority over and be senior in all respects and prior to any Lien on the Shared Collateral securing any Second Priority Debt Obligations and (b) any Lien on the Shared Collateral securing any Second Priority Debt Obligations now or hereafter held by or on behalf of any Second Priority Representative, any Second Priority Debt Parties or any Second Priority Representative or other agent or trustee therefor, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Shared Collateral securing any Senior Obligations. All Liens on the Shared Collateral securing any Senior Obligations shall be and remain senior in all respects and prior to all Liens on the Shared Collateral securing any Second Priority Debt Obligations for all purposes, whether or not such Liens securing any Senior Obligations are subordinated to any Lien securing any other obligation of the Borrower, any Grantor or any other Person or otherwise subordinated, voided, avoided, invalidated or lapsed.

SECTION 2.02. <u>Nature of Senior Lender Claims</u>. Each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, acknowledges that, in accordance with the provisions of the Senior Debt Documents (a) a portion of the Senior Obligations is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (b) the terms of the Senior Debt Documents and the Senior Obligations may be amended, supplemented or otherwise modified, and the Senior Obligations, or a portion thereof, may be Refinanced from time to time and (c) the aggregate amount of the Senior Obligations may be increased, in each case, without notice to or consent by the Second Priority Representatives or the Second Priority Debt Parties and without affecting the provisions hereof. The Lien priorities provided for in Section 2.01 shall not be altered or otherwise affected by any amendment, supplement or other modification, or any Refinancing, of either the Senior Obligations or the Second Priority Debt Obligations, or any portion thereof. As between the Borrower and the other Grantors and the Second Priority Debt Parties, the foregoing provisions will not limit or otherwise affect the obligations of the Borrower and the Grantors contained in any Second Priority Debt Document with respect to the incurrence of additional Senior Obligations.

-12-

SECTION 2.03. Prohibition on Contesting Liens . Each of the Second Priority Representatives, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien securing any Senior Obligations held (or purported to be held) by or on behalf of any Senior Representative or any of the other Senior Secured Parties or other agent or trustee therefor in any Senior Collateral, and each Senior Representative, for itself and on behalf of each Senior Secured Party under its Senior Facility, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority or enforceability of any Lien securing any Second Priority Debt Obligations held (or purported to be held) by or on behalf of any Second Priority Representative or any of the Second Priority Debt Parties in the Second Priority Collateral. Notwithstanding the foregoing, no provision in this Agreement shall be construed to prevent or impair the rights of any Senior Representative to enforce this Agreement (including the priority of the Liens securing the Senior Obligations as provided in Section 2.01) or any of the Senior Debt Documents.

SECTION 2.04. No Other Liens, Rights or Remedies.

(a) The parties hereto agree that, so long as the Discharge of Senior Obligations has not occurred, none of the Grantors shall, or shall permit any of its subsidiaries to, grant or permit any Lien on any asset to secure any Second Priority Debt Obligation and no Second Priority Debt Party shall hold any Lien on any asset to secure any Second Priority Debt Obligation, unless such Grantor has granted, or concurrently therewith grants, a senior priority Lien on such asset to secure the Senior Obligations. To the extent that the provisions of the immediately preceding sentence are not complied with for any reason, without limiting any other right or remedy available to any Senior Representative or any other Senior Secured Party, each Second Priority Representative agrees, for itself and on behalf of the other Second Priority Debt Parties, that (i) each Second Priority Representative and the other Second Priority Debt Parties shall be deemed to hold and have held such Lien for the benefit of each of the Senior Priority Representatives and the other Senior Secured Parties and (ii) any amounts received by or distributed to any Second Priority Debt Party pursuant to or as a result of any Lien granted in contravention of this Section 2.04 shall be subject to Section 4.02.

(b) To the extent any of the Grantors or any of their respective subsidiaries grants or permits a Second Priority Representative or any other Second Priority Debt Party any right or remedy with respect to the Shared Collateral that has not also been granted or permitted to the Senior Representative or any other Senior Secured Party, each Second Priority Representative agrees, for itself and on behalf of the other Second Priority Debt Parties, that (i) such Second Priority Representative shall be required to exercise such right or remedy at the direction of the Designated Senior Representative and (ii) any exercise of such right or remedy by such Second Priority Representative shall be for the benefit of the Senior Representatives and the other Senior Secured Parties pursuant to and in accordance with the terms of this Agreement.

-13-

SECTION 2.05. <u>Perfection of Liens</u>. Except for the limited agreements of the Senior Representatives pursuant to Section 5.05 hereof, none of the Senior Representatives or the Senior Secured Parties shall be responsible for perfecting and maintaining the perfection of Liens with respect to the Shared Collateral for the benefit of the Second Priority Representatives or the Second Priority Debt Parties. The provisions of this Agreement are intended solely to govern the respective Lien priorities as between the Senior Secured Parties and the Second Priority Debt Parties and shall not impose on the Senior Representatives, the Senior Secured Parties, the Second Priority Representatives, the Second Priority Debt Parties or any agent or trustee therefor any obligations in respect of the disposition of Proceeds of any Shared Collateral which would conflict with prior perfected claims therein in favor of any other Person or any order or decree of any court or governmental authority or any applicable law.

SECTION 2.06. <u>Certain Cash Collateral</u>. Notwithstanding anything in this Agreement or any other Senior Debt Documents or Second Priority Debt Documents to the contrary, collateral consisting of cash and cash equivalents pledged to secure First Lien Credit Agreement Obligations consisting of reimbursement obligations in respect of Letters of Credit or otherwise held by the First Lien Collateral Agent pursuant to Section 2.03(g), 2.04, 2.05, 2.17 or Article VIII of the First Lien Credit Agreement (or any equivalent successor provision) shall be applied as specified in the First Lien Credit Agreement and will not constitute Shared Collateral.

ARTICLE III

Enforcement

SECTION 3.01. <u>Exercise of Remedies</u>.

(a) So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, (i) neither any Second Priority Representative nor any Second Priority Debt Party will (x) exercise or seek to exercise any rights or remedies (including setoff) with respect to any Shared Collateral in respect of any Second Priority Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or action brought with respect to the Shared Collateral or any other Senior Collateral by any Senior Representative or any Senior Secured Party in respect of the Senior Obligations, the exercise of any right by any Senior Representative or any Senior Secured Party (or any agent or sub-agent on their behalf) in respect of the Senior Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Senior Representative or any Senior Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies relating to the Shared Collateral under the Senior Debt Documents or otherwise in respect of the Senior Collateral or the Senior Obligations, or (z) object to the forbearance by the Senior Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Shared Collateral in respect of Senior Obligations and (ii) the Senior Representatives and the Senior Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions with respect to the Shared Collateral without any consultation with or the consent of any Second Priority Representative or any Second Priority Debt Party; <u>provided</u>, <u>however</u>, that (A) in any Insolvency or Liquidation Proceeding commenced by or against the

-14-

Borrower or any other Grantor, any Second Priority Representative may file a claim or statement of interest with respect to the Second Priority Debt Obligations under its Second Priority Debt Facility, (B) any Second Priority Representative may take any action (not adverse to the prior Liens on the Shared Collateral securing the Senior Obligations or the rights of the Senior Representatives or the Senior Secured Parties to exercise remedies in respect thereof) in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Lien on, the Shared Collateral, (C) any Second Priority Representative and the Second Priority Secured Parties may exercise their rights and remedies as unsecured creditors, to the extent provided in Section 5.04, (D) the Second Priority Debt Parties may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Priority Debt Parties or the avoidance of any Second Priority Lien to the extent not inconsistent with the terms of this Agreement, and (E) from and after the Second Priority Enforcement Date, the Designated Second Priority Representative may exercise or seek to exercise any rights or remedies (including setoff) with respect to any Shared Collateral in respect of any Second Priority Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure). In exercising rights and remedies with respect to the Senior Collateral, the Senior Representatives and the Senior Secured Parties may enforce the provisions of the Senior Debt Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion and without consultation with any Second Priority Representative or any other Second Priority Debt Party and regardless of whether any such exercise is adverse to the interest of any Second Priority Debt Party. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Shared Collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b) So long as the Discharge of Senior Obligations has not occurred, except as expressly provided in the proviso in clause (ii) of Section 3.01(a), each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, agrees that it will not, in the context of its role as secured creditor, take or receive any Shared Collateral or any Proceeds of Shared Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Shared Collateral in respect of Second Priority Debt Obligations. Without limiting the generality of the foregoing, unless and until the Discharge of Senior Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.01(a), the sole right of the Second Priority Representatives and the Second Priority Debt Parties with respect to the Shared Collateral is to hold a Lien on the Shared Collateral in respect of Second Priority Debt Obligations pursuant to the Second Priority Debt Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, after the Discharge of Senior Obligations has occurred.

(c) Subject to the proviso in clause (ii) of Section 3.01(a), (i) each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that neither such Second Priority Representative nor any such Second Priority Debt Party will take any action that would hinder any exercise of remedies undertaken by any Senior Representative or any Senior Secured Party with respect to the Shared

-15-

Collateral under the Senior Debt Documents, including any sale, lease, exchange, transfer or other disposition of the Shared Collateral, whether by foreclosure or otherwise, and (ii) each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, hereby waives any and all rights it or any such Second Priority Debt Party may have as a junior lien creditor or otherwise to object to the manner in which the Senior Representatives or the Senior Secured Parties seek to enforce or collect the Senior Obligations or the Liens granted on any of the Senior Collateral, regardless of whether any action or failure to act by or on behalf of any Senior Representative or any other Senior Secured Party is adverse to the interests of the Second Priority Debt Parties.

(d) Each Second Priority Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Second Priority Debt Document shall be deemed to restrict in any way the rights and remedies of the Senior Representatives or the Senior Secured Parties with respect to the Senior Collateral as set forth in this Agreement and the Senior Debt Documents.

(e) Subject to Section 3.01(a), the Designated Senior Representative shall have the exclusive right to exercise any right or remedy with respect to the Shared Collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto. Following the Discharge of Senior Obligations, the Designated Second Priority Representative shall have the exclusive right to exercise any right or remedy with respect to the Collateral, and the Designated Second Priority Representative shall have the exclusive right to direct the time, method and place of exercising or conducting any proceeding for the exercise of any right or remedy available to the Second Priority Debt Parties with respect to the Collateral, or of exercising or directing the exercise of any trust or power conferred on the Second Priority Representatives, or for the taking of any other action authorized by the Second Priority Collateral Documents; provided, however, that nothing in this Section 3.01(e) shall impair the right of any Second Priority Representative or other agent or trustee acting on behalf of the Second Priority Debt Parties to take such actions with respect to the Collateral after the Discharge of Senior Obligations as may be otherwise required or authorized pursuant to any intercreditor agreement governing the Second Priority Debt Parties or the Second Priority Debt Obligations.

SECTION 3.02. <u>Cooperation</u>. Subject to the proviso in clause (ii) of Section 3.01(a), each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, agrees that, unless and until the Discharge of Senior Obligations has occurred, it will not commence, or join with any Person (other than the Senior Secured Parties and the Senior Representatives upon the request of the Designated Senior Representative) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it in the Shared Collateral under any of the Second Priority Debt Documents or otherwise in respect of the Second Priority Debt Obligations.

