UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, <u>et al.</u>,<br><br>                        Debtors.[1] | Case No. 16-42529<br>CHAPTER 11<br><br>(Joint Administration Requested)<br><br>Hearing Date and Time:<br>TBD<br><br>Hearing Location:<br>TBD |

**DECLARATION OF CARLIN ADRIANOPOLI
IN SUPPORT OF CERTAIN FIRST DAY MOTIONS**

      I, Carlin Adrianopoli, being duly sworn, state the following under penalty of perjury:

      1.      I am a Senior Managing Director at FTI Consulting ("<u>FTI</u>") in FTI's Corporate Finance & Restructuring practice.  FTI is the proposed financial advisor for Peabody Energy Corporation ("<u>PEC</u>") and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned cases under chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>").

      2.      I make this Declaration in support of the "first-day" relief that the Debtors' have requested in the:

- Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 361, 363, 364 and 507(b) and Bankruptcy Rules 4001(b) and (c), for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral; (II) Granting Adequate Protection to

---

[1]     The Debtors and their employer identification numbers are listed on Schedule 1 attached hereto.  The addresses for each of the Debtors are set forth in the Debtors' chapter 11 petitions.

NAI-1500940900v19

Prepetition Secured Parties; and (III) Scheduling a Final Hearing (the "DIP Motion");[2] and the

- Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for an Order Authorizing them to Honor Customer Obligations and for Related Relief (the "Customer Motion").

3.  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, my discussions with the Debtors' senior management, other members of the FTI team, the Debtors' other advisors and my review of relevant documents and/or my opinion based upon my experience.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

## QUALIFICATIONS

4.  FTI Consulting is one of the world's prominent restructuring consulting firms, providing clients with a breadth and depth of expertise across a worldwide network of more than 4,600 employees located in 28 countries on six continents.  FTI's Corporate Finance & Restructuring practice consists of senior, experienced professionals who have provided services in some of the largest domestic and cross-border turnarounds in history.

5.  I joined FTI in 2002 and have been a senior managing director in FTI's Corporate Finance & Restructuring practice since 2010.  I have more than 17 years of experience serving as financial advisor and providing interim management and performance improvement services to corporations, various creditor classes, equity owners, and directors of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

underperforming companies.  I have provided restructuring services on large and high profile national and international matters in both out-of-court workout situations and chapter 11 proceedings.  Most recently, I served as interim CFO of RadioShack Corporation ("RadioShack") during the chapter 11 cases of RadioShack and its affiliated debtors.  Some of my other notable engagements include Archbrook Laguna; Barzel Industries; Bliss Technologies; Brush Engineered Material Carbide-Graphite; Criimi Mae; GS Industries; HomePlace; Insilco Technologies; Kitty Hawk; LTV Steel; National Envelope; Murray; PTC Alliance; Southern Air Transport; Special Metals; Tactical Intermediate Holdings; Weirton Steel Industries and Wheeling-Pittsburgh Steel.

6.  I hold an M.B.A. with emphasis in corporate finance from the University of Notre Dame and a B.S.B.A. in accountancy from John Carroll University.

## FTI RETENTION

7.  In November 2015, the Debtors engaged FTI to act as their financial advisor in connection with the Debtors' restructuring efforts.  During the course of its engagement, FTI has worked closely with the Debtors' management and other professionals to be retained by the Debtors with respect to these Chapter 11 Cases and has become well-acquainted with the Debtors' capital structure, liquidity needs and business operations.

8.  FTI assisted the Debtors in developing the 13-Week Projection forecasting the Debtors' cash needs in the initial 13 weeks of these Chapter 11 Cases and a process for updating the 13-Week Projection on a rolling basis thereafter.  FTI assisted the Debtors in all aspects of developing the 13-Week Projection, including but not limited to: (a) evaluating assumptions used to forecast cash receipts and disbursements; (b) developing a process to maintain and update the forecast on a rolling basis during the course of these Chapter 11 Cases;

(c) creating a process to gather actual cash flow data during the course of these Chapter 11 Cases to compare the 13-Week Projection and subsequent iterations to actual results to allow for variance analysis; and (d) assisting the Debtors with developing and implementing a process for variance reporting. Through these efforts, the Debtors will be able to more accurately project anticipated cash inflows and outflows during these Chapter 11 Cases and more quickly respond to appropriate inquiries from various parties in interest.

9. FTI was also involved, along with the Debtors' other advisors in the Debtors' efforts to obtain postpetition financing for these Chapter 11 Cases. As detailed below, FTI, with the assistance of Lazard, evaluated the Debtors' financing needs for a potential chapter 11 restructuring and advised the Debtors regarding those needs. FTI, along with the Debtors' other advisors, was involved in discussions and negotiations regarding potential financing for these Chapter 11 Cases, including with respect to the DIP Financing that the Debtors ultimately obtained. During the course of those discussions and negotiations, FTI advised the Debtors regarding, among other things, the impact of various proposed financial covenants and financing structures.

