**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br><br>Peabody Energy Corporation, <u>et</u> <u>al.</u>,<br><br>               Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>Jointly Administered<br><br>Hearing Date and Time:<br>May 17, 2016 10:00 a.m. (Central)<br><br>Response Deadline:<br>May 10, 2016<br><br>Hearing Location:<br>United States Courthouse<br>Thomas F. Eagleton Federal Building<br>5th Floor, North Courtroom<br>111 S. 10th Street<br>St. Louis, Missouri  63102 |

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO
SECTIONS 105, 363, 365 AND 554 OF THE BANKRUPTCY CODE, FOR AN ORDER
APPROVING PROCEDURES TO SELL, TRANSFER OR ABANDON CERTAIN
MISCELLANEOUS AND *DE MINIMIS* ASSETS, FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES, AND TO PAY RELATED COMMISSIONS
<u>IN CONNECTION WITH SUCH SALES WITHOUT FURTHER COURT APPROVAL</u>**

Peabody Energy Corporation ("<u>PEC</u>") and certain of its direct and indirect subsidiaries,

as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), hereby move this Court,

pursuant to sections 105, 363, 365 and 554 of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>"), for the entry of an order authorizing the Debtors to implement procedures by which the

Debtors may, from time to time, sell or abandon miscellaneous assets (the "<u>Miscellaneous</u>

<u>Assets</u>") that are no longer needed in their ongoing business activities by private sale or public

auction and pay applicable broker commissions (collectively, the "<u>Broker Commissions</u>"),

auction fees (collectively, the "<u>Auction Fees</u>") and fees for other service providers, including,

among others, surveyors, title companies and specialized real estate and title attorneys (collectively, the "Other Fees" and, together with the Broker Commissions and Auction Fees, the "Sale Fees") in the ordinary course of business in connection with such sales without need for further Court approval, but subject to the notice procedures set forth below, and in support thereof, respectfully represent as follows:[1]

### Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

2.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri. PEC was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a wholly-owned direct or indirect subsidiary of PEC.

4.      PEC is the world's largest private-sector coal company (by volume), with 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators. PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is

---

[1]      A copy of the proposed order will be made available on the Debtors' case website at http://www.kccllc.net/peabody.

exported to international customers.  As of December 31, 2015, Debtor PEC and its subsidiaries'

property holdings include 6.3 billion tons of proven and probable coal reserves and

approximately 500,000 acres of surface property through ownership and lease agreements.

In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion

tons of proven and probable coal reserves, and the Debtors generated sales of approximately 180

million tons of coal.  In addition to its mining operations, the Debtors market and broker coal

from other coal producers across the United States, Australia, Europe and Asia.

5.      The Debtors operate in a competitive and highly regulated industry that has

experienced strong headwinds and precipitously declining demand and pricing in recent years

due to the rise of low priced alternative energy sources – including an abundance of natural gas.

Combined with these factors, slowing global economic growth drove a wide range of goods

prices lower in 2015 and resulted in the largest broad market decline since 1991.  Indeed,

demand from electric utilities in the United States alone declined approximately 110 million tons

in 2015.  These market conditions, in connection with lower realized pricing in the United States

and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor

subsidiaries' coal sales during 2015.

6.      A comprehensive description of the Debtors' businesses and operations, capital

structure and the events leading to the commencement of these chapter 11 cases can be found in

the Declaration of Amy Schwetz, Executive Vice President and Chief Financial Officer of

Debtor PEC, in Support of First Day Motions of Debtors and Debtors in Possession (the "First

Day Declaration"), which was filed on April 13, 2016 and is incorporated herein by reference.

### Facts Relevant to This Motion

7.      Prior to the Petition Date, and in furtherance of their reorganization efforts, the

Debtors sought to streamline their operations and eliminate unnecessary operating expenses by

selling non-core or surplus assets.  From time to time in the ordinary course of business, the

Debtors sell real estate, equipment or other assets when these assets are no longer needed.

The Debtors continue to assess, evaluate and pursue opportunities for further Miscellaneous

Asset dispositions in an effort to maximize the value of their estates and minimize excess costs.

8.     To further these goals, the Debtors anticipate that, during the pendency of

these cases and in the ordinary course of their operations, they will wish to sell, transfer or

otherwise dispose of Miscellaneous Assets that (a) are no longer necessary to their business and

(b) in most cases, will be of relatively de minimis value compared to the Debtors' total assets.

In addition, the Debtors may wish to sell Miscellaneous Assets pursuant to transactions that

arguably may be outside of the ordinary course of their business (and, thus, will require Court

approval pursuant to section 363(b)(1) of the Bankruptcy Code).  Although the Debtors intend to

monetize Miscellaneous Assets if at all possible, circumstances may arise where (a) the cost of

continuing to maintain, relocate and/or store a given Miscellaneous Asset outweighs any

potential recovery from a future sale or transfer thereof or (b) the Debtors are simply unable to

find purchasers for, or reach acceptable terms for the sale of, a Miscellaneous Asset.  In such

circumstances, the Debtors may seek to abandon such property pursuant to section 554 of the

Bankruptcy Code.  Finally, the disposition of certain Miscellaneous Assets may include the

related assumption, assumption and assignment or rejection of executory contracts under

section 365 of the Bankruptcy Code.

9.     Requiring Court approval of every such transaction identified above

would be administratively burdensome for the Court and costly for the Debtors' estates,

especially in light of the relative value of the Miscellaneous Assets involved.  Moreover,

although the Debtors believe that, in many cases, small dispositions of assets such as those

contemplated by this Motion may fall within the scope of the ordinary course of business doctrine under section 363(c) of the Bankruptcy Code, they believe that many purchasers will be uncomfortable consummating sales without confirmation that such sales are authorized.  In other cases, the Debtors anticipate that purchasers will want confirmation that the sales will be free and clear of liens under section 363(f) of the Bankruptcy Code, or may require the assumption or assumption and assignment of related contracts under section 365 of the Bankruptcy Code. Similarly, the Debtors may seek to reject other contracts as unnecessary in light of the sale, transfer or abandonment of Miscellaneous Assets.  The Debtors also believe that they would benefit from the ability to sell Miscellaneous Assets as promptly as possible where market opportunities arise.

