**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Case No. 16-42529-399 |
| Peabody Energy Corporation, *et al.*, | CHAPTER 11 |
| Debtors. | (Jointly Administered) |

**AMENDED MOTION OF ARIZONA PUBLIC SERVICE COMPANY AND
PACIFICORP FOR ENTRY OF AN ORDER PURSUANT TO
11 U.S.C. §§ 556, 560 AND 362 AUTHORIZING MOVANTS TO
<u>ENFORCE TERMINATION PROVISIONS OF COAL SUPPLY AGREEMENT</u>**

Arizona Public Service Company ("**APS**") and PacifiCorp (collectively, the "**Movants**"), by their undersigned counsel, respectfully request that this Court enter an order under Sections 556, 560 and 362 of the Bankruptcy Code determining that the Movants are authorized to enforce the termination provisions in that certain Coal Supply Agreement, dated December 21, 2005 (as later amended in December 2013, the "**Agreement**"), by and between Peabody COALSALES, LLC (f/k/a COALSALES, LLC and hereinafter, "**CoalSales**" or the "**Debtor**"), a subsidiary of Peabody Energy Corporation (when together with CoalSales and the other affiliates filing for chapter 11 in the above-captioned cases, the "**Debtors**"), on the one hand, and APS and PacifiCorp, on the other hand (a copy of which would be annexed hereto as Exhibit A, but is the subject of a separate Motion to File Under Seal). In support thereof, the Movants rely on the Declaration of Bradley J. Albert of APS (the "**Albert Declaration**") (a copy of which is annexed hereto as Exhibit B), and the Declaration of Dana Ralston of PacifiCorp (the "**Ralston Declaration**") (a copy of which is annexed hereto as Exhibit C) and respectfully state the following:

1

### Introduction

1. The Bankruptcy Code provides unique protections to contract counterparties of a debtor who can demonstrate that they can satisfy the exceptions to the treatment of executory contracts under Section 365 of the Bankruptcy Code as set forth in Section 556 for forward contracts and Section 560 for commodity forward agreements that constitute swap agreements. In addition, Sections 362(b)(6) and 362(b)(17) provide corresponding exceptions to the automatic stay of Section 362(a) with respect to forward contracts and commodity forward agreements that are swap agreements respectively. More specifically, Sections 556 and 560 allow a debtor's counterparties to exercise their rights to terminate a forward contract or a commodity forward agreement that is a swap agreement pursuant to an *ipso facto* clause notwithstanding the general prohibition on the enforcement of *ipso facto* clauses under Section 365(e)(1). Similarly, Section 362(b)(6) exempts from the application of the automatic stay any exercise of remedies in connection with a forward contract while Section 362(b)(17) provides the same relief in respect of commodity forward agreements that are swap agreements.

2. These provisions fulfill a specific legislative policy that the termination and settlement of certain forward contracts by or with forward contract merchants and the termination of swap agreements by a swap participant represent an important interest in maintaining the dynamic and highly liquid nature of the commodities markets. The Agreement in these cases constitutes a forward contract and APS and PacifiCorp, on the one hand, and CoalSales, on the other hand, all qualify as forward contract merchants under the Bankruptcy Code. Furthermore, the Agreement also constitutes a commodity forward agreement and therefore a swap agreement for purposes of the Bankruptcy Code and by extension, APS and PacifiCorp qualify as swap participants. Accordingly, APS and PacifiCorp present this motion

(the "**Amended Motion**") for authorization to enforce the termination provisions of the Coal Supply Agreement under Section 556 or Section 560 of the Bankruptcy Code and the applicable subsections of Section 362(b) of the Bankruptcy Code.

### Jurisdiction and Venue

3. This Court has subject-matter jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(1). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

### Background

4. Both APS and PacifiCorp are vertically integrated electric utility companies that provide electricity generation, transmission, and other energy-related services. Entering into forward contracts for commodities such as coal and natural gas is a regular part of both parties' business practices. In fact, they both operate substantial around the clock trading floors to trade in the wholesale power market and each has used forward contracts with respect to long term power arrangements for many years. APS and PacifiCorp regularly use these forward contracts, in addition to other purchasing strategies that range from long-term to quarterly, monthly, daily and hourly purchases, to manage long-term supply costs and to hedge market risks. Many of these contracts mature more than two days after entry into the contract. APS and PacifiCorp are currently parties to a significant number of contracts for coal and other commodities with a variety of vendors and for varying terms.

