## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>       Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>Jointly Administered<br><br><br>Hearing Date and Time:<br>June 15, 2016 at 10:00 a.m. Central Time<br><br>Objection Deadline: June 8, 2016<br><br>Hearing Location:<br>United States Courthouse<br>Thomas F. Eagleton Federal Building<br>5th Floor, North Courtroom<br>111 S. 10th Street<br>St. Louis, Missouri  63102 |

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 503 OF THE BANKRUPTCY CODE, FOR AN ORDER APPROVING KEY EMPLOYEE RETENTION PLAN

Peabody Energy Corporation ("PEC") and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this

Court for entry of an order, pursuant to sections 105, 363(b), and 503(c)(3) of title 11 of the

United States Code (the "Bankruptcy Code") Rule 2002 of the Federal Rules of Bankruptcy

Procedure, for entry of an order approving the Debtors' key employee retention plan

(the "KERP"), and in support thereof, respectfully represent as follows:[1]

---

[1]   A copy of the proposed order will be made available on the Debtors' case website at http://www.kccllc.net/peabody.

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri.  PEC was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a wholly-owned direct or indirect subsidiary of PEC.

4.      PEC is the world's largest private-sector coal company (by volume), with 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators.  PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is exported to international customers.  As of December 31, 2015, Debtor PEC and its subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements. In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons of proven and probable coal reserves, and the Debtors generated sales of approximately 180 million tons of coal.  In addition to its mining operations, the Debtors market and broker coal from other coal producers across the United States, Australia, Europe and Asia.

5.      The Debtors operate in a competitive and highly regulated industry that has experienced strong headwinds and precipitously declining demand and pricing in recent years due to the rise of low priced alternative energy sources – including an abundance of natural gas.  Combined with these factors, slowing global economic growth drove a wide range of goods prices lower in 2015 and resulted in the largest broad market decline since 1991.  Indeed, demand from electric utilities in the United States alone declined approximately 110 million tons in 2015.  These market conditions, in connection with lower realized pricing in the United States and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-debtor subsidiaries' coal sales during 2015.

## Relief Requested

6.      By this Motion, the Debtors seek entry of an order (the "Order") authorizing and approving, pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, the Debtors to: (1) make payments to certain critical non-insider employees (collectively, the "Key Employees") under the terms of the KERP; (2) to alter, without further order of this Court the KERP Award (defined below) to be made to a Key Employee in the event that, in the sole judgment of the Debtors, the Key Employee is promoted or is affected by a department reorganization that warrants an alteration of the Key Employee's KERP Award; and (3) make payment to any non-insider employee not currently included in the KERP if such employee becomes, in the Debtors' sole judgment, a Key Employee during the pendency of these chapter 11 cases.  In support of the relief requested herein, the Debtors submit:  (a) the Declaration of John Dempsey, a partner at Mercer (US) Inc. ("Mercer") (the "Dempsey Declaration"), a copy of which is attached hereto as Exhibit A; and (b) the Declaration of Geoffrey M. Woodcroft, Acting Senior Vice President, Human Resources at PEC (the "Woodcroft Declaration), a copy of which is attached hereto as Exhibit B (together, the "KERP Declarations").

**Facts Relevant to this Motion**

7.      On the Petition Date, the Debtors filed the Motion of the Debtors and

Debtors in Possession for an Order: (I) Authorizing Payment of Prepetition Employee Wages

and Benefits; (II) Authorizing Payment and Continuation of Certain Postpetition Employee

Wages and Benefits; (III) Authorizing Payment of Costs and Expenses Incident to the Foregoing;

(IV) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and

(V) Granting Other Related Relief [Docket No. 18] (the "Wage & Benefit Motion").  In the

Wage & Benefit Motion, the Debtors sought authority to pay employees' prepetition and

postpetition wages and to continue a number of employee health and welfare benefit and

incentive programs in the ordinary course of business, including, among others, the Non-Insider

Long Term Incentive Plan (the "Non-Insider LTIP").  On April 14, 2016, the Court entered an

order granting in part the Wage & Benefit Motion, which granted the Debtors' requests except

for the Debtors' request for authority for the Non-Insider LTIP [Docket No. 109].  On

May  17,  2016, the Court granted final approval of the Wage & Benefit Motion as to the Non-

Insider LTIP [Docket No. 517].  The Non-Insider LTIP ensures that non-Insider employees are

compensated for their continuing contributions to improve the Debtors' operations.

8.      As described in the Woodcroft Declaration, there has been an

unprecedented decline in the coal industry in recent years that has had a deleterious effect on the

Debtors and their personnel.  In exit interviews, departing employees often stated that they were

changing industries or seeking higher levels of job security elsewhere.

9.      The involuntary departure of many employees, and the depressed

conditions of the coal industry in general, led to the voluntary departures of other employees.  In

2012, the Debtors' U.S. headcount for salaried employees was 1,655.  As of May 31, 2016, the

Debtors' U.S. headcount for salaried employees had decreased to 903, a drop of over 45%. During this time frame, the Debtors took actions aimed at creating a leaner organizational structure; however in addition to the involuntary departures, there were approximately 533 voluntary departures by salaried employees.  Between January 1, 2015 and May 31, 2016, the Debtors' U.S. headcount for salaried employees decreased by 147, a drop of  14%.  This includes a net headcount reduction of 24 salaried positions at the St. Louis location alone.  Additionally, 107 salaried employees voluntarily departed the St. Louis location during the same 17 month period.  To date, the Debtors' 2016 voluntary turnover among salaried employees classified as "corporate" is 24%.  With significant reductions in the Debtors' workforce over the past several years, the Debtors' business operates with a much smaller staff.  The increased workload on the remaining employees, combined with the well-publicized challenges facing the coal industry and recruiting from other employers, particularly with respect to those employees with transferable skills, have accelerated the departure of employees.

10.     Departing employees have become exceedingly difficult, if not impossible, to replace.  The challenges facing the Debtors' industry have led to the disruption of succession planning at all levels of the Debtors' business and in some instances, have created holes in critical skill areas.  Moreover, the Debtors' efforts to replace critical employees through recruitment have been hampered in recent years.  Given the current distressed state of the coal industry generally, and the Debtors' recent restructuring efforts, candidates with transferable skills are reluctant to commit to taking a position in the coal industry and/or relocating to accept a position with the Debtors.  These factors, combined with reductions in employee compensation programs offered by the Debtors,[2] have rendered the Debtors less able to compete with other

---

[2]     The Debtors: (i) made no performance contribution to the employee 401(k) plan for the first time since that feature was added to the plan in 1999; and (ii) decreased the awards provided to employees under the Non-

employers for highly qualified employees with transferable skills. As a result, the Debtors have been exposed to a critical talent drain in many departments, which they have attempted to address through the KERP.

