**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>Peabody Energy Corporation, et al.,<br><br>                Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>Jointly Administered<br><br><br>Hearing Date and Time:<br>August 17, 2016<br>10:00 am<br><br>Objection Deadline: August 10, 2016<br><br>Hearing Location:<br>United States Courthouse<br>Thomas F. Eagleton Federal Building<br>5th Floor, North Courtroom<br>111 S. 10th Street<br>St. Louis, Missouri  63102 |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO**
**SECTIONS 105, 363 AND 503 OF THE BANKRUPTCY CODE, FOR AN ORDER**
**APPROVING (I) KEY EMPLOYEE INCENTIVE PLAN, (II) EXECUTIVE**
**LEADERSHIP TEAM  SHORT TERM INCENTIVE PLAN AND (III)**
**MODIFICATIONS TO DIRECTOR COMPENSATION PROGRAM**

        Peabody Energy Corporation ("PEC") and certain of its direct and indirect

subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this

Court, pursuant to sections 105, 363 and 503 of title 11 of the United States Code

(the "Bankruptcy Code") and Rule 2002 of the Federal Rules of Bankruptcy Procedure, for the

entry of an order approving the Debtors' (i) key employee incentive plan (the "KEIP"), (ii) 2016

and 2017 executive leadership team short-term incentive plans (the "ELT-STIP", and together

with the KEIP, the "Incentive Plans") and (iii) a modification to Debtor PEC's director compensation program, and in support thereof, respectfully represent as follows:[1]

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 81-9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.      On April 13, 2016 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Debtor PEC is a Delaware corporation headquartered in St. Louis, Missouri.  PEC was incorporated in 1998 and became a public company in 2001.  Each of the other Debtors is a wholly-owned direct or indirect subsidiary of PEC.

4.      PEC is the world's largest private-sector coal company (by volume), with 26 active coal mining operations located in the United States and Australia.  The Debtors' domestic mines produce and sell thermal coal, which is primarily purchased by electricity generators.  PEC's Australian operations mine both thermal and metallurgical coal, a majority of which is exported to international customers.  As of December 31, 2015, Debtor PEC and its subsidiaries' property holdings include 6.3 billion tons of proven and probable coal reserves and approximately 500,000 acres of surface property through ownership and lease agreements.

---

[1]      A copy of the proposed order will be made available on the Debtors' case website at http://www.kccllc.net/peabody.

In the United States alone, as of December 31, 2015, the Debtors held an estimated 5.5 billion tons of proven and probable coal reserves, and the Debtors generated sales of approximately 180 million tons of coal.  In addition to their mining operations, the Debtors market and broker coal from other coal producers across the United States, Australia, Europe and Asia.

5.      The Debtors operate in a competitive and highly regulated industry that has experienced strong headwinds and precipitously declining demand and pricing in recent years due to the rise of low priced alternative energy sources – including an abundance of natural gas.  Combined with these factors, slowing global economic growth drove a wide range of goods prices lower in 2015 and resulted in the largest broad market decline since 1991.  Indeed, demand from electric utilities in the United States alone declined approximately 110 million tons in 2015.  These market conditions, in connection with lower realized pricing in the United States and Australia, resulted in a 21.0 million ton decline in the Debtors' and their non-Debtor subsidiaries' coal sales during 2015.

**Relief Requested**

6.      By this Motion, the Debtors seek entry of an order (the "Order") authorizing and approving, pursuant to sections 105, 363 and 503 of the Bankruptcy Code, the Debtors' (i) KEIP, (ii) ELT-STIP and (iii) a modification to Debtor PEC's director compensation program.  In support of the relief requested herein, the Debtors submit:  (a) the Declaration of John Dempsey, a partner at Mercer (US) Inc. ("Mercer"), an independent consulting firm that assisted the Debtors in developing the programs described in this Motion (the "Dempsey Declaration"), a copy of which is attached hereto as Exhibit A; and (b) the Declaration of Geoffrey M. Woodcroft, Acting Senior Vice President, Human Resources at PEC (the "Woodcroft Declaration"), a copy of which is attached hereto as Exhibit B, (together, the "Incentive Plan Declarations").

## Facts Relevant to This Motion

**A.    Non-Insider Compensation, Retention Agreements and Other Relevant Orders**

7.    On the Petition Date, the Debtors filed the Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 361, 362, 363, 364 and 507(b) and Bankruptcy Rules 4001(b) and (c), for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; and (III) Scheduling a Final Hearing [Docket No. 45] (the "DIP Motion").  On May 18, 2016, the Court entered a final order granting the DIP Motion [Docket No. 544] (the "Final DIP Order").

8.    In the DIP Motion, the Debtors sought authorization to, among other things, obtain debtor-in-possession financing in order to maintain liquidity during the restructuring process (the "DIP Loan") by entering into the Credit Agreement attached as Exhibit B to the DIP Motion (the "DIP Credit Agreement").  Under the terms of the DIP Credit Agreement, the Debtors were required to provide the DIP Loan lenders with a 12-month budget based on monthly projections for the Debtors' operations during these chapter 11 cases (the "DIP Budget").  See DIP Credit Agreement, § 4.01(a)(ix).  Additionally, the Debtors agreed to provide the Lenders (as defined in the DIP Credit Agreement), by August 11, 2016, with comprehensive business plans for their United States and Australian operations and a consolidated business plan encompassing the entire enterprise in form and substance reasonably acceptable to the Required Lenders[2] (as they may be modified based on discussions with certain creditors, the "US Business Plan," the "Australian Business Plan" and the "Consolidated Business Plan").[3]  Id., at § 6.19(a), (b).

---

[2]    As such term is defined in the DIP Credit Agreement.

[3]    The Consolidated Business Plan included comprehensive business plans for the entire enterprise, including

9.      On the Petition Date, the Debtors also filed the Motion of the Debtors and Debtors in Possession for an Order: (I) Authorizing Payment of Prepetition Employee Wages and Benefits; (II) Authorizing Payment and Continuation of Certain Postpetition Employee Wages and Benefits; (III) Authorizing Payment of Costs and Expenses Incident to the Foregoing; (IV) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (V) Granting Other Related Relief [Docket No. 18] (the "Wage & Benefit Motion").   In the Wage & Benefit Motion, the Debtors sought authority to pay employees' prepetition and postpetition wages and to continue a number of employee health and welfare benefit and incentive programs in the ordinary course of business, including, among others, the Non-Insider Long Term Incentive Plan (the "Non-Insider LTIP") and the Non-Insider Short Term Incentive Plan (the "Non-Insider STIP").   In the Wage & Benefit Motion, however, the Debtors did not seek authority for the six executive employees who comprise the Debtors' Executive Leadership Team (collectively, the "ELT") to continue to participate in either the Non-Insider LTIP or the Non-Insider STIP.  On April 14, 2016, the Court entered an order granting in part the Wage & Benefit Motion, which granted the Debtors' requests except for the Debtors' request for authority to continue and perform under the Non-Insider LTIP [Docket No. 109].  On May 17, 2016, the Court granted final approval of the Wage & Benefit Motion as to the Non-Insider LTIP [Docket No. 517].

10.      To maintain the stability of their operations and retain critical mid-level managers and other key employees, on June 1, 2016, the Debtors also filed the Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 363 and 503 of the Bankruptcy Code, for an Order Approving Key Employee Retention Plan [Docket No. 632] (the "KERP

---

subsidiaries of PEC whose operations are located outside of the United States and Australia and were therefore not included in either the US Business Plan or the Australian Business Plan.

Motion").  The KERP Motion requested authorization to pay retention awards to certain key employees to promote stability in operations and efficiency in the Debtors' reorganization. The members of the ELT were excluded from the KERP Motion.  On June 16, 2016, the Court granted the KERP Motion [Docket No. 776].

**B.    The Executive Leadership Team**

11.    The members of the ELT are the current executive officers of Debtor PEC. See Woodcroft Declaration, at ¶ 4.  The ELT's managerial experience and skills, along with their familiarity and understanding of the operations, customer and supplier relationships and infrastructure of the entire company's operations are vital, not only to the day-to-day operation of the Debtors' and non-Debtors' businesses, but also to the ability of the Debtors to effectuate a successful restructuring.  See Id., at ¶ 4.  The ELT's positions with Debtor PEC are: (a) President and Chief Executive Officer; (b) President–Australia;[4] (c) President–Americas; (d) Executive Vice President and Chief Financial Officer; (e) Executive Vice President and Chief Legal Officer, Government Affairs and Corporate Secretary; and (f) Group Executive Marketing & Trading.  Id., at ¶ 4.

