## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br><br>Peabody Energy Corporation, et al.,<br><br>Reorganized Debtors. | Case No. 16-42529-399<br>CHAPTER 11<br><br>Jointly Administered |

### MEMORANDUM OPINION REGARDING THE DMS CLAIM

This contested matter came before the Court at an August 31, 2017 evidentiary hearing regarding Reorganized Peabody Energy Corporation ("Reorganized PEC") and certain of its direct and indirect subsidiaries', as reorganized debtors and debtors in possession (collectively, the "Reorganized Debtors"), *Sixteenth Omnibus Objection to Certain Claims (Zero Liability Claims)* (the "Objection") [Docket No. 2910] solely as it relates to DMS Contracting, Inc.'s ("DMS") KCC Claim No. 6144; ECF Claim No. 23-1 (Debtor Peabody Gateway North Mining, LLC, Case No. 16-42624) (the "DMS Claim"). The dispute concerns whether DMS waived the DMS Claim under the terms of the Agreement Between Owner and Design-Builder, dated April 23, 2015, by and between Peabody Gateway North, LLC ("Peabody") and DMS [Reorganized Debtors Exhibit 2] (the "Contract").

At issue is whether DMS can seek an upward adjustment of the contract price based on the subsoil conditions at the construction site. DMS contends that the subsoil conditions at the construction site were concealed and unknown conditions, and that DMS provided sufficient notice of those conditions to assert a claim under the Contract. The Reorganized Debtors contend that DMS waived that claim under the Contract for three independent reasons. First, DMS' contention that the subsoil conditions were concealed or unknown is based solely on the allegation that those conditions were not disclosed in information regarding subsoil conditions that Peabody provided in the bidding process, and DMS expressly waived the right to assert such claims. Second, DMS did not provide timely or adequate notice of those alleged concealed and unknown conditions under the Contract. Third, DMS did not timely assert a claim under the Contract.

For the reasons that follow, the Court finds that DMS waived the DMS Claim under the Contract. As a result, the Court sustains the Objection as it relates to the DMS Claim, and disallows the DMS Claim.

# FINDINGS OF FACT

## Cell 5 Project

1.    Peabody operates an underground coal mine in Coulterville, Illinois (the "Gateway North Mine").

2.    As the coal is mined at the Gateway North Mine, it is loaded onto a conveyor, which takes the coal to a preparation plant where the coal is washed to remove non-coal refuse.

3.    Peabody disposes of the fine and coarse refuse from the washing process in large cells created by building earthen embankments that cordon off an area.

4.    In 2015, Peabody solicited bids to expand Peabody's existing refuse disposal site at the Gateway North Mine by building a new refuse disposal cell ("Cell 5").

5.    The Cell 5 project involved excavating soils on an approximately 150-acre site adjacent to existing refuse cells and building three earthen embankment walls to close off a relatively rectangular area abutting existing cells at the Gateway North Mine.  Reorganized Debtors Ex. 2 at Exhibits A-C.

6.    Among other things, the Contract prohibited "[s]oil classified as SC (clayey sands) or coarser [from being] used directly for embankment construction" unless "mixed with clay soils," and required that all "[s]oil or soil mixtures used in embankment construction must have at least 17% (by weight) particles smaller than the No. 200 U.S. Sieve." Id. at Exhibit A § 4.2.

7.    In addition, after placing the soil, the contractor would have to compact the soil with heavy machinery into 12-inch "lifts" that met contract specifications.  See Contract at Exhibit B-2.

8.    The Contract contained two principal compaction criteria.  See id.

    (a)    The compacted soil had to have a dry density equivalent equal to at least 95% of the maximum dry density attainable by the standard proctor method.  See id.

    (b)    The compacted soil had to have moisture content within +3% to -2% or +/-3%, depending on location, of that soil's optimal moisture content.  See id.

## Peabody selects DMS for the Cell 5 project

9.    As part of the bidding process for the Cell 5 project, Peabody provided bidders with the April 20, 2011 Soil Borings and Laboratory Testing Slurry Cell #5 Gateway North Project – Coulterville, Illinois [Reorganized Debtors Ex. 1] (the "Holcomb Borehole Study").