SECTION 3.03. <u>Actions upon Breach</u>. Should any Second Priority Representative or any Second Priority Debt Party, contrary to this Agreement, in any way take, attempt to take or threaten to take any action with respect to the Shared Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, this Agreement shall create a rebuttable presumption and admission

-16-

by such Second Priority Debt Party that any Senior Representative or other Senior Secured Party (in its or their own name or in the name of the Borrower or any other Grantor) or the Borrower may obtain (and any such Senior Representative or other Senior Secured Party may obtain) relief against such Second Priority Representative or such Second Priority Debt Party by injunction, specific performance or other appropriate equitable relief. Each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Facility, hereby (i) agrees that the Senior Secured Parties' damages from the actions of the Second Priority Representatives or any Second Priority Debt Party may at that time be difficult to ascertain and may be irreparable and waives any defense that the Borrower, any other Grantor or the Senior Secured Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by any Senior Representative or any other Senior Secured Party.


ARTICLE IV

Payments


SECTION 4.01. Application of Proceeds. After an event of default under any Senior Debt Document has occurred and until such event of default is cured or waived, so long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, the Shared Collateral or Proceeds thereof or any proceeds received in connection with the sale or other disposition of, or collection on, such Shared Collateral upon the exercise of remedies shall be applied by the Designated Senior Representative to the Senior Obligations in such order as specified in the relevant Senior Debt Documents (including the First Lien Intercreditor Agreement) until the Discharge of Senior Obligations has occurred; provided, that any non-cash Shared Collateral or non-cash proceeds may be held by the applicable Senior Representative as Shared Collateral unless the failure to apply such amounts would be commercially unreasonable. Upon the Discharge of Senior Obligations, each applicable Senior Representative shall deliver promptly to the Designated Second Priority Representative any Shared Collateral or Proceeds thereof held by it in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct, to be applied by the Designated Second Priority Representative to the Second Priority Debt Obligations in such order as specified in the relevant Second Priority Debt Documents (including any Second Priority Pari Passu Intercreditor Agreement or Junior Lien Intercreditor Agreement, as applicable).


SECTION 4.02. Payments Over. Unless and until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor, any Shared Collateral or Proceeds thereof received by any Second Priority Representative or any Second Priority Debt Party in connection with the exercise of any right or remedy (including setoff) relating to the Shared Collateral, in contravention of this Agreement or otherwise, shall be segregated and held in trust for the benefit of and forthwith paid over to the Designated Senior Representative for the benefit of the Senior Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The Designated Senior Representative is hereby authorized to make any such endorsements as agent for each of the Second Priority Representatives or any such Second Priority Debt Party. This authorization is coupled with an interest and is irrevocable.

-17-

ARTICLE V

Other Agreements

SECTION 5.01. Releases.

(a) Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that: (1) in connection with any exercise of any Senior Representatives' rights or remedies in respect of the Shared Collateral, in each case prior to the Discharge of Senior Obligations, such Senior Representative, for itself or on behalf of any of the Senior Secured Parties, releases any of its Liens on any part of the Shared Collateral or such Senior Representative, for itself or on behalf of any of the Senior Secured Parties releases any Grantor from its obligations under its guaranty of the Senior Obligations, then the Liens, if any, of each Second Priority Representative, for itself or for the benefit of the Second Priority Debt Parties, on such Shared Collateral, and the obligations of such Grantor under its guaranty of the Second Priority Debt Obligations, shall be automatically, unconditionally and simultaneously released, (2) if in connection with any exercise of any Senior Representatives' remedies, in each case prior to the Discharge of Senior Obligations, the equity interests of any Person are foreclosed upon or otherwise disposed of and such Senior Representative releases its Lien on the property or assets of such Person then the Liens of each Second Priority Representative with respect to the property or assets of such Person will be automatically released to the same extent as the Liens of such Senior Representative and (3) in the event of a sale, transfer or other disposition of any specified item of Shared Collateral (including all or substantially all of the equity interests of any subsidiary of the Borrower) other than a release granted upon or following the Discharge of Senior Obligations, the Liens granted to the Second Priority Representatives and the Second Priority Debt Parties upon such Shared Collateral to secure Second Priority Debt Obligations shall terminate and be released and any Grantor released from its obligations under its Guarantee of Senior Obligations released by a Senior Representative shall be released under its Guarantee of Second Priority Debt Obligations, automatically and without any further action, concurrently with the termination and release of all Liens granted upon such Shared Collateral to secure Senior Obligations; provided that, in the case of any such sale, transfer or other disposition of Shared Collateral (other than any sale, transfer or other disposition in connection with the enforcement or exercise of any rights or remedies with respect to the Shared Collateral), the Liens granted to the Second Priority Representatives and the Second Priority Debt Parties shall not be so released if such sale, transfer or other disposition is not permitted under the terms of any Second Priority Debt Document. Promptly upon delivery to a Second Priority Representative of a certificate from a Senior Representative or Grantor stating that any such termination and release of the Liens securing the Senior Priority Debt Obligations will occur, each Second Priority Representative, for itself or on behalf of any Second Priority Debt Parties represented by it, shall execute and deliver, at the Borrower's or the other Grantor's sole cost and expense and without any representation or warranty, to the Senior Representatives or such Grantor such termination statements, releases and other documents (including documents which are corresponding second lien versions of termination statements, releases and other documents that the First Lien Collateral Agent delivers under the First Lien Credit Agreement to the extent

-18-

applicable) so as to confirm the foregoing releases referred to in clauses (1) and (2) of the first sentence of this clause (a) when such releases occur. Nothing in this Section 5.01(a) will be deemed to affect any agreement of a Second Priority Representative, for itself and on behalf of the Second Priority Debt Parties under its Second Priority Debt Facility, to release the Liens on the Second Priority Collateral as set forth in the relevant Second Priority Debt Documents.

(b) Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility and until the Discharge of Senior Obligations has occurred (but subject to Section 5.06), hereby irrevocably constitutes and appoints the Designated Senior Representative and any officer or agent of the Designated Senior Representative, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Second Priority Representative or such Second Priority Debt Party or in the Designated Senior Representative's own name, from time to time in the Designated Senior Representative's discretion, for the purpose of carrying out the terms of Section 5.01(a), to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of Section 5.01(a), including any termination statements, endorsements or other instruments of transfer or release.

(c) Unless and until the Discharge of Senior Obligations has occurred, each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, hereby consents to the application, whether prior to or after an event of default under any Senior Debt Document of proceeds of Shared Collateral to the repayment of Senior Obligations pursuant to the Senior Debt Documents; provided that nothing in this Section 5.01 (c) shall be construed to prevent or impair the rights of the Second Priority Representatives or the Second Priority Debt Parties to receive proceeds in connection with the Second Priority Debt Obligations not otherwise in contravention of this Agreement.

(d) Notwithstanding anything to the contrary in any Second Priority Collateral Document, in the event the terms of a Senior Collateral Document and a Second Priority Collateral Document each require any Grantor (i) to make payment in respect of any item of Shared Collateral, (ii) to deliver or afford control over any item of Shared Collateral to, or deposit any item of Shared Collateral with, (iii) to register ownership of any item of Shared Collateral in the name of or make an assignment of ownership of any Shared Collateral or the rights thereunder to, (iv) cause any securities intermediary, commodity intermediary or other Person acting in a similar capacity to agree to comply, in respect of any item of Shared Collateral, with instructions or orders from, or to treat, in respect of any item of Shared Collateral, as the entitlement holder, (v) hold any item of Shared Collateral in trust for (to the extent such item of Shared Collateral cannot be held in trust for multiple parties under applicable law), (vi) obtain the agreement of a bailee or other third party to hold any item of Shared Collateral for the benefit of or subject to the control of or, in respect of any item of Shared Collateral, to follow the instructions of or (vii) obtain the agreement of a landlord with respect to access to leased premises where any item of Shared Collateral is located or waivers or subordination of rights with respect to any item of Shared Collateral in favor of, in any case, both the Designated Senior Representative and any Second Priority Representative or Second Priority Debt Party, such Grantor may, until the applicable Discharge of Senior Obligations has occurred, comply with such requirement under the Second Priority Collateral Document as it relates to such Shared Collateral by taking any of the

-19-

actions set forth above only with respect to, or in favor of, the Designated Senior Representative. Until the Discharge of Senior Obligations occurs, to the extent that any Senior Representative or Senior Secured Parties (i) have released any Lien on Shared Collateral or any Grantor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any new liens or additional guarantees from any Grantor, then each Second Priority Representative, for itself and for the Second Priority Debt Parties represented by it, shall be granted a Lien on any such Shared Collateral, subject to the lien subordination provisions of this Agreement, and each Second Priority Representative, for itself and for the Second Priority Debt Parties represented by it, shall be granted an additional guaranty, as the case may be.

SECTION 5.02. Insurance and Condemnation Awards. Unless and until the Discharge of Senior Obligations has occurred, the Designated Senior Representative and the Senior Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under, and to the extent required by, the Senior Debt Documents, (a) to be named as additional insured and loss payee under any insurance policies maintained from time to time by any Grantor, (b) adjust settlement for any insurance policy covering the Shared Collateral in the event of any loss thereunder and (c) to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral. Unless and until the Discharge of Senior Obligations has occurred, all proceeds of any such policy and any such award, if in respect of the Shared Collateral, shall be paid (i) first, prior to the occurrence of the Discharge of Senior Obligations, to the Designated Senior Representative for the benefit of Senior Secured Parties pursuant to the terms of the Senior Debt Documents, (ii) second, after the occurrence of the Discharge of Senior Obligations, to the Designated Second Priority Representative for the benefit of the Second Priority Debt Parties pursuant to the terms of the applicable Second Priority Debt Documents and (iii) third, if no Second Priority Debt Obligations are outstanding, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct. If any Second Priority Representative or any Second Priority Debt Party shall, at any time, receive any proceeds of any such insurance policy or any such award in contravention of this Agreement, it shall pay such proceeds over to the Designated Senior Representative in accordance with the terms of Section 4.02.

SECTION 5.03. Amendments to Debt Documents.

(a) The Senior Debt Documents may be amended, restated, supplemented or otherwise modified in accordance with their terms, and the Indebtedness under the Senior Debt Documents may be Refinanced, in each case, without the consent of any Second Priority Debt Party; provided, however, that, without the consent of the Designated Second Priority Representative, no such amendment, restatement, supplement, modification or Refinancing (or successive amendments, restatements, supplements, modifications or Refinancings) shall contravene any provision of this Agreement.

(b) Without the prior written consent of the Senior Representatives or unless permitted under the Senior Debt Documents, unless and until the Discharge of Senior Obligations has occurred, no Second Priority Debt Document may be amended, restated, supplemented or otherwise modified and no Indebtedness under the Second Priority Debt Documents may be Refinanced, to the extent such amendment, restatement, supplement or modification or Refinancing, or the terms of such new Second Priority Debt Document, would (i) contravene the provisions

-20-

of this Agreement, (ii) change to earlier dates any scheduled dates for payment of principal (including the final maturity date) under such Second Priority Debt Document or of interest on Indebtedness under such Second Priority Debt Document, (iii) modify (or have the effect of a modification of) the mandatory prepayment provisions of the applicable Second Priority Debt Document for such Second Priority Debt Facility in a manner that would result in the weighted average life to maturity being less than the weighted average life to maturity of the Second Priority Debt under such Second Priority Debt Document prior to giving effect thereto or (iv) reduce the capacity to incur Indebtedness for borrowed money constituting Senior Obligations to an amount less than the aggregate principal amount of term loans and aggregate principal amount of revolving commitments, in each case, under the Senior Debt Documents on the day of any such amendment, restatement, supplement, modification or Refinancing; provided that the holders (and their representatives) of any such Refinancing indebtedness execute a Joinder Agreement or otherwise bind themselves in writing to the terms of this Agreement.