## DIP MOTION

*Need for DIP Financing*

10. In January 2016, the Debtors authorized FTI, with the assistance of Lazard, to initiate the process of evaluating the Debtors' financing needs and potential financing alternatives to fund a potential chapter 11 restructuring. FTI worked closely with the Debtors and their other advisors to determine the Debtors' cash needs for their businesses and their potential chapter 11 cases. The options with respect to postpetition financing were limited by the Debtors' long term liquidity needs, the projected cash losses of the Debtors' foreign businesses and their prepetition capital structure.

NAI-1500940900v19                                   4

11. Even though the Debtors' domestic operations have continued to be profitable and cash flow positive on a unlevered basis (excluding the cost of hedges) despite the numerous economic headwinds challenging its various markets and products, the current economic environment that has negatively impacted the coal industry as a whole have caused the Debtors' current capital structure to become unsustainable. However, due to their successful efforts to procure critical postpetition financing, the Debtors enter these Chapter 11 Cases with significant liquidity and with domestic operations that produce positive EBITDA. We believe that a restructuring process over time can and will maximize value for all stakeholders. The protection of bankruptcy will give the Debtors time to develop a business and restructuring plan that, among other things, reduces debt and takes advantage of their strengths in a changing market.

12. Among other things, the Debtors have the advantages of geographically dispersed operations, high performing mines even in the current market, a strong management team and investments in critical industry infrastructure assets. More time and funding is needed, however, to complete a business plan and develop a restructuring strategy that will enable the Debtors to participate profitably in the coal industry over the long term.

13. The DIP Financing is critical in that it provides the Debtors with the necessary liquidity to fund their operations, capital expenditures, and corporate costs over the duration of these Chapter 11 Cases. The DIP Facilities will substantially enhance the Debtors' ability to minimize disruption to their business and instill confidence in their various creditor constituencies, including customers, employees, and vendors, allowing the Debtors to, among other things, continue operating their businesses in the ordinary course, thereby preserving value for the benefit of all stakeholders. It will also be critical for the Debtors to be able to

demonstrate, on day one of these Chapter 11 Cases, that they have the capability to provide the state regulatory agencies with the types of security, including a bonding accommodation facility that has been required in the other recent significant Chapter 11 filings in the coal industry.

***Arm's Length and Good Faith***

14.     I believe, based on my involvement in the process, that the negotiations regarding the terms of the DIP Financing were at arm's length and characterized by good-faith bargaining by all parties.

***The Need for Interim Relief***

15.     As noted above, the Debtors' businesses are cash intensive, with significant daily costs to produce and ship coal to customers, satisfy obligations to employees, maintain the safety of their mines and other facilities and fulfill environmental and other regulatory requirements. As such, the Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value and pursue their restructuring goals. The Debtors, in consultation with FTI, have performed a review and analysis of their projected cash needs. Based upon that review and analysis, the Debtors and FTI prepared the 13-Week Projection outlining the Debtors' postpetition cash needs in the initial 13 weeks of these Chapter 11 Cases. A copy of the 13-Week Projection (which will be updated from time to time in accordance with the DIP Credit Agreement) is attached as Exhibit C to the DIP Motion. The 13-Week Projection reflects the Debtors' funding requirements over the identified period and will allow them to meet their obligations—including administrative expenses in these Chapter 11 Cases—and is reasonable and appropriate under the circumstances.

16.     As reflected in the 13-Week Projection, the Debtors will start these Chapter 11 Cases with approximately $150 million in cash and are forecasted to disburse over

$200 million in the next four weeks.  Without interim relief the Debtors could experience a cash crunch before obtaining access to postpetition funding.  While the Debtors forecast some positive cash flows from operations, $150 million of cash is insufficient liquidity to operate the business and provides little room for error.  The lack of DIP Financing being in place at the outset of these Chapter 11 Cases may cause the Debtors' customers, suppliers, employees, regulators and others to lose confidence in the Debtors' ability to operate their businesses postpetition and successfully reorganize.  Reduced confidence may result in additional unforecasted cash drains on the Debtors' operations if, for example, (1) the Debtors were to deliver less coal due to the loss of customers or delays in customer orders, (2) the Debtors' costs of production were to increase due to lower productivity attendant to the loss of employees or the impacts of unforeseen operational disruptions, (3) regulators were to demand that the Debtors provide additional security for the Debtors' reclamation obligations, or (4) suppliers demand additional collateral or disrupt supply.  Each of these scenarios would negatively impact the Debtors' cash flow and potentially harm the Debtors' ability to successfully reorganize and maximize value for their stakeholders.  Incurring short-term cash losses without the assurance of adequate financing immediately to finance and complete a restructuring could irreparably harm the Debtors.