10.     Accordingly, the Debtors believe that it would be most efficient, and the proceeds realized with respect to such transactions will be maximized, if the Debtors are authorized to implement procedures that allow them to sell, transfer or abandon Miscellaneous Assets, or groups of such assets, and address related contracts, on an expedited basis without incurring the delay and costs of preparing, filing, serving and having hearings on motions for approval of each such disposition (the "Miscellaneous Asset Procedures").

11.     The Debtors further believe that the use of brokers and auctions in certain circumstances will significantly aid in the timely disposition and realization of the maximum possible value for the Miscellaneous Assets.  Accordingly, the Debtors also seek approval to pay applicable market rate Sale Fees for brokers, auctioneers and other service providers, including, among others, surveyors, title agencies and specialized real estate and title attorneys (collectively, the "Sale Professionals") utilized in connection with dispositions of Miscellaneous Assets.

12.     The Miscellaneous Assets are subject to the liens of the Debtors' debtor-in-possession lenders (collectively, the "DIP Lenders") pursuant to the terms of the Debtor-in Possession Credit, Guaranty and Security Agreement (the "DIP Financing Agreement").[2]  Additionally, prior to the Petition Date, the Debtors entered into two separate secured credit facilities:  (a) that certain Amended and Restated Credit Agreement, dated as of September 24, 2013, and amended by the Omnibus Amendment Agreement, dated as of February 5, 2015 (the "2013 Credit Agreement"), under which the Debtors incurred certain term loan, revolving credit and letter of credit obligations secured by substantially all of the Debtors' assets and (b) that certain Senior Secured Second Lien Notes Indenture, dated as of March 16, 2015 (the "Second Lien Notes Indenture"), pursuant to which $1 billion in notes were issued (the "Second Lien Notes"), which are secured by a second priority lien on substantially the same assets securing the Debtors' obligations under the 2013 Credit Agreement (together, the "Prepetition Loan Agreements").  Accordingly, the Miscellaneous Assets also are subject to the liens of those lenders, agents and trustees party to the Prepetition Loan Agreements (collectively, the "Prepetition Lenders").

13.     In addition, other creditors may have or assert liens against certain of the Miscellaneous Assets (collectively, to the extent such liens are valid and properly perfected, the "Other Liens").  The DIP Lenders' liens, the Prepetition Lenders' liens and the Other Liens will attach to the net proceeds from the sales of Miscellaneous Assets, and such net proceeds will

---

[2]     As of the date of the filing of this Motion, the Debtors have received interim authority to enter into the DIP Financing Agreement.  See Amended Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) [Docket No. 149] (the "Interim DIP Order").  A hearing has been tentatively scheduled for May 5, 2016 to determine whether the DIP Financing Agreement will be given final approval (the "Final DIP Order").

-6-

be utilized consistent with the provisions of the DIP Financing Agreement, the Interim DIP

Order, the any final order approving the Debtors' postpetition financing (a "Final DIP Order") or

other applicable Court orders or agreements with secured parties.

## Sale Notice Procedures

### *Transactions Subject to the Miscellaneous Asset Procedures*

14.     The Miscellaneous Asset Procedures will apply only to:  (a) the private sale or

transfer of Miscellaneous Assets involving, in each case, $10 million or less for an individual

private sale, or $15 million in the aggregate for multiple purchases by a single buyer at one

time,[3] in total consideration (together, the "Sales Cap"), as measured by the amount of cash and

other consideration (such as assumption of liabilities) to be received by the Debtors on account

of the Miscellaneous Assets to be sold or transferred in any one transaction or in any series of

related transactions;[4] (b) the auction of any Miscellaneous Asset with a book value equal to or

less than the Sales Cap; and (c) the abandonment of Miscellaneous Assets with a book value of

$10 million or less.

15.     If the sale, auction or abandonment of Miscellaneous Assets that the Debtors

believe is arguably outside the ordinary course of business is greater than $10 million in total

consideration, except in the instance where one buyer purchases several Miscellaneous Assets

that, individually, are less than or equal to $10 million but collectively are less than or equal to

---

[3]     If the relief requested in this Motion is granted, a single purchaser could simultaneously purchase two Miscellaneous Assets without the need for further court approval so long as: (i) the individual price for each Miscellaneous Asset is under $10 million; and (ii) the aggregate price of both Miscellaneous Assets is under $15 million (*e.g.*, Asset A's cost equals $9 million and Asset B's cost equals $4 million but not if Asset A's cost equals $9 million and Asset B's cost equals $7 million).  For the avoidance of doubt, the $15 million aggregate Sales Cap applies only to contemporaneous purchases and not purchases by a single buyer throughout the pendency of these chapter 11 cases.

[4]     Pursuant to section 7.05(k)(B) of the DIP Financing Agreement, if the Miscellaneous Asset is sold for more than $5 million, the Debtors must receive at least 85% of the consideration for such Miscellaneous Asset in cash or Permitted Investments (as defined in the DIP Financing Agreement).

$15 million, the Debtors shall file a motion with the Court requesting approval of the sale, auction or abandonment.