5. APS's purchasing department and trading floor forecast APS's long-term supply needs and costs, to manage APS's energy costs and market risks as more fully set forth in the Albert Declaration. PacifiCorp's Fuel Resources group regularly and as part of its business

3

enters into long-term coal contracts for the benefit of each of its ten (10) coal-fired generating facilities.

6. On or around December 21, 2005, APS, PacifiCorp and the Debtor entered into the Agreement. Under the Agreement, APS and PacifiCorp agreed to acquire coal from CoalSales for delivery at the Cholla Generating Station in Northeastern Arizona each year over a term of nineteen years commencing January 1, 2006. (See Agreement, at Exh. A, §1.1). For each calendar year, the Agreement specified, among other things, the quantity and price for coal to be provided, subject to various adjustments and conditions. (See id. at §§3 and 4).

7. Section 11.6 of the Agreement provides that the "Agreement shall automatically terminate" if either party files a petition for bankruptcy relief. A clause that provides for the automatic termination of a contract, such as the clause in Section 11.6 of the Agreement, is commonly known as an "*ipso facto*" clause. *See* Lawrence P. King, *et al.* (ed.), 3 *Collier on Bankruptcy* ¶ 365.08[1] (16th Ed. 2016).

8. Under Sections 12.8 and 12.9 of the Agreement, the law of New Mexico and its applicable provisions of the Uniform Commercial Code (the "**U.C.C.**") govern the contract. The Agreement further provides that the coal supplied is deemed a "good" for the purposes of the U.C.C.

9. The Debtor filed its voluntary petition for bankruptcy relief on April 13, 2016 (the "**Petition Date**") and has continued to operate its business and affairs as a debtor and debtor in possession. The Office of the United States Trustee has appointed an official committee of unsecured creditors in these cases.

**Argument**

I. **This Court Should Authorize Termination of the Agreement as a Forward Contract under 11 U.S.C. §§ 556 and 362.**

10. Although *ipso facto* clauses are typically invalid under the Bankruptcy Code, *see* 11 U.S.C. § 365(e)(1), Section 556 of the Bankruptcy Code provides an exception to this default rule. Under the provisions of Section 556 applicable here:

> "[t]he contractual right of a commodity broker, financial participant, or forward contract merchant to cause the liquidation, termination, or acceleration of a commodity contract, as defined in section 761 of this title, or forward contract because of a condition of the kind specified in section 365(e)(1) of this title . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title.

11 U.S.C. § 556; *see also* 11 U.S.C. § 362(b)(6) (incorporating Section 556's exception as an exception to Section 362(a)). Accordingly, for the safe harbor to apply in this case, the *ipso facto* clause must arise from a "forward contract" by or with a "forward contract merchant." Both terms are defined by the Bankruptcy Code. *See* 11 U.S.C. § 101(25)-(26). As such, the statutory definitions are controlling. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1332 (2010).

A. **The Agreement is a forward contract.**

11. The Bankruptcy Code defines "forward contract" as

> a contract (other than a commodity contract as defined in section 761) for the purchase, sale, or transfer of a commodity, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into..."

11 U.S.C. § 101(25). While the Eighth Circuit has not addressed the meaning of "forward contract" under Section 101(25), the Fifth Circuit has explained that the term refers to a contract "for the future purchase or sale of commodities that are not subject to the rules of a contract

5

market or board of trade." *In re Olympic Nat. Gas Co.*, 294 F.3d 737, 741 (5th Cir. 2002). Similarly, outside of title 11, the Eighth Circuit has held that the "hallmark" of a "forward contract" is "the contemplation of physical delivery of the subject commodity" that occurs in the future. *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 991 (8th Cir. 1999) (distinguishing individualized forward contracts from exchange-traded commodities futures contracts under the Commodities Exchange Act). This interpretation is consistent with decisions from other courts of appeals. *See, e.g.*, *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 441 (7th Cir.2000); *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 579 (9th Cir.1982).