### The KERP

11.     In an effort to protect their business and prevent the loss of Key Employees, the Debtors, in consultation with their advisors, have developed the KERP to promote stability in areas where their operations are at greatest risk. The goal of the KERP is to ensure that certain employees who are essential to the operation of the Debtors' business are retained.

12.     Through the selection process described below, the Debtors have identified 42 non-insider employees who are critical to the Debtors' continued business and successful reorganization of the estates (the "Key Employees"). The Key Employees work in various facets of the Debtors' business, including finance, operations, legal, sales, marketing, human resources and information technology.

13.     Generally, the Bankruptcy Court defines an "insider" to include, among other things, an "officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." In re Velo Holdings, Inc., 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation and quotation omitted). An employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code. See In re Borders Grp., Inc., 453 B.R. 459, 469-70 (Bankr. S.D.N.Y. 2011)

---

Insider Short Term Incentive Plan by 50% for calendar year 2015. It is also worth noting that prior to the Petition Date, the Debtors routinely provided equity awards under the Non-Insider LTIP. The value of that equity has obviously been diminished by the filing of these chapter 11 cases.

(noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director-level" employees in that case were not insiders); see also In re Patriot Coal Corp., 492 B.R. 518, 535 (Bankr. E.D. Mo. 2013) ("Whether an employee is an insider turns on the degree of involvement in the debtor's affairs . . . the label an employer chooses to attach to a position is not dispositive for purposes of insider analysis.") (internal quotation omitted).

14.    A successful chapter 11 reorganization depends on the Key Employees staying with the business.  As discussed above in paragraph 12, for purposes of eligibility in the KERP, the Debtors only considered non-insider employees.  Although some of the Key Employees are technically labeled "officers" of Debtor PEC, the Key Employees do not exercise sufficient authority to dictate corporate policy.  Indeed, such employees have these titles with Debtor PEC to enable them to perform ministerial tasks at the direction of others.  Moreover, none of the Key Employees report directly to the Debtors' board of directors; rather, each Key Employee reports to a more senior management employee and must obtain approval from that senior manager before taking any significant actions with respect to the Debtors' corporate policies or the disposition of significant assets.  Therefore, no Key Employee is an "insider" of the Debtors (as such term is defined by the Bankruptcy Code), and the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the KERP.

15.    To select the Key Employees, the Debtors' executive team conducted extensive due diligence.  The executive team first identified employees critical to the Debtors' organizational structure and necessary for the day-to-day functions of the Debtors' business.  Once identified, the executive team further evaluated each employee on the basis of his or her job's importance and the likelihood of retaining such employee.  Specifically, factors considered

by the executive team included: (a) whether the employee's unique skills or experiences were crucial to the Debtors' operations and for emerging from the restructuring process in an efficient fashion; (b) the likelihood of the employee's departure, given the anticipated demand for the employee's knowledge and skill in the marketplace; and (c) the time, expense and ease of finding an adequate replacement should such an employee leave.

16.    Based on their evaluation of these and other criteria, the executive team identified the Key Employees, who are critical to operations and would be too costly, time consuming or expensive to replace.  The executive team then divided the Key Employees into three tiers based on their relative importance to retain, difficulty of replacement and likelihood of departure.  The executive team also considered whether a Key Employee is entitled to payment under the Non-Insider LTIP.  Initially, award sizes were determined in comparison to typical awards for KERPs based on the level in the organization and tier.  The Debtors, in consultation with Mercer, reduced the award sizes to take into account the existing cash long-term incentive awards under the Non-Insider LTIP.  Tier 3 participants were typically not eligible for long-term incentives under the Non-Insider LTIP.  The variation within a given tier is due to the distinctions between the job duties of the employees located within a tier.

17.    The tier in which a Key Employee is placed, and his or her position within the Debtors determines the size of the KERP Award.  The awards are defined as percentages of base salary and range from 40% (a Tier 1 senior vice president) to 25% (a Tier 3 individual contributor).

18.    The Debtors tailored the KERP to incentivize the Key Employees to remain with the Debtors through the Debtors' emergence from these chapter 11 cases.  If a Key Employee is still employed by the Debtors on the date the Debtors emerge from these chapter 11

cases, then the Key Employee will receive a payment under the terms of the KERP (a "KERP Award").  If a Key Employee is not employed by the Debtors on the date the Debtors emerge from these chapter 11 cases, the Key Employee will *not* receive a KERP Award.

19.    In total, the KERP will cost the Debtors no more than $3.24 million (the "KERP Funds").  As currently drafted, and as reflected in the KERP Schedule (defined below), the KERP will cost the Debtors approximately $2.74 million.  The highest potential KERP Award for any individual Key Employee is $134,000.  The Key Employees will only receive their KERP Award upon the Debtors' emergence from chapter 11.  If a Key Employee leaves the Debtors' employment prior to the Debtors' emergence from chapter 11, that Key Employee will not be entitled to any payment under the KERP.  The Dempsey Declaration, attached hereto as Exhibit A, includes a schedule that details the job title, KERP tier, base salary, Non-Insider LTIP award (if applicable) and KERP Award for each Key Employee (the "KERP Schedule").[3]

20.    The Debtors, in consultation with Mercer, drafted the KERP to align with similar programs created by companies of similar size.  As of the Petition Date, the Debtors had more than $10 billion in assets.  However, in order to ensure that the KERP was not excessive, the Debtors and Mercer focused on KERP plans developed by companies with over $3 billion in assets.

21.    In reviewing the KERP plans of companies with more than $3 billion in assets, the Debtors concluded that: (a) plans in the lowest quartile of overall cost were plans valued at less than $2.10 million; (b) plans in the second quartile were valued between $2.10 million and $4.40 million; (c) plans in the third quartile were valued between $4.40 million and $12.15 million; and (d) plans in the highest quartile were valued above $12.15 million.  Given

---

[3]    Contemporaneously with the filing of this Motion, the Debtors filed a motion seeking authority to file certain aspects of the KERP Schedule under seal.

the size of the Debtors, the Debtors believe that the KERP Plan's cost, which lands squarely in the second quartile described above, is appropriate.