12.    The Debtors have required, and anticipate that they will continue to require, extraordinary efforts from the ELT to implement a successful restructuring and to maximize the value of their estates.  The Debtors believe that incentives for the ELT to successfully implement the Debtors' restructuring and enhance value at this critical time will help maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders.

---

[4]    Although focused primarily on foreign operations, the "President–Australia" position is a position at Debtor PEC.  Additionally, despite the fact that Debtor PEC's Australian subsidiaries are not part of these chapter 11 cases, the Debtors believe that the success of the Australian entities is crucial to reaching the Debtors' long-term goals.  In fact, as described below, the proposed awards for all members of the ELT, not just the President-Australia, under the STIP and the KEIP are partially tied to the performance of the Debtors' non-Debtor affiliates, including its Australian affiliates (the "Australian Affiliates"), during these cases.

## C.    The Historic Compensation of the ELT

13.    Historically, the ELT has received three principal forms of direct compensation:   (a) base salary; (b) short-term incentive awards; and (c) long-term incentive awards.  Woodcroft Declaration, at ¶ 6.  This compensation program was designed to support the Debtors' performance objectives, and the compensation earned under certain components varied significantly based upon the Debtors' performance.  See Id., at ¶ 7.  As a result of the recent difficult times in the coal industry and the relatively short tenure of certain members of the ELT in their current positions, the ELT's aggregate prepetition total direct compensation if all target incentive metrics were achieved would have been approximately 12% below market based on the size of the Debtors' revenue when compared to similar companies in heavy manufacturing, mining and other industrial sectors.  See Dempsey Declaration, at ¶ 16.[5]  Prior to the Petition Date, the ELT's incentive programs provided incentive awards in the form of both cash and equity.  The Debtors' prepetition short-term incentive program provided cash awards after the end of performance periods when the metrics under the program were met; while, the awards earned under the Debtors' prepetition long-term incentive program were comprised of 50% performance based restricted stock units and 50% time-based cash awards, which were scheduled to vest over a period of three years.  Woodcroft Declaration, at ¶ 7.

## D.    Overview of The Incentive Plans

14.    With the assistance of Mercer, and in consultation with the Debtors' other advisors, the Debtors designed the Incentive Plans in order to motivate the ELT to meet and exceed certain operational goals that will be critical for the Debtors' restructuring and will

---

[5]    This data was obtained from Frederic W. Cook & Co. Inc.'s report, Competitive Market Review dated July 12, 2016.  The report is available upon request.   While the peer group for five of the six ELT members consisted of companies of similar revenues in the heavy manufacturing, mining and other industrial sectors, the peer group for the Group Executive, Marketing & Trading is based on general industry survey data due to the fact that there is no appropriate peer group match available.

enhance the value of the estates.  As noted above, the Incentive Plans have two separate components, the ELT-STIP and the KEIP.  The Debtors have historically provided a short-term incentive program for the ELT.  The ELT-STIP provides the ELT with similar incentives to the employees participating in the Non-Insider STIP, maintains parity with the compensation practices offered to non-insiders and continues the Debtors' historical practice of paying a short-term incentive following the completion of each fiscal year.  The ELT-STIP is intended to incentivize participants to maximize current year profitability while supporting and reinforcing the Debtors' excellent safety record.  The KEIP was designed separately to provide the ELT with a long-term incentive that pays out at emergence from chapter 11 to focus the ELT on sustained performance over the duration of these chapter 11 cases.  The KEIP is intended to incentivize the ELT to drive value for stakeholders during the chapter 11 process, with the expectation that this performance will maximize value available to creditors and other stakeholders in the plan of reorganization.  Attached as Exhibit 1 to the Dempsey Declaration is a schedule identifying the members of the ELT, their titles, salaries and award opportunities under both the ELT-STIP and KEIP.[6]

15.    As with most executive compensation programs, both the ELT-STIP and the KEIP set "target" performance objectives, and "maximum" and "minimum" performance objectives set above and below the target objectives, respectively,  to establish an appropriate relationship between actual company performance and the executives' incentive compensation.  Because compensation awards are subject to the Debtors' attainment of these performance objectives, a significant portion of the ELT's potential direct compensation is at risk.  The ELT-STIP and the

---

[6]    The combined awards under the KEIP and 2016 ELT-STIP are capped at $11.9 million.  To the extent the Debtors have not emerged from bankruptcy at the time payments are made for any 2017 ELT-STIP award, the 2017 ELT-STIP award will be capped at $4.62 million.

8

KEIP incentive awards if target performance objectives are achieved for each member of the ELT are set forth in Exhibit 1 to the Dempsey Declaration

16.    It is important to note that, despite the fact that the Debtors are seeking authorization to provide the ELT with incentive awards, each member of the ELT's potential target direct compensation will *decrease* as compared to their prepetition compensation levels, even if this Motion is granted.  See Woodcroft Declaration, at ¶ 9.  In fact, if this Motion is approved by the Court as proposed, the decrease in potential target direct compensation for the six members of the ELT will aggregate approximately *26%*.  Id., at ¶ 9.  The Debtors' President and Chief Executive Officer's potential target direct compensation will decrease by approximately *40%*.  Id., at ¶ 9.  As the ELT's potential target direct compensation was already 12% below market (based on companies with similar assets) prior to the filing of these chapter 11 cases, the resulting decrease would bring the ELT's aggregate potential target direct compensation to *35%* below market, with the Debtors' President and Chief Executive Officer being the furthest below market at *46%*.  See Dempsey Declaration, at ¶ 23.  These decreases will be more severe if the performance objectives for target awards under the Incentive Plans, which are rigorous, are not met.

### E.    The ELT-STIP

17.    Prior to the Petition Date, the ELT was eligible to receive awards under the prepetition version of the Non-Insider STIP.  The ELT-STIP has been modified from the Non-Insider STIP to raise the bar on the financial metrics that must be achieved before the ELT will receive payment in order to incentivize the ELT to produce superior results for the Debtors' estates.  The ELT-STIP has two award metrics: (a) the Debtors' achievement of certain overall financial and performance goals judged by the Debtors' and non-Debtor affiliates' ability to meet or exceed certain adjusted EBITDAR (earnings before interest, taxes, depreciation, amortization

and restructuring costs)[7] targets; and (b) the Debtors' and non-Debtors' achievement of certain safety improvement goals.    Both metrics are used in the Non-Insider STIP;[8] however, the Debtors have significantly increased the performance levels necessary to trigger incentive awards for the ELT under the EBITDAR metric as compared to the Non-Insider STIP.

18.    Exhibit 1 of the Dempsey Declaration (a) shows the target incentive award opportunity under the ELT-STIP for each ELT member expressed as a percentage of such member's base salary and (b) compares each ELT member's total target direct compensation postpetition against their scheduled prepetition target direct compensation.    If, in a given performance period, the target performance objectives are met for any one of the ELT-STIP performance metrics, then each ELT member would earn a target weighted payout with respect to that achieved performance metric.  As noted in the Dempsey Declaration, the ELT-STIP has a minimum performance threshold, a target performance level and a maximum performance level, with increasing payouts on a straight line basis as performance improves once the minimum threshold is met.  See Dempsey Declaration, at ¶ 20.  In the event that the Debtors' performance falls below the minimum threshold amount for a particular metric, the ELT will not be eligible for an incentive award related to that metric.

---

[7]    In all instances in this Motion, EBITDAR will follow the "Adjusted EBITDA" definition as defined in Debtor PEC's public filings with the Securities and Exchange Commission and will exclude all restructuring costs. Restructuring costs include any charges or payments related to: internal or external restructuring (for example, severance or professional fees, and any other reorganization charges), the KEIP/KERP, prepetition hedges related to fuel costs and international currency, adequate protection payments, and any proceeds, repayments, fees, interest, or other charges related to the DIP Loan. Additionally, EBITDAR will exclude the gain incurred in connection with the settlement of a dispute regarding Debtor PEC and certain of its subsidiaries' obligations under that certain 2013 Definitive Settlement Agreement pursuant to which they had previously agreed to make total payments of $310.0 million, payable over four years through 2017, to partially fund the newly established voluntary employee beneficiary association (VEBA).

[8]    The Non-Insider STIP includes a subjective metric for individual objectives for each participant.  Because the Debtors have determined that each member of the ELT should be measured on the same objective performance goals, this individualized metric has been eliminated from the ELT-STIP.