10. The Holcomb Borehole Study contained the results of a variety of tests on subsoil conditions at the Cell 5 project site, including several soil borings and four proctor tests.

11. The Holcomb Borehole Study indicated, among other things: (a) the types of soil; (b) that there was sand at the site; and (c) the moisture content of the soil.

12. Other than its review of the Holcomb Borehole Study, DMS never conducted an investigation or examination of the subsoil conditions at the Cell 5 project site prior to entering into the Contract.

13. DMS submitted a bid for the Cell 5 project, and Peabody selected DMS as the winning bidder.

**The Contract and its provisions**

14. On April 23, 2015, Peabody and DMS entered into the Contract.

15. The Contract called for DMS to be compensated on a unit of work basis and not on a time and material basis. See Reorganized Debtors Ex. 2, Contract § 4.1 and Exhibit F.

16. The Contract defined the amount to be paid under the Contract as the Contract Sum. Id. § 4.1.

17. The units of work in the Contract were estimates, and the Contract provided a mechanism for the Contract Sum to be adjusted if fewer or more units of work were required than estimated. Id.

18. DMS, however, guaranteed the overall contract price would not exceed $5,985,937.59. See id. § 4.2.

19. Under the Contract, DMS agreed to fully complete the work by October 15, 2015. See id. § 3.3.

20. Prior to the final completion of the Cell 5 project, DMS agreed to certain interim deadlines, including substantially completing all of the work by October 1, 2015, and substantially completing other individual tasks by earlier dates. See id. § 3.2.

21. The Contract defined these and other deadlines as Contract Time. Id. § 3.4

22. Claims for adjustments to the Contract Sum and the Contract Time could only be made in limited circumstances. See generally id. at General Conditions Article 4.

23.   For concealed or unknown conditions, the parties expressly agreed that certain claims were not allowed:

> It is expressly agreed that no adjustment in the Contract Time or Contract Sum shall be permitted, however, in connection with a concealed or unknown condition which does not differ materially from those conditions disclosed or which reasonably should have been disclosed by [DMS's] (1) prior inspections, tests, reviews and preconstruction investigations for the Project, or (2) inspections, tests, reviews and preconstruction inspections which the [DMS] had the opportunity to make or should have performed in connection with the Project.   [Peabody] assumes no responsibility for any conclusions or interpretations based upon information relating to subsurface or other Site conditions made available by [Peabody].   [Peabody] does not warrant the accuracy of any information relating to subsurface conditions contained in reports, documents and drawings made available to [DMS] and such documents are not Contract Documents.   [DMS] may not rely upon the accuracy or completeness of such reports and drawings and should perform its own tests and investigations of the same. ***[DMS] shall make no Claim against [Peabody] for any inaccuracy of such information, reports, documents or drawings, including any Claim that the physical conditions are different than those indicated in such reports and drawings.***

Id. at General Conditions § 4.2.2 (emphasis added).

24.   Peabody disclaimed any representation or warranty that the information provided about the subsurface conditions "is accurate and complete."   Id. at General Conditions § 1.2.5.

25.   DMS "represent[ed] that it has performed its own investigation and examination of the Site and its surroundings and satisfied itself before entering into this Contract as to . . . the form and nature of the Site, including the surface and subsurface conditions based upon a reasonable investigation that Design-Builder made or had the opportunity to perform."   Id. at General Conditions § 1.3.1.5.

26.     To the extent a claim for adjustment to the Contract Sum and the Contract Time based upon an unforeseen or concealed condition was not waived under § 4.2.2, DMS had to promptly provide notice upon encountering such a condition to preserve its ability to later assert a claim.   Section 4.2.1 of the General Conditions provides:

> If conditions are encountered at the Site which are (1) subsurface or otherwise concealed physical conditions, other than Underground Facilities, which differ materially from those specifically indicated in the Contract Documents, or (2) unknown physical conditions, other than Underground Facilities, of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, ***then notice by [DMS] shall be given to [Peabody] promptly before conditions are disturbed, and in no event later than three (3) days after first observance of the conditions.***   [Peabody] will promptly investigate such conditions.   If such conditions differ materially, as provided for above and cause a material increase or decrease in the [DMS's] cost of, or time required for performance of the Work, an equitable adjustment in the Contract Sum or Contract Time, or both, shall be made, subject to the provisions and restrictions set forth herein.   If [Peabody] determines that no change in the terms of the Contract is justified, [Peabody] will so notify [DMS] in writing. If [DMS] disputes the finding of [Peabody] that no change in the terms of the Contract terms is justified, [DMS] shall proceed with the Work, taking whatever steps are necessary to overcome or correct such conditions so that [DMS] can proceed in a timely manner.   [DMS] may have the right to file a Claim in accordance with the Contract Documents.

Id. at General Conditions § 4.2.1 (emphasis added).

27.     "All notices required to be given under the terms of this Contract shall be made in writing."  Id. at General Conditions § 13.1.1.

28. The General Conditions also required that all claims, including unwaived claims for unforeseen or concealed conditions, "must be made by written notice" (§ 4.1.1) and must be made promptly, and no later than seven days after occurrence of the event giving rise to the claim.  Section 4.1.2 of the General conditions provides:

> Claims by Design-Builder must be made promptly, and no later than within seven (7) days after occurrence of the event giving rise to such Claim.  Within twenty (20) days after the events allegedly giving rise to such Claim, Design-Builder shall provide Owner with a detailed statement of facts, including, but not limited to, all reasons for the Claim and an estimate of amount of additional money and additional time claimed by Design-Builder, supported by all required affidavits and other documentation. The notice of Claims shall also strictly comply with all other provisions of the Contract Documents.  Design-Builder shall not be entitled to rely upon any grounds or basis for additional money or additional time not specifically set forth in the written notice of Claim.  ***All Claims not made in the manner and within the required timeframe provided herein shall be deemed waived and of no effect.***

Id. at General Conditions § 4.1.2 (emphasis added).

29. The Contract requires that "[a]ll claims, disputes or controversies between [DMS] and [Peabody] which arise out of or relate to this Contract, or breach thereof, and not waived by the terms of these General Conditions, shall be submitted and resolved by arbitration."  Id. at General Conditions § 4.7.1.

## Performance under the Contract

30. By early 2016, Peabody had become concerned with the delays in the Cell 5 project and requested a meeting with DMS to discuss the timely completion of the project.

31. The parties had a meeting on March 9, 2016 at which DMS made a presentation [Reorganized Debtors Ex. 7] regarding the status of the project.

32. In its presentation, DMS asserted that "some risks . . . out of [DMS'] control . . . has created increases in time and cost."  See id. at 3 [PEC_00004].

33. Among other things, DMS asserted in the presentation that the additional costs and time were attributable to availability of "Suitable Materials," "Site Availability," and "Weather Delays."  Id. at 7 [PEC_00008].

34.     With respect to "Suitable Materials," DMS claimed that "[s]and caused significant rework that was an [sic] not of the provided geology reports."  DMS was referring to the Holcomb Borehole Study when referencing the "geology reports."  Id.

35.     In the presentation, DMS stated that it would complete the project in "roughly 13 days."  Id. at 4 [PEC_00005].

36.     At a subsequent meeting on March 16, 2016 between Matt Stukenberg, the President of DMS, and Paul Wagner, Vice President Supply Chain Management Americas for Reorganized PEC, at the Reorganized Debtors' offices in St. Louis, Mr. Wagner told Mr. Stukenberg to make a case for additional compensation.

37.     On March 28, 2016, DMS sent Peabody Reorganized Debtors Ex. 8 (the "March 28, 2016 Letter").  In that letter, DMS purports to make a case for an increase in the Contract Sum.

38.     In the March 28, 2016 Letter, DMS requested additional compensation based on actual subsoil conditions that were allegedly different from what was reflected in the Holcomb Borehole Study.