(c) Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that each Second Priority Collateral Document under its Second Priority Debt Facility shall include the following language (or language to similar effect reasonably approved by the Designated Senior Representative):

"Notwithstanding anything herein to the contrary, (i) the liens and security interests granted to the Second Priority Representative pursuant to this Agreement are expressly subject and subordinate to the liens and security interests granted in favor of the Senior Secured Parties (as defined in the First Lien/Second Lien Intercreditor Agreement referred to below), including liens and security interests granted to Citibank, N.A., as collateral agent, pursuant to or in connection with the Amended and Restated Credit Agreement, dated as of September 24, 2013 and as amended on February 5, 2015, among the Borrower, the lenders from time to time party thereto, Citibank, N.A., as administrative agent and collateral agent, and the other parties thereto, as further amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time and (ii) the exercise of any right or remedy by the Second Priority Representative hereunder is subject to the limitations and provisions of the First Lien/Second Lien Intercreditor Agreement dated as of March 16, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien/Second Lien Intercreditor Agreement"), among Citibank, N.A., as First Lien Collateral Agent, U.S. Bank National Association, as Second Lien Collateral Agent, the Borrower and its subsidiaries and affiliated entities party thereto. In the event of any conflict between the terms of the First Lien/Second Lien Intercreditor Agreement and the terms of this Agreement, the terms of the First Lien/Second Lien Intercreditor Agreement shall govern."

(d) In the event that each applicable Senior Representative and/or the Senior Secured Parties enter into any amendment, waiver or consent in respect of any of the Senior Collateral Documents for the purpose of adding to or deleting from, or waiving or consenting to any departures from any provisions of, any Senior Collateral Document or changing in any manner the rights of the Senior Representatives, the Senior Secured Parties, the Borrower or any other Grantor thereunder (including the release of any Liens in Senior Collateral) in a manner that is

-21-

applicable to all Senior Facilities, then such amendment, waiver or consent shall apply automatically to any comparable provision of each comparable Second Priority Collateral Document without the consent of any Second Priority Representative or any Second Priority Debt Party and without any action by any Second Priority Representative, the Borrower or any other Grantor; provided, however, that (i) no such amendment, waiver or consent shall (A) remove assets subject to the Second Priority Liens or release any such Liens, except to the extent that such release is permitted or required by Section 5.01(a) and provided that there is a concurrent release of the corresponding Senior Liens or (B) amend, modify or otherwise affect the rights or duties of any Second Priority Representative in its role as Second Priority Representative without its prior written consent and (ii) written notice of such amendment, waiver or consent shall have been given to each Second Priority Representative promptly after the effectiveness of such amendment, waiver or consent.

(e) Upon the request of the Designated Senior Representative or Designated Second Priority Representative, the Borrower agrees to deliver to each of the Designated Senior Representative and the Designated Second Priority Representative copies of (i) any amendments, supplements or other modifications to the Senior Debt Documents or the Second Priority Debt Documents and (ii) any new Senior Debt Documents or Second Priority Debt Documents promptly after effectiveness thereof.

SECTION 5.04. Rights as Unsecured Creditors. The Second Priority Representatives and the Second Priority Debt Parties may exercise rights and remedies as unsecured creditors against the Borrower and any other Grantor in accordance with the terms of the Second Priority Debt Documents and applicable law so long as such rights and remedies do not violate any express provision of this Agreement. Nothing in this Agreement shall prohibit the receipt by any Second Priority Representative or any Second Priority Debt Party of the required payments of principal, premium, interest, fees and other amounts due under the Second Priority Debt Documents so long as such receipt (i) is not the direct or indirect result of the exercise in contravention of this Agreement by a Second Priority Representative or any Second Priority Debt Party of rights or remedies as a secured creditor in respect of Shared Collateral or (ii) whether in contravention of this Agreement or not, does not have the effect of discharging the Lien of any Senior Representative or First Lien Collateral Agent on such Shared Collateral. In the event any Second Priority Representative or any Second Priority Debt Party becomes a judgment lien creditor in respect of Shared Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of Second Priority Debt Obligations, such judgment lien shall be subordinated to the Liens securing Senior Obligations on the same basis as the other Liens securing the Second Priority Debt Obligations are so subordinated to such Liens securing Senior Obligations under this Agreement. Nothing in this Agreement shall impair or otherwise adversely affect any rights or remedies the Senior Representatives or the Senior Secured Parties may have with respect to the Senior Collateral.

SECTION 5.05. Gratuitous Bailee for Perfection.

(a) Each Senior Representative acknowledges and agrees that if it shall at any time hold a Lien securing any Senior Obligations on any Shared Collateral that can be perfected by the possession or control of such Shared Collateral or of any account in which such Shared Collateral is held, and if such Shared Collateral or any such account is in fact in the possession or

-22-

under the control of such Senior Representative, or of agents or bailees of such Person (such Shared Collateral being referred to herein as the "Pledged or Controlled Collateral"), or if it shall any time obtain any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral, the applicable Senior Representative shall also hold such Pledged or Controlled Collateral, or take such actions with respect to such landlord waiver, bailee's letter or similar agreement or arrangement, as sub-agent or gratuitous bailee for the relevant Second Priority Representatives, in each case solely for the purpose of perfecting the Liens granted under the relevant Second Priority Collateral Documents and subject to the terms and conditions of this Section 5.05.

(b) Except as otherwise specifically provided herein, until the Discharge of Senior Obligations has occurred, the Senior Representatives and the Senior Secured Parties shall be entitled to deal with the Pledged or Controlled Collateral in accordance with the terms of the Senior Debt Documents as if the Liens under the Second Priority Collateral Documents did not exist. The rights of the Second Priority Representatives and the Second Priority Debt Parties with respect to the Pledged or Controlled Collateral shall at all times be subject to the terms of this Agreement.

(c) The Senior Representatives and the Senior Secured Parties shall have no obligation whatsoever to the Second Priority Representatives or any Second Priority Debt Party to assure that any of the Pledged or Controlled Collateral is genuine or owned by the Grantors or to protect or preserve rights or benefits of any Person or any rights pertaining to the Shared Collateral, except as expressly set forth in this Section 5.05. The duties or responsibilities of the Senior Representatives under this Section 5.05 shall be limited solely to holding or controlling the Shared Collateral and the related Liens referred to in paragraphs (a) and (b) of this Section 5.05 as sub-agent and gratuitous bailee for the relevant Second Priority Representative for purposes of perfecting the Lien held by such Second Priority Representative.

(d) The Senior Representatives shall not have by reason of the Second Priority Collateral Documents or this Agreement, or any other document, a fiduciary relationship in respect of any Second Priority Representative or any Second Priority Debt Party, and each, Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, hereby waives and releases the Senior Representatives from all claims and liabilities arising pursuant to the Senior Representatives' roles under this Section 5.05 as sub-agents and gratuitous bailees with respect to the Shared Collateral.

(e) Upon the Discharge of Senior Obligations, each applicable Senior Representative shall, at the Grantors' sole cost and expense, (i) (A) deliver to the Designated Second Priority Representative, to the extent that it is legally permitted to do so, all Shared Collateral, including all proceeds thereof, held or controlled by such Senior Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral, or (B) direct and deliver such Shared Collateral as a court of competent jurisdiction may otherwise direct, (ii) notify any applicable insurance carrier that it is no longer entitled to be a loss payee or additional insured under the insurance policies of any Grantor

-23-

issued by such insurance carrier and (iii) notify any governmental authority involved in any condemnation or similar proceeding involving any Grantor that the Designated Second Party Representative is entitled to approve any awards granted in such proceeding. The Borrower and the other Grantors shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Senior Representative for loss or damage suffered by such Senior Representative as a result of such transfer, except for loss or damage suffered by any such Person as a result of its own willful misconduct, gross negligence or bad faith. The Senior Representatives have no obligations to follow instructions from any Second Priority Representative or any other Second Priority Debt Party in contravention of this Agreement.

(f) None of the Senior Representatives nor any of the other Senior Secured Parties shall be required to marshal any present or future collateral security for any obligations of the Borrower or any Subsidiary to any Senior Representative or any Senior Secured Party under the Senior Debt Documents or any assurance of payment in respect thereof, or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights in respect of such collateral security or any assurance of payment in respect thereof shall be cumulative and in addition to all other rights, however existing or arising.

SECTION 5.06. <u>When Discharge of Senior Obligations Deemed To Not Have Occurred</u>. If, at any time substantially concurrently with or after the occurrence of the Discharge of Senior Obligations, the Borrower or any Subsidiary consummates any Refinancing of any Senior Obligations, then such Discharge of Senior Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Obligations) and the applicable agreement governing such Senior Obligations shall automatically be treated as a Senior Debt Document for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Shared Collateral set forth herein and the agent, representative or trustee for the holders of such Senior Obligations shall be the Senior Representative for all purposes of this Agreement. Upon receipt of notice of such incurrence (including the identity of the new Senior Representative), each Second Priority Representative (including the Designated Second Priority Representative) shall promptly (a) enter into such documents and agreements, including amendments or supplements to this Agreement, as the Borrower or such new Senior Representative shall reasonably request in writing in order to provide the new Senior Representative the rights of a Senior Representative contemplated hereby, (b) deliver to such Senior Representative, to the extent that it is legally permitted to do so, all Shared Collateral, including all proceeds thereof, held or controlled by such Second Priority Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of the Pledged or Controlled Collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to Shared Collateral, (c) notify any applicable insurance carrier that it is no longer entitled to be a loss payee or additional insured under the insurance policies of any Grantor issued by such insurance carrier and (d) notify any governmental authority involved in any condemnation or similar proceeding involving a Grantor that the new Senior Representative is entitled to approve any awards granted in such proceeding; <u>provided</u> that any reasonable costs or other expenses incurred in connection with clauses (a) to (d) above shall be the exclusive responsibility of the Grantors.

-24-

SECTION 5.07. <u>Purchase Right</u>. Without prejudice to the enforcement of the Senior Secured Parties remedies, the Senior Secured Parties agree that following (a) the acceleration of the Senior Obligations in accordance with the terms of the First Lien Credit Agreement or (b) the commencement of an Insolvency or Liquidation Proceeding (each, a "<u>Purchase Event</u>"), within thirty (30) days of the Purchase Event, one or more of the Second Priority Debt Parties may request, and the Senior Secured Parties hereby offer the Second Priority Debt Parties the option, to purchase all, but not less than all, of the aggregate amount of outstanding Senior Obligations (including unfunded commitments under any Senior Debt Document) outstanding at the time of purchase at par, plus any premium that would be applicable upon prepayment of the Senior Obligations and accrued and unpaid interest and fees (including breakage costs and, in the case of any secured hedging obligations, the amount that would be payable by the relevant Grantor thereunder if such Grantor were to terminate the hedge agreement in respect thereof on the date of the purchase or, if not terminated an amount determined by the relevant Senior Secured Party to be necessary to collateralize its credit risk arising out of such agreement and, if applicable, the cash collateral to be furnished to the Senior Secured Parties providing letters of credit under the Senior Debt Documents in such amounts (not to exceed 103% thereof) as such Senior Secured Party determines is reasonable necessary to secure such Senior Secured Party in connection with such outstanding and undrawn letters of credit), without warranty or representation or recourse (except for representations and warranties required to be made by assigning lenders pursuant to the Assignment and Assumption (as such term is defined in the First Lien Credit Agreement)). If such right is exercised, the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the request. If one or more of the Second Priority Debt Parties exercise such purchase right, it shall be exercised pursuant to documentation mutually acceptable to each of the Senior Representative and the Second Priority Representative. If none of the Second Priority Debt Parties exercise such right, the Senior Secured Parties shall have no further obligations pursuant to this Section 5.07 for such Purchase Event and may take any further actions in their sole discretion in accordance with the Senior Debt Documents and this Agreement. Each Senior Secured Party will retain all rights to indemnification provided in the relevant Senior Debt Document for all claims and other amounts relating to period prior to the purchase of the Senior Obligations pursuant to this Section 5.07.