17. In addition, the DIP Lenders' agreement to provide the DIP Financing is contingent upon the Debtors' receiving interim relief.  If the court were to deny interim relief, the DIP Lenders could elect not to provide the DIP Financing.  Thus, there is no guarantee that DIP Financing will be available to the Debtors when the court holds a final hearing on the DIP Motion, and other sources of financing may not be available at that time.  In consultation with the Debtors and their other advisors, FTI concluded that the current volatility in the coal market made it prudent to lock in adequate financing, including an agreement on the consensual use of

cash collateral, at the outset of these Chapter 11 cases, if an appropriate financing facility and reasonable cash collateral agreement could be obtained. Any delay in obtaining financing and an agreement on the consensual use of cash collateral could put the Debtors at risk that they would not be able to obtain needed financing on as favorable terms (or at all) at a future date. This would undermine the Debtors' ability to pursue their restructuring in a manner that maximizes value for stakeholders.

## CUSTOMER MOTION

*The Debtors' Customer Obligations*

18. Prior to the Petition Date, the Debtors, in the ordinary course of their businesses, entered into various coal supply agreements ("Agreements") with coal buyers. The Agreements typically require the Debtors to deliver a specified quantity of coal and include a base price for each ton of coal of delivered. The base price makes certain assumptions about the quality of coal that will be delivered (e.g., BTU, ash, sulfur and moisture content of the coal). Because delivered coal rarely has the same quality specifications assumed in the base price, the Agreements contain formulas for adjusting the base price due to variances between the delivered coal's quality specifications and the assumed quality specifications in the base price. Other adjustments need to be made from time to time such as volume adjustments if the Debtors were to discover a scale was miscalibrated.

19. Typically, the Debtors issue separate invoices to their customers for the base price ("Base Invoices") and quality adjustments ("Quality Invoices"). Base Invoices generally are sent more frequently than Quality Invoices. Depending on the Agreement, the majority of Base Invoices are sent weekly or semi-monthly. Quality Invoices generally are sent monthly. Base Invoices are always positive. In most instances, Quality Invoices also are positive. The Debtors typically deliver coal that is of a higher quality than the base price

assumes. In certain instances, however, Quality Invoices can be negative. In those cases, the Quality Invoices are netted against a Base Invoice, and the customer pays the Debtors the difference.

20. These quality adjustments are a common practice in this industry given that producers rarely, if ever, can deliver coal with the precise specifications contained in a contract. These adjustments typically result in additional revenues for the Debtors since the Debtors usually deliver higher quality coal than the base specifications. Given where the Debtors currently are in their invoicing cycle, the Debtors intend to issue postpetition Quality Invoices with respect to prepetition deliveries of coal. In the aggregate, the Quality Invoices, if paid, will result in substantial additional revenue to the estates. However, a few of the Quality Invoices may be negative. While it is difficult to estimate the prepetition amount of these quality adjustments, the Debtors estimate that they likely will issue postpetition invoices that include negative quality adjustments respecting coal delivered prepetition of approximately $500,000.

21. In addition, the Debtors' agreement (the "Duke Agreement") with Duke Energy Indiana, Inc. ("Duke") requires the Debtors to rebate a certain amount on each ton delivered. The rebates relate to an agreed-to base price change for previously delivered coal. In accordance with the Duke Agreement, the Debtors include the rebates on Duke's Base Invoices where those rebates are netted against the base price, with the resulting Base Invoices always requiring payment to the Debtors. On average, the Debtors rebate approximately $2.1 million each month. The Debtors' obligation to provide the rebate is backed by a letter of credit.

22. The value of the Debtors' business – and, thus, the ability of the Debtors to maximize stakeholder recoveries through a plan of reorganization – is dependent upon the continued loyalty and confidence of their customers. Delays in honoring, or possible

cancellation of, Customer Obligations could severely damage the Debtors' relations with existing customers and impair their ability to generate new customers. If the Debtors are unable to sell coal in sufficient quantities, their ability to reorganize will be harmed and the recoveries of their creditors will be reduced. Accordingly, the Debtors need the discretion to honor Customer Obligations respecting both prepetition and postpetition deliveries of coal to reduce the likelihood of such negative consequences.

23. For the foregoing reasons, I believe the relief requested in the Customer Motion is reasonable and in the best interests of the Debtors and their estates.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 13, 2016
         Chicago, Illinois

/s/ Carlin Adrianopoli
Carlin Adrianopoli
Senior Managing Director
FTI Consulting