***Notice and Opportunity to Object***

16.    Other than with respect to De Minimis Assets (as defined below), after the Debtors obtain any necessary consents required pursuant to the DIP Financing Agreement and enter into a contract or contracts (or bill of sale or other legal document) contemplating a sale or transfer of assets subject to the Miscellaneous Asset Procedures (a "Proposed Sale"), the Debtors will serve a notice of the Proposed Sale (a "Sale Notice") by hand delivery, overnight mail or email on: (i) the Office of the United States Trustee for the Eastern District of Missouri, 111 South 10th Street, Suite 6.353, St. Louis, MO  63102 (Attn:  Leonora S. Long, Esq., Assistant United States Trustee) (the "United States Trustee"); (ii) Davis Polk & Wardwell LLP and Bryan Cave LLP, as counsel to Citibank, N.A. as Administrative Agent for the First Lien Secured Credit Facility and  the Administrative Agent for the DIP Financing Agreement; (iii) Brown Rudnick LLP, as counsel to Wilmington Savings Fund Society, FSB as trustee and collateral agent for the Secured Second Lien Notes; (iv) Foley & Lardner LLP, as counsel to Wilmington Trust Company as Indenture Trustee for Unsecured Notes;[5] (v) Emmet, Marvin & Martin, LLP, as counsel to Computershare Trust Company, N.A. as resigning Indenture Trustee to the Convertible Junior Subordinated Debentures due December 2066 (the "Convertible Notes"); (vi) Bank of Oklahoma, National Association, as prospective Indenture Trustee to the Convertible Notes; (vii) Morrison & Foerster, as counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee"); (viii) Mayer Brown LLP, as counsel to PNC Bank, N.A.,

---

[5]    These include the: (i) 6.00% Senior Notes due November 2018; (ii) 6.50% Senior Notes due September 2020; (iii) 6.25% Senior Notes due September 2021; and the (iv) 7.875% Senior Notes due November 2026.

as Administrator under the Debtors' prepetition accounts receivable securitization facility; (ix) if applicable, the nondebtor counterparties to all executory contracts or unexpired leases that the Debtors propose to assume, assume and assign or reject in connection with such sale; (x) any other known holder of a lien, claim or encumbrance against the specific property to be sold; (xi) in connection with a sale or transfer of interests in real property, (a) any applicable federal or state (I) permitting or licensing authority, (II) environmental regulatory agency and/or (III) reclamation bonding entity (any such entity, a "Governmental Authority") and (b) any non-Debtor party that has secured, through the issuance of a bond, guaranty or other form of credit support, any obligation of the Debtors with respect to such property (any such party, a "Surety"); and (xii) the proposed purchaser or transferee (the "Proposed Purchaser") (all parties (i) through (xii) collectively, the "Sale Notice Parties").

17.     If the Proposed Sale is to be effected by a private sale, the Sale Notice, at a minimum, will include the following information with respect to the Proposed Sale:[6]

    (a)    a description of the assets that are the subject of the Proposed Sale and their location(s);[7]

    (b)    the identity of the nondebtor party or parties to the Proposed Sale (the "Transferee(s)"), the service address of the Transferee(s) and any relationships of the Transferee(s) with the Debtors;

    (c)    the identities of any parties known to the Debtors to hold liens on or other interests in the assets and a statement indicating that all such liens or interests are capable of monetary satisfaction;

---

[6]    This information may be provided (in whole or in part) by attaching the applicable contract or contracts (or other relevant documents) to the Sale Notice. To the extent that the contract or contracts are not attached to the Sale Notice, the Debtors shall also serve a copy of such contract or contracts on the Sale Notice Parties.

[7]    The description shall use any of the following methods to identify the asset: (1) specific listing, (2) category, (3) type of collateral defined in Article 9 of the Uniform Commercial Code (such as "accounts," "goods," "general intangibles" and the like), (4) quantity, (5) computational or allocational formula or procedure, or (6) any other method by which the identity of the collateral is objectively determinable.

(d)     the major economic terms and conditions of the Proposed Sale, including the amount of cash consideration and the nature, value and, if applicable, method of valuation of any non-cash consideration, as well as any material terms specific to the Proposed Sale;

(e)     the executory contracts and unexpired leases, if any, that the Debtors propose to be assumed, assumed and assigned or rejected as part of the Proposed Sale;

(f)     for any assumption, or assumption and assignment, of an executory contract or unexpired lease, the amounts required to cure any defaults pursuant to section 365(b) of the Bankruptcy Code (collectively, the "Cure Claims"), and a statement regarding the adequate assurance of future performance by the purchaser or transferee, consistent with section 365 of the Bankruptcy Code;

(g)     an affidavit of the broker, if any, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that identifies the broker and the amount of the Commission, and that contains the disclosures required by Bankruptcy Rule 2014; and

(h)     instructions consistent with the terms described below regarding the procedures to assert objections to the Proposed Sale ("Objections").

18.     If the Proposed Sale is to be effected by auction, the Sale Notice, at a minimum, will include the following information with respect to the Proposed Sale:[8]

(a)     a description of the assets that are the subject of the Proposed Sale and their location(s);[9]

(b)     the identities of any parties known to the Debtors to hold liens on or other interests in the assets and a statement indicating that all such liens or interests are capable of monetary satisfaction;

(c)     the executory contracts and unexpired leases, if any, that the Debtors propose to be assumed, assumed and assigned or rejected as part of the Proposed Sale;

---

[8]     This information may be provided (in whole or in part) by attaching the applicable contract or contracts (or other relevant documents) to the Sale Notice. To the extent that the contract or contracts are not attached to the Sale Notice, the Debtors shall also serve a copy of such contract or contracts on the Sale Notice Parties.

[9]     The description shall use any of the following methods to identify the asset:  (1) specific listing, (2) category, (3) type of collateral defined in Article 9 of the Uniform Commercial Code (such as "accounts," "goods," "general intangibles" and the like), (4) quantity, (5) computational or allocational formula or procedure, or (6) any other method by which the identity of the collateral is objectively determinable.

(d)     for any assumption, or assumption and assignment, of an executory contract or unexpired lease, the amounts of any Cure Claims;

(e)     the date, time and place of the auction;

(f)     the minimum acceptable bid (the "Minimum Bid");

(g)     any terms and conditions of sale to be imposed at the auction;

(h)     a copy of any documentation executed in contemplation of the Proposed Sale (e.g., a proposed form of purchase agreement);

(i)     an affidavit of a third party auctioneer, if any, pursuant to Bankruptcy Rule 2014, that identifies the auctioneer and the amount of the Commission, and that contains the disclosures required by Bankruptcy Rule 2014; and

(j)     instructions regarding the procedures to assert Objections.