12. Accordingly, the elements of a "forward contract" under Section 101(25) can be summarized as (a) a contract for the sale of a commodity, (b) with a maturity date of greater than two days, that (c) does not fall within the scope of a "commodity contract." Here, the Agreement satisfies all three elements.

13. First, the Agreement is a contract that calls for the sale of coal, a commodity. (See Exh. A at §3.1). The Bankruptcy Code incorporates the definition of "commodity" from the Commodities Exchange Act, which defines the term as including "all goods and articles" except "onions" and "motion picture box office receipts." 11 U.S.C. § 7a(1)(9). Although there does not appear to be any case law that analyzes whether coal is a "good" that qualifies as a "commodity" under the Bankruptcy Code, coal appears to fall well within the plain and ordinary meaning of both "good" and "commodity." *See Taniguchi v. Kan Pac. Saipan Ltd.*, 132 S. Ct. 1997, 2003 (2012) (explaining that statutory language should be construed in the ordinary sense and when multiple meanings are possible, given the "more natural" meaning).

6

14. It is undisputed that the coal is a "good," as the parties stipulated in the Agreement that the coal supplied by the contract would be deemed "goods for the purposes of the U.C.C." (See Exh. A at §12.9.) And the U.C.C. definition includes as "goods" all things "movable at the time of identification to the contract for sale other than the money in which the price is paid." U.C.C. § 2-105. On the meaning of "commodity," Merriam-Webster defines as a "commodity" as "an economic good," including "a product of agriculture or mining" and "an article of commerce especially when delivered for shipment." Commodity, Merriam-Webster, *http://www.merriam-webster.com/dictionary/commodity* (last visited May 2, 2016); *see also* The New Shorter Oxford English Dictionary 452 (1993) (defining commodity as "a thing that is an object of trade."); *cf. In re Borden Chems. & Plastics Operating Ltd. P'ship*, 336 B.R. 214, 218 (Bankr. D. Del. 2006) (finding that "it can hardly be questioned that natural gas is a commodity under the [Bankruptcy] Code"). Accordingly, the most natural meaning of the statutory language includes coal—as an economic good, product of mining, and article of commerce delivered for shipment—within the broad scope of the term "commodity."

15. Second, the Agreement calls for the sale of coal at a specified quantity and price for each calendar year over a term of nineteen years. (See Exh. A at §1.1). As such, the Agreement's maturity date is far greater than the minimum term of two days.

16. Third, the Agreement (a) is an individualized contract between a supplier of coal and an end-user of coal, (b) calls for the actual delivery of coal to the Cholla Generating Station in Northeastern Arizona, and (c) is not a regulated, exchange-traded contract. Therefore, although in this case the Agreement may be a contract for a commodity, it is not considered a "commodity contract" as that term is used in Section 101(25) which refers to regulated, exchange-traded contracts for commodities. *Olympic*, 294 F.3d at 741 (*citing* 11 U.S.C.

7

§761(4));[1] *Grain Land*, 199 F.3d at 991; *see also Senate Report No. 95-989, 95th Cong. 2d Sess. 104(1978)* (noting that the term "commodity contract" means a commodity futures contract, a commodity option, or a leverage contract).

17. Accordingly, the Court should find that the Agreement is a "forward contract" under Sections 101(25) and 556.

### B. APS and PacifiCorp Are "Forward Contract Merchants" in their Own Right and Counterparties to the Debtor, a Forward Contract Merchant.

18. The Bankruptcy Code defines "forward contract merchant" as "an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in Section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." 11 U.S.C. § 101(26). As established above, the Agreement is a "forward contract." Therefore, under this statutory definition, APS and PacifiCorp are "forward contract merchants" if their businesses consist, in whole or in part, of entering into forward contracts "as or with merchants in a commodity." *Id*. Given this definition, the Movants should only have to demonstrate that they entered into a contract "with" a merchant, that is the Debtor, but they can also satisfy the definition in their own right.