22.    Due to the high rate of employment turnover at the Debtors' business to date, the Debtors anticipate that some employees, including Key Employees, may voluntarily end their employment during the pendency of these cases.  The Debtors believe that the departure of any Key Employees will cause hardship to the Debtors' operations and path to emerge from chapter 11 efficiently, and it will then become even more crucial for the Debtors to retain talented and experienced employees.  In addition, those employees may be promoted or asked to take on significantly greater responsibility.  The Debtors therefore request that the Court authorize, but not direct the Debtors to: (a) modify any Key Employee's KERP Award, without further order of the Court, in the event that such Key Employee is promoted or is affected by a department reorganization that, in the sole judgment of the Debtors utilizing the methodology described in paragraphs 15-18 above, warrants an adjustment to the Key Employee's KERP Award; and (b) to provide a KERP Award to any non-insider employee not currently included in the KERP if such employee becomes, in the sole judgment of the Debtors utilizing the methodology described in paragraphs 15-18 above, a Key Employee during the pendency of these chapter 11 cases.  Notwithstanding the above, the KERP Funds will not exceed $3.24 million without further order of this Court.

23.    In the event that the Debtors determine to amend the KERP as described in paragraph 22 (a "KERP Amendment") and such KERP Amendment increases the total amount of KERP Funds expected to be paid out under the KERP to an amount greater than the total cost listed in the KERP Schedule, the Debtors shall provide five days notice (the "Notice Period") with opportunity to object to (i) the Office of the United States Trustee for the Eastern District of

10

Missouri, (ii) Davis Polk & Wardwell LLP and Bryan Cave LLP, as counsel to Citibank, N.A. as

Administrative Agent for the First Lien Secured Credit Facility and  the Administrative Agent

for the DIP Financing Agreement and (iii) Morrison & Foerster, as counsel to the Official

Committee of Unsecured Creditors (collectively, the "Notice Parties").  If the Notice Period runs,

and no Notice Party serves an objection, the Debtors request the authority to finalize the KERP

Amendment without further order of this Court.  Any objection must be in writing and served on

the Debtors and the Notice Parties so as to be received by all such parties prior to expiration of

the Notice Period.  Each Objection must state with specificity the grounds for objection.

24.     If an objection is properly served, the KERP Amendment may not be

finalized absent (a) a written withdrawal of the objection, or (b) entry of an order of the Court

specifically approving the KERP Amendment.

### Basis for Relief Requested

25.     As described above, the Debtors structured the KERP to motivate the Key

Employees to remain with the Debtors, continue their increased efforts to manage and operate

the Debtors and to maximize the value of the estates through the emergence of the Debtors from

these chapter 11 proceedings.  Courts in this district have approved similar retention plans.

See, e.g., Patriot Coal, 492 B.R. 518 (Bankr. E.D. Mo. 2013); In re Falcon Products, Inc.,

No. 05-41108-399 (BSS) (Docket No. 578).

26.     Bankruptcy courts have broad authority and discretion under section 105

of the Bankruptcy Code to enforce the provisions of the Bankruptcy Code.  Sections 105(a) of

the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title.  No provision of this title
> providing for the raising of an issue by a party in interest shall be construed to
> preclude the court from, sua sponte, taking any action or making any

determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

27.     Here, approval of the KERP will ensure that the value of the Debtors' estates is maximized for the benefit of the Debtors' estates and creditors.  The KERP is appropriate under Section 363(b) of the Bankruptcy Code, which provides that the Debtors "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The "business judgment standard" governs a court's approval of a debtor's non-ordinary course use of estate assets.  See Inst. Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); Patriot Coal, 492 B.R. at 530-31 (Bankr. E.D. Mo. 2013) ("Any transfer made outside the ordinary course of business for the benefit of officers, managers or consultants hired after the date of the filing of the petition must be justified by the facts and circumstances of the case, which ordinarily means that the business judgment standard of Section 363(b) applies"); In re Corn Advantage Coop., No. 09-01222, 2012 WL 4059894, at *2 (Bankr. N.D. Iowa Sept. 14, 2012) ("[I]f it is in the best interest of the estate, the court may approve a sale of estate property outside the ordinary course of business under § 363.").

28.     The KERP reflects the Debtors' reasoned use of their business judgment. The Debtors need their Key Employees to remain with the business during the reorganization process.  A retention program like the KERP is justified by the need to reduce turnover, hiring

costs and inefficiency caused by additional departures.[4]  To maximize the value of the estates, the Debtors must reduce attrition and promote stability in order to focus on a smooth and efficient reorganization.  The KERP achieves these important goals.

29.    The KERP is also appropriate under section 503(c)(3) of the Bankruptcy Code.  Section 503(c) limits payments to insiders and employees of the Debtors.  Subsections 503(c)(1) and (2) limit payments to insiders of a debtor; these subsections are not applicable here, as none of the Key Employees are insiders.  Instead, Section 503(c)(3) is the applicable provision.  That subsection prohibits "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to . . . officers, managers, or consultants hired after the date of the filing of the petition."  11 U.S.C. § 503(c)(3).

30.    The standard under section 503(c)(3) is generally the same as the business judgment standard.  See Patriot Coal., 492 B.R. at 530-31 ("Any transfer made outside the ordinary course of business for the benefit of officers, managers or consultants hired after the date of the filing of the petition must be justified by the facts and circumstances of the case, which ordinarily means that the business judgment standard of Section 363(b) applies."); Velo Holdings, 472 B.R. at 212 ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).").

31.    In determining whether an incentive plan meets the business judgment test, a court considers the following factors:

---

[4]    For the 28 Key Employees who have already been granted an award this fiscal year under the Non-Insider LTIP, the Debtors believe that additional incentives will promote further stability.  And as provided above, those Key Employees already subject to the Non-Insider LTIP will receive lower KERP bonuses, as their potential KERP Awards were lowered in reflection of their amounts due under the Non-Insider LTIP.

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
- Is the plan or proposal consistent with industry standards?
- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Patriot Coal, 492 B.R. at 531 (quoting In re Dana Corp., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006)).  These factors all support a finding that the KERP as presented here is a sound exercise of the Debtors' business judgment.

32.    The Debtors worked with their consultants to structure the KERP to achieve the desired results.  The KERP is a sound exercise of business judgment because it allows the Debtors to avoid the cost and delay associated with the loss of personnel and experience.  See, e.g., In re Residential Capital, LLC, 491 B.R. 73, 85 (Bankr. S.D.N.Y. 2013) ("The continuity promoted, and the institutional knowledge preserved, by the retention of such employees will increase the chances of successfully implementing the Debtors' wind-down plan.").