19.     Awards under the ELT-STIP for calendar years 2016 and 2017 will be determined based on the Debtors' performance in calendar year 2016 and calendar year 2017, respectively.  The Debtors will adjust EBITDAR performance goals and EBITDAR financial results to reflect the effects of any material operating asset sale to neutralize the impact of such transactions.   Any award payments under the ELT-STIP for calendar year 2016 will be made no later than March 15, 2017; any award payments under the ELT-STIP for calendar year 2017 will be made no later than March 15, 2018 (by which time, the Debtors expect to have emerged from bankruptcy).  To receive any earned incentive award under the ELT-STIP, an ELT member must be employed with the Debtors up to and including the date such incentive award is paid (except if the ELT member's employment is involuntarily terminated without cause, including death or disability, prior to the relevant payment date).[9]  Assuming the Debtors achieve the target ELT-STIP metrics, the Debtors estimate that the ELT would be paid a total of approximately $3.08 million in connection with the ELT-STIP for calendar year 2016.  In the event that the Debtors achieve the maximum ELT-STIP metrics, the Debtors estimate that the ELT would be paid a total of approximately $4.62 million in connection with the ELT-STIP for calendar year 2016.[10]

*EBITDAR Metric*

20.     The EBITDAR metric comprises 75% of the possible award for an ELT member under the ELT-STIP.  The EBITDAR metric is one of three performance metrics under

---

[9]     In the event an ELT member's employment is involuntarily terminated without cause, including death or disability, prior to the payment date, the ELT member's awards under the Incentive Plans will be prorated for the number of days the ELT member worked during the respective performance period prior to his or her termination with the ultimate payout dependent on the company's performance relative to the metrics.

[10]    Exhibit 1 to the Dempsey Declaration lists the ELT's 2016 salaries.  However, the ELT-STIP awards based on the Debtors' performance during calendar year 2017 will be based on the ELT's base salary during calendar year 2017, which the Debtors' reserve the right to modify in the ordinary course of their business. In the event that the Debtors make such election, the Debtors will provide notice to counsel for: the Administrative Agent for the First Lien Secured Credit Facility and  the Administrative Agent for the DIP Financing Agreement, the Official Committee of Unsecured Creditors and the Office of the United States Trustee.

the already approved Non-Insider STIP. However, as displayed in the table below, the Debtors have increased significantly the EBITDAR performance levels necessary to obtain minimum threshold, target or maximum awards under the ELT-STIP as compared to the Non-Insider STIP:

| | Non-Insider STIP | | | ELT-STIP | | |
|---|---|---|---|---|---|---|
| Award Level | Corporate Consolidated EBITDAR (2016) | Corporate Consolidated EBITDAR (2017)[11] | Payout | Corporate Consolidated EBITDAR (2016)[12] | Corporate Consolidated EBITDAR (2017) | Payout |
| Entry Minimum Threshold | $238 M | TBD | 50% | $273M (71% of Consolidated Business Plan) | $359M (75% of Consolidated Business Plan) | 40% |
| Target | $369 M | TBD | 100% | $405M (105% of Consolidated Business Plan) | $479M (100% of Consolidated Business Plan) | 100% |
| Maximum | $551 M | TBD | 150% | $618M (160% of Consolidated Business Plan) | $671M (140% of Consolidated Business Plan) | 150% |

21.     The ELT-STIP's EBITDAR performance targets are more difficult to achieve than the Non-Insider STIP EBITDAR performance targets. The ELT-STIP demands significantly higher EBITDAR than the Non-Insider STIP, meaning that, in order for the ELT to receive the target award under the ELT-STIP, the Debtors will need to achieve about $40 million

---

[11]     The metrics under the 2017 Non-Insider STIP will be set in the ordinary course of the company's business and in a manner consistent with past practices.

[12]     The figures in these columns related to Corporate Consolidated EBITAR (2016) have been modified based on the Consolidated Business Plan's assumptions about EBITDAR Collars (as defined below). Without the impact of the assumed EBITDAR Collars, the figures would be $379M, $511M and $724M, respectively for the ELT-STIP, and $344M, $475M and $657M, respectively, for the Non-Insider STIP.

more in EBITDAR—through increased cost savings, revenues or some combination of the two—than in the Non-Insider STIP.

22.    Given the price volatility endemic to the coal sector and the cyclical nature of the global markets, both the Non-Insider STIP and the ELT-STIP have a "price collar" feature to mitigate fifty percent of price swings (positive and negative) versus the assumed prices utilized in setting the applicable metrics, with a maximum impact to Corporate Consolidated EBITDAR of +/- $100 million (the "Price Collar").  Additionally, to address currency exchange fluctuations (positive and negative) related to our Australian operations, the Non-Insider STIP and the ELT-STIP have a "foreign currency exchange collar" feature to mitigate 75% of foreign currency exchange fluctuations (positive or negative) versus our assumed exchange rate utilized in setting the applicable metrics (collectively with the Price Collar, the "EBITDAR Collars"). The EBITDAR Collars are designed to eliminate potential windfalls and penalties arising from uncontrollable factors that can significantly affect Corporate Consolidated EBITDAR. This allows the ELT to focus on operational performance and take the necessary actions to benefit the Debtors' estates on an annual basis and in the longer term.  In years when coal prices decline significantly or foreign currency exchange rates increase significantly (i.e., the Australian dollar strengthens vs. U.S. dollar), the EBITDAR Collars have the effect of increasing Corporate Consolidated EBITDAR.  Conversely, in years when coal prices rise significantly or foreign currency exchange rates decrease significantly (i.e., the Australian dollar weakens vs. U.S. dollar), the EBITDAR Collars have the effect of decreasing Corporate Consolidated EBITDAR.

*Safety Metric*

23.    The Safety metric represents 25% of an ELT member's target award under the ELT-STIP and is equally divided into two components (each of which accounts for 12.5% of

13

an ELT member's target award respectively):  (a) the Debtors' reduction in Global Total Recordable Injury Frequency Rates ("TRIFR"); and (b) the Debtors' adherence to their "*Safety, A Way of Life*" Management System ("SAWOL").  The Safety metric mirrors the safety performance metric under the Non-Insider STIP.  Safety is of paramount concern of the Debtors, and in fact is "A Way of Life."  The Debtors believe that it is vital that every employee maintains the same high safety standards.  Moreover, the target performance levels of the Non-Insider STIP and ELT-STIP's safety metrics are extremely rigorous.

24.    As displayed in the tables below, in order to earn a target award under this metric, the participants in the Non-Insider STIP and ELT-STIP would have to improve on their already stellar safety record.

| | *Non-Insider STIP* | | *ELT-STIP* | | |
|---|---|---|---|---|---|
| Award Level | TRIFR | Payout | TRIFR | Payout | Change from 2015 |
| Minimum Threshold | 1.53 | 50% | 1.53 | 40% | -0.28[13] |
| Target | 1.12 | 100% | 1.12 | 100% | 0.13 |
| Maximum | .79 | 150% | .79 | 150% | 0.46 |

---

[13]    In 2015, the Debtors achieved a TRIFR of 1.25, their best score ever and well above industry averages. See Woodcroft Declaration, at ¶ 12; see also Dempsey Declaration, at ¶ 21; n.4.  The Target performance level asks the ELT members to improve on that record breaking performance, while the Minimum Threshold performance level requires the ELT members to continue to far exceed the average performance within the industry.

| | *Non-Insider STIP* | | *ELT-STIP* | |
|---|---|---|---|---|
| Award Level | SAWOL | Payout | SAWOL | Payout |
| Minimum Threshold | 90% of global mine sites complete SAWOL audit | 50% | 90% of global mine sites complete SAWOL audit and average of 80% compliance with SAWOL elements and approved standards | 40% |
| Target | 90% of global mine sites complete SAWOL audit and 95% compliance with SAWOL major elements and approved standards | 100% | 90% of global mine sites complete SAWOL audit and average of 95% compliance with SAWOL elements and approved standards | 100% |
| Maximum | 90% of global mine sites complete SAWOL audit and 100% compliance with SAWOL major and minor elements and approved standards | 150% | 90% of global mine sites complete SAWOL audit and average 100% compliance with SAWOL elements and approved standards | 150% |

25.    The TRIFR represents the amount of reportable injuries (i.e., injuries that require medical attention) per 200,000 work hours, which is an industry-standard metric for tracking and comparing injury rates.  See Woodcroft Declaration, at ¶ 12.  Last year, Debtor PEC's subsidiaries achieved a TRIFR of 1.25, the lowest TRIFR the company has ever achieved.[14]  Id., at ¶ 12.  In order to reach the target performance level under the TRIFR metric, the company will have to improve upon its record TRIFR rate from a year ago.

---

[14]    Industry participants typically report the TRIFR metric used by to the Mine Health and Safety Administration ("MSHA").  Unlike Peabody's internal tracking of the TRIFR, the TRIFR reported to MSHA does not include international mine sites, contractors or office workers.  Using MSHA's metric, Debtor PEC's American subsidiaries had a TRIFR of 1.51 in 2015 which is well below the 2015 incident rate of 3.4 for all industry participants.