> The level of moisture has been the principal issues that we have experienced throughout this project.  ***The level of moisture experienced on average appears to be higher than the provided borings would suggest***.  Prior to the bid, we reviewed the soil borings moisture content to see if it was going to be an issue.  As you will see from the synopsis of the provided data from the boreholes, the average moisture is between 18 and 20%.  At these moisture levels, we anticipated minimal blending, disking, and laying out of material to dry.

Id. at 8 [DMS000504] (emphasis added); see also id. at 9 ("there is a significant swath of land that had no borings.  This area is between boreholes 9, 10, 11 and 12, 13, 14 (image below).  In this area, we discovered a very significant sand boil.  ***This sand boil was not indicated on any borehole samplings***." (emphasis added)).

39.     In the March 28, 2016 Letter, DMS estimated that it could complete the Cell 5 project in eight days at an additional cost of $200,055.25.  The March 28, 2016 Letter did not provide notice that that DMS would encounter allegedly concealed or unknown conditions after March 28, 2016.

40.     On July 19, 2016, DMS sent to Peabody Reorganized Debtors Ex. 11 (the "July 19, 2016 Letter").  That letter requested additional compensation due to allegedly concealed and unknown subsoil conditions at the project site.  See generally Reorganized Debtors Ex. 11, July 19, 2016 Letter [DMS000513-537].

41.   In the July 19, 2016 Letter, DMS asserted its request for additional compensation was based on actual subsoil conditions that were allegedly different from what was reflected in the Holcomb Borehole Study:

> Holcomb Engineers had provided testing services over the course of the Project.   The following Moisture Density Relationships (AKA Proctor(s)) (Attachment "I") from Holcomb Engineering's pre-construction work were provided as the basis of quality material for the site.   Had the information reflected material of the quality actually found, the bids would have been significantly different.

Id. at 2 [DMS000515]; see also id. at 8 [DMS000521] ("Based on the soil borings, the time and effort needed to blend, disk, and lay out material to dry was minimal and estimated to be required for less than 5% of the material used in the construction of Cell 5."); id. at Attachment I, Description Row 4 [DMS000533] (contending the encountered conditions would have been disclosed "had representative soil borings been taken."); id. at Description Row 5 ("Again, if the soil borings had represented the site, then this extra excavation would have been known to Peabody."); id. at Description Row 9 ("The soil borings provided the bidders with 4 proctors and an average moisture content of 18%.  The soil borings appear to be accurate for the exact area that they were taken.  However, Holcomb Engineering told our team that the material between the borings varies quite a bit.  Additionally, we expected to pick up dirt that was 18% moisture and place according to the provided proctors, and compact with an optimum moisture content of 14.5% +- 3%.  This means that we would have to do minimal, if any, additional processing to get the dirt to dry.  In reality, much of the dirt actually had an optimum moisture content of 8 to 10%.  This requires the material to be dried from 18% to 8 to 10% without the use of the typical drying agent, Code L."); id. at Impact Row 10 ("the soil borings were not representative.").

42.   The DMS Claim is based solely on alleged differences between the subsoil conditions reflected in the Holcomb Borehole Study and the actual subsoil conditions encountered by DMS.   The differences between actual subsoil conditions and those reflected in the Holcomb Borehole Study that DMS alleges are that there was more sand and more moisture encountered than would be expected based on the information contained in the Holcomb Borehole Study.

**DMS failed to provide timely notice of the allegedly concealed or unknown conditions**

43.   DMS was aware of the moisture content of the soil and the composition of the soil from the beginning of its work on the Cell 5 project.   See Reorganized Debtors Ex. 8, March 28, 2016 Letter at 8 [DMS000504] ("The suitability of the material being excavated has been a hindrance to the project since the commencement."); see also id. ("The level of moisture has been the principal issue that we have experienced throughout this project."); Reorganized Debtors

Ex. 18, Affidavit of Matthew E. Stukenberg [Docket No. 3056-2] ¶ 3 ("Shortly after DMS commenced work on the project, it encountered unforeseen conditions at the work site.  Those unforeseen conditions consisted of poor composition of the soil and moisture content in the soil …."); Reorganized Debtors Ex. 7, March 9, 2016 Presentation at 6 [PEC_00007] (stating that the construction process "has been interrupted and changed since the outset primarily due to chasing suitable and dry material").