ARTICLE VI

Insolvency or Liquidation Proceedings.

SECTION 6.01. <u>Financing Issues</u>. Until the Discharge of Senior Obligations has occurred, if the Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and any Senior Representative or any Senior Secured Party shall desire to consent (or not object) to the sale, use or lease of cash or other collateral or to consent (or not object) to the Borrower's or any other Grantor's obtaining financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law ("<u>DIP Financing</u>"), then each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that it will raise no objection to and will not otherwise contest (a) such sale, use or lease of such cash or other collateral, unless a Senior Representative or any other Senior Secured Party shall oppose or object to such use of cash collateral (in which case, no Second Priority Representative nor any other Second Priority Debt Party shall seek any relief in connection therewith that is inconsistent with the relief being

-25-

sought by the Senior Secured Parties); (b) such DIP Financing, unless a Senior Representative or any other Senior Secured Party shall oppose or object to such DIP Financing, and, except to the extent permitted by Section 6.03, will not request adequate protection or any other relief in connection therewith and, to the extent the Liens securing any Senior Obligations are subordinated or pari passu with such DIP Financing, will subordinate (and will be deemed hereunder to have subordinated) its Liens in the Shared Collateral to (x) such DIP Financing (and all obligations relating thereto) on the same basis as the Liens securing the Second Priority Debt Obligations are so subordinated to Liens securing Senior Obligations under this Agreement, (y) any adequate protection Liens provided to the Senior Secured Parties, and (z) to any "carve-out" for professional and United States Trustee fees agreed to by the Senior Representatives; (c) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Obligations made by any Senior Representative or any other Senior Secured Party; (d) any exercise by any Senior Secured Party of the right to credit bid Senior Obligations at any sale in foreclosure of Senior Collateral under Section 363(k) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law; (e) any other request for judicial relief made in any court by any Senior Secured Party relating to the lawful enforcement of any Lien on Senior Collateral; or (f) any order relating to a sale or other disposition of assets of any Grantor to which any Senior Representative has consented or not objected that provides, to the extent such sale or other disposition is to be free and clear of Liens, that the Liens securing the Senior Obligations and the Second Priority Debt Obligations will attach to the proceeds of the sale on the same basis of priority as the Liens on the Shared Collateral securing the Senior Obligations rank to the Liens on the Shared Collateral securing the Second Priority Debt Obligations pursuant to this Agreement. Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that notice received two Business Days prior to the entry of an order approving such usage of cash or other collateral or approving such financing shall be adequate notice. No Second Priority Debt Party may provide DIP Financing to the Borrower or any other Grantor secured by Liens equal or senior in priority to the Liens securing any Senior Obligations; provided, that if no Senior Secured Party offers to provide DIP Financing to the extent permitted under this Section 6.01 after the Borrower provides the Designated Senior Representative with an opportunity to provide such DIP Financing (and consults with the Designated Senior Representative for a reasonable period of time with respect to such DIP Financing), then a Second Priority Debt Party may seek to provide such DIP Financing secured by Liens equal or senior in priority to the Liens securing any Senior Obligations, and Senior Secured Parties may object thereto; provided, further, that such DIP Financing may not "roll-up" or otherwise include or refinance any pre-petition Second Priority Debt Obligations.

SECTION 6.02. Relief from the Automatic Stay. Until the Discharge of Senior Obligations has occurred, each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof, in each case in respect of any Shared Collateral, without the prior written consent of the Designated Senior Representative.

SECTION 6.03. Adequate Protection. Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that none of them shall (A) object, contest or support any other Person objecting to or contesting (a) any request by any Senior Representative or any Senior Secured Parties for

-26-

adequate protection, (b) any objection by any Senior Representative or any Senior Secured Parties to any motion, relief, action or proceeding based on any Senior Representative's or Senior Secured Party's claiming a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts of any Senior Representative or any other Senior Secured Party under Section 506(b) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law or (B) assert or support any claim for costs or expenses of preserving or disposing of any Collateral under Section 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law. Notwithstanding anything contained in this Section 6.03 or in Section 6.01, in any Insolvency or Liquidation Proceeding, (i) if the Senior Secured Parties (or any subset thereof) are granted adequate protection in the form of additional collateral or superpriority claims in connection with any DIP Financing or use of cash collateral under Section 363 or 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, then each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, may seek or request adequate protection in the form of a replacement Lien or superpriority claim on such additional collateral, which (A) Lien is subordinated to the Liens securing all Senior Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Second Priority Debt Obligations are so subordinated to the Liens securing Senior Obligations under this Agreement and (B) superpriority claim is subordinated to all superpriority claims of the Senior Secured Parties on the same basis as the other claims of the Second Priority Debt Parties are so subordinated to the claims of the Senior Secured Parties under this Agreement, (ii) in the event any Second Priority Representatives, for themselves and on behalf of the Second Priority Debt Parties under their Second Priority Debt Facilities, seek or request adequate protection and such adequate protection is granted (in each instance, to the extent such grant is otherwise permissible under the terms and conditions of this Agreement) in the form of additional or replacement collateral, then such Second Priority Representatives, for themselves and on behalf of each Second Priority Debt Party under their Second Priority Debt Facilities, agree that each Senior Representative shall also be granted a senior Lien on such additional or replacement collateral as security for the Senior Obligations and any such DIP Financing and that any Lien on such additional or replacement collateral securing the Second Priority Debt Obligations shall be subordinated to the Liens on such collateral securing the Senior Obligations and any such DIP Financing (and all obligations relating thereto) and any other Liens granted to the Senior Secured Parties as adequate protection on the same basis as the other Liens securing the Second Priority Debt Obligations are so subordinated to such Liens securing Senior Obligations under this Agreement (and, to the extent the Senior Secured Parties are not granted such adequate protection in such form, any amounts recovered by or distributed to any Second Priority Debt Party pursuant to or as a result of any Lien on such additional or replacement collateral so granted to the Second Priority Debt Parties shall be subject to Section 4.02), and (iii) in the event any Second Priority Representatives, for themselves and on behalf of the Second Priority Debt Parties under their Second Priority Debt Facilities, seek or request adequate protection and such adequate protection is granted (in each instance, to the extent such grant is otherwise permissible under the terms and conditions of this Agreement) in the form of a superpriority claim, then such Second Priority Representatives, for themselves and on behalf of each Second Priority Debt Party under their Second Priority Debt Facilities, agree that each Senior Representative may also seek adequate protection in the form of a superpriority claim and that no Second Priority Debt Party shall contest the granting of such adequate protection in such form, which superpriority claim shall be senior to the superpriority claim of the Second Priority Debt

-27-

Parties (and, to the extent the Senior Secured Parties are not granted such adequate protection in such form, any amounts recovered by or distributed to any Second Priority Debt Party pursuant to or as a result of any such superpriority claim so granted to the Second Priority Debt Parties shall be subject to Section 4.02).

SECTION 6.04. <u>Preference Issues</u>. If any Senior Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of the Borrower or any other Grantor (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "<u>Recovery</u>"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Senior Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Secured Parties shall be entitled to the benefits of this Agreement until a Discharge of Senior Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

SECTION 6.05. <u>Separate Grants of Security and Separate Classifications</u>. Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, acknowledges and agrees that (a) the grants of Liens by the Borrower and the other Grantors pursuant to the Senior Collateral Documents and the Second Priority Collateral Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Shared Collateral, the Second Priority Debt Obligations are fundamentally different from the Senior Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding. If it is held that any claims of the Senior Secured Parties and the Second Priority Debt Parties in respect of the Shared Collateral constitute a single class of claims (rather than separate classes of senior and junior secured claims), then each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, hereby acknowledges and agrees that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Shared Collateral, with the effect being that, to the extent that the aggregate value of the Shared Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Debt Parties), the Senior Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing (or that would be owing if there were such separate classes of senior and junior secured claims) in respect of Post-Petition Interest, including any additional interest payable pursuant to the Senior Debt Documents, arising from or related to a default, which is disallowed as a claim in any Insolvency or Liquidation Proceeding) before any distribution is made in respect of the Second Priority Debt Obligations, and each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its

-28-

Second Priority Debt Facility, hereby acknowledges and agrees to turn over to the Designated Senior Representative amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Debt Parties.

SECTION 6.06. No Waivers of Rights of Senior Secured Parties. Nothing contained herein shall, except as expressly provided herein, prohibit or in any way limit any Senior Representative or any other Senior Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Second Priority Debt Party, including the seeking by any Second Priority Debt Party of adequate protection or the assertion by any Second Priority Debt Party of any of its rights and remedies under the Second Priority Debt Documents or otherwise.

SECTION 6.07. Application. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law, shall be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. The relative rights as to the Shared Collateral and proceeds thereof shall continue after the commencement of any Insolvency or Liquidation Proceeding on the same basis as prior to the date of the petition therefor, subject to any court order approving the financing of, or use of cash collateral by, any Grantor. All references herein to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor.

SECTION 6.08. Other Matters. To the extent that any Second Priority Representative or any Second Priority Debt Party has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code or any similar provision of any other Bankruptcy Law with respect to any of the Shared Collateral, such Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, or such Second Priority Debt Party agrees not to assert any such rights without the prior written consent of each Senior Representative, provided that if requested by any Senior Representative, such Second Priority Representative shall timely exercise such rights in the manner requested by the Senior Representatives (acting unanimously), including any rights to payments in respect of such rights.

SECTION 6.09. 506(c) Claims. Until the Discharge of Senior Obligations has occurred, each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Bankruptcy Law senior to or on a parity with the Liens securing the Senior Obligations for costs or expenses of preserving or disposing of any Shared Collateral.

SECTION 6.10. Reorganization Securities.

(a) If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of both the Senior Obligations and the Second Priority Debt Obligations, then, to the extent the debt obligations distributed on account of the Senior Obligations and on account of the Second Priority Debt Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

-29-

(b) No Second Priority Debt Party (whether in the capacity of a secured creditor or an unsecured creditor) shall propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization that is inconsistent with the priorities or other provisions of this Agreement or otherwise impairs the repayment of the Senior Obligations (with impairment to be determined under Section 1124 of the Bankruptcy Code), other than with the prior written consent of the Designated Senior Representative or to the extent any such plan is proposed or supported by the number of Senior Secured Debt Parties required under Section 1126(d) of the Bankruptcy Code.

SECTION 6.11. <u>Section 1111(b) of the Bankruptcy Code</u>. Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, shall not object to, oppose, support any objection, or take any other action to impede, the right of any Senior Secured Party to make an election under Section 1111 (b)(2) of the Bankruptcy Code. Each Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, waives any claim it may hereafter have against any senior claimholder arising out of the election by any Senior Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code.

SECTION 6.12. <u>Post-Petition Interest</u>.