19.     After determining to abandon any Miscellaneous Assets (the "Proposed Abandonment"), the Debtors will serve a notice (the "Abandonment Notice") by hand delivery, overnight mail or email on the Sale Notice Parties.  The Abandonment Notice will specify: (a) the Miscellaneous Assets being abandoned; (b) a summary of the justifications for the abandonment; (c) the identities of any known parties holding or asserting liens or other interests in the relevant Miscellaneous Assets; (d) if applicable, the identity of the entity to which the Miscellaneous Assets will be abandoned; and (e) in connection with the abandonment of any interest in real property, a statement that neither any environmental condition related to such property nor the abandonment thereof presents any threat of an imminent and identifiable harm to public health and safety.

20.     Sale Notice Parties will have ten days after the date of service of a Sale Notice or Abandonment Notice, as applicable (the "Notice Period"), to object, pursuant to the objection procedures described below, to (a) the Proposed Sale and the payment of any Sale Fees, (b) the Proposed Abandonment or (c) any related assumptions, assumptions and assignments or

rejections of executory contracts or unexpired leases.  If (a) no Objections are properly asserted

prior to expiration of the Notice Period and (b) the Debtors have obtained any consents required

pursuant to the DIP Financing Agreement in connection with the Proposed Sale or the Proposed

Abandonment, the Debtors will be authorized, without further notice and without further Court

approval, to:  (a)(i) either (A) for Miscellaneous Assets to be sold by private sale, consummate

the Proposed Sale in accordance with the terms and conditions of the underlying contract or

contracts or (B) for Miscellaneous Assets to be sold at auction, conduct the auction and sell the

assets at the auction, provided, however, that no sale at an auction may be completed for

consideration below the Minimum Bid identified in the applicable Sale Notice;[10] and (ii) take

such other actions as are necessary to close the transaction and collect the proceeds of such sale,

including, without limitation, payment of any Sale Fees, and assumption, assumption and

assignment or rejection of the executory contracts and unexpired leases described in the Sale

Notice and payment of the Cure Claims proposed in such notice; or (b) proceed with the

Proposed Abandonment, including the rejection of any related executory contracts and unexpired

leases.  In addition, the Debtors may consummate a Proposed Sale or Proposed Abandonment

prior to expiration of the applicable Notice Period if each Sale Notice Party consents in writing

to the Proposed Sale or Proposed Abandonment.  Finally, within ten (10) days after the end of

any Notice Period, the DIP Lenders and the Prepetition Lenders shall execute, deliver and file (or

authorize the Debtors or its designee to file) any release documents reasonably requested and

prepared by the Debtors (to be in form and substance satisfactory to the DIP Lenders and the

---

[10]   If no Sale Notice Party files an Objection to the Minimum Bid proposed for an auction, or any such
Objections are resolved so that the auction may proceed, the Debtors may sell the applicable Miscellaneous
Asset at the auction for any price above the Minimum Bid, even if the sale price exceeds the Sales Cap.

Prepetition Lenders), reasonably necessary to release, extinguish or otherwise terminate the DIP

Lenders and Prepetition Lenders' security interest in the Miscellaneous Asset(s).

21.     The applicable Proposed Sale, including the assumption, assumption and

assignment or rejection of executory contracts and unexpired leases proposed in connection with

the sale, will be deemed fully authorized by the Court upon either (a) for a private sale, (i) the

expiration of the Notice Period without the assertion of any Objections or (ii) the written consent

of all Sale Notice Parties; or (b) for a sale by auction, (i) the expiration of the Notice Period

without the assertion of any Objections or the written consent of all Sale Notice Parties and

(ii) the Debtors' acceptance of a qualifying bid in excess of the Minimum Bid at the auction.  If a

sale transaction is completed at an auction, the Debtors will file with the Court and serve upon

the Sale Notice Parties a report of the results of the auction within 10 days after the conclusion of

the auction.  If a holder of a lien, claim or encumbrance receives a Sale Notice and does not

object within the prescribed time period, such holder shall be deemed to have consented to the

Proposed Sale.

22.     If any significant economic terms of a Proposed Sale are amended after

transmittal of the Sale Notice, but prior to the expiration of the Notice Period (including as part

of the resolution of any Objections), the Debtors will send a revised Sale Notice to all Sale

Notice Parties describing the Proposed Sale, as amended.  If a revised Sale Notice is required,

the Notice Period will be extended for an additional ten days from the date of service of such

revised Sale Notice.

***Objection Procedures***

23.     Any Objections to a Proposed Sale or a Proposed Abandonment must be in

writing and served on the Sale Notice Parties, the Debtors and the Debtors' counsel and any

Transferee(s) so as to be received by all such parties prior to expiration of the Notice Period.

-13-

Each Objection must state with specificity the grounds for objection.  If an Objection to a Proposed Sale or the Proposed Abandonment is properly served, the Proposed Sale or Proposed Abandonment may not proceed absent (a) written withdrawal of the Objection, (b) entry of an order of the Court specifically approving the Proposed Sale or the Proposed Abandonment or (c) an order of the Court submitted on a consensual basis by the applicable Debtor or Debtors, any Transferee(s) and the objecting party (a "Consent Order").