19. The term "merchant" is not defined by the Bankruptcy Code and there is no Eighth Circuit law defining the term for the purpose of Section 101(26). The Eighth Circuit has, however, considered the term in the context of the U.C.C. And as explained by the Eighth Circuit, "[a] party is thus a 'merchant' of goods for purposes of the U.C.C. either: (1) by dealing in those goods; or (2) by way of specialized knowledge of the goods." *Regents of Univ. of Minn.*

---

[1] According to the Fifth Circuit, "commodity contracts" and "forward contracts" cover "the entirety of transactions in the commodity and forward contract markets." *Id.* (*quoting* Lawrence P. King *et al.* (ed.), 5 *Collier on Bankruptcy* ¶ 556.02[2], at 556-5 (15th ed. 2002)).

8

*v. Chief Indus. Inc.*, 106 F.3d 1409, 1411 (8th Cir. 1997) (considering Minnesota law, which like New Mexico, adopted the U.C.C. definition of "merchant").[2]

20. Under Eighth Circuit law, the first test—whether a party is a dealer—is satisfied when a party is either a seller of the goods subject to the transaction or is "a manufacturer with sophisticated knowledge of a component" and "incorporates that component into its product." *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 884 (8th Cir. 2000) (holding that a business that purchased wood preservatives for use in constructing custom windows and doors was a dealer of the wood preservatives). The second test—whether the purchasing party has specialized knowledge of the goods—is a fact-intensive inquiry, in which courts consider factors such as the party's history in purchasing such goods and technical knowledge of the goods. *See Regents of Univ. of Minn.*, 106 F.3d at 1409 (holding that a University had specialized knowledge of grain dryers based on (a) thirty years of purchasing experience, (b) its specialized purchasing department, and (c) its consultation with a prominent expert in grain drying in connection with the purchase); *Marvin Lumber*, 223 F.3d at 883 (citing with approval the district court's determination that the company's bargaining strength, long history of purchasing, and activity in an industry standard-setting organization was "strong evidence" of specialized knowledge).

21. Furthermore, the Eighth Circuit's definition of "merchant" is consistent with the text of Section 101(26), which defines "forward contract merchant" as any entity whose business, "in whole or in part," consists of entering into forward contracts (a) as a merchant in a commodity or (b) with a merchant in a commodity. § 101(26). As explained by the United States Bankruptcy Court for the District of Delaware, the plain meaning of the statutory text is

---

[2] The Eighth Circuit's definition of "merchant" is also congruent with the plain meaning of the term, which has traditionally encompassed businesses that deal in goods on a wholesale or retail level.

9

that "essentially any person that is in need of protection with respect to a forward contract in a business setting should be covered, except in the unusual instance of a forward contract between two nonmerchants who do not enter into forward contracts with merchants." *In re Borden Chemicals and Plastics Operating Ltd. P'ship*, 366 B.R. 214, 225 (Bankr. D. Del. 2006) (quoting 5 Collier On Bankruptcy ¶ 556.03[2] at 556-6 (15th ed. rev. 2001)).

22. Here, APS and PacifiCorp qualify as "forward contract merchants" under the plain text of Section 101(25) for two separate and independent reasons. First, they qualify as merchants in a commodity under Section 101(25) because each of them engages in a multiplicity of these transactions as part of the ordinary course of its business as set forth in the Albert Declaration and the Ralston Declaration respectively. Second, APS and PacifiCorp entered into a forward contract with CoalSales, one of the Debtors, which undoubtedly qualifies as a merchant of coal under all known authority.

23. Accordingly, this Court should find that APS and PacifiCorp, as well as the Debtor, are "forward contract merchants" and hold that the automatic stay does not apply to the Agreement.

### C. The *Mirant* Decision Lacks Precedential Value and Misinterprets the Bankruptcy Code.

24. By exempting a specific type of contract from the automatic stay, Congress acted specifically to address certain contracts and legislative intent should be inferred from the plain meaning of the words. After all, Congress wrote all sorts of other exemptions into the text of Section 365. There is nothing about this one exception that would render the remainder of section 365 "nonsensical" or "superfluous." *See United States v. Cook*, 594 F.3d 883, 891 (D.C. Cir. 2010).