33.    As shown above, the Key Employees are essential to the Debtors' business because of their experience, knowledge and difficulty to replace.  The Debtors selected the Key Employees based on, among other factors, the importance of the Key Employee's position, the difficulty of replacement and the likelihood that a Key Employee would depart the Debtors for employment elsewhere.

14

34.     Prior to the date of this Motion, a number of the Debtors' personnel have voluntarily terminated their employment with the Debtors.  The Debtors cannot afford any additional attrition, as they currently operate with a reduced staff that has taken on additional duties in order to promote the success of the reorganization.  Through the KERP, the Key Employees will be incentivized to remain with the Debtors during the reorganization process, thereby promoting stability and efficiency in the Debtors' operations.

35.     The cost of the KERP is also reasonable considering the Debtors' assets and liabilities.  The Debtors operate a global corporate structure, which requires efficient operations and communications at all levels.  The Debtors have selected 42 Key Employees from seven different areas of the Debtors' business.  These Key Employees provide vital services necessary for the functioning of the Debtors' day-to-day business operations.  The KERP is large enough to cover Key Employees who perform these vital service roles but costs no more than necessary to incentivize the crucial Key Employees to continue providing these services to the Debtors.

36.     Similarly, the scope of the KERP is reasonable and fair.  The Debtors designed the KERP to cover those employees considered essential to their business during these chapter 11 cases, and, accordingly, limited the number of employees eligible for a KERP Award. Given the possibility that a Key Employee may voluntarily terminate his or her employment with the Debtors, or that a non-insider employee not currently included in the KERP will show himself or herself to be vital to the Debtors during the pendency of these chapter 11 cases, the Debtors ask the Court to authorize the Debtors to award a non-insider employee who may later be designated as a Key Employee with a KERP Award.  This is fair because the Debtors require the ability to act quickly to incentivize remaining employees to stay with the Debtors.

15

37.     The KERP is consistent with industry standards as well.  In developing the KERP, the Debtors and their consultant compared the KERP to KERPs in the bankruptcy cases of Patriot Coal Corp., Walter Energy, Inc. and James River Coal Inc., as well as to the pre-petition retention plans approved in Alpha Natural Resources, Inc. and Arch Coal, Inc. (collectively, the "KERP Comparables").  The Debtors had a larger dollar amount of prepetition assets than any of the before-mentioned entities, yet the amount of the KERP Funds here is just above the median of the total cost of the KERP Comparables.  See, Dempsey Declaration, ¶¶ 19-23.  Given that the Debtors' total assets are significantly larger than other industry participants, the Debtors believe the plan cost is imminently reasonable and reflects fair market conditions.

38.     The KERP is also appropriate under the remaining two factors cited above. The Debtors engaged in significant due diligence regarding the size and scope of the KERP and engaged the services of Mercer in designing the plan.  The Debtors considered multiple factors, detailed above, in selecting the Key Employees and placing them into the appropriate tiers.  The Debtors conducted a particularized inquiry into the Key Employee's likelihood of departure, factoring in both an employee's selection as a Key Employee as well as the tier into which such employee was placed.

39.     In total, the Debtors respectfully submit that the KERP is a sound exercise of the Debtors' business judgment, is justified by the facts and circumstances of these chapter 11 proceedings, and that, if approved, the KERP will promote an increase in the value of the Debtors' estates for the benefit of the Debtors, their creditors and other stakeholders.

## Notice

40.     In accordance with the Order Establishing Certain Notice, Case Management and Administrative Procedures (Docket No. 114) (the "Case Management Order"),

16

notice of this Motion has been given to (a) all parties on the Master Service List (as defined in the Case Management Order) and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

### No Previous Request

41.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter an order, substantially in the form that was submitted to the Court, granting the relief requested herein; and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: June 1, 2016
      St. Louis, Missouri

Respectfully submitted,

*/s/ Steven N. Cousins*
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 612-2239
Email:  scousins@armstrongteasdale.com
Email:  sehlers@armstrongteasdale.com

Heather Lennox (admitted *pro hac vice*)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Amy Edgy (admitted *pro hac vice*)
Daniel T. Moss (admitted *pro hac vice*)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Attorneys for Debtors and*
*Debtors in Possession*

## Exhibit A

**Declaration of John Dempsey**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

In re:

Peabody Energy Corporation, et al.,

                Debtors.

Case No. 16-42529-399
CHAPTER 11

Jointly Administered

## DECLARATION OF JOHN DEMPSEY IN SUPPORT OF MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 503 OF THE BANKRUPTCY CODE, FOR AN ORDER APPROVING KEY EMPLOYEE RETENTION PLAN

**I, JOHN DEMPSEY**, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

      1.      I am a partner at Mercer (US) Inc. ("Mercer"). My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606. Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "Debtors").

      2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge and experience, my review of publicly available and proprietary information regarding incentive and retention plans in chapter 11 cases and information learned from my review of relevant documents and information supplied to me by management and advisors of the Debtors. I am authorized to submit this declaration in support of the Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 363 and 503 of the Bankruptcy Code, for an Order Approving Key Employee Retention Plan (the "Motion"),

filed contemporaneously herewith.[1]  If called upon to testify, I would testify to the facts and opinions set forth herein.

### Professional Background and Qualifications

3.       I am an expert in executive and management compensation with over 20 years of experience in the field.  I have familiarized myself with the Debtors' operations and unique challenges, gathered relevant market data on incentives and retention payments in chapter 11 cases, reviewed data regarding the compensation levels at the Debtors' peer companies, assisted the Debtors in developing the KERP and analyzed whether those programs are consistent with typical market practice.  My analysis (discussed further below) is attached as Exhibit 2.

4.       I joined Mercer following my graduation from Yale University and have worked out of the firm's offices in Chicago, Cleveland and London.  I received an MBA in 1992 from The Ohio State University.  I have been a Principal or Partner at Mercer for approximately 16 years.  Mercer offers a wide variety of services to private and public clients, including expert analysis of executive and management compensation.  Mercer has access to a broad range of market compensation data, including data specific to companies in chapter 11 cases, and has substantial expertise in designing such programs for companies in the midst of restructuring or bankruptcy.

5.       I have extensive experience advising organizations undergoing major financial transitions including bankruptcies, IPOs, LBOs and acquisitions, on compensation issues, and with designing annual and multi-year incentive programs, change in control arrangements and employment agreements.  My recent bankruptcy-related engagements include

---

[1]        I have reviewed the Motion.  Capitalized terms not otherwise defined herein have the same meanings as in the Motion.