26.    Given the importance of safety to the Debtors, in 2013 the Debtors instituted an additional component to the TRIFR metric which allows the Debtors in their discretion to eliminate any award under this metric if there is a work-related fatality.  Id., at ¶ 12, n.4.  As a result of a work-related fatality at one of the Debtors' mine sites in 2015, there was no incentive payout associated with the TRIFR metric even though this metric indicated award achievement on a quantitative basis.  Id., at ¶ 12, n.4.  The Debtors believe this impact to the Debtors' 2015 annual cash incentive awards was appropriate and consistent with the Debtors' core organizational values.  The ELT-STIP's TRIFR metric employs a more rigorous version of this component.  If there are any work-related fatalities, any award under the TRIFR metric will automatically be eliminated.  Id., at ¶ 12, n.4.

27.    The TRIFR is a reflective metric based on past performance; the SAWOL metric is a proactive metric meant to incentivize the employees to prevent future incidents.  The SAWOL Management System is a proactive and preventive approach that focuses on three main areas including leadership excellence, effective safety and health risk management.  Id., at ¶ 13.  The SAWOL Management System includes a robust audit and assurance process.  Id., at ¶ 13.  This process is designed to ensure that the mine sites operated by the Debtors and their non-Debtor affiliates are complying with the SAWOL system and are all supporting Peabody safety and health standards.  Id., at ¶ 13.  All three performance levels require 90% of the mine sites to complete a rigorous audit that examines their operations to ensure compliance with the requirements of SAWOL.  Last year, 100% of the mines owned by the Debtors and their non-Debtor affiliates were audited.

28.    The SAWOL metric has three performance levels based on the Debtors' performance on those audits to align with the incentive compensation targets.  In order for the

ELT to satisfy the minimum performance level, the Debtors' and non-Debtor affiliates' mine sites must average an 80% compliance score with SAWOL's elements and approved standards. While there are 260 requirements, an open major non-conformance[15] with regard to any one of them results in a 10% reduction in a mine site's score. In other words, if every one of the Debtors' and non-Debtor affiliates' audited mine sites had just over two open major non-conformances, the aggregate score would be less than 80%, which would fall below the minimum threshold performance level. In order for the ELT to satisfy the target performance level, the Debtors' and non-Debtor affiliates' mine sites must average a 95% compliance score with SAWOL's elements and approved standards, meaning the Debtors' and non-Debtor affiliates' audited mine sites would have to average less than one open major non-conformance.

29.    In order for the ELT to satisfy the maximum performance level under the SAWOL metric, every audited mine owned by the Debtors and their non-Debtor affiliates must be in 100% compliance with all SAWOL elements and approved standards. Last year, the average mine site was 97% in compliance (however that was against 93 requirements, this year, six new safety and health standards have been included – hence the additional 167 requirements).[16]

## F.    Overview of the KEIP

30.    The KEIP is comprised of one performance period, which will conclude on the date that the Debtors emerge from these chapter 11 cases – the effective date of a plan of reorganization (the "Effective Date"). Therefore, unlike the ELT-STIP metrics, which are tied to

---

[15]    Under SAWOL, a "major non-conformance" is defined as: "an issue identified during an audit that is a failure or large deficiency in a significant part of the system." Such a major non-conformance could be a long-standing minor non-conformance from previous assessments, or a collection of similar minor non-conformances indicating a widespread problem.

[16]    This metric will be substantially similar during fiscal year 2017. Like the rest of the metrics under the ELT-STIP, the performance periods of fiscal year 2016 and fiscal year 2017 will be completely separate and results under one performance period will not affect performance under the other.

performance as of a specific date (calendar year-end), the KEIP's metrics are dependent on the quarter in which the Debtors emerge from chapter 11.  In the event that the Effective Date falls between the close of two quarters, the KEIP's metrics will be prorated based upon the Effective Date.  Each ELT member's incentive opportunity at the target performance level is expressed as a percentage of such member's base salary, as identified on Exhibit 1 of the Dempsey Declaration. As noted in the Dempsey Declaration, the KEIP has a minimum performance threshold, a target performance level and a maximum performance level, with increasing payouts on a straight line basis as performance improves once the minimum threshold is met.  See Dempsey Declaration, at ¶ 20.  In the event that the Debtors' performance falls below the minimum threshold amount for a particular KEIP Metric, the ELT will not be eligible for an award related to that metric.

      31.    The target award for each member of the ELT, if the Debtors achieve target performance objectives on all KEIP Metrics, is 125% of the ELT Member's base salary except for the President and Chief Executive Officer (175%), Chief Financial Officer (150%) and the Group Executive Marketing & Trading (100%).

      32.    Awards under the KEIP will be determined based on the Debtors' performance from the Petition Date through the Effective Date, [17] and any award payments will be made on or as soon as practical after that date.  To receive any earned incentive award, an ELT member must be employed with the Debtors up to and including the Effective Date (unless the ELT member's employment is involuntarily terminated without cause, including due to death or disability, prior to that date).

      33.    The proposed KEIP has four performance metrics, each of which constitutes a separate percentage of the total KEIP Award as described in the table below:

---

[17]    The metrics for the KEIP reflect cumulative performance since January 1, 2016.

| Metric | Percent of KEIP Award |
|---|---|
| Consolidated EBITDAR (Excluding Australia) | 30% |
| Australian EBITDAR | 10% |
| Consolidated Cash Flow (Before Restructuring Costs)[18] | 40% |
| Environmental Reclamation | 20% |

34.   Each ELT Member will receive an award based upon the Debtors' achievement relative to the performance levels for each metric, and the Debtors' failure to achieve one or more metrics does not disqualify an ELT Member from receiving an award based upon the Debtors' achievement of another metric.  If the performance levels for a metric exceed the minimum threshold, award amounts will be interpolated for performance between minimum threshold and target performance levels, and target and maximum performance levels on a straight line basis.  If the minimum threshold performance level for a performance metric is met, an ELT member will earn an incentive award equal to a percentage of that target award opportunity for that metric.   If the minimum threshold performance level is not met for a performance metric, an ELT member will not earn any incentive award for that metric.

35.   The aggregate cost of the KEIP will be approximately $4.86 million if the Debtors' performance satisfies the target performance levels across all KEIP Metrics as of the Effective Date.   The aggregate cost of the KEIP will be approximately $7.29 million if the Debtors' performance satisfies the maximum performance levels across all KEIP Metrics as of the Effective Date.

## G.   The KEIP Metrics and Performance Goals

36.   As noted above, the KEIP Awards are based on four independent metrics: (a) Consolidated EBITDAR (Excluding Australia); (b) Australia EBITDAR; (c) Consolidated

---

[18]    "Restructuring Costs" has the same meaning as described in n. 7, *supra*.

Cash Flow (Before Restructuring Costs); and (d) Environmental Reclamation, each as more fully described below. The goals for the ELT-STIP and the KEIP are based off of current anticipated performance during the remainder of 2016 and 2017 reflected in the Consolidated Business Plan. As the DIP Loan could extend until 18 months from the Petition Date (i.e., into the third quarter of 2017), the Debtors established financial KEIP Metrics for each quarter through 2017. The relative timing of the Effective Date will determine the levels used to attain the minimum threshold, target and maximum awards under the KEIP Metrics. In the event that the Effective Date falls between the close of two quarters, the KEIP's metrics will be prorated based upon the Effective Date.

*Consolidated EBITDAR (Excluding Australia) Metric*

37. Both the DIP Budget and Consolidated Business Plan include EBITDAR performance targets. 30% of the target KEIP Award is tied to the EBITDAR of Debtor PEC's non-Australian entities.[19] The KEIP's Consolidated EBITDAR (Excluding Australia) metric was designed to incentivize the ELT to maximize the value of the Debtors' non-Australian assets. Regardless of the timing of the Effective Date, and the target performance level will always be the Consolidated EBITDAR projected by the Consolidated Business Plan subtracted by the EBITDAR projected in the Australian Business Plan.

38. The maximum and minimum performance levels will be judged solely on the performance of Debtor PEC's non-Australian subsidiaries, but was constructed using the Consolidated Business Plan. As explained below, the Debtors' Australian Business Plan projects that the Australian Affiliates will have negative EBITDAR during most, if not all, of the pendency of these chapter 11 cases. Therefore, unlike the Consolidated Cash Flow (Before

---

[19] This would include the EBITDAR of the subsidiaries located outside of the United States or Australia whose business plans are only included in the Consolidated Business Plan. See n. 2, *supra*.