44.    DMS was aware of the alleged excessive moisture content of the subsoil no later than September 2015.

45.    DMS was aware of the alleged excessive sand no later than December 2015.

46.    According to DMS, it provided notice of issues with the moisture content and the volume of sand: (i) a January 11, 2016 email from Cheryl Hughey at Holcomb Engineering to employees of DMS and Peabody attaching a Holcomb Daily Field Report dated January 8, 2016 (the "Hughey Email"),  (ii) a January 11, 2016 email from Matthew Rodewald at DMS to Chris Van Arsdale and Adam Robertson (the "Rodewald Email"); and (iii) all Holcomb Daily Field Reports that were sent after January 11, 2016 (the "Post January 11 Holcomb Reports").  See DMS Ex. 4, Hughey Email [DMS001007, DMS000710]; DMS Ex. 3, Rodewald Email [DMS000496].

47.    The Hughey Email was not notice of concealed or unknown conditions under section 4.2.1 of the General Conditions.  Even if it were notice, it was untimely because it was not provided to Peabody within three days of DMS first observing the alleged concealed and unknown conditions.

48.    The Rodewald Email was not notice of concealed or unknown conditions under section 4.2.1 of the General Conditions.  Even if it were notice, it was untimely because it was not provided to Peabody within three days of DMS first observing the alleged concealed and unknown conditions.

49.    The Post January 11 Holcomb Reports were not notice of concealed or unknown conditions under section 4.2.1 of the General Conditions.  Even if they were notice, they were untimely because they were not provided to Peabody within three days of DMS first observing the alleged concealed and unknown conditions.

**Procedural background of this litigation**

50.    On April 13, 2016 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under the Bankruptcy Code.

51.    On August 19, 2016, DMS filed the DMS Claim as an administrative claim against Peabody.

52. On September 15, 2016, the Court entered the *Order Establishing Procedures for Claims Objections* [Doc. No. 1288] (the "Claim Objection Procedures Order").

53. On April 14, 2017, the Reorganized Debtors filed their Sixteenth Omnibus Objection.

54. In the Sixteenth Omnibus Objection, the Reorganized Debtors objected to 125 proofs of claim, including the DMS Claim.

55. On May 4, 2017, DMS filed the *Response to Debtors' Sixteenth Omnibus Objection to Certain Claims (Zero Liability Claims) and Demand of DMS Contracting, Inc. for Arbitration* [Doc. No. 3005] (the "Response").

56. In the Response, DMS:  (a) made a demand for arbitration, and (b) argued that it is owed a $3,467,836.60 administrative priority claim pursuant to the Contract.

57. On May 15, 2017, the Reorganized Debtors filed the *Sur-Reply of the Reorganized Debtors Regarding the Debtors' Sixteenth Omnibus Objection to Certain Claims (Zero Liability Claims)* [Doc. No. 3018].

58. On May 17, 2017, the Court held the hearing regarding the Sixteenth Omnibus Objection including the relief from the automatic stay and demand for arbitration requested in the Response.

59. The Court ruled in favor of the Reorganized Debtors, denying DMS' demand for arbitration and, in addition, sustaining, among other things, the Sixteenth Omnibus Objection as it related to the DMS Claim and disallowing, among other claims, the DMS Claim.

60. On May 18, 2017, the Court entered an *Order Sustaining in part and Adjourning in part the Sixteenth Omnibus Objection* (the "Order to Disallow").

61. The Order to Disallow specifically denied DMS' demand for arbitration and disallowed the DMS Claim.  See Order to Disallow, ¶¶ 2-3 [Doc. No. 3027].

62. On June 1, 2017, fourteen days after the entry of the Order to Disallow, DMS filed the *Motion for Rehearing, Reconsideration, Additional Findings of Fact, and Relief from Order* [Doc. No. 3056].

63. On June 16, 2017, the Reorganized Debtors filed the *Objection of the Reorganized Debtors to DMS Contracting Inc.'s Motion for Rehearing, Reconsideration, Additional Findings of Fact, and Relief From Order* [Doc. No. 3170].