(a) None of any Second Priority Representative or any other Second Priority Debt Party shall oppose or seek to challenge any claim by any Senior Representative, or any other Senior Secured Party for allowance in any Insolvency or Liquidation Proceeding of Senior Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the Senior Representatives on behalf of the Senior Secured Parties on the Shared Collateral or any other Senior Secured Party's Lien, without regard to the existence of the Liens of the Second Priority Representatives on behalf of the Second Priority Debt Parties on the Shared Collateral.

(b) None of any Senior Representative or any other Senior Secured Party shall oppose or seek to challenge any claim by any Second Priority Representative or any other Second Priority Debt Party for allowance in any Insolvency or Liquidation Proceeding of Second Priority Debt Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of the Second Priority Representatives on behalf of the Second Priority Debt Parties on the Shared Collateral (after taking into account the value of the Senior Obligations).

-30-

ARTICLE VII

Reliance; Etc.

SECTION 7.01. Reliance. All loans and other extensions of credit made or deemed made on and after the date hereof by the Senior Secured Parties to the Borrower or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, acknowledges that it and such Second Priority Debt Parties have, independently and without reliance on any Senior Representative or other Senior Secured Party, entered into the Second Priority Debt Documents to which they are party or by which they are bound, this Agreement and the transactions contemplated hereby and thereby, and in taking or not taking any action under the Second Priority Debt Documents or this Agreement they will continue to do so independently and without reliance on any Senior Representative or other Senior Secured Party.

SECTION 7.02. No Warranties or Liability . Each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, acknowledges that neither any Senior Representative nor any other Senior Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Senior Debt Documents, the ownership of any Shared Collateral or the perfection or priority of any Liens thereon. The Senior Secured Parties will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Debt Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Secured Parties may manage their loans and extensions of credit without regard to any rights or interests that the Second Priority Representatives and the Second Priority Debt Parties have in the Shared Collateral or otherwise, except as otherwise provided in this Agreement. Neither any Senior Representative nor any other Senior Secured Party shall have any duty to any Second Priority Representative or Second Priority Debt Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance an event of default or default under any agreement with the Borrower or any Subsidiary (including the Second Priority Debt Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the Senior Representatives, the Senior Secured Parties, the Second Priority Representatives and the Second Priority Debt Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectability of any of the Senior Obligations, the Second Priority Debt Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) any Grantor's title to or right to transfer any of the Shared Collateral or (c) any other matter except as expressly set forth in this Agreement.

SECTION 7.03. Obligations Unconditional. All rights, interests, agreements and obligations of the Senior Representatives, the Senior Secured Parties, the Second Priority Representatives and the Second Priority Debt Parties hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any Senior Debt Document or any Second Priority Debt Document;

(b) any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Obligations or Second Priority Debt Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the First Lien Credit Agreement or any other Senior Debt Document or of the terms of the Second Lien Indenture or any other Second Priority Debt Document;

-31-

(c) any exchange of any security interest in any Shared Collateral or any other collateral or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Obligations or Second Priority Debt Obligations or any guarantee thereof;

(d) the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrower or any other Grantor; or

(e) any other circumstances that otherwise might constitute a defense available to (i) the Borrower or any other Grantor in respect of the Senior Obligations (other than the Discharge of Senior Obligations subject to Sections 5.06 and 6.04) or (ii) any Second Priority Representative or Second Priority Debt Party in respect of this Agreement.

SECTION 7.04. <u>No Waiver of Lien Priorities.</u>

(a) No right of the Senior Secured Parties, the Senior Representatives or any of them to enforce any provision of this Agreement or any Senior Debt Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Borrower or any other Grantor or by any act or failure to act by any Senior Secured Party or Senior Representative, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Senior Debt Documents or any of the Second Priority Debt Documents, regardless of any knowledge thereof which any other Senior Representative, or any Senior Secured Party, or any of them, may have or be otherwise charged with.

(b) Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Borrower and the other Grantors under the Senior Debt Documents and subject to the provisions of Section 5.03(a)), the Senior Secured Parties, the Senior Representatives, and any of them may, at any time and from time to time in accordance with the Senior Debt Documents and/or applicable law, without the consent of, or notice to, any Second Priority Representative or any other Second Priority Debt Party, without incurring any liabilities to any Second Priority Representative or any other Second Priority Debt Party and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Second Priority Representative, or any other Second Priority Debt Party is affected, impaired or extinguished thereby) do any one or more of the following:

(1) change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Senior Obligations or any Lien on any Shared Collateral or guaranty of any of the Senior Obligations or any liability of the Borrower or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any

-32-

increase in or extension of the Senior Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by any Senior Representative, or any of the other Senior Secured Parties, the Senior Obligations or any of the Senior Debt Documents;

(2) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Shared Collateral or any liability of the Borrower or any other Grantor to any of the Senior Secured Parties or the Senior Representatives, or any liability incurred directly or indirectly in respect thereof;

(3) settle or compromise any Senior Obligation or any other liability of the Borrower or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the Senior Obligations) in any manner or order; and

(4) exercise or delay in or refrain from exercising any right or remedy against the Borrower or any other Grantor or any other Person or any security, and elect any remedy and otherwise deal freely with the Company, any other Grantor or any Shared Collateral and any security and any guarantor or any liability of the Borrower or any other Grantor to the Senior Secured Parties or any liability incurred directly or indirectly in respect thereof.

(c) Except as otherwise expressly provided herein, each Second Priority Representative, on behalf of itself and the Second Priority Debt Parties represented by it, also agrees that the Senior Secured Parties and the Senior Representatives shall have no liability to such Second Priority Representative, or any such Second Priority Debt Parties, and such Second Priority Representative, on behalf of itself and the Second Priority Debt Parties represented by it, hereby waives any claim against any Senior Secured Party or any Senior Representative arising out of any and all actions which the Senior Secured Parties or any Senior Representative may take or permit or omit to take with respect to:

(1) the Senior Debt Documents (other than this Agreement);

(2) the collection of the Senior Obligations; or

(3) the foreclosure upon, or sale, liquidation or other disposition of, any Shared Collateral.

Each Second Priority Representative, on behalf of itself and the Second Priority Debt Parties represented by it, agrees that the Senior Secured Parties and the Senior Representatives have no duty to them in respect of the maintenance or preservation of the Shared Collateral, the Senior Obligations or otherwise.

-33-

Until the Discharge of Senior Obligations, each Second Priority Representative on behalf of itself and the Second Lien Indenture Secured Parties represented by it, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to any Shared Collateral or any other similar rights a junior secured creditor may have under applicable law.

ARTICLE VIII

Miscellaneous

SECTION 8.01. Conflicts.

(a) In the event of any conflict between the provisions of this Agreement and the provisions of any Senior Debt Document or any Second Priority Debt Document, the provisions of this Agreement shall govern. Notwithstanding the foregoing, the relative rights and obligations of the Senior Secured Collateral Agent, the Senior Representatives and the Senior Secured Parties (as amongst themselves) with respect to any Senior Collateral shall be governed by the terms of the First Lien Intercreditor Agreement and in the event of any conflict between the First Lien Intercreditor Agreement and this Agreement as to such relative rights and obligations, the provisions of the First Lien Intercreditor Agreement shall control.

(b) The parties hereto acknowledge that the secured creditor relationship between different classes of Second Priority Debt Obligations may be governed separately from this Agreement, including by a Second Priority Pari Passu Intercreditor Agreement and/or a Junior Lien Intercreditor Agreement. Notwithstanding the foregoing, the parties hereto acknowledge and agree that this Agreement shall govern the secured creditor relationship between the Senior Obligations, on the one hand, and the Second Priority Debt Obligations, on the other hand, and that in the event of any conflict between the terms of this Agreement and that of an intercreditor agreement governing the rights among different classes of Second Priority Debt (including any Second Priority Pari Passu Intercreditor Agreement or Junior Lien Intercreditor Agreement), this Agreement shall control.

SECTION 8.02. Continuing Nature of this Agreement; Severability. This is a continuing agreement of Lien subordination, and the Senior Secured Parties may continue, at any time and without notice to the Second Priority Representatives or any Second Priority Debt Party, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any Subsidiary constituting Senior Obligations in reliance hereon. The terms of this Agreement shall survive and continue in full force and effect in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions. All references to the Borrower or any other Grantor shall include the Borrower or such Grantor as debtor and debtor in possession and any receiver, trustee or similar person for the Borrower or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect:

-34-

(a) with respect to any Senior Representative, the Senior Secured Parties represented by it and their Senior Obligations, on the date on which no Senior Obligations of such Senior Secured Parties are any longer secured by, and no longer required to be secured by, any of the Senior Representatives pursuant to the terms of the applicable Shared Collateral, subject to the rights of the Senior Secured Parties under Section 6.03; and

(b) with respect to any Second Priority Representative, the Second Priority Debt Parties represented by it and their Second Priority Debt Obligations, on the date on which no Second Priority Debt Obligations of such Second Priority Debt Parties are any longer secured by, and no longer required to be secured by, any of the Shared Collateral pursuant to the terms of the applicable Second Priority Debt Documents.

SECTION 8.03. <u>Amendments; Waivers</u>.

(a) No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b) This Agreement may be amended in writing signed by each Representative (in each case, acting in accordance with the documents governing the applicable Debt Facility); <u>provided</u> that any such amendment, supplement or waiver which by the terms of this Agreement requires the Borrower's consent or which increases the obligations or reduces the rights of, or otherwise materially adversely affects, the Borrower or any Grantor (which for avoidance of doubt includes Sections 5.01, 5.03, 5.05, 6.01 and Article VIII hereof), shall require the consent of the Borrower. Any such amendment, supplement or waiver shall be in writing and shall be binding upon the Senior Secured Parties and the Second Priority Debt Parties and their respective successors and assigns.

(c) Notwithstanding the foregoing, without the consent of any Secured Party (and with respect to any amendment or modification which by the terms of this Agreement requires the Borrower's consent or which increases the obligations or reduces the rights of the Borrower or any other Grantor, with the consent of the Borrower), any Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 8.09 of this Agreement and upon such execution and delivery, such Representative and the Secured Parties and Senior Obligations or Second Priority Debt Obligations of the Debt Facility for which such Representative is acting shall be subject to the terms hereof.

-35-

(d) Notwithstanding anything in this Agreement to the contrary, it is understood and agreed that each Senior Representative and Second Priority Representative then party to this Agreement, without the consent of any other Senior Secured Party or any other Second Priority Debt Party, may enter into a supplemental agreement (which may take the form of an amendment and restatement of this Agreement) (i) to facilitate having Additional Senior Debt or Additional Second Priority Debt or other obligations of any of the Grantors become Senior Obligations or Second Priority Debt Obligations, as the case may be, under this Agreement, including, without limitation, an amendment to the definition of "Senior Obligations" to increase the amount of obligations included thereunder, (ii) to give effect to any amendments in connection with a Refinancing of Senior Obligations or Second Priority Obligations, as applicable or (iii) to effectuate the subordination of Liens granted pursuant to Sections 7.01(t) and (w) of the First Lien Credit Agreement or the corresponding provisions of the Second Lien Indenture (or in each case any Refinancing thereof) to the Liens on the Shared Collateral securing the Senior Obligations; provided, that any such supplemental agreement is not prohibited by the Senior Debt Documents and the Second Priority Debt Documents then extant in accordance with the terms thereof and a certificate of a Responsible Officer delivered to the applicable Representatives certifying such compliance shall be conclusive and such Representatives may rely thereon without further inquiry and shall be fully protected in doing so; and provided, further, that the applicable Senior Representative and Second Priority Representative shall execute and deliver such supplemental agreement at the other's request and such supplemental agreement may contain additional intercreditor terms applicable solely to the holders of such Additional Senior Debt or Additional Second Priority Debt vis-à-vis the holders of the relevant obligations hereunder.