***De Minimis Assets***

24.     Notwithstanding the notice procedures described above (the "Notice Procedures"), for (a) any transaction involving the private sale or transfer of a Miscellaneous Asset for less than $3 million in total consideration, as measured by the amount of cash and other consideration (such as assumption of liabilities) to be received by the Debtors on account of the Miscellaneous Assets to be sold or transferred in any one transaction or in any series of related transactions (a "De Minimis Private Sale"); (b) the auction of any Miscellaneous Asset with a book value equal to or less than $3 million (together with any De Minimis Private Sale, a "De Minimis Sale"); or (c) the abandonment of any non-real estate asset with a book value of less than $3 million (a "De Minimis Abandonment"),[11] the Debtors will be authorized, without following the Notice Procedures and without further notice and further Court approval, to consummate the De Minimis Sale or De Minimis Abandonment and such De Minimis Sales or De Minimis Abandonments will be deemed fully authorized by the Court, provided that the Debtors have obtained any necessary consents required pursuant to the DIP Financing Agreement in

---

[11]     Any real property subject to oversight by a Governmental Authority (e.g., pursuant to an environmental order issued by a Governmental Authority) will be abandoned only pursuant to the Notice Procedures or by separate motion of the Debtors.  Within 20 days after the end of any calendar month in which one or more De Minimis Abandonments is effected, the Debtors will file a written report on the docket listing such De Minimis Abandonment(s) and the effective date(s) thereof.

connection with such De Minimis Sale or De Minimis Abandonment.[12]  Although notice or

hearing will not be required for the Debtors to consummate a De Minimis Sale or a De Minimis

Abandonment, the Debtors (a) at their discretion, may use the Notice Procedures for any such

sale or abandonment and (b) shall use the Notice Procedures in connection with any De Minimis

Sale or De Minimis Abandonment involving the assumption, assumption and assignment or

rejection of an executory contract or unexpired lease.

***Effects of Sale***

25.    Buyers of any assets sold pursuant to the Miscellaneous Asset Procedures will

take title to the assets free and clear of liens, claims, encumbrances and other interests, pursuant

to section 363(f) of the Bankruptcy Code.  All such liens, claims, encumbrances and other

interests will attach to the net proceeds of the sale to the extent applicable state law or any

relevant security agreement (or both) provide for the continuation of such liens, claims,

encumbrances and other interests, with the same validity and priority as with respect to the assets.

In addition, the Debtors propose that all buyers of any assets sold pursuant to the Miscellaneous

Asset Procedures be entitled to the protections of section 363(m) of the Bankruptcy Code.

Finally, with respect to executory contracts to be assumed, or assumed and assigned, as part of

any transaction under the Miscellaneous Asset Procedures, adequate assurance of future

---

[12]    Prior to or contemporaneously with the consummation of a De Minimis Sale, at the Debtors' discretion, the
Debtors may inform the DIP Lenders and the Prepetition Lenders of such De Minimis Sale.  Within ten (10)
days of the Debtors informing the DIP Lenders and Prepetition Lenders that a De Minimis Sale has been, or
is about to be, consummated, the DIP Lenders and the Prepetition Lenders shall execute, deliver and file (or
authorize the Debtors or its designee to file) any release documents reasonably requested and prepared by
the Debtors (to be in form and substance satisfactory to the DIP Lenders and the Prepetition Lenders),
reasonably necessary to release, extinguish or otherwise terminate the DIP Lenders and Prepetition
Lenders' security interest in the Miscellaneous Asset(s).

performance will be provided, and Cure Claims paid, consistent with section 365 of the Bankruptcy Code.[13]

26.     All purchasers or transferees will take Miscellaneous Assets sold or transferred by the Debtors "as is" and "where is" without any representations or warranties from the Debtors as to quality or fitness for either their intended purposes or any particular purposes.

27.     Nothing in the foregoing Notice Procedures would prevent the Debtors, in their sole discretion, from seeking Court approval of any proposed sale transaction upon notice and a hearing or, if necessary to comply with a condition on a sale imposed by a purchaser, to submit a separate order to the Court along with a notice of presentment to be entered without need for a hearing on the matter.

***Reporting Requirements***

28.     The Debtors will provide, to the extent practicable, a written report or reports, within 20 days after the end of each calendar month concerning any such sales, transfers or abandonments made pursuant to the Miscellaneous Asset Procedures (including the names of the purchasing parties and the types and amounts of the sales or abandonments) to the United States Trustee and counsel to the Creditors' Committee.   The reports shall contain information substantially similar to the information provided in the Sale Notices.

---

[13]     To the extent that any Cure Claims – the payment of which is made to, and redounds to the benefit of, the applicable contract or lease counterparty rather than the Debtors – are payable in connection with a transaction under the Miscellaneous Asset Procedures, such Cure Amounts will (a) not count against the Sales Cap to the extent paid by the purchaser of assets and (b) to the extent paid by the Debtors, be deducted from the total consideration received by the Debtors to be applied against the Sales Cap.

-16-

### Argument

***Approval of Proposed Sale on Section 363(b) of the Bankruptcy Code***

29.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  See In re Channel One Commc'ns, Inc., 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)); accord In re Lionel Corp., 722 F.2d at 1071 (requiring a "good business reason" to approve a sale pursuant to section 363(b)); In re W.A. Mallory Co. Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing WBQ P'ship v. Va. Dep't of Med. Assistance Serv. (In re WBQ P'ship), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)); Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992) (affirming the district court's holding that the sale of property of the estate is justified if it is supported by a good business reason); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a motion pursuant to section 363(b) of the Bankruptcy Code is "a good business reason").

30.     Courts in this jurisdiction and others have consistently been reluctant to interfere with corporate decisions unless "it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code."  In re Farmland Indus., Inc., 294 B.R 855, 881 (Bankr. W.D. Mo. 2003) (citing In re United Artists Theatre Co., 315 F.3d 217, 233 (3d Cir. 2003), Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309

-17-

(5th Cir. 1985) and In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).

See also Crystalin, L.L.C. v. Selma Props. (In re Crystalin, L.L.C.), 293 B.R. 455, 463-64

(B.A.P. 8th Cir. 2003) (holding that the business judgment rule may be satisfied "'as long as the

proposed action appears to enhance the debtor's estate.'") (emphasis in original) (quoting Four B.

Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 567 n.16 (8th Cir.

1997) (internal quotations and alterations omitted)); Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y.

1992) (finding that "[c]ourts are loath to interfere with corporate decisions absent a showing of

bad faith, self-interest, or gross negligence.").