25. Yet, some lower courts have held that a business that purchases commodities under a forward contract for actual use does not qualify as a "merchant". *See, e.g., In re Mirant Corp.*, 310 B.R. 548 (Bankr. N.D. Tex. 2004). In *Mirant*, the bankruptcy court held that the term "forward contract merchant," at least for the purpose of section 556, had to be narrowed to intermediaries to avoid a perceived absurd result: that allowing the end-users of commodities to benefit from the statutory provision would result in "virtually every person that is a party to a contract for goods or services . . . being permitted to ignore the automatic stay and enforce *ipso facto* clauses." *Id.* at 568 (citing § 101(25)).

26. *Mirant's* invocation of the absurdity doctrine to avoid the plain meaning of "merchant" was improper. First, it ignores the limitations inherent in the structure of section 556—that the exception to the automatic stay only applies to a specific class of contracts designated by Congress -- forward contracts for commodities. *See* 11 U.S.C. § 556. Second, even assuming that the *Mirant* court meant only to refer to forward contracts for commodities, its invocation of the absurdity doctrine with respect to who qualifies as forward contract merchant was still unjustified.[3] The Fifth Circuit has warned against adopting interpretations of these terms in the Bankruptcy Code to make unwarranted distinctions that do not otherwise exist. *See In re Olympic Nat. Gas Co.*, 294 F.3d at 742. Indeed, the use of broad statutory language to implement Congressional intent is not "absurd" in this instance because as the Fourth Circuit

---

[3] The canon against absurdities should be invoked only "where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone." *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 470-71 (1989) (Kennedy, J., concurring). This standard is extraordinarily high. *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 202-03 (1819) (stating that absurdity must be "so monstrous, that all mankind would, without hesitation, unite in rejecting" it); *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1334 (11th Cir. 2005) (citations omitted) (stating that absurdity must be "so gross as to shock the general moral or common sense . . . plainly at variance with the policy of the legislation as a whole."

pointed out in *National Gas*, "[e]ven though an overarching policy of the Bankruptcy Code is to provide equal distribution among creditors, . . .Congress intended to serve a countervailing policy of protecting financial markets and therefore favoring an entire class of instruments and participants." *In re National Gas Distributors, LLC*, 556 F.3d 247, 259 (4th Cir. 2009).

27. In this instance, APS and PacifiCorp are active participants in the markets for the trading of coal, electricity and other fuel supply commodities. They each run their own active trading desks and serve as participants in the broad markets for these commodities. As market participants who rely upon the continuing, uninterrupted nature and liquidity of these markets, they clearly qualify as the entities for whom the protections of Section 556 should apply.

## II.   The Agreement Constitutes a Commodity Forward Agreement and thus a Swap Agreement that May Also Be Terminated under 11 U.S.C. §§ 560 and 362.

28. Section 560 of the Bankruptcy Code provides a similar basis for relief for swap agreements which includes the Agreement that is at issue here. Section 560 provides, in relevant part, that:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation or acceleration of one or more swap agreements shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560. Similarly, Section 362(b)(17) of the Bankruptcy Code provides an exception to the automatic stay for swap agreements analogous to that found in Section 362(b)(6) for forward contracts.

### A.   The Agreement Qualifies as a Commodity Forward Agreement and thus, a Swap Agreement.

29. The definition of "swap agreement" under Section 101(53B) covers a broad spectrum of swap and derivative agreements including commodity forward agreements. *See generally* Alan N. Resnick and Henry J. Sommer, *Collier Bankruptcy Manual*, ¶¶560 and 101(53B) ("The definition of 'swap agreement' expressly covers a wide range of interest rate, foreign exchange, precious metals, equity, debt, credit, **commodity**, weather, emissions and inflation swap and derivative products.") (emphasis added). More specifically, it includes "any agreement...which is...a commodity index or a commodity swap, option, future, or forward agreement." *See* 11 U.S.C. §101(53B)(A)(i)(VII). In 2009, the Fourth Circuit Court of Appeals reasoned that the concept of a "commodity forward agreement" as found in Section 101(53B)(A)(i)(VII) is broader than the concept of a "forward contract" and thus, all forward contracts were commodity forward agreements within the meaning of the Bankruptcy Code. *See In re National Gas Dist.*, 556 F.3d at 256. The court further stated that the fact that a contract was for the physical delivery of a commodity (*i.e.* a supply contract) did not rule out the possibility that such a contract was a commodity forward agreement entitled to the safe harbors for swap agreements under the Bankruptcy Code. *Id*.