Arch Coal, SunEdison, Dendreon, Altegrity, Allied Nevada, James River, Exide Technologies,

RIH Acquisitions NJ, Residential Capital, Overseas Shipholding Group, Allied Systems

Holdings, Patriot Coal, Borders, Synagro Technologies, Nortel Networks, Tribune Company,

Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia

Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion,

Dana, Owens Corning, Kaiser Aluminum, Solutia, Ogelebay Norton, Citation, Intermet, Venture

Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation and FLAG Telecom.

      6.      Additionally, I published an article entitled *Bankruptcy Blues: Retaining*

*Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of

Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August

2008.  I have been frequently quoted on issues relating to effective transitional compensation

practices in such publications as HR Magazine, Cox News and the Atlanta Journal Constitution.

In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune and the

Milwaukee Journal Sentinel.  I have also presented at the National Meeting of the Conference

Board, the National Association of Stock Plan Professionals and the National Center for

Employee Ownership.

      7.      In 2010, my testimony was proffered and accepted in connection with the

approval of Nortel's Special Incentive Plan and Tribune's 2010 Management Incentive Plan.  On

March 11, 2011, my testimony was proffered and accepted during Tribune's confirmation

hearing.  On February 2, 2013, I testified in connection with a review of the compensation of the

CEO of Fastbucks.  On March 21, 2013, I testified in connection with the approval of a non-

executive incentive plan and other compensation and benefit arrangements for Overseas

Shipholding Group.  On April 11, 2013, my testimony was proffered in connection with the

approval of the estate KEIP in Residential Capital.  In Exide, my testimony was proffered on

August 15, 2013 in connection with the approval of the AIP and KERP and on September 17,

2013 in connection with the KEIP.  On December 16, 2013, I testified in connection with the

approval of the KEIP for RIH Acquisitions NJ LLC.  On January 30, 2014, my testimony was

proffered in connection with the approval of the Chief Restructuring Officer's success fee in

Residential Capital.

### Mercer's Independent Development of the KERP

8.     Based on my analysis, I have concluded that the payouts proposed under

the KERP, and the allocation thereof, are reasonable and consistent with market practice.  This

conclusion is based upon a comparison (discussed below) of the design structures and proposed

payouts under the KERP with market data regarding incentive and retention payments for other

companies going through chapter 11.

9.     To ensure a successful restructuring process, the Debtors enlisted the

services of Mercer on approximately March 21, 2016.  The Debtors selected Mercer because

Mercer specializes in designing executive and employee incentive, retention and severance plans

for companies undergoing chapter 11 and has access to large amounts of industry compensation

data.

10.    Together, the Debtors and Mercer reviewed the Debtors' objectives during

these chapter 11 cases and the necessary features of incentive and retention plans.  In concert

with the Debtors, Mercer designed the KERP, bearing in mind the Debtors' goals of maximizing

the value of their estates, including the maximization of cash flow, the advancement of key

strategic projects and ensuring effective management throughout these chapter 11 cases.  The

KERP underwent multiple rounds of revisions between the Debtors' senior management and

4

Mercer before being reviewed by the compensation committee of the Debtors' Board of Directors (the "Compensation Committee") and approved by the Debtors' senior management.

11.     From April 1 to May 20, Mercer, other advisors and members of the Debtors' human resources staff discussed the terms of the KERP and conducted due diligence. As a result of this process, the KERP was designed with input from the Debtors' human resources department as well as with input from line managers who identified participants based on the selected criteria.

12.     On May 24, 2016, the Debtors began discussions with the advisors to the Debtors' DIP Lenders regarding the terms of the KERP.  Discussions between the Debtors and the DIP Lenders are ongoing.

13.     On May 24, 2016 the Debtors began discussions with the advisors to the official committee of unsecured creditors (the "Creditors' Committee").  Discussions between the Debtors and the Creditors' Committee are ongoing.

## The KERP

14.     Mercer worked closely with advisors and members of the Debtors' senior management to ensure the KERP is reasonably tailored to achieve the Debtors' desired results and is fair and reasonable in application.

15.     The Debtors and Mercer identified forty-two (42) employees who are critical to the Debtors' continued operations and successful reorganization (the "Key Employees").  The job titles of the Key Employees are listed on the KERP Schedule, attached hereto as Exhibit 1.[2]  The Key Employees represent a cross-section of various functions within

---

[2]     Contemporaneously with the filing of this Declaration, the Debtors filed a motion to seal certain aspects of the KERP Schedule.

the Debtors' businesses, including operations, information technology, finance, operations, legal, sales, marketing, human resources and information technology.

16.    The Key Employees cannot readily or easily be replaced.  The Debtors and Mercer determined that there would be a disproportionate and negative impact on the Debtors' estates if any of the Key Employees left the Debtors' employ.  As a consequence, the Debtors and Mercer determined that the KERP would serve as an effective program to retain key employees during these chapter 11 cases, and that the costs of the KERP are outweighed by the benefit of ensuring the Key Employees remain with the Debtors.

17.    Key Employees are divided into the following tiers: (i) KERP Tier 1, with payouts of 40% of base salary; (ii) KERP Tier 2, with payouts between 25-40% of base salary; and (iii) KERP Tier 3, with payouts of 25-30% of base salary.

18.    Selection of a Key Employee's KERP tier was based largely on three factors:  job importance, difficulty to replace and risk of attrition.  Key Employees placed in Tier 1 were determined to be the most critical to retain, due to a high job importance, difficulty to replace and high risk of attrition.  Key Employees placed in Tier 2 were deemed critical to retain, due to either high job importance or high risk of attrition.  Key Employees placed in Tier 3 were deemed to have high job importance, but with a relatively lower replacement difficulty and/or attrition risk when compared to the Tier 1 and Tier 2 Key Employees.  To earn the full retention payment, Key Employees must be employed until the Debtors' emergence from chapter 11. Initially, award sizes were determined in comparison to typical awards for KERPs based on the level in the organization and tier.  A tier 1 non-insider executive would typically have an award of 75% of base salary, while a Tier 3 individual contributor would receive 25% of base salary. The Debtors, in consultation with Mercer, reduced the award sizes to take into account the

6

existing cash long-term incentive awards under the Debtors' Non-Insider LTIP.  Tier 3

participants generally were usually not eligible for long-term incentives under the Debtors' Non-

Insider LTIP.  As a result, their awards are between 25% and 30% of their base salary.  The

combined value of the KERP and Non-Insider LTIP for these Tier 3 Key Employees was smaller

than Tier 1 and Tier 2 participants.