Restructuring Costs) and Environmental Reclamation metrics, it is difficult to calculate improved Australia EBITDAR performance on a percentage basis. To solve this problem, the Debtors used the consolidated EBITDAR projected by the Consolidated Business Plan as the base for the maximum and minimum performance levels for both the Consolidated (Excluding Australia) EBITDAR metric and the Australian EBITDAR metric. The maximum and minimum performance levels under the Consolidated (Excluding Australia) EBITDAR metric represents the EBITDAR that the Debtors project that the Australian Affiliates subsidiaries would have to achieve in order for the consolidated EBITDAR to be 150% or 33%, respectively, of that projected in the Consolidated Business Plan.

39.    Achieving the results demanded by the Consolidated Business Plan provides more of a challenge to the ELT inasmuch as the Consolidated Business Plan gives effect to 1.5 months  (through May) of actual postpetition results—which have been better than originally forecast in the DIP Budget—and raise the bar from there. The performance goals for this metric (with the EBITDAR of Q3 2017—the maximum term of the DIP Loan—highlighted) are summarized below.

| Consolidated EBITDAR (Excluding Australia) (in Millions) | Source | 2016 | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Minimum Threshold | Budgeted contribution of Non-Australian entities to reach 50% of the Consolidated Business Plan | $138 | $234 | $325 | $414 | $504 | $605 | $700 |
| Target | 100% of Consolidated Business Plan (Excluding Australia) | $172 | $292 | $406 | $517 | $627 | $755 | $875 |
| Maximum | Budgeted contribution of Non-Australian entities to reach 150% of the Consolidated Business Plan | $206 | $350 | $487 | $620 | $752 | $907 | $1,050 |

40.     As shown above, in order for the ELT to be eligible for any award under this metric, the Debtors must achieve Consolidated EBITDAR (Excluding Australia) high enough to meet the level the Debtors project is needed for the Debtors' Consolidated EBITDAR (Including Australia) to be 50% of what is projected in the Consolidated Business Plan.  In order for the ELT to receive the target award under this metric, the Debtors must achieve the Consolidated EBITDAR (Excluding Australia) contained in the Consolidated Business Plan. This constitutes a "stretch" goal for the ELT, as the Consolidated Business Plan has been designed to incentivize the Debtors to achieve goals that are superior to the DIP Budget so that they will emerge from these chapter 11 cases in a strong financial position.  Finally, as described above, the ELT can only receive their maximum awards under this metric if the Debtors' consolidated EBITDAR (Excluding Australia) is high enough to meet the level that the Debtors project is needed for the Debtors' Consolidated EBITDAR (Including Australia) to be 150% of what is projected in the Consolidated Business Plan.  Assuming a third quarter 2017 emergence from bankruptcy, the Debtors' non-Australian Affiliates would have to achieve an extra $152 million in EBITDAR above and beyond what is provided for in the Consolidated Business Plan (excluding the EBITDAR projected in the Australian Business Plan) to achieve the Maximum award, which would be $323 million more than the requirements of the DIP Budget.  Such a result could only be the product of extraordinary results in cost-cutting and revenue generation.

*Australian EBITDAR Metric*

41.     10% of the KEIP Award that ELT members can earn is tied to the EBITDAR of the Debtors' Australian Affiliates.  Like the Consolidated EBITDAR (Excluding Australia) metric, the target Australian EBITDAR performance objective is tied to the requirements of the Australian Business Plan.

42.    The Debtors, in consultation with Mercer and their other professionals, created a separate metric for the Debtors' Australian Affiliates to incentivize the ELT to focus on improving the profitability of those businesses.  In other words, the ELT members cannot receive their full target awards without generating significant improvement in the Australian businesses.

43.    The maximum and minimum performance levels under the Australian EBITDAR metric will be judged solely on the performance of the Australian Affiliates. The ELT can only receive their maximum and minimum awards under this metric if the Debtors' Australian EBITDAR is high enough to meet the level that the Debtors project is needed for the Consolidated EBITDAR (Including Australia) to be 150% of 50%, respectively, of what is projected in the Consolidated Business Plan.  The performance goals for this metric (with the EBITDAR of Q3 2017—the maximum term of the DIP Loan—highlighted) are summarized below.

| Australia EBITDAR (in Millions) | Source | 2016 | | | 2017 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Minimum Threshold | Budgeted contribution of Australian Affiliates to reach 50% of Consolidated Business Plan | -$64 | -$124 | -$132 | -$179 | -$209 | -$236 | -$268 |
| Target | 100% of Australian Business Plan | -$24 | -$73 | -$20 | -$47 | -$38 | -$18 | -$10 |
| Maximum | Budgeted contribution of Australian Affiliates to reach 150% of Consolidated Business Plan | $16 | -$22 | $92 | $85 | $133 | $200 | $248 |

As demonstrated by this chart, the Debtors' Australian Affiliates are currently not profitable due in large part to depressed seaborne metallurgical coal prices.  However, this metric incentivizes the ELT to best position the Australian Affiliates to take advantage of the seaborne metallurgical

coal market when pricing and demand for metallurgical coal (particularly in China) stabilize.

*Consolidated Cash Flow (Before Restructuring Costs) Metric*

44.    40% of the KEIP award that an ELT member can receive is tied to the consolidated cash flow of all of the Debtors' subsidiaries, including Australia, less restructuring costs (defined in the same matter as in the EBITDAR metrics used in the ELT-STIP).[20]  Like the two EBITDAR related KEIP Metrics, the Consolidated Cash Flow (Before Restructuring Costs) metric is tied to the Consolidated Business Plan.  The performance goals for this metric (with the Consolidated Cash Flow (Before Restructuring Costs) for Q3 2017—the maximum term of the DIP Loan—highlighted) are summarized below.

| *Consolidated Cash Flow (Before Restructuring Costs) (in Millions)* | Source | 2016 | | | 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| **Minimum Threshold** | 50% of Consolidated Business Plan | $314 | $291 | $262 | $323 | $373 | $429 | $490 |
| **Target** | 100% of Consolidated Business Plan | $627 | $581 | $524 | $646 | $745 | $857 | $979 |
| **Maximum** | 150% of Consolidated Business Plan | $941 | $872 | $786 | $969 | $1,118 | $1,286 | $1,469 |

45.    The difference between the three Consolidated Cash Flow (Before Restructuring Costs) performance goals cannot be overstated.  In order for the ELT to receive their target award, and assuming a third quarter 2017 emergence from bankruptcy, the Debtors must have a cash flow approximately 3.5 times higher than what the DIP Budget mandates.  The factor increases to 5.2 times in order to receive the maximum award.  These goals are difficult by

---

[20]    The Debtors intend to maintain ordinary course working capital.

design, and their achievement would significantly improve the long-term prospects for the Debtors and the expected recoveries for their creditors.

*Environmental Reclamation Metric*

46.    The Environmental Reclamation metric represents 20% of the KEIP award an ELT member may receive.  The prior three metrics concentrate on enhancing the value of the Debtors' and non-Debtors' businesses.    The Environmental Reclamation metric serves to incentivize the ELT to achieve these financial metrics while honoring the Debtors' commitment to reclaim mined land in an environmentally responsible manner and in accordance with existing laws.  Therefore, this metric focuses on the ratio of reclaimed land to disturbed land during the pendency of these chapter 11 cases.  The Environmental Reclamation metric is summarized below.

| Performance Measure | Minimum Threshold | Target | Maximum |
|---|---|---|---|
| **Land Restoration** | 1 to 1<br><br>*Grading the same amount of land as that which is disturbed* | 1.1 to 1<br><br>*Grading 10% more land than that which is disturbed* | 1.3 to 1<br><br>*Grading 30% more land than that which is disturbed* |
| | 25% of Target | 100% of Target | 150% of Target |

47.    In order to receive any award under this metric, the Debtors must reclaim, or grade, at least as much land as they disturb during the performance period.[21]  However, the target award can only be reached if the Debtors reclaim 10% more acres than are disturbed. Only acres disturbed during the time period of measurement and only acres graded during the

---

[21]    The term "grading" means returning the land to the final contour grading prior to soil replacement.  The term "disturbed" means new acres impacted for mining purposes.

time period of measurement are involved in the calculation. Finally, in order for the ELT to receive the maximum award, the Debtors must reclaim 30% more acres than they disturb. The significance of the 1.1 to 1 ratio of reclaimed land to disturbed land for the target performance goal lies not only in the obvious benefit of compliance with environmental laws, but it also improves the Debtors' financial health. Coal companies like the Debtors must provide to the states in which they operate some form of financial assurances that they will comply with their environmental reclamation obligations, which assurances usually take the form of commercial surety bonds or corporate guaranties. By reclaiming more land than they disturb, the Debtors reduce the amount of financial assurances that must be provided to the states, thus improving their financial position.