64. On July 7, 2017, the Court entered the *Order Granting Motion of DMS Contracting, Inc. for Rehearing on and Relief from Order Concerning Debtors' Sixteenth Omnibus Objection to Certain Claims* [Doc. No. 3225] (the "Order on Rehearing")

65.     The Order on Rehearing granted DMS' Motion for Rehearing and scheduled an evidentiary hearing concerning the DMS Claim for August 31, 2017.  <u>See</u> Order on Rehearing at 2.

66.     The Order on Rehearing provided that the "hearing shall be limited in scope to the issues of whether: (a) DMS's claim was 'waived by the terms of these general conditions of that certain contract by and between DMS and Peabody Gateway North Mining LLC, dated April 23, 2015 (the 'Contract'), <u>see</u> Contract at General Conditions § 4.7.1; and (b) the notice requirements of the Contract were not satisfied to the extent relevant to whether there was a waiver under the preceding subparagraph." <u>Id</u>.

67.     On August 31, 2017, the Court held an evidentiary regarding the Obection solely as it relates to the DMS Claim.  At the hearing, the Court heard live testimony from Mr. Paul Wagner, Mr. Daniel Russell, Mr. Josh Mazander, and Mr. Raymond Brockmeyer.  The Court also received into evidence prior testimony of Mr. Matthew Stukenberg and certain exhibits.

## DISCUSSION

### I.   The legal standard for a valid claim

This is a core matter under section 28 U.S.C. § 157(b)(2)(B) and Article III of the United States Constitution.  <u>See</u> *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990) (per curiam).

A proof of claim that is filed in accordance with the Bankruptcy Rules is *prima facie* evidence of the validity and the amount of the claim.  <u>In re Austin</u>, 538 B.R. 543, 545 (Bankr. E.D. Mo. 2015).  A filed proof of claim is deemed allowed unless a party in interest objects to it.  <u>See</u> 11 U.S.C. § 502(a); <u>Dove-Nation v. eCast Settlement Corp. (In re Dove-Nation)</u>, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004).  Once an objecting party rebuts the proof of claim with evidence, the burden shifts back to the claimant to "produce additional evidence to prove the validity of the claim by a preponderance of the evidence."  <u>In re Austin</u>, 538 B.R. at 545 (citation and internal quotation marks omitted).

At the August 31, 2017 hearing on the DMS Claim, the Reorganized Debtors presented sufficient evidence to rebut DMS' *prima facie* evidence of the validity of the DMS Claim.  As discussed below, DMS failed to meet its burden to prove that it did not waive its claim under the Contract by a preponderance of the evidence.

## II. DMS waived its right to bring the DMS Claim

Under Missouri law,[1] when interpreting a contract, courts "first examine the plain language of the agreement to determine whether it clearly addresses the issue at hand." Brittany Sobery Family Ltd. P'ship v. Coinmach Corp., 392 S.W.3d 46, 50 (Mo. Ct. App. 2013) (citing TAP Pharm. Prod. Inc. v. State Bd. of Pharmacy, 238 S.W.3d 140, 143 (Mo. 2007) (En Banc)). "If that language clearly addresses the matter at issue, the inquiry ends." TAP Pharm. Prod. Inc., 238 S.W.3d at 143. See also Lafarge N. Am., Inc. v. Discovery Gp. L.L.C., 574 F.3d 973, 979 (8th Cir. 2009) ("If the contract is unambiguous, then the intent of the parties is to be gathered from the contract alone, and 'any extrinsic or parole evidence as to the intent and meaning of the contract must be excluded from the court's review.'" (quoting Vidacak v. Okla. Farmers Union Mut. Ins. Co., 274 S.W.3d 487, 490 (Mo. Ct. App. 2008)).