SECTION 8.04. Information Concerning Financial Condition of the Borrower and the Subsidiaries. None of the Senior Representatives and the Senior Secured Parties, on the one hand, and the Second Priority Representatives and the Second Priority Debt Parties, on the other hand, shall have any duty to inform the other parties of (a) the financial condition of the Borrower and the Subsidiaries and all endorsers or guarantors of the Senior Obligations or the Second Priority Debt Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Senior Obligations or the Second Priority Debt Obligations. The Senior Representatives, the Senior Secured Parties, the Second Priority Representatives and the Second Priority Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any Senior Representative, any Senior Secured Party, any Second Priority Representative or any Second Priority Debt Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and the Senior Representatives, the Senior Secured Parties, the Second Priority Representatives and the Second Priority Debt Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

-36-

SECTION 8.05. <u>Subrogation</u>. Each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Obligations has occurred.

SECTION 8.06. <u>Application of Payments</u>. Except as otherwise provided herein, all payments received by the Senior Secured Parties may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Obligations as the Senior Secured Parties, in their sole discretion, deem appropriate, consistent with the terms of the Senior Debt Documents. Except as otherwise provided herein, each Second Priority Representative, on behalf of itself and each Second Priority Debt Party under its Second Priority Debt Facility, assents to any such extension or postponement of the time of payment of the Senior Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any Lien that may at any time secure any part of the Senior Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

SECTION 8.07. <u>Additional Grantors</u>. The Borrower agrees that, if any Subsidiary shall become a Grantor after the date hereof, it will promptly cause such Subsidiary to become party hereto by executing and delivering an instrument in the form of Annex I. Upon such execution and delivery, such Subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the Designated Second Priority Representative and the Designated Senior Representative. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 8.08. <u>Dealings with Grantors</u>. Upon any application or demand by the Borrower or any Grantor to any Representative to take or permit any action under any of the provisions of this Agreement or under any Collateral Document (if such action is subject to the provisions hereof), at the request of such Representative, the Borrower or such Grantor, as appropriate, shall furnish to such Representative a certificate of an Authorized Officer (an "<u>Officer's Certificate</u>") stating that all conditions precedent, if any, provided for in this Agreement or such Collateral Document, as the case may be, relating to the proposed action have been complied with, except that in the case of any such application or demand as to which the furnishing of such documents is specifically required by any provision of this Agreement or any Collateral Document relating to such particular application or demand, no additional certificate or opinion need be furnished.

SECTION 8.09. <u>Additional Debt Facilities</u>. To the extent, but only to the extent, permitted by the provisions of the then extant Senior Debt Documents and Second Priority Debt Documents, the Borrower or any Restricted Subsidiary permitted under the Debt Facilities may incur or issue and sell one or more series or classes of Additional Second Priority Debt and one or more series or classes of Additional Senior Debt. Any such additional class or series of Second Priority Debt (the "<u>Second Priority Class Debt</u>") may be secured by a junior priority, subordinated Lien on Shared Collateral, in each case under and pursuant to the relevant Second Priority Collateral Documents for such Second Priority Class Debt, if and subject to the condition that the Representative of any such Second Priority Class Debt (each, a "<u>Second Priority</u>

-37-

Class Debt Representative"), acting on behalf of the holders of such Second Priority Class Debt (such Representative and holders in respect of any Second Priority Class Debt being referred to as the "Second Priority Class Debt Parties"), becomes a party to this Agreement by satisfying conditions (i) through (iii), as applicable, of the immediately succeeding paragraph. Any such additional class or series of Senior Facilities (the "Senior Class Debt"; and the Senior Class Debt and Second Priority Class Debt, collectively, the "Class Debt") may be secured by a senior Lien on Shared Collateral, in each case under and pursuant to the relevant Senior Collateral Documents, if and subject to the condition that the Representative of any such Senior Class Debt (each, a "Senior Class Debt Representative"; and the Senior Class Debt Representatives and Second Priority Class Debt Representatives, collectively, the "Class Debt Representatives"), acting on behalf of the holders of such Senior Class Debt (such Representative and holders in respect of any such Senior Class Debt being referred to as the "Senior Class Debt Parties; and the Senior Class Debt Parties and Second Priority Class Debt Parties, collectively, the "Class Debt Parties"), becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (iii), as applicable, of the immediately succeeding paragraph and becomes a party to the First Lien Intercreditor Agreement in accordance with the terms thereof.

In order for a Class Debt Representative to become a party to this Agreement:

(i) such Class Debt Representative shall have executed and delivered a Joinder Agreement substantially in the form of Annex II (if such Representative is a Second Priority Class Debt Representative) or Annex III (if such Representative is a Senior Class Debt Representative) (with such changes as may be reasonably approved by the Designated Senior Representative and such Class Debt Representative) pursuant to which it becomes a Representative hereunder, and the Class Debt in respect of which such Class Debt Representative is the Representative constitutes Additional Senior Debt Obligations or Additional Second Priority Debt Obligations, as applicable, and the related Class Debt Parties become subject hereto and bound hereby as Additional Senior Debt Parties or Additional Second Priority Debt Parties, as applicable;

(ii) the Borrower (a) shall have delivered to the Designated Senior Representative an Officer's Certificate identifying the obligations to be designated as Additional Senior Debt Obligations or Additional Second Priority Debt Obligations, as applicable, and the initial aggregate principal amount or face amount thereof and certifying that such obligations are permitted to be incurred and secured (I) in the case of Additional Senior Debt Obligations, on a senior basis under each of the Senior Debt Documents and (II) in the case of Additional Second Priority Debt Obligations, on a junior or subordinate basis under each of the Second Priority Debt Documents and (b) if requested, shall have delivered true and complete copies of each of the Second Priority Debt Documents or Senior Debt Documents, as applicable, relating to such Class Debt, certified as being true and correct by an authorized officer of the Borrower; and

(iii) the Second Priority Debt Documents or Senior Debt Documents, as applicable, relating to such Class Debt shall provide that each Class Debt Party with respect to such Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Class Debt.

-38-

SECTION 8.10. <u>Refinancings</u>. The Senior Debt Obligations and the Second Priority Debt Obligations may be refinanced or replaced, in whole or in part along with any Permitted Refinancing Increase, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing or replacement transaction under any Senior Debt Document or any Second Priority Debt Document) of any Senior Representative or any Secured Party, all without affecting the Lien priorities provided for herein or the other provisions hereof (it is understood that the foregoing shall in no way be interpreted to limit the ability of any Loan Party to undertake any refinancing or replacement transaction otherwise permitted by the Senior Debt Documents and Second Priority Debt Documents). Without limiting the application or effectiveness of Section 5.06, the Second Priority Representative hereby agrees that at the request of the Borrower in connection with refinancing or replacement of Senior Obligations ("<u>Replacement Senior Obligations</u>") it will promptly enter into an agreement in form and substance reasonably acceptable to the Second Priority Representative with the agent for the Replacement Senior Obligations containing terms and conditions substantially similar to the terms and conditions of this Agreement.

SECTION 8.11. <u>Consent to Jurisdiction; Waivers</u>. Each Representative, on behalf of itself and the Secured Parties of the Debt Facility for which it is acting, irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the Collateral Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York or the United States of America located in the Borough of Manhattan, City of New York, and appellate courts from any thereof;

(b) consents and agrees that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Representative) at the address referred to in Section 8.12; and

(d) agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by law.

SECTION 8.12. <u>Notices</u>. All notices, requests, demands and other communications provided for or permitted hereunder shall be in writing and shall be sent:

(i) if to the Borrower or any Grantor, to the Borrower, at its address at:

Peabody Energy Corporation
Attn: Chief Financial Officer
701 Market Street, St. Louis, MO 63101-1826
Telephone: (314) 342 - 7742
Facsimile: (314) 342-7597

-39-

with a copy to the Chief Legal Officer at the same address

    (ii) if to the First Lien Collateral Agent, to it at:

Citi Global Loans
115 Brett Road, Ops III
New Castle, DE 19720
Attention: Agency Department
Telephone: (302) 894-6010
Facsimile: (212) 994-0961
Electronic Mail: <u>agencyabtfsupport@citi.com</u>

    (iii) if to the Second Lien Collateral Agent to it at:

U.S. Bank National Association
Goodwin Square
225 Asylum Street, 23rd Floor
EX CT SS
Hartford, Connecticut 06103
Attention: Philip G. Kane, Jr.
Telephone: (860) 241-6842
Facsimile: (860) 241 - 6881
Electronic Mail: <u>philip.kanejr@usbank.com</u>

    (iv) if to any other Representative, to it at the address specified by it in the Joinder Agreement delivered by it pursuant to Section 8.09.

Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

    SECTION 8.13. <u>Further Assurances</u>. Each Senior Representative, on behalf of itself and each Senior Secured Party under the Senior Debt Facility for which it is acting, each Second Party Representative, on behalf of itself, and each Second Priority Debt Party under its Second Priority Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

-40-

SECTION 8.14. **GOVERNING LAW; WAIVER OF JURY TRIAL**.

**(A) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE** OF NEW YORK.

**(B) EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

SECTION 8.15. <u>Binding on Successors and Assigns</u>. This Agreement shall be binding upon the Senior Representatives, the Senior Secured Parties, the Second Priority Representatives, the Second Priority Debt Parties, the Borrower, the other Grantors party hereto and their respective successors and assigns.

SECTION 8.16. <u>Section Titles</u>. The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

SECTION 8.17. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, including by means of facsimile or other electronic method, each of which shall be an original and all of which shall together constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 8.18. <u>Authorization</u>. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The First Lien Credit Agreement Secured Parties have appointed the First Lien Collateral Agent as collateral agent pursuant to the First Lien Credit Agreement on behalf of the First Lien Credit Agreement Secured Parties and the First Lien Collateral Agent represents and warrants that it has duly accepted such appointment. The Borrower and the other Grantors have appointed the Second Lien Collateral Agent as collateral agent pursuant to the Second Lien Indenture on behalf of the Second Lien Indenture Secured Parties and the Second Lien Collateral Agent represents and warrants that it has duly accepted such appointment.

SECTION 8.19. <u>No Third Party Beneficiaries; Successors and Assigns</u>. The lien priorities set forth in this Agreement and the rights and benefits hereunder in respect of such lien priorities shall inure solely to the benefit of the Senior Representatives, the Senior Secured Parties, the Second Priority Representatives and the Second Priority Debt Parties, and their respective permitted successors and assigns, and no other Person (including the Grantors, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert such rights. Nothing in this Agreement is intended to or shall impair the obligations of the Borrower or any other Grantor, which are absolute and unconditional, to pay the Senior Obligations and the Second Priority Debt Obligations as and when the same shall become due and payable in accordance with their terms. Except for Sections 5.01, 5.03, 5.05, 6.01 and Article VIII hereof, neither the Borrower nor any other Grantor shall have any rights hereunder.

-41-

SECTION 8.20. <u>Effectiveness</u>. This Agreement shall become effective when executed and delivered by the parties hereto.