31.    Sound business reasons exist to justify selling or transferring the Miscellaneous

Assets under the Miscellaneous Asset Procedures.  Indeed, allowing the Debtors to sell or

transfer Miscellaneous Assets in accordance with these procedures constitutes the most efficient

and cost-effective means of maximizing the value realized for such assets and, thus, is in the best

interests of the Debtors' estates and their creditors.  Obtaining Court approval of each separate

transaction would result in administrative expenses for drafting, serving and filing pleadings, as

well as time incurred by attorneys for appearing at Court hearings.  The Debtors believe that the

proceeds that would be generated by many of the aforementioned sale transactions do not

warrant incurring such expenses, particularly given the anticipated sales by the Debtors.

***Approval of Abandonment under Section 554(a) of the Bankruptcy Code***

32.    Section 554(a) of the Bankruptcy Code provides that "[a]fter notice and a hearing,

the trustee may abandon any property of the estate that is burdensome to the estate or that is of

inconsequential value and benefit to the estate."  11 U.S.C. § 554(a) (emphasis added).

The debtor-in-possession is afforded significant discretion in determining the value and benefits

of particular property for purposes of the decision to abandon it.  See Terjen v Santoro (In re

-18-

Terjen), 154 B.R. 456, 458 (E.D. Va. 1993) (stating that "it is well settled that a trustee has

discretion to abandon property in the best interests of the estate").

33.    The Debtors expect to take all reasonable steps to monetize or otherwise

maximize the value of their Miscellaneous Assets for the benefit of their chapter 11 estates.

The costs associated with sales of certain Miscellaneous Assets, however, may exceed any

possible proceeds thereof.  The inability to consummate a commercially reasonable sale of

Miscellaneous Assets would indicate that such assets have no meaningful monetary value.

Further, the costs of maintaining or storing such assets may burden the Debtors' estates.

Accordingly, the abandonment of Miscellaneous Assets pursuant to the procedures set forth

herein is in the best interests of the Debtors' estates and should be approved.

### *Approval of Proposed Sales or Proposed Abandonments on Shortened and Limited Notice and Without A Hearing*

34.    The "notice" required by section 363(b)(1) of the Bankruptcy Code is "such notice

as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  Courts are authorized

to shorten the 21-day notice period generally applicable to asset sales, or direct another method

of giving notice, upon a showing of "cause."  Fed. R. Bankr. P. 2002(a)(2).  Moreover, courts are

authorized to limit notice of asset sales and uses of property outside of the ordinary course of the

debtor's business, even without a prior showing of cause, to any official committee appointed

under section 1102 of the Bankruptcy Code and any creditor or equity holder requesting notice.

See Fed. R. Bankr. P. 2002(i).

35.    Due process requires that any notice is "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections."  Mullane v. Cent. Hanover Bank & Trust Co.,

339 U.S. 306, 314 (1950).  Creditors are entitled to notice "reasonably calculated to apprise the

-19-

creditor of the pendency of the bankruptcy proceeding and give the creditor an opportunity to object or otherwise respond." Riverchase Apartments, L.P. v. Campbell Cty. (In re Riverchase Apartments, L.P.), 184 B.R. 35, 39 (Bankr. M.D. Tenn. 1995). In sum, if basic due process is afforded to interested parties and appropriate cause is established, a court may determine that shortened or limited notice of an asset sale is appropriate.

36.     Asset sales may be authorized without conducting an actual hearing if no party in interest timely requests such a hearing. See 11 U.S.C. § 102(1)(B)(i) (notwithstanding any statutory requirement for "notice and a hearing," the Bankruptcy Code "authorizes an act without an actual hearing if such notice is given properly and if . . . such a hearing is not requested timely by a party in interest"). Due process is satisfied if parties in interest are given "an opportunity to present their objections." Mullane, 339 U.S. at 314 (emphasis added).

37.     The Debtors seek the approval of the Miscellaneous Asset Procedures to maximize the net value realized from sales of relatively immaterial or de minimis assets. These procedures will accommodate the smooth and timely consummation of such smaller asset sales. Under the circumstances, the usual process of obtaining Court approval of each Proposed Sale subject to the Miscellaneous Asset Procedures (a) would impose unnecessary administrative burdens on the Court and use valuable Court time at omnibus hearings, (b) would create costs to the Debtors' estates that may undermine or eliminate the economic benefits of the underlying transactions and (c) in some instances may hinder the Debtors' ability to take advantage of sale opportunities that are available only for a limited time. As such, the Debtors propose to streamline the process as described herein.

38.     The Debtors also believe that limiting service of the Sale Notices and Abandonment Notices to the Sale Notice Parties is justified under the circumstances. The Sale

-20-

Notice Parties represent the key parties in interest who should receive notice of any Proposed

Sale or Proposed Abandonment. In particular, Sale Notices and Abandonment Notices would be

served on the primary parties representing the interests of unsecured creditors of the Debtors'

estates, i.e., the United States Trustee and counsel to the Creditors' Committee, as well as any

relevant Governmental Authority or Surety. Under the circumstances, the Debtors believe that

this manner of notice is appropriate and fully preserves necessary due process rights.

39.     The Debtors also believe that the Miscellaneous Asset Procedures comport with

the hearing requirements of the Bankruptcy Code and due process by providing an opportunity

for the Sale Notice Parties to present Objections and request a hearing on each Proposed Sale and

Proposed Abandonment. Under these circumstances, a Proposed Sale or a Proposed

Abandonment may be approved without a hearing if, after being presented with the opportunity

to object and seek a determination of the Court, no Sale Notice Party requests a hearing.

***Approval of Sales Free and Clear***
***of Liens, Claims and Encumbrances***

40.     Pursuant to section 363(f) of the Bankruptcy Code, the Court may authorize the

sale of assets free and clear of existing liens, claims and encumbrances if (a) applicable non-

bankruptcy law permits the sale of such property free and clear of such interest, (b) the entity

holding the lien, claim or encumbrance consents to the proposed sale, (c) such interest is a lien

and the price at which such property is to be sold is greater than the aggregate value of all liens

on such property, (d) such interest is in bona fide dispute or (e) such entity could be compelled in

a legal or equitable proceeding to accept a money satisfaction of such interest. See Citicorp

Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that a

court may approve sale "free and clear" provided at least one of the  subsections is met). See also

Abir v. Stern, No. 09 CV 2872, 2010 WL 1170060, at *2 (E.D.N.Y.  Mar. 22, 2010) (SJF)

(quoting In re Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *34 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.")).