30. In *National Gas*, the trustee claimed that certain pre-bankruptcy gas supply contracts that *National Gas* had entered into with various counterparties were at below market rates and therefore were fraudulent conveyances that could be unwound by the court. The customers countered that the contracts in question were swap agreements and thus protected from avoidance actions pursuant to Section 546(g) concerning swap agreements. In ruling in favor of the counterparties, the Court of Appeals indicated that commodity forward agreements include by definition forward contracts. *See id*. at 256-257. In addition, a commodity forward

13

agreement should (i) concern the sale of a commodity, (ii) require payment at a fixed price at the time of contracting for delivery more than two days after the date the contract is entered into, (iii) be for a fixed time and quantity and (iv) need not be assignable. Id. at 259-260.

31. The Agreement here satisfies each of these elements in the same way that it satisfied the elements of a forward contract. First, there is no question that coal, a commodity, is the subject of the Agreement (*See* Exh. A at §3.1). Second, it requires payment of a fixed price, at the time of contracting for delivery more than two days after the contract date. (*See id*. at §4.1 regarding the Base Price, and Art. 1 regarding term.) Finally, pursuant to Section 12.7, the Agreement may only be assigned on a limited basis to a parent or an affiliate, as part of a merger or for the purpose of allowing the Debtor to employ subcontractors to perform certain of its measuring and delivery duties.

### B.   APS and PacifiCorp are Swap Participants.

32. Unlike the analysis that may be required to determine whether a party to the Agreement is a forward contract merchant under Section 101(26) of the Bankruptcy Code for purposes of the application of Section 556, the examination of Section 101(53C) is both simple and straightforward. All that Section 101(53C) requires in order for an entity to be a swap participant is that an entity have, at any time before the filing of the bankruptcy petition, an outstanding swap agreement with the debtor. *See* 11 U.S.C. §101(53C). Therefore, so long as this Court determines that the Agreement is a swap agreement pursuant to Section 101(53B), then by default APS and PacifiCorp are swap participants.

33. Accordingly, consistent with the reasoning of the Fourth Circuit Court of Appeals in *National Gas*, the Agreement also constitutes a commodity forward agreement and thus a "swap agreement" for purposes of Section 101(53B) of the Bankruptcy Code. On that basis, this

Court should determine that the Movants at their option can enforce the *ipso facto* clause in the Agreement in accordance with Sections 560 and 362(b)(17) of the Bankruptcy Code. The automatic stay does not prevent the Movants from exercising their rights in respect of the Agreement.

## Notice

34. In accordance with the *Order Establishing Certain Notice, Case Management and Administrative Procedures* (Docket No. 114) (the "Case Management Order"), notice of this Amended Motion has been given to (a) the Debtors, (b) all parties on the Master Service List (as defined in the Case Management Order) and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service. In light of the nature of the relief requested, the Movants submit that no further notice is necessary.

## No Prior Request

35. The Movants have not made any prior or similar request for the relief requested in this Amended Motion.

## Conclusion

WHEREFORE, the Movants respectfully requests that this Court enter an order (i) granting this Amended Motion authorizing the Movants to enforce the termination provisions of the Coal Supply Agreement pursuant to Sections 556, 560 and 362 of the Bankruptcy Code and (ii) granting such other and further relief as may be just and proper.

Dated: May 5, 2016
      St Louis, Missouri

Respectfully submitted,

POLSINELLI PC

By: /s/Matthew S. Layfield
    Matthew S. Layfield
    100 S. Fourth Street, Suite 1000
    St. Louis, MO 63102
    Tel. No. 314.889.8000
    Fax No. 314.231.1776
    Email: mlayfield@polsinelli.com

BAKER BOTTS L.L.P.

    Emanuel C. Grillo
    Michael Didriksen
    30 Rockefeller Plaza
    New York, New York 10112
    Tel No. 212.408.2500
    Fax No. 212 408.2501

*Counsel for Movants*