### Assessment of the KERP

19.     Mercer worked closely with the Debtors to ensure the KERP is reasonable

in cost and consistent with industry standards.  The Debtors and Mercer designed the KERP

based upon market comparisons and studies reviewed by Mercer.

20.     In developing the KERP, Mercer sought to find comparable companies

that obtained bankruptcy court approval of retention plans under similar circumstances.  In

undertaking this search, Mercer analyzed approved retention plans of entities with at least $3

billion in total assets, and Mercer limited the retention plans it reviewed to those that retained

employees in various support functions (e.g., HR, IT, sales, finance, accounting), rather than

those that were clearly applicable only to rank-and-file employees (e.g., retail store workers).

21.     Applying these criteria, Mercer compared the KERP to retention plans

approved in seven prior cases.  Mercer's analysis of the KERP relative to the comparable

retention plans demonstrates that the KERP is reasonable in cost and consistent with industry

standards:

| Summary Statistics | Number of Participants | Aggregate Payout | Per-Participant Average |
|---|---|---|---|
| 25th | 38 | $2.10MM | $35.35K |
| 50th | 155 | $4.40MM | $44.00K |
| 75th | 247 | $12.15MM | $69.5K |

7

| | *Number of Participants* | *Aggregate Payout* | *Per-Participant Average* |
|---|---|---|---|
| *Peabody* | 42 | $2.74MM | $65.2K |
| *Percentile* | 28% | 37% | 70% |

22.     Based on my experience and Mercer's independent analysis, the proposed KERP payments are well within the range of market norms for retention payments paid to key employees during the chapter 11 process.  Through my work, I am aware of seven recent chapter 11 cases involving assets in excess of $3 billion in which an incentive or retention plan was approved by the court.

23.     Based on my experience and the work I have done in this case and the independent analysis performed by Mercer, it is my opinion that the Debtors' KERP is reasonable, within market norms and tailored to retain the Key Employees to maximize value for stakeholders in the Debtors' chapter 11 cases and ensure the efficient management of the Debtors' ongoing business.

24.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   June 1, 2016
         Chicago, Illinois

                                   */s/ John Dempsey*
                                   John Dempsey
                                   Partner
                                   Mercer (US) Inc.

8

**<u>Exhibit 1</u>**

**KERP Schedule**

**Exhibit 1**

**(To Be Filed Under Seal)**

**Exhibit 2**

HEALTH WEALTH CAREER

# PEABODY ENERGY

## PROPOSED KEY EMPLOYEE RETENTION PLAN MARKET COMPARISON

June 1, 2016



John Dempsey
+1 312 917 0609
john.dempsey@mercer.com



MAKE TOMORROW, TODAY    MERCER

# BACKGROUND & CONTEXT

- Mercer was engaged by Peabody Energy ("Peabody") to advise on market practice and the design of compensation programs to be implemented in the event of a filling for bankruptcy under Chapter 11 of the US Bankruptcy Code

# COAL INDUSTRY 2015 BANKRUPTCY PRECEDENTS APPROACHES HAVE VARIED WIDELY

- **The recent bankruptcies have all provided for a retention program and three of the four have provided for an incentive program**

- **Arch**: Arch's wage motion provides for continuation of incentive compensation programs for non-Insiders

  – To date, nothing has been filed or publicly disclosed with respect to compensation for insiders

  – It would be consistent with the wage motion for Arch to consider its ICP plan and cash-based Performance Units during 2016; according to its proxy statements, Performance Units represent 30% of the target long-term incentive value

  – Since Arch is expected to emerge from Chapter 11 prior to the payment of incentive compensation in early 2017, Arch may not have seek authority to continue its programs

  – Arch disclosed in its schedules  that it made $8 million of payments to insiders; since Arch has not filed any 8-k disclosure associated with any pre-payment, it is probable that these payments are associated with previously disclosed incentive compensation arrangements such as its 2015 incentive compensation plan and 2013 – 2015 performance units

  – Arch continued under its wage motion its pre-petition retention program with respect to non-insiders

- **Walter:**  Walter did not win authority to continue its incentive compensation programs under its wage motion

  – Walter sought and won authority to implement a KERP costing approximately $2 million and covering 26 people

  – Prior to filing, Walter had paid $5.6 million to 5 executives, including $2.4 million to the CEO as part of a 3 year retention award

- **Alpha:** Alpha implemented a package of incentive and retention programs

- **Patriot (2015):**  Patriot adopted a KERP costing $2.88 million

*Privileged and Confidential; Prepared at the Request of Counsel*

**KERP**



© MERCER 2015

3

# KERP
# AWARD SIZE DEVELOPMENT GUIDELINES

- To determine award sizes, companies conduct a criticality assessment of each employee eligible for the KERP and usually assign each employee to either Tier 1, 2, or 3 based on that assessment

- Critical roles include:
  - Positions critical to driving the strategic objectives of the company
  - Restructuring focused (finance, legal)
  - Critical to the operations of the company and value retention of the assets being sold (if applicable)

- Individual criticality is typically measured by considering cost to backfill / replace position, value of institutional knowledge, and past performance
  - Tier 1: Most critical (high job importance, very difficult to replace, high risk of attrition)
  - Tier 2: Critical (high job importance or high risk of attrition)
  - Tier 3: Critical but replaceable (high job importance, medium-to-low difficulty to replace and attrition risk)

- Below is a general guideline for award levels and the distribution of eligible employees by tier based on market practice:

### US Retention Award Levels by Tier (excluding top executives)

| | Proposed Award (% Salary) | | |
| | Tier 1 | Tier 2 | Tier 3 |
|---|---|---|---|
| VP/Directors | 75% | 50% | 25% |
| Managers | 50% | 40% | 20% |
| Ind. Contrib. | 40% | 25% | 20% |
| Admin/Clerical | N/A | N/A | 15% |



Target Distribution of Employee Award Sizes

# KERP
# PARTICIPANT IDENTIFICATION PROCESS

- **Evaluating Role Criticality**
  - Positions critical to driving the strategic objectives of the company
    - Restructuring focused (often in finance, legal)
    - Central to operations
    - Product development
    - Client relationship management
    - Critical leadership roles required to stabilize the organization

- **Evaluating Backfill Cost**
  - Difficult or costly "replacement" processes can be identified by understanding roles where:
    - External market is in extremely short supply
    - External market reflects very high demand for candidates (this might be reflected internally by those individuals being highly pursued by competitor companies)
  - Further backfill difficulty can occur in roles with steep learning curves, where no strong succession plan is in place, or where highly specialized knowledge in technical or functional areas is required for success