48.     Each of the three performance levels under this metric would require the Debtors to improve upon their past reclamation ratios. In 2015, the Debtors reclaimed 2,841 acres and disturbed 3,303 acres, for a ratio of .86. In 2014, the Debtors reclaimed 3,471 acres and disturbed 3,626 acres, for a ratio of .96.

**H.     Summary and Comparison of Costs to Relevant Examples**

49.     The following table provides a summary of the KEIP Metrics and the KEIP Awards. Each ELT member's target KEIP Award can be thought of the sum of four separate awards, one for each KEIP Metric. Each KEIP Metric will be calculated and awarded independently, with no performance in any one metric affecting the eligibility of an ELT member to receive an award under another metric. For instance, if a hypothetical target KEIP Award was $500,000, and the Debtors achieved the minimum threshold performance level for the Australian EBITDAR metric, the award under that metric would equal .10 multiplied by $500,000 multiplied by .50, or $25,000.

26

| METRIC | PERFORMANCE GOALS (AS OF THE DATE OF EMERGENCE) | | PAYOUT (AS A PERCENT OF TARGET OPPORTUNITY) | PERCENT OF TARGET KEIP AWARD |
|---|---|---|---|---|
| Consolidated EBITDAR Metric (Excluding Australia) | Minimum Threshold | Budgeted contribution of Non-Australian entities to reach 50% Consolidated Business Plan | 33% | 30% |
| | Target | 100% of Consolidated Business Plan (Excluding Australia) | 100% | |
| | Maximum | Budgeted contribution of Non-Australian entities to reach 150% Consolidated Business Plan | 150% | |
| Australian EBITDAR Metric | Minimum Threshold | Budgeted contribution of Australian Affiliates to reach 50% of Consolidated Business Plan | 50% | 10% |
| | Target | 100% of Australian Business Plan | 100% | |
| | Maximum | Budgeted contribution of Australian Affiliates to reach 150% of Consolidated Business Plan | 150% | |
| Consolidated Cash Flow (Before Restructuring Costs) Metric | Minimum Threshold | 50% of Consolidated Business Plan | 50% | 40% |
| | Target | 100% of Consolidated Business Plan | 100% | |
| | Maximum | 150% of Consolidated Business Plan | 150% | |
| Environmental Reclamation Metric | Minimum Threshold | 1 to 1 | 25% | |
| | Target | 1.1 to 1 | 100% | 20% |
| | Maximum | 1.3 to 1 | 150% | |

50.    The Incentive Plans were designed together so that comparisons of the Incentive Plans in the aggregate can be made to postpetition award programs to insiders in other chapter 11 cases.  The ELT's target Awards under the Incentive Plans are 7% above the market rate for comparable companies in bankruptcy, and 35% *below* the general industry market rate based on the size of those companies' assets and liabilities.  See Dempsey Declaration, at ¶ 23.

51.    In reviewing the postpetition incentive plans of companies with pre-filing revenue between $3 and $10 billion, the Debtors and their advisors concluded that:  (a) plans in

the lowest quartile of <u>maximum</u> potential cost were valued at less than $6.75 million; (b) plans in the second quartile were valued between $6.75 million and $12.06 million; (c) plans in the third quartile were valued between $12.06 million and $16.88 million; and (d) plans in the highest quartile were valued above $16.88 million.  <u>See Id.</u>, at ¶ 22.  Given the size of the Debtors' entire organization, the Debtors believe that the potential maximum cost of the KEIP of approximately $7.29 million, is reasonable and appropriate, because it places the Debtors' KEIP in the second quartile of comparable postpetition insider KEIPs.[22]

## I.    Vesting and Payment of KEIP Awards and Adjustment of Performance Targets

52.    The Debtors will adjust EBITDAR performance goals and EBITDAR financial results to reflect the effects of any material operating asset sale to neutralize the impact of such transactions.  Upon the Debtors' emergence from chapter 11, each member of the ELT will be paid their earned incentive award, if any, within 30 days of the Effective Date.  Any ELT member who is involuntarily terminated without cause (including due to death or disability) will remain eligible to receive pro-rata payments (based on the date of termination) in the normal course under the KEIP based on the company's actual performance.  Any ELT member who, prior to the Effective Date, is terminated for cause or who voluntarily terminates his or her employment will forfeit any entitlement to any incentive award payout under the KEIP.

---

[22]    Aggregating the cost of the ELT-STIP and the KEIP for the target incentive payouts to the ELT brings the total cost to approximately $7.94 million.  The maximum awards under the Incentive Plans would bring the total cost to $11.90 million.  As discussed below, this places the Incentive Plans in the second quartile of postpetition incentive plans implemented by chapter 11 debtors of similar size.

J.       **The Directors**

53.     Since the Petition Date, the independent directors of Debtor PEC's Board of Directors (the "Directors") have continued to provide oversight and guidance for the Debtors. See Woodcroft Declaration, at ¶ 5.[23]

54.     In 2015, the Directors were compensated in the following ways:  (i) an annual cash retainer of $90,000,[24] payable quarterly in advance, and (ii) equity compensation valued at $130,000, awarded in deferred stock units.  Id., at ¶ 19.  Additionally, the lead independent director on the board was provided an additional annual retainer of $25,000, while chairs of committees received additional retainers of either $10,000 or $15,000, all paid quarterly in advance (collectively, and including the Board Chair Retainer (defined below) the "Chair Retainers").  Id., at ¶ 19.  Prior to, and including 2015, the Chairman of the Board of Directors was also the Chief Executive Officer.[25]  Id., at ¶ 19.  As of January 1, 2016, the Chairman of the Board of Directors is an independent Director.  In 2016, the Directors were to be compensated in the following ways:  (a) an annual cash retainer of $110,000, payable quarterly in advance, (plus the Chair Retainers), (b) a deferred cash award of $65,000 that vests monthly and would be payable in January 2017 and (c) equity with a value of $65,000, that vested monthly, awarded in deferred stock units.  Id., at ¶ 20.  In recognition that an independent Director was now the Chairman of the Board of Directors, the lead independent Director's Chair Retainer was discontinued and replaced with a retainer for the Chairman of the Board of Directors (the "Board

---

[23]    Debtor PEC's Board of Directors can include directors that are employees of Debtor PEC.  These employees would not be considered independent directors.  Currently, the only employee director is the President and Chief Executive Officer.  Any director who is also an employee (including the President and Chief Executive Officer) receives no compensation for service as a director in addition to their employment compensation.

[24]    The Directors were eligible to receive $110,000 but voluntarily waived $20,000 due to company performance and market conditions.

[25]    In May 2015, Debtor PEC's current President and Chief Executive Officer assumed the role of Chief Executive Officer.  His predecessor remained as Chairman of the Board of Directors until December 31, 2015.

Chair Retainer") of $150,000.  Neither the 2016 deferred cash award nor the 2016 deferred stock units were paid to the Directors prior to the Petition Date.  Id., at ¶ 20.  Because the annual cash retainer and the Chair Retainers are paid quarterly in advance, as of the Petition Date, no amounts were due under the retainers.  Id., at ¶ 20.

## K.    Modified Director Compensation Program

55.    The Debtors seek authorization and approval for certain changes to the Directors' compensation.  Traditionally, as explained above, the Debtors compensated the Directors with both cash payments and equity awards.  Due to the filing of these chapter 11 cases, the Debtors have determined that modifying the Directors' compensation to eliminate the equity award altogether (with no replacement of its value) and to combine all cash compensation into the cash retainer is beneficial to the Debtors and appropriate under the facts and circumstances of these cases.  Therefore, the Debtors propose that the Directors be paid an annual retainer of $175,000 (plus applicable Chair Retainers) during the pendency of these chapter 11 cases.  This amount is *less than* the value of the Directors' scheduled 2016 compensation package, which totaled $240,000 (exclusive of the Chair Retainers, which will remain unchanged consistent with the Debtors' past practices).

## L.    Review and Approval of Incentive Plans and Amendments to Director Compensation

56.    Both the Compensation Committee of Debtor PEC's Board of Directors and the PEC Board of Directors have reviewed the Incentive Plans and the proposed amendments to the Director compensation.  After reviewing the final Incentive Plans and proposed changes to the Director compensation, and with the advice of outside advisors and in accordance with their customary approval process, (a) the Compensation Committee approved the Incentive Plans for the ELT members other than the President and Chief Executive Officer,

(b) the independent directors of the PEC Board approved the Incentive Plans as to the President

and Chief Executive Officer and (c) the full PEC Board approved the proposed changes to

Director compensation.[26]  See Woodcroft Declaration, at ¶ 22.