"Evidence of custom and usage may not be used to change the meaning of unambiguous terms" of a contract. Ins. & Consulting Assocs., LLC v. ITT Hartford Ins. Grp., 48 F. Supp. 2d 1181, 1188 (W.D. Mo. 1999) (citing Jake C. Byers, Inc. v. J.B.C. Inv., 834 S.W.2d 806, 817 (Mo. Ct. App. 1992)). Nor can implied terms be used to contradict the express terms of a contract. See Stone Motor Co. v. General Motors Corp., 293 F.3d 456, 466 (8th Cir. 2002); Bishop v. Shelter Mut. Ins. Co., 129 S.W.3d 500, 506 (Mo. Ct. App. 2004).

### A. DMS waived its right to bring the DMS Claim under section 4.2.2

As found above, the DMS Claim is based on differences between the subsoil conditions reflected in the Holcomb Borehole Study and the actual subsoil conditions encountered by DMS. See supra Findings of Fact ¶ 42. In the March 9, 2016 Presentation, DMS claimed that "[s]and caused significant rework that was an [sic] not of the provided geology reports," which was in reference to differences in the Holcomb Borehole Study. Id. ¶ at 34. DMS again asserted in its March 28, 2016 Letter that "[t]he level of moisture experienced on average appears to be higher than the provided borings would suggest," and that the alleged "sand boil was not indicated on any borehole samplings." Id. ¶ 38. And in the July 19, 2016 Letter, DMS repeatedly asserted that its claim was based on actual subsoil conditions being different then the subsoil conditions in the Holcomb Borehole Study. Id. ¶ 41.

DMS, however, assumed the risk under the contract that the Holcomb Borehole Study was inaccurate or incomplete. Peabody disclaimed any representation or warranty that the Holcomb Borehole Study was "accurate or complete." Reorganized Debtors Ex. 2, Contract at General Conditions § 1.25. See also id. at General Conditions § 4.2.2 ("[Peabody] does not warrant the accuracy of any information relating

---

[1] The Contract chooses Missouri law, and the Court applies it accordingly. See Contract at General Conditions, § 13.6.6; Amtech Lighting Servs. Co. v. Payless Cashways, Inc. (In re Payless Cashways, Inc.), 203 F.3d 1081, 1084 (8th Cir. 2000) ("The bankruptcy court applies the choice of law rules of the state in which it sits."); Cicle v. Chase Bank USA, 583 F.3d 549, 553 (8th Cir. 2009) (choice-of-law provisions are enforced under Missouri law).

to subsurface conditions contained in reports, documents and drawings made available to [DMS].).  In addition, DMS agreed that "it has performed its own investigation and examination of the Site and its surroundings and satisfied itself before entering into this Contract as to: . . . [t]he form and nature of the Site, including the surface and subsurface conditions based upon a reasonable investigation that [DMS] made or had the opportunity to perform."  Id. at General Conditions § 1.3.1.5.

Based upon this allocation of risk, DMS specifically waived, and agreed it would not bring such claims based on inaccuracies in the Holcomb Borehole Study:

> [Peabody] does not warrant the accuracy of any information relating to subsurface conditions contained in reports, documents and drawings made available to [DMS] and such documents are not Contract Documents.  [DMS] may not rely upon the accuracy or completeness of such reports and drawings and should perform its own tests and investigations of the same.  [DMS] shall make no Claim against [Peabody] for any inaccuracy of such information, reports, documents or drawings, including any Claim that the physical conditions are different than those indicated in such reports and drawings."

Id. at General Conditions § 4.2.2.  Because the Holcomb Borehole Study relates to "subsurface conditions," DMS has waived the right to make the DMS Claim under section 4.2.2.

### B.  DMS waived any claim because it failed to provide Peabody with timely notice of any alleged concealed or unknown conditions as required by section 4.2.1 of the General Conditions

The Court holds that DMS also waived the DMS Claim for an additional independent reason:  DMS failed to provide timely notice of the alleged "concealed or unknown" conditions.  See Contract at General Conditions § 4.2.1.

To the extent not otherwise waived, the Contract provided two types of concealed or unknown conditions for which DMS could seek additional compensation: (i) "subsurface … conditions, other than Underground Facilities, which differ materially from those specifically indicated in the Contract Documents," or (ii) "unknown physical conditions, other than Underground Facilities, of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents."  Id. Upon encountering either of these conditions, DMS was obligated to provide written notice of the condition(s) to Peabody "promptly before conditions are disturbed, and in no event later than three (3) days after first observance of the conditions."  Id.  The Contract required that all notices be made in writing.  Id. at General Conditions § 13.1.1. Although DMS knew about the alleged excess moisture since September 2015 and the alleged excess sand no later than December 2015, DMS does not contend that it sent

written notice before January 11, 2016.  <u>See</u> <u>supra</u> Findings of Fact ¶¶ 44-46.  As a result, the Hughey Email, Rodewald Email, and the Post January 11 Holcomb Reports were sent too late to constitute notice under the Contract.  <u>See</u> Contract at General Conditions § 4.2.1.

Moreover, even if timely, the purported notices do not satisfy section 4.2.1.  The purpose of this provision was to give Peabody time to investigate the claim before any allegedly concealed or unknown condition was disturbed, and determine within three days whether to make an equitable adjustment to the Contract Time or Contract Sum.  The Hughey Email, the Post January 11 Holcomb Reports, and the Rodewald Email do not satisfy any of these objectives.  They do not reference section 4.2.1.  They do not mention that any conditions were concealed or unknown.  They do not mention that excessive moisture or sand was encountered, nor do they state where such conditions were encountered.  Indeed, the emails and reports do not contain any information from which Peabody could conclude that DMS was seeking an adjustment to the Contract Sum or Contract Time due to concealed or unknown conditions.

Because DMS did not provide timely or adequate notice under section 4.2.1, it waived its right to bring the DMS Claim.

### C. DMS waived any claim because it failed to make a timely claim as required by section 4.1.2 of the General Conditions

The Court holds that DMS waived the DMS Claim for an additional independent reason:  DMS did not assert a timely claim under the Contract.

The General Conditions provide:

> ***Claims by Design-Builder must be made promptly, and no later than within seven (7) days after occurrence of the event giving rise to such Claim.*** Within twenty (20) days after the events allegedly giving rise to such Claim, Design-Builder shall provide Owner with a detailed statement of facts, including, but not limited to, all reasons for the Claim and an estimate of amount of additional money and additional time claimed by Design-Builder, supported by all required affidavits and other documentation. The notice of Claims shall also strictly comply with all other provisions of the Contract Documents. Design-Builder shall not be entitled to rely upon any grounds or basis for additional money or additional time not specifically set forth in the written notice of Claim. ***All Claims not made in the manner and within the required timeframe provided herein shall be deemed waived and of no effect.***

Reorganized Debtors Ex. 2, Contract at General Conditions, § 4.1.2 (emphasis added).

The record demonstrates that the events giving rise to DMS' claim for additional compensation occurred as early as the commencement of the project.  <u>See</u> <u>supra</u> at ¶¶ 43-45.   Even assuming, as DMS contends, that it first encountered unforeseen conditions concerning the soil's moisture content and the unexpected volume of sand around January 11, 2016, DMS did not make a written claim for additional compensation within seven days of January 11, 2016.

By not making a claim by January 18, 2017, DMS failed to comply with the express requirement of the Contract that any claim for additional compensation be made within seven days.  In failing to make a written claim for additional compensation within seven days, DMS failed to comply with the express requirement that any claim under the Contract be made "no later than within seven (7) days after occurrence of the event giving rise to such Claim."   Contract at General Conditions § 4.1.2.   DMS has waived its claim as a result.  <u>See</u> <u>id.</u> ("All Claims not made in the manner and within the required timeframe provided herein shall be deemed waived and of no effect.").


DATED:  October 12, 2017
St. Louis, Missouri

cke

Barry S. Schermer
United States Bankruptcy Judge

Submitted by:

Steven N. Cousins
Jaimie L. Mansfield
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO  63105

Heather Lennox (admitted *pro hac vice*)
Matthew C. Corcoran (admitted *pro hac vice*)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH  44114

Amy Edgy (admitted *pro hac vice*)
Daniel T. Moss (admitted *pro hac vice*)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113

*Attorneys for Reorganized Debtors*