SECTION 8.21. <u>Collateral Agent and Representative</u>. It is understood and agreed that (a) the First Lien Collateral Agent is entering into this Agreement in its capacity as collateral agent under the First Lien Credit Agreement and the provisions of Article IX of the First Lien Credit Agreement applicable to the Collateral Agent (as defined therein) thereunder shall also apply to the First Lien Collateral Agent hereunder and (b) the Second Lien Collateral Agent is entering into this Agreement in its capacity as collateral agent under the Second Lien Indenture and the provisions of Article XII of the Second Lien Indenture applicable to the Collateral (as defined therein) thereunder shall also apply to the Second Lien Collateral Agent hereunder.

SECTION 8.22. <u>Survival of Agreement</u>. All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 8.23. <u>Certain Notices to the Designated Second Priority Representative</u>. The Borroweer agrees to give the Designated Second Priority Representative reasonable notice of the occurrence of the Discharge of Senior Obligations.

-42-

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective
authorized officers as of the day and year first above written.

                                                        **CITIBANK, N.A.,**
                                                        as First Lien Collateral Agent

                                                        By: /s/ Christopher Wood
                                                            Name: Christopher Wood
                                                            Title: Vice President

                                                        **U.S. BANK NATIONAL ASSOCIATION,**
                                                        as Second Lien Collateral Agent

                                                        By: /s/ Philip G. Kane, Jr.
                                                            Name: Philip G. Kane, Jr.
                                                            Title: Vice President

                    [Signature page to First Lien/Second Lien Intercreditor Agreement]

**PEABODY ENERGY CORPORATION**, as
Borrower

By: /s/ James A. Tichenor
    Name: James A. Tichenor
    Title: Vice President and Treasurer

[Signature page to First Lien/Second Lien Intercreditor Agreement]

## SUBSIDIARY GUARANTORS

| | |
|---|---|
| American Land Development, LLC | Delaware |
| American Land Holdings of Colorado, LLC | Delaware |
| American Land Holdings of Illinois, LLC | Delaware |
| American Land Holdings of Indiana, LLC | Delaware |
| American Land Holdings of Kentucky, LLC | Delaware |
| American Land Holdings of New Mexico, LLC | Delaware |
| American Land Holdings of West Virginia, LLC | Delaware |
| Arid Operations Inc. | Delaware |
| Big Ridge, Inc. | Illinois |
| Black Hills Mining Company, LLC | Illinois |
| BTU Western Resources, Inc. | Delaware |
| Caballo Grande, LLC | Delaware |
| Caseyville Dock Company, LLC | Delaware |
| Central States Coal Reserves of Illinois, LLC | Delaware |
| Central States Coal Reserves of Indiana, LLC | Delaware |
| Century Mineral Resources, Inc. | Illinois |
| Coal Reserve Holding Limited Liability Company No. 1 | Delaware |
| COALSALES II, LLC | Delaware |
| Colorado Yampa Coal Company | Delaware |
| Conservancy Resources, LLC | Delaware |
| Cottonwood Land Company | Delaware |
| Cyprus Creek Land Company | Delaware |
| Cyprus Creek Land Resources, LLC | Delaware |
| Dyson Creek Coal Company, LLC | Delaware |
| Dyson Creek Mining Company, LLC | Delaware |
| El Segundo Coal Company, LLC | Delaware |
| Empire Land Holdings, LLC | Delaware |
| Falcon Coal Company, LLC | Indiana |
| Francisco Equipment Company, LLC | Delaware |
| Francisco Land Holdings Company, LLC | Delaware |
| Francisco Mining, LLC | Delaware |
| Gallo Finance Company | Delaware |
| Gold Fields Chile, LLC | Delaware |
| Gold Fields Mining, LLC | Delaware |
| Gold Fields Ortiz, LLC | Delaware |
| Hayden Gulch Terminal, LLC | Delaware |
| Henderson Coal Reserves, LLC | Delaware |
| Highwall Mining Services Company | Delaware |
| Hillside Recreational Lands, LLC | Delaware |
| HMC Mining, LLC | Delaware |

[Signature page to First Lien/Second Lien Intercreditor Agreement]

| | |
|---|---|
| Illinois Land Holdings, LLC | Illinois |
| Independence Material Handling, LLC | Delaware |
| James River Coal Terminal, LLC | Delaware |
| Juniper Coal Company | Delaware |
| Kayenta Mobile Home Park, Inc. | Delaware |
| Kentucky Syngas, LLC | Delaware |
| Lively Grove Energy, LLC | Delaware |
| Lively Grove Energy Partners, LLC | Delaware |
| Marigold Electricity, LLC | Delaware |
| Midco Supply and Equipment Corporation | Illinois |
| Midwest Coal Acquisition Corp. | Delaware |
| Midwest Coal Reserves of Illinois, LLC | Delaware |
| Midwest Coal Reserves of Indiana, LLC | Delaware |
| Moffat County Mining, LLC | Delaware |
| Mustang Energy Company, L.L.C. | Delaware |
| New Mexico Coal Resources, LLC | Delaware |
| NM Equipment Company, LLC | Delaware |
| Pacific Export Resources, LLC | Delaware |
| Peabody America, Inc. | Delaware |
| Peabody Archveyor, L.L.C. | Delaware |
| Peabody Arclar Mining, LLC | Indiana |
| Peabody Bear Run Mining, LLC | Delaware |
| Peabody Bear Run Services, LLC | Delaware |
| Peabody Caballo Mining, LLC | Delaware |
| Peabody Cardinal Gasification, LLC | Delaware |
| Peabody COALSALES, LLC | Delaware |
| Peabody COALTRADE, LLC | Delaware |
| Peabody COALTRADE International (CTI), LLC | Delaware |
| Peabody Colorado Operations, LLC | Delaware |
| Peabody Colorado Services, LLC | Delaware |
| Peabody Coulterville Mining, LLC | Delaware |
| Peabody Development Company, LLC | Delaware |
| Peabody Electricity, LLC | Delaware |
| Peabody Employment Services, LLC | Delaware |
| Peabody Energy Generation Holding Company | Delaware |
| Peabody Energy Investments, Inc. | Delaware |
| Peabody Energy Solutions, Inc. | Delaware |
| Peabody Gateway North Mining, LLC | Delaware |
| Peabody Gateway Services, LLC | Delaware |
| Peabody Holding Company, LLC | Delaware |
| Peabody Illinois Services, LLC | Delaware |
| Peabody Indiana Services, LLC | Delaware |

[Signature page to First Lien/Second Lien Intercreditor Agreement]

| | |
|---|---|
| Peabody International Investments, Inc. | Delaware |
| Peabody International Services, Inc. | Delaware |
| Peabody Investments Corp. | Delaware |
| Peabody Magnolia Grove Holdings, LLC | Delaware |
| Peabody Midwest Management Services, LLC | Delaware |
| Peabody Midwest Mining, LLC | Indiana |
| Peabody Midwest Operations, LLC | Delaware |
| Peabody Midwest Services, LLC | Delaware |
| Peabody Natural Gas, LLC | Delaware |
| Peabody Natural Resources Company | Delaware |
| Peabody New Mexico Services, LLC | Delaware |
| Peabody Operations Holding, LLC | Delaware |
| Peabody Powder River Mining, LLC | Delaware |
| Peabody Powder River Operations, LLC | Delaware |
| Peabody Powder River Services, LLC | Delaware |
| Peabody PowerTree Investments, LLC | Delaware |
| Peabody Recreational Lands, L.L.C. | Delaware |
| Peabody Rocky Mountain Management Services, LLC | Delaware |
| Peabody Rocky Mountain Services, LLC | Delaware |
| Peabody School Creek Mining, LLC | Delaware |
| Peabody Services Holdings, LLC | Delaware |
| Peabody Southwest, LLC | Delaware |
| Peabody Terminal Holding Company, LLC | Delaware |
| Peabody Terminals, LLC | Delaware |
| Peabody Trout Creek Reservoir LLC | Delaware |
| Peabody Twentymile Mining, LLC | Delaware |
| Peabody Venezuela Coal Corp. | Delaware |
| Peabody Venture Fund, LLC | Delaware |
| Peabody-Waterside Development, L.L.C. | Delaware |
| Peabody Western Coal Company | Delaware |
| Peabody Wild Boar Mining, LLC | Delaware |
| Peabody Wild Boar Services, LLC | Delaware |
| Peabody Williams Fork Mining, LLC | Delaware |
| Peabody Wyoming Gas, LLC | Delaware |
| Peabody Wyoming Services, LLC | Delaware |
| PEC Equipment Company, LLC | Delaware |
| Point Pleasant Dock Company, LLC | Delaware |
| Pond River Land Company | Delaware |
| Porcupine Production, LLC | Delaware |
| Porcupine Transportation, LLC | Delaware |

[Signature page to First Lien/Second Lien Intercreditor Agreement]

Riverview Terminal Company                                          Delaware
Sage Creek Land & Reserves, LLC                                     Delaware
School Creek Coal Resources, LLC                                    Delaware
Shoshone Coal Corporation                                          Delaware
Star Lake Energy Company, L.L.C.                                    Delaware
Sugar Camp Properties, LLC                                         Indiana
Thoroughbred Generating Company, LLC                               Delaware
Thoroughbred Mining Company, L.L.C.                                Delaware
Twentymile Coal, LLC                                               Delaware
Twentymile Holdings, LLC                                           Delaware
West Roundup Resources, LLC                                        Delaware
Wild Boar Equipment Company, LLC                                   Delaware
Wild Boar Land Holdings Company, LLC                               Delaware

By: /s/ James A. Tichenor
    Name: James A. Tichenor
    Title: Vice President and Treasurer


Big Sky Coal Company                                               Delaware

By: /s/ Brian R. Cropper
    Name: Brian R. Cropper
    Title: Treasurer


Peabody Sage Creek Mining, LLC                                     Delaware

By: /s/ Douglas D. Loucks
    Name: Douglas D. Loucks
    Title: Treasurer


Peabody Western Coal Company                                       Delaware

By: /s/ Eric J. Baltz
    Name: Eric J. Baltz
    Title: Treasurer


Sage Creek Holdings, LLC                                           Delaware

By: /s/ Robert A. Fenley
    Name: Robert A. Fenley
    Title: Treasurer


Seneca Coal Company, LLC                                           Delaware

By: /s/ Kurt A. Jones
    Name: Kurt A. Jones
    Title: Treasurer


[Signature page to First Lien/Second Lien Intercreditor Agreement]

[FORM OF] SUPPLEMENT NO. [          ] dated as of [          ], 201[ ], to the FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT dated as of March 16, 2015 (the "First Lien/Second Lien Intercreditor Agreement"), among PEABODY ENERGY CORPORATION, a Delaware corporation (the " Borrower"), certain subsidiaries and affiliates of the Borrower (each a "Grantor"), CITIBANK, N.A., as First Lien Collateral Agent under the First Lien Credit Agreement, U.S. BANK NATIONAL ASSOCIATION, as Second Lien Collateral Agent under the Second Lien Indenture, and the additional Representatives from time to time party thereto.

A. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien/Second Lien Intercreditor Agreement.

B. The Grantors have entered into the First Lien/Second Lien Intercreditor Agreement. Pursuant to the First Lien Credit Agreement, the Second Lien Indenture, certain Additional Senior Debt Documents, and certain Additional Second Priority Debt Documents, certain newly acquired or organized Subsidiaries of the Borrower are required to enter into the First Lien/Second Lien Intercreditor Agreement. Section 8.07 of the First Lien/Second Lien Intercreditor Agreement provides that such Subsidiaries may become party to the First Lien/Second Lien Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New Grantor") is executing this Supplement in accordance with the requirements of the First Lien Credit Agreement, the Second Lien Indenture, the Additional Second Priority Debt Documents and Additional Senior Debt Documents.