41.     The Debtors believe that the Sale Notice Procedures set forth above satisfy the requirements of section 363(f) of the Bankruptcy Code.  Among other things, if a holder of a lien, claim or encumbrance receives the requisite notice and does not object within the prescribed time period, the Debtors request that such holder be deemed to have consented to the proposed sale and that the property then may be sold free and clear of such holder's liens, claims or encumbrances.

**_Good Faith Status of Purchasers_**

42.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal."  11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Eighth Circuit Court of Appeals, in Sears v. U.S. Tr. (In re AFY) has held that:

> Lack of good faith is shown by misconduct surrounding the sale. Typically, the requisite misconduct necessary to establish a lack of good faith involves "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

734 F.3d 810, 818 (8th Cir. 2013) (quoting Badami v. Burgess (In re Burgess), 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000)); In re Burgess, 246 B.R. at 355-56 ("The relevant test is twofold: a good faith purchaser is one who buys in good faith and for value.").  See also In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the

precursor to section 363(m) of the Bankruptcy Code); SHF Holdings, LLC v. Allamakee Cty. (In re Agriprocessors, Inc.), 465 B.R. 822, 835-36 (Bankr. N.D. Iowa 2012) ("The rule is well established that to be a good faith purchaser for value, one must show that he made the purchase before he had notice of the claim of another, express or implied. . . . Federal bankruptcy cases appear to use the same test, and hold that the purchaser's knowledge of competing claims defeats good-faith-purchaser status.") (internal citations and quotations omitted).

***Approval of Assumption, Assumption and Assignment or
Rejection, as Applicable, of Executory Contracts and Unexpired Leases***

43.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease."

11 U.S.C. § 365(a).  Courts routinely approve motions to assume, assume and assign or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.  See In re Steaks to Go, Inc., 226 B.R. 35, 37 (Bankr. E.D. Mo. 1998) ("Generally, a Bankruptcy Court is to review a decision by a debtor in possession or a trustee to reject an executory contract, and order rejection if the rejection is based on the debtor or trustee's best business judgment in the circumstances."); In re Gateway Apparel, Inc., 210 B.R. 567, 570 (Bankr. E.D. Mo. 1997) ("The Court must examine the contract and the surrounding circumstances and apply the 'best business judgment' test to determine if assumption would be beneficial to the estate.") (citing Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993)).  See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts under section 365 of the Bankruptcy Code is that of "business judgment"); In re GP Express Airlines, Inc., 200 B.R. 222, 230 (Bankr. D. Neb. 1996) ("In deciding whether to approve a debtor's assumption of an executory contract, bankruptcy

-23-

courts usually apply the best business judgment test.  The best business judgment test generally requires a showing that assumption of an executory contract benefits and is in the best interests of the bankruptcy estate, and is the result of the exercise of reasonable business judgment.").

44.    Courts generally will not second-guess a debtor's reasonable and good-faith business judgment concerning the assumption or rejection of an executory contract or unexpired lease.  See, e.g., Food Barn Stores, 107 F.3d 558, 567 n.16 ("Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval 'as long as the proposed action appears to enhance the debtor's estate.'") (quoting Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985)); Crystalin, L.L.C., 293 B.R. at 464 ("If the initial test is met, the bankruptcy court should not interfere with the trustee or debtor-in-possession's business judgment 'except upon a finding of bad faith or gross abuse of their business discretion.'") (quoting Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985)).  The "business judgment" test is not a strict standard; it merely requires a showing that assumption of the executory contract will benefit the debtor's estate.  See Crystalin, L.L.C., 293 B.R. at 463-64 ("[The business judgment test] is not an onerous [test] and does not require the bankruptcy court to place 'itself in the position of trustee or debtor-in-possession and determin[e] whether assuming the lease would be a good business decision or a bad one.'") (quoting Orion Pictures Corp., 4 F.3d at 1099).

45.    The Debtors anticipate that certain Miscellaneous Asset Sales will require the Debtors to dispose of executory contracts or unexpired leases that are related to the Miscellaneous Assets to be sold.  As part of the negotiations with the purchaser or purchasers of the Miscellaneous Assets, the applicable Debtor may need to determine whether the purchaser will take assignment of such related contracts or leases that are assignable under applicable

nonbankruptcy law or whether the Debtor instead should reject any such contracts or leases. The Debtors believe that any such determination will fall squarely within their business judgment and will be made in the best interests of such Debtor's estate and creditors. Moreover, under the Sale Notice Procedures, the assumption, assumption and assignment or rejection of any contracts or leases will be accomplished only after providing notice (including the amount of any Cure Claim) to the nondebtor parties to such contracts and leases and all other interested parties, with an opportunity for such parties to object. Accordingly, the requirements of section 365 of the Bankruptcy Code will be satisfied under the Sale Notice Procedures.

### *Approval of Payment of Sale Fees*

46.    The payment of the Sale Fees  to Sale Professionals engaged by the Debtors in connection with the sale of Miscellaneous Assets pursuant to the Sale Notice Procedures is in the best interest of the Debtors' estates and their creditors. The Debtors believe that the use of Sale Professionals in certain circumstances will significantly aid in the timely disposition and realization of the maximum possible value for the Miscellaneous Assets. Payment of the Sale Fees pursuant to the Sale Notice Procedures will save the Debtors' estates the expenses associated with the Sale Professionals filing retention applications and will avoid the incurrence of additional fees for preparing and prosecuting interim fee applications. The Sale Fees will represent only a fraction of the value of any Miscellaneous Asset sold pursuant to the Sale Notice Procedures and are not significant relative to the aggregate size of the Debtors' estates. The Debtors believe that payment of the Sale Fees pursuant to the Sale Notice Procedures will provide an efficient means of compensating Sale Professionals and avoid the incurrence of these unnecessary administrative and professional expenses. Accordingly, approval of the payment of the Sale Fees pursuant to the Sale Notice Procedures is in the best interest of the Debtors' estates and their creditors.