- **Final Screening Criteria**
  - Individual performance contribution: typically participants are among the stronger performers; if a robust performance management system is in place, participants are usually rated among the high performing / high potential population

© MERCER 2015
*Privileged and Confidential; Prepared at the Request of Counsel*

# KERP
# OVERVIEW OF PLAN DESIGN

| Element | Proposed/ Market Practice | Commentary |
|---|---|---|
| **Eligibility** | (see table below) | • Participation tends to increase with the size of the company<br>• KERP population should be identified based on criticality to the business and risk of attrition due to bankruptcy |

| Percentile | All Companies | | Assets > $3B | |
|---|---|---|---|---|
| | Total # of Eligible EEs | % EE Population | Total # of Eligible EEs | % EE Population |
| **Peabody** | **42** | **0.6%** | **42** | **0.6%** |
| 75th Percentile | 69 | 2.9% | 247 | 2.8% |
| 50th Percentile | 47 | 1.8% | 155 | 2.5% |
| 25th Percentile | 25 | 0.7% | 38 | 1.3% |

**Total Cost**

Commentary:
• Most companies use a tiered approach, identifying their critical talent and assigning them a greater retention bonus amount
• Total potential KERP cost for Peabody is $3.30 million[1], of which $2.74 million has been allocated; this cost falls between the 25th percentile and 50th percentile for companies with assets greater than $3 billion

| Percentile | All Companies | | Assets > $3B | |
|---|---|---|---|---|
| | Pre-Filing Assets ($B) | Total Cost of KERP ($M) | Pre-Filing Assets ($B) | Total Cost of KERP ($M) |
| **Peabody** | **$11.02** | **$2.74** | **$11.02** | **$2.74** |
| 75th Percentile | $2.68 | $2.26 | $12.34 | $12.15 |
| 50th Percentile | $1.43 | $1.41 | $8.68 | $4.40 |
| 25th Percentile | $0.70 | $1.08 | $7.28 | $2.10 |

| Element | Proposed/ Market Practice | Commentary |
|---|---|---|
| **Payout Determination** | • Predominant market practice is to pay KERP payments based on continued employment through certain pre-determined milestone dates<br>• Some companies pay portions of the total payout over time (multiple milestones), while others pay the total bonus as a lump sum | • As long as the KERP population is appropriately identified (i.e., employees critical to the business, no Insiders), KERPs are increasingly accepted by the court<br>• Payment milestones are often calibrated to the bankruptcy process (for example, payment occurs upon continued employment through the Emergence Date) |
| **Payout Timing** | • Proposed award payout to occur at Emergence<br>• Predominant market practice is to make KERP payments upon the appropriate time-based milestone | • Some companies implement a deferral (for example, paid 90 days after plan confirmation) to encourage talent continuity |

[1] The total potential KERP cost for Peabody ($3.30 million) includes a discretionary pool, not to exceed $500,000, to be provided to non-insider employees in the event that: (i) any Key Employee, in the sole judgment of the Debtors, if the Key Employee is promoted or affected by a departmental reorganization that justifies alteration of the Key Employee's KERP Award; or (ii) any additional employees become, in the sole judgment of the Debtors, Key Employees during the pendency of these chapter 11 cases.

© MERCER 2015
*Privileged and Confidential; Prepared at the Request of Counsel*

# KERP
# OVERVIEW OF APPROACHES: COAL INDUSTRY

- Within the coal industry since 2009, 3 companies had a KERP approved and two companies received approval to continue a pre-petition retention program for non-insider employees. The details of each plan are provided in the table below.

| Company | Pre-Filing Assets ($B) | Pre-Filing Revenue ($B) | Total # Eligible EEs | Max Plan Cost ($M) |
|---|---|---|---|---|
| Peabody | $11.02 | $5.61 | 42 | $3.24 |
| Alpha Natural Resources, Inc.[1] | $10.74 | $4.30 | 143 | $7.13 |
| Arch Coal, Inc.[1] | $8.43 | $2.57 | 20 | $2.96 |
| Walter Energy, Inc. | $5.39 | $1.41 | 26 | $2.00 |
| Patriot Coal Corp. (2015) | $2.07 | $1.92 | 47 | $2.88 |
| James River Coal | $1.20 | $1.10 | 39 | $1.40 |

[1] Pre-petition retention program for non-insiders continued during bankruptcy with court approval. The max plan cost reflects the anticipated costs post-filing.

© MERCER 2015

*Privileged and Confidential; Prepared at the Request of Counsel*

**<u>Exhibit B</u>**

**Declaration of Geoffrey M. Woodcroft**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>        Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>Jointly Administered |

### DECLARATION OF GEOFFREY M. WOODCROFT IN SUPPORT OF MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 503 OF THE BANKRUPTCY CODE OF AN ORDER APPROVING KEY EMPLOYEE RETENTION PLAN

**I, GEOFFREY M. WOODCROFT**, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I serve as the Acting Senior Vice President, Human Resources of Peabody Energy Corporation and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors").  I am intimately familiar with the day-to-day operations, business affairs, financial performance and restructuring efforts of the Debtors.

2.      I submit this declaration to support the relief requested in the Motion of the Debtors and Debtors in Possession for Entry of an Order Approving Key Employee Retention Plan (the "Motion").[1]  Unless otherwise indicated, all facts set forth in this declaration are based upon (a) my personal knowledge of the Debtors' current operations and financial performance, (b) information learned from my review of relevant documents and (c) information

---

[1]      I have reviewed the Motion.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Motion.

I have received from members of the Debtors' management or advisors.  I am not a participant in the Debtors' KERP, and I will receive no payments under the KERP.

3.    I am authorized to submit this declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Importance of the Key Employees

4.    I believe it is essential that the Debtors retain these 42 non-insider employees (the "Key Employees") that the Debtors have determined are vital to the Debtors' business and restructuring efforts.  I believe that, absent adequately incentivizing the Key Employees to remain in the Debtors' employ during these chapter 11 cases, there is a significant risk of impairment to and/or delay in the Debtors' restructuring efforts.  Accordingly, I believe the Debtors have an immediate need to implement the KERP to retain the Key Employees by providing them with job security and appropriate compensation.

## Overview and Necessity of the KERP

5.    As part of the Debtors' changing business environment and ongoing restructuring efforts, the Key Employees, which consist of 42 of the Debtors' non-insider employees who are vital to the Debtors' business and restructuring, have been called upon to undertake additional responsibilities and expend significantly more working-hours than contemplated by the normal terms of their employment.  The Key Employees' additional responsibilities include, among other things, negotiating with suppliers and vendors; participating in contract assumption and rejection analysis; preparing business plans; cash flow projections; and related budgets required under the DIP Facility; gathering and coordinating the dissemination of due diligence information; preparing schedules and statements; assisting with the creation of the plan and disclosure statement; and complying with the various reporting requirements for debtors operating in chapter 11.