**Basis for Relief Requested**

57.    As described above, the Debtors structured the KEIP and ELT-STIP to

incentivize the ELT to meet and exceed certain operational goals that will be critical to the

success of the Debtors' restructuring and the augmentation of value for the estates.  Additionally,

the Debtors have structured the Director compensation program to fairly compensate the

Directors for their service in a manner consistent with, but lower than, the Debtors' past

practices.

**A.    The Incentive Plans**

58.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor],

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a

debtor to use property of the estate when such use has a "sound business purpose" and when the

use of the property is proposed in good faith.  See, e.g., In re W.A. Mallory Co., Inc., 214 B.R.

834, 836 (Bankr. E.D. Va. 1997) (noting that the "requirement [of] a sound business reason . . . is

---

[26]    As part of the discussions involving the Incentive Plans, the Compensation Committee also performed a
regularly scheduled annual review of the target direct compensation of  every member of the ELT.  After
the review, the Compensation Committee unanimously voted to provide Amy Schwetz, Debtor PEC's
Executive Vice President and Chief Financial Officer, with a 5% increase ($25,000) in base salary in
recognition of her year in the position of Executive Vice President, Chief Financial Officer, her superior
performance, the level by which her salary was below the market rate and the significant increase in her
duties occasioned by these chapter 11 cases.   The Debtors believe that this action constitutes an action
taken in the ordinary course of business and are disclosing this decision in the abundance of caution.  In the
event the Court determined that this salary increase was not in the Debtors' ordinary course of business, the
Debtors submit that this increase is amply justified under section 503(c) of the Bankruptcy Code and the
facts and circumstances of these cases given that, even with this increase, Ms. Schwetz' base salary remains
40% below market for comparable companies, she has assumed a tremendously increased workload as a
result of the filing of these cases, she is one of the primary architects of the Business Plans and the
reorganization strategy for these cases and she is the primary liaison to the Debtors' creditors.

similar to many states' 'business judgment rule'"); see also In re Patriot Coal Corp., 492 B.R. 518, 530-31 (Bankr. E.D. Mo. 2013) (discussing the "business judgment standard of Section 363(b)").

59.     Section 503(c) of the Bankruptcy Code restricts the compensation that a debtor can pay to its executives and other employees in bankruptcy, including a prohibition on the payment of retention payments to insiders unless certain conditions are met.  See 11 U.S.C. § 503(c)(l).   As an initial matter, the Incentive Plans are not subject to the restrictions in section 503(c)(1) of the Bankruptcy Code because the Incentive Plans are not retention plans. No awards are given under the KEIP or ELT-STIP simply for remaining in the Debtors' employ. Rather, as described above, awards are obtainable under the Incentive Plans only after the achievement of specific, and difficult, metrics tied to EBITDAR, cash flow, environmental reclamation and safety.  Because the Incentive Plans tie the proposed incentive payments to the achievement of specific "stretch" metrics, they are not subject to section 503(c)(1) of the Bankruptcy Code, even if they could have some retentive effect.  See In re Dana Corp., 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006) ("[B]ecause a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature.").[27]  Nor are the Incentive Plans retentive because they are "lay-ups."  Quite to the contrary, the goals under both plans will be challenging to reach and require significant effort on the part of the ELT.  See Dempsey Declaration, at ¶ 20.

---

[27]     Neither are the Incentive Plans subject to the restrictions set forth in section 503(c)(2) of the Bankruptcy Code because no payments under the Incentive Plans are tied to the termination of the employment of any participant.  See Dana, 358 B.R. at 577–78 (incentive plan was not subject to section 503(c)(2) of the Bankruptcy Code because incentives were not tied to termination of employment); accord In re Pilgrim's Pride Corp., 401 B.R. 229, 235–36 (Bankr. N.D. Tex. 2009) (consulting agreement did not fall under section 503(c)(2) of the Bankruptcy Code because payments were not intended as severance).

60.     Section 503(c)(3) of the Bankruptcy Code limits the payment of obligations outside of the ordinary course of business that are not covered by sections 503(c)(1) or (2).  Specifically, section 503(c)(3) provides as follows:

> [there shall neither be allowed, nor paid…] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).  Generally, section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The standards for approval under sections 363(b) and 503(c)(3) are substantially the same.  See  In re Patriot Coal Corp., et al., No. 15-32450 (Bankr. E.D. Va. July 29, 2015), No. 672; In re Patriot Coal Corp., 492 B.R. at 530-31 ("Any transfer made outside the ordinary course of business for the benefit of officers, managers or consultants hired after the date of the filing of the petition must be justified by the facts and circumstances of the case, which ordinarily means that the business judgment standard of Section 363(b) applies."); In re Velo Holdings, Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); In re Viking Offshore (USA), Inc., No. 08-31219-H3-11, 2008 WL 1930056, at *2 n.1 (Bankr. S.D. Tex. Apr. 30, 2008) (stating that the two tests are "substantially similar"); see also In re Borders Grp., Inc., 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' non-insider key employee retention plan and insider key employee incentive plan under business judgment rule).

61.     In Dana, the bankruptcy court set forth various factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of

a management incentive plan under section 503(c)(3) of the Bankruptcy Code.  These factors include:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable or whether it discriminates unfairly; (d) whether the plan is consistent with industry standards; (e) whether the debtor employed appropriate due diligence efforts in developing the plan; and (f) whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.  See Dana, 358 B.R. at 576-77; see also In re Patriot Coal Corp., 492 B.R. at 531 (adopting Dana factors).  As outlined in greater detail below, the Incentive Plans satisfy each of these factors.

62.    With respect to the first factor, the Incentive Plans are designed to incentivize the ELT to achieve performance goals that are critical to the interests of the Debtors and will enhance the value of the estates for all stakeholders.  The Consolidated EBITDAR (Excluding Australia), Australian EBITDAR and Consolidated Cash Flow (Before Restructuring Costs) metrics in the KEIP, along with the consolidated EBITDAR in the ELT-STIP, are designed to provide incentives for the ELT to achieve cost savings and greater efficiencies while simultaneously maximizing the value of the Debtors' overall operations.  The Environmental Reclamation metric provides the ELT with incentives to exit these chapter 11 cases with the Debtors' overall environmental performance improved and overall bonding requirements lower than when they entered.  The Safety metric in the ELT-STIP incentivizes the ELT to maintain and improve upon their already stellar safety record.  The maximum and target awards under each metric can only be reached by a marked improvement in the Debtors' revenues, outlays,

liquidity and operational performance across all aspects of the company's operations, and the maximum payments can only be achieved by "hitting it out of the ballpark."

63.    As discussed above, and in the Dempsey Declaration, the target performance levels under the Incentive Plans will require significant improvement in the Debtors' financial, operational, environmental and safety sectors.  In short, in order for the ELT to receive their target direct compensation, which would be significantly lower than the target direct compensation the ELT members were scheduled to earn prior to the Petition Date, the Debtors and their non-Debtor affiliates will have to exceed expectations in every facet of their businesses.

64.    With respect to the second factor, the cost of each Incentive Plan is reasonable, as set forth in the Dempsey Declaration.  The aggregate total cost of the Incentive Plans, assuming all of the target award performance levels are met across all metrics, is $7.94 million, which is reasonable, especially when compared to KEIPs designed for companies with similar revenues to the Debtors.  Further, the target payout opportunity as a percentage of the ELT members' salaries and the payout timing are both consistent with market standards. Finally, as demonstrated by Exhibit 1 to the Dempsey Declaration, each ELT member's total target direct compensation is significantly less than what it was prepetition.  In total, the target direct compensation for the six ELT members is *26%* less than their prepetition compensation. The Debtors' President and Chief Executive Officer is taking the largest reduction, as his target direct compensation is approximately *40%* lower postpetition than prepetition.

65.    With respect to the third factor, the scope of each Incentive Plan is fair and reasonable and does not discriminate unfairly.  The Debtors' employees who were eligible for awards under the Debtors' Non-Insider STIP and Non-Insider LTIP and other mine-level

incentives have continued to be eligible to receive such awards, as the Debtors obtained authority to continue such programs pursuant to the Wage Order.  Therefore, about 135 of the Debtors' employees continue to be eligible to receive incentive awards under the Non-Insider LTIP, and approximately 430 of the Debtors' employees continue to be eligible to receive incentive awards under the Non-Insider STIP.  In like vein, the Debtors designed the Incentive Plans, in part based on these prior plans, to motivate the ELT to deliver superior results.  The Debtors designed the KEIP to cover the six members of the ELT who are the most critical to the restructuring process and the Debtors' ongoing operations and replace the prior long-term incentive program.  The Debtors designed the ELT-STIP to focus on achieving organizational alignment (which is the reason that the ELT-STIP uses similar metrics as the Non-Insider STIP) on shorter-term goals that are also necessary for maximizing the value of the Debtors' estates.

66.    With respect to the fourth factor, the Incentive Plans are consistent with industry standards.  As shown in the Dempsey Declaration, the total target cost of the Incentive Plans is in the second quartile of similar incentive plans.  Additionally, the total number of ELT members places the KEIP in the lowest quartile of plans.  Finally, consistent with market and industry standards, the KEIP payouts occur only upon the Debtors' emergence from these chapter 11 cases.

67.    With respect to the fifth factor, the Debtors and their advisors conducted thorough due diligence in designing the metrics and payouts under the Incentive Plans.  Specifically, Mercer conducted a review of incentive plans across chapter 11 cases and focused particularly on cases involving debtors with comparable pre-filing revenues to the Debtors here.  Mercer identified the metrics, payout awards and timing of payments in those incentive programs as it assisted the Debtors in developing the Incentive Plans.

36

68.    Finally, with respect to the sixth factor, the Incentive Plans were developed with the assistance of outside advisors and professionals.  As shown in the Dempsey Declaration, Mercer advised the Debtors on industry standards and comparable incentive plans. As discussed above, the Incentive Plans were reviewed and unanimously approved, as applicable, by the Compensation Committee of Debtor PEC's Board of Directors and the independent directors of the Board of Directors of Debtor PEC (i.e., all directors other than the CEO).

69.    The Incentive Plans are consistent with other incentive programs that courts have approved since the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  See, e.g., In re Patriot Coal Corp., 492 B.R. 518 (approving an incentive plan with metrics based on financial performance, safety and environmental compliance and individual performance); Velo Holdings, 472 B.R. 201 (Bankr. S.D.N.Y. 2012) (approving key employee incentive plan with incentive targets tied to financial performance and sales of the debtors' businesses); Borders, 453 B.R. 459 (Bankr. S.D.N.Y. 2011) (approving a key employee incentive plan with metrics related to cost reductions and distributions to unsecured creditors); In re Lightsquared, Inc., No. 12-12080 (SCC) (Bankr. S.D.N.Y. Oct. 23, 2012), No. 394 (approving key employee incentive plan with metrics relating to budget compliance and emergence from chapter 11 proceedings).

**B.    Director Compensation**

70.    Section 363(c) of the Bankruptcy Code provides that a debtor "may use property of the estate in the ordinary course of business . . . ."  A transaction that is in the ordinary course of business is one that satisfies a two-part test: (1) the "horizontal test," which asks whether the transaction is of a type common in the debtor's industry; and (2) the "vertical test," which asks whether the transaction would have been anticipated by the creditors and

whether it is "consistent" with the debtor's prior business dealings.  See Pillar Capital Holdings, LLC v. Williams (In re Living Hope Southwest Med. Servs., LLC), 509 Fed. Appx. 578, 583 (8th Cir. 2013); see also Streetman v. United States, 187 B.R. 287, 292-293 (W.D. Ark. 1995). A court engages in a "comparison between the debtor's pre and postpetition activities to discern significant alterations in its activity" for purposes of the vertical test.  In re Hanson Industries, Inc., 90 B.R. 405, 414 (Bankr. D. Minn. 1988).

71.     Section 363(b) of the Bankruptcy Code, as detailed supra, provides the standard for evaluation of the use of property outside the ordinary course of business.  As shown above, such use is subject to an inquiry as to whether the debtor has used "sound business judgment" in determining that the use of the property would be beneficial to the estate.

72.     Section 105(a) of the Bankruptcy Code, which codifies the equitable powers of bankruptcy courts, authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

73.     The Debtors believe that the Director compensation program constitutes use of estate assets in the ordinary course of the Debtors' business, as the Directors will receive *less than* the total amount of compensation they would have received prepetition, and the cash amount paid to the Directors would remain the same.  As set forth below, because the Debtors can satisfy both the vertical and horizontal tests, court approval for payments under the modified Director compensation program is not required pursuant to section 363(c) of the Bankruptcy Code.  Out of an abundance of caution, however, the Debtors also seek the approval of this Court for the modified Director compensation program.

74.     Debtor PEC's compensation of the Directors is in the ordinary course because it is common practice both at Debtor PEC and in the Debtors' industry.  The horizontal test is met because compensation of the type provided to the Directors is commonplace for a large public corporation like Debtor PEC.  Dempsey Declaration, at ¶ 27.  The vertical test is met because Debtor PEC's creditors would have reasonably expected that the Debtors would continue to compensate the Directors—who provide vital services to the Debtors' businesses— for their services and around the same value as prior to the Petition Date.  In the modified Director compensation program, the Directors will receive cash compensation at the same level as prepetition, but they are losing their equity awards entirely.  Thus, the modification to the Directors' compensation for their service is in accord with practices in other bankruptcy cases and is ordinary course.

75.     If, however, this Court finds that the modifications to the Director compensation program are outside the ordinary course of business, the Debtors hereby request authority to implement and perform under the modified Director compensation program pursuant to sections 105, 363(b) and 503(b) of the Bankruptcy Code.  The compensation to be paid under the modified Director compensation program is appropriate under the circumstances, and is an exercise of the Debtors' sound business judgment.  The Directors are subject to a significant burden during these chapter 11 cases, and the current environment in which the Debtors operate is challenging at best.  The modified Director compensation program will assure the Directors that they will be compensated in a manner consistent with (although below) the market and reflective of their efforts necessary during these chapter 11 cases.  Thus, implementing the modified Director compensation program is an exercise of the Debtors' sound business judgment and will ensure that the Board of Directors continues to be comprised of Directors who have the

skill, knowledge, judgment and expertise necessary to make the important and difficult decisions that the Debtors will face during these chapter 11 cases.

76.    Section 503 of the Bankruptcy Code permits the Debtors to pay the Directors for their service.  Section 503(b) provides that, subject to the limitations of section 503(c), "[a]fter notice and a hearing, there shall be allowed administrative expense . . .including . . . the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b).  Section 503(c) restricts three types of payments and other transfers: (a) payments to insiders that are made "for the purpose of inducing such person to remain with the debtor's business"; (b) certain severance payments to insiders; and (c) payments made to management, employees and consultants that are outside the ordinary course of business and not justified under the facts and circumstances of the case.  11 U.S.C. § 503(c).

77.    The first two limitations of section 503(c) are inapplicable to the modifications to the Director compensation program.  While the Directors are "insiders" for purposes of section 503, the payments under the program are not provided "for the purpose of inducing [the insiders] to remain" with the Debtors.  Rather, the payments are standard compensation for services rendered in the ordinary course of the Debtors' businesses.  Such payments are not retentive; they are fair compensation for services that have been and will be rendered.  Section 503(c)(2) is also inapplicable because the proposed payments are clearly not severance payments.

78.    Even if the Court were to find the modifications to the Director compensation program to be outside the ordinary course of business, section 503(c)(3) is satisfied because the payments contemplated by the modifications to the Director compensation program are justified by the facts and circumstances in these cases.  Providing competitive

compensation is critical to ensuring that Debtor PEC receives the benefit of the services provided by its Directors, especially in light of the challenges and significant time commitment that participation on the Board of Directors has and will entail during these proceedings.  The modified Director compensation program ensures a market-competitive payment for the Directors.  Thus, there is a "sound business purpose" for the modifications to the Director compensation program.  See In re Dana Corp., No. 06-10354 (BRL) (Bankr. S.D.N.Y. June 8, 2006) [Docket No. 1458].

## Notice

79.    In accordance with the Order Establishing Certain Notice, Case Management and Administrative Procedures (Docket No. 114) (the "Case Management Order"), notice of this Motion has been given to (a) all parties on the Master Service List (as defined in the Case Management Order) and (b) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## No Previous Request

80.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter an order, substantially in the form that was submitted to the Court, granting the relief requested herein; and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated: August 3, 2016
St. Louis, Missouri

Respectfully submitted,

/s/ Susan K. Ehlers
Steven N. Cousins, MO 30788
Susan K. Ehlers, MO 49855
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO  63105
Telephone:  (314) 621-5070
Facsimile:  (314) 612-2239
Email:  scousins@armstrongteasdale.com
Email:  sehlers@armstrongteasdale.com

Heather Lennox (admitted *pro hac vice*)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Amy Edgy (admitted *pro hac vice*)
Daniel T. Moss (admitted *pro hac vice*)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Attorneys for Debtors and*
*Debtors in Possession*