Accordingly, the Designated Senior Representative and the New Subsidiary Grantor agree as follows:

SECTION 1. In accordance with Section 8.07 of the First Lien/Second Lien Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the First Lien/Second Lien Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the First Lien/Second Lien Intercreditor Agreement applicable to it as a Grantor thereunder. Each reference to a "Grantor" in the First Lien/Second Lien Intercreditor Agreement shall be deemed to include the New Grantor. The First Lien/Second Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2. The New Grantor represents and warrants to the Designated Senior Representative and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Bankruptcy Laws and by general principles of equity.

SECTION 3. This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Designated Senior Representative shall have received a counterpart of this Supplement that bears the signature of the New Grantor. Delivery of an executed signature page to this Supplement by facsimile transmission or other electronic method shall be as effective as delivery of a manually signed counterpart of this Supplement.

Annex I-1

SECTION 4. Except as expressly supplemented hereby, the First Lien/Second Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5. THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6. In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien/Second Lien Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 8.12 of the First Lien/Second Lien Intercreditor Agreement. All communications and notices hereunder to the New Grantor shall be given to it in care of the Borrower as specified in the First Lien/Second Lien Intercreditor Agreement.

SECTION 8. The Borrower agrees to reimburse the Designated Senior Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated Senior Representative as required by the applicable Senior Debt Documents.

Annex I-2

IN WITNESS WHEREOF, the New Grantor, and the Designated Senior Representative have duly executed this Supplement to the First Lien/Second Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY GRANTOR]

By: _____
     Name:
     Title:

Acknowledged by:

[     ], as Designated Senior Representative

By: _____
     Name:
     Title:

[     ], as Designated Second Priority Representative

By: _____
     Name:
     Title:

Annex I-3

ANNEX II

[FORM OF] REPRESENTATIVE SUPPLEMENT NO. [__] dated as of [         ], 20[ ] to the FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT dated as of March 16, 2015 (the "First Lien/Second Lien Intercreditor Agreement"), among PEABODY ENERGY CORPORATION, a Delaware corporation (the "Borrower"), certain subsidiaries and affiliates of the Borrower (each a "Grantor"), CITIBANK, N.A., as First Lien Collateral Agent under the First Lien Credit Agreement, U.S. BANK NATIONAL ASSOCIATION, as Second Lien Collateral Agent under the Second Lien Indenture, and the additional Representatives from time to time party thereto.

A. Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien/Second Lien Intercreditor Agreement.

B. As a condition to the ability of the Borrower to incur Second Priority Class Debt after the date of the First Lien/Second Lien Intercreditor Agreement and to secure such Second Priority Class Debt with the Second Priority Lien and to have such Second Priority Class Debt guaranteed by the Grantors, in each case under and pursuant to the Second Priority Collateral Documents relating thereto, the Second Priority Class Debt Representative in respect of such Second Priority Class Debt is required to become a Representative under, and such Second Priority Class Debt and the Second Priority Class Debt Parties in respect thereof are required to become subject to and bound by, the First Lien/Second Lien Intercreditor Agreement. Section 8.09 of the First Lien/Second Lien Intercreditor Agreement provides that such Second Priority Class Debt Representative may become a Representative under, and such Second Priority Class Debt and such Second Priority Class Debt Parties may become subject to and bound by, the First Lien/Second Lien Intercreditor Agreement as Additional Second Priority Debt Obligations and Additional Second Priority Debt Parties, respectively, pursuant to the execution and delivery by the Second Priority Class Debt Representative of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 8.09 of the First Lien/Second Lien Intercreditor Agreement. The undersigned Second Priority Class Debt Representative (the "New Representative") is executing this Supplement in accordance with the requirements of the Senior Debt Documents and the Second Priority Debt Documents.

Accordingly, the Designated Senior Representative and the New Representative agree as follows:

SECTION 1. In accordance with Section 8.09 of the First Lien/Second Lien Intercreditor Agreement, the New Representative by its signature below becomes a Representative under, and the related Second Priority Class Debt and Second Priority Class Debt Parties become subject to and bound by, the First Lien/Second Lien Intercreditor Agreement as Additional Second Priority Debt Obligations and Additional Second Priority Debt Parties, respectively, with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Second Priority Class Debt Parties, hereby agrees to all the terms and provisions of the First Lien/Second Lien Intercreditor Agreement applicable to it as a Second Priority Representative and to the Second Priority Class Debt Parties that it represents as Second Priority Debt Parties. Each reference to a "Representative" or "Second Priority Representative" in the First Lien/Second Lien Intercreditor Agreement shall be deemed to include the New Representative. The First Lien/Second Lien Intercreditor Agreement is hereby incorporated herein by reference.

Annex II-1

SECTION 2. The New Representative represents and warrants to the Designated Senior Representative and the other Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee], (ii) this Representative Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Second Priority Debt Documents relating to such Second Priority Class Debt provide that, upon the New Representative's entry into this Agreement, the Second Priority Class Debt Parties in respect of such Second Priority Class Debt will be subject to and bound by the provisions of the First Lien/Second Lien Intercreditor Agreement as Second Priority Debt Parties.

SECTION 3. This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Representative Supplement shall become effective when the Designated Senior Representative shall have received a counterpart of this Representative Supplement that bears the signature of the New Representative. Delivery of an executed signature page to this Representative Supplement by facsimile transmission or other electronic method shall be effective as delivery of a manually signed counterpart of this Representative Supplement.

SECTION 4. Except as expressly supplemented hereby, the First Lien/Second Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5. THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6. In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien/Second Lien Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 8.12 of the First Lien/Second Lien Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8. The Borrower agrees to reimburse the Designated Senior Representative for its reasonable out-of-pocket expenses in connection with this Representative Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated Senior Representative as required by the applicable Senior Debt Documents.

Annex II-2

       IN WITNESS WHEREOF, the New Representative and the Designated Senior Representative have duly executed this Representative Supplement to the First Lien/Second Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE],
as [      ] for the holders of
[      ]

By: _____
     Name:
     Title:

Address for notices:

_____

Attention of: _____
Telecopy: _____

[      ],
as Designated Senior Representative

By: _____
     Name:
     Title:

Annex II-3

Acknowledged by:

PEABODY ENERGY CORPORATION

By: _____
        Name:
        Title:

[SUBSIDIARY GRANTORS]

By: _____
        Name:
        Title:

Annex II-4

Schedule I to the
Representative Supplement to the
First Lien/Second Lien Intercreditor Agreement

Grantors

[            ]

Annex II-5

ANNEX III

[FORM OF] REPRESENTATIVE SUPPLEMENT NO. [ ] dated as of [          ], 20[ ] to the FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT dated as of March 16, 2015 (the "First Lien/Second Lien Intercreditor Agreement"), among PEABODY ENERGY CORPORATION, a Delaware corporation (the "Borrower"), certain subsidiaries and affiliates of the Borrower (each a "Grantor"), CITIBANK, N.A., as First Lien Collateral Agent under the First Lien Credit Agreement, U.S. BANK NATIONAL ASSOCIATION, as Second Lien Collateral Agent under the Second Lien Indenture, and the additional Representatives from time to time party thereto.

A. Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien/Second Lien Intercreditor Agreement.

B. As a condition to the ability of the Borrower to incur Senior Class Debt after the date of the First Lien/Second Lien Intercreditor Agreement and to secure such Senior Class Debt with the Senior Lien and to have such Senior Class Debt guaranteed by the Grantors on a senior basis, in each case under and pursuant to the Senior Collateral Documents relating thereto, the Senior Class Debt Representative in respect of such Senior Class Debt is required to become a Representative under, and such Senior Class Debt and the Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the First Lien/Second Lien Intercreditor Agreement. Section 8.09 of the First Lien/Second Lien Intercreditor Agreement provides that such Senior Class Debt Representative may become a Representative under, and such Senior Class Debt and such Senior Class Debt Parties may become subject to and bound by, the First Lien/Second Lien Intercreditor Agreement as Additional Senior Debt Obligations and Additional Senior Debt Parties, respectively, pursuant to the execution and delivery by the Senior Class Debt Representative of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 8.09 of the First Lien/Second Lien Intercreditor Agreement. The undersigned Senior Class Debt Representative (the "New Representative") is executing this Supplement in accordance with the requirements of the Senior Debt Documents and the Second Priority Debt Documents.

Accordingly, the Designated Senior Representative and the New Representative agree as follows:

SECTION 1. In accordance with Section 8.09 of the First Lien/Second Lien Intercreditor Agreement, the New Representative by its signature below becomes a Representative under, and the related Senior Class Debt and Senior Class Debt Parties become subject to and bound by, the First Lien/Second Lien Intercreditor Agreement as Additional Senior Debt Obligations and Additional Senior Debt Parties, respectively, with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Senior Class Debt Parties, hereby agrees to all the terms and provisions of the First Lien/Second Lien Intercreditor Agreement applicable to it as a Senior Representative and to the Senior Class Debt Parties that it represents as Senior Debt Parties. Each reference to a "Representative" or "Senior Representative" in the First Lien/Second Lien Intercreditor Agreement shall be deemed to include the New Representative. The First Lien/Second Lien Intercreditor Agreement is hereby incorporated herein by reference.

Annex III-1

SECTION 2. The New Representative represents and warrants to the Designated Senior Representative and the other Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee], (ii) this Representative Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Senior Debt Documents relating to such Senior Class Debt provide that, upon the New Representative's entry into this Agreement, the Senior Class Debt Parties in respect of such Senior Class Debt will be subject to and bound by the provisions of the First Lien/Second Lien Intercreditor Agreement as Senior Secured Parties.

SECTION 3. This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Representative Supplement shall become effective when the Designated Senior Representative shall have received a counterpart of this Representative Supplement that bears the signature of the New Representative. Delivery of an executed signature page to this Representative Supplement by facsimile transmission or other electronic method shall be effective as delivery of a manually signed counterpart of this Representative Supplement.

SECTION 4. Except as expressly supplemented hereby, the First Lien/Second Lien Intercreditor Agreement shall remain in full force and effect.

**SECTION 5. THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6. In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien/Second Lien Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 8.12 of the First Lien/Second Lien Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8. The Borrower agrees to reimburse the Designated Senior Representative for its reasonable out-of-pocket expenses in connection with this Representative Supplement, including the reasonable fees, other charges and disbursements of counsel for the Designated Senior Representative as required by the applicable Senior Debt Documents.

Annex III-2

       IN WITNESS WHEREOF, the New Representative and the Designated Senior Representative have duly executed this Representative Supplement to the First Lien/Second Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE],
as [       ] for the holders of
[       ]

By: _____

    Name:
    Title:

Address for notices:

_____
Attention of: _____
Telecopy: _____

[       ],
as Designated Senior Representative

By: _____
    Name:
    Title:

Annex III-3

Acknowledged by:

PEABODY ENERGY CORPORATION

By: _____
       Name:
       Title:

[SUBSIDIARY GRANTORS]

By: _____
       Name:
       Title:

                          Annex III-4

Schedule I to the
Representative Supplement to the
First Lien/Second Lien Intercreditor Agreement

Grantors

[          ]

Annex III-5

## Exhibit E

Fee Letter (Filed Under Seal)