### *Approval of Similar Procedures in Other Cases*

47.      Relief similar to that requested in this Motion has been granted in other large

chapter 11 cases in this District and elsewhere.  See, e.g., In re Arch Coal, Inc., No. 16-40120

(Bankr. E.D. Mo. Feb. 24, 2016) (Docket No. 398) (order approving procedures governing sales

under $2 million with no notice and up to $7.5 million with notice); accord In re Alpha Natural

Res., Inc., No. 15-33896 (Bankr. E.D. Va. Sept. 17, 2015) (Docket No. 466) (order approving

procedures governing sales of up to $2 million with no notice and $7.5 million with notice); In re

Patriot Coal Corp., No. 15-32450 (Bankr. E.D. Va. June 25, 2015) (Docket No. 398) (approving

procedures governing sales up to $1.5 million with no notice and up to $5 million with notice);

In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. Aug. 16, 2012) (Docket No. 372)

(approving procedures governing sales of under $1.5 million with no notice and up to $5 million

with notice); In re Old HB, Inc. (f/k/a Hostess Brands, Inc.), No. 12-22052 (Bankr. S.D.N.Y.

Feb. 22, 2012) (Docket No. 387) (approving procedures governing sales of up to $750,000

without notice and $4 million with notice); In re Oldco M Corp. (f/k/a Metaldyne Corp.),

No. 09-13412 (Bankr. S.D.N.Y. July 7, 2009 (Docket No. 392) (approving procedures governing

sales of up to $750,000 million in assets without notice and $3 million in assets with notice);

In re Nortel Networks, Inc., No. 09-10138 (Bankr. D. Del. Feb. 18, 2009) (Docket No. 322)

(approving procedures governing sales of up to $1.5 million in assets without notice and

$10 million in assets in a single transaction with notice up to an aggregate of $50 million per

purchaser); In re Dana Corp., No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) (Docket No. 739)

-26-

(approving procedures governing asset sales of up to $10 million per transaction with notice and up to $1 million without notice and the payment of related broker commissions).[14]

### **Request for Waiver of Stay**

48.     Pursuant to Bankruptcy Rules 6003(b), 6004(h) and 6006(d), the Debtors seek the entry of orders granting the relief requested by this Motion and, to the extent it applies, a waiver of any stay of the effectiveness of such orders.

49.     Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting … a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate including a motion to pay all or part of a claim that arose before the filing of the petition."  Fed. R. Bankr. P. 6003(b).  In other words, where the failure to grant any such requested relief would result in immediate and irreparable harm to the Debtors' estates, the Court may authorize the relief prior to the twenty-second day following the Petition Date.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Pursuant to Bankruptcy Rule 6006(d), "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

50.     Prior to the Petition Date, in the ordinary course of their business, the Debtors had begun, but did not complete, negations regarding numerous sales of Miscellaneous Assets.

---

[14]     Unreported orders cited herein are not attached to this Motion.  Copies of these orders will be made available to the Court or other parties upon request made to the Debtors' counsel.

After the Petition Date, the Debtors suspended the negotiation of such sales out of the abundance of caution, in order to first obtain the relief requested in this Motion. If any order granting the relief requested herein is subject to a stay, the Debtors may not be able to close the sales of Miscellaneous Assets negotiated prepetition, and thus may not be able receive the same return if forced to market the Miscellaneous Assets for a second time. It is important to note that all such sales would be subject to the procedures set forth herein, and, if the specific Miscellaneous Asset has a book value of over $3 million, the Notice Parties will have ten days after the delivery of a Sale Notice to object to such sales. Therefore, the Debtors respectfully submit that granting a waiver from the stay of the effectiveness of an order granting this motion will not prejudice any party in interest.

### Notice

51.     Notice of this Motion has been given to: (a) Davis Polk & Wardwell LLP and Bryan Cave LLP as counsel to Citibank, N.A. as Administrative Agent for the First Lien Secured Credit Facility and the Administrative Agent for the DIP Financing Agreement; (b) Brown Rudnick LLP, as counsel to Wilmington Savings Fund Society, FSB as trustee and collateral agent for the Secured Second Lien Notes; (c) Foley & Lardner LLP, as counsel to Wilmington Trust Company as Indenture Trustee for the Unsecured Notes; (d) Emmet, Marvin & Martin, LLP, as counsel to Computershare Trust Company, N.A. as resigning Indenture Trustee to the Convertible Notes; (e) Bank of Oklahoma, National Association as prospective Indenture Trustee to the Convertitible Notes; (f) Morrison & Foerster as counsel to the Creditors' Committee; (g) Mayer Brown LLP, as counsel to PNC Bank, N.A., as Administrator under the Debtors' prepetition accounts receivable securitization facility; (h) the United Mine Workers of America; (i) the Office of the United States Trustee for the Eastern District of Missouri; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Department

of the Interior; (m) the United States Department of Labor; (n) the United States Attorney's Office for the Eastern District of Missouri; and (o) Pension Benefit Guaranty Corporation (collectively, the "Notice Parties").  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

**<u>No Prior Request</u>**

52.    No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these chapter 11 cases.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WHEREFORE, the Debtors respectfully request that this Court:  (i) enter an order, substantially in the form submitted to the Court, granting the relief sought herein; and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: May 3, 2016
      St. Louis, Missouri

Respectfully submitted,

  /s/ Steven N. Cousins         
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
 St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 612-2239
Email:  scousins@armstrongteasdale.com
Email:  sehlers@armstrongteasdale.com

Heather Lennox
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Email:  hlennox@jonesday.com

Amy Edgy
Daniel T. Moss
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
Email:  aedgy@jonesday.com
Email:  dtmoss@jonesday.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

-30-

Proposed Order
(to be emailed to the Court)