6.      The Key Employees have been carefully selected by certain members of the Debtors' management team as persons who are critical to maximizing the value of the Debtors' estates leading up to consummation of the Debtors' restructuring.  The Key Employees work across various departments within the Debtors' business, including human resources, operations, finance, legal, sales, marketing and information technology, and play important roles in smoothly operating the Debtors' day-to-day business.  Though work performed by the Key Employees is integral to the Debtors' businesses, none of the Key Employees have a degree of control over the Debtors such that they can be considered a "person in control."  Moreover, as explained to me and discussed in paragraph 11-13 in the Motion, none of the Key Employees are insiders of Debtor PEC.

7.      I believe that each of the Key Employees is necessary to the Debtors' restructuring efforts and that such participants possess important experience, relationships and familiarity with the Debtors' operations and infrastructure that would be incredibly costly to replace.  The risk of attrition is very real as evidenced by the fact that the Debtors have already lost valuable employees as a result of the uncertainty caused by these chapter 11 cases.  The involuntary departure of many employees, and the depressed conditions of the coal industry in general, led to the voluntary departures of other employees.  In 2012, the Debtors' U.S. headcount for salaried employees was 1,655.  As of May 31, 2016, the Debtors' U.S. headcount for salaried employees had decreased to 903, a drop of over 45%.  During this time frame, the Debtors took actions aimed at creating a leaner organizational structure; however in addition to the involuntary departures, there were approximately 533 voluntary departures by salaried employees.  Between January 1, 2015 and May 31, 2016, the Debtors' U.S. headcount for salaried employees decreased by 147, a drop of 14%.  This includes a net salaried headcount

reduction of 24 positions at the St. Louis location alone.  Additionally, 107 salaried employees voluntarily departed the St. Louis location during the same 17 month period.  To date, the Debtors' 2016 voluntary turnover among salaried employees classified as "corporate" is 24%. With significant reductions in the Debtors' workforce over the past several years, the Debtors' business operates with a much smaller staff.  The increased workload on the remaining employees, combined with the well-publicized challenges facing the coal industry and recruiting from other employers, particularly with respect to those employees with transferable skills, have accelerated the departure of employees.  The Debtors have experienced a significant increase in voluntary resignations.

8.    In exit interviews, employees commonly state that they are seeking employment in a different industry or at a company that offers a higher level of job security. There have been additional losses of employees in the legal, human resources, finance, risk management, information technology and operational departments during the time period between 2012 and 2016, leaving the Debtors thinly staffed.  Employee flight risk in these chapter 11 cases is heightened due to the uncertainty of future employment as a result of the challenges facing the coal industry generally.  The Debtors simply cannot afford to lose more employees. Indeed, defections among the Key Employees would cause the Debtors to incur significant costs in recruiting and attracting similarly qualified replacements, and there is a real risk that similarly qualified replacements may not exist, especially since a new employee would be agreeing to join a firm undertaking a restructuring process.  The Key Employees represent "flight risks" and are critical to ongoing operations of the Debtors.  Loss of any of the Key Employees would therefore likely negatively impact the value of the Debtors' assets.  Because the Key Employees provide essential services to the Debtors that are necessary both during and after the Debtors'

4

restructuring, I believe the KERP is necessary and appropriate to improve morale, prevent attrition and maximize enterprise value.

9.      The total aggregate payout under the KERP, as currently drafted, to the Key Employees will be no more than $3.24 million.[2]  The Key Employees have been divided into three "tiers" according to the impact the Key Employees have on the Debtors' business.  Tier 1 employees, which consist of eight of the most vital Key Employees, will be entitled to 40% of their base salary; Tier 2 employees, which consist of 28 Key Employees, will be entitled to between 25-40% of their base salary; and Tier 3 employees, which consist of the remainder of the 42 Key Employees, will be entitled to 25-30% of their base salary.  The KERP Awards will be payable only upon the Debtors' emergence from these chapter 11 cases.  The percentage figure for each tier was determined based upon recommendations provided by Mercer, which I understand reflect industry-standard awards.  In the interest of including as many employees as the Debtors felt should be designated Key Employees, while still maintaining as low a cost as practicable, the Debtors worked with Mercer to lower the percentage amounts for each tier in a manner that would achieve these goals while still providing adequate incentives to each Key Employee.  Specifically, the KERP Awards were redesigned to take into account the existing cash long-term incentive awards under the Non-Insider LTIP.

10.     I believe the KERP is necessary to maintain employee focus and morale and complete a successful restructuring.  The Key Employees possess important knowledge, experience and relationships and have been identified as critical to the Debtors' operations and a

---

[2]      The KERP, as drafted, will cost the Debtors approximately $2.74 million.  In their Motion, the Debtors seek authority to: (i) alter the KERP Award any Key Employee receives if, in the sole judgment of the Debtors, the Key Employee is promoted or affected by a departmental reorganization that justifies alteration of the Key Employee's KERP Award; and (ii) provide additional employees KERP Awards if such employees become, in the sole judgment of the Debtors, Key Employees during the pendency of these chapter 11 cases.  Notwithstanding the above, the KERP Funds will not exceed $3.24 million without further order of the Court.

successful restructuring.  I also believe that the KERP Awards are reasonable, fully warranted and necessary to the success of these chapter 11 cases.  The payments contemplated by the KERP will be key to preserving and bolstering employee morale and loyalty at a time when employee support is critical and certain employees may seek alternative employment, especially where their skills are transferrable to other industries.  The loss of valuable employees, with the resulting loss of institutional knowledge and the need to identify and recruit new employees, would be distracting and costly at this critical juncture.

11.     Furthermore, the amount of the payments under the KERP is, in the aggregate, modest in comparison to the expected benefits making these payments will afford the Debtors.  Indeed, the bonus payments on an individual basis are relatively de minimis compared to the Debtors' overall assets, but are significant to the Key Employees.

12.     For all of these reasons, I believe that approving the KERP and the payments thereunder will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption and encouraging their continued participation in the Debtors' restructuring efforts.

13.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    June 1, 2016

/s/ Geoffrey Woodcroft
Geoffrey Woodcroft
Acting Senior Vice President, Human Resources
Peabody Energy